**NON-CONFIDENTIAL VERSION**

**2023-2391**

---

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

---

**CHINA MANUFACTURERS ALLIANCE, LLC, DOUBLE COIN HOLDINGS LTD.,**

*Plaintiffs-Appellants*

**GUIZHOU TYRE CO., LTD., GUIZHOU TYRE IMPORT AND EXPORT CO., LTD.,**

*Plaintiff*

**v.**

**UNITED STATES,**

*Defendants-Appellee*

---

Appeal from United States Court of International Trade
Court Nos. 1:15-cv-00124, 1:15-cv-00128, Judge Timothy C. Stanceu

---

# PLAINTIFFS-APPELLANTS OPENING BRIEF

---

Daniel L. Porter
James P. Durling
James C. Beaty
Katherine R. Afzal

CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
202-452-7373

*Counsel for China Manufacturers Alliance, LLC et al.*

November 28, 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 23-2391

**Short Case Caption** China Manufacturers Alliance, LLC v. US

**Filing Party/Entity** China Manufacturers Alliance, LLC, Double Coin Holdings Ltd

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 11/28/2023

Signature: /s/Daniel L. Porter

Name: Daniel L. Porter

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br>☐ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br>☐ None/Not Applicable |
| Double Coin Holdings Ltd | Shanghai Huayi Group Corporation Limited (formerly Double Coin Holdings., Ltd.) | Shanghai Huayi Group Corporation Limited (formerly Double Coin Holdings., Ltd.) |
| China Manufacturers Alliance, LLC, | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| Daniel L. Porter | Katherine R. Afzal | |
| James P. Durling | | |
| James C. Beaty | | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐    Yes (file separate notice; see below)    ☐    No    ☐    N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

**TABLE OF CONTENTS**

STATEMENT OF CONFIDENTIAL INFORMATION ........................................ 1

STATEMENT OF RELATED CASES ................................................................ 2

JURISDICTIONAL STATEMENT ...................................................................... 3

STATEMENT OF THE ISSUES ......................................................................... 4

STATEMENT OF THE CASE ............................................................................ 5

SUMMARY OF THE ARGUMENT ................................................................. 15

ARGUMENT ..................................................................................................... 18

I. COMMERCE'S APPROACH TO ANALYZING WHETHER DOUBLE COIN WAS CONTROLLED BY THE CHINESE GOVERNMENT WAS UNLAWFUL ........................................................ 18

A. Commerce Did Not Properly Apply The Applicable Legal Criteria for Analyzing Separate Rate Eligibility ................................ 19

B. Commerce Adopted an Unlawful Interpretation and Application of "Rebuttable Presumption" ............................................................ 31

II. COMMERCE'S DETERMINATION THAT DOUBLE COIN FAILED TO REBUT THE PRESUMPTION OF GOVERNMENT CONTROL IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE ...... 38

A. Commerce's Conclusion That The Chinese Government Controls Double Coin's Day-To-Day Activities Is Not Supported By Substantial Evidence .................................................. 40

1. Double Coin is a publicly traded company ............................... 43

2. Double Coin's Articles of Association create further obligations of independence .................................................... 44

3. Double Coin has minority shareholders with specific rights....46

4. Double Coin has independent directors....51

5. Not a single actual instance of the exercise of control over day-to-day operations....53

B. In Any Event, There Is No Evidence That The Chinese Government Controlled Double Coin's *Export Activities;* In Fact, All The Record Evidence Demonstrates The Lack of Control....54

CONCLUSION AND RECOMMENDED APPELLATE REMEDY....67

**Confidential Material Omitted**

The material omitted on pages 12, 13 and 14 describes financial figures and liability of CMA, pages 46 and 50 contains descriptions of company policies, page 57 contains CMA's ownership structure.

# TABLE OF AUTHORITIES

**Cases**

*A. C. Aukerman Co. v. R. L. Chaides Constr. Co.*,
960 F.2d 1020 (Fed. Cir. 1992)....32

*Advanced Tech. & Materials Co. v. United States*,
885 F. Supp. 2d 1343 (Ct. Int'l Trade 2012)....26

*Advanced Tech. & Materials Co. v. United States*,
938 F. Supp. 2d 1342 (Ct. Int'l Trade 2013).... 27, 28, 53, 65

*Burlington Truck Lines, Inc. v. United States*,
371 U.S. 156 (1962) ....37

*China Manufacturers Alliance, LLC v. United States*,
1 F.4th 1028 (Fed. Cir. 2021)....11

*China Mfrs. All., LLC v. United States*,
205 F. Supp. 3d 1325 (Ct. Int'l Trade 2017) ....10

*China Mfrs. All., LLC v. United States*,
639 F. Supp. 3d 1260 (Ct. Int'l Trade 2023) .... passim

*GPX et al v. United States*,
587 F. Supp. 2d 1278 (Ct. Int'l Trade 2008)....7

*Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*,
519 F. Supp. 3d 1224 (Ct. Int'l Trade 2021)....28

*Pennzoil Co. v. Federal Energy Regulatory Comm'n.*,
789 F.2d 1128 (5th Cir. 1986)....32

*Securities Exchange Comm'n v. Chenery Corp.*,
332 U.S. 194 (1947) ....37

*Yantai CMC Bearing Co. v. United States*,
203 F. Supp. 3d 1317 (Ct. Int'l Trade 2017)....28

*Zhejiang Mach. Imp. & Exp. Corp. v. United States*,
521 F. Supp. 3d 1345 (Ct. Int'l Trade 2021)....28

*Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*, 350 F. Supp. 3d 1308 (Ct. Int'l Trade 2018) .......... 29, 30, 52

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) .......... 34, 36

28 U.S.C. § 1295(a)(5) .......... 3

**Administrative Decisions**

*Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Amended Final Results of the Antidumping Duty Administrative Review; 2012-2013*, 80 Fed. Reg. 26,230 (May 17, 2015) .......... passim

*Certain New Pneumatic Off-The-Road Tires from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 Fed. Reg. 40,485 (July 15, 2008) .......... 7

*Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of Sunset Reviews and Revocation of Antidumping Duty and Countervailing Duty Orders*, 84 Fed. Reg. 20,616 (May 10, 2019) .......... 11

*Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Notice of Amended Final Affirmative Determination of Sales at Less Than Fair Value and Antidumping Duty Order*, 73 Fed. Reg. 51,624 (Sept. 4, 2008) ... 6, 11, 12

*Sparklers From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 56 Fed. Reg. 20,588 (May 6, 1991) .......... 25

**Other Authorities**

BLACK'S LAW DICTIONARY at 1185 (6th Ed.) .......... 31, 36

*Import Administration Policy Bulletin 05.1 Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations involving Non-Market Economy Countries* (Apr. 5, 2005) .......... passim

*Quarterly IRS Interest Rates Used in Calculating Interest on Overdue Accounts and Refunds on Customs Duties*, 86, Fed. Reg. 53,335 (U.S. Customs and Border Protection, Sept. 27, 2021) .......... 13

## STATEMENT OF CONFIDENTIAL INFORMATION

Pursuant to Federal Circuit Rule 28(d), Plaintiffs–Appellants state that their Opening Brief contains certain confidential business proprietary information protected by Administrative Protective Order in the underlying agency proceeding. Such confidential business proprietary information ("BPI") consists of information contained in business proprietary documents and data provided to the Department of Commerce ("Commerce"). During the underlying proceeding, Commerce accepted the BPI designation and agreed to accord confidential treatment to the BPI.

Accordingly, confidential information has been redacted from the following pages of the non-confidential version of this Opening Brief: 12, 13, 14, 46, 50, and 57.

**STATEMENT OF RELATED CASES**

Pursuant to Federal Circuit Rule 47.5(a), Plaintiffs–Appellants state that the prior case: China Manufacturers Alliance v. US, Ct. No. 20-1159 (Decided June 10, 2021) (panel consisting of Circuit Judges Lourie, Clevenger, and Hughes), 1 F.4th 1028 was before this court.

The court has determined that this case, 23-2391, is a companion case with the following cases now pending before this court: Guizhou Trye Co., Ltd. v. US, Ct. No. 23-2163 and Guizhou Trye Co., Ltd. v. US, Ct. No. 23-2165.

## JURISDICTIONAL STATEMENT

Pursuant to 28 U.S.C. §1295(a)(5), this Court has jurisdiction over "appeal{s} from a final decision of the United States Court of International Trade." 28 U.S.C. §1295(a)(5).

The Trade Court issued its final judgment in this proceeding on July 19, 2023 sustaining Commerce's Remand Redetermination. China Manufacturers' Alliance, LLC ("CMA") and Double Coin Holdings Ltd. ("Double Coin") timely filed a notice of appeal to the Trade Court on September 11, 2023. As such, this Court has jurisdiction over the instant appeal.

## STATEMENT OF THE ISSUES

This case involves the following issues:

1.      Whether Commerce's approach in analyzing whether Double Coin's export activities were controlled by the Chinese Government was unlawful.

2.      Even if Commerce's analytic approach was lawful, whether Commerce' conclusion that the Chinese Government controlled Double Coin's export activities was unsupported by substantial evidence.

## STATEMENT OF THE CASE

Plaintiff-Appellants include Double Coin, a Chinese producer-exporter for who Commerce denied separate rate status in an AD review, and CMA, a U.S. importer that is facing crippling antidumping liability because of the Commerce determination.

This appeal challenges the determination by the Department of Commerce (hereinafter "Commerce" or " Department") to assign Double Coin the "PRC-wide entity" antidumping (AD) assessment rate of 105 percent instead of the Commerce calculated rate of 0.14 percent.  This Commerce determination was based on the conclusion that Double Coin was not eligible for "separate rate" status because, according to Commerce, the mere fact that Double Coin had a shareholder structure in which a state-owned entity (Huayi) had a majority of the equity meant there was *de facto* Chinese government control over Double Coin.  This finding is deeply flawed for many reasons and cannot be sustained.

In this Opening Brief we set forth specific reasons why Commerce's conclusion about *de facto* control over Double Coin cannot be sustained.  This brief thus addresses those arguments that were not addressed in this Court's earlier review of the same Commerce's decision that focused on a separate statutory authority claim.

Given the rather long passage of time since this Court's review of Commerce's conclusion for Double Coin, we believe it is helpful to review the key underlying facts and history. Although this case addresses an issue that is not uncommon in Commerce AD proceedings against China, the procedural posture of this case and the unique facts on the record here are quite distinctive.

The Initial AD Investigation That Led to AD Order

The AD Order for which Commerce conducted the underlying AD review and imposed its AD assessment rate on Double Coin was published in September 2008. *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Notice of Amended Final Affirmative Determination of Sales at Less Than Fair Value and Antidumping Duty Order*, 73 Fed. Reg. 51,624 (Sept. 4, 2008) ("*OTR Tires AD Order*"). Like it does for all of its cases against China, in that underlying original investigation, Commerce required all Chinese producer-exporters to submit "separate rate applications." *Initiation of Antidumping Duty Investigation: Certain New Pneumatic Off-The-Road Tires From the People's Republic of China*, 72 Fed. Reg. 43,591 (Aug. 6, 2007). Such applications required the Chinese producer-exporter to provide full details concerning its corporate ownership structure and the management of its day-to-day operations, as well as examples of sales negotiations with U.S. customers.

Double Coin submitted a complete separate rate application during the original investigation and in July 2008 (at the conclusion of the original AD investigation) Commerce made a factual finding that Double Coin was eligible for separate rate status. *Certain New Pneumatic Off-The-Road Tires from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 Fed. Reg. 40,485 (July 15, 2008).

The 2012 – 2013 AD Review

The Commerce 2012 – 2013 AD review for the *OTR Tires* cases was initiated pursuant to a request of Petitioner. Such request was the first AD review that Petitioner had made of Double Coin. Petitioner did not request any AD review of Double Coin for the AD review period 2008–2009, 2009–2010, 2010–2011 and 2011–2012.

In its 2012–2013 AD review results Commerce did not make any factual finding that the shareholder ownership of Double Coin in 2013, and specifically majority control by the state-owned entity Huayi, was any different from the shareholder ownership of Double Coin in 2008. (Indeed, it is certain that it was not.)[1] Moreover, in its 2012–2013 AD review results Commerce did not make any

---

[1] Given that the court appeal of the OTR investigation did not end until June 2015 (*see GPX et al v. United States*, 587 F. Supp. 2d 1278 (Ct. Int’l Trade 2008)), at the

factual finding that the composition of the Double Coin's Board of Directors in 2013, was any different from 2008. (Indeed, it is certain that it was not.)[2] The underlying facts were the same.

Given this prior finding of separate rate eligibility and the unchanged facts, and because Double Coin was selected to be a "mandatory respondent," during its 2012–2013 AD review Commerce required Double Coin to spend an entire year responding to multiple AD questionnaires. Commerce thus collected the necessary data to compare Double Coin's actual U.S. prices to a calculated normal value based on Double Coin's factors of production and the application of surrogate values. And Commerce determined that such comparison yielded a Double Coin specific AD rate of 0.14 percent (*de minimis*).

Commerce determined, however, that it would ignore all of this actual data, ignore the fact that the actual dumping margin was *de minimis*, and instead impose a 105 percent AD rate to Double Coin because of Commerce's new conclusion that the shareholder ownership of Double Coin was somehow improper.

Double Coin's 2016 Court Appeal of Commerce's Results

Double Coin initiated a timely court appeal to challenge Commerce's 2012–2013 AD review results for the *OTR Tires* case. Double Coin's Complaint

---

time it made its decision in this review the Commerce still had in its possession Double Coin's 2008 separate rate application.

[2] *See id*.

identified five counts, five different reasons why Commerce's determination was not supported by substantial evidence and otherwise not in accordance with law. And Double Coin's opening brief organized the various arguments in four different sections.

In Section I of that brief, we argued that Commerce had no statutory authority to render a separate "PRC-wide" AD rate. In Section II, we argued that even if Commerce had the statutory authority to impose a special PRC-wide AD rate at all, the imposition of that rate in this review was unlawful because Commerce relied on an outdated presumption of fact to justify the application of this rate to Double Coin. In Section III, we argued Commerce's conclusion that the Chinese Government controls Double Coin's export activities was not supported by substantial evidence and that Commerce had not undertaken a proper separate rate analysis. And in Section IV, we argued that Commerce's decision to impose a 105 percent AD rate and 105 percent AD liability on Plaintiffs CMA and Double Coin constitutes impermissible application of "adverse facts available."

As can be seen, three of the four primary sections advanced broader legal arguments concerning Commerce's authority to apply the PRC-entity rate, and one argument addressed the specifics of Commerce's analysis as to whether the evidentiary record supported a conclusion that Double Coin's export activities were controlled by the Chinese Government.

The Court of International Trade ("Trade Court") rendered its first decision in 2017. *See China Mfrs. All., LLC v. United States,* 205 F. Supp. 3d 1325 (Ct. Int'l Trade 2017), Slip Op. 17-12, Appx0216-0408. The Trade Court broadly agreed with Double Coin's argument that Commerce had no legal authority to impose the PRC-entity AD assessment rate to Double Coin, albeit with a somewhat different legal analysis. In an obvious exercise of judicial economy, the Trade Court's decision did not advance any rulings concerning Double Coin's arguments that Commerce's conclusion that the Chinese Government controls Double Coin's export activities was not supported by substantial evidence and that Commerce had not undertaken a proper separate rate analysis. Given the ruling, the Trade Court remanded the case back to Commerce for a new determination vis-à-vis Double Coin.

In its remand redetermination, Commerce changed its approach (under protest) and concluded that Double Coin should be granted separate rate status and thereby entitled to receive an AD assessment rate of 0.14 percent.

Primarily because the court case was a consolidated court appeal that included arguments from another Chinese producer-exporter that resulted in multiple remands to Commerce, this Court's final judgment was not rendered until 2019. *See* Slip Op. 19-115, Appx0045-0055.

Revocation of the AD Order

September 2018 was the second five year anniversary of the *OTR Tires AD Order*. As such, the statute provided an opportunity for any U.S. producer to inform Commerce that they wanted the AD Order to continue for another five years. However, neither Petitioner nor any other U.S. producer did so. Accordingly, Commerce officially revoked the *OTR Tires AD Order* in 2019. *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of Sunset Reviews and Revocation of Antidumping Duty and Countervailing Duty Orders*, 84 Fed. Reg. 20,616 (May 10, 2019).

The *OTR Tires AD Order* no longer exists because there is no interest by the U.S. industry. And indeed, the Petitioner, Titan Tire, subsequently withdrew from participating in Double Coin's court appeal.

Court of Appeals for The Federal Circuit

In November 2019, Commerce filed its Notice of Appeal indicating an intention to appeal the Trade Court's conclusion vis-à-vis Double Coin to the Court of Appeals for the Federal Circuit. In mid-June 2021, this Court issued its decision, reversing the Trade Court's decision and remanding the case back to the Trade Court. *See China Manufacturers Alliance, LLC v. United States*, 1 F.4th 1028 (Fed. Cir. 2021) ("*CMA IV*"), Appx0025-0044.

Court of International Trade on the Remaining Issues

After the decision by this Court in *CMA IV*, the Trade Court issued an opinion and accepted briefing on the remaining issues that CMA argued were not covered by this Court's mandate. The Trade Court found that one of the remaining issues presented here had not been adjudicated by this Court's mandate or the Trade Court. The Trade Court permitted updated briefing on the remaining issues and in May 2023, rendered its final decision affirming Commerce's application of the presumption of state control and finding that Commerce's determination regarding government control was supported by substantial evidence.

Crippling AD Liability Faced By CMA

CMA is Double Coin's U.S. corporation affiliate that served as the importer of record for virtually all of Double Coin's U.S. exports of OTR tires during the 2012 – 2013 time period. Section A QR at 1, Appx0517. According to the Commerce's own calculation, during the 2012 -2013 AD review time period, the total entered value of CMA's imports of OTR tires that were sold during the AD review time period was [ amount ]. Commerce Final Analysis Memo, Appx4049. The AD cash deposit rate paid on these import entries was the same cash deposit rate that was assigned to Double Coin in the original investigation; namely 12.9 percent. *OTR AD Order*. Applying this AD assessment rate of 105 percent yields a base AD liability for CMA of [ amount ] and an amount of

additional AD liability owed of [ amount ], which equals the base AD liability minus the cash deposits already paid.

However, under the law, CMA must also pay interest on the additional AD liability. 19 U.S.C. § 1677g(a) ("Interest shall be payable on overpayments and underpayments of amounts deposited on merchandise entered, or withdrawn from warehouse, for consumption."). The applicable interest rates are those published by Customs and Border Protection governing underpayment (and overpayment) of customs duties. *See, e.g.*, *Quarterly IRS Interest Rates Used in Calculating Interest on Overdue Accounts and Refunds on Customs Duties*, 86, Fed. Reg. 53,335 (U.S. Customs and Border Protection, Sept. 27, 2021). And given the rather long time since 2012 – 2013 time period, and the application of the interest rates to the base AD liability, such interest amount is substantial. We set forth below CMA's AD liability as of early 2023 based on these facts:

| | |
|---|---|
| Total entered value of OTR imports: | [ amount ] |
| AD cash deposit paid (12.9%): | [ amount ] |
| Actual AD liability (105.3%): | [ amount ] |
| Difference (amount owed): (approx.) | [ amount ] |
| Interest (as of ) of amount owed: (approx.) | [ amount ] |
| Total amount of additional AD duty owed (to-date) | [ amount ] |

As detailed above CMA's current additional AD liability is more than [amount ] million dollars. To place this amount in context, we note that the evidentiary

record before Commerce indicates that CMA's net income in 2012 was just  [

amount   ].  Section A QR, Appx1433.  Or stated differently, CMA's additional

AD liability is [                    description of liability                    ]

      Accordingly, this case thus presents an extreme situation in the following

respects.  Commerce is unlawfully applying a presumption of state control to find

massive dumping liability when Commerce in fact actually investigated and

confirmed the lack of any such dumping.  And Commerce is applying its

presumption to create crippling dumping liability that has no basis in the facts of

this record, pursuant to an antidumping order that no longer exists due to lack of

any domestic industry interest.  Presumptions are not facts, and a presumption

cannot take the place of a factual finding the when the record contains facts to the

contrary.

## SUMMARY OF THE ARGUMENT

This Court should not uphold Commerce's final results because they are not supported by substantial evidence and are otherwise not accordance with law.

In Section I, we demonstrate how this Court can find that Commerce's conclusion regarding Double Coin's eligibility for a separate rate is "otherwise unlawful" even before addressing the record evidence. Commerce's approach and analysis of the core issue of government control failed to apply the applicable legal criteria for analyzing separate rate eligibility with regard to Double Coin. Specifically, Commerce's application of the practice described in its own Policy Bulletin 05.1 was flawed and Commerce failed to link it's finding of management control to Double Coin's export activities.

Moreover, Commerce adopted an unlawful interpretation and application of the rebuttable presumption that undergirds its separate rate analysis practice. Commerce continued to rely on a presumed fact for its conclusions even after Double Coin had produced voluminous evidence rebutting the factual premise that Commerce ultimately relied on. As a result, it is unclear what standard of proof Commerce applied in this case and whether it analyzed Double Coin's separate rate application through the lens of substantial evidence or some other standard.

In Section II, we explain in great detail why Commerce's conclusion that the Chinese government controls Double Coin's export activities is just not true.

Indeed, the record evidence on this point leads to the exact opposite conclusion and Commerce's failure to address contrary evidence means its determination cannot be supported by substantial evidence.

Commerce's determination in this case confirms that it blindly presumed state control over export activities based solely on majority ownership by a SASAC-supervised entity, and found that Double Coin could not rebut that presumption for that reason alone. But this conclusion ignored the actual record evidence. Specifically, Commerce's conclusion that the Chinese Government had the ability to control the board and management of Double Coin simply because Double Coin is majority-owned by Huayi (a state-owned entity) ignores Commerce's own conclusion about lack of *de jure* control, and fundamentally misunderstands the operation of (a) Chinese law, (b) the special regulations governing publicly listed companies such as Double Coin, (c) Double Coin's own Articles of Association, and particularly (d) the presence of independent directors. Commerce largely ignored this evidence and what it meant for the possibility of actual control in this case. These facts, individually and collectively, fatally undermine the basis for Commerce's conclusion of actual control.

In addition, we explain why, even if the Court were to disagree with arguments about the operation of the special regulations governing publicly listed companies, in light of the other facts regarding corporate control and the

independent directors, the Court must still conclude that Commerce's determination is not supported by substantial evidence on the record.

There is no evidence that the Chinese Government exercised *de facto* control over Double Coin's export activities (that is, pricing in the U.S. market); in fact, all the record evidence is to the contrary.  Moreover, we summarize the record evidence under all four factors – including the three of those factors that Commerce effectively ignored – showing the absence of any actual control in this case.  There is absolutely no factual dispute that one hundred percent of Double Coin's "export pricing" is handled by American employees of the U.S. company CMA, after importation, without any possibility of influence by Double Coin's management, let alone any influence by Double Coin's shareholder.  This is the business reality codified in the operating agreement between Double Coin and CMA.  Double Coin does not even know the U.S. prices being set and charged by CMA.  Commerce ignored and did not address any of this record evidence due to its rote reliance on a presumption of state control, which leaves its determination legally defective as not based on substantial evidence.

## ARGUMENT

### I. COMMERCE'S APPROACH TO ANALYZING WHETHER DOUBLE COIN WAS CONTROLLED BY THE CHINESE GOVERNMENT WAS UNLAWFUL

Commerce's separate rate methodology applies a rebuttable presumption that any company in a non-market economy that has a state-owned entity in its corporate tree must be dumping and the company's exports should therefore be subject to the adverse country-wide rate regardless of what other evidence is on the record. In the case now before the Court, Commerce has applied that presumption to Double Coin . This case – and the robust record before the Court – illustrates the flaws in Commerce's methodology.

At the time of its decision, Commerce had in place an explicit policy for determining whether the Chinese Government controlled an exporter's activities. But instead of following that policy and considering all the relevant factors, Commerce ignored three of the four categories of evidence deemed relevant under that policy.

The first legal flaw is that Commerce ignored its own framework for linking evidentiary findings to conduct that is relevant to antidumping proceedings. In the context of non-market economy proceedings, Commerce examines whether an individual company is free of both *de jure* and *de facto* government control. This analysis has evolved over time and Commerce's practice is currently described in

Policy Bulletin 05.1.  The key point of the Policy Bulletin is its explicit focus and emphasis on "export functions", and not business operations more generally.

The second legal flaw is that the so-called "rebuttable" presumption has morphed from a reasonable tool of administrative efficiency when there is only a limited record to an unlawful *per se* evidentiary assumption that substitutes for substantial evidence.  As applied in this case, the presumption is untethered to any statutory authority or reasonable review of the record.  In effect, Commerce is unlawfully applying an evidentiary assumption to parties that actually produced extensive relevant evidence that Commerce should have carefully assessed.

Commerce's decision at issue here intertwined these two legal errors. Perhaps recognizing that the record evidence on "export functions" provided little basis for its desired conclusion, Commerce used the presumption as an excuse to ignore the record evidence.  By combining a few random points disconnected from any assessment of "export functions" and using the presumption to create a near impossible hurdle to overcome, Commerce essentially rewrote Policy Bulletin 05.1 and ignored the statutory standard of "substantial evidence." That approach was contrary to law.

### A.    Commerce Did Not Properly Apply The Applicable Legal Criteria for Analyzing Separate Rate Eligibility

Commerce's application of the test announced in Policy Bulletin 05.1 was legally flawed and failed to link Commerce's theory of control to export activities.

In 2005, Commerce formalized its test in Policy Bulletin 05.1. *Import Administration Policy Bulletin 05.1 Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations involving Non-Market Economy Countries* (Apr. 5, 2005) ("Policy Bulletin 05.1"). Policy Bulletin 05.1 stated that "the test focuses on controls over the decision-making process on export-related investment, pricing, and output decisions at the individual firm level." *Id.* Further, Policy Bulletin 05.1 announced three *de jure* control criteria and four *de facto* criteria that Commerce would consider. *Id.* Policy Bulletin 05.1 also noted the "growing administrative burden in analyzing requests for separate rate status" and announced certain procedural controls on the separate rate application process to mitigate that burden. *Id.*

The language of the test and the structure of the bulletin explicitly focuses on "export functions" and the practices from which the test emerged confirm that Commerce must link each of the *de facto* criteria to the export activities of the responding company. Of particular importance in this case is the need to establish the factual basis for linking management control, the third factor, to an ability to influence export activities. Commerce's own past decisions upon which the test is based show that export activities were a key area of focus in making that determination. Yet, Commerce and the Trade Court largely ignored this important

focus on the "export functions" of the respondent in the AD review results and the subsequent judicial review.

The language and structure of Policy Bulletin 05.1 is crucially important in understanding where the focus of the inquiry must lie. With respect to the *de facto* analysis, which is relevant to the proceeding at issue here, the bulletin states that:

> Typically, the Department considers four factors in evaluating whether each respondent is subject to *de facto* governmental control of its export functions:
>
> 1) whether the export prices are set by, or subject to the approval of, a governmental authority;
> 2) whether the respondent has authority to negotiate and sign contracts and other agreements;
> 3) whether the respondent has autonomy from the central, provincial and local governments in making decisions regarding the selection of its management; and
> 4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses.

Policy Bulletin 05.1.

For the reasons described below, Commerce has used a legally flawed approach in applying this policy to this case. Even in the face of specific and compelling record evidence about "export functions," Commerce largely dismissed the very evidence on which the Policy Bulletin 05.1 directed Commerce to focus.

The enunciation of the *de facto* test begins with a chapeau – applicable to the detailed discussion below – that "{Commerce} considers four factors in evaluating

whether each respondent is subject to *de facto* governmental control of its export functions." Policy Bulletin 05.1 (emphasis supplied). In other words, the discussion to follow is about establishing control over export functions, not some more generic or unspecified form of general control. The test has an explicit focus that is firmly grounded in the purpose of an antidumping inquiry, namely whether export prices to the United States are fair.

This statement of purpose is followed by four specific factors, only one of which is "whether the respondent has autonomy from the central, provincial and local governments in making decisions regarding the selection of its management." Policy Bulletin 05.1. Due to that language and structure, it is clear that the test elaborates four factors that relate to the core question of whether a separate rate applicant has control over its export functions such that its data would actually show whether or not it is dumping and, if so, at what level, which as we know did not occur in this case.

In the underlying proceeding Commerce acknowledged the same proposition, noting, "{i}n antidumping proceedings involving NME countries, such as the PRC, the Department has a rebuttable presumption that the export activities of all firms within the country are subject to government control and influence." *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Amended Final Results of the Antidumping Duty Administrative Review;*

*2012-2013*, 80 Fed. Reg. 26,230 (May 17, 2015) and accompanying Issues and Decisions Memorandum (April 8, 2015) ("Final IDM") at Appx0421. By Commerce's own admission, the focus is properly on export functions and activities. Ultimately, Commerce found that "there is undeniable evidence that the 100 percent SASAC-owned majority-owner of Double Coin exerts considerable influence over the board of directors (and, thus, the management and operations of the company), and that the factual record does not provide sufficient information to rebut the presumption of government control." Final IDM, Appx0429. Ostensibly, Commerce was focusing on the management of Double Coin, in reaching this conclusion, but as discussed more fully below in Section II, a conclusion on that basis was not supported by the record.

The Trade Court found that "Commerce reasonably could infer that this level of government control was inconsistent with the independent exercise of decision making over export functions." *China Mfrs. All., LLC v. United States,* 639 F. Supp. 3d 1260 (Ct. Int'l Trade 2023) ("Slip-Op. 23-75"), Appx0023. Although the Trade Court references "export functions" at no point does Commerce or the Trade Court point to a single example of government control over Double Coin's export functions. To support its statement the Trade Court goes further stating that "{i}n the absence of a statute or regulation that defines or otherwise governs this inquiry, the court lacks a basis to conclude that Commerce

acted contrary to law in exercising its broad discretion in this way." Slip-Op. 23-75, Appx0023. This Trade Court finding, however, is wrong for two reasons.

First, as a matter of the language and structure of Commerce's own Policy Bulletin 05.1 test, the express mention of "exports" in some specific factors does not eliminate the overall focus on "export functions" set forth in the chapeau. Indeed, the language in chapeau confirms just the opposite, and shows that Commerce's treatment of factor three lacks the necessary precision to survive judicial review.

Second, the overall purpose of the four-factor test cannot be ignored or frustrated by the application of any one single factor set forth in the test. Although there are four factors, Commerce's decision basically ignored three of the four factors. Indeed, during oral argument in the early stage of this litigation, the Trade Court itself asked and the Defendant explicitly conceded Commerce's failure to address three of the four factors in Policy Bulletin 05.1 in this specific case. Transcript of Oral Argument at 182-191, *China Manufacturers Alliance, LLC et al., v. United States*, Consol. Court No. 15-00124 (2016) (ECF No. 259) ("THE COURT: How can I possibly sustain reasoning where they say they applied a four-factor test and they don't tell me what the four factors even were as opposed to what their decisions were thereunder? How can I do that?").

This Commerce decision to ignore three of the four factors is perplexing. Indeed, as evidenced by numerous past Commerce determinations, for two decades Commerce's primary focus in applying its *de facto* control test was whether the respondent is able to negotiate selling prices with U.S. customers free of Chinese Government influence. Essentially, for two decades Commerce has agreed that, provided that the respondent could demonstrate actual price negotiations with U.S. customers, the respondent was eligible for separate rate status.[3]

Although the emphasis has shifted in recent cases, the basic policy has not. Policy Bulletin 05.1 is still in effect. It still calls for the consideration of four factors. And no one factor is legally dispositive. Commerce applies presumptions, but those presumptions can still be tested and rebutted by evidence.

[3] That Commerce's *de facto* analysis has a particular focus on actual price negotiation with U.S. customers has a long history. Indeed, such focus on the actual price negotiations with U.S. customers is evident in the very case that is considered the grandfather of Commerce's separate rate test, *Sparklers From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 56 Fed. Reg. 20,588 (May 6, 1991). In *Sparklers*, Commerce noted as follows: "*De facto* absence of central government control with respect to exports is based on two prerequisites: (1) Whether each exporter sets its own export prices independently or the government and other exporters, and (2) whether each exporter can keep the proceeds from its sales." *See also* Priya Alagir, 26 Law & Policy Int'l Bus at 1071 ("In Sparklers . . . Commerce developed {the} criteria, which, if met, demonstrate sufficient independence from the central Chinese government to overcome the China Inc presumption and to warrant the granting of a separate rate.").

A 2012 decision by the Trade Court, and the subsequent appeals, resulted in a shift in Commerce's approach to applying its separate rate test.  Specifically, in *Advanced Tech. & Materials Co. v. United States*, the Trade Court remanded Commerce's decision to continue to grant certain diamond sawblade manufacturers separate rate status for further explanation regarding how the separate rate test had been applied in light of government controlled entities within the ownership structure of the exporter.  *Advanced Tech. & Materials Co. v. United States*, 885 F. Supp. 2d 1343, 1349 (Ct. Int'l Trade 2012).  In its review of the first remand redetermination the court found that Commerce's reliance on certain aspects of corporate law in China, including corporate forms, disciplines on board influence, Shanghai State-owned Assets Supervision and Administration Commission of the State Council's ("Shanghai SASAC") regulations and provisions within the articles of association, were not themselves sufficient to allow the Court to conclude that granting a specific rate to the exporter under review was supported by substantial evidence.  *Id.* at 1363 ("the court emphasizes it is not here substituting judgment for that of Commerce on these issues or insisting upon application of the separate rates test in a certain way . . . {t}he court simply seeks to discern the reasonableness of a determination, and the wisdom to do so.").

In the second remand redetermination, Commerce reversed course, abandoning its focus on the exporting entity, "altering its analysis under protest

given this Court's prior remand orders." *Advanced Tech. & Materials Co. v. United States*, 938 F. Supp. 2d 1342, 1350 (Ct. Int'l Trade 2013) (quoting remand redetermination). Commerce found that "the {entity which included the exporter} is not entitled to a separate rate based on the *de facto* criterion regarding the autonomy to select its management independent from government oversight or control. Therefore, we find the {entity including the applicant} to be part of the PRC-wide entity." Final Results of Remand Redetermination Pursuant to Remand Order Diamond Sawblades and Parts Thereof from the People's Republic of China, *Advanced Technology & Materials Co., Ltd., Beijing Gang Yan Diamond Products Company, and Gang Yan Diamond Products, Inc. with Bosun Tools Group Co. Ltd. v. United States and Diamond Sawblades Manufacturers Coalition, Weihai Xiangguang Mechanical Industrial Co., Ltd., and Qingdao Shinhan Diamond Industrial Co., Ltd.*, Slip Op. 12-147 (May 6, 2013), Consol. Court No. 09-00511 at 15 ("*Advanced Tech. Remand*"). The remand redetermination was upheld by the Trade Court and the CAFC affirmed the Trade Court's decision. *Advanced Tech. & Materials Co.*, 938 F. Supp. 2d 1342, *aff'd* 581 Fed. Appx. 900 (Fed. Cir. 2014) (*per curiam*).

The shift in focus from the actual operations of the exporter to the potential ability of a state-owned or controlled entity to impact decisions regarding board membership and thus company management has governed Commerce's separate

rate analysis ever since. But the holdings of the *Advanced Tech.* cases did not necessarily dictate that result. In fact, as noted above, Judge Musgraves' remand in *Advanced Tech. II* took pains to state that he was not dictating a particular result only urging Commerce to further explain. *Advanced Tech. & Materials Co.*, 938 F. Supp. 2d at 1363.Commerce also expressed reluctance to abandon its prior method of analysis, conducting the remand "under protest." *Advanced Tech. Remand* at 20 n. 47.

Application of this new shareholder focused standard has, in recent years, been challenged as an irrebuttable presumption. *See, e.g.*, *Yantai CMC Bearing Co. v. United States*, 203 F. Supp. 3d 1317, 1323 (Ct. Int'l Trade 2017); *Zhejiang Mach. Imp. & Exp. Corp. v. United States*, 521 F. Supp. 3d 1345, 1352 (Ct. Int'l Trade 2021); *Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*, 519 F. Supp. 3d 1224, 1233 (Ct. Int'l Trade 2021). In *Jilin Forest*, the court found that Commerce's analysis was unsupported by substantial evidence because it failed to establish the link between equity ownership and export activities that are the stated focus of Commerce's separate rate analysis. *Jilin Forest*, 519 F. Supp. 3d at 1234.

In the ensuing remand redetermination, Commerce stated that its four *de facto* criteria "and the related questions that appear in the {separate rate questionnaires} identified above constitute Commerce's analysis of 'export functions.'" Final Results of Remand Redetermination, *Jilin Forest Industry*

*Jinqiao Flooring Group Co., Ltd. v. United States* Slip Op. 21-49 (April 29, 2021),

CIT Court No. 18-00191 at 9 ("*Jilin Forest Remand Redetermination*").  Further,

Commerce stated that "company operations" include the full compass of business

activities and thus any aspect of the applicant's operations, including the actual or

potential selection of board members, was necessarily linked to export activities.

*Jilin Forest Remand Redetermination* at 9, 11.  Although it has shifted its

emphasis, Commerce has not formally abandoned the four factors announced in

Policy Bulletin 05.1.

     In *Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*, the Trade

Court endorsed Commerce's practice of according "more weight to evidence of an

exporter's government ownership as a consequence of the *Diamond Sawblades*

proceeding."  *Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*, 350 F.

Supp. 3d 1308, 1324 (Ct. Int'l Trade 2018).  That case, however, cites the United

States brief for the proposition that in Commerce's separate rate test "{t}he

presence of direct or indirect majority government ownership may require

exporters to surmount a high bar to demonstrate the absence of de facto control,

but it does not necessarily preclude exporters from obtaining a separate rate."  *Id.*

at 1323.  That means that while a focus on government ownership may be

appropriate, the Defendant, i.e. the Department of Commerce, acknowledged, and

the Court specifically noted, that there is some level of evidence that would

warrant granting a separate rate despite a majority government owned entity in an applicant's corporate tree. In fact, the Trade Court's opinion in *Zhejiang Quzhou* arguably requires this conclusion stating "{t}hat Commerce did not forecast the type of evidence that would be sufficient to rebut the presumption does not render its determination unreasonable or unsupported by substantial evidence." *Id*.

In response to these arguments, the Trade Court stated that "{a}lthough the decisions… in the *Advanced Tech. & Materials* litigation are not precedential, nothing precluded Commerce from being guided by them in revising the practice by which it applies its de facto test…{the Trade Court} is not persuaded by Double Coin's argument that Commerce exceeded its discretion by giving controlling weight to its third factor on the record facts of the review." Slip-Op. 23-75, Appx0019-0020.

The emphasis may have shifted over time, but the basic policy and its four factors remain in place. Even if there is a "high bar" to demonstrate the absence of government control, that fact that there is a bar at all means the evidence in a particular case still matters. And in this case, Commerce and the Trade Court simply ignored the relevant evidence regarding whether Double Coin's export functions were susceptible to influence by government-controlled shareholders and thus did not ground its finding of government control in substantial evidence.

As a result, this Court must remand Commerce's determination for further proceedings consistent with the test described above.

**B. Commerce Adopted an Unlawful Interpretation and Application of "Rebuttable Presumption"**

Commerce has treated its separate rate analysis as a binary test. Either (1) a respondent rebuts the presumption of control and receives a separate rate or (2) the presumption stands and the respondent is treated as an arm of the government of the country where it is located, in this case China. This approach is legally flawed and treats the presumption as a new standard of evidence rather than a tool for gauging whether the burden of substantial evidence has been met.

At the outset, it is important to recall what a presumption is in a common law system. A presumption is "{a} legal device which operates in the absence of other proof . . . a presumption is not evidence." BLACK'S LAW DICTIONARY at 1185 (6th Ed.). A rebuttable presumption is "{a} species of legal presumption which holds good until evidence contrary to it is introduced." *Id.* at 1267. In line with these black letter law precepts, the Federal Circuit has found that rebutting a "presumption compels the production of this minimum quantum of evidence from the party against whom it operates, nothing more" and that once that evidence is proffered "a presumption is not merely rebuttable but completely vanishes upon the introduction of evidence sufficient to support a finding of the nonexistence of the presumed fact." *A. C. Aukerman Co. v. R. L. Chaides Constr. Co.*, 960 F.2d

1020, 1037 (Fed. Cir. 1992). A Fifth Circuit case considering administrative disputes flowing from the Natural Gas Policy Act of 1978 noted the bursting bubble theory of presumptions where "the *only* effect of a presumption is to shift the burden of producing evidence with regard to the presumed fact. If the party against whom the presumption operates produces evidence challenging the presumed fact, the presumption simply disappears from the case." *Pennzoil Co. v. Federal Energy Regulatory Comm'n.*, 789 F.2d 1128, 1136-1137 (5th Cir. 1986) (emphasis in original).

Commerce does not apply its presumption in this manner. Instead, Commerce requires a respondent to prove that the presumption is affirmatively wrong to win separate rate eligibility. According to the cited jurisprudence, the correct standard required to rebut a presumption is, however, much lower, and all that is required to rebut a presumption is for a litigant to produce some evidence that is contrary to the fact for which the presumption initially substitutes. To the extent that Commerce's practice diverges from that standard, it is unlawful and has the effect of replacing the substantial evidence standard with some other standard of evidence not contemplated by the statute.

With respect to Double Coin's separate rate application, Commerce found that the company had not rebutted the presumption of government control because it failed to demonstrate that Huayi does not have "near complete control over any

shareholder decisions, including decisions which may affect the management and

operations of the company" and thus failed on the third factor of the test in Policy

Bulletin 05.1.  Final IDM, Appx0426-0427.  Commerce noted that Huayi's

majority ownership "*may* affect the management and operations of the company"

*id.* (emphasis added) but Commerce did not specifically describe any examples of

control Huayi actual exercised over Double Coin's management decisions.

Commerce's analysis largely focused on the fact that Huayi had the potential to

control Double Coin's day-to-day operations due to its 65 percent ownership.  *Id.*

Commerce has focused its analysis entirely on ownership of the ultimate

shareholders of the exporting entity to the exclusion of the other categories of

evidence under the policy.  Ignoring this evidence is itself a fatal flaw.  But more

fundamentally this ignored evidence actually demonstrates that the exporter sets

prices, negotiates with customers, and otherwise conducts its export operations free

from government control.  In other words, the evidence affirmatively demonstrates

the absence of government control over what matters – the export activities of the

entity under investigation.  Accordingly, the substantial evidence on this record

meets the high bar and rebuts any presumption of control.

In its decision memorandum, Commerce stated that the presumption of state

control had not been rebutted and went on to explain those elements of the record

that supported its position regarding Double Coin's separate rate eligibility.  Final

IDM, Appx0426-0427.  Commerce's reliance on the presumption as the basis for its determination was unlawful because there is evidence contrary to the assumed fact embodied in the presumption, *i.e.* whether Double Coin's management is influenced by the Chinese shareholder with respect to export activities.  As soon as Commerce starts to weigh evidence, its decision cannot be based on a presumption and the characterization of this analytical methodology as a rebuttable presumption frustrates the ability of litigants and the Courts to ensure that Commerce adheres to its obligation to support its findings with substantial evidence because it is unclear what standard Commerce is actually using.  Once Double Coin presented evidence that the government was not able to influence its management selection, as it did, it was unlawful for Commerce to continue to base its decision on a rebuttable presumption that had been rebutted.

It was only lawful for Commerce to analyze Double Coin's separate rate eligibility on the basis of the statutorily mandated standard of substantial evidence.  19 U.S.C. § 1516a(b)(1)(B)(i).  Commerce's decision memorandum is, however, very clear that the basis for its decision was "that Double Coin's arguments regarding U.S. sales by CMA does not overcome the rebuttable presumption of government control" and not the more comprehensive review of the record required by law.  Final IDM, Appx0428.  To the extent that the rebuttable presumption, as applied in this case, is simply an excuse to ignore or short-change

the analysis that Commerce is required to perform, the continued use of the presumption is unlawful.

It is important to clarify that the framework Double Coin describes here allows for the possibility that a respondent might rebut the presumption of government control and still be found to be ineligible for a separate rate based on a more complete review of the record based on substantial evidence standard. The rebuttable presumption cannot, however, become an excuse to supplant the second part of Commerce's obligation, that is to examine evidence related to separate rate eligibility through the same lens that it views other types of evidentiary questions, substantial evidence. Double Coin does not, here, contest the legal basis for Commerce's assumption in the first instance that a company with a state-owned entity in its ownership tree is not eligible for a separate rate but the balance of Commerce's analysis of these questions must comport with not supplant the substantial evidence standard.

The Trade Court found that Double Coin's argument in this respect failed " {b}ecause of the breadth of the Department's discretion in implementing its test for government control of export functions, the court has no reason to conclude that Commerce may not do so." Slip-Op. 23-75, Appx0022. That conclusion misses the important distinction that the Double Coin's arguments draw above. A rebuttable presumption cannot continue to act as the basis for an evidentiary

conclusion in the face of a complete factual record on the relevant issue. A finder of fact might weigh evidence and conclude that a party has failed to prove an underlying point but the basis for the conclusion cannot lawfully be a presumption if there is actually evidence on the record that speaks to the issue. The force of the presumption is removed once the required evidence has been submitted. "A presumption is not evidence" and only acts in the absence of other facts. BLACK'S LAW DICTIONARY at 1185 (6th Ed.). As soon as a finder of fact is weighing two sets of contrary evidence relevant to a disputed factual point, a presumption, rebuttable or otherwise, has no place. Yet, Commerce expressly relied on the presumption for its findings, Final IDM, Appx0426-0427, even after considering evidence presented by Double Coin and identifying aspects of the record that, in its view, detracted from that evidence. As a result, it is entirely unclear what standard of evidence Commerce applied in its review. The statute is however, clear in what standard Commerce must meet. The statute requires that the decision be supported by substantial evidence. 19 U.S.C. § 1516a(b)(1)(B)(i). To the extent Commerce was applying a presumption despite contrary evidence, that is not substantial evidence and the evidentiary burden imposed on Double Coin exceeded the one that prevails in this circuit.

When reviewing agency actions, the court "must judge the propriety of such action solely by the grounds invoked by the agency." *Securities Exchange*

*Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947); *see also Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962) (holding that a court is obligated to review a decision of an administrative agency according to the reasoning the agency puts forth).  Here, the legal basis for the agency's conclusion regarding Double Coin's separate rate eligibility is a presumption of a specific factual conclusion for which Double Coin provided extensive contrary evidence.  In the face of that evidence, Commerce continued to rely on the presumption as the legal basis for its conclusion rather than performing the statutorily mandated analysis and determining whether the record contained substantial evidence that supported its conclusion.  That legal position is inconsistent with the general principles of law discussed above and the jurisprudence of this Court and must be remanded for further analysis based on the applicable burden of proof by the agency and how the application of that burden comports with the statute.

## II. COMMERCE'S DETERMINATION THAT DOUBLE COIN FAILED TO REBUT THE PRESUMPTION OF GOVERNMENT CONTROL IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

Commerce acknowledged that it relied on the presumption of state control for its evidentiary findings in this case. In the original determination underlying this appeal, Commerce stated that

> managers should be presumed 'to be beholden to the board that controls their pay, in particular to the chairman of the board as the de facto company head under the PRC model," until proven otherwise. Similarly, we find that as Huayi is the controlling shareholder, it is the entity controlling Double Coin's board and management.

Final IDM, Appx0426. Commerce further stated, in response to Double Coin's evidence showing that such control had not occurred in fact, that "{t}he standard for determining such a status is that an NME exporter is presumed to be under government control until such a presumption is sufficiently rebutted. As such, the absence of evidence of control or other demonstrable action on behalf of a minority shareholder does nothing to rebut this presumption." *Id.* at Appx0426-0427. Yet, Commerce's approach to the presumption of state control in this case essentially ignored the evidence that rebutted the presumption.

Commerce's final determination makes clear the conclusion that the Chinese Government controls Double Coin's export activities is based on the following analytical paradigm: (1) the overall legal environment in China is "permissive of individual firms maintaining independent operations with respect to export

activities" and therefore not dispositive of de jure control; (2) however, Double Coin is majority owned by Huayi; (3) as majority owner, Huayi is entitled to nominate a majority of Double Coin's Board of Directors; (4) Huayi, in turn, is wholly owned by the Shanghai State-owned Assets Supervision and Administration Commission of the State Council; and therefore (5) the Chinese Government exercises de facto control over Double Coin's export activities. *See* Final IDM, Appx0416-0432.

This is the entire sum and substance of Commerce's conclusion that the Chinese Government controls Double Coin's export activities. Indeed, Commerce's final determination readily admits that its conclusion is premised entirely on ownership:

> Whether or not the Huayi Group, which is the majority owner of Double Coin, demonstrably exercised control over Double Coin's day-to-day operations does not refute the fact that a government-owned entity has near complete control of shareholder decisions of Double Coin.

Final IDM, Appx0427.

In response to these arguments, the Trade Court stated, "{w}hile Double Coin put forth certain evidence of independence of government control, including, in particular the ability of its U.S. affiliate to set prices of subject merchandise, it did not show that it was free from all material aspects of government control." Slip-Op. 23-75, Appx0023. However, the Trade Court's decision largely ignored

all the evidence presented, and discussed below, in favor of one point made by Commerce.

### A. Commerce's Conclusion That The Chinese Government Controls Double Coin's Day-To-Day Activities Is Not Supported By Substantial Evidence

In its final determination, Commerce asserted that it could not reach a finding of *de jure* control of Double Coin's export activities. To the contrary, it found:

> The PRC laws and regulations at issue provide a framework for various corporate entities to form and operate at some distance from the central government. . . . {Commerce} continues to find that the overall legal environment is permissive of individual firms maintaining independent operations with respect to export activities.
>
> {T}he PRC Company Law and other laws and regulations demonstrate that, within the PRC's NME, distance can exist between decisions made at the central government level and decisions made at the firm level with respect to exports.

Final IDM, Appx0425-0426.

As discussed below, Commerce departed from the logic of its analysis recognizing *de jure* space for Double Coin's *de facto* autonomy. Namely, Commerce chose to find that because there might be some possibility for involvement in Double Coin's commercial affairs, this conclusion necessarily leads to the further conclusion that Double Coin's export activities are in fact controlled. If anything, Commerce's findings with respect to *de jure* control

should have informed its analysis of the Chinese Government's *de facto* control over Double Coin's export activities. They did not. Instead, Commerce effectively concluded the record regarding *de jure* control was irrelevant, even in the absence of actual evidence of control of export activities, and even if it meant that *de facto* control could mean the violation of Chinese law. But such a fact would seemingly have some bearing on a *de facto* analysis where Commerce was limited to assessing *possibilities*. If there are legal consequences associated with the exercise of *de facto* control, at some point the mere possibility of *de facto* control must fade into speculation far removed from the tenets of substantial evidence. Commerce never really addressed the point in its determination. Rather, Commerce focused its reasoning on possibility alone without considering additional evidence detailing the actual absence of day-to-day control. This failure to test whether Double Coin had reached Commerce's "high bar" was unreasonable and not supported by substantial evidence.

In essence Commerce concluded that the Chinese Government had the ability to control the day-to-day activities of Double Coin simply because Double Coin is majority-owned by Huayi, an entity which is wholly-owned by Shanghai SASAC. This position is evidenced by Commerce's preliminary determination in which Commerce succinctly stated: "Because of this level of government ownership, and the control that *such ownership on its own* establishes, we

preliminarily conclude that {Double Coin}, does not satisfy the criteria

demonstrating an absence of *de facto* government control over export activities."

Preliminary Results IDM, Appx2945.  For the final results, Commerce continued

to emphasize SASAC's 100 percent ownership of the Huayi Group.  *See* Final

IDM, Appx0425.

Commerce's conclusion about the meaning of government ownership is not

supported by the evidentiary record, and therefore is not premised upon a proper

understanding of Double Coin's actual operations or the evidentiary record.  There

are several key facts that demonstrate why Commerce's conclusion about the

meaning of ownership has no basis in the factual record and therefore cannot be

sustained.  These facts— the extensive evidence of limits and constraints on the

majority shareholder combined with the lack of any evidence at all that the

majority shareholder actually exercised any control—collectively demonstrate that

the Commerce decision finding actual *de facto* control has no basis in substantial

evidence.  We address each of these in further detail below.

In response to these arguments and the evidence presented below, the Trade

Court stated, "{u}nder its revised *de facto* test, Commerce need not base its

decision entirely on evidence, or the lack thereof, of direct government control of

the day-to-day general business operations, or the export-related operations in

particular, of a majority-government-owned corporation."  Slip-Op. 23-75,

Appx0020. And so, the Trade Court did not seriously address the additional evidence and facts that Appellants presented.

We respectfully submit that such approach is contrary to the analysis required under the substantial evidence standard.

**1. Double Coin is a publicly traded company**

Commerce discounts the fact that, as a publicly listed company, Double Coin is governed by specific rules. *See* Final IDM, Appx0425-0426. As the record demonstrates, these rules limit the rights of shareholders with a majority or controlling interest, and grant certain rights of supervision and control to minority shareholders. This fact is readily discerned from the record of this case, beginning with an examination of China's Company Law, which establishes the independent legal and financial interests of corporate entities and restricts the ability of shareholders, directorship, or management to act contrary to those interests through an abuse of their position. *See* Article 20, Article 21 and Article 22 of Company Law, July 2014 Supplemental QR, Appx2196-2197.

These restrictions and the legal liability connected to them are reinforced in the case of publicly listed companies through the Code of Corporate Governance for Listed Companies. The Code, much like the Company Law, provides that a publicly traded company should act independently from the controlling shareholders for all issues of substantial relevance for the company and that

directors and management act in the interests of the company. This is the unavoidable conclusion from review of several of the Articles contained in the Code, including Articles 22 – 27. *See* Code of Corporate Governance for Listed Companies, July 2014 Supplemental QR, Appx2230-2237.

Therefore, as a matter of Chinese law, Double Coin is required to act as an independent company, and the directorship and management must act in accordance with the interests of the company, not the shareholders, regardless of the composition of a company's equity structure, directorship, or management. Indeed these laws are why Commerce found no *de jure* control. Commerce's conclusion about "control" does not bother with these facts, but instead continues to dwell on the potential to control derived from being a majority shareholder without considering the additional evidence available in this case that distinguishes it from instances where corporate form alone was found insufficient to insulate the exporter from central government control.

### 2. Double Coin's Articles of Association create further obligations of independence

Commerce's conclusion also discounts the fact that Huayi's authority is further tempered by Double Coin's Articles of Association ("Double Coin AOA") that are given legal effect through the Company Law. *See* July 2014 Supplemental QR, Appx2104, Appx2141-2178. Articles 34, 35, and 36 of the Double Coin AOA expose both shareholders, directors, and senior managers to prosecution should

they act against the interests of the company in violation of the law and administrative regulations. Article 37 furthers sets forth the obligations of all shareholders including, *inter alia*, that they:

> Shall not abuse the Shareholder's rights to damage the company or interests of other shareholders; shall not use the independent status of the company and limited liability of the shareholders to damage the interests of the company's creditors. If the shareholder of the company abuse their rights and damage the company and other shareholders, he or she shall liable for the responsibility of compensation. If the shareholder abuse the independent status and the limited liability to dodging payment of debts and materially damage the interests of the creditors, he or she shall liable jointly for the company debt. Appx2147.

Article 39 of the Double Coin AOA creates further specific obligations for controlling shareholders, stating:

> Controlling shareholders and Actual Controllers may not use their relationship to violate interests of the company. Those break this regulation and cause loss of the company shall reliable for the damage. Controlling shareholders and Actual Controllers is under the obligation of faithfulness & credit to other shareholders. Controlling shareholder should exert the rights as investor, and cannot make damages to the company and other shareholders in the profit distribution, assets re-composition, investment, occupation of funds, loan guarantee or figure for additional profits from the special position. *Id.* Appx2148.

With respect to Directors, Article 110 limits the scope of their activities and duties to those strategic decisions of the company distinct from the day-to-day operations of the company such as export sales. Similarly, Article 113 entitles

Directors to directly decide on those matters involving no less than 10 percent of the total audited assets of the company. Double Coin AOA, Appx2161.

With respect to senior managers, Article 144 makes clear that they cannot serve the interests of any holding company of Double Coin or actual controllers of Double Coin and still serve as an executive of Double Coin. Appx2166. Rather, consistent with Article 143, they must act in good faith and diligence for the benefit of Double Coin. Article 154 makes clear, yet again, that where senior managers of the company "violate laws, administrative rules, regulations and the relevant provisions in the Articles of Association on the occasion of performing his (her) duty and caused losses to the company," they shall be held liable. *Id.* at Appx2168. This fact, in conjunction with the other facts on the record, is also crucial to demonstrating the Double Coin has met Commerce's high bar and is eligible for a separate rate.

**3. Double Coin has minority shareholders with specific rights**

Commerce's conclusion ignores the fact that Double Coin's minority shareholders have *bona fide* rights that temper the control that Huayi can exert. Commerce dismisses the rights of Double Coin's minority shareholders on the basis that they "are limited only to the [description of company policies] and not for other resolutions … and that, regardless of any such [description of company policies],

the majority shareholder … has near complete control over any shareholder decisions." Preliminary Analysis Memo, Appx3017.

In its final results Commerce attempts to respond to this argument, but all Commerce does is fall back on its flawed "potential to control" standard without considering any context. Specifically, Commerce states:

> {T}he existence of certain minority shareholder rights (such as the ability to bring suit against a board member or manager who acts against the interests of the company, and the right of minority shareholders to call a shareholder meeting) prove the absence of government control.

Final IDM, Appx0426-0427. However, Commerce is confusing two issues. All shareholder decisions do not automatically translate into control of the day-to-day operations of the company. And in fact, the day-to-day operations are the responsibility of managers, who by the terms of the Company Law, the Code of Corporate Governance, and the Double Coin AOA must serve the interests of the Company and definitively cannot serve the interests of controlling shareholders or "actual controllers."

In addition, the rights afforded to minority shareholders are to protect their rights as shareholders, not somehow to convert them into the controlling shareholders. Indeed, the rights of Double Coin's minority shareholders mean that Huayi cannot exercise unilateral and unlimited control over Double Coin. One of the key minority rights ignored by Commerce is the right to bring suit against a member of the board or senior management who acts against the interests of the

company, breaching applicable law or Double Coin's AOA. *See* Double Coin AOA at Article 35, Appx2147. Another minority shareholder right ignored by Commerce is the right of minority shareholders representing 10 percent of the shares to call a meeting of the shareholders. *See* Double Coin AOA, Articles 45 and 50, Appx2149-2150. Understanding this right in conjunction with the conflict of interest rule—also included in Double Coin AOA (*see* Article 82, Appx2155)—demonstrates that anytime a decision is debated by the meeting of the shareholders in which Huayi has a conflict of interest, Huayi's shares would have to be excluded from voting, rendering the percentage of its shareholding moot. The same protection would exist if shareholders representing 3 percent of Double Coin's shares were to raise a proposal at a meeting of the shareholders which created a conflict of interest for Huayi—a minority right also protected in Double Coin's Articles of Association. *See* Double Coin AOA at Article 55, Appx2151.

In the final analysis, given Double Coin's actual corporate organization and the laws governing that organization, Commerce adopted an <u>incorrect inference—indeed an adverse inference—that the right to appoint Double Coin's board of directors</u> somehow results in unrestricted control by Huayi. In its preliminary results Commerce concluded that since "Huayi has the potential … to nominate and appoint all members of {Double Coin's} board" Huayi is therefore in control or has the potential to control Double Coin because Double Coin's "Articles of

Association set up a structure where the majority-owner … has effective control over the composition of the board of directors, which appoints all management and maintains operational control." Preliminary Analysis Memo, Appx3016. Commerce reiterated this reasoning in its final results. Final IDM, Appx0427 However, this analysis confuses the right to appoint the members of the board with effectively exercising control over the board's actions, decisions and policies, as well as confusion over the scope of the Board's duties.[4]

The Board is not directly involved in the day-to-day operation of the company, and members of management who do involve themselves in day-to-day operations may not serve as controlling shareholders or actual controllers of the Company. Rather, both the Board and managers must discharge their duties faithfully and honestly, and to diligently perform their duties in the best interests of Double Coin. Additionally, the members of the board are responsible to all the shareholders of Double Coin, not just to the shareholders who appointed them. *See* Company Law, Article 46, Appx2201; Code of Corporate Governance, Article 42, Appx2234; Double Coin AOA, Article 108, Appx2160.

---

[4] In addition, Commerce's understanding about how directors are nominated to the Board of Directors, *see* Commerce's Verification Report, Appx2976, is not entirely correct. Specifically, Commerce misunderstands how Double Coin's Articles of Association applies for <u>independent</u> directors. Of the seven directors, three are independent directors. Commerce was wrong to ignore this fact.

As a result, although a majority shareholder has significant influence in the constitution of the board, and even in the selection of Double Coin's management, such right does not automatically result in control by Huayi over the board and management because: (a) the members of the board are required to act in the best interest of Double Coin; (b) the minority shareholders have a right to bring a suit against members of the board who fail such duty; (c) there are independent members of the board.

Commerce is also wrong to conclude that the fact of intertwined management and board membership between Double Coin and Huayi provides unequivocally the existence of control by Huayi. *See* Final IDM, Appx0427-0428. The undisputed fact is that only one member of Double Coin's board is an employee at Huayi at any given time. *See* Commerce Verification Report, Appx2973-2977. Moreover, the fact that members of the board of one company have been in the employ of the other company does not create control of one over the other, but is rather a common occurrence in publicly-traded companies with this type of profile.

Commerce relies heavily on the fact that "Double Coin was unable to provide an example . . . where [ description of company policies ]." According to Commerce this means that "Huayi has *de facto* control over the composition of Double Coin's board."

Preliminary Analysis Memo, Appx3017 (unchanged in the final results). This conclusion is wrong. The fact that a minority shareholder has never nominated a director, or that no Huayi nominees have ever been rejected, does not signify that Huayi has *de facto* control over Double Coin; again, it simply means it has not happened yet.

#### 4. Double Coin has independent directors

In addition to the controls inherent in Chinese Corporate Law and the Double Coin's own articles of association there are certain facts unique to this case that demonstrate Commerce's failure to examine the record as a whole and render a decision supported by substantial evidence. Commerce's conclusion regarding control ignores the importance of the <u>independent members of Double Coin's board of directors</u>. Pursuant to the Double Coin AOA, more than a third of the members of the board shall be "independent directors." "Independent directors" are required to act "without the interference of the principal shareholders or the persons in actual control of, or other entities or individuals that have a material interest in" Double Coin. *See* Article 130 of the Double Coin AOA, Appx2163-2164.

Although Commerce makes light of the rights and obligations of the independent directors, *see* Preliminary Analysis Memo, Appx3017, the reality is that independent directors have rights and authorities beyond those granted to the

shareholder-appointed directors, including the right to engage independent auditors.  *See* Article 137 of Double Coin AOA, Appx2165.  Further the obligations of the independent directors are expressly required to favor solely the company's (Double Coin's) interest, not the majority shareholders.  *Id*.  Indeed, the Double Coin AOA makes clear that the independent directors shall "in particular, pay attention that the lawful rights and interests of small and medium shareholders are not prejudiced."  *See* Article 130 of the Double Coin AOA, Appx2163-2164.

This is a fundamental factual difference from the situation that the Trade Court considered in *Zhejiang Quzhou Lianzhou*.  Although that decision considered several features of Chinese corporate law that are also at issue here, that decision did not address the unique facts of independent directors and how they affect the overall analysis.   The presence of independent directors here demonstrates the high level of evidence before Commerce in this case demonstrating actual independence from any supposed government control.

In sum, Commerce's conclusion that the nature of Double Coin's corporate organization gives Huayi the ability to exercise control over Double Coin is premised upon an incorrect understanding of how Double Coin is governed.  A proper understanding of the underlying documents demonstrates that, in fact, Huayi does not have the control upon which Commerce's determination rests.

### 5. Not a single actual instance of the exercise of control over day-to-day operations

Finally, and perhaps most importantly, although Double Coin vigorously believes that Commerce's understanding of Double Coin's corporate organization and governance is wrong, this issue is really beside the point. All of the "evidence" cited by Commerce concerns the legal rights of a majority shareholder. Commerce does not—because it cannot—cite a single example in which Huayi <u>actually exercised</u> its legal right to control or influence a day-to-day decision about the manner in which Double Coin sold subject merchandise to the United States. In in our view, no matter how one decides to interpret the different provisions of the various documents governing Double Coin's corporate structure, this lack of any actual evidence of control or influence is fatal to Commerce's finding of *de facto* control. Although we appreciate that Commerce may be relying on some perceived "potential to control," the implication of Commerce's standard is that shareholders, directors, and management will break the law. If this is the standard, facts that rise to the point of "potential control" are virtually limitless. If this is the foundation of Commerce's conclusions those conclusions are completely unreasonable. There is no basis to support Commerce's adverse inference.

We recognize that Commerce was relying on the holding approach affirmed in *Advanced Tech. & Materials Co.,* 938 F. Supp. 2d. 1342, *aff'd* 581 Fed. Appx. 900 to rely on government majority ownership as dispositive of *de facto* control.

*See* Final IDM, Appx0425-0428. However, we respectfully submit that Commerce's logic here cannot be sustained. Majority ownership may provide a basis for a presumption, but it does not provide a basis to ignore all other record evidence that disproves the correctness of that presumption.

In response to this argument the Trade Court stated, that "{u}nder its revised *de facto* test, Commerce need not base its decision entirely on evidence, or the lack thereof, of direct government control of the day-to-day general business operations, or the export-related operations in particular, of a majority-government-owned corporation." Slip-Op. 23-75, Appx0020. As discussed above, we respectfully submit that such approach is contrary to the analysis required under the substantial evidence standard.

### B. In Any Event, There Is No Evidence That The Chinese Government Controlled Double Coin's *Export Activities;* In Fact, All The Record Evidence Demonstrates The Lack of Control

In the section above we detail why Commerce's conclusion that the Chinese Government had the ability to control the day-to-day activities of Double Coin through Double Coin's majority shareholder, Huayi, reflects a fundamental misunderstanding of the operation of (a) Chinese law, (b) the special regulations governing publicly listed companies such as Double Coin, and (c) the Double Coin AOA. And it ignores the relevance of independent directors in this particular case. A proper understanding of these laws and corporate organization documents

demonstrates that the Chinese Government cannot influence the day-to-day

activities of Double Coin, and therefore Commerce's conclusion is not supported

by substantial evidence on the record

In this section, we explain why, even if the Court were to disagree with our

assessment above, the Court still should conclude that Commerce' determination is

not supported by substantial evidence on the record.  There is no evidence that the

Chinese Government exercised *de facto* control over Double Coin's export

activities; in fact, all the record evidence is to the contrary and shows the absence

of any such control.

Specifically, in applying a PRC-wide rate to Double Coin in the instant case,

Commerce has denied Double Coin separate rate status eligibility without any

evidence that Double Coin's export prices were influenced by "central government

control."  As detailed above, the sole reason for Commerce's determination to

include Double Coin with the PRC-wide entity is Commerce's determination that

its "controlling shareholder is wholly-owned by the State-owned Assets

Supervision and Administration Commission" and that this shareholder exercises a

"significant level of control . . . over the respondent's Board of Directors." Even

assuming (for purposes of argument) that Commerce's determination that Double

Coin's board of directors was effectively chosen by an agency of the Chinese

government, this does not demonstrate that the government exercised control over Double Coin's export activities, as required by Commerce's Policy Bulletin 05.1.

This lack of any operational control can be seen by the figure below which illustrates the very remote nature of the Chinese Government control that Commerce is assuming:

**NON-CONFIDENTIAL VERSION**

**Ownership Structure of Double Coin and CMA**
***Source:* Section A Response of Double Coin and CMA (CR 15)**



Commerce has effectively concluded that the Chinese Government somehow has control over the selling prices the CMA negotiates with its U.S. customers. Simply looking at the figure above demonstrates that such contention makes little sense, because it ignores the attenuated nature of any Chinese Government ownership stake. The U.S. based company CMA is simply too far removed from the Chinese government and there are too many other intervening actors who have a role the decision making.

We fully recognize that, in the absence of any contradictory evidence, the Commerce *might* be able *presume* that a company whose board of directors is chosen in whole or in part by a government is subject to government control in its export activities. However, such presumption is not appropriate in this case because substantial contrary evidence exits. In this case, when properly reviewed in total and in context, the evidentiary record before Commerce demonstrates that neither the government of China (nor any government-controlled entity) exercises *control* over Double Coin's *export* activities. We summarize below in a chart the evidence that was before Commerce concerning each of the four factors in the Policy Bulletin 05.1:

**Actual Evidence on Record for Each of the Four *De Facto* Criterion**

| **Factor** | **Evidence on Record** |
|---|---|
| (1) whether the export prices are set by, or subject to the approval of, a governmental authority | • All – one hundred percent – of Double Coin's U.S. sales of subject merchandise were made by Double Coin's U.S. corporate subsidiary China Manufacturers' Alliance (CMA) after importation.[5]<br>• The operating agreement between Double Coin and its affiliate CMA (an American company run by American personnel) provides that " the day to day affairs of the company – such as price setting" are operated and managed by CMA's own officers and with no mention of operational control or authority on behalf of other entities ."[6]<br>• CMA sales of subject OTR customers are handled by Walter Weller and Aaron Murphy, two American CMA employees that have worked at CMA selling tires since before Double Coin obtained majority ownership of CMA.[7]<br>• CMA sets prices directly with its U.S. customers based on price lists that are created and updated regularly.[8] |

[5] *See* Preliminary Analysis Memo, Appx3006.
[6] *See* Commerce Verification Report, Appx2973.
[7] *See id.* at Appx2980, *see also* July 2014 Supplemental QR, Appx1894.
[8] *See* July 2014 Supplemental QR, Appx1894; Commerce's Verification Report, Appx2980.

| | |
|---|---|
| | • Double Coin does not review CMA's price lists, nor would CMA readily share this information with Double Coin.[9] |
| (2) whether the respondent has authority to negotiate and sign agreements | • As a publicly held company operating under the Company Law, Double Coin has full authority to negotiate and sign agreements.[10]<br><br>• CMA, an American affiliate run by American employees has full authority to bind Double Coin to sales contract with U.S. customers.[11] |
| (3) whether the respondent has autonomy from the central, provincial and local governments in making decisions regarding the selection of its management | • Commerce factual finding of no *de jure* control by Chinese Government.[12]<br><br>• Double Coin's Articles of Association that give shareholders rights in proportion to their ownership.[13]<br><br>• Double Coin's Articles of Association that require the independent status of Double Coin.[14]<br><br>• Existence of independent directors.[15]<br><br>• Protections for minority shareholders against majority shareholder abuse.[16] |

---

[9] *See* Commerce Verification Report, Appx2980.
[10] *See id.* at Appx2972-2973.
[11] *See id.* at Appx2979-2980; *see also* July 2014 Supplemental QR, Appx1894, Appx1896, Appx2368-2380.
[12] Final IDM, Appx0425-0426.
[13] *See* Double Coin AOA, Appx2141-2178.
[14] *Id.*
[15] *See id.* at Article 130, Appx2163-2164.
[16] *See id.* at Article 35, 45, 50 and 55, Appx2147, Appx2149-2150.

| | |
|---|---|
| | • Requirement that directors and officers must act in interest of company.[17]<br><br>• Not a single example of any shareholder influencing day-to-day operations .[18] |
| (4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses | • Double Coin's Articles of Association that require the independent status of Double Coin.[19]<br><br>• The operating agreement between Double Coin and its affiliate CMA (an American company run by American personnel) provides that "the day to day affairs of the company – including disposition of profits from sales – <u>are operated and managed by CMA's own officers</u>.[20] |

[17] *See* Double Coin AOA at Articles 34, 35, 36 and 39, Appx2147-2148.
[18] *See* Final IDM, Appx0427.
[19] *See* Code of Corporate Governance for Listed Companies, Appx2230-2237.
[20] *See* Commerce Verification Report, Appx2973.

We respectfully ask the Court to review each of the above facts carefully. Not a single one of the above facts is in dispute. Indeed, most are reflected in the Commerce own verification report, and therefore each one constitutes separate piece of evidence on the administrative record.

And so, there is absolutely no factual dispute about the key facts of control, there is no dispute that, during the AD review time period, one hundred percent of Double Coin's "export pricing" was handled by American employees of the U.S. company CMA. Commerce presumes there is control over export pricing but the specific record evidence here shows just the opposite. Commerce never actually addresses this evidence and instead just dismisses it.

Moreover, there is no dispute that these export prices are set after importation. Given this reality it is hard to see any possible influence by the exporter Double Coin, let alone any influence by Double Coin's SASAC-owned shareholder. The relevant prices in the U.S.. market are not set until after the product has left China and Double Coin has finished its involvement with the individual transactions. Commerce never considers the export price in its analysis, and focuses only on the resale price by the affiliated importer.

Finally, there is also no dispute that this business reality was codified in the operating agreement between Double Coin and CMA. Indeed, Double Coin does not even know the U.S. prices being set and charged by CMA. This business

reality precludes the possibility for government control, since there would be no mechanism for such control. It simply defies belief that the Government of China is somehow controlling the prices being set by American employees of CMA.

And we note there are undisputed facts under each of the three categories of evidence that Commerce simply ignored. Indeed, some of these undisputed facts are relevant under more than one of the Policy Bulletin 05.1 factors that should all have been considered.

Commerce's final determination does not attempt to refute a single one of these facts (all of which were referenced in Double Coin's Case Brief to Commerce.) Rather, Commerce attempts to dismiss the legal significance of all of these critical facts with a single paragraph:

> Double Coin further argues that Huayi's control of Double Coin's board cannot be equated to control of Double Coin's export activity and that the PRC ownership structure has no effect on sales prices in the United States because the prices are set by Double Coin's U.S. affiliate, CMA. We note that the respondent in the *Diamond Sawblades* litigation made similar arguments in that proceeding. The CIT rejected this line of reasoning in *Advanced Technology I*, stating that "the actual setting of price is only one of the four de facto factors described in the Policy Bulletin, whereas governmental manipulation of the cost of inputs,… or rationalization of industry or output are among numerous other scenarios of concern that can affect seller pricing." Similarly, we find that Double Coin's arguments regarding U.S. sales by CMA does not overcome the rebuttable presumption of government control.

Final IDM, Appx0427-0428.

There are two fundamental problems with Commerce's treatment of this evidence. First, Commerce conveniently ignores that Double Coin's argument is about substantial evidence in this case. The question is whether all of the undisputed specific facts in this case (identified above) demonstrating how even Double Coin does not control CMA export pricing (let alone Huayi) sufficiently rebuts the general presumption of Chinese Government control over export activities. And yet, instead of appropriately addressing these very specific facts (facts which are, by definition, unique to Double Coin), Commerce simply notes that in some other case "similar arguments" (not even evidence, "arguments") were rejected. We respectfully submit that a factual ruling in another case involving a different product, different Chinese producers, and a different time period has little bearing on the proper analysis of the specific substantial evidence in this case.

Second, Commerce quotes language from another court case in which the court noted that "actual setting of price is only one of the four *de facto* factors described in the Policy Bulletin, whereas governmental manipulation of the cost of inputs, . . . or rationalization of industry or output are among numerous other scenarios of concern that can affect seller pricing." However, Commerce's assessment stops there – simply quoting the language from another court case. Commerce makes absolutely no attempt to explain how the evidentiary record in this case demonstrates that there is evidence of the alleged concerns identified by

the Court.  Commerce makes no attempt to detail evidence on the record in this case that there is a sufficient basis to believe that the Chinese Government undertook "manipulation of cost of inputs . . . or rationalization or industry or output."  Commerce makes no attempt, because there is no evidence in this case.  There is not a single shred of evidence that the Chinese Government actually manipulated the input costs for producing OTR tires or attempted to undertake rationalization of the Chinese OTR industry.

In response to these arguments the Trade Court stated, "Double Coin's arguments are unconvincing because they are based on a presumption that the effect of government control is manifested only when there is conflict or "interference" between the governmental and commercial interests of a company," relying on Commerce's broad discretion to create a new four-factor test, as discussed above. Slip-Op. 23-75, Appx0022.

In short, Commerce's decision to apply the PRC-wide rate to Double Coin, based solely on its determination that a PRC affiliate controlled appointments to the board of directors flatly contradicts *Commerce's own* factual findings that the Double Coin board of directors exercised no influence over the setting of export prices.  Since the purpose of the country-wide rate policy is to determine "whether there is government control of a nonmarket company's export activities," *Advanced Tech. & Materials Co.*, 938 F. Supp. 2d at 1347 (quoting Commerce's

decision memorandum), Commerce has applied a single factor in its *de facto* control test to frustrate and contradict the very reason for its policy. Commerce's action in this case is thus unreasonable under its own policy criteria, and therefore unlawful. As importantly, Commerce's conclusions are not supported by substantial evidence on the record.

## CONCLUSION AND RECOMMENDED APPELLATE REMEDY

For the reasons set forth above, China Manufacturers Alliance, respectfully requests that this Court hold Commerce's determination unlawful and otherwise inconsistent with the record, reverse the Trade Court's decision affirming the determination, and remand the matter to the Trade Court for further proceedings consistent with this court's decision.

Respectfully submitted,

/s/ Daniel L. Porter

Daniel L. Porter
James P. Durling
James C. Beaty
Katherine R. Afzal

CURTIS, MALLET-PREVOST, COLT &
MOSLE LLP
1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

*Counsel for China Manufacturers
Alliance, LLC et al.*

*China Manufacturers Alliance, LLC v. US*, CAFC Ct. No. 2023-2391

**Addenda of Documents required by the CAFC Rules**

| Document Title | Appx Range |
|---|---|
| Judgement pursuant to China Manufacturers Alliance, LLC v. United States, Ct. No. 15-00124, Slip Op. 23-105 (CIT July 19, 2023) | Appx0001-0002 |
| Dept. of Commerce's Remand Redetermination pursuant to Remand Order China Manufacturers Alliance, LLC v. United States, Ct. No. 15-00124, Slip Op. 23-75 (June 14, 2023) | Appx0003-0009 |
| China Manufacturers Alliance, LLC v. United States, Ct. No. 15-00124, Slip Op. 23-75 (CIT May 16, 2023) | Appx0010-0024 |
| China Manufacturers Alliance, LLC v. United States, 1 F.4th 1028 (Fed. Cir. 2021) (June 10, 2021) | Appx0025-0044 |
| China Manufacturers Alliance, LLC v. United States, Ct. No. 15-00124, Slip Op. 19-115 (CIT September 3, 2019) | Appx0045-0055 |
| Dept. of Commerce's Second Remand Redetermination pursuant to Remand China Manufacturers Alliance, LLC v. United States, Ct. No. 15-00124, Slip Op. 19-7 (April 6, 2019) | Appx0056-0071 |
| China Manufacturers Alliance, LLC v. United States, Ct. No. 15-00124, Slip Op. 19-7 (CIT January 16, 2019) | Appx0072-0173 |
| Dept. of Commerce's Final Results of Redetermination Pursuant to Remand, Court No. 15-00124, Slip Op. 17-12 (June 21, 2017) | Appx0174-0215 |
| China Manufacturers Alliance, LLC et al. v. United States, Consol. Court No. 15-00124, Slip Op 17-12 (CIT February 6, 2017) | Appx0216-0408 |
| Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Amended Final Results of the Antidumping Duty Administrative Review; 2012-2013, 80 Fed. Reg. 26,230 (May 17, 2015) and I&D Memo (April 8, 2015) | Appx0409-0470 |

**Slip Op. 23-105**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**CHINA MANUFACTURERS ALLIANCE, LLC and DOUBLE COIN HOLDINGS LTD., et al.,**

Plaintiffs,

v.

**UNITED STATES,**

Defendant.

**Before: Timothy C. Stanceu, Judge**

**Consol. Court No. 15-00124**

**JUDGMENT**

Before the court are the Final Results of Redetermination Pursuant to Court Remand (June 14, 2023), ECF No. 272 (the "Remand Redetermination") submitted to the court by the International Trade Administration, U.S. Department of Commerce ("the Department") in response to the court's Opinion and Order in *China Manufacturers Alliance, LLC v. United States*, No. 23-75, 2023 WL 3479423 (Ct. Int'l Trade May 16, 2023) ("*CMA V*").

The court determines that the Remand Redetermination complies with the court's decisions in *CMA V* that plaintiffs China Manufacturers Alliance, LLC and Double Coin Holdings Ltd. (collectively, "Double Coin") did not rebut the Department's presumption of control by the Government of China over export activities and that Double Coin, consequently, must be assigned the PRC-wide rate of 105.31%.

No party filed comments in opposition to the Remand Redetermination within the 30-day period provided for in USCIT Rule 56.2(h).

Upon consideration of the Remand Redetermination and all other papers and proceedings had herein, and upon due deliberation, it is hereby

**ORDERED** that the Department's finding in the Remand Redetermination that Double Coin did not rebut the presumption of government control be, and hereby is, sustained; it is further

**ORDERED** that the Department's assignment of the PRC-wide rate of 105.31% to Double Coin be, and hereby is, sustained; and it is further

**ORDERED** that entries affected by this litigation shall be liquidated in accordance with the final judicial decision in this action.

/s/ Timothy C. Stanceu
Timothy C. Stanceu, Judge

Dated: July 19, 2023
New York, New York

UNITED STATES DEPARTMENT OF COMMERCE
Office of the General Counsel
OFFICE OF THE CHIEF COUNSEL FOR TRADE ENFORCEMENT & COMPLIANCE
Washington, D.C. 20230

June 14, 2023

**FILED ELECTRONICALLY VIA CM/ECF**

Mario Toscano
Clerk of the Court
U.S. Court of International Trade
One Federal Plaza
New York, NY 10278-0001

Re: Redetermination Pursuant to Court Remand Order in *China Manufacturers Alliance, LLC v. United States*, Court No. 15-00124

Dear Mr. Toscano:

Pursuant to the Court's order of May 16, 2023, please find attached the U.S. Department of Commerce's Redetermination Pursuant to Court Remand in the above-captioned action. The remand redetermination is a public document.

In accordance with Court Rule 56.2(h)(1), filing of the administrative record index for the remand proceeding will follow under separate cover. Should you have any questions concerning the matter, please contact me at (202) 482-3558.

Respectfully submitted,

/s Paul K. Keith
Paul K. Keith
Assistant Chief Counsel
Office of the Chief Counsel
for Trade Enforcement & Compliance

Attachment

cc:

Daniel Lewis Porter
Curtis, Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Avenue, NW.
Washington, DC 20006

Ned Herman Marshak
Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP
599 Lexington Avenue
36th Floor
New York, NY 10022

John J. Todor
U.S. Department of Justice
Commercial Litigation Branch - Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044

A-570-912
Remand
Slip Op. 23-75
POR: 9/1/2012 – 8/31/2013
**Public Document**
E&C/OIII: BQ

***China Manufacturing Alliance, LLC, et al. v. United States***
**Consol. Court No. 15-00124; Slip Op. 23-75 (CIT 2023)**
**Certain New Pneumatic Off-The-Road Tires from the People's Republic Of China**

# FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND

## I. SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of redetermination in accordance with the May 16, 2023, remand order of the U.S. Court of International Trade (the Court or CIT), in *China Manufacturers Alliance, LLC et al. v. United States*, Consol. Court No. 15-00124, Slip Op 23-75 (CIT 2023) (*Remand Order*). These final results of redetermination concern the final results of the administrative review of the antidumping duty order on certain new pneumatic off-the-road tires from the People's Republic of China (China), covering the period of review (POR) September 1, 2012, through August 31, 2013.[1]

The *Remand Order* effectuates the mandate of the June 10, 2021, decision from the Court of Appeals for the Federal Circuit (Federal Circuit) in *China Manufacturers Alliance, LLC et al. v. United States*, 1 F.4th 1028 (Fed. Cir. 2021) (*China Mfr. Alliance IV*), wherein the Federal Circuit reversed and remanded the CIT's prior decision in: (1) *China Mfr. Alliance I*, in which

[1] *See Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review; 2012-2013*, 80 FR 26230 (May 7, 2015) (*Amended Final Results*); *see also Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012-2013*, 80 FR 20197 (April 15, 2015), and accompanying Issues and Decision Memorandum (IDM) (*Final Results*).

the CIT found that Commerce had to assign mandatory respondent Double Coin Holdings Ltd. (Double Coin) a margin based exclusively on Double Coin's own information, despite Double Coin being found to be part of the non-market economy (NME) entity and assigned the applicable 105.31 percent China-wide entity rate in the *Final Results* and *Amended Final Results*,[2] as well as; (2) the CIT's decision in *China Mfr. Alliance II* to deny Commerce's request for a motion for a partial remand to revisit the issue of the margin calculated for Double Coin in light of the Federal Circuit's decision regarding the China-wide entity in *Diamond Sawblades*,[3] which specifically identified the *China Mfr. Alliance I* decision as incompatible with the practice of applying the NME presumption to companies which fail to rebut the presumption of government control.[4]

Specifically, in *China Mfr. Alliance IV*, the Federal Circuit reversed the CIT's distinction between the facts of the underlying review and the *Diamond Sawblades* decision and resulting finding regarding the inapplicability of the *Diamond Sawblades* decision as a basis to deny Commerce's motion for partial remand in *China Mfr. Alliance II*, instead agreeing with Commerce that there was no material difference between the record upon which Commerce established its China-wide rate in the two cases.[5] Further, the Federal Circuit confirmed essential aspects of the existing NME-entity practice and confirmed that Commerce may apply the country-wide NME entity rate to a respondent that cooperated with an investigation or review

---

[2] *See China Manufacturers Alliance, LLC et al. v. United States,* 205 F. Supp. 3d 1325 (CIT 2017) (*China Mfr. Alliance I*).

[3] *See Diamond Sawblades Mfrs. Coal. v. United States*, 866 F.3d 1304 (Fed. Cir. 2017), at 1313 n.6 (*Diamond Sawblades*).

[4] *See China Manufacturers Alliance, LLC et al. v. United States,* 357 F. Supp. 3d 1364 (CIT 2019) (*China Mfr. Alliance II*).

[5] *See China Mfr. Alliance IV* at 11, n.6 ("{W}e disagree with the Trade Court that the non-cooperation of some identified portion of the PRC-wide entity with the administrative review on appeal was a predicate to our decision in *Diamond Sawblades*, and we accordingly disagree with the Trade Court that Diamond Sawblades can be distinguished from this case on that ground.").

but fails to rebut the presumption of government control, and may do so regardless of whether other members of the NME-wide entity are identified by name and subject to the administrative review at issue.[6] Therefore, the Federal Circuit found Commerce's application of the 105.31 percent China-wide entity rate to Double Coin in the *Final Results* and *Amended Final Results* was not contrary to law and was reasonable on the facts of the case. In doing so, the Federal Circuit overturned the CIT's final judgement in *China Mfr. Alliance III*,[7] which had sustained Commerce's application of the 0.14 percent margin to Double Coin in the *First Remand Redetermination*[8] resulting from the CIT's remand directive in *China Mfr. Alliance I* and subsequent denial of Commerce's motion requesting a partial voluntary remand in *China Mfr. Alliance II*.[9]

In the *Remand Order*, the CIT first examines the scope of the mandate of the Federal Circuit's *China Mfr. Alliance IV* opinion to determine whether any issues remain to be adjudicated, *i.e.*, whether the *China Mfr. Alliance IV* ruling definitively resolved Double Coin's claims that Commerce erred in finding that Double Coin failed to rebut the presumption of Chinese government control over the company's export activities.[10] The CIT finds that, though the Federal Circuit is explicit that the application of the 105.31 percent China-wide entity rate to Double Coin in the *Final Results* and *Amended Final Results* was not contrary to law and was

---

[6] *Id.* at 18 ("Because the conduct of members of a PRC-wide entity is not a condition necessary to sustain an AFA-based PRC-wide entity rate for a cooperating mandatory respondent who joins the PRC-wide entity during a review, this case cannot be distinguished from *Diamond Sawblades*. As we perceive no material difference between the record upon which Commerce established its PRC-wide rate in the two cases, we conclude that Commerce was within the law in assigning the 105.31% PRC-wide entity rate to Double Coin.").
[7] *See China Manufacturers Alliance, LLC et al. v. United States*, Consol. Court No. 15–00124; Slip Op. 19–115 (CIT 2019) (*China Mfr. Alliance III*), and resulting *Notice of Court Decision Not in Harmony With Final Results of Administrative Review and Notice of Amended Final Results of Antidumping Duty Administrative Review*, 84 FR 55553 (October 17, 2019) (*Timken Notice*).
[8] *See Final Results of Redetermination Pursuant to Remand*, *China Manufacturing Alliance, LLC, et al. v. United States*, Court No. 15–00124, Slip Op. 17–12 (CIT 2017), dated June 21, 2017 (*First Remand Redetermination*), available at https://access.trade.gov/resources/remands/17-12.pdf.
[9] *See China Mfr. Alliance IV* at 20.
[10] *See Remand Order* at 3.

reasonable on the facts of the case, the Court agrees with Double Coin that it had not yet reached the merits of Double Coin's substantive challenge to the question of whether Commerce erred in finding that Double Coin failed to rebut the presumption of Chinese government control.[11] On this sole remaining issue, the CIT concludes that Commerce's determination that Double Coin failed to rebut the presumption of government control is supported by substantial record evidence, specifically that Double Coin failed to demonstrate that its board and management were free from influence by its state-controlled parent company.[12] Having permissibly found that Double Coin failed to rebut the presumption of government control over export functions, the CIT explicitly directs Commerce to reach a new determination on remand, which must effectuate the mandate of the Federal Circuit's *China Mfr. Alliance IV* ruling by assigning Double Coin the 105.31 percent China-wide rate.[13]

All issues otherwise raised in litigation and applicable to the other mandatory respondent in the underlying review, Guizhou Tyre Co., Ltd. and Guizhou Tyre Export and Import Co., Ltd. (collectively GTC), have been resolved in prior remand segments. Specifically, in *China Mfr. Alliance III*, the CIT sustained: 1) Commerce's determination in the *China Mfr. Alliance I Remand Redetermination*, to recalculate warehousing expenses for one respondent in the underlying review, Guizhou Tyre Co., Ltd./Guizhou Tyre Import and Export Co., Ltd. (collectively, GTC), to account for an inflation adjustment, and to exclude Shanghai Port Charges from the calculation of the ocean freight surrogate value (SV), on the basis that both recalculations were consistent with the *China Mfr. Alliance I* and were unchallenged in subsequent litigation;[14] and 2) Commerce's determination in the *China Mfr. Alliance II Remand*

---

[11] *Id.* at 4-6.
[12] *Id.* at 6-14.
[13] *Id.* at 14-15.
[14] *See First Remand Redetermination*; *see also China Mfr. Alliance III*; and *Timken Notice*.

*Redetermination* to recalculate export price and constructed export price for GTC without making deductions for irrecoverable value added taxes and adjustment to GTC's brokerage and handling and ocean freight costs for certain double-counted expenses.[15] Therefore, the Federal Circuit's decision in *China Mfr. Alliance IV* reverses the CIT's prior determination only with respect to the appropriate rate applied to Double Coin, but does not reverse the CIT's final judgment in *China Mfr. Alliance III* sustaining the changes to GTC's margin calculation reflected in the *First* and *Second Remand Redetermination*s and reflected in the *Timken Notice*.

## II. FINAL RESULTS OF REDETERMINATION

The explicit directive of the *Remand Order* states that "Commerce must issue a new determination upon remand. That determination must effectuate the mandate of the Court of Appeals in CMA IV by assigning Double Coin the PRC wide rate of 105.31…. ORDERED that Commerce shall issue new determination upon remand that assigns Double Coin the PRC-wide rate of 105.31%."[16] Accordingly, in compliance with the CIT's *Remand Order* and Federal Circuit's determination in *China Mfr. Alliance IV*, we determine the China-wide rate of 105.31 percent to be the final dumping margin applicable to Double Coin.

6/12/2023

X 

Signed by: LISA WANG

Lisa Wang
Assistant Secretary
for Enforcement and Compliance

---

[15] *See Final Results of Redetermination Pursuant to Court Remand*, *China Manufacturing Alliance, LLC, et al. v. United States*, Court No. 15-00124, Slip Op. 19-7 (CIT 2019), dated April 16, 2019 (*Second Remand Redetermination*) available at https://access.trade.gov/resources/remands/19-7.pdf; *see also China Mfr. Alliance III*; and *Timken Notice*.

[16] *See Remand Order* at 15.

**Slip Op. 23-75**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| **CHINA MANUFACTURERS ALLIANCE, LLC and DOUBLE COIN HOLDINGS LTD., et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES,**<br><br>Defendant. | **Before: Timothy C. Stanceu, Judge**<br><br>**Consol. Court No. 15-00124** |
|---|---|

**OPINION AND ORDER**

[Effectuating the mandate of the Court of Appeals for the Federal Circuit and adjudicating the remaining claim in this litigation, in which parties contested an agency determination concluding an administrative review of an antidumping duty order on off-the-road tires from the People's Republic of China]

Dated: May 16, 2023

*Daniel L. Porter*, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, D.C., for plaintiffs China Manufacturers Alliance, LLC and Double Coin Holdings Ltd. With him on the briefs were *James P. Durling, Matthew P. McCullough*, and *Tung A. Nguyen.*

*Ned H. Marshak*, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, D.C., for plaintiffs Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd. With him on the briefs were *Brandon M. Petelin*, *Dharmendra N. Choudhary*, *Andrew T. Schutz*, and *Jordan C. Kahn*.

*John J. Todor*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant. With him on the briefs were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Franklin E. White, Jr.*, Assistant Director. Of counsel was *Paul K.*

*Keith*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

Stanceu, Judge: In this consolidated case, plaintiffs contested a final determination the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") issued upon the conclusion of the fifth periodic administrative review ("Fifth Review") of an antidumping duty order on certain off-the-road pneumatic tires (the "subject merchandise") from the People's Republic of China ("China" or the "PRC").

This Opinion and Order is issued to effectuate the mandate of the Court of Appeals for the Federal Circuit ("Court of Appeals"), CAFC Mandate in Appeal # 20-1159 (Aug. 2, 2021), ECF No. 253, in *China Mfrs. Alliance, LLC v. United States*, 1 F.4th 1028 (Fed. Cir. 2021) ("*CMA IV*") and to adjudicate the sole claim that remains at issue in this litigation.

## I. Background

Background on this case is presented in the prior opinions of this Court and the Court of Appeals and is supplemented herein. *See CMA IV*, 1 F.4th at 1030–35; *China Mfrs. Alliance, LLC v. United States*, No. 19-115, 2019 WL 4165274, at *1–3 (Ct. Int'l Trade Sept. 3, 2019) ("*CMA III*"); *China Mfrs. Alliance, LLC v. United States*, 43 CIT __, __, 357 F. Supp. 3d 1364, 1365–68 (2019) ("*CMA II*"); *China Mfrs. Alliance, LLC v. United States*, 41 CIT __, __, 205 F. Supp. 3d 1325, 1329–32 (2017) ("*CMA I*").

The administrative determination contested in this case, referred to herein as the "Final Results," appeared in two Federal Register publications. *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review; 2012-2013*, 80 Fed. Reg. 26,230 (Int'l Trade Admin. May 7, 2015) (correcting a ministerial error in an earlier published decision, *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012-2013*, 80 Fed. Reg. 20,197 (Int'l Trade Admin. Apr. 15, 2015)).

The plaintiffs in this case are China Manufacturers Alliance LLC and Double Coin Holdings Ltd. (collectively, "Double Coin"), and Guizhou Tyre Co., Ltd. and Guizhou Tyre Export and Import Co., Ltd. (collectively, "GTC"). Double Coin and GTC were the exporters/producers that Commerce selected as the mandatory respondents in the Fifth Review. Defendant is the United States.

## II. Discussion

All issues pertaining to the claims brought by GTC in this litigation have been resolved. As to Double Coin, the court first must interpret the scope of the mandate of the Court of Appeals in *CMA IV*, on which Double Coin and defendant United States disagree, as shown by submissions they made to the court following the issuance of that mandate. The court then must decide what issues, if any, remain to be litigated as to the claims of Double Coin.

### A. Double Coin's Claim Concerning Control by the Government of the PRC Has Not Been Adjudicated

Double Coin argues that remaining to be adjudicated is its claim that Commerce erred in finding that Double Coin failed to rebut the Department's presumption that Double Coin is controlled by the government of the PRC. Joint Status Report and Proposed Briefing Schedule 1–3 (Sept. 17, 2021), ECF No. 255. Disagreeing, defendant argues that this claim already has been adjudicated in its favor.

According to defendant, the Court of Appeals held in *CMA IV* that "Commerce's application of the 105.31% PRC-wide entity rate to Double Coin was not contrary to law and was reasonable on the facts of this case." *Id*. at 4 (quoting *CMA IV*, 1 F.4th at 1040). Defendant interprets this statement in the *CMA IV* opinion to mean that the Court of Appeals has adjudicated the claim at issue on the merits and that Commerce, on remand, must assign Double Coin the 105.31% rate Commerce determined for the PRC-wide entity in the Final Results, which rate the Court of Appeals, reversing this Court's decision and judgment in *CMA III*, ruled was according to law as applied to that entity. If defendant is correct, no issues remain to be decided in this litigation. If Double Coin is correct, then the court now must adjudicate its claim contesting the Department's determination that Double Coin failed to rebut the presumption of control by the PRC government and the Department's resulting decision to include Double Coin within the PRC-wide entity. Were Double Coin to prevail on that claim, Commerce would be required on remand to assign to Double Coin the rate Commerce calculated for Double

Coin in the Final Results, which was a *de minimis* rate of 0.14%. *Issues and Decision Memorandum for Final Results of Antidumping Duty Administrative Review: Certain New Pneumatic Off-the-Road Tires from the People's Republic of China; 2012-2013* at 12 (Int'l Trade Admin. Apr. 8, 2015), P.R. 293 ("*Final I&D Mem.*").[1]

The court concludes that Double Coin is correct as to the interpretation of the mandate of the Court of Appeals. *CMA IV* held that it is permissible for Commerce to determine a "country-wide NME [nonmarket economy] entity rate" and to "assign such a rate to the unitary group of exporters in an NME country that have failed to rebut the presumption of government control." *CMA IV*, 1 F. 4th at 1039. Commerce determined that Double Coin failed to rebut the presumption and thus was among the unitary group of exporters, but that determination, which Double Coin contested in one of the claims it asserted in this action, has not been adjudicated by this Court. As defendant acknowledges, this Court "did not make any findings in *CMA I* regarding Double Coin's substantial evidence challenge to Commerce's conclusion that Double Coin failed to rebut the presumption of *de facto* Chinese government control." Def.'s Resp. to Pls.' Mot. for J. on the Admin. R. 5 (Feb. 4, 2022), ECF No. 264; *see CMA I*, 41 CIT at __, 205 F. Supp. 3d at 1344. The issue of whether substantial evidence supported that agency decision was not before the Court of Appeals in *CMA IV*, this Court not having

[1] References to public documents in the Joint Appendix (Mar. 11, 2022), ECF Nos. 266 (Public), 267 (Conf.) are cited as "P.R. __."

adjudicated Double Coin's claim contesting it. Accordingly, the judgment of this Court set aside by *CMA IV* was not a judgment on the merits of Double Coin's claim contesting the Department's determination that Double Coin failed to rebut the presumption of government control. Judgment (Sept. 3, 2019), ECF No. 243. The court, therefore, proceeds to adjudicate that claim as asserted in support of Double Coin's motion for judgment on the agency record.

The parties have submitted updated briefing on Double Coin's motion. Opening Br. of Pls. China Manufacturing Alliance, LLC and Double Coin Holdings, Ltd. (Dec. 6, 2021), ECF Nos. 260 (Conf.), 261 (Public) ("Double Coin's Br."); Pls.' Rule 56.2 Mot. for J. on the Agency R. (Dec. 6, 2021), ECF Nos. 260 (Conf.), 261 (Public). Defendant has responded in opposition to this motion, Def.'s Resp. to Pls.' Mot. for J. on the Admin. R. (Feb. 4, 2022), ECF No. 264, and plaintiffs have replied, Reply Br. of Pls. China Manufacturers Alliance, LLC and Double Coin Holdings, Ltd. (Feb. 25, 2022), ECF No. 265.

**B. The Department's Determination that Double Coin Failed to Rebut the Presumption of Government Control Is Supported by Substantial Evidence**

In determining that Double Coin failed to rebut the presumption of *de facto* control over its export functions by the Chinese government, Commerce relied principally on Double Coin's corporate ownership structure. Commerce found that Double Coin's majority shareholder was the Huayi Group ("Huayi"), which held a 65.66% ownership share. *Decision Memorandum for Preliminary Results of Antidumping*

*Duty Administrative Review: Certain Pneumatic Off-the-Road-Tires from the People's Republic of China, 2012-2013* at 10 (Int'l Trade Admin. Sept. 30, 2014), P.R. 259 ("*Prelim. Decision Mem.*"); *Final I&D Mem.* at 16 (incorporating findings from *Prelim. Decision Mem.*). Commerce also found that Huayi is 100% owned by the Shanghai State-owned Assets Supervision and Administration Commission of the State Council ("SASAC") and that SASAC "is a central governmental body that oversees important state assets." *Prelim. Decision Mem.* at 10. The record also contains evidence that no other shareholder held more than a one percent ownership share. *2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Analysis of the Preliminary Results Margin Calculation for Double Coin* at 11 (Int'l Trade Admin. Sept. 30, 2014), P.R. 264 (citing *Double Coin's Section A Response* at 2–3 (Jan. 22, 2014), P.R. 48, 55).

Commerce also reached findings addressing what it considered to be the effect of the level of government ownership in Double Coin. Commerce found that "as Huayi is the controlling shareholder, it is the entity controlling Double Coin's board and management." *Final I&D Mem*. at 15. It also found that "Double Coin's Articles of Association demonstrate that a majority shareholder—and particularly one with a 65.66 percent ownership—has near complete control over any shareholder decisions, including decisions which may affect the management and operations of the company." *Id*. at 16. Commerce found, in summary, that "there is undeniable evidence that the

100 percent SASAC-owned majority-owner of Double Coin exerts considerable influence over the board of directors (and, thus, the management and operations of the company), and that the factual record does not provide sufficient information to rebut the presumption of government control." *Id*. at 18.

In support of its motion for judgment on the agency record, Double Coin acknowledges that Huayi "has significant influence in the constitution of the board, and even in the selection of Double Coin's management" but argues that "such right does not automatically result in control by Huayi over the board and management." Double Coin's Br. 36. Double Coin argues that despite the majority government ownership, it retained control over its own business activities, and, in particular, its export activities. *Id*. at 10, 39–50. Double Coin points out that its U.S. subsidiary, China Manufacturers Alliance, set prices directly with U.S. customers. *Id*. at 44. Double Coin also argues that Commerce, although saying it applied a four-factor test to make its determination, departed from its established policy by regarding its decision on the third factor as the controlling factor, which was whether a respondent has autonomy from the government in making decisions regarding the selection of management.[2] *Id*. at 13–15.

---

[2] Concerning its four-factor test, Commerce explained:

> Typically, the Department considers four factors in evaluating whether each respondent is subject to *de facto* government control of its export functions: (1) whether the export prices are set by or are subject to the approval of a government agency; (2) whether the respondent has

(continued . . .)

Double Coin's remaining claim turns on the issue of the level of discretion Commerce may exercise in determining whether a majority-government-owned respondent has rebutted its presumption of *de facto* government control. The court concludes that this discretion is considerably broad.

The Court of Appeals repeatedly has affirmed the Department's authority to apply a rebuttable presumption of government control, even to a cooperative mandatory respondent, and to apply to that respondent a rate selected for the PRC-wide entity if the presumption is not rebutted. *CMA IV*, 1 F.4th at 1039; *Diamond Sawblades Mfrs. Coal. v. United States*, 866 F.3d 1304 (Fed. Cir. 2017). Commerce has not grounded its exercise of that authority in a specific provision of the Tariff Act or implementing regulations. *See Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*, No. 23-14, 2023 WL 1867677, at *9 (Ct. Int'l Trade Feb. 9, 2023). Thus, there is no statutory language, legislative history, or regulatory language or preamble to guide a court when ruling on the Department's decision to apply its methodology. According

(. . . continued)

> authority to negotiate and sign contracts and other agreements; (3) whether the respondent has autonomy from the government in making decisions regarding the selection of management; and (4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses.

*Decision Mem. for Preliminary Results of Antidumping Duty Administrative Review: Certain Pneumatic Off-the-Road-Tires from the People's Republic of China, 2012-2013* at 8 (Int'l Trade Admin. Sept. 30, 2014), P.R. 259 (citing two previous administrative determinations).

to that methodology as applied in the Fifth Review, the presumption of government control over export functions, as a general matter, is not rebutted if a board of directors under the control of a majority government shareholder had the authority and potential to select and oversee company management.

Untethered by statutory or regulatory standards, Commerce was free to change its interpretation and application of the four-factor test at any time, so long as it provided a reasonable explanation for a departure from past practice. *See, e.g.*, *Atchison, T. & S. F. Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973); *Allegheny Ludlum Corp. v. United States*, 346 F.3d 1368, 1373 (Fed. Cir. 2003) (citing *Atchison*, 412 U.S. at 808) ("Commerce is permitted to deviate from this past practice, at least where it explains the reason for its departure," where the "past practice" was "not a burden imposed by statute or regulation" but was merely "a general practice of Commerce."). For the Final Results, Commerce explained that it revised its practice in response to the decision of this Court in *Advanced Tech. & Materials Co. v. United States*, 36 CIT 1576, 1593, 885 F. Supp. 2d 1343, 1359 (2012), *aff'd*, 581 F. App'x 900 (Fed. Cir. 2014) (reasoning that absent proof otherwise, management of a company with majority government ownership should be presumed "to be beholden to the board that controls their pay . . . ."). *Final I&D Mem.* at 18 n.64. Although the decisions of this Court and the Court of Appeals in the *Advanced Tech. & Materials* litigation are not precedential, nothing precluded Commerce from being guided by them in revising the practice by

which it applies its *de facto* test. For these reasons, the court is not persuaded by Double Coin's argument that Commerce exceeded its discretion by giving controlling weight to its third factor on the record facts of the review.

Nor is the court persuaded by Double Coin's argument that substantial evidence did not support a finding that Huayi actually controlled day-to-day business decisions during the period of review, including decisions on the pricing of exports. Under its revised *de facto* test, Commerce need not base its decision entirely on evidence, or the lack thereof, of direct government control of the day-to-day general business operations, or the export-related operations in particular, of a majority-government-owned corporation. Instead, Commerce may consider whether there is indirect, or potential, control of such day-to-day operations because of a government-influenced board of directors that has the authority to appoint and oversee a company's management. That is what Commerce did for the Final Results. *Final I&D Mem.* at 16 (emphasis added) (finding "near complete control over any shareholder decisions, including decisions which *may* affect the management and operations of the company.").

Moreover, an agency may draw reasonable inferences from the record evidence considered as a whole. *SeAH Steel VINA Corp. v. United States*, 950 F.3d 833, 845 (Fed. Cir. 2020) (quoting *Matsushita Elec. Indus. Co., Ltd. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) for the principle that "substantial evidence includes 'reasonable

inferences from the record'").  Under its revised test, it sufficed that Huayi, a

government entity, was the majority shareholder, that no other shareholder had more

than a one percent share, and, as Double Coin itself acknowledges, that Huayi had

significant influence in the constitution of the board and the selection of Double Coin's

management.  From these facts, Commerce reasonably inferred that an entity of the

Chinese government, among all shareholders, had outsized influence over all business

decisions of Double Coin.

Double Coin argues that despite Huayi's significant influence in the constitution

of the board and selection of management, Huayi did not "control" the board and

management because the board must act in the best interest of Double Coin, because

minority shareholders may bring suit against board members who fail such duty, and

because of the presence of "independent" board members.  Double Coin's Br. 36.

Double Coin explains that independent board members are required to act without the

interference of the principal shareholders, or of persons in actual control or holding a

material interest in, the company.  *Id*. at 37 (citing Article 130 of Double Coin's Articles

of Association ("AoAs"), P.R. 192).  It points out that three of the seven directors were

independent directors.  *Id*. at 35 n.4.  Double Coin points to safeguards such as

Article 35 of the AoAs, which recognizes the right of a minority shareholder to bring

suit against a member of the board or senior management who acts against the interests

of the company and thereby breaches applicable law or Double Coin's AoAs.  *Id*. at 34.

Double Coin also mentions the right of holders of 10% of shares to call a shareholders' meeting, and of shareholders of 3% of shares to raise a proposal at a shareholders' meeting, adding that Huayi's shares would be excluded from voting in the event of a conflict of interest on a decision under debate. *Id*.

Double Coin's arguments are unconvincing because they are based on a presumption that the effect of government control is manifested only when there is conflict or "interference" between the governmental and commercial interests of a company. Double Coin fails to explain why Commerce, when examining the effect of government ownership in the context of a company's governing structure, was required to construe the influence and effect of government control so narrowly. Implicit in the Department's inquiry under its revised four-factor test is that a government-controlled business enterprise differs fundamentally from one that is free of government control with respect to its export functions. Because of the breadth of the Department's discretion in implementing its test for government control of export functions, the court has no reason to conclude that Commerce may not do so. In its narrow focus on "conflict" or "interference" with commercial interests, Double Coin fails to recognize that a government-controlled company may have, for example, commercial advantages, as well as commercial disadvantages, compared to companies that are independent of such control. On the evidentiary record of the Fifth Review, Commerce reasonably could conclude that Double Coin failed to demonstrate independence from aspects of

government control over its business operations in general.  Commerce reasonably

could infer that this level of government control was inconsistent with the independent

exercise of decision-making over export functions.

### III.  CONCLUSION AND ORDER

Commerce centered its inquiry on the influence of a government-controlled

majority shareholder on the selection and supervision of management.  That inquiry is

not necessarily confined to a consideration of evidence of government control over

management's day-to-day business decisions.  In the absence of a statute or regulation

that defines or otherwise governs this inquiry, the court lacks a basis to conclude that

Commerce acted contrary to law in exercising its broad discretion in this way.

The court concludes, further, that the record evidence as a whole supported the

Department's findings, and reasonable inferences, which in the aggregate showed that

Double Coin failed to demonstrate that it was free of the influence of Huayi on its board

and, indirectly, on its management.  While Double Coin put forth certain evidence of

independence of government control, including, in particular, the ability of its U.S.

affiliate to set prices of subject merchandise, it did not show that it was free from all

material aspects of government control that emanated from the authority of the board

to select and oversee the company's management personnel.  Therefore, the court

sustains as supported by substantial record evidence the determination that Double

Coin failed to rebut the presumption of control of export functions, when viewed according to the methodology Commerce permissibly applied in the review.

Finally, Commerce permissibly having found that Double Coin did not rebut its presumption of government control of its export functions, and there being no other issues to be decided in this litigation by either Commerce or the court, Commerce must issue a new determination upon remand. That determination must effectuate the mandate of the Court of Appeals in *CMA IV* by assigning Double Coin the PRC-wide rate of 105.31%, which will allow the court to enter judgment concluding this litigation.

Therefore, upon consideration of all papers and proceedings had herein, and upon due deliberation, it is hereby

**ORDERED** that Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record (Dec. 6, 2021), ECF Nos. 260 (Conf.), 261 (Public) be, and hereby is, denied; it is further

**ORDERED** that Commerce shall issue a new determination upon remand that assigns to Double Coin the PRC-wide rate of 105.31%; and it is further

**ORDERED** that Commerce shall issue the required redetermination within 30 days of the issuance of this Opinion and Order.

/s/ Timothy C. Stanceu
Timothy C. Stanceu, Judge

Dated: May 16, 2023
New York, New York

# United States Court of Appeals for the Federal Circuit

---

**CHINA MANUFACTURERS ALLIANCE, LLC, DOUBLE COIN HOLDINGS LTD.,**
*Plaintiffs-Appellees*

**GUIZHOU TYRE CO., LTD., GUIZHOU TYRE IMPORT AND EXPORT CO., LTD.,**
*Plaintiffs*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

---

2020-1159

---

Appeal from the United States Court of International Trade in Nos. 15-cv-00124-TCS, 15-cv-00128-TCS, Chief Judge Timothy C. Stanceu.

---

Decided: June 10, 2021

---

JAMES P. DURLING, Curtis, Mallet-Prevost, Colt & Mosle LLP, Washington, DC, argued for plaintiffs-appellees. Also represented by CHRISTOPHER A. DUNN, DANIEL L. PORTER; GENE C. SCHAERR, Schaerr Jaffe LLP, Washington, DC.

JOHN JACOB TODOR, Commercial Litigation Branch,

Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellant. Also represented by BRIAN M. BOYNTON, JEANNE DAVIDSON, FRANKLIN E. WHITE, JR.; PAUL KEITH, Office of the Chief Counsel for Trade Enforcement and Compliance, United States Department of Commerce, Washington, DC.

---

Before LOURIE, CLEVENGER, and HUGHES, *Circuit Judges*.

CLEVENGER, *Circuit Judge*.

The United States appeals from the final judgment of the United States Court of International Trade ("Trade Court"), which held that the Department of Commerce ("Commerce") could not apply an existing China-wide antidumping duty rate, applicable to all Chinese exporters that had not demonstrated independence from the Chinese government, to Double Coin Holdings Ltd. ("Double Coin"), even though it is undisputed that Double Coin failed to demonstrate independence from the Chinese government. For the reasons set forth below, we reverse the final judgment of the Trade Court and remand for further proceedings consistent with this opinion.

BACKGROUND

Initial Investigation and Four Administrative Reviews

The background to this appeal begins with Commerce's antidumping investigation into "Certain New Pneumatic Off-The-Road Tires from the People's Republic of China." Commerce's Final Determination in this investigation encompassed a period of investigation from October 1, 2006 through March 31, 2007 and was published on July 15, 2008. *Certain New Pneumatic Off–The-Road Tires from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 Fed. Reg. 40,485, 40,485–92 (Dep't of Commerce July 15, 2008); *see*

*also Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Notice of Amended Final Affirmative Determination of Sales at Less Than Fair Value and Antidumping Duty Order*, 73 Fed. Reg. 51,624 (Dep't of Commerce Sept. 4, 2008). In antidumping investigations concerning countries with non-market economies ("NMEs"), such as the People's Republic of China ("PRC"), Commerce applies a presumption that all exporters are subject to government control. Our court has previously approved Commerce's application of a presumption of government control over exporters in NME countries, as well as Commerce's use of a single antidumping rate for an NME-wide entity composed of companies that have not demonstrated their independence from government control. *See Sigma Corp. v United States*, 117 F.3d 1401, 1405–06 (Fed. Cir. 1997). In its Final Determination, Commerce identified Double Coin as among the companies that had overcome the presumption of government control and assigned Double Coin a separate weighted-average antidumping margin.[1] The "PRC-wide entity," comprising all exporters that failed to overcome the presumption of government control (i.e., all exporters not individually listed in Commerce's Final Determination) was assigned a rate of 210.48%. Commerce calculated this rate from facts available with an adverse inference ("adverse facts available" or "AFA"), based on Commerce's determination that the PRC-wide entity had "failed to cooperate [with Commerce's investigation] to the best of its ability" because the record indicated that there were many exporters of subject merchandise who failed to respond to Commerce's questionnaires. *Certain New Pneumatic Off-The-Road Tires from the People's Republic of China; Preliminary Determination of Sales at Less Than Fair Value and Postponement*

[1] Commerce initially assigned Double Coin a margin of 9.48%. 73 Fed. Reg. at 40,489. This margin was subsequently amended to 12.91%. 73 Fed. Reg. at 51,626.

*of Final Determination*, 73 Fed. Reg. 9278, 9285 (Dep't of Commerce Feb. 20, 2008); 73 Fed. Reg. at 40,488.

Commerce subsequently conducted three annual administrative reviews of the antidumping duty order.[2] Double Coin's individual assigned antidumping rate remained in place following each of these reviews. The PRC-wide entity rate remained at 210.48%. A fourth annual antidumping review was initiated by Commerce, but was rescinded before it was conducted after all parties that requested a review timely withdrew their requests.[3]

---

[2] *See Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Final Results of the 2008–2009 Antidumping Duty Administrative Review*, 76 Fed. Reg. 22,871 (Dep't of Commerce April 25, 2011) (period of review February 20, 2008 through August 31, 2009); *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Final Results of the 2009–2010 Antidumping Duty Administrative Review and Final Rescission, in Part*, 77 Fed. Reg. 14,495 (Dep't of Commerce March 12, 2012) (period of review September 1, 2009 through August 31, 2010); *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Rescission, in Part; 2010–2011*, 78 Fed. Reg. 22,513 (Dep't of Commerce April 16, 2013) (period of review September 1, 2010 through August 31, 2011).

[3] *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Rescission of Antidumping Duty Administrative Review; 2011–2012*, 78 Fed. Reg. 33,059 (Dep't of Commerce June 3, 2013) (review period September 1, 2011 through August 31, 2012).

Fifth Administrative Review and
Trade Court Proceedings

Notice of initiation of the fifth administrative review (the review on appeal in this case) was published in November 2013. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part*, 78 Fed. Reg. 67,104 (Dep't of Commerce Nov. 8, 2013). Double Coin was selected as a mandatory respondent in this review. *Id.* at 67108; *see also* J.A. 168–226, 168[4] (Issues and Decision Memorandum for Final Results of Antidumping Duty [Fifth] Administrative Review). Double Coin fully cooperated with Commerce during the course of the fifth administrative review.

Based on the information Double Coin submitted to Commerce during the review, Commerce initially calculated a *de minimis* 0.14% final antidumping margin for Double Coin. J.A. 371. However, Commerce also determined that Double Coin had "failed to demonstrate absence of *de facto* government control over export activities due to the fact that its controlling shareholder is wholly owned by the State-owned Assets Supervision and Administration Commission of the State Council and the significant level of control this majority shareholder wields over the respondent's Board of Directors," and was thus not eligible for its separate rate.[5] *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2012–2013*, 79 Fed. Reg. 61,291, 61,293 (Dept. of Commerce Oct. 10, 2014); *see also Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Amended Final*

---

[4]     Citations to "J.A. ___" refer to the joint appendix filed by the parties to this appeal.

[5]     Double Coin does not appeal Commerce's factual determination that Double Coin failed to demonstrate *de facto* independence from Chinese government control.

*Results of Antidumping Duty Administrative Review; 2012–2013*, 80 Fed. Reg. 26,230 (Dep't of Commerce May 7, 2015). Commerce's policy, which we have approved, is that exporters that fail to demonstrate independence from government control do not qualify for a separate rate. *Transcom, Inc. v. United States*, 294 F.3d 1371, 1373 (Fed. Cir. 2002); *see also* 78 Fed. Reg. at 67,111 n.10 (*Initiation Notice* of fifth administrative review, stating that exporters who do not qualify for a separate rate will be deemed part of a single China-wide entity).

Commerce's practice in place at the time of the fifth administrative review was to conditionally review the NME entity during an administrative review of an antidumping duty order if one or more of the exporters subject to the review did not demonstrate that it was separate from the NME entity (i.e., did not overcome the presumption of government control). J.A. 178–79. Thus, Commerce's *Initiation Notice* for the fifth administrative review put the PRC entity in this case on notice that it was conditionally subject to the review: "If one of the above-named companies does not qualify for a separate rate, all other exporters of Certain New Pneumatic Off-the-Road Tires [from] the PRC who have not qualified for a separate rate are deemed to be covered by this review as part of the single PRC entity of which the named exporters are a part." *See* 78 Fed. Reg. at 67,111 n.10.

Following from Double Coin's failure to overcome the presumption of control by the Chinese government, the PRC-wide entity (including Double Coin) became subject to the fifth administrative review. J.A. 179. Commerce thus reviewed the assigned PRC-wide antidumping rate, which had previously been set at 210.48%. Because Double Coin fully cooperated with Commerce and had provided Commerce with its verified sales and production data (resulting in the calculated rate of 0.14%), but no other portion of the PRC entity had provided data to Commerce, Commerce determined that it was "able to calculate a margin for an

unspecified portion of a single PRC-wide entity [i.e. Double Coin], but cannot do so for the remaining unspecified portion of the entity [i.e., any and all other exporters in the PRC-wide entity]." 79 Fed. Reg. at 61,293. Commerce thus performed a simple average of the previous PRC-wide rate and the calculated rate for Double Coin, to arrive at a final rate of 105.31% applicable to the PRC-wide entity (including Double Coin). 80 Fed. Reg. at 26,231.

Multiple companies, including Double Coin, challenged the Final Results of the fifth administrative review before the Trade Court. *See China Mfrs. Alliance, LLC v. United States*, 205 F. Supp. 3d 1325 (Ct. Int'l Trade 2017) (*CMA I*). In *CMA I*, the Trade Court concluded that because Commerce had selected Double Coin to participate in the review as a mandatory respondent and had calculated an individual rate for Double Coin (prior to determining that Double Coin failed to demonstrate independence from the Chinese Government), the antidumping statute 19 U.S.C. § 1677f-1(c) required Commerce to assign the calculated individual rate of 0.14% to Double Coin, notwithstanding Commerce's policy to assign the PRC-wide entity rate to manufacturers that failed to demonstrate independence from the Chinese government. 205 F. Supp. 3d at 1339–41. The Trade Court determined that, because Double Coin fully cooperated with Commerce's investigation, Commerce could not lawfully carry forward against Double Coin the adverse inferences built into the original PRC-wide 210.48% rate, because to do so would apply a punitive rate to a cooperating party. 205 F. Supp. 3d at 1334–41. The Trade Court held that Commerce could not permissibly assign any rate other than the 0.14% calculated rate to Double Coin, and remanded the case to Commerce for further proceedings. In its Remand Redetermination, Commerce assigned the *de minimis* 0.14% rate to Double Coin under respectful protest. J.A. 705. Various parties again contested the Remand Redetermination before the Trade Court. J.A. 72–73.

The Intervening *Diamond Sawblades* Decision

After Commerce issued its Remand Redetermination but before the Trade Court issued its opinion in *China Mfrs. Alliance, LLC v. United States*, 357 F. Supp. 3d 1364 (Ct. Int'l Trade 2019) (*CMA II*) reviewing the challenges to the Remand Redetermination, we issued our opinion in *Diamond Sawblades Manufacturers Coalition v. United States*, 866 F.3d 1304 (Fed. Cir. 2017), which reviewed Commerce's first administrative review of the underlying antidumping order. Like this case, *Diamond Sawblades* involved a fully cooperating non-independent exporter who was assigned an antidumping rate as part of the PRC-wide entity, which rate was based in part on AFA.

Specifically, *Diamond Sawblades* concerned an antidumping rate assigned to a group of affiliated Chinese exporters of diamond sawblades, the group identified as the Advanced Technology & Materials Co. ("ATM"). In the original investigation that led to the antidumping order, ATM was determined to have overcome the presumption of Chinese government control, was individually investigated, and was assigned an individual antidumping rate of 2.50%. The Diamond Sawblades Manufacturers Coalition, on behalf of the United States domestic industry, appealed the final antidumping order, and the Trade Court remanded the case for further explanation of the test used to determine independence, and other evidence of record. On remand, Commerce again found ATM independent of Chinese government control, and hence entitled to its 2.50% antidumping rate. After yet another appeal to the Trade Court, the case was again remanded for further review of ATM's status. On that remand, Commerce determined that ATM had failed to rebut the presumption of government control and was thus not qualified for its individually investigated rate. ATM unsuccessfully appealed that determination to the Trade Court, and then to this court, which affirmed Commerce's determination without opinion under our Rule 36. *Advanced Tech. & Materials Co.*

*v. United States*, 541 F. App'x 1002 (Fed. Cir. 2013). While ATM's status was *sub judice* before the Trade Court and this court, Commerce's first administrative review of the diamond sawblades antidumping order commenced. In the initial proceedings Commerce designated ATM as a mandatory respondent, found it to be independent of Chinese government control, and with ATM fully cooperating, assigned ATM an individually investigated antidumping rate of 0.15%. After judicial confirmation that ATM was not independent, Commerce determined that ATM was disqualified from its 0.15% individually investigated rate. The then-governing PRC-wide entity rate for non-independent exporters (established through AFA in the original investigation) was 164.09%. Commerce reviewed and updated the existing PRC-wide rate in the first administrative review proceedings by calculating a simple average of the existing rate with ATM's 0.15% rate to set a new PRC-wide rate of 82.12%. *See Diamond Sawblades*, 866 F.3d at 1307–11 (citing *Diamond Sawblades Mfrs. Coal. v. United States (Remand Redetermination)* at 9, Court No. 13-00078 (Dep't of Commerce Apr. 10, 2015), http://enforcement.trade.gov/remands/14-50.pdf).

ATM unsuccessfully appealed to the Trade Court, which affirmed Commerce's application of the PRC-wide rate to ATM. ATM then appealed to this court. In deciding *Diamond Sawblades*, we rejected ATM's argument that, because ATM cooperated with the first administrative review, Commerce could not apply a PRC-entity rate to ATM which was derived in part from a rate based on AFA. *Id*. at 1310–11. We held that because it had failed to rebut the presumption of government control, ATM was subject to the PRC-wide rate, and that the calculation of the PRC-wide rate using AFA did not change this result. *Id*. at 1312–13. Over ATM's challenge to application of an AFA-based rate to it, we expressly approved as lawful "Commerce's use of the previously established PRC-wide entity rate to calculate an updated PRC-wide entity rate that

applies to ATM in this administrative review . . . ." *Id.* at 1314. We further observed that "[t]he CIT . . . concluded that Commerce's decision was a review of the PRC-wide entity *rate* within the meaning of 19 U.S.C. § 1675(a), not a review of the makeup of the PRC-wide entity." *Id.* at 1309–10 (internal citation omitted). Though "Commerce expressly found that the PRC-wide entity included ATM and 21 other companies[,]" "Commerce did not address the cooperation—or lack thereof—of other companies that make up the PRC-wide entity." *Id.* at 1313–14. It was thus ATM's failure to rebut the presumption of government control, not the composition of the PRC-wide entity or the cooperation or non-cooperation of ATM or any other potential member of the PRC-wide entity, that validated Commerce's determination to apply the AFA-derived PRC-wide rate to ATM.

Post-Remand Proceedings in Trade Court

Returning to the case here now on appeal, various parties filed comments on Commerce's Remand Redetermination (issued pursuant to the Trade Court's opinion in *CMA I*). Double Coin did not comment on the Remand Redetermination. *CMA II*, 357 F. Supp. 3d at 1369. The government also filed a motion before the Trade Court seeking a partial remand for Commerce to revisit the issue of Double Coin's margin in light of our intervening decision in *Diamond Sawblades*, which Double Coin opposed. *Id.* at 1367–68. Unsurprisingly, the government viewed our holding in *Diamond Sawblades* to foreclose any challenge Double Coin could mount against application of the PRC-wide rate to it.

The Trade Court correctly understood our decision in *Diamond Sawblades* to authorize Commerce to assign a partially AFA-based PRC-wide entity rate to a fully cooperating exporter selected as a mandatory respondent that fails to rebut the presumption of government control. *Id.* at 1382. Nonetheless, the Trade Court perceived a difference between the facts in this case and in *Diamond Sawblades*

that prohibited Commerce from assigning the 105.31% PRC-wide entity rate to Double Coin. In this case, the Trade Court emphasized that all parties to the administrative review cooperated with Commerce, and that Commerce "did not find the PRC-wide entity, or any portion of it, to be an uncooperative respondent in the [fifth administrative] review." *Id.* at 1380. But in *Diamond Sawblades*, the PRC-wide entity included twenty-one companies that did not cooperate in the first administrative review. *Id.* at 1383 n.11. The Trade Court treated our decision in *Diamond Sawblades* to condition our approval of the AFA-based PRC-wide entity rate for ATM on the lack of cooperation of part of the PRC-wide entity in that case, and thus to make our decision in *Diamond Sawblades* inapplicable to the situation where all parties to a review fully cooperate with Commerce. Because no party to the review proceeding in this case failed to cooperate so as to warrant lawful application of an AFA-based rate, the Trade Court held that the PRC-wide rate must be fixed at the 0.14% rate individually investigated for Double Coin. Having distinguished *Diamond Sawblades*, the Trade Court denied the government's motion for partial remand on the ground that the only permissible rate for Double Coin is the 0.14% rate previously mandated by the Trade Court. *Id.* at 1382.[6]

The case was again remanded to Commerce on matters related to exporters other than Double Coin. Commerce's second Remand Redetermination was again appealed to the Trade Court, which affirmed all of Commerce's

[6] As discussed below, we disagree with the Trade Court that the non-cooperation of some identified portion of the PRC-wide entity with the administrative review on appeal was a predicate to our decision in *Diamond Sawblades*, and we accordingly disagree with the Trade Court that *Diamond Sawblades* can be distinguished from this case on that ground.

decisions, including the 0.14% rate assigned to Double Coin. *China Mfrs. Alliance, LLC v. United States*, No. 15-00124, 2019 WL 4165274 (Ct. Int'l Trade Sept. 3, 2019) (*CMA III*).

The United States timely appeals from the Trade Court's final judgment in *CMA III*. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5). For the reasons discussed below, we reverse the final judgment of the Trade Court.

## Discussion

We apply the same standard of review as was applied by the Trade Court, without deference. *Dupont Teijin Films USA, LP v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005); *SNR Roulements v. United States*, 402 F.3d 1358, 1361 (Fed. Cir. 2005). Accordingly, we uphold Commerce's determination unless it is "unsupported by substantial evidence . . . or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *see Dupont Teijin*, 407 F.3d at 1215; *SNR Roulements*, 402 F.3d at 1361. Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951).

The question before the court is whether Commerce is justified in assigning the 105.31% PRC-wide entity rate to Double Coin in this case. The government argues that our decision in *Diamond Sawblades* governs this case because, in its view, the record in that case is not materially different from the record in this case; consequently, Commerce lawfully applied a carried-forward PRC-wide rate to an exporter who failed to rebut the presumption of government control. Double Coin counters, arguing that the records of the two cases materially differ. In this case, the only identified member of the PRC-wide entity is Double Coin, but in the *Diamond Sawblades* first annual review, there were other members of the PRC-wide entity identified in the

Case 1:15-cv-00124-TCS Document 25 Filed 06/10/21 Page 13 of 20
Case: 23-1959 Document: 14 Page: 113 Filed: 11/28/2023

review. According to Double Coin, the permissibility of applying the carried-forward PRC-wide rate in this case hinges on the presence of such other members of the PRC-wide entity, and absent any such other members in this case, the Trade Court correctly blocked application of the PRC-wide rate and instead required application of the 0.14% rate to Double Coin. For the reasons set forth below, we reject the ground relied upon by the Trade Court to distinguish our decision in *Diamond Sawblades*, and also reject as immaterial the distinction Double Coin draws between this case and *Diamond Sawblades*. Consequently, no basis has been argued to preclude Commerce from applying to this case the same analysis and rationale it used in *Diamond Sawblades* to sustain the applicable PRC-wide entity rate.

Legal Authority for NME Entity-Wide Antidumping Rates

Double Coin argues that Congress has specifically provided for only two kinds of rates in antidumping investigations. For support, it cites 19 U.S.C. § 1673d(c)(1)(B)(i), which provides in subpart (I) for a rate "for each exporter and producer individually investigated," and in subpart (II) for "the estimated all-others rate for all exporters and producers not individually investigated." Double Coin acknowledges 19 C.F.R. § 351.107(d), an antidumping proceeding regulation, which reads as follows:

> (d) *Rates in antidumping proceedings involving nonmarket economy countries*. In an antidumping proceeding involving imports from a nonmarket economy country, "rates" may consist of a single dumping margin applicable to all exporters and producers.

Because Congress has expressly provided for only two kinds of rates in antidumping proceedings, Double Coin argues that this regulation cannot serve as authority to create and impose a third kind of rate, to be applicable to exporters or producers from NME countries who fail to

rebut the presumption of government control. The government does not disagree with Double Coin on this point, and indeed agrees with Double Coin that a lawful antidumping rate for an NME-wide entity must be one of the two rates specified in § 1673d.

The government argues that the rate assigned to the PRC-wide entity in this case is a rate for the defined entity, and is a rate that was individually investigated for that group. Double Coin disagrees, arguing first that Commerce lacks authority to treat the entity as an "each exporter" under the statute, and additionally, even if Commerce has authority to recognize the PRC-wide entity as an "each exporter," the PRC-wide rate in this case cannot stand because it was not "individually investigated."

As to whether Commerce may treat a group of exporters in an NME-economy as a single, separate exporter for purposes of receiving an antidumping rate, Double Coin recognizes that binding cases (too numerous to list in their entirety) have uniformly sustained Commerce's recognition of an NME-wide entity as a single exporter for purposes of assigning an antidumping rate to the individual members of the entity. *See*, *e.g.*, *Michaels Stores, Inc. v. United States*, 766 F.3d 1388, 1390–91 (Fed. Cir. 2014). But Double Coin questions here the authority for Commerce to so recognize such an NME-wide entity. Although 19 C.F.R. § 351.107 may bar an additional kind of antidumping rate, Double Coin does not come to grips with the clear authority provided by the regulation for Commerce to fashion a single rate for all exporters and producers that qualify for the single rate. We think it clear that Commerce may, where the facts warrant, recognize a single NME-wide entity to include all exporters that fail to rebut the presumption of government control. The authority question left in this case is thus whether the PRC-wide rate in this case can fairly be understood as a rate investigated for the single PRC-wide entity. We think, contrary to Double Coin's view, that

the PRC-wide rate in this case qualifies as individually investigated.[7]

It is true, as Double Coin notes, that in the fifth administrative review the members of the PRC-wide entity (other than Double Coin, the later-arriving member of the entity) were not individually investigated. Double Coin, of course, was so investigated and given its individually investigated rate, which it forfeited upon its failure to rebut the presumption of government control. But the non-Double Coin members of the PRC-wide entity were investigated in the initial investigation. As the government explains, "Commerce investigated the exporters in China during its initial investigation and calculated a single, China-wide entity rate to be applied to exporters who fail to establish independence from state control." *See* Appellant Reply Br. at 6. In the initial antidumping investigation, Commerce sent quantity and value questionnaires to ninety-four identified

---

7 The subject of what kind of antidumping rates Commerce may legally apply in antidumping investigations was under adjudication in another case before the Trade Court during the time this case was also pending before the Trade Court. In *Thuan An Production Trading & Service Co. v. United States*, the Trade Court held that the only permissible rates for antidumping proceedings are the two specified in 19 U.S.C. § 1673d(c)(1)(B)(i)(I)–(II), and that 19 C.F.R. § 351.107(d) does not provide authority for a third kind of rate. 348 F. Supp. 3d 1340, 1347–48 (Ct. Int'l Trade 2018) (*Thuan An I*). Following a remand, the Trade Court further held that the rate established for the PRC-wide entity in that case qualified as "individually investigated" within the meaning of § 1673d(c)(1)(B)(i)(I). *Thuan An Prod. Trading & Serv. Co. v. United States*, 396 F. Supp. 3d 1310, 1315–19 (Ct. Int'l Trade 2019) (*Thuan An II*). The final decision in *Thuan An II* was not appealed to this court.

Chinese exporters, and received responses from only thirty. Based on that information, Commerce identified an entity composed of uncooperative exporters, who had failed to rebut the presumption of government control and for whom Commerce had no individual data. Accordingly, Commerce calculated an AFA rate for this PRC-wide entity. The PRC-wide entity rate resulting from Commerce's initial investigation constitutes an "individually investigated" weighted average dumping margin within the meaning of § 1673d(c)(1)(B)(i)(I) because "Commerce treats the companies comprising the China-wide entity as a single entity and investigated them as such in the original investigation." *See* Appellant Reply Br. at 6. Double Coin fails to establish that any additional investigation into the country-wide entity is required in order to comport with the statute in carrying this investigated rate forward into later administrative review proceedings. Our decision in *Diamond Sawblades* confirmed that Commerce may carry forward an initial NME entity rate, including the adverse inferences built into that rate, in subsequent administrative reviews. 866 F.3d at 1314–15.

Application of PRC-Wide Rate in This Case

Commerce determined that the proper PRC-wide entity rate in the fifth annual review is a simple average of the carried-forward AFA-based PRC-wide rate of 210.48% and Double Coin's 0.14% investigated rate, for a PRC-wide rate of 105.31%.[8] Commerce's authority generally to carry forward pre-existing AFA-based PRC-wide rates was sustained in *Dongtai Peak Honey Industry Co. v. United*

---

8 We understand Double Coin to challenge the propriety of carrying forward the previously established 210.48% PRC-wide rate into the fifth annual review, but if the carrying forward is permissible, not to challenge the averaging methodology used by Commerce to calculate the 105.31% rate.

*States*, 777 F.3d 1343, 1356 (Fed. Cir. 2015), and Double Coin points to no precedent that precludes the discretion Commerce exercised in averaging the two rates in this case. *See Sigma*, 117 F.3d at 1405 (Commerce "has broad authority to interpret the antidumping statute and devise procedures to carry out the statutory mandate."). The Trade Court correctly understood our holding in *Diamond Sawblades* to authorize a PRC-wide rate for Double Coin, but the court concluded that Commerce is barred from applying an AFA-based PRC-wide rate to a cooperating exporter following an administrative review in which no member of the PRC-wide entity failed to cooperate with Commerce. Because the record in *Diamond Sawblades* showed that twenty-one exporters within the PRC-wide entity had not cooperated with Commerce, the Trade Court interpreted our *Diamond Sawblades* decision to condition its holding on the presence of non-cooperating PRC-wide entity members in the annual review. Thus distinguishing *Diamond Sawblades*, the Trade Court concluded that the only permissible rate for Double Coin on the record of this case is its 0.14% rate.

In *Diamond Sawblades*, a mandatory respondent (ATM) who cooperated with the review and supplied sufficient data for calculation of an individual rate for it, but who failed to rebut the presumption of government control, was denied its individually investigated rate and instead given an AFA-based PRC-wide rate set by investigation in the underlying antidumping investigation. In that case, as in this case, Commerce did not review the composition of the PRC-wide entity, or data particular to the exports of members of the PRC-wide entity, but did review the PRC-wide rate.[9] The other 21 identified members of the PRC-

---

9 *See Diamond Sawblades*, 866 F.3d at 1309 (noting lack of information concerning other members of the PRC-wide entity and review of only the PRC-wide rate).

wide entity, like Double Coin in this case, joined the PRC-wide group after failing to rebut the presumption of government control. *See* Appellant Br. at 30. The review of the PRC-wide rate consisted of Commerce's carrying forward of the preexisting AFA-based PRC-wide entity rate, in combination with a simple averaging of ATM's individually investigated rate, to calculate an updated PRC-wide entity rate. *Diamond Sawblades*, 866 F.3d at 1314. In *Diamond Sawblades*, the cooperation (or lack thereof), or even the presence, of other exporters who made up the composition of the PRC-wide entity was immaterial to Commerce's decision to apply the PRC-wide rate to ATM, and was similarly considered immaterial by this court. We found "no issue with Commerce's use of the previously established PRC-wide entity rate to calculate an updated PRC-wide entity rate that applies to ATM." *Id*. Because the conduct of members of a PRC-wide entity is not a condition necessary to sustain an AFA-based PRC-wide entity rate for a cooperating mandatory respondent who joins the PRC-wide entity during a review, this case cannot be distinguished from *Diamond Sawblades*. As we perceive no material difference between the record upon which Commerce established its PRC-wide rate in the two cases, we conclude that Commerce was within the law in assigning the 105.31% PRC-wide entity rate to Double Coin.

Double Coin nonetheless points to numerous past cases involving PRC-wide antidumping rates in which numerous members of the PRC-wide entity were present before Commerce during the relevant investigations,[10] and in which other exporters fell into the PRC-wide entity upon failure

---

[10]     *See, e.g., Albemarle Corp. v. United States*, 821 F.3d 1345 (Fed. Cir. 2016); *Michaels Stores*, 766 F.3d 1388; *Transcom, Inc. v. United States*, 294 F.3d 1371 (Fed. Cir. 2002); *Sigma Corp. v. United States*, 117 F.3d 1401 (Fed. Cir. 1997).

to rebut the presumption of government control. Double Coin suggests that the presence of other PRC-entity members in those cases was a legal prerequisite to application of the PRC-wide rate to the exporters who fell into the group after failing to rebut the key presumption. But none of those cases state such a prerequisite, and we see no reason to read such a prerequisite into those cases. Double Coin also makes much of the fact that in this case, Commerce did not review exports by other members of the PRC-wide entity. But Double Coin has not pointed to any record evidence in Commerce's proceedings in *Diamond Sawblades* showing review by Commerce of exports by any of the other members of the PRC-wide entity in that case.[11] As our decision in *Diamond Sawblades* recognized, focus on the other members of the PRC-wide entity was not a condition upon which the legality of the PRC-wide rate depended. The fact that Double Coin is the only member of the PRC-wide group identified by name in the fifth annual review in this case does not undermine the assignment of the PRC-wide entity rate to Double Coin. Double Coin entered the fifth annual review knowing that Commerce was carrying forward a preexisting PRC-wide rate, based on AFA, for application to any exporter who failed to rebut the presumption of government control. Double Coin sought, but failed, to rebut the presumption of government control. Double Coin has not convinced us that application of the PRC-wide rate to it is unlawful, but the government has convinced us that the Trade Court erred in blocking Commerce from applying the PRC-wide rate to Double Coin.

## CONCLUSION

We have previously affirmed Commerce's practice of applying a rebuttable presumption that all companies

---

[11]  Our independent review of Commerce's actions in *Diamond Sawblades* also did not reveal any assessment of exports by other members of the PRC-wide entity.

within an NME country are subject to government control. *Sigma*, 117 F.3d at 1405. We now confirm that the resulting country-wide NME entity rate may be an "individually investigated" rate within the meaning of 19 U.S.C. § 1673d(c)(1)(B)(i)(I), which Commerce may determine using its ordinary techniques of investigation. Commerce may permissibly assign such a rate to the unitary group of exporters in an NME country that have failed to rebut the presumption of government control. This rate may be based in whole or in part on FA or AFA, and Commerce may carry forward an initial NME entity rate, including adverse inferences built into that rate, in subsequent administrative reviews. *Diamond Sawblades*, 866 F.3d at 1312–15. As we concluded in *Diamond Sawblades*, where a respondent in an NME country cooperates with an investigation or review but fails to rebut the presumption of government control, Commerce may permissibly apply the country-wide NME entity rate. This conclusion applies whether or not other members of the NME-wide entity are identified by name and subject to the administrative review at issue. For the reasons discussed, we conclude that Commerce's application of the 105.31% PRC-wide entity rate to Double Coin was not contrary to law and was reasonable on the facts of this case. Accordingly, we reverse the final judgment of the Trade Court and remand the case with instructions to return the case to Commerce for it to proceed in a manner consistent with this opinion.

**REVERSED AND REMANDED**

COSTS

No costs.

**Slip Op. 19-115**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| **CHINA MANUFACTURERS ALLIANCE, LLC and DOUBLE COIN HOLDINGS LTD., et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES,**<br><br>Defendant. | **Before: Timothy C. Stanceu, Chief Judge**<br><br>**Consol. Court No. 15-00124** |

**OPINION**

[Sustaining a remand redetermination issued in response to court order in an action contesting the final results of an administrative review of an antidumping duty order on pneumatic off-the-road tires from the People's Republic of China]

Dated: September 3, 2019

*Daniel L. Porter*, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, D.C., for plaintiffs China Manufacturers Alliance, LLC and Double Coin Holdings Ltd. With him on the brief were *James P. Durling*, *Matthew P. McCullough*, and *Tung A. Nguyen.*

*Ned H. Marshak*, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, D.C., for plaintiffs Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd. With him on the brief were *Brandon M. Petelin*, *Dharmendra N. Choudhary*, *Andrew T. Schutz*, and *Jordan C. Kahn*.

*John J. Todor*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant. With him on the brief were *Chad A. Readler*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Franklin E. White, Jr.*, Assistant Director. Of counsel was *James H. Ahrens II*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

Stanceu, Chief Judge: In this consolidated case, plaintiffs contested a final determination of the International Trade Administration, U.S. Department of Commerce ("Commerce" or the

"Department") concluding the fifth periodic administrative review of an antidumping duty order on certain off-the-road pneumatic tires ("OTR tires") from the People's Republic of China ("China" or the "PRC").

Before the court is the Department's decision (the "Second Remand Redetermination") responding to the court's order in *China Mfrs. Alliance, LLC. v. United States*, 43 CIT __, 357 F. Supp. 3d 1364 (2019) ("*CMA II*"). *Final Results of Redetermination Pursuant to Ct. Remand* (Apr. 16, 2019), ECF No. 231-1. The court sustains the Second Remand Redetermination because it complies with the court's order in *CMA II* and because no party has commented in opposition.

## I. BACKGROUND

Background on this case is presented in the court's prior opinions and supplemented briefly herein. *CMA II*, 43 CIT at __, 357 F. Supp. 3d at 1366-68; *China Mfrs. Alliance, LLC v. United States*, 41 CIT __, 205 F. Supp. 3d 1325 (2017) ("*CMA I*").

### A. The Parties

Plaintiffs China Manufacturers Alliance, LLC and Double Coin Holdings Ltd. (collectively, "Double Coin"), and plaintiffs Guizhou Tyre Co., Ltd. and Guizhou Tyre Export and Import Co., Ltd. (collectively, "GTC") were the mandatory respondents in the fifth review. They are the plaintiffs in this litigation. Defendant is the United States.

### B. The Contested Decision

The contested administrative decision is *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review; 2012-2013*, 80 Fed. Reg. 26,230 (Int'l Trade Admin. May 7, 2015) ("*Amended Final Results*"). Commerce issued the Amended Final Results to correct a

ministerial error in its earlier decision, *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012-2013*, 80 Fed. Reg. 20,197 (Int'l Trade Admin. Apr. 15, 2015) ("*Final Results*"). In the Amended Final Results, Commerce assigned GTC a weighed average dumping margin of 11.41%. Commerce determined that Double Coin was a member of the "PRC-wide entity," concluding that Double Coin had failed to establish its independence from the government of the PRC and assigned it the rate it determined for that entity, which was 105.31%.

## II. Discussion

### A. Jurisdiction and Standard of Review

The court exercises jurisdiction pursuant to section 201 of the Customs Courts Act of 1980, 28 U.S.C. § 1581(c) (2012), which grants the Court of International Trade jurisdiction of any civil action commenced under 19 U.S.C. § 1516a.[1] The court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

### B. Prior Judicial Proceedings

In *CMA I*, the court remanded the Amended Final Results to Commerce with respect to four determinations. Only one of those determinations pertained to Double Coin: the court rejected the Department's decision to assign Double Coin the 105.31% rate that Commerce determined for the PRC-wide entity and directed Commerce to assign Double Coin the weighted-average dumping margin of 0.14% (a *de minimis* margin) that Commerce determined from its examination of Double Coin's own sales. *CMA I*, 41 CIT at __, 205 F. Supp. 3d

[1] All citations to the United States Code herein are to the 2012 edition.

at 1334-41. The other three determinations pertained to GTC's margin. First, the court held unlawful the Department's decision to make an 8% reduction in the starting prices used to determine export price ("EP") and constructed export price ("CEP") to account for what Commerce termed "irrecoverable" value-added tax ("VAT"). *Id.*, 41 CIT at __, 205 F. Supp. 3d at 1344-51. The court reasoned that Commerce, based on an impermissible construction of 19 U.S.C. § 1677a(c)(2)(B), resorted to a presumption in reducing the starting prices without reaching a finding that any specific amount actually was imposed by the government of the PRC as an "export tax, duty, or other charge" within the meaning of that provision. *Id.* Second, the court ordered Commerce to reconsider its calculations of deductions from CEP for GTC's brokerage and handling costs and ocean freight costs, concluding that the Department's finding that these calculations were free of "double counting" was not supported by substantial evidence on the record. *Id.*, 41 CIT at __, 205 F. Supp. 3d at 1356-58. Finally, the court ordered Commerce to reconsider its decision not to make an inflation adjustment for GTC's domestic warehousing costs. *Id.*, 41 CIT at __, 205 F. Supp. 3d at 1358-59.

In *CMA II*, the court ruled on the decision ("First Remand Redetermination") Commerce submitted to the court in response to the court's opinion and order in *CMA I*. In the First Remand Redetermination, Commerce, under protest, assigned Double Coin a weighted average dumping margin of 0.14% (*de minimis*). Making several changes to its calculations, Commerce revised GTC's margin from 11.41% to 11.33%. *CMA II*, 43 CIT at __, 357 F. Supp. 3d at 1367.

*CMA II* sustained two of the changes to GTC's margin calculation in the First Remand Redetermination, changes to which neither party objected. Commerce concluded that one element of its calculation of deductions from CEP for GTC's brokerage and handling and ocean freight expenses, "Shanghai Port Charges," was double counted and made a correction for this

purpose. Commerce also redetermined GTC's surrogate warehousing expenses, adjusting for inflation. *Id.*, 43 CIT at __, 357 F. Supp. 3d at 1369.

In the First Remand Redetermination, Commerce, under protest, assigned Double Coin the 0.14% margin it had calculated based on Double Coin's own sales, in response to the court's order. *Id.*, 43 CIT at __, 357 F. Supp. 3d at 1381. After Commerce submitted the First Remand Redetermination to the court, defendant moved for a partial remand that would allow Commerce to revisit the issue of Double Coin's weighted-average dumping margin in light of the decision of the Court of Appeals for the Federal Circuit in *Diamond Sawblades Mfrs. Coal. v. United States*, 866 F.3d 1304 (Fed. Cir. 2017) ("*Diamond Sawblades*"). *Id.* Three issues then remained in this litigation: (1) defendant's motion for a partial remand to reconsider Double Coin's rate; (2) whether the Department's deductions from the EP and CEP starting prices for irrecoverable VAT were lawful; and (3) whether elements of the Department's calculation of deductions for GTC's brokerage and handling costs, and ocean freight costs, other than the Shanghai Port Charges, also were double counted.

In considering defendant's motion for a partial remand, the *CMA II* opinion analyzed the holdings in *Diamond Sawblades*, one of which the court considered to bear on this case. The opinion described that holding as follows: "*Diamond Sawblades* holds that the Tariff Act allows Commerce to assign the rate it assigns to the PRC-wide entity to a cooperative respondent it selected as a mandatory respondent, provided the respondent fails to rebut the Department's presumption of control by the government of the PRC." *Id.*, 43 CIT at __, 357 F. Supp. 3d at 1382. Without deciding the question of whether Double Coin had rebutted the Department's presumption of government control, the *CMA II* opinion concluded, for various reasons as explained therein, that "the only rate supported by the record evidence that Commerce

reasonably could apply to the PRC-wide entity—and therefore to Double Coin—were the court to grant the requested partial remand, would be one equivalent to the 0.14% margin Commerce already determined for Double Coin in the Remand Redetermination." *Id.*, 43 CIT at __, 357 F. Supp. 3d at 1388.  The court observed that "Commerce never requested any information from the government of the PRC or from any part of the PRC-wide entity other than Double Coin." *Id.*, 43 CIT at __, 357 F. Supp. 3d at 1387.  The court also observed that only four exporters or producers of OTR tires specifically were included in the fifth review.  *Id.*  Two of these were the mandatory, and fully cooperating, respondents, i.e., Double Coin and GTC, and the other two were unexamined respondents Commerce found to have demonstrated independence from the PRC government, both of which were assigned the rate determined for GTC.  *Id.*  Noting that Double Coin was the only Chinese exporter or producer of OTR tires that Commerce considered to be part of the PRC-wide entity and that can be identified from the record as actually being in the fifth review, the court concluded that "the only record information relevant to determining a rate for the PRC-wide entity was the information pertinent to Double Coin." *Id.*, 43 CIT at __, 357 F. Supp. 3d at 1388.  The court reasoned that because Commerce already had assigned the 0.14% *de minimis* rate to Double Coin in the First Remand Redetermination and "does not seek to reconsider the 105.31% rate it assigned to the PRC-wide entity (except with respect to Double Coin), granting defendant's motion for a partial remand would serve no purpose." *Id.*

For the First Remand Redetermination, Commerce retained the 8% reduction in GTC's EP and CEP starting prices for what Commerce considered to be irrecoverable value-added tax. The court set aside that decision as unlawful in *CMA II*.  Citing *Qingdao Qihang Tyre Co. v. United States*, 42 CIT __, __, 308 F. Supp. 3d 1329, 1338-47 (2018), which was issued after *CMA I* was decided, the court concluded that the statutory interpretation under which Commerce

made deductions from EP and CEP starting prices for irrecoverable VAT "contravenes the plain meaning, statutory history, and legislative history" of 19 U.S.C. § 1677a(c)(2)(B). *CMA II*, 43 CIT at __, 357 F. Supp. 3d at 1375. After discussing provisions in the Tariff Act that addressed domestic taxes such as value-added taxes separately from the export taxes falling within the scope of § 1677a(c)(2)(B), the court concluded that "Congress had a specific intent with respect to VAT imposed by an exporting country on subject merchandise or the materials used to produce it." *Id.* "Congress did not intend that irrecoverable VAT, i.e., VAT that was not refunded or avoided by reason of exportation of the good, would increase a dumping margin (although it did intend that *recoverable* VAT, in some circumstances not present here, could reduce a dumping margin.)" *Id.* "In addition, Commerce erred in finding, without any evidentiary support, that Chinese irrecoverable VAT is a tax not imposed on the domestic good." *Id.* *CMA II* ordered Commerce to "take the appropriate corrective action to remove from the calculation of GTC's margin its downward EP and CEP adjustments for VAT." *Id.*

*CMA II* held that substantial evidence on the record was not available to support the Department's finding in the First Remand Redetermination that only one cost category of the brokerage and handling and ocean freight costs, i.e., the Shanghai Port Charges, were double counted. *Id.*, 43 CIT at __, 357 F. Supp. 3d at 1379. The court ordered Commerce to ensure that no costs are double counted either as between brokerage and handling costs and ocean freight costs, or as between ocean freight costs and U.S. inland freight costs. *Id.*

C. The Second Remand Redetermination

In the Second Remand Redetermination, Commerce recalculated GTC's weighted average dumping margin, reducing it from 11.33%, as determined in the First Remand Redetermination, to 4.59%. *Second Remand Redetermination* 14. Commerce, under protest,

eliminated its deductions for irrecoverable VAT and, reconsidering its calculations of GTC's brokerage and handling and ocean freight costs, eliminated additional cost elements it determined to have been double counted. The court addresses each of these changes below.

1. Elimination of Irrecoverable VAT Adjustment in Calculating GTC's Dumping Margin

In *CMA II*, the court directed Commerce to recalculate EP and CEP without making a reduction in the EP and CEP starting prices for irrecoverable VAT. Commerce, in response, eliminated its irrecoverable VAT deduction. Commerce stated that "[w]e respectfully disagree with the court's decision in *China Mfr. Alliance II* [*CMA II*] concerning the irrecoverable VAT adjustment used in GTC's weighted-average margin calculation," *Second Remand Redetermination* 4, but provided no explanation of why it disagreed with the analysis of the VAT issue in *CMA II*.

2. Recalculation of GTC's Ocean Freight Surrogate Value

Commerce obtained a surrogate value for GTC's export brokerage and handling costs from a World Bank publication, *Doing Business 2014: Indonesia*, Indonesia being the surrogate country Commerce used for surrogate values in the review. *CMA II*, 43 CIT at __, 357 F. Supp. 3d at 1375. Commerce valued GTC's trans-Pacific ocean freight using shipping price quotes published online by Descartes Systems Group, Inc. ("Descartes"). *Id.*, 43 CIT at __, 357 F. Supp. 3d at 1376. It also used Descartes price data to derive a value for U.S. inland freight. *Id*. In *CMA II*, the court ordered Commerce to "ensure that no costs are double counted either as between (1) brokerage and handling (based on the *Doing Business* report) and ocean freight (based on the Descartes quotes), or (2) ocean freight (based on the Descartes quotes) and U.S. inland freight (based on the Descartes price lists)." *Id.*, 43 CIT at __, 357 F. Supp. 3d at 1379. The court concluded in *CMA II* that Commerce did not explain why seven charges

identified as ocean freight charges in Descartes price quotes were not accounted for again in the U.S. inland freight charges. These were the Automated Manifest System ("AMS") Charge, Chassis Usage Charges, International Ship and Port Security Charges, ISD Handling Charges, Traffic Mitigation Fee, Clean Truck Fee, and Documentation Charges. *Id.*, 43 CIT at __, 357 F. Supp. 3d at 1378.

Commerce stated in the Second Remand Redetermination that, pursuant to the court's order in *CMA I*, it reopened the record to solicit information on potential double counting. *Second Remand Redetermination* 6. On the basis of the expanded record, Commerce eliminated the Shanghai Port Charge from the ocean freight calculation. *Id.* Upon re-examining the record, Commerce concluded in the Second Remand Redetermination that no additional double counting of costs occurred between the brokerage and handling and the ocean freight cost categories. *Id.* at 8. Also, Commerce noted that, after the Shanghai Port Charge was removed from the ocean freight surrogate value, no party argued that additional double counting occurred between brokerage and handling costs and ocean freight costs. *Id.*

In examining potential double counting between ocean freight charges and U.S. inland freight charges, Commerce concluded that four of the seven charges listed above appeared on only one of the twenty-four ocean freight price quotes Commerce used and therefore did not appear to be customary charges. Commerce eliminated this price quote from its calculation. Commerce then considered whether the remaining three types of charges—AMS Charges, Documentation Charges, and Traffic Mitigation Fees—were duplicated in the data it used for inland freight charges. *Id.* at 9-10.

Of the three charges in question, Commerce concluded that only the Traffic Mitigation Fees are reasonably attributable to inland freight expenses and removed these fees from its

calculation of international freight expense. Commerce cited record evidence from the first remand in concluding that the Traffic Mitigation Fees are "charged to truck freight carriers upon pick-up of cargo from the port, to fund operations of the port to allow for off-peak hour pick up of freight from the ports of Los Angeles and Long Beach to mitigate traffic congestion," *id.* at 12 (footnote omitted), and are "reasonably attributable to U.S. inland freight expenses," *id.* at 13.

Commerce cited record information—specifically, the Descartes logistics and supply chain glossary—in concluding that the Automated Manifest System Charge is an ocean freight expense related to arrival of cargo at the port of destination. *Id.* at 11. The record information indicates that the charge is for the providing electronic transmission of manifest information from the vessel to Customs and Border Protection. *Id.* The record supports the Department's conclusion that the charge is not related to U.S. inland movement of freight and therefore was not double counted.

Commerce stated that "Documentation Charges" appear on approximately half of the Descartes quotes for ocean freight charges. *Id.* at 11-12. Commerce reiterated its finding from the First Remand Redetermination that these charges relate to documents such as the master bill of lading, which covers all containers aboard an ocean-going vessel, and to U.S. destination document fees. *Id.* at 12. Commerce concluded that evidence did not support a finding that these documentation charges related to inland freight, *id.*, a conclusion the record supports.

In summary, the court concludes that Commerce's findings and conclusions pertaining to possible double counting were supported by substantial evidence on the augmented record and comply with the court's order in *CMA II*.

## II. CONCLUSION

The court concludes, for the reasons discussed above, that the Second Remand Redetermination complies with the court's order in *CMA II*. Judgment sustaining the determinations therein will enter accordingly.

/s/ Timothy C. Stanceu
Timothy C. Stanceu, Chief Judge

Dated: September 3, 2019
New York, New York

UNITED STATES DEPARTMENT OF COMMERCE
Office of the General Counsel
OFFICE OF THE CHIEF COUNSEL FOR TRADE ENFORCEMENT & COMPLIANCE
Washington, D.C. 20230

April 16, 2019

**FILED ELECTRONICALLY VIA CM/ECF**

Mario Toscano
Clerk of the Court
U.S. Court of International Trade
One Federal Plaza
New York, NY 10278-0001

Re: Redetermination Pursuant to Court Remand Order in
*China Manufacturers Alliance, LLC et al v. United States*, Court No. 15-00124

Dear Mr. Toscano:

Pursuant to the Court's order of January 16, 2019, please find attached the U.S. Department of Commerce's Redetermination Pursuant to Court Remand in the above-captioned action. The remand redetermination is a public document

In accordance with Court Rule 56.2(h)(1), filing of the administrative record index for the remand proceeding will follow under separate cover. Should you have any questions concerning the matter, please contact me at (202) 482-4378.

Respectfully submitted,

/s Kristen McCannon
Kristen McCannon
Attorney
Office of the Chief Counsel
for Trade Enforcement & Compliance

Attachment

cc:

Daniel Lewis Porter
Curtis, Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Avenue, NW.
Washington, DC 20006
Email: dporter@curtis.com

Ned Herman Marshak
Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP
599 Lexington Avenue
36th Floor
New York, NY 10022
Email: nmarshak@gdlsk.com

John J. Todor
U.S. Department of Justice
Commercial Litigation Branch - Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Email: john.todor@usdoj.gov

William A. Fennell
Stewart and Stewart
2100 M Street, NW.
Suite 200
Washington, DC 20037
Email: wfennell@stewartlaw.com

A-570-912
Remand: Slip Op 19-7
**Public Document**
E&C Office III: KAH

***China Manufacturing Alliance, LLC, et al. v. United States***
**Consol. Court No. 15-00124; Slip Op. 19-7 (CIT 2019)**

## FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND

### A. SUMMARY

The Department of Commerce (Commerce) prepared these final results of redetermination pursuant to the second remand order of the U.S. Court of International Trade (CIT or the Court), issued on January 16, 2019, in *China Manufacturers Alliance, LLC et al. v. United States*, Consol. Court No. 15-00124, Slip Op 19-7 (CIT January 16, 2019) (*China Mfr. Alliance II*). These final remand results concern the final results of the administrative review of the antidumping duty order on certain new pneumatic off-the-road tires from the People's Republic of China (China), covering the period of review (POR) September 1, 2012, through August 31, 2013.[1]

The Court's order in *China Mfr. Alliance II* follows the Court's prior remand of the underlying review in *China Mfr. Alliance I* and our first remand redetermination.[2] The CIT sustained in part Commerce's determination, explained in the *China Mfr. Alliance I Remand Redetermination*, to recalculate warehousing expenses for one respondent in the underlying review, Guizhou Tyre Co., Ltd./Guizhou Tyre Import and Export Co., Ltd. (collectively, GTC), to account for an inflation adjustment, and to exclude Shanghai Port Charges from the

---

[1] *See Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review; 2012-2013*, 80 FR 26230 (May 7, 2015) (*Amended Final Results*); *see also Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012-2013*, 80 FR 20197 (April 15, 2015), and accompanying Issues and Decision Memorandum (IDM) (*Final Results*).

[2] *See China Manufacturers Alliance, LLC et al. v. United States*, Consol. Court No. 15-00124, Slip Op 17-12 (CIT February 6, 2017) (*China Mfr. Alliance I*). *See also Final Results of Redetermination Pursuant to Remand*, Court No. 15-00124, Slip Op. 17-12 (CIT 2017) (*China Mfr. Alliance I Remand Redetermination*).

calculation of the ocean freight surrogate value (SV), on the basis that both recalculations were consistent with the *China Mfr. Alliance I* and were unchallenged in subsequent litigation.[3] Further, the Court denied Commerce's request for a motion for a partial remand to revisit the issue of the margin calculated for Double Coin Holdings Ltd. (Double Coin), in light of the decision in *Diamond Sawblades,*[4] on the basis that: "the only rate supported by the record evidence that Commerce reasonably could apply to the PRC-wide entity – and therefore to Double Coin – were the court to grant the requested partial remand, would be one equivalent to the 0.14% margin Commerce already determined for Double Coin in the Remand Redetermination. Because Commerce assigned that rate to Double Coin in the Remand Redetermination and does not seek to reconsider the 105.31% rate it assigned to the PRC-wide entity (except with respect to Double Coin), granting defendant's motion for a partial remand would serve no purpose."[5]

Accordingly, in *China Mfr. Alliance II*, the CIT has remanded two remaining issues and directed Commerce to: (1) submit a new determination in which it recalculates export price (EP) and constructed export price (CEP) for GTC by removing the downward adjustments for irrecoverable value-added tax (VAT) from the calculation of GTC's weighted-average dumping margin;[6] and (2) ensure that no costs are double-counted between the underlying SV information used to value Chinese brokerage and handling expenses and that used to value ocean freight expenses, or between the ocean freight SV and the information used to value U.S. inland freight expenses, in calculating GTC's margin.[7]

---

[3] *See China Mfr. Alliance II* at 8-9 and 42.
[4] *See Diamond Sawblades Mfrs. Coal. v. United States*, 866 F.3d 1304 (Fed. Cir. 2017), at 1313 n.6.
[5] *See China Mfr. Alliance II* at 41-42.
[6] *Id.* at 19 and 42.
[7] *Id.* at 25 and 42.

As set forth in detail below, consistent with the Court's second remand order, we have: (1) under respectful protest, recalculated EP and CEP for GTC without making deductions for irrecoverable VAT; [8] and (2) adjusted GTC's brokerage and handling and ocean freight costs for certain double-counted expenses.[9] In light of these determinations, Commerce has made changes to GTC's margin calculation.[10] Because we assigned the 0.14% *de minimis* margin to Double Coin in the *China Mfr. Alliance I Remand Redetermination* pursuant to the Court's directive, we have made no further changes to Double Coin's margin calculation in this second remand redetermination.

## B. REMOVAL OF IRRECOVERABLE VAT ADJUSTMENT IN CALCULATING GTC'S DUMPING MARGIN

***Background***

In *China Mfr. Alliance I*, the Court ordered Commerce to reconsider the adjustment for irrecoverable VAT for EP and CEP for GTC in accordance with its Opinion and Order.[11]

After reconsideration per the Court's Opinion and Order, Commerce reasoned that its deduction of irrecoverable VAT from GTC's U.S. prices was in accordance with law, and in light of the record evidence, continued to make an irrecoverable VAT adjustment in calculating GTC's weighted-average dumping margin.[12]

---

[8] *See Viraj Group, Ltd. v. United States*, 343 F.3d 1371, 1376 (Fed. Cir. 2003) (*Viraj Group*).
[9] *See China Mfr. Alliance II* at 25.
[10] *See* memorandum, "Draft Results of Redetermination Pursuant to Second Court Remand in the 2012-2013 Antidumping Duty Administrative of Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Margin Calculation and Surrogate Value Memorandum for Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd.," dated March 21, 2019 (GTC's Draft Results Analysis and SV Memo).
[11] *See China Mfr. Alliance I* at 41-42, 67.
[12] *See China Mfr. Alliance I Remand Redetermination* at 12.

In *China Mfr. Alliance II*, the Court disagreed that the statute allows for an irrecoverable VAT adjustment and directed Commerce to recalculate EP and CEP without a downward adjustment for irrecoverable VAT.[13]

***Analysis***

We respectfully disagree with the Court's decision in *China Mfr. Alliance II* concerning the irrecoverable VAT adjustment used in GTC's weighted-average margin calculation. Nevertheless, in accordance with the Court's explicit directive that Commerce recalculate EP and CEP for GTC without making deductions for Chinese VAT, under respectful protest,[14] we have recalculated EP and CEP in the margin program for GTC to exclude the irrecoverable VAT deduction.[15]

## C. RECALCULATION OF GTC'S OCEAN FREIGHT SURROGATE VALUE

***Background***

Section 772(c)(2)(A) of the Act requires Commerce to reduce U.S. price (*i.e.*, the starting prices for determining EP or CEP) by "the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, and United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States."

In compliance with section 772(c)(2)(A) of the Act, in the *Final Results*, Commerce valued brokerage and handling costs incurred in China based on prices included in the World Bank *Doing Business 2014: Indonesia* report (*Doing Business*).[16] Additionally, Commerce

[13] *See China Mfr. Alliance II* at 18-19, 42.
[14] *See Viraj Group, Ltd. v. United States*, 343 F.3d 1371, 1376 (Fed. Cir. 2003).
[15] *See* GTC's Draft Results Analysis and SV Memo at Attachment 4.
[16] *See Final Results* IDM at 44.

valued trans-Pacific Ocean freight from China to the United States using a calculated average of monthly per-container shipping prices for both the East and West coast sales using quotes published online by Descartes Systems Group, Inc. (Descartes).[17]  In the *Final Results*, we did not exclude any charges from the Descartes ocean freight quotes, determining that they appeared to be integral to, and necessary for, the shipment of freight and did not appear to have been included in the brokerage and handling surrogate value.[18]  During the underlying administrative review and in the subsequent litigation, GTC argued that Commerce double-counted certain costs by including them both in the brokerage and handling surrogate value and in the ocean freight costs, thereby overstating the CEP deduction required by section 772(c)(2)(A) of the Act.[19]

In *China Mfr. Alliance I*, the Court held that, "{b}ecause the Department's finding that no double-counting occurred is not supported by substantial evidence, the court must remand the Department's decisions as to deductions from CEP for brokerage and handling, and for ocean freight, for reconsideration."[20]  Specifically, the Court held that, "in reconsidering these decisions, Commerce should address specifically each of the charges in the Descartes quotes that GTC identifies as charges that may overlap with the charges Commerce obtained from the Doing Business report," *i.e.*, "'Documentation Charges,' 'Traffic Metigation {sic} fee,' 'AMS Charge,' 'Clean Truck Fee,' 'Chassis Usage Charges,' 'Shanghai Port Charges,' 'International Ship & Port Security charges,' and 'ISD Handling Charge.'"[21]

---

[17] *See* http://rates.descartes.com, included in GTC's April 14, 2014 Surrogate Value Submission at Exhibit 8.
[18] *Id.*
[19] *See* GTC's letter, "GTC Direct Case Brief: Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated December 11, 2014 at 6-10.
[20] *See China Mfr. Alliance I* at 54.
[21] *Id.* at 53-54.

Pursuant to the Court's order in *China Mfr. Alliance I*, for the *China Mfr. Alliance I Remand Redetermination*, we re-opened the record to solicit further information on the individual expenses identified as potentially double-counted and, upon examination of the costs included in the Descartes international ocean freight surrogate value, as well as the information on record with respect to the costs listed in the World Bank's *Doing Business* report as part of brokerage and handling, we determined that only the "Shanghai Port Surcharge" included in the international freight surrogate value was potentially double-counted and, thus, removed from the build-up of the ocean freight SV.[22] We determined that the "Documentation Charges,' 'Traffic Mitigation fee,' 'AMS Charge,' 'Clean Truck Fee,' 'Chassis Usage Charges,' 'International Ship & Port Security charges,' and 'ISD Handling Charge' were unique to ocean freight or activities at the U.S. destination."[23]

In making this determination, Commerce rejected GTC's argument that certain costs that Commerce associated with post-ocean transport are more appropriately valued under U.S. inland truck freight,[24] on the basis that the Court's order in *China Mfr. Alliance I* directed Commerce to address only expenses potentially double-counted between the ocean freight and Chinese brokerage and handling (B&H) SVs, and that any potential issues regarding double-counting between the ocean freight SV and U.S. inland freight SV were not previously considered on the

[22] *See* memorandum, "Final Results of Redetermination Pursuant to Court Remand in the 2012-2013 Antidumping Duty Administrative Review of Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Remand Analysis and Surrogate Value Memorandum for Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd.," dated June 21, 2017 at Attachment 4 (First Remand Redetermination Analysis Memorandum).

[23] *Id.*

[24] In the underlying review, GTC reported that it paid shipping charges all the way to the customer for certain sales. Accordingly, Commerce valued U.S. domestic inland freight using Descartes "price lists" to various inland locations to calculate an inland freight amount from ports on the East and West coasts and added this inland freight SV to the ocean freight SV for relevant transactions. *See* memorandum, "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Preliminary Results Surrogate Value Memorandum," dated September 30, 2014 (Preliminary SV Memorandum). This price list was placed on the record in Preliminary SV Memorandum at Attachment X.

Case: 23-2391 Document: 13 Page: 140 Filed: 11/28/2023

administrative record.[25] We further rejected GTC's argument, reasoning that use of a 'fully-loaded' international freight surrogate value rendered the question whether certain charges are appropriately part of the ocean freight cost as moot.[26]

In *China Mfr. Alliance II*, the Court sustained Commerce's determination regarding the overlap between the Shanghai Port Surcharge in the Descartes quotes and charges in the World Bank's *Doing Business* report.[27] However, the Court took issue with Commerce's assertion that its evaluation of the record was limited in scope with respect to the characterization of certain charges as appropriately a part of the ocean freight cost.[28] Specifically, the Court held that its prior opinion did not preclude Commerce from considering whether alleged double-counting occurred between certain cost categories that appeared to overlap with domestic transportation costs that would be included in the prices reflected by the Descartes price lists Commerce used to calculate GTC's U.S. inland freight costs.[29] The Court reasoned that "Commerce reopened the record during the remand proceeding, accepted new information during that proceeding and, following its issuance of its draft for comment by the parties, changed its position on most of the costs it determined to have been double-counted in the draft, based on the new record information."[30] As such, the Court held that Commerce must give GTC the opportunity to object to Commerce's new determination with regard to the issue of double-counting, which stemmed from the new information Commerce admitted to the record.[31] Accordingly, the Court ordered Commerce to consider whether certain post-ocean freight charges overlap with domestic

---

[25] *See China Mfr. Alliance I Remand Redetermination* at 3.
[26] *Id.*
[27] *See China Mfr. Alliance II* at 24.
[28] *Id.*
[29] *Id.* at 23.
[30] *Id.*
[31] *Id.* at 23-24.

transportation costs that would be included in the Descartes prices Commerce used to calculate GTC's U.S. inland freight costs.[32]

Thus, the Court has ordered Commerce to ensure that no costs are double-counted either between (1) brokerage and handling (based on the *Doing Business* report) and ocean freight (based on the Descartes quotes), or (2) ocean freight (based on the Descartes quotes) and U.S. inland freight (based on the Descartes price lists).[33]

***Analysis***

The Court has ordered Commerce to ensure that no costs are double-counted in either: 1) brokerage and handling (based on the *Doing Business* report) and ocean freight (based on the Descartes quotes), or (2) ocean freight (based on the Descartes quotes) and U.S. inland freight (based on the Descartes price lists).[34] We note that, though the first part of the Court's instructions again direct Commerce to ensure there is no double-counting between the *Doing Business* SV for brokerage and handling charges incurred in China and the ocean freight SV, with the removal of the Shanghai Port Surcharge from the ocean freight SV pursuant to *China Mfr. Alliance I,* no party to this litigation subsequently disputes Commerce's specific finding in the *China Mfr. Alliance I Remand Redetermination* that the remaining charges under consideration were either unique to ocean freight *or* activities at the U.S. destination nor further argued remain double-counted with respect to the Chinese B&H SV. Moreover, further analysis of the remaining seven charges, as discussed below, continues to support our prior finding that all such charges were unique to ocean freight or activities at the U.S. destination. Accordingly, we continue to find that the current SV calculation contains no double counting of costs between

---

[32] *Id*.
[33] *Id*. at 25.
[34] *Id*.

brokerage and handling (based on the *Doing Business* report) and ocean freight (based on the Descartes quotes).

Therefore, in accordance with the Court's holding, we have reconsidered whether the seven charges in question ('Automated Manifest System (AMS) Charge,' 'Chassis Usage Charges,' 'ISPS- Int'l Ship and Port Security Charges,' 'ISD Handling Charges,' 'Traffic Metigation {sic} fee,' 'CTF- Clean Truck Fee,' and 'Documentation Charges') listed within the Descartes quotes used as a surrogate to value ocean freight are unique to ocean freight or are related to the inland movement of goods and thus may be potentially double-counted between the ocean freight SV and the separate Descartes fee schedule used to value U.S. inland freight expenses. In order to determine whether any of the aforementioned fees listed in the ocean freight quotes overlap with the U.S. inland freight SV, it is first necessary to examine the U.S. inland freight SV source information to determine whether any such component charges explicitly overlap with those listed in ocean freight. However, upon review of the record, we note that the inland freight SV source information consists of only a general fee schedule of estimated truck freight costs from port to specific destinations in the United States; the inland freight information does not break out the specific components underlying the charges comprising the values used for the U.S. inland freight surrogate value.[35] Given this, Commerce is applying a conservative presumption and removing any expenses from the ocean freight calculation where record information suggests those expenses may be related to the inland movement of goods and, thus, potentially double-counted.

As an initial matter, in examining each of the 24 ocean freight price quotes used to calculate the ocean freight SV, we note that four of the seven expenses under consideration (*i.e.*,

[35] *See* Preliminary SV Memorandum at Attachment X.

Clean Truck Fee, Chassis Usage Charges, ISPS, and ISD Handling Charges) are listed on only a *single* quote provided to estimate East Coast shipping expenses for March 2013.[36] The expenses listed on this quote do not appear to be customary with respect to those listed in the dataset on the whole – though the dataset remains robust regardless of the inclusion of this single quote (*i.e.*, otherwise containing data from 23 quotes). We find that, given the degree of ambiguity which remains with respect to classifying the individual surcharges within the ocean freight SV as related to the inland transport of goods or not, and to determine whether any such expenses may be included within the non-descript inland freight SV, it is appropriate to not rely on this information. As such, Commerce has removed the March 2013 price quote from the calculation of the ocean freight SV, thus rendering the classification of the Clean Truck Fee, Chassis Usage Charges, ISPS, and ISD Handling Charges moot, consistent with the Court's directive to ensure that these costs are not double-counted between ocean freight (based on the Descartes quotes) and U.S. inland freight (based on the Descartes price lists).[37]

As a result, only three charges listed within the ocean freight quotes remain for consideration with respect to whether they are properly classified as ocean freight surcharges or are related to the inland movement of goods within the U.S. border: AMS Charges, Documentation Charges, and Traffic Mitigation fees. Our analysis of each follows, below:

[36] *See* GTC April 14, 2014 SV at Exhibit 8.
[37] *See* GTC's Draft Results Analysis and SV Memo at 4-5.

*a. AMS Charges*

As established on the record of the prior *China Mfr. Alliance I Remand Redetermination*, the AMS Charge is a cost associated with the use of the Automated Manifest System (AMS).[38] According to the Descartes logistics and supply chain glossary, the AMS:

> "handles manifest information provided by the carrier … when the merchandise can be transported from the port of entry… Vessel AMS allows participants to transmit manifest data electronically prior to vessel arrival. Customs can then determine in advance whether the merchandise merits examination or immediate release. Upon receiving notification from Customs, the carrier can make decisions on staging cargo and the importer can arrange for examination, release, and distribution of the merchandise."[39]

Accordingly, in the *China Mfr. Alliance I Remand Redetermination* we stated that "{w}e find that this cost is an ocean freight expense related to arrival at the destination port, and therefore not covered by Doing Business."[40] We continue to determine that this cost is an ocean freight expense related to arrival at the destination port, and find no evidence that this expense relates to the inland movement of freight within the U.S. border that would reasonably be included as a component of the inland freight SV. Therefore, where relevant, we continue to include the AMS Charge in our ocean freight surrogate value.

*b. Documentation Charges*

With respect to the documentation charges listed on approximately half of the Descartes

---

[38] *See China Mfr. Alliance I Remand Redetermination* at 15-16; *see also* GTC's letter, "GTC's Factual Rebuttal Information: Remand Redetermination pursuant to Litigation in Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated May 8, 2017 at Exhibit 2 (GTC's NFI Submission).

[39] *See* Commerce's Draft Redetermination Pursuant to Ct. Remand at Attachment 2, *China Manufacturers Alliance, LLC et al. v. United States*, Consol. Court No. 15-00124, Slip Op. 17-12 (CIT Feb. 6, 2017) (Draft Results of First Remand Redetermination); *see also* GTC's NFI Submission at Exhibit 2.

[40] *See* Draft Results of First Remand Redetermination at 34 (citing Petitioners' RFI Submission at Attachment 1 at 7); *see also* letter from petitioners, "*China Manufacturing Alliance, LLC, et al. v. United States*: Consol. Court No. 15-00124; Slip Op. 17-12 (CIT 2017): Titan and USW's Comments on Draft Redetermination," dated May 12, 2017 at 9 (Petitioner Draft Remand Comments).

ocean freight quotes in question, in the *China Mfr. Alliance I Remand Redetermination*, we noted the following:

> "Ocean carriers, like Descartes, require paperwork unique to their services and charge fees to create and process those documents. Though a bill of lading is created by the freight forwarder, ocean carriers are required to create a master bill of lading to cover all containers aboard their ships. The remand record also shows that ocean carriers like Descartes have document charges related to U.S. destination document fees… {as such, these expenses may} {r}easonably be attributed to costs associated with ocean freight."[41]

We continue to find that the Documentation Charges can reasonably be attributed to costs associated with ocean freight and find no evidence that this expense relates to the inland movement of freight within the U.S. border that would reasonably be included as a component of the inland freight SV. Thus, we continue to include the Documentation Charges in the international freight surrogate value.[42]

*c. Traffic Mitigation Fees*

In the prior *China Mfr. Alliance I Remand Redetermination* we determined that "this cost is a U.S. port-specific charge related to U.S. truck freight."[43] The record shows that the Traffic Mitigation Fee (listed as "Traffic Metigation{sic} Fee" on the quote) is not an expense related to on-ocean services, but rather a post-ocean pass-through fee specific to the ports of Los Angeles and Long Beach.[44] Specifically, record evidence provided in the prior remand describes this as a fee charged to truck freight carriers upon pick-up of cargo from the port, to fund operations of the port to allow for off-peak hour pick-up of freight from the ports of Los Angeles and Long Beach to mitigate traffic congestion.[45] Therefore, record evidence suggests that this charge is

[41] *See* letter from the petitioner, "*China Manufacturing Alliance, LLC, et al. v. United States*: Consol. Court No. 15-00124; Slip Op. 17-12 (CIT 2017): Titan and USW's Remand Factual Submission," dated May 8, 2017 at Attachment 4 (Petitioners' NFI Submission).
[42] *See* GTC's Draft Results Analysis and SV Memo at 4, Attachment 1.
[43] *See* Petitioners' NFI Submission at Attachment 4.
[44] *Id*.
[45] *Id*.

reasonably attributable to U.S. inland freight expenses. Accordingly, applying a conservative presumption, we have removed Traffic Mitigation Fees from the surrogate value for international freight.[46]

**D. COMMENTS FROM INTERESTED PARTIES**

Commerce released the draft remand results on March 21, 2019.[47] On March 28, 2019, GTC submitted comments regarding Commerce's draft remand results.[48]

*GTC's Comments*

- The CIT in its opinion ordered that Commerce: '"must take the appropriate corrective action to remove from the calculation of GTC's margin its downward EP and CEP adjustments for VAT"'; and '"must ensure that no costs are double counted either as between (1) brokerage and handling (based on the Doing Business report) and ocean freight (based on the Descartes quotes), or (2) ocean freight (based on the Descartes quotes) and U.S. inland freight (based on the Descartes price lists)."' Commerce's Second Draft Remand properly complied with the CIT's instructions.[49]

*No other interested parties commented on Commerce's Second Draft Redetermination.*

**Commerce's Position:** We agree with GTC. In accordance with the Court's order, we have (1) under protest, recalculated EP and CEP for GTC by removing the downward adjustments for irrecoverable VAT from the calculation of GTC's weighted-average dumping margin; and (2) ensured that no costs were double-counted between the underlying SV information used to value

---

[46] *Id*.
[47] *See* Draft Results of Redetermination Pursuant to Court Remand, C*hina Manufacturing Alliance, LLC, et al. v. United States*, Consol. Court No. 15-00124; Slip Op. 19-7, dated March 21, 2019.
[48] *See* GTC's March 28, 2019 Comments on the Draft Remand Redetermination.
[49] *Id*. at 2.

Chinese brokerage and handling expenses and that used to value ocean freight expenses, or between the ocean freight SV and the information used to value U.S. inland freight expenses, in calculating GTC's margin.

**E. FINAL RESULTS OF REDETERMINATION**

These final remand results have resulted in a weighted-average dumping margin of 4.59 percent for GTC.

4/16/2019

X

Signed by: JEFFREY KESSLER

**Slip Op. 19-7**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| **CHINA MANUFACTURERS ALLIANCE, LLC and DOUBLE COIN HOLDINGS LTD., et al.,**<br>Plaintiffs,<br>v.<br>**UNITED STATES,**<br>Defendant. | **Before: Timothy C. Stanceu, Chief Judge**<br>**Consol. Court No. 15-00124** |

**OPINION AND ORDER**

[Sustaining in part, and remanding in part, a determination in response to court order in litigation contesting the final results of an administrative review of an antidumping duty order on pneumatic off-the-road tires from the People's Republic of China]

Dated: January 16, 2019

*Daniel L. Porter*, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, D.C., for plaintiffs China Manufacturers Alliance, LLC and Double Coin Holdings Ltd. With him on the brief were *James P. Durling*, *Matthew P. McCullough*, and *Tung A. Nguyen*.

*Ned H. Marshak*, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, D.C., for plaintiffs Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd. With him on the brief were *Brandon M. Petelin*, *Dharmendra N. Choudhary*, *Andrew T. Schutz*, and *Jordan C. Kahn*.

*John J. Todor*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant. With him on the brief were *Chad A. Readler*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Franklin E. White, Jr.*, Assistant Director. Of counsel was *James H. Ahrens II*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

Stanceu, Chief Judge: Before the court is a decision (the "Remand Redetermination") the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") issued in ongoing litigation contesting a determination by Commerce in an

antidumping duty proceeding. *Final Results of Redetermination Pursuant to Ct. Remand* (June 21, 2017), ECF No. 200 ("*Remand Redetermination*"). Commerce issued the Remand Redetermination in response to the court's Opinion and Order of February 6, 2017. *China Mfrs. Alliance, LLC v. United States*, 41 CIT __, 205 F. Supp. 3d 1325 (2017) ("*CMA I*"). Also before the court is defendant's motion for a partial remand, which defendant bases on an intervening decision of the Court of Appeals for the Federal Circuit ("Court of Appeals"), *Diamond Sawblades Mfrs. Coal. v. United States*, 866 F.3d 1304 (Fed. Cir. 2017) ("*Diamond Sawblades*"). Def.'s Mot. for Partial Voluntary Remand (Aug. 28, 2017), ECF No. 218 ("Def.'s Mot. for Remand"). The court sustains in part, and remands in part, the Remand Redetermination and denies defendant's motion for a partial remand.

## I. BACKGROUND

The background of this consolidated action is set forth in the court's prior Opinion and Order, which is summarized and supplemented herein. *See CMA I*, 41 CIT at __, 205 F. Supp. 3d at 1329-32.

### A. The Agency Decision Contested in this Litigation

The contested administrative decision, which concluded the fifth periodic administrative review of certain pneumatic off-the-road tires from the People's Republic of China ("China" or the "PRC"), was published as *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review; 2012-2013*, 80 Fed. Reg. 26,230 (Int'l Trade Admin. May 7, 2015) ("*Amended Final Results*"). The Amended Final Results were issued to correct a ministerial error made in the Department's decision published as *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012-2013*, 80 Fed.

Case: 23-2391 Document: 13 Page: 150 Filed: 11/28/2023

Reg. 20,197 (Int'l Trade Admin. Apr. 15, 2015) ("*Final Results*"). The Final Results incorporated by reference the *Issues and Decision Memorandum for Final Results of Antidumping Duty Administrative Review: Certain New Pneumatic Off-the-Road Tires from the People's Republic of China; 2012-2013* (Apr. 8, 2015) (Pub. Doc. 293), *available at* https://enforcement.trade.gov/frn/summary/prc/2015-08673-1.pdf (last visited Jan. 9, 2019) ("*Final I&D Mem.*").

B. The Parties in this Consolidated Case

China Manufacturing Alliance, LLC ("CMA") and Double Coin Holdings Ltd. ("Double Coin Holdings") (collectively, "Double Coin") are plaintiffs in this consolidated case.[1] CMA is a U.S. importer of subject merchandise produced and exported by Double Coin Holdings and its affiliated entities.[2] Compl. ¶ 2 (Apr. 28, 2015), ECF No. 6. A second group of plaintiffs consists of Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd. (collectively, "GTC"). GTC is a producer and exporter of subject merchandise. Compl. ¶ 3, *Guizhou Tyre Co. v. United States*, No. 15-00128 (May 1, 2015), ECF No. 6. Double Coin and GTC were the mandatory respondents in the fifth review and the only two respondents individually examined by Commerce. *Final Results*, 80 Fed. Reg. at 20,197. Also a plaintiff, and a defendant-intervenor,

---

[1] Consolidated under *China Mfrs. Alliance, LLC v. United States*, Consol. Ct. No. 15-00124, are *Guizhou Tyre Co. v. United States*, Ct. No. 15-00128, and *United Steel, Paper and Forestry, Rubber, Mfg., Energy, Allied Indus. and Serv. Workers Int'l Union, AFL-CIO, CLC v. United States*, Ct. No. 15-00136. Order (July 17, 2015), ECF No. 24.

[2] Commerce decided that Double Coin Holdings and two companies affiliated with it, Double Coin Group Jiangsu Tyre Co., Ltd. and Double Coin Group Shanghai Donghai Tyre Co., Ltd., should be treated as a single entity ("collapsed") for purposes of the review. *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012-2013*, 80 Fed. Reg. 20,197, 20,198 (Int'l Trade Admin. Apr. 15, 2015) ("*Final Results*"). This decision is not challenged in this litigation.

is the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC (the "USW").[3] Order (May 13, 2015), ECF No. 17. The USW was a petitioner in the investigation that gave rise to the underlying antidumping duty order and participated in this administrative review as an interested party. Comp. ¶ 3, *United Steel, Paper and Forestry, Rubber, Mfg., Energy, Allied Indus. and Serv. Workers Int'l Union, AFL-CIO, CLC v. United States*, No. 15-00136 (May 6, 2015), ECF No. 6.

C. Procedural History

Commerce issued the antidumping duty order on off-the-road tires from China in 2008. *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Notice of Amended Final Affirmative Determination of Sales at Less Than Fair Value and Antidumping Duty Order*, 73 Fed. Reg. 51,624 (Int'l Trade Admin. Sept. 4, 2008). On November 8, 2013, Commerce initiated the subject review, which covered entries made during the period of September 1, 2012 through August 31, 2013 (the "Period of Review" or "POR"). *See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part*, 78 Fed. Reg. 67,104 (Int'l Trade Admin. Nov. 8, 2013) ("*Initiation Notice*").

Commerce issued the Final Results on April 15, 2015. *Final Results*, 80 Fed. Reg. 20,197. Following a ministerial error allegation, Commerce issued the Amended Final Results, which assigned GTC a weighted-average dumping margin of 11.41%.[4] *Amended Final Results*, 80 Fed. Reg. at 26,231. Commerce assigned to Double Coin the antidumping duty rate

---

[3] Titan Tire Corporation, a U.S. producer of off-the-road tires and former defendant-intervenor, has withdrawn from this litigation. Order (May 16, 2018), ECF No. 224.

[4] The Final Results had assigned GTC a weighted-average dumping margin of 11.34%. *Final Results*, 80 Fed. Reg. at 20,199.

of 105.31%, which was the rate Commerce assigned to the "PRC-wide entity," concluding that Double Coin had not established its independence from the government of the PRC. This rate was unchanged from the Final Results. *Id*.

Following the court's decision in *CMA I*, Commerce submitted the Remand Redetermination on June 21, 2017. Under protest, the Remand Redetermination changed the final weighted-average dumping margin for Double Coin from 105.31% to 0.14% (a *de minimis* margin). *Remand Redetermination* 39-40. The Remand Redetermination changed the final weighted average margin for GTC from 11.41% to 11.33%. *Id.*

GTC and the USW each filed comments on the Remand Redetermination.[5] Consol. Pl. GTC's Comments on Final Results of Redetermination Pursuant to Ct. Order (July 21, 2017), ECF No. 208 ("GTC's Comments"); Titan Tire Corp. and USW Comments on the Dept. of Commerce's Redetermination Pursuant to Ct. Remand (July 21, 2017), ECF No. 207 ("USW's Comments"). Before filing a response to these comments, defendant filed its motion for a partial remand, under which Commerce would revisit the issue of Double Coin's margin in light of *Diamond Sawblades*, which was issued after the court's Opinion and Order in *CMA I*. Def.'s Mot. for Remand. On September 1, 2017, defendant filed its response to the parties' comments on the Remand Redetermination. Def.'s Resp. to Comments on Remand Results, ECF No. 221 ("Def.'s Reply"). Double Coin opposed defendant's motion for a partial remand. Double Coin and CMA's Opp'n to Def.'s Mot. for Partial Voluntary Remand (Sept. 18, 2017), ECF No. 222 ("Double Coin's Opp'n"). On October 5, 2017, defendant filed a reply in support of its motion for a partial remand. Def.'s Reply in Support of its Mot. for Partial Voluntary Remand (Oct. 5, 2017), ECF No. 223.

---

[5] Double Coin did not file comments on the remand redetermination.

## II. Discussion

### A. Jurisdiction and Standard of Review

The court exercises jurisdiction under section 201 of the Customs Courts Act of 1980, 28 U.S.C. § 1581(c), pursuant to which the court reviews actions commenced under section 516A of the Tariff Act of 1930 (the "Tariff Act"), *as amended* 19 U.S.C. § 1516a, including an action contesting a final determination that Commerce issues to conclude an antidumping duty administrative review. In reviewing a final determination, the court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

### B. The Department's Remand Redetermination

In *CMA I*, the court directed Commerce to submit a redetermination addressing the following four decisions in the Amended Final Results, which the court had ruled were contrary to law: (1) the 105.31% antidumping duty rate assigned to Double Coin, *CMA I*, 41 CIT at __, 205 F. Supp. 3d at 1334-41; (2) downward adjustments Commerce made to GTC's export price ("EP") and constructed export price ("CEP") to account for Chinese irrecoverable value-added tax ("VAT"), *id.*, 41 CIT at __, 205 F. Supp. 3d at 1344-51; (3) the calculation of surrogate values for GTC's brokerage and handling costs and ocean freight costs, *id.*, 41 CIT at __, 205 F. Supp. 3d at 1356-58; and (4) the Department's decision not to make an inflation adjustment in calculating a surrogate value for GTC's domestic warehousing costs, *id.*, 41 CIT at __, 205 F. Supp. 3d at 1358-59.

In the Remand Redetermination, Commerce, under protest and indicating its disagreement with the court's decision, assigned Double Coin a 0.14% *de minimis* margin to

replace the previous margin of 105.31%, which Commerce assigned in the fifth review. *Remand Redetermination* 21, 39-40; *see also Amended Final Results*, 80 Fed. Reg. 26,231.

The downward adjustment from 11.41% to 11.33% that the Remand Redetermination made to GTC's margin resulted from two changes from the Amended Final Results. On the surrogate values for GTC's brokerage and handling costs and ocean freight costs, Commerce concluded that its surrogate value determinations for brokerage and handling costs and ocean freight overlapped, such that "Shanghai Port Charges" were double counted, but it rejected GTC's argument that other charges were double counted as well. *Remand Redetermination* 12-18. Commerce also changed its calculation of its surrogate value for GTC's warehousing costs by including an inflation adjustment. *Id.* at 19. On the VAT issue, Commerce made no change to its methodology, again reducing GTC's starting prices for EP and CEP by 8% of the FOB value of GTC's exported subject merchandise, upon a finding that GTC had failed to demonstrate that it had not incurred "irrecoverable VAT" in these amounts. *Id.* at 12.

C. Positions Taken by the Parties on the Remand Redetermination

Double Coin did not comment on the Remand Redetermination. GTC opposes the Department's decision to maintain the deductions from EP and CEP starting prices it had made for irrecoverable VAT, GTC's Comments 5-13, and, on the brokerage and handling and ocean freight costs, argues that charges in addition to the Shanghai Port Charges were double counted due to the Department's method of determining a surrogate value, *id.* at 13-16. The USW supports the Department's maintaining the deductions for VAT, USW's Comments 3-7, supports the decision that only the Shanghai Port Charge was double counted, *id.* at 7-8, and opposes the decision to assign Double Coin the 0.14% margin, arguing instead that the rate for the PRC-wide entity should have been maintained at 210.48%, which was the rate for the PRC-wide entity prior

to the fifth review, and that this rate should have been assigned to Double Coin, *id.* at 8-12. Defendant United States supports the Remand Redetermination on all issues except for the issue of Double Coin's margin, Def.'s Reply 9, which it addresses in its partial remand motion, *see* Def.'s Mot. for Remand.

D. Decisions in the Remand Redetermination to which No Party Objects

In the Final Results, Commerce determined a surrogate value for GTC's domestic warehousing expenses using a price quote from an Indonesian warehousing and logistics provider. *CMA I*, 41 CIT at __, 205 F. Supp. 3d at 1358; *see Petitioners' Initial Surrogate Value Comments*, Attach. 18 (Apr. 14, 2014) (Pub. Doc. 108), ECF No. 86-43 (warehousing price quote from GIC Logistics Group). The price quote on which Commerce relied was undated, but the website from which it originated was accessed more than seven months after the close of the POR. *CMA I*, 41 CIT at __, 205 F. Supp. 3d at 1359. Before the court, GTC argued that Commerce should have adjusted this price quote for inflation. *Id.*, 41 CIT at __, 205 F. Supp. 3d at 1358-59. In *CMA I*, the court held that Commerce failed to support adequately its decision not to make an inflation adjustment and directed Commerce to "provide a more thorough analysis of the issue that is grounded in whatever relevant evidence exists on the record." *Id.*, 41 CIT at __, 205 F. Supp. 3d at 1359. In the Remand Redetermination, Commerce concluded that the record lacked specific information demonstrating that the price quote was contemporaneous with the POR and adjusted the price quote using the Producer Price Index of the International Monetary Fund. *Remand Redetermination* 19.

Because no party objects to the Department's decision to make an inflation adjustment to GTC's warehouse costs, and because that decision complies with the court's opinion and order in *CMA I*, the court sustains that decision. For the same reasons, the court sustains the

Department's decision that the Shanghai Port Charges were double counted in the Department's calculation of a surrogate value for GTC's brokerage and handling and ocean freight expenses.

E. Issues Remaining in this Litigation

Two issues remain undecided with respect to GTC's margin: (1) whether the deductions from EP and CEP starting prices for Chinese value-added tax were lawful, and (2) whether charges other than the Shanghai Port Charges were double counted in the Department's calculation of a surrogate value for brokerage and handling and international freight expenses. Only one issue remains undecided with respect to Double Coin: whether the court should permit Commerce to reconsider the 0.14% *de minimis* margin it assigned to Double Coin in the Remand Redetermination, due to the decision of the Court of Appeals in *Diamond Sawblades*. The court addresses these three issues below.

1. Commerce Unlawfully Made Deductions from GTC's EP and CEP Starting Prices for Value-Added Tax

In calculating export price or constructed export price of the subject merchandise, Commerce is directed by the Tariff Act to make certain additions to, and deductions from, the starting prices used for determining the "U.S. price," i.e., either the export price or the constructed export price, of the subject merchandise. Some of these adjustments are made to achieve a "tax neutral" comparison between U.S. price and normal value. Among the upward tax-related adjustments, which reduce a dumping margin, are upward adjustments in U.S. price to account for import duties imposed by the country of exportation that have been rebated (i.e., duty drawback), or not collected, by reason of the exportation of the merchandise to the United States. *See* Section 772(c)(1)(B) of the Tariff Act, 19 U.S.C. § 1677a(c)(1)(B). Such duties are added to the U.S. price to allow a tax-neutral comparison with the home market price of the foreign like product, which presumably includes import duties, such as duties on materials used

in production in the exporting country. If the import duties are "irrecoverable," i.e., not rebated or avoided by reason of the exportation, the duties presumably are included in the U.S. price, and no upward adjustment or downward adjustment is made, the price comparison already being tax-neutral. As explained below, the Tariff Act treats domestic value-added taxes of an exporting country in a way similar to its treatment of import duties imposed by an exporting country; i.e., a dumping margin potentially may be reduced for value-added taxes imposed on a finished good, or the materials used to produce it, if those taxes are refunded or avoided due to the exportation of the good. But under the statutory scheme, a domestic value-added tax, whether or not refunded or avoided by reason of the exportation of the finished good, does not increase a dumping margin.

In contrast, a downward adjustment, which increases a dumping margin, generally is made to the U.S. price under the "export tax" provision, to adjust for an export tax, duty, or other charge imposed on the exportation of the subject merchandise to the United States, if included in the U.S. price. Section 772(c)(2)(B) of the Tariff Act, 19 U.S.C. § 1677a(c)(2)(B). A tax subject to this provision is presumed to be present in the price of the exported subject merchandise but, by definition, is not present in the price of the foreign like product in the home market. *Id.* The plain meaning of the provision illustrates this point. Section 772(c)(2)(B) directs Commerce to reduce the price used to establish EP and CEP by "the amount, if included in such price, of any *export* tax, duty, or other charge imposed by the exporting country *on the exportation of the subject merchandise* to the United States, other than an export tax, duty, or other charge described in section 1677(6)(C) of this title."[6] 19 U.S.C. § 1677a(c)(2)(B) (emphasis added). In

---

[6] The "export taxes, duties, or other charges" described in section 1677(6)(C) are those which are "levied on the export of merchandise to the United States specifically intended to (. . . continued)

contrast, a domestic value-added tax *is* presumed to be included in the price of the subject merchandise *and also* in the price of the foreign like product. Therefore, the Tariff Act does not make a downward adjustment in U.S. price for a domestic value-added tax, as no such adjustment is necessary or appropriate to achieve tax-neutrality.

Even though 19 U.S.C. § 1677a(c)(2)(B), by its plain meaning, does not address taxes such as import duties or value-added taxes incurred by producers in the exporting country, Commerce resorted to this provision in the Final Results to make downward, i.e. margin-increasing, adjustments to the prices used for determining the U.S. price, i.e., the export price or constructed export price, of GTC's subject merchandise. Commerce made these downward adjustments for irrecoverable value-added taxes included in the prices of materials used to make GTC's subject merchandise. *Final I&D Mem.* at 28. Commerce erroneously reasoned that "irrecoverable" VAT, by which it meant VAT not rebated by reason of exportation of the finished good, "amounts to" an "export tax, duty or other charge imposed on exportation of the subject merchandise to the United States" within the meaning of that term as used in 19 U.S.C. § 1677a(c)(2)(B). *Id.* (internal quotation marks omitted) (footnote omitted).

There is no record evidence in this case demonstrating that China imposed on the subject merchandise an export tax or anything resembling one. The record shows that the PRC value-added tax is incurred by an OTR tire producer in the PRC by the inclusion of this tax in the prices of materials used in domestic production, regardless of whether the finished tire is sold for domestic consumption or export. It also shows that at least some of that tax is rebated, refunded, or avoided if the tire is sold for export. The fact that a domestic value-added tax incurred on

(continued . . .)

offset the countervailable subsidy received." 19 U.S.C. § 1677(6)(C). The countervailable subsidy offset exception has not been invoked in this case.

materials used in producing OTR tires in China might not be fully refunded by reason of

exportation of the finished tire does not convert any unrefunded portion of such a tax from a

domestic value-added tax into an export tax. In other words, irrecoverable VAT is still VAT, not

an export tax. When reduced to its basics, the rationale Commerce adopted in the Final Results

appears to have been that irrecoverable value-added tax, which is a domestic tax incurred on

materials used in production in the exporting country, somehow becomes an export tax simply

because it is irrecoverable.

In the Remand Redetermination, Commerce decided that its deductions from GTC's U.S.

prices, as effected in the Final Results, were correct and should be maintained in the Remand

Redetermination. *Remand Redetermination* 12. This decision is contrary to the record evidence

and the intent Congress expressed in the Tariff Act. Whether recoverable or not, a domestic

value-added tax is not properly the subject of a downward, margin-increasing adjustment under

19 U.S.C. § 1677a(c)(2)(B).

In contesting the Final Results, GTC claimed, *inter alia*, that the Department's

deductions from U.S. price were unauthorized by the plain language of the statute. *CMA I*,

41 CIT at __, 205 F. Supp. 3d at 1344-45. Continuing to pursue this claim, GTC objects that the

Remand Redetermination "does not affirmatively answer the threshold question presented by this

Court; that is, whether the VAT adjustment is consistent with the statutory authorization to

deduct from EP/CEP 'a tax, duty, or other charge . . . so imposed in relation to the subject

merchandise.'" GTC's Comments 7 (quoting *CMA I*, 41 CIT at __, 205 F. Supp. 3d at 1346).

*CMA I* did not decide the question of whether any EP and CEP deduction for Chinese

VAT is authorized by 19 U.S.C. § 1677a(c)(2)(B) because Commerce impermissibly resorted

only to a presumption, rather than an actual finding, that a charge, of whatever character, in an

amount equal to 8% of the export value was imposed and was specific to GTC's merchandise.[7] *Id.* at 1349. "That is why the court need not reach the question of whether any unrefunded VAT charge that Commerce might have found to have been incurred would have qualified as an 'export' tax, duty or other charge within the meaning of the statute." *Id.*

After *CMA I* was decided and the parties filed their comments on the Remand Redetermination, another decision of this Court answered the statutory interpretation question *CMA I* did not reach. In *Qingdao Qihang*, 42 CIT at __, 308 F. Supp. 3d at 1338-47, this Court analyzed the plain meaning, statutory history, and legislative history of 19 U.S.C. § 1677a(c)(2)(B). *Qingdao Qihang* concluded that Congress, in enacting that and related provisions in the Tariff Act, intended that a domestic value-added tax imposed by an exporting country on subject merchandise or the materials used to produce it, whether or not "recoverable" by reason of exportation of the subject merchandise, would not increase a dumping margin.[8] Moreover, the opinion explained that the application of § 1677a(c)(2)(B) does not depend on whether or not the exporting country is treated by Commerce as a nonmarket economy country, as are China and Vietnam.

---

[7] Contrary to the Department's conclusions, in neither the Final Results nor in the Remand Redetermination did Commerce reach a finding supported by substantial evidence that GTC incurred irrecoverable VAT in the amount of 8% of the export value of the subject merchandise. But as the court explains in the Opinion and Order, the Department's decision to make deductions in U.S. price for irrecoverable VAT was unlawful regardless of the Department's erroneous presumption as to how much VAT was irrecoverable.

[8] Prior decisions of this Court had sustained as reasonable the Department's interpretation of 19 U.S.C. § 1677a(c)(2)(B) to apply to irrecoverable VAT. *See Qingdao Qihang Tyre Co. v. United States*, 42 CIT __, 308 F. Supp. 3d 1329, 1346 ("*Qingdao Qihang*") (citing other decisions of this Court). *Qingdao Qihang* opined that in these prior decisions, the issue of whether the Department's interpretation was consistent with statutory purpose and legislative history does not appear to have been argued, as it was not addressed in the various opinions.

The *Qingdao Qihang* opinion noted that Congress, when enacting 19 U.S.C. § 1677a(c) and its related provisions, addressed the precise question of how a domestic tax such as a value-added tax, imposed by the exporting country directly upon an exported good or the components used to produce that good, would affect a dumping margin. The court pointed out that Congress intended that VAT avoided or refunded by reason of exportation of the subject merchandise, i.e., "recoverable" VAT, would have the potential to reduce a dumping margin. It explained that prior to the enactment of the Uruguay Round Agreements Act ("URAA"), the Tariff Act contained a provision that potentially increased U.S. price by the amount of recoverable VAT, thereby reducing a dumping margin, while the export tax provision, in the ordinary instance, would increase a dumping margin. *Qingdao Qihang*, 42 CIT at __, 308 F. Supp. 3d at 1340-41. The former increased U.S. price (and thereby reduced a dumping margin) by "the amount of any taxes imposed in the country of exportation directly upon the exported merchandise or components thereof, which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States, but only to the extent that such taxes are added to or included in the price of such or similar merchandise when sold in the country of exportation." 19 U.S.C. § 1677a(d)(1)(C) (1982). The provision generally was understood to apply to recoverable value-added tax imposed by the country of exportation. *See Federal-Mogul Corp. v. United States*, 63 F.3d 1572, 1576-78 (Fed. Cir. 1995). *Qingdao Qihang* reasoned that Congress had to have been aware of the difference between an "export tax, duty, or other charge imposed by the exporting country on the exportation of the subject merchandise," which it addressed in one paragraph of the provision on U.S. price, and a recoverable domestic tax such as a VAT, which it addressed in a separate paragraph of that provision, with the opposite result. *Qingdao Qihang*, 42 CIT at __, 308 F. Supp. 3d at 1338-39. It noted that Congress used

distinctly different language in the export tax provision than it used in the provision addressing recoverable domestic taxes (such as VAT taxes) that are imposed by the exporting country directly on the exported subject merchandise or the materials used to produce it. *Id.* Congress, therefore, could not have intended that a VAT tax imposed directly upon an exported good or the components thereof, which it addressed in the domestic tax provision, would also fall within the scope of the export tax provision.

The *Qingdao Qihang* opinion further explained that after enactment of the URAA, the statute converted the upward adjustment to U.S. price for recoverable VAT to a downward adjustment in normal value, whether determined by price in the comparison market or by constructed value, thereby again providing that recoverable VAT, in the ordinary instance, would lower a dumping margin. *Id.*, 41 CIT at __, 308 F. Supp. 3d at 1339-44. The opinion went on to discuss that under the URAA, goods exported from NME countries do not get the benefit of the lowering of the margin for recoverable VAT because normal value in those proceedings ordinarily is determined by the special procedures of 19 U.S.C. § 1677b(c), not by home market price or by constructed value. *Id.*, 41 CIT at __, 308 F. Supp. 3d at 1344-46. But as the opinion also discussed, nothing in the Tariff Act, either before or after amendment by the URAA, reasonably can be interpreted to *increase* a dumping margin for VAT, whether "recoverable" or "irrecoverable," and the legislative history is contrary to any such interpretation. *Id.* *Qingdao Qihang* also concluded that the Department's interpretation of 19 U.S.C. § 1677a(c)(2)(B) is contrary to the statutory scheme and the clearly expressed intent of Congress, regardless of whether the good is exported from a nonmarket economy country such as the PRC. The opinion explained that in 19 U.S.C. § 1677a(c)(2)(B), which pertains to U.S. price, not normal value,

Congress made no distinction between market economy and nonmarket economy countries. *Id.*, 41 CIT at __, 308 F. Supp. 3d at 1344-45.

In *Jiangsu Senmao Bamboo and Wood Indus. Co. v. United States*, 42 CIT __, 322 F. Supp. 3d 1308 (Ct. Int'l Trade 2018) ("*Senmao*"), this Court considered specifically the question of whether record evidence supported the finding of Commerce in that review that Chinese irrecoverable VAT "amounts to a tax, duty or other charge imposed on exports that is not imposed on domestic sales." *Senmao*, 42 CIT at __, 322 F. Supp. 3d at 1342. *Senmao* concluded that this finding, which was critical to the Department's rationale, was directly contradicted by the evidence on the administrative record of the review at issue in that case. That record contained detailed information about the workings of the PRC VAT scheme as applied to a respondent in the review, Jiangsu Senmao Bamboo and Wood Indus. Co., Ltd. ("Senmao"). The court concluded that Commerce erroneously presumed that China irrecoverable VAT was not incurred on domestic sales of the good. *Senmao*, 42 CIT at __, 322 F. Supp. 3d at 1344 ("Commerce lacked evidentiary support for its finding that under the PRC's VAT system a producer of exported merchandise such as Senmao did not incur irrecoverable input VAT on domestic sales."). The record in that case showed that potential liability for Chinese "output" VAT affected both domestic sales and sales for export, with the export sales incurring output VAT at a preferentially lower rate. *Id.* The record also showed that the taxpayer applied the total value of input VAT incurred on all materials used (whether used in production for domestic sale or for export) against the potential combined liability for output VAT on domestic sales.[9] *Id.*, 42 CIT at __, 322 F. Supp. 3d at 1343.

---

[9] In this case, unlike in *Jiangsu Senmao Bamboo and Wood Indus. Co. v. United States*, 42 CIT __, 322 F. Supp. 3d 1308 (Ct. Int'l Trade 2018), there is no record evidence that sales of (. . . continued)

The finding the court ruled unsupported by record evidence in *Senmao* was also made in the review at issue in this case. Commerce stated in the Final Issues and Decision Memorandum as follows:

> In a typical VAT system, companies do not incur any VAT expense; they receive on export a full rebate of the VAT they pay on purchases of inputs used in the production of exports ("input VAT"), and, in the case of domestic sales, the company can credit the VAT they pay on input purchases for those sales against the VAT they collect from customers. That stands in contrast to the PRC's VAT regime, where some portion of the input VAT that a company pays on purchases of inputs used in the production of exports is not refunded. This amounts to a tax, duty, or other charge imposed on exports *that is not imposed on domestic sales*.

*Final I&D Mem.* at 28 (emphasis added) (footnotes omitted). The Issues and Decision Memorandum cited no factual basis for its finding that Chinese irrecoverable VAT "amounts to" a tax, duty, or other charge imposed on exports "that is not imposed on domestic sales," and the Remand Redetermination is also defective in this respect. There is no record evidence that could support such a finding, and it is hard to imagine that there could be such evidence. If all value-added tax incurred on domestic sales were "recoverable," then it would appear that the taxation scheme would produce no revenue for the government on domestic sales, defeating the purpose of a VAT.

The Remand Redetermination relies on a finding that "[i]n this case, the record demonstrates that the Chinese VAT system can result in companies [*sic*] having un-refunded or

---

(continued . . .)

the subject merchandise incurred output VAT. GTC argues that the record evidence shows that the output VAT rate on exported OTR tires is zero. GTC's Mem. in Support of Mot. for J. on the Agency R. 8 (Sept. 24, 2015), ECF No. 36. Regardless, the important point is that in this case, no record evidence demonstrates that OTR tires sold in the Chinese domestic market receive preferential value-added tax treatment of *any* kind over OTR tires sold for export. The record evidence in this case, as in the review at issue in *Senmao*, shows that the opposite is true: sales for exportation from China are treated more favorably than domestic sales under the PRC VAT scheme.

irrecoverable VAT, in which some portion of the VAT that a company pays on purchases of inputs used in the production of exports of subject merchandise is not refunded," *Remand Redetermination* 9. This reliance is misplaced. A value-added tax that a domestic producer incurs on its domestic sales but does not avoid entirely on its export sales is not the same as a tax, duty, or charge imposed on the exportation of the good. In the Remand Redetermination, as in the Final Results, the Department's illogical rationale appears to be that for purposes of 19 U.S.C. § 1677a(c)(2)(B), irrecoverable Chinese VAT is an "export tax, duty, or other charge" that is "imposed by the exporting country on the exportation" of the good simply because it is irrecoverable. See *id.* at 28. Commerce emphasizes the term "charge" as used in the statutory phrase "export tax, duty, or other charge," noting the lack of a statutory definition, and claims entitlement to "deference" for its "reasonable" interpretation. *Id.* at 8-9 ("'[E]xport tax, duty, or other charges' includes 'a cost that arises as the result of export sales,' consistent with other cases interpreting the word 'charges.'") (footnote omitted). But the question of whether Chinese value-added tax is a "tax" or, alternatively, some form of "other charge" is not the question posed by this case. To the contrary, the question is whether the Department's statutory interpretation is reasonable. Because it contravenes the plain meaning, statutory history, and legislative history of § 1677a(c)(2)(B), it is not. An agency interpretation that disregards the clearly expressed intent of Congress is not a reasonable one.

In summary, Congress had a specific intent with respect to VAT imposed by an exporting country on subject merchandise or the materials used to produce it. Congress did not intend that irrecoverable VAT, i.e., VAT that was not refunded or avoided by reason of exportation of the good, would increase a dumping margin (although it did intend that *recoverable* VAT, in some circumstances not present here, could reduce a dumping margin). In addition, Commerce erred

in finding, without any evidentiary support, that Chinese irrecoverable VAT is a tax not imposed on the domestic good. In its redetermination in response to this Opinion and Order, Commerce must take the appropriate corrective action to remove from the calculation of GTC's margin its downward EP and CEP adjustments for VAT.

2. The Department's Finding that Only One Cost Category of B&H and Freight Costs Was Double Counted Is Not Supported by Substantial Evidence on the Record

The statute directs Commerce to reduce U.S. price (i.e., the starting prices for determining EP or CEP) by "the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, and United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States." 19 U.S.C. § 1677a(c)(2)(A).

For GTC's export brokerage and handling costs paid in RMB or provided by a Chinese freight carrier in the Final Results, Commerce used a surrogate value of 0.0455 USD per kilogram that it obtained from information pertaining to Indonesia, its chosen surrogate country. This information was published by the World Bank as *Doing Business 2014: Indonesia* ("*Doing Business Indonesia*"). *See Petitioners' Initial Surrogate Value Comments*, Attach. 17 (Apr. 14, 2014) (Pub. Docs. 107-108), ECF Nos. 86-42, 86-43 ("*Petitioners' Initial SV Comments*") (placing on the administrative record portions of *Doing Business Indonesia*); *Surrogate Value Comments for GTC*, Ex. 11 (Apr. 14, 2014) (Pub. Doc. 111), ECF No. 90-1 ("*SV Comments for GTC*") (same).

Commerce obtained the surrogate value of 4.55 cents per kilogram for export brokerage and handling by adding three cost categories shown in *Doing Business Indonesia* for "trading a standard shipment of goods by ocean transport" from Indonesia. These costs were: "documents preparation" of $165, "Customs clearance and technical control" of $125, and "Ports and

terminal handling" of $165. *See CMA I*, 41 CIT at __, 205 F. Supp. 3d at 1357. Commerce presumed (and GTC does not contest) that a "standard shipment" of goods would consist of a standard, fully-loaded oceangoing cargo container of 10,000 kilograms. *See Petitioners' Initial SV Comments*, Attach. 17 (Apr. 14, 2014) (methodology for *Doing Business Indonesia*). To calculate the per-kilogram surrogate value, Commerce divided the sum of the costs, $455, by this kilogram quantity.

To value GTC's trans-Pacific ocean freight from China to the United States, Commerce calculated an average of monthly per-container shipping price quotes to both the east and west coasts of the United States using information published online by Descartes Systems Group Inc. ("Descartes") and provided to the record by GTC. *Final Results Surrogate Value Mem*. 2 (Apr. 8, 2015) (Pub. Doc. 294), ECF No. 107-6 ("*Final Surrogate Value Mem.*"); *Preliminary Results Surrogate Value Mem.* 15-16 (Sept. 30, 2014) (Pub. Doc. 265), ECF No. 108-1 ("*Prelim. Surrogate Value Mem.*"); *see SV Comments for GTC*, Ex. 8. Commerce converted the per-container costs to per-kilogram costs using an average kilograms-per-container factor obtained from GTC's proprietary information. *Prelim. Surrogate Value Mem.* 15-16. Commerce also included in its deduction under 19 U.S.C. § 1677a(c)(2)(A) an amount for U.S. domestic inland freight for those sales in which GTC paid shipping charges all the way to the customer. *Final Surrogate Value Mem*. 2. Commerce obtained this U.S. inland freight amount from "price lists from Descartes for delivery from ports on the East and West coasts, averaged the cost of delivery per container from the price list, and applied the same average proprietary kilograms-per-container factors as we did for the ocean freight." *Prelim. Surrogate Value Mem.* 16 (footnote omitted).

Before Commerce and again before the court, GTC claimed that Commerce double counted some costs by including them both in the brokerage and handling surrogate value and in the ocean freight costs, thereby overstating the CEP deduction required by 19 U.S.C. § 1677a(c)(2)(A). *See* GTC's Comments 6-10. The costs in question were listed for one or more of the Descartes ocean freight quotes and described as surcharges separate from the cost item for ocean freight itself. *CMA I* directed Commerce to reconsider its conclusion in the Final Results that double counting did not occur and also directed Commerce to "address specifically each of the charges in the Descartes quotes that GTC identifies as charges that overlap with the charges Commerce obtained from the *Doing Business* report." *CMA I*, 41 CIT at __, 205 F. Supp. 3d at 1358. Noting that Commerce did not address adequately "the specific question" of the double counting raised by GTC, the court stated:

> As an example, one of the three cost elements in the Department's calculation of the $455 brokerage and handling cost from that [*Doing Business*] report is "Documents preparation" at $165. Commerce did not address the specific question of whether this charge overlapped with the item identified on certain of the Descartes quotes as "Documentation Charges" of $45 and the item listed on one of the quotes as "Doc. Handling Charges" of $60. As another example, Commerce also included in the $455 total a charge for "Ports and terminal handling" at $165. Commerce does not explain its reasoning for its apparent conclusion that this had no overlap with "Shanghai Port Charges" of $66, which is listed on one of the Descartes quotes.

*Id.*

In a draft version of the remand redetermination, Commerce considered the following eight cost categories for possible double counting with the *Doing Business* report: (1) "Documentation charges," (2) "Traffic Metigation {sic} fee," (3) "AMS Charge," (4) "Clean Truck Fee," (5) Chassis Usage Charges," (6) "Shanghai Port Charges," (7) "International Ship & Port Security charges," and (8) "ISD Handling Charge." *See Draft Results of Redetermination Pursuant to Court Remand* 11 (May 4, 2017) (Remand Pub. Doc. 1), ECF No. 210-5 ("*Draft*

*Remand Redetermination*"). Commerce concluded in the draft results that of the eight costs, all but two—cost (3), "AMS Charge," and cost (5), "Chassis Usage Charges"—were double counted, having "appeared in both ocean freight and shipping and handling charges." *Id.* at 12. Commerce removed the other six costs from the ocean freight cost calculation. Commerce reasoned that the "AMS Charge" referred to the cost of providing manifest information to U.S. Customs and Border Protection through the Automated Manifest System ("AMS") and, accordingly, "are necessarily charged by the freight forwarder and not a port charge covered by *Doing Business*." *Id.* at 12-13. Commerce found that a "Chassis Usage Charge" is "the additional charge for renting the chassis to support and transport full container loads transported via ocean freight at the destination" and therefore "not port charges covered by *Doing Business*." *Id.* at 13 (footnote omitted).

After admitting new factual information to the record, Commerce decided in the Remand Redetermination that only cost (6), the "Shanghai Port Surcharge," is within the costs reported in *Doing Business* and therefore double counted. The effect of this change was to increase the 11.24% margin for GTC determined in the draft remand redetermination to 11.33%. *Compare Draft Remand Redetermination* 16-17, *with Remand Redetermination* 39-40.

Commerce, relying on information submitted during the remand proceeding by the petitioner, concluded that four of the costs in question were related to activities in the United States occurring after ocean transport and therefore were not included in the brokerage and handling costs covered by the *Doing Business* report. These were cost (2), the Traffic Mitigation Fee, cost (3), the Chassis Usage Charges, cost (5), ISD Handling Charges, and cost (7), the "Clean Truck Fee." *See Remand Redetermination* 15-17. Commerce found that the Chassis Usage Charges were "additional charges for renting the chassis to support and transport full

container loads transported via ocean freight at the destination." *Id.* at 16 (footnote omitted). It concluded that the ISD handling Charges "are not related to on-ocean services, but rather are charged by the U.S. Consumer Product Safety Commission (CPSC) for inspection of cargo entering the United States" and therefore are "not covered by *Doing Business.*" *Id.* (footnote omitted). Commerce added that the Traffic Mitigation Fee and Clean Truck Fee "are not expenses related to on-ocean services, but, rather, are post-ocean pass-through fees specific to the ports of Los Angeles and Long Beach." *Id.* (footnote omitted).

In commenting on the Department's draft remand redetermination, GTC objected that the costs Commerce associated with post-ocean transport are more appropriately valued under U.S. inland truck freight, *see Remand Redetermination* 35-36, and GTC renews that objection before the court, GTC's Comments 15-16. GTC argues that "Commerce refused to exclude costs that it found related to services undertaken in the United States based on a technicality: 'the scope of the remand permits the Department only the discretion to evaluate fees potentially double counted with the surrogate for PRC brokerage and handling.'" *Id.* at 15 (*quoting Remand Redetermination* 37 n.174). The Remand Redetermination also gave a second reason for rejecting the argument that the costs Commerce associated with post-ocean transport were not double counted: "Regardless, the use of a 'fully loaded' international freight SV [surrogate value] renders this question moot." *Remand Redetermination* 37 n.174. The court finds both of these reasons unconvincing.

Commerce was not precluded by *CMA I* from considering whether alleged double counting occurred between the brokerage and handling surrogate value and the ocean freight costs. Commerce reopened the record during the remand proceeding, accepted new information during that proceeding and, following its issuance of its draft for comment by the parties,

changed its position on most of the costs it determined to have been double counted in the draft, based on the new record information. Because the Department's latest decision on double counting raises a new issue, GTC must be given the opportunity to object to the Department's new determination on double counting, which stemmed from the new information Commerce admitted to the record. Accordingly, Commerce must consider GTC's objection that four cost categories (i.e., cost (2), the "Traffic Mitigation Fee," cost (3), the "Chassis Usage Charges," cost (5), "ISD Handling Charges," and cost (7), the "Clean Truck Fee") appear to overlap with domestic transportation costs that would be included in the prices reflected by the Descartes price lists Commerce used to calculate GTC's U.S. inland freight costs. *See Prelim. Surrogate Value Mem.* 16, Attach. X (explaining that Commerce added U.S. inland freight costs—based on the Descartes price lists—to ocean freight costs to calculate "a total freight value for shipments entering through both East and West coast ports"). Commerce has not reached a valid determination that the cost categories GTC identified as double counted are separate from charges incurred during inland transportation in the United States, and it cannot be permitted to avoid this obligation by citing what it narrowly considered to be the scope of the court's order in *CMA I*.

The second reason Commerce gave—that the Department's international freight surrogate value was a "fully loaded" cost—is not adequately demonstrated. *See Remand Redetermination* 12-13, 17. Commerce stated that the "international freight surrogate value did not encompass only ocean freight, but also all post-exportation expenses incurred to deliver the merchandise to the unaffiliated customer (*i.e.*, ocean freight, U.S. inland freight charges, U.S. brokerage and handling expenses, etc.) – a 'fully-loaded' transportation charge." *Remand Redetermination* 12-13 (footnote omitted). But in its Remand Redetermination, Commerce

failed to explain why certain "ocean freight" charges identified in the Descartes quotes were not accounted for again in the "U.S. inland freight" charges, which were derived from separate Descartes price lists. *See id.* Specifically, Commerce found that the "'Automated Manifest System (AMS) Charge,' 'Chassis Usage Charges,' 'ISPS- Int'l Ship and Port Security Charges,' 'ISD Handling Charges,' 'Traffic Mitigation Fee,' 'CTF- Clean Truck Fee,' and 'Documentation Charges' are unique to ocean freight *or* activities at the U.S. destination." *Id.* at 15 (emphasis added). If any of these "ocean freight" costs also are encompassed by the "U.S. inland freight" costs, it would appear that they were double counted in the Department's "fully loaded transportation charge" calculation. *See id.* at 12-13.

Commerce engaged in a complex calculation, and used multiple sources of data, to determine the transportation-related and logistics-related costs for deduction under 19 U.S.C. § 1677a(c)(2)(A). That provision requires Commerce to determine the "additional costs, charges, or expenses . . . which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States." 19 U.S.C. § 1677a(c)(2)(A). It must do so as accurately as possible based on the record information. On remand, therefore, Commerce must review and reconsider all aspects of its determination that only one cost identified by GTC was double counted and may not rely on its narrow conception of the scope of the court's previous order of remand to refuse to consider whether costs were double counted. In summary, Commerce must ensure that no costs are double counted either as between (1) brokerage and handling (based on the *Doing Business* report) and ocean freight (based on the Descartes quotes), or (2) ocean freight (based on the Descartes quotes) and U.S. inland freight (based on the Descartes price lists).

3. The Court Denies Defendant's Motion for a Partial Remand

Commerce selected Double Coin for individual examination as a mandatory respondent, the other mandatory respondent having been GTC. *Respondent Selection Mem*. 7 (Dec. 13, 2013) (Pub. Doc. 27) (Conf. Doc. 6), ECF No. 85-12. Commerce based its choice on import data showing Double Coin to be one of the two largest exporters of subject merchandise into the United States during the POR. *Id*.

The sales and production data Double Coin submitted during the fifth review enabled Commerce to calculate for Double Coin an individually-determined margin of 0.14%. *Final Results*, 80 Fed. Reg. at 20,199. Rather than assign this margin to Double Coin, either individually or to the PRC-wide entity of which it considered Double Coin to be a part, Commerce assigned the PRC-wide entity (and therefore Double Coin) a rate of 105.31%. *Id*. Commerce calculated this rate as "a simple average of the previously assigned PRC-wide rate (210.48 percent) and Double Coin's calculated margin (0.14%)." *Id.* (footnotes omitted); *see Amended Final Results*, 80 Fed. Reg. at 26,231. The pre-existing 210.48% PRC-wide rate was the rate Commerce applied to the PRC-wide entity in the investigation, which Commerce did not change in any of the periodic reviews of the antidumping duty order prior to the fifth review. *See Final I&D Mem.* at 12-13. Commerce included Double Coin in the PRC-wide entity because it concluded that Double Coin "failed to demonstrate absence of *de facto* government control over export activities due to the fact that its controlling shareholder is wholly-owned by the State-owned Assets Supervision and Administration Commission of the State Council and the significant level of control this majority shareholder wields over the respondent's Board of Directors." *Final Results*, 80 Fed. Reg. at 20,199 (footnote omitted).

a. The Adjudication of Double Coin's Claim in *CMA I*

In support of its claim challenging the 105.31% rate, Double Coin made several arguments before the Court of International Trade, including that Double Coin demonstrated the absence of *de facto* control by the PRC government. The court did not reach this argument in *CMA I*, granting relief on Double Coin's claim on other grounds. The court ruled that in the particular circumstance presented by this case, the statute required Commerce to assign Double Coin "an individual weighted average dumping margin." *CMA I*, 41 CIT at __, 205 F. Supp. 3d at 1334-41. The particular circumstance included the facts that Commerce selected Double Coin for individual examination and that all parties, including Double Coin, fully cooperated in the review. The court concluded that the *de minimis* margin of 0.14% calculated for Double Coin qualified as an "individual weighted average dumping margin" within the meaning of 19 U.S.C. § 1677f-1(c)(1), but the rate of 105.31% that Commerce assigned to Double Coin, which was determined by averaging the individual margin with the existing PRC-wide rate of 210.48%, did not. *See* 19 U.S.C. § 1677f-1(c)(1) (stating the general rule that Commerce "shall determine the individual weighted average dumping margin for each known exporter and producer of the subject merchandise").

The court reasoned, first, that Commerce had discretion under 19 U.S.C. §§ 1675(a) and 1677f-1(c)(2) *not* to examine Double Coin individually and, had it exercised that authority, could have assigned Double Coin a rate other than an individual margin. *CMA I*, 41 CIT at __, 205 F. Supp. 3d at 1335. The court noted that Commerce intentionally decided not to exercise that discretion and instead designated Double Coin (but not the rest of the PRC-wide entity) for individual examination under 19 U.S.C. § 1677f-1(c)(1), thereby placing itself under the

Case: 23-2391 Document: 13 Page: 175 Filed: 11/28/2023

statutory obligation to assign Double Coin an individual weighted-average dumping margin. *Id.*, 41 CIT at __, 205 F. Supp. 3d at 1334-35.

Second, the court concluded that although Commerce has authority under 19 U.S.C. § 1677e(a) to use "facts otherwise available" in "reaching the applicable determination," it could not validly use that authority here, Commerce having found Double Coin's submitted information sufficient for calculation of an individual weighted average margin. *Id.*, 41 CIT at __, 205 F. Supp. 3d at 1336-37. Mentioning that 19 U.S.C. § 1677e(a) may be invoked when "necessary information is not available on the record," 19 U.S.C. § 1677e(a)(1), the court concluded that Commerce did not make a valid finding that "necessary information" was unavailable. *Id.* The court noted that Commerce said it lacked "complete information" with which to establish a new rate for the PRC-wide entity, i.e., information on the portion of the PRC-wide entity not constituted by Double Coin. *Id.* The court concluded, nevertheless, that Commerce had no need for such information because it expressly had declined to designate the non-Double Coin portion of the PRC-wide entity for individual examination. *Id.*, 41 CIT at __, 205 F. Supp. 3d at 1336-41.

Third, the court concluded that even had it been permissible for Commerce to use facts otherwise available, Commerce could not permissibly use its "adverse inference" authority of 19 U.S.C. § 1677e(b) to apply the 105.31% rate, which was based in part on "adverse facts available" ("AFA"). *Id.*, 41 CIT at __, 205 F. Supp. 3d at 1338. The court reasoned that Commerce found Double Coin to have fully cooperated and did not find the PRC-wide entity, or any portion of it, to be an uncooperative respondent in the review. *Id.*

Seeing no statutory exception allowing Commerce to assign anything other than an individual dumping margin to Double Coin, the court directed Commerce "to assign the 0.14%

*de minimis* margin to Double Coin because it is the only possible result that, on the record of the fifth administrative review, could comply with all statutory requirements." *Id*., 41 CIT at __, 205 F. Supp. 3d at 1344.

b. Defendant's Motion for a Partial Remand and Double Coin's Opposition

In the Remand Redetermination, Commerce assigned Double Coin a 0.14% *de minimis* margin. *Remand Redetermination* 19-21. It did so "under respectful protest," noting that it disagreed with the "rationale and holding" of *CMA I*. *Id*. at 21. After Commerce submitted the Remand Redetermination to the court, defendant filed its motion for a partial remand "so that Commerce can revisit the issue of Double Coin's margin in light of *Diamond Sawblades.*" Def.'s Mot. for Remand 2 (citing *Diamond Sawblades*, 866 F.3d at 1313 n.6). Defendant's motion directs the court's attention, in particular, to footnote 6 of the *Diamond Sawblades* opinion. Responding to an argument that appellant Advanced Technology & Materials ("ATM") had based on *CMA I*, the footnote expressed disapproval of the analysis in *CMA I*. In the footnote, the Court of Appeals stated as follows:

> The CIT's analysis in *China Manufacturers Alliance* suffers from the same deficiencies as ATM's arguments in this appeal. The analysis does not properly apply our precedent upholding Commerce's use of the PRC-wide entity rate for companies that fail to rebut the presumption of government control and is incompatible with the underlying NME presumption. *See Transcom*[*, Inc. v. United States*], 294 F. 3d [1371] at 1381. Accordingly, we do not find the CIT's decision in *China Manufacturers Alliance* persuasive.

*Diamond Sawblades*, 866 F.3d at 1313 n.6. Defendant argues in its motion that the decision of the Court of Appeals in *Diamond Sawblades* constitutes intervening legal authority that Commerce could not have considered when making its decision in the Remand Redetermination to address Double Coin's margin. Def.'s Mot. for Remand 5. Defendant argues, further, that the appellate decision "'may affect the validity of the agency action' of assigning Double Coin,

under protest, a *de minimis* margin in its *Remand Redetermination*." *Id.* (quoting *SKF USA Inc. v. United States*, 254 F.3d 1022, 1028 (Fed. Cir. 2001)).

Double Coin opposes the remand motion. It argues, first, that "Commerce cannot at this time seek to change the remand result" in this situation, in which Commerce assigned Double Coin an individual weighted-average dumping margin as required by the court's order. Double Coin's Opp'n. 1. According to Double Coin, "[b]ecause this Court has already opined on the matter, Commerce must respect and abide by such opinion—until and unless it is changed or vacated." *Id.* at 3. Double Coin adds that granting defendant's motion "would result in inefficient litigation and resolution of this appeal." *Id.* at 4. Double Coin argues, in the alternative, that if the court grants the motion, it also must address the three other arguments it made in contesting the 105.31% rate, i.e., the arguments the court did not reach in granting relief on Double Coin's claim. Those arguments, as recounted in its opposition to the remand motion, were that: (1) Commerce lacked authority to issue a "country-wide" rate such as the PRC-wide rate, being limited by the statute to assigning individual margins and an all-others rate, (2) the Department's presumption of government control in China is no longer valid given the changes in China to the underlying factual basis that previously gave rise to that presumption, and (3) in this case, Double Coin rebutted the presumption of government control. *See id.* at 4-5.

The court will deny the motion for a partial remand. Were the court to grant the motion, upon reconsideration the only rate Commerce reasonably could assign the PRC-wide entity on the record of the fifth review would be the 0.14% rate Commerce assigned Double Coin in the Remand Redetermination. This result obtains under the relevant holding in *Diamond Sawblades*, as discussed below. Because Commerce has requested to reconsider only the rate it assigned Double Coin, and not the 105.31% rate assigned to the entire PRC-wide entity that Commerce

left unchanged in the Remand Redetermination, no purpose would be served by granting defendant's motion.

One of the holdings of *Diamond Sawblades* bears directly on this case and is intervening legal authority. *See SKF USA*, 254 F.3d at 1028-29 (explaining that an agency may seek remand in order to consider new legal decisions). *Diamond Sawblades* holds that the Tariff Act allows Commerce to assign the rate it assigns to the PRC-wide entity to a cooperative respondent it selected as a mandatory respondent, provided the respondent fails to rebut the Department's presumption of control by the government of the PRC. *Diamond Sawblades*, 866 F.3d at 1313 & n.6. The analysis by which *CMA I* ordered Commerce to assign Double Coin the calculated individual margin of 0.14% does not conform to the holding in *Diamond Sawblades* because it did not require expressly that the rate to be assigned to Double Coin be the rate ultimately determined for the PRC-wide entity as a whole.[10] Therefore, in order to rule on defendant's motion, the court reconsiders, in light of the holding in *Diamond Sawblades*, its decision in *CMA I* to require Commerce to assign that margin to Double Coin. In doing so, the court applies the analysis the Court of Appeals applied in *Diamond Sawblades*. Also, solely for purposes of ruling on defendant's motion for a partial remand, the court presumes, but does not decide, that the Department's rebuttable presumption that the export activities of all firms within the PRC are subject to government control is factually supported and that Commerce permissibly found that Double Coin had not rebutted that presumption.

---

[10] It should be noted that *CMA I* did not *preclude* Commerce from assigning the 0.14% margin to the PRC-wide entity as well as to Double Coin. No party other than Double Coin challenged the PRC-wide rate in this litigation.

<u>c. *Diamond Sawblades* Does Not Hold that Commerce May Assign the PRC-Wide Entity an Adverse Inference Rate if the PRC-Wide Entity Did Not Fail to Cooperate in the Review</u>

In ruling on defendant's motion for a partial remand, the court first considers what *Diamond Sawblades* does *not* hold. The Court of Appeals did not hold that Commerce may assign a rate derived, in whole or in part, from an adverse inference rate in an administrative review of an antidumping duty order when no party to the review failed to cooperate for purposes of 19 U.S.C. § 1677e(b).

In *Diamond Sawblades*, which involved the final results of the first review of an antidumping duty order, the Department's remand redetermination assigned the respondent ATM the rate (82.12%) it calculated in the review for the PRC-wide entity. *Diamond Sawblades*, 866 F.3d at 1309. Commerce calculated this rate as a simple average of the individually-determined margin it calculated for ATM, which was 0.15%, and the rate for the PRC-wide entity prior to the review, which was 164.09%. *Id.* On remand, Commerce reached a finding (which the Court of Appeals sustained) that ATM had failed to rebut the Department's presumption of control by the PRC government. *Id.* at 1308. As it did in this case, Commerce concluded that "it did not have the necessary information 'from the remaining unspecified portion of the PRC-wide entity to calculate a margin for the unspecified portion of the PRC-wide entity.'" *Id.* at 1309 (quoting the remand redetermination in that case). Like Double Coin, ATM was a mandatory, fully cooperative respondent in the review. *See id.* at 1311. The Court of Appeals held that "[b]ecause ATM failed to rebut the presumption of government control, Commerce's decision to apply the PRC-wide rate to ATM was not contrary to law." *Id.* at 1312.

The 82.12% rate applied to the mandatory respondent ATM in *Diamond Sawblades* was affected by an adverse inference, having been calculated as a simple average of ATM's individually-determined 0.15% margin in the first review and the 164.09% rate, which was the

rate determined for the non-cooperating PRC-wide entity in the immediately-preceding less-than-fair-value investigation. *See id.* at 1309. In *Diamond Sawblades*, 21 companies that were part of the PRC-wide entity failed to cooperate in the review, and therefore the PRC-wide entity as a whole could be considered to have failed to cooperate.[11] Such is not the case here. In concluding the fifth review, Commerce stated that Double Coin was a fully cooperative respondent and that "no other part of the [PRC-wide] entity failed to cooperate." *Final I&D Mem.* at 19.

d. *Diamond Sawblades* Does Not Hold that the "Simple Average" Rate Commerce Assigned to the PRC-Wide Entity in that Case Necessarily Was Reasonable on the Facts of that Case

As the court mentioned above, in the review in *Diamond Sawblades* Commerce calculated the PRC-wide rate of 82.12% as a simple average of the individually-determined margin it calculated for ATM, which was 0.15%, and the rate for the PRC-wide entity prior to the review, which was 164.09%. *Diamond Sawblades*, 866 F.3d at 1309. The Court of Appeals expressly declined to decide whether this method of determining a rate for the PRC-wide entity was reasonable. *Diamond Sawblades*, 866 F.3d at 1309 n.3 ("Neither party challenges

[11] In the remand redetermination at issue in *Diamond Sawblades*, Commerce stated a finding that "'unlike the less-than-fair-value investigation, no part of the PRC-wide entity failed to cooperate to the best of its ability.'" *Diamond Sawblades Mfrs. Coal. v. United States*, 866 F.3d 1304, 1309 (Fed. Cir. 2017) (internal citation omitted). In the Court of International Trade decision on appeal in that case, which the Court of Appeals affirmed, the Court of International Trade had interpreted that finding to apply only to the cooperation of the mandatory respondent Advanced Technology & Materials ("ATM") and not to that of the PRC-wide entity as a whole. *Id.* The CIT concluded that the record in that case lacked substantial evidence to support a finding that the entire PRC-wide entity cooperated in the review. *Id.* The PRC-wide entity in that case included ATM and 21 other companies, all of which failed to demonstrate independence from government control. While ATM fully cooperated, that was not the case for the other 21 companies. As the Court of Appeals stated, "the PRC-wide entity comprised twenty-one other companies, aside from ATM, that also had failed to demonstrate a lack of government control. The other twenty-one companies *did not cooperate in the first administrative review*." *Id.* at 1309 n.2 (emphasis added).

Commerce's decision to take a simple average of the two rates as its method for recalculating the PRC-wide entity rate based on the information it had before it. We therefore do not address the reasonableness of that decision.").

In this case, Double Coin challenged the PRC-wide rate on numerous grounds that necessarily encompass a challenge to the reasonableness of the method by which Commerce derived it.[12] *See* Double Coin's Corrected Br. in Support of Mot. for J. on the Agency R. 8-13, 51-59 (Oct. 5, 2015) ECF Nos. 48 (conf.), 49 (public) ("Double Coin's Br.").

e. The Only Rate Commerce Reasonably Could Assign to the PRC-Wide Entity Is One Equivalent to the Individual Margin It Calculated for Double Coin

Were the court to grant defendant's partial remand motion and thereby permit it to determine a new rate that would apply to Double Coin and to the entire PRC-wide entity, it would not be permissible for Commerce to choose the 105.31% rate Commerce assigned to the PRC-wide entity in the Final Results and the Remand Redetermination.[13] Nor could Commerce assign any other rate derived, in whole or in part, from an adverse inference. As discussed previously, Commerce found that every party to the fifth review, including the PRC-wide entity, was a fully cooperating party.

A party to an antidumping duty proceeding ordinarily may be subjected to a rate based in whole or in part on an adverse inference only if that party "failed to cooperate by not acting to

[12] The Court of Appeals also noted in *Diamond Sawblades* that the plaintiff did "not challenge Commerce's ability to apply a PRC-wide entity rate under the statutory framework." *Diamond Sawblades*, 866 F.3d at 1310 n.4. Double Coin brings that challenge in this case.

[13] Because Double Coin is the only party to this litigation that challenged the PRC-wide rate, and because Double Coin received a rate more favorable than the existing 105.31% PRC-wide rate on remand, Commerce permissibly did not change the PRC-wide rate in the Remand Redetermination. As noted herein, defendant does not seek to change the PRC-wide rate in its motion for a voluntary remand.

the best of its ability to comply with a request for information from the administering authority"

in that proceeding, i.e., the proceeding in which the agency is "reaching the applicable

determination under this subtitle." 19 U.S.C. § 1677e(b).  As the Court of Appeals has opined,

"applying an adverse rate to cooperating respondents undercuts the cooperation-promoting goal

of the AFA statute."  *Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367,

1378 (Fed. Cir. 2012).[14]  Nor could it plausibly be argued that a rate only partially derived from

an adverse inference would not suffer from this defect.  *See id.* ("Commerce misses the point

when it argues that the appellant cannot complain because it does not bear an AFA rate directly,

but only a separate rate derived from the AFA rate, which is only half as adverse.").

The next question, then, is what rate Commerce could assign to the PRC-wide entity that

is *not* derived, in whole or in part, from an adverse inference.  A rate equal to the 0.14% margin

Commerce calculated in the Final Results for Double Coin clearly qualifies under that criterion,

as it used the actual data for Double Coin, which fully cooperated in the review, but the court

must consider whether any rate other than that one also would be reasonable on the record of the

fifth review.

Commerce has a longstanding practice of assigning a single rate to all exporters and

producers of subject merchandise in a nonmarket economy country that do not rebut its

presumption of government control, and it followed that practice in the fifth review.  *See Final

I&D Mem.* at 10-11.  Generally, the Department's practice has been to base the PRC-wide rate

---

[14] The Court of Appeals has recognized a circumstance in which Commerce, applying
19 U.S.C. § 1677e, may rely on policies of deterrence "as part of a margin determination for a
cooperating party" to ensure that another party does not benefit from its own noncompliance, so
long as Commerce does not confine itself to a deterrence rationale and also considers accuracy.
*Mueller Com. De Mex., S. De R.L. De C.V. v. United States*, 753 F.3d 1227, 1233 (Fed.
Cir. 2014).  This case does not present a factual situation analogous to that of *Mueller*.

directly or, as in the Final Results and in the review at issue in *Diamond Sawblades*, indirectly, on an adverse inference rate (typically, a "total AFA" rate). The facts of the fifth review, in which there was no uncooperative party, require Commerce, in order to comply with the limitations in 19 U.S.C. § 1677e(b), to depart from its prior practice of deriving the PRC-wide rate from an adverse inference rate.

In this litigation, Double Coin claims that the Department's practice of issuing a single, "country-wide" rate to the PRC-wide entity is contrary to the Tariff Act. It argued in its Rule 56.2 motion, and argues again in opposition to defendant's motion for a partial remand, that the statute provides for only two types of antidumping duty rates: individual weighted-average dumping margins, which are assigned to exporters and producers that are individually investigated or examined, and an "all-others" rate that applies to all exporters and producers not individually investigated or examined. Double Coin's Br. 8; *see* Double Coin's Opp'n 3-4. A recent decision of the Court of International Trade agreed with that argument. *Thuan An Production Trading and Service Co. v. United States*, 42 CIT __, 2018 WL 5794540, at *4-6 (Nov. 5, 2018) ("*Thuan An*") (holding that the Vietnam-wide rate Commerce assigned in an administrative review of an antidumping duty order "cannot stand" under the Tariff Act if it "is something other than one of the two statutorily authorized rates, i.e., it is not an individual rate or an all-others rate"). This Court reasoned in *Thuan An* that these are the only two types of rates the statute, in 19 U.S.C. § 1673d(c)(1)(B)(i)(I)-(II), authorizes for investigations, *id.* at *4-6, and that this principle applies with equal force to reviews, *id.* at *4 n.11 (citing *Albemarle v. United States*, 821 F.3d 1345, 1352 (Fed. Cir. 2016)). The court considers the reasoning of *Thuan An* persuasive. Moreover, the Tariff Act provides for the assignment of dumping margins (whether or not they are individual margins) to exporters and producers of the subject merchandise, not

countries (although state-owned enterprises may be exporters or producers).  *See* 19 U.S.C.

§§ 1673b(d)(1)(A) (preliminary determinations in investigations); 1673d(c)(1)(B)(i)(I)-(II) (final

determinations in investigations); 1677f-1(c) (determination of dumping margins in

investigations and reviews).

In this case, an "all others" rate could not be assigned to the PRC-wide entity so long as

that entity includes Double Coin.  An all-others rate applies to respondents in an investigation

that are *not* selected for individual examination, *see* 19 U.S.C. § 1673d(c)(1)(B)(i)(I)-(II),  and

this principle also applies to reviews, *see Albemarle*, 821 F.3d at 1352.  In the fifth review,

Commerce designated Double Coin as a mandatory respondent (although declining to so

designate the remainder of the entity).[15]  Therefore, under the holding, and the reasoning, this

Court adopted in *Thuan An*, any rate Commerce could apply to the PRC-wide entity must be an

individual weighted-average dumping margin.

Two individual weighted-average dumping margins are available for assignment in the

fifth review: the rate that will be assigned to GTC (which has not yet been determined in this

litigation), and the 0.14% rate that Commerce already determined based on Double Coin's data.[16]

Because Commerce included Double Coin, but not GTC, in the PRC-wide entity, the 0.14% rate

---

[15] Designating only part of an entity as a mandatory respondent would seem inconsistent with the Department's treating the PRC-wide entity as a "single" entity in which all exporters within the entity are "subject to government control and influence," *Final I&D Mem.* at 10, 13. Regardless, in this case the court need not decide if the designation of only part of an entity for individual examination under 19 U.S.C. §§ 1673d(c)(1)(B)(i)(I)-(II) and 1677f-1(c) is statutorily permissible.

[16] A PRC-wide rate based on "total AFA" arguably could be characterized as an individual rate that is assigned to a single entity, the PRC-wide entity, even though it is not based on examination of individual sales or entries.  But as the court has discussed, it would not be permissible for Commerce to assign an AFA-based rate to the PRC-wide entity in this case.

is, in that respect, representative of the entity, and therefore it would be reasonable for Commerce to assign the PRC-wide entity Double Coin's individual rate. That is not the case with the margin to be determined for GTC, which Commerce found not to be part of the PRC-wide entity.

The holding of *Thuan An* is one reason for the court's conclusion that only the 0.14% rate could be assigned to the PRC-wide entity. But there is another reason as well: *Thuan An* aside, the 0.14% rate is the only rate that reasonably could be applied to the PRC-wide entity according to the particular facts of the fifth review, whether or not the court holds that the rate to be assigned to the PRC-wide entity is required by statute to be an individual rate. Commerce explained that the PRC-wide entity consisted of Double Coin and any other exporter "that has not established its eligibility for a separate rate" by demonstrating independence from "government control and influence." *Final I&D Mem.* at 10. But in the fifth review, no Chinese exporter or producer of OTR tires other than Double Coin was in a position to be determined to be part of the PRC-wide entity, with the result that the record contained no information on any part of the PRC-wide entity except for Double Coin. The administrative record for the fifth review confirms this point.

In the *Initiation Notice*, Commerce announced that it initiated a review of five Chinese producers or exporters of OTR tires: Double Coin, GTC, Hangzhou Zhongce Rubber Co., Ltd. ("Zhongce"), Trelleborg Wheel System (Xingtai) China, Co. Ltd., and Weihai Zhongwei Rubber Co., Ltd. ("Zhongwei"). *Initiation Notice*, 78 Fed. Reg. at 67,108. Double Coin and GTC were the mandatory respondents. *Final Results*, 80 Fed. Reg. at 20,197. Trelleborg was found to have no shipments during the POR and therefore was not a reviewed entity. *Id.* Commerce found that Zhongce and Zhongwei had established independence from the PRC government and were

treated as "separate-rate" respondents in the fifth review, i.e., they were respondents that were under review by Commerce but were not individually examined. *Id.*, 80 Fed. Reg. at 20,198. Therefore, only four companies—Double Coin, GTC, Zhongce, and Zhongwei—were reviewed. In the Amended Final Results, Zhongce and Zhongwei each were assigned a rate equal to the margin individually determined for GTC; i.e., they all received the all-others rate applicable to entities separate from the PRC-wide entity. *Amended Final Results*, 80 Fed. Reg. at 26,231. Like the Final Results, the Amended Final Results listed only four rates, each of which it described as a "[w]eighted average dumping margin (percent)": GTC, 11.41%, Zhongce, 11.41%, Zhongwei, 11.41%, and the "PRC-wide entity," in which Commerce included Double Coin, 105.31%. *Id.* (footnote omitted).

Commerce considered the PRC-wide entity to be under review in the proceeding at issue in this case, but it conceded that the only reason for this was that Double Coin was under review:

> Though Double Coin notes that the NME entity is not listed as one of the companies for which review was requested in the *Initiation Notice*, the *Initiation Notice* plainly states that "If one of the above-named companies does not qualify for a separate rate, all other exporters of Certain Pneumatic Off-the-Road Tires {from} the PRC who have not qualified for a separate rate are deemed to be covered by this review as part of the single PRC entity of which the named exporters are a part. Thus, the Department explicitly put the PRC-wide entity and all other interested parties on notice that the PRC-wide entity would be reviewed if one of the named exporters did not qualify for a separate rate. Thus, pursuant to Double Coin's failure to demonstrate a lack of *de facto* government control, the PRC-wide entity is subject to review.

*Final I&D Mem.* at 12 (footnote omitted). Although Commerce conceded that that the record contained no information "with respect to the composition of the PRC-wide entity," *id.*, and although Double Coin was the only producer or exporter Commerce identified as a member of the PRC-wide entity, Commerce nevertheless seemed to imply that Double Coin was not the only reviewed exporter or producer the PRC-wide entity included:

> Having not demonstrated the absence of *de facto* control from the government over selection of its management, Double Coin constitutes a part of the PRC-wide entity. Further, the PRC-wide entity *is comprised of producers and exporters that can provide answers to questions*, as evidenced by Double Coin in this review.

*Id.* at 14 (emphasis added). The record does not support any such implication.

As Double Coin argued in the review, *see id.* at 10, and argues before the court, *see* Double Coin's Br. 54-55, Commerce never requested any information from the government of the PRC or from any part of the PRC-wide entity other than Double Coin. In explaining the Final Results, Commerce did not dispute that in conducting the fifth review it did not request such information. *See Final I&D Mem.* at 14. In its brief in response to this argument in Double Coin's Rule 56.2 motion, defendant does not dispute that in conducting the fifth review Commerce never requested information from the PRC government or from any other exporter or producer Commerce potentially could have deemed to be part of it. *See* Def.'s Response to Mots. for J. on the Admin. R. 39-40 (Dec. 7, 2015), ECF No. 60 ("Def.'s Br."). As a factual matter, only four exporters or producers of OTR tires specifically were included in the fifth review: two were cooperating mandatory respondents and the other two were unexamined respondents (and were assigned GTC's margin). Therefore, if the PRC-wide entity can be presumed to include any exporters or producers of OTR tires other than Double Coin, they cannot be identified and do not appear in the record of the review.[17]

In opposing Double Coin's Rule 56.2 motion, defendant points out that "Commerce did not preclude a company from participating in this review, nor did it preclude a company from seeking a review of a part of the PRC-wide entity." Def.'s Resp. 39; *see Final I&D Mem.* at 14.

---

[17] This is in contrast to the review at issue in *Diamond Sawblades*, in which 21 companies in addition to ATM were specifically included in the PRC-wide entity. *Diamond Sawblades*, 866 F.3d at 1309 n.2.

This argument does not address the problem posed by the limited record evidence.  That one or more additional Chinese exporters or producers *could* have participated in the review, and, had they done so, might have been found to be part of the PRC-wide entity, does not change the record fact that none actually did.  As a result, the only record information relevant to determining a rate for the PRC-wide entity was the information pertinent to Double Coin. Commerce acknowledged that the record lacked any information on the non-Double Coin portion of the PRC-wide entity: "[t]he Department must calculate a single rate for the PRC-wide entity, and in this review, we do not have the necessary information, *i.e.*, sales and production data, from the remaining unspecified portion of the PRC-wide entity." *Final I&D Mem.* at 12.

When "necessary information is not available on the record" and there is no failure to cooperate, Commerce may resort to "facts otherwise available" without an adverse inference (to which information Commerce refers as "neutral" facts otherwise available).  *See* 19 U.S.C. § 1677e(a).  Here, the only information on the record that reasonably could serve as facts otherwise available for determining a rate for the PRC-wide entity is Double Coin's information. While it might be argued that it would be reasonable for Commerce to use information pertinent to GTC for this purpose, this argument would be unconvincing for the reason the court mentioned earlier.  While both sets of data pertain to the current (fifth) review, Double Coin's information is representative of the PRC-wide entity while the information of GTC, which Commerce excluded from the PRC-wide entity, is not.

In conclusion, the only rate supported by the record evidence that Commerce reasonably could apply to the PRC-wide entity—and therefore to Double Coin—were the court to grant the requested partial remand, would be one equivalent to the 0.14% margin Commerce already determined for Double Coin in the Remand Redetermination.  Because Commerce assigned that

rate to Double Coin in the Remand Redetermination and does not seek to reconsider the 105.31% rate it assigned to the PRC-wide entity (except with respect to Double Coin), granting defendant's motion for a partial remand would serve no purpose. The court, therefore, must deny this motion.

## III. CONCLUSION AND ORDER

For the reasons discussed in the foregoing, the court remands to Commerce the decision published as the Final Results of Redetermination Pursuant to Court Remand (June 21, 2017), ECF No. 200 (the "Remand Redetermination") for further consideration in accordance with this Opinion and Order. Upon consideration of the Remand Redetermination, Defendant's Motion for Partial Voluntary Remand (Aug. 28, 2017), ECF No. 218, all comments thereon, and all papers and proceedings herein, and upon due deliberation, it is hereby

**ORDERED** that Defendant's Motion for Partial Voluntary Remand, be, and hereby is, denied; it is further

**ORDERED** that the Department's decision to make an inflation adjustment to GTC's warehouse costs and its determination that the Shanghai Port Charges were double counted in the Department's calculation of GTC's freight and handling expenses, both of which are uncontested, be, and hereby are, sustained; it is further

**ORDERED** that Commerce shall submit a new determination upon remand ("Second Remand Redetermination") in which it redetermines export price and constructed export price for GTC as directed in this Opinion and Order; it is further

**ORDERED** that Commerce will submit its Second Remand Redetermination, which shall comply with the directives in this Opinion and Order, within 90 days of the date of this Opinion and Order; it is further

**ORDERED** that all plaintiffs may file comments on the Second Remand Redetermination no later than 30 days after the filing of the Second Remand Redetermination; and it is further

**ORDERED** that defendant may file a response to any comments on the Second Remand Redetermination no later than 15 days from the date on which the last comments are filed.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Chief Judge

Dated:  January 16, 2019
        New York, New York

Case 1:15-cv-00124-TCS Document 22-1 Filed 01/16/19 Page 1 of 59

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-912
AR: 09/01/12 - 8/31/13
**Public Document**
E&C AD/CVD OIII: BCQ/AMM

April 8, 2015

**MEMORANDUM TO:** Ronald K. Lorentzen
Acting Assistant Secretary
for Enforcement and Compliance

**FROM:** Christian Marsh
Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations

**SUBJECT:** Issues and Decision Memorandum for Final Results of Antidumping Duty Administrative Review: Certain New Pneumatic Off-the-Road Tires from the People's Republic of China; 2012-2013

---

**SUMMARY**

The Department of Commerce ("Department") analyzed the case and rebuttal briefs of interested parties in the fifth administrative review of the antidumping duty ("AD") order on certain new pneumatic off-the-road tires ("OTR Tires") from the People's Republic of China ("PRC") for the period of review ("POR") September 1, 2012, through August 30, 2013. The review covers the following exporters of subject merchandise: mandatory respondents Double Coin Holdings Ltd. ("Double Coin")[1] and Guizhou Tyre Co., Ltd. / Guizhou Tyre Import and Export Co., Ltd. (collectively, "GTC");[2] separate rates applicants Zhongce Rubber Group Company Limited

---

[1] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part*, 78 FR 67104, 67108 (November 8, 2013) ("*Initiation Notice*"). The review was initiated on Double Coin Group Rugao Tyre Co., Ltd. – renamed Double Coin Group Jiangsu Tyre Co., Ltd. – ("DC Rugao/Jiangsu"), Double Coin Group Shanghai Donghai Tyre Co., Ltd. ("DC Donghai"), and Double Coin Holdings, Ltd. ("DCH" or "Double Coin"). The respondent in this review is DCH, which exported all subject merchandise produced by both its wholly-owned and affiliated factories during the POR. We collapsed DCH (including its Shanghai Heavy Tire factory), DC Rugao/Jiangsu, and DC Donghai into a single entity for the purposes of this review. *See* Memorandum to the File, entitled, "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Double Coin Affiliation and Collapsing Memorandum," dated September 30, 2014 ("Double Coin Affiliation and Collapsing Memo"). Our collapsing determination remains unchallenged and unchanged for these final results. The China Manufacturers' Alliance ("CMA") is DCH's U.S. sales affiliate for all POR sales, and provided and certified to relevant and requested sales-related information on behalf of the respondent. *See* Double Coin Affiliation and Collapsing Memo. Accordingly, for ease of reference we use "Double Coin" to collectively refer to each of the above-mentioned production, export, and sales entities that comprise the respondent in this review, but note that DCH is the actual exporter-respondent.

[2] *See Initiation Notice*. The review was initiated on Guizhou Advance Rubber Co., Ltd. ("GAR"), Guizhou Tyre Co., Ltd., and Guizhou Tyre Import and Export Co., Ltd. *See* Letter from GTC, entitled, "Section A Response: Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated January 29, 2014 ("GTC's SAQR"). These three companies were collapsed

Case: 23-2391 Document: 13 Page: 192 Filed: 11/28/2023

("Zhongce") and Weihai Zhongwei Rubber Co., Ltd.; and Trelleborg Wheel System (Xingtai) China, Co. Ltd. ("Trelleborg" or "TWS Xingtai"). We recommend that you approve the positions we developed in the "Discussion of the Issues" section of this memorandum.

**BACKGROUND**

On September 30, 2014, the Department published the *Preliminary Results* of this administrative review.[3] At that time, the Department invited interested parties to comment on the *Preliminary Results*.[4]

On December 11, 2014, the Department received timely filed case briefs from Double Coin,[5] GTC,[6] and Titan Tire Corporation and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("Petitioners").[7] Trelleborg provided a timely filed rebuttal brief on December 19, 2014.[8] On December 23, 2014, the Department received timely filed rebuttal briefs from Petitioners,[9] Double Coin,[10] GTC,[11] and Zhongce.[12]

---

into a collective entity, "GTC," in the investigation. *See Certain New Pneumatic Off-The-Road Tires From the People's Republic of China; Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 73 FR 9278, 9283 (February 20, 2008), unchanged in *Certain New Pneumatic Off-The-Road Tires from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 FR 40485 (July 15, 2008). As such, we refer to the respondent, collectively, as "GTC" throughout this memorandum.

[3] *See Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2012–2013*, 79 FR 61291 (October 10, 2014) ("*Preliminary Results*") and accompanying memorandum to Paul Piquado, entitled "Decision Memorandum for Preliminary Results of Antidumping Duty Administrative Review: Certain New Pneumatic Off-the-Road Tires from the People's Republic of China; 2012-2013," dated September 30, 2014 ("PDM").

[4] *See Preliminary Results*, 79 FR at 61291.

[5] *See* Letter from Double Coin entitled, "Case Brief of Double Coin Holdings and China Manufacturers Alliance Certain New Pneumatic Off-the-Road Tires from China," dated December 11, 2014 ("Double Coin's Case Brief").

[6] *See* Letter from GTC entitled, "GTC Direct Case Brief: Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated December 11, 2014 ("GTC's Case Brief").

[7] *See* Letter from Petitioners entitled, "Case Brief Of Titan Tire Corporation And The United Steel, Paper And Forestry, Rubber, Manufacturing, Energy, Allied Industrial And Service Workers International Union, AFL-CIO, CLC," dated December 11, 2014 ("Petitioners' Case Brief").

[8] *See* Letter from Trelleborg entitled, "Trelleborg Wheel Systems (Xingtai) Co. Ltd.'s Rebuttal Brief in the 12/13 Administrative Review of New Pneumatic Off-The-Road Tires from the People's Republic of China," dated December 18, 2014 ("Trelleborg's Rebuttal").

[9] *See* Letter from Petitioners entitled, "Rebuttal Brief Of Titan Tire Corporation And The United Steel, Paper And Forestry, Rubber, Manufacturing, Energy, Allied Industrial And Service Workers International Union, AFL-CIO, CLC," dated December 23, 2014 ("Petitioners' Rebuttal Brief").

[10] *See* Letter from Double Coin entitled, "Rebuttal Brief of Double Coin Holdings and China Manufacturers Alliance Certain New Pneumatic Off-the-Road Tires from China," dated December 23, 2014 ("Double Coin's Rebuttal Brief").

[11] *See* Letter from GTC entitled, "GTC Rebuttal Case Brief: Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated December 23, 2014 ("GTC's Rebuttal Brief").

[12] *See* Letter from Zhongce entitled, "Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Rebuttal Brief of Zhongce Rubber Group Company Limited," dated December 23, 2014 ("Zhongce's Rebuttal").

On December 30, 2014, the Department extended the deadline for the final results until April 8, 2015.[13] In accordance with timely requests from parties, the Department conducted a hearing on February 25, 2015.[14]

**SCOPE OF THE ORDER**

The products covered by the order are new pneumatic tires designed for off-the-road and off-highway use, subject to exceptions identified below. Certain OTR tires are generally designed, manufactured and offered for sale for use on off-road or off-highway surfaces, including but not limited to, agricultural fields, forests, construction sites, factory and warehouse interiors, airport tarmacs, ports and harbors, mines, quarries, gravel yards, and steel mills. The vehicles and equipment for which certain OTR tires are designed for use include, but are not limited to: (1) agricultural and forestry vehicles and equipment, including agricultural tractors,[15] combine harvesters,[16] agricultural high clearance sprayers,[17] industrial tractors,[18] log-skidders,[19] agricultural implements, highway-towed implements, agricultural logging, and agricultural, industrial, skid-steers/mini-loaders;[20] (2) construction vehicles and equipment, including earthmover articulated dump products, rigid frame haul trucks,[21] front end loaders,[22] dozers,[23] lift trucks, straddle carriers,[24] graders,[25] mobile cranes,[26] compactors; and (3) industrial vehicles and equipment, including smooth floor, industrial, mining, counterbalanced lift trucks, industrial and mining vehicles other than smooth floor, skid-steers/mini-loaders, and smooth floor off-the-road counterbalanced lift trucks. The foregoing list of vehicles and equipment generally have in common that they are used for hauling, towing, lifting, and/or loading a wide variety of

---

[13] *See* "Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Extension of Deadline for Final Results of Antidumping Duty Administrative Review," dated December 30, 2014.

[14] *See* "Hearing Transcript," filed onto the record by Lisa Dennis Court Reporting on March 25, 2015.

[15] Agricultural tractors are dual-axle vehicles that typically are designed to pull farming equipment in the field and that may have front tires of a different size than the rear tires.

[16] Combine harvesters are used to harvest crops such as corn or wheat.

[17] Agricultural sprayers are used to irrigate agricultural fields

[18] Industrial tractors are dual-axle vehicles that typically are designed to pull industrial equipment and that may have front tires of a different size than the rear tires.

[19] A log-skidder has a grappling lift arm that is used to grasp, lift and move trees that have been cut down to a truck or trailer for transport to a mill or other destination.

[20] Skid-steer loaders are four-wheel drive vehicles with the left-side drive wheels independent of the right-side drive wheels and lift arms that lie alongside the driver with the major pivot points behind the driver's shoulders. Skid-steer loaders are used in agricultural, construction and industrial settings.

[21] Haul trucks, which may be either rigid frame or articulated (*i.e.*, able to bend in the middle) are typically used in mines, quarries and construction sites to haul soil, aggregate, mined ore, or debris.

[22] Front loaders have lift arms in front of the vehicle. They can scrape material from one location to another, carry material in their buckets, or load material into a truck or trailer.

[23] A dozer is a large four-wheeled vehicle with a dozer blade that is used to push large quantities of soil, sand, rubble, *etc.*, typically around construction sites. They can also be used to perform "rough grading" in road construction.

[24] A straddle carrier is a rigid frame, engine-powered machine that is used to load and offload containers from container vessels and load them onto (or off of) tractor trailers.

[25] A grader is a vehicle with a large blade used to create a flat surface. Graders are typically used to perform "finish grading." Graders are commonly used in maintenance of unpaved roads and road construction to prepare the base course on to which asphalt or other paving material will be laid.

[26] *I.e.,* "on-site" mobile cranes designed for off-highway use.

equipment and materials in agricultural, construction and industrial settings. Such vehicles and equipment, and the descriptions contained in the footnotes are illustrative of the types of vehicles and equipment that use certain OTR tires, but are not necessarily all-inclusive. While the physical characteristics of certain OTR tires will vary depending on the specific applications and conditions for which the tires are designed (*e.g.*, tread pattern and depth), all of the tires within the scope have in common that they are designed for off-road and off-highway use. Except as discussed below, OTR tires included in the scope of the order range in size (rim diameter) generally but not exclusively from 8 inches to 54 inches. The tires may be either tube-type[27] or tubeless, radial or non-radial, and intended for sale either to original equipment manufacturers or the replacement market. The subject merchandise is currently classifiable under Harmonized Tariff Schedule of the United States ("HTSUS") subheadings: 4011.20.10.25, 4011.20.10.35, 4011.20.50.30, 4011.20.50.50, 4011.61.00.00, 4011.62.00.00, 4011.63.00.00, 4011.69.00.00, 4011.92.00.00, 4011.93.40.00, 4011.93.80.00, 4011.94.40.00, and 4011.94.80.00. While HTSUS subheadings are provided for convenience and customs purposes, our written description of the scope is dispositive.

Specifically excluded from the scope are new pneumatic tires designed, manufactured and offered for sale primarily for on-highway or on-road use, including passenger cars, race cars, station wagons, sport utility vehicles, minivans, mobile homes, motorcycles, bicycles, on-road or on-highway trailers, light trucks, and trucks and buses. Such tires generally have in common that the symbol "DOT" must appear on the sidewall, certifying that the tire conforms to applicable motor vehicle safety standards. Such excluded tires may also have the following designations that are used by the Tire and Rim Association:

Prefix letter designations:
- P - Identifies a tire intended primarily for service on passenger cars;
- LT - Identifies a tire intended primarily for service on light trucks; and,
- ST - Identifies a special tire for trailers in highway service.

Suffix letter designations:
- TR - Identifies a tire for service on trucks, buses, and other vehicles with rims having specified rim diameter of nominal plus 0.156" or plus 0.250";
- MH - Identifies tires for Mobile Homes;
- HC - Identifies a heavy duty tire designated for use on "HC" 15" tapered rims used on trucks, buses, and other vehicles. This suffix is intended to differentiate among tires for light trucks, and other vehicles or other services, which use a similar designation.
- Example: 8R17.5 LT, 8R17.5 HC;
- LT - Identifies light truck tires for service on trucks, buses, trailers, and multipurpose passenger vehicles used in nominal highway service; and
- MC - Identifies tires and rims for motorcycles.

---

[27] While tube-type tires are subject to the scope of this proceeding, tubes and flaps are not subject merchandise and therefore are not covered by the scope of this proceeding, regardless of the manner in which they are sold (*e.g.,* sold with or separately from subject merchandise).

The following types of tires are also excluded from the scope: pneumatic tires that are not new, including recycled or retreaded tires and used tires; non-pneumatic tires, including solid rubber tires; tires of a kind designed for use on aircraft, all-terrain vehicles, and vehicles for turf, lawn and garden, golf and trailer applications. Also excluded from the scope are radial and bias tires of a kind designed for use in mining and construction vehicles and equipment that have a rim diameter equal to or exceeding 39 inches. Such tires may be distinguished from other tires of similar size by the number of plies that the construction and mining tires contain (minimum of 16) and the weight of such tires (minimum 1500 pounds).

**DISCUSSION OF THE ISSUES**

**Comment 1: Whether to Include Double Coin in the PRC-Wide Entity and Adjust the Entity Rate**

Double Coin's Brief[28]

[28] *See* Double Coin's Case Brief at 9-58. In support of its arguments, Double Coin cites to: *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1331(Fed. Cir. 2011); *Transcom, Inc. v. United States*, 182 F.3d 876 (Fed. Cir. 1999); *Sigma Corp v. United States*, 117 F.3d 1401 (Fed. Cir. 1997) ("*Sigma*"); *Georgetown Steel v. United States*, 801 F.2d 1308 (Fed. Cir. 1986) ("*Georgetown Steel*"); *Jiangsu Changbao Steel Tube Co., Ltd. v. United States*, 884 F. Supp.2d, 1295 (CIT 2012) ("*Jiangsu Changbao*"); *Advanced Tech. & Materials Co. v. United States*, Court No. 09-00511, Slip Op. 2011 (CIT 2011); *Qingdao Taifa Group Co. v. United States*, 637 F. Supp. 2d 1231 (CIT 2009); *Peer Bearing Company – Changshan v. United States*, 587 F. Supp. 2d 1319 (CIT 2008) ("*Peer Bearing*"); *Hontex Enters. Inc. v. United States*, 248 F. Supp. 2d 1323 (CIT 2003); *UCF America v. United States*, 919 F. Supp. 435 (CIT 1996); Panel Report, *United States – Antidumping Measures on Certain Shrimp from Viet Nam*, WT/DS429/R (November 17, 2014); Panel Report, *United States – Antidumping Measures on Certain Shrimp from Vietnam*, WT/DS404/R (September 2, 2011); Panel Report, *United States – Antidumping Measures on Certain Shrimp from Vietnam*, WT/DS429/R (November 17, 2014) (currently before the WTO Appellate Body); *Announcement of Change in Department Practice for Respondent Selection in Antidumping Duty Proceedings and Conditional Review of the Nonmarket Economy Entity in NME Antidumping Duty Proceedings*, 78 FR 65963 (November 4, 2013) ("*Change in Practice*"); *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of Antidumping Duty New Shipper Review; 2011-2012*, 78 FR 33341 (June 4, 2013); *Utility Scale Wind Towers From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 77 FR 75992 (December 26, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part*, 77 FR 63791 (October 17, 2012); *Methodological Change for Implementation of Section 772(c)(2)(B) of the Tariff Act of 1930, as Amended, In Certain Non-Market Economy Antidumping Proceedings*, 77 FR 36481 (June 19, 2012) ("*Section 772(c)(2)(B) Methodological Change*"); *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of the 2008-2009 Antidumping Duty Administrative Review*, 76 FR 22871 (April 25, 2011) ("*Tires/PRC 2008-2009*"); *Certain Cut-to-Length Carbon Steel Plate From the People's Republic of China: Final Results of the 2007-2008 Administrative Review of the Antidumping Duty Order*, 75 FR 8301 (February 24, 2010); *Certain New Pneumatic Off-The-Road Tires from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 FR 40485 (July 15, 2008); *Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, From the People's Republic of China: Final Results of Antidumping Duty Administrative Reviews and Final Rescission and Partial Rescission of Antidumping Duty Administrative Reviews*, 71 FR 54269 (September 14, 2006); *Final Determination of Sales at Less Than Fair Value and Final Partial Affirmative Determination of Critical Circumstances: Diamond Sawblades and Parts Thereof from the People's Republic of China*, 71 FR 29303 (May 22, 2006) ("*Sawblades/PRC LTFV Final*"); *Honey From the People's Republic of China: Preliminary Results, Partial Rescission, and Extension of Final Results of Second Antidumping Duty Administrative Review*, 69 FR 77184 (December 27, 2004); *Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination: Structural Steel Beams From Germany*, 66 FR 67190 (December 28, 2001); *Notice of Preliminary Determination of Sales at Less Than Fair Value: Foundry*

- The Department does not have the authority to apply a country-wide entity rate that meets neither the statutory requirements for an "individually investigated" or "all others" rate.
- The determination to apply the PRC-wide rate to Double Coin in the *Preliminary Results* presumed that there was another state-owned entity producing and exporting OTR tires to the United States during the POR and that Double Coin was affiliated with said entity without any factual basis and despite verified evidence to the contrary.
- The Department proceeded to apply a rate in excess of the ceiling applicable to companies that are not individually investigated.
- Even if the Department had the authority to issue a country-wide rate, there was no written request for review of the NME entity and, thus, the PRC-wide entity is not under review.
- Given that Double Coin fully participated in this review and obtained a calculated margin, the Department lacks the authority to issue anything other than that company-specific rate and, regardless, cannot apply a country-wide rate based on adverse facts available ("AFA") to a fully cooperative exporter if the statutory requirements for AFA have not been met.
- PRC law, regulations, and Double Coin's Articles of Association plainly disallow government control of Double Coin's day-to-day operations.

---

*Coke From the People's Republic of China*, 66 FR 13885 (March 8, 2001); *Notice of Final Rule, Antidumping Duties, Countervailing Duties*, 62 FR 27296 (May 19, 1997) ("*Final Rule*"); *Notice of Proposed Rulemaking and Request for Public Comment*, 61 FR 7308 (February 27, 1996); *Final Determination of Sales at Less Than Fair Value: Silicon Carbide from the People's Republic of China*, 59 FR 22585 (May 2, 1994); *Iron Construction Castings From the People's Republic of China; Final Results of Antidumping Duty Administrative Review*, 56 FR 2742 (January 24, 1991); *Final Determinations of Sales at Less Than Fair Value: Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, From the People's Republic of China*, 56 FR 241 (January 3, 1991); Department Memorandum regarding "Countervailing Duty Investigation of Coated Free Sheet Paper from the People's Republic of China - Whether the Analytical Elements of the Georgetown Steel Opinion are Applicable to China's Present-Day Economy," dated March 29, 2007 ("Georgetown Steel Memorandum"); Department's *Policy Bulletin 05.1: Separate-Rates Practice and Application of Combination Rates in Antidumping Investigation involving Non-Market Economy Countries*, dated April 5, 2005 ("Policy Bulletin 05.1"); and Alagari, Reform, Reality, and Recognition: Reassessing U.S. Antidumping Policy Toward China, 26 L. Pol'y Int'l Bus. 1061 (1995). Double Coin further cites to 19 CFR 351.213(b) and 19 CFR. 351.213 of the Department's regulations and the following sections of the Tariff Act of 1930, as amended ("the Act"): 735(c), 777A(c), 782(a), 701(d), 751, 776(a), and 776(b).

Double Coin references the following submissions: Department Memorandum to the File, entitled, "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Verification of the Sales and Factors Response of Double Coin Holdings and China Manufacturers Alliance," dated concurrently with this memorandum ("Double Coin's Verification Report"); PDM; Department Memorandum to the file entitled, "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Analysis of the Preliminary Results Margin Calculation for Double Coin," dated September 30, 2014 ("Double Coin's Preliminary Analysis Memo"); Double Coin's Submission entitled, "Response to the Department's 2nd Sections A, C, and D Supplemental Questionnaire for Double Coin Holdings Ltd. and China Manufacturers Alliance, LLC (collectively, "Double Coin") Certain New Pneumatic Off-the-Road Tires from China," dated July 31, 2014 ("Double Coin's 2nd Supplemental ACD Response"); Department Memorandum to Melissa Skinner entitled, "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Respondent Selection," dated December 13, 2013 ("Respondent Selection Memo"); Department Letter to Interested Parties entitled, "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: U.S. Customs and Border Protection Import Data for Use in Respondent Selection," dated November 12, 2013 ("CBP Data Release"); and Double Coin Affiliation and Collapsing Memo.

- The Department failed to cite a single instance in which Huayi, Double Coin's state-owned parent company, exercised control and, rather, relies on hypotheticals with no basis in fact.
- There is direct and verified evidence that the PRC government did not exercise any control over Double Coin's export activities, as all export prices were negotiated by American employees of CMA, Double Coin's U.S. affiliate.
- The Department's policy with respect to PRC government control is based on outdated 25 year old presumptions which are contrary to the Department's own factual findings about changes in the PRC economy that have already been revisited in a countervailing duty ("CVD") context.
- Questions regarding government control bear no relevance to the primary question of whether Double Coin is exporting to the United States at below fair value. In this case, that question has been demonstrably settled, as the Department's calculations show that – even if the PRC government were controlling operations – Double Coin is not selling tires to the United States at less than fair value.
- The Department's decision to reverse its 20 year policy concerning separate rate eligibility in this review is fundamentally unfair, considering that Double Coin was previously determined eligible for a separate rate, underwent no material changes in ownership or management selection processes since this eligibility determination and, therefore, had every reason to assume that this separate rate finding would be upheld prior to making its export shipments for the POR. The Department effectively changed the rules in the middle of the game.

Petitioners' Rebuttal Brief[29]

- The Department maintains the authority to issue a PRC-entity rate, and this long-standing practice has been upheld by the courts, as has been the practice of assigning the entity rate to individually investigated respondents that fail to demonstrate eligibility for separate rates. The Department should dismiss Double Coin's arguments to the contrary.
- Double Coin failed to rebut the presumption of state control; thus, its individual behavior is no longer relevant to this review and the country-wide rate is the relevant margin.
- The Department explicitly put all interested parties on notice that the PRC-wide entity would be reviewed if one of the named exporters did not qualify for a separate rate. The change in practice with respect to the conditional review cited by Double Coin took effect subsequent to the initiation of the instant review.
- The non-market economy ("NME")-entity rate does not constitute an AFA rate when applied to individual members, as this is not an adverse inference applied to a specific company, but based on the actions of the entity regardless of the specific actions of its constituent members.
- Contrary to Double Coin's claims, the Department is correct to state that the record does not contain information to determine the percentage of PRC-wide activity Double Coin accounted for in the POR.
- The Department's findings with respect government control and relevant PRC laws are consistent with the guidance from the Court of International Trade ("CIT" or "Court") and Court of Appeals for the Federal Circuit ("Federal Circuit") in the recent *Diamond Sawblades* litigation, which addressed and dismissed many of Double Coin's arguments.

---

[29] *See* Petitioners' Rebuttal Brief at 2-15. Petitioners cite to the following: *Advanced Technology & Materials Co., Ltd., et al. v. United States*, 885 F. Supp. 2d 1343 (CIT 2012) ("*Advanced Technology I*"), remand affirmed in *Advanced Technology & Materials Co., Ltd., et al. v. United States*, 938 F. Supp. 2d 1342 (CIT 2013), aff'd 541 F. App'x 1009 (Fed. Cir. 2014) ("*Advanced Technology II*") (collectively, "*Diamond Sawblades* litigation"); *Transcom* (Fed. Cir. 1999); *Sigma*, 117 F.3d 1401 (Fed. Cir. 1997); *David v. United States*, 24 F. Supp. 3d 1355 (CIT 2014) ("*Mark David*"); *Michaels Stores, Inc. v. United States*, 931 F. Supp. 2d 1308 (CIT 2013) ("*Michaels Stores*"); *SKF USA Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001) ("*SKF*"); *Jiangsu Changbao* (CIT 2012); *Watanabe Group v. United States*, 2010 Ct. Intl. Trade LEXIS 144 (CIT 2010) ("*Watanabe*"); *Peer Bearing* (CIT 2008); *Coalition for the Preservation of American Brake Drum and Rotor Aftermarket Manufacturers v. United States v. United States*, 44 F.Supp. 2d 229 (CIT 1999) ("*CPABDRAM*"); *Diamond Sawblades and Parts Thereof From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 35723 (June 24, 2014) ("*Diamond Sawblades 11-12*"); *Preliminary Results* (October 10, 2014) and PDM; *Galvanized Steel Wire From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 77 FR 17430 (March 26, 2012) ("*Steel Wire/PRC LTFV Final*"); *Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review*, 78 FR 54235 (September 3, 2013) ("*Opportunity to Request*"); *Change in Practice*; *Initiation Notice* (November 8, 2013); and *Brake Rotors From the People's Republic of China: Final Results and Partial Rescission of the Seventh Administrative Review; Final Results of the Eleventh New Shipper Review*, 70 FR 69937 (November 18, 2005) ("*Brake Rotors 11th AR Final*"). Petitioners reference the following record submissions: Double Coin's Case Brief; Petitioners' Case Brief; CBP Data Release; Respondent Selection Memo; Letter from Petitioners' entitled, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off-The-Road Tires from China (A-570-912): Titan and the USW's Request for Administrative Reviews," dated September 30, 2013 ("Petitioners' Review Request"); Letter from Petitioners' entitled, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off-The-Road Tires from China (A–570–912): Petitioners' Rebuttal Factual Information to Double Coin's Supplemental Section A Questionnaire Response," dated June 23, 2014 ("Petitioners' June 23 Submission"); and Letter from Double Coin, entitled, "Supplemental Section A Response of Double Coin Holdings and China Manufacturers Alliance, LLC Certain New Pneumatic Off-the-Road Tires from China," dated June 16, 2014 ("Double Coin's SSAQR").

- The fact that the record lacks affirmative evidence showing government intervention in operations is irrelevant, as the standard is that there is a rebuttable presumption of control, which Double Coin has not overcome.
- Finally, Petitioners maintain that, should the Department continue to deny Double Coin's separate rate and agree to not calculate a margin for Double Coin for these final results (*i.e.*, apply a 210.48 percent margin, unadjusted by Double Coin's calculated rate, to the entirety of the entity, including Double Coin), the Department need not address the arguments in Double Coin's case brief, as these concerns are moot.

Petitioners' Brief[30]

- Once the Department has determined that an NME respondent is ineligible for a separate rate, the individual examination of said respondent should end, no margin should be calculated, and there should be no subsequent revision to the PRC-wide rate.
- The calculation of a margin for Double Coin conflicts with past practice (*i.e.*, *Diamond Sawblades* litigation Remand Redetermination, *Brake Rotors 11th AR Prelim* (May 9, 2005), etc.) where the inability of a respondent to overcome the presumption of government control resulted in the application of a PRC-wide rate.
- The idea that a respondent's sales behavior ceases to be meaningful if it is found to be part of the PRC-wide entity has been supported by the Court (*e.g.*, *Watanabe* (CIT 2010), *Jiangsu Changbao* (CIT 2012), and *Mark David* (CIT 2014)) and is reflected in the Department's standard practice.
- The Department maintains reasonable concerns that allowing a focus on the activities of only one member of the PRC-wide entity would create the potential for the larger entity to manipulate AD results by selectively providing data on the record and dictating what data would be verified from review to review.

---

[30] *See* Petitioners' Case Brief at 2-6. Petitioners cite to: *Mark David*, 24 F. Supp. 3d 1355 (CIT 2014); *Jiangsu Changbao*, 884 F. Supp.2d 1295; *Watanabe*, 2010 Ct. Intl. Trade LEXIS 144 (CIT 2010); *Peer Bearing Company* (CIT 2008); *Preliminary Results* (October 10, 2014); *Change in Practice,* 78 FR 65963; Final Results of Redetermination Pursuant to Remand Order for Diamond Sawblades and Parts Thereof from the People's Republic of China, Court No. 09-00511, Slip Op. 12-147 (CIT 2012), dated May 6, 2013 ("*Diamond Sawblades* litigation Remand Redetermination") in *Advanced Technology I* (CIT 2012), affirmed in *Advanced Technology II,* 938 F. Supp. 2d 1342 ; *Steel Wire/PRC LTFV Final* (March 26, 2012); *Brake Rotors From the People's Republic of China: Preliminary Results and Partial Rescission of the Seventh Administrative Review and Preliminary Results of the Eleventh New Shipper Review*, 70 FR 24382 (May 9, 2005) ("*Brake Rotors 11th AR Prelim*"), unchanged in *Brake Rotors 11th AR Final* (November 18, 2005); *Porcelain-on-Steel Cooking Ware from the People's Republic of China: Notice of Preliminary Results of Antidumping Duty Administrative Review*, 70 FR 76027 (December 22, 2005) ("*Porcelain Cookware/PRC*"), unchanged in *Porcelain-on-Steel Cooking Ware from the People's Republic of China: Notice of Final Results of Antidumping Duty Administrative Review*, 71 FR 24641 (April 26, 2006); and *Notice of Final Determination of Sales at Less Than Fair Value: Certain Cut-to-Length Carbon Steel Plate From Ukraine*, 62 FR 61754 (November 19, 1997). Petitioners further reference the PDM.

Double Coin's Rebuttal Brief[31]

- For the reasons stated in Double Coin's Case Brief, there is no justification for the Department to assign the PRC-wide rate to Double Coin.
- Even should the Department disagree and believe that Double Coin is ineligible for a separate rate, the Department lacks justification to impose the 210 percent AFA rate, because:
  - The Department has not undertaken in this review any corroboration of the AFA rate.
  - The cases cited by Petitioners purporting to show a "prior practice" of automatically assigning the PRC-wide entity rate to any company that fails to attain separate-rate status, are inapposite, as they either concern original investigations (*Wantanabe* (CIT 2010) and the *Diamond Sawblades* litigation) or uncooperative respondents (*Mark David* (CIT 2014)).

**Department's Position:** As an initial matter, we disagree with Double Coin's contention that the Department has no authority to issue a rate for the NME entity. Rather, the Department's NME practice, including its assignment of a specific rate to all NME exporters that do not establish their eligibility for a separate rate is well-established[32] and has been upheld by the courts.[33]

The Department considers the PRC to be a non-market economy country under section 771(18) of the Act. In antidumping proceedings involving NME countries, such as the PRC, the Department has a rebuttable presumption that the export activities of all firms within the country are subject to government control and influence. Therefore, in PRC cases, the Department uses a rate established for the PRC-wide entity, which it applies to all imports from an exporter that has not established its eligibility for a separate rate. Section 351.107(d) of the Department's regulations, provides that "in an antidumping proceeding involving imports from a nonmarket economy country, 'rates' may consist of a single dumping margin applicable to all exporters and producers."[34] The Department's practice of assigning a PRC-wide rate has been upheld by the Federal Circuit. In *Sigma*, the Federal Circuit affirmed that it was within the Department's authority to employ a presumption for state control in a NME country and place the burden on the exporters to demonstrate an absence of central government control.[35] The Federal Circuit

[31] *See* Double Coin's Rebuttal Brief at 1-6. Double Coin cites to: *Hubbell Power Sys., Inc. v. United States*, 884 F. Supp. 2d 1283 (CIT 2012); *Qingdao Taifa Grp. Co. v. United States*, 760 F. Supp. 2d 1379 (CIT 2010); section 776(c) of the Act; Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, vol. 1 (1994) ("SAA"); and *Gallant Ocean (Thailand) Co., Ltd v. United States*, 602 F.3d 1319 (Fed. Cir. 2010) ("*Gallant Ocean*"). Double Coin further addresses the following cases cited in Petitioners' Case Brief: *Mark David,* 24 F. Supp. 3d 1355 (CIT 2014); *Watanabe*, 2010 Ct. Intl. Trade LEXIS 144 (CIT 2010); and *Advanced Technology II*, 938 F. Supp. 2d 1342. Double Coin references Petitioners' Case Brief and Double Coin's Case Brief.

[32] *See*, *e.g.*, *Steel Wire/PRC LTFV Final* and accompanying IDM at 8.

[33] *See*, *e.g.*, *Sigma*, 117 F.3d at 1405.

[34] *See 1,1,1,2-Tetrafluroethane From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 79 FR 62597 (October 20, 2014) and the accompanying IDM at Comment 1 (explaining the Department's practice with respect to separate rates as upheld by the Federal Circuit in *Sigma*, 117 F.3d at 1405-06, and describing the Department's practice with respect to the rate assigned to the PRC-wide entity).

[35] *See Sigma*, 117 F.3d at 1405-1406 ("We agree with the government that it was within Commerce's authority to employ a presumption of state control for exporters in a nonmarket economy, and to place the burden on the exporters to demonstrate an absence of central government control. The antidumping statute recognizes a close

recognized that sections 771(18)(B)(iv)-(v) of the Act recognized a close correlation between an NME economy and government control of prices, output decisions, and allocation of resources and, therefore, the Department's presumption was reasonable.[36] The application of a PRC-wide rate to all parties which were not eligible for a separate rate was also affirmed by the Federal Circuit in *Transcom* in 2002.[37] In *Transcom*, the Federal Circuit also found that a rate based on "BIA" (the precursor to facts available and AFA under the current statute) is not punitive.[38] Thus, contrary to Double Coin's assertions, the courts have consistently upheld the Department's authority to apply a presumption of state control in NME countries and to apply a single rate to all exporters that fail to rebut that presumption.

Double Coin claims that the Department has no authority to issue a PRC-wide rate in this review since a review was not properly initiated on the PRC-wide entity. Double Coin's insistence that the PRC entity is not under review in the instant case appears to rely, in part, on the November 2013 *Change in Practice* which, indeed, requires an explicit request prior to initiating a review of the NME entity. However, the Department specifically stated that this change in practice announced would apply to "administrative reviews for which the notice of opportunity to request an administrative review is published on or after December 4, 2013."[39] The opportunity to request a review for this review was published September 3, 2013 and, as such, the change in practice noted by Double Coin is inapplicable in this review.[40] Rather, for administrative reviews for which the notice of opportunity was published before December 4, 2013 (as in the instant case), the Department conditionally reviewed the NME entity; therefore, even absent a

---

correlation between a nonmarket economy and government control of prices, output decisions, and the allocation of resources. Moreover, because exporters have the best access to information pertinent to the 'state control' issue, Commerce is justified in placing on them the burden of showing a lack of state control.") (internal citations omitted).

[36] *Id*. *See also CPABDRAM*, 44 F.Supp. 2d at 243, quoting *Sigma*, 117 F.3d at 1405 ("Under the broad authority delegated to it from Congress, Commerce has employed 'a presumption of state control for exporters in a non-market economy'… Under this presumption, all exporters receive one non-market economy country ('NME') rate, or country-wide rate, unless an exporter can 'affirmatively demonstrate' its entitlement to a separate, company-specific margin by showing 'an absence of central government control, both in law and in fact, with respect to exports.'"); *Michaels Stores*, 931 F. Supp. 2d at 1315, quoting *SKF*, 263 F.3d at 1030 ("The regulations clarify, however, that for non-market economies, 'rates may consist of a single dumping margin applicable to all exporters and producers.' Moreover, whenever the statute is silent on a particular issue, it is well-settled that Commerce may 'formulate policy' and make rules 'to fill any gap left, implicitly or explicitly, by Congress.'") (internal citations omitted).

[37] *See Transcom v. United States*, 294 F.3d 1371, 1381-83 (Fed. Cir. 2002) ("*Transcom*"). (The PRC-wide rate, and its adverse inference are applicable to all companies which were initiated on yet failed to show their entitlement to a separate rate. "Accordingly, while section 1677e provides that Commerce may not assign a {best information available}-based rate to a particular party unless that party has failed to provide information to Commerce or has otherwise failed to cooperate, the statue says nothing about whether Commerce may presume that parties are entitled to *independent* treatment under 1677e in the first place" {*emphasis added*}). *See* also *Transcom*, 294 F.3d at 1376 citing *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990) (Instead, the objective of best information available ("BIA") is to aid Commerce in determining dumping margins as accurately as possible). The litigation in *Transcom* covered three periods of review between June 1990 and May 1993. *See Transcom*, 294 F.3d at 1374-75, and *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China: Final Results of Antidumping Duty Administrative Reviews,* 61 FR 65527 (Dec. 13, 1996). The term BIA is now referred to under the statute as facts available or AFA. *Id.*

[38] *See Transcom*, 294 F.3d at 1376.

[39] *See Change in Practice*, 78 FR at 65964.

[40] *See Opportunity to Request*, 78 FR at 54235.

request, the NME entity can be subject to the review if an exporter subject to the review does not demonstrate that it is separate from the entity.[41]  Though Double Coin notes that the NME entity is not listed as one of the companies for which review was requested in the *Initiation Notice*, the *Initiation Notice* plainly states that "If one of the above-named companies does not qualify for a separate rate, all other exporters of Certain New Pneumatic Off-the-Road Tires {from} the PRC who have not qualified for a separate rate are deemed to be covered by this review as part of the single PRC entity of which the named exporters are a part."[42]  Thus, the Department explicitly put the PRC-wide entity and all other interested parties on notice that the PRC-wide entity would be reviewed if one of the named exporters did not qualify for a separate rate.  Thus, pursuant to Double Coin's failure to demonstrate a lack of *de facto* government control, the PRC-wide entity is subject to review.  In *Transcom*, the Federal Circuit held that, in addition to the named companies in an initiation notice, conditionally reviewed companies also received sufficient notice in the initiation.[43]  Accordingly, we find Double Coin's claims with respect to the NME-entity not being subject to review are unfounded.

We further disagree with Double Coin's argument that, because Double Coin was selected as a mandatory respondent and provided information from which the Department was able to calculate an antidumping margin, the statute requires the Department to assign Double Coin a rate based on this information.  It is the Department's policy to assign all exporters of the merchandise subject to review in NME countries a single rate unless an exporter can affirmatively demonstrate an absence of government control.  As discussed in the *Preliminary Results* and further established below, we found that Double Coin is ineligible for a separate rate due to its inability to demonstrate the absence of government control.  As such, Double Coin is a part of the PRC-wide entity.  The Department must calculate a single rate for the PRC-wide entity, and in this review, we do not have the necessary information, *i.e.*, sales and production data, from the remaining unspecified portion of the PRC-wide entity.  Nor is there information on the record with respect to the composition of the PRC-wide entity.  As such, we do not consider it reasonable to determine a rate for the PRC-wide entity based solely on the information provided for Double Coin.  Rather, based on the unique circumstances presented in this review, we consider it reasonable to use the information provided by Doubly Coin as well as the only information we have regarding the entire PRC-wide entity, to calculate a new margin for the PRC-wide entity.  Specifically, we calculated the final margin for the PRC-wide entity, which includes Double Coin, using a simple average of the previously assigned PRC-wide rate (210.48 percent)[44] and the calculated final margin for Double Coin (0.14 percent).  Accordingly, the Department revised the PRC-wide entity rate to 105.31 percent for these final results.

Further, Double Coin's contention ignores the Department's well-established practice of assigning the PRC-wide entity rate to individually investigated respondents who participated in an investigation or review but do not qualify for a separate rate.[45]  Indeed, the courts have agreed

---

[41] *See Change in Practice*, 78 FR at 65970.

[42] *See Initiation Notice*, 78 FR at 67111, footnote 10.

[43] *See Transcom*, 294 F.3d at 1379.

[44] *See Certain New Pneumatic Off-The-Road Tires from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 FR 40485, 40489 (July 15, 2008) ("*LTFV Determinations*").

[45] *See, e.g.*, *Certain Activated Carbon From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2011-2012*, 78 FR 26748 (May 8, 2013) and PDM at 10-11, unchanged in *Certain*

that, once a respondent has been held to be part of the NME-wide entity, inquiring into said respondent's separate sales behavior ceases to be meaningful.[46] Therefore, because Double Coin has failed to rebut the presumption of state control, as discussed further below, the Department is no longer required to base the margin assigned to the PRC-wide entity, of which Double Coin is a part, solely on Double Coin's behavior.

Double Coin also objects to the application of the 210.48 percent PRC-wide rate to Double Coin, at least in part, on the basis that this NME entity rate is an AFA rate. Double Coin argues that section 776(b) of the Act requires a party to fail to cooperate to the best of its ability as a prerequisite before the Department is permitted to apply an adverse inference. Therefore, because Double Coin has been fully cooperative, as acknowledged by the Department, the statutory requirements for AFA have not been met and the Department is not permitted to apply the 210.48 percent PRC-entity rate (which is based on AFA) in any manner with respect to Double Coin's margin. However, in *Advanced Technology II*, the Court addressed the issue as to whether the PRC-wide is an adverse rate, stating "Commerce did not apply adverse facts available to AT&M, Commerce rather found that AT&M had not rebutted the presumption of state control and assigned it the PRC-wide rate. These are two distinct legal concepts: a separate AFA rate applies to a respondent who has received a separate rate but has otherwise failed to cooperate fully whereas the PRC-wide rate applies to a respondent who has not received a separate rate."[47] In the investigation at issue in that case, the PRC-wide entity received a rate based on AFA.[48] In this review, to the extent that the application of the pre-existing PRC-wide rate affects the antidumping duties assessed on Double Coin's entries as a result of this review, this rate is not an application of AFA to the entity in this review; rather, it reflects in part the rate applied to the entity based on the actions of the entity in the investigation of which Double Coin is now a part (and unchanged by any subsequent review). In this review, we are seeking to establish a new rate for the entity, which is under review, and a part of which was selected as a mandatory respondent, but for which we do not have complete information. Regardless, as discussed below, as a result of our instant determination, the portion of the PRC-wide entity calculation that is based on its pre-existing rate is reasonably representative only of the unspecified non-Double Coin portion of the <u>single</u> NME-entity, whereas the Double Coin portion of the <u>single</u> entity is reasonably represented by Double Coin's own data.

---

*Activated Carbon From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 78 FR 70533 (November 26, 2013) ("*Activated Carbon/PRC*"); *Brake Rotors 11th AR Final* and accompanying IDM at Comment 7. *See also*, *Advanced Technology II*, 938 F. Supp. 2d 1342.

[46] *See Advanced Technology II*, 938 F. Supp. 2d at 1351, citing *Watanabe,*2010 Ct. Intl. Trade LEXIS 144 at 8 ("Commerce's permissible determination that {a respondent} is part of the PRC-wide entity means that inquiring into {that respondent}'s separate sales behavior ceases to be meaningful.") and *Jiangsu Changbao* at 1312 (referencing *Watanabe* at 8) ("losing all entitlement to an individualized inquiry appears to be a necessary consequence of the way in which Commerce applies the presumption of government control… applying a countrywide AFA rate without individualized findings of failure to cooperate is no different from applying such a countrywide AFA rate without individualized corroboration.").

[47] *Advanced Technology II*, 938 F. Supp. 2d at 1351, citing *Watanabe*, 2010 Ct. Intl. Trade LEXIS 144 at 9, footnote 8. *See also Peer* at 1327 ("… there is no requirement that the PRC-wide entity rate based on AFA relate specifically to the individual company. It is not directly analogous to the process used in a market economy, where there is no countrywide rate. Here, the rate must be corroborated according to its reliability and relevance to the countrywide entity as a whole.")

[48] *See Sawblades/PRC LTFV Final*, 71 FR 29303 (May 22, 2006).

Further, Double Coin argues that the Department has no basis to apply the PRC-wide rate to Double Coin based either on other parties' inability to cooperate or the failure of a party to provide information with respect to the PRC-wide entity because such information was never requested by the Department. As mentioned above, in *Sigma*, the Federal Circuit affirmed that it was within the Department's authority to employ a presumption for state control in a NME country and found the presumption reasonable, noting that sections 771(18)(B)(iv)-(v) of the Act recognized a close correlation between a NME economy and government control of prices, output decisions, and allocation of resources.[49] Having not demonstrated the absence of *de facto* control from the government over selection of its management, Double Coin constitutes a part of the PRC-wide entity. Further, the PRC-wide entity is comprised of producers and exporters that can provide answers to questions, as evidenced by Double Coin in this review.

Double Coin then asserts that, setting aside all prior arguments with respect to the permissibility of the Department's application of the PRC-wide rate to Double Coin, the Department was further incorrect on the underlying factual finding that Double Coin failed to rebut the presumption of government control and that neither the Huayi Group (*i.e.*, Double Coin's majority owner), the State Owned Assets Supervision Committee ("SASAC") (which owns 100 percent of the Huayi Group), nor any other government entity maintains control over its day to day activities. However, in making our preliminary finding on this issue, we were – and continue to be – guided by the Court's findings in the *Diamond Sawblades* litigation, which dismissed many of the same arguments that Double Coin currently presents in this proceeding. For example, Double Coin claims that under PRC law, the Huayi Group cannot exercise control over Double Coin. The respondent involved in the *Diamond Sawblades* litigation made the same argument during the administrative proceeding. In rejecting those arguments, the Court found that the PRC Company Law provides evidence rebutting the presumption of *de jure* control "is inadequate … and it lacks … common business sense."[50] For Article 20 of the PRC Company Law in particular, it "does not appear that this {article} may reasonably be construed to 'limit' the power of the state in the companies in which the state invests."[51] Further, the Court found the structure of the PRC Company Law provides controlling shareholders direct and effectual control as "{s}hareholders have the ability to hire and fire each board member and decide their pay pursuant to Article 38, and each board member is thereby beholden. That amounts to delegation, as opposed to separation…. since the general manager, in point of fact, is selected by the same board of directors 'in charge of overall business planning and the selection of upper management' that is 'responsible to the shareholders' and can readily be replaced at their whim."[52] Furthermore, the Court addressed Articles 22-27 of the PRC Code of Governance for Listed Companies, noting that these articles "reveal little to an inquiry into 'governmental control' in the running of a company including its export operations."[53]

The Department finds that the PRC laws and regulations at issue (*i.e.*, the Interim Regulations, and the PRC Company Law) are not dispositive with regard to control of export activities. The PRC laws and regulations at issue provide a framework for various corporate entities to form and

[49] *See Sigma*, 117 F.3d at 1405-1406.
[50] *See Advanced Technology I*, 885 F. Supp. 2d at 1353.
[51] *Id.*, at 1354.
[52] *Id.*, at 1355.
[53] *Id.*, at 1358.

operate at some distance from the central government. While the Interim Regulations also indicate the existence of some degree of government control, the Department continues to find that the overall legal environment is permissive of individual firms maintaining independent operations with respect to export activities.

In the Department's experience applying the separate rate test, the *de jure* factors are not overridingly indicative of the absence of control of export activities in the typical case, but rather they demonstrate an ability on the part of the exporter to control its own commercial decision making. In large part, the laws and regulations that the Department has examined over the years, such as the laws referenced above, indicate that a certain level of control has devolved in that the commercial decision-making can lie with the various corporate entities operating under these laws and regulations, which in turn, merits an analysis of the record evidence to ensure that there is an absence of *de facto* aspects of government control over export activities. This is supported by our findings over the years that numerous PRC respondents operating under such laws also maintain *de facto* control over their export functions. These situations where parties are found to be entitled to a separate rate are, however, based on the individual facts with respect to each such party. Because of the centralized control inherent in the PRC's status as a NME country, we presume that decision making of an enterprise in an NME country is under a form of centralized government control (whether at the central, provincial, or local level). Nevertheless, the PRC Company Law and other laws and regulations demonstrate that, within the PRC's NME, distance can exist between decisions made at the central government level and decisions made at the firm level with respect to exports.

Thus, an analysis of *de facto* control is critical in determining whether respondents are, in fact, subject to a degree of government control which would preclude the Department from granting a separate rate.

With respect to Double Coin's assertions that its Articles of Association and other company documents make clear that managers control the day-to-day operations, the Court addressed similar arguments made as part of the *Diamond Sawblades* litigation. Specifically, the Court rejected arguments made by the respondent in that proceeding regarding its management and control of daily operations. The Court stated that managers should be presumed "to be beholden to the board that controls their pay, in particular to the chairman of the board as the *de facto* company head under the PRC model," until proven otherwise.[54] Similarly, we find that as Huayi is the controlling shareholder, it is the entity controlling Double Coin's board and management.

Double Coin then argues the fact that no minority shareholder has ever nominated a director and no Huayi nominee has ever been rejected (facts which supplemented the Department's preliminary finding) simply means that such an event has never occurred and by no means confirms Huayi's control over Double Coin. Moreover, Double Coin asserts that minority shareholders indeed have *bona fide* rights pursuant to the company's Articles of Association. Double Coin's assertions, however, do not demonstrate that it should be given separate rate status. The standard for determining such a status is that an NME exporter is presumed to be

[54] *Id.*, at 1359. *See also*, *id.*, at 1352 ("…the exclusion of 'day to day operations' from 'oversight' responsibility is a straw man.").

under government control until such a presumption is sufficiently rebutted. As such, the absence of evidence of control or other demonstrable action on behalf of a minority shareholder does nothing to rebut this presumption[55], nor does the existence of certain minority shareholder rights (such as the ability to bring suit against a board member or manager who acts against the interests of the company, and the right of minority shareholders to call a shareholder meeting) prove the absence of government control.[56] Moreover, Double Coin's general argument that the Department cannot cite a single example in which Huayi actually exercised its legal right to control or influence a day-to-day decision about the manner in which Double Coin sold subject merchandise to the United States is similarly unconvincing, as this also ignores the fact that the burden to rebut the presumption of government control is on the party seeking separate rate status.

With respect to Double Coin's assertion that that the Department is setting up an improper standard based on a notion of potential control rather than examples of actual control, and concerns that such examples of potential control are virtually limitless, we find that the facts on the record counter Double Coin's arguments regarding potential or theoretical control. Specifically, as noted in Double Coin's Preliminary Analysis Memo, regardless of the restrictions of PRC law and the protections afforded to minority shareholders, Double Coin's Articles of Association demonstrate that a majority shareholder – and particularly one with 65.66 percent ownership – has near complete control over any shareholder decisions, including decisions which may affect the management and operations of the company.[57] Whether or not the Huayi Group, which is the majority owner of Double Coin, demonstrably exercised control over Double Coin's day-to-day operations does not refute the fact that a government-owned entity has near complete control of shareholder decisions of Double Coin.

Double Coin further argues that Huayi's control of Double Coin's board cannot be equated to control of Double Coin's export activity and that the PRC ownership structure has no effect on sales prices in the United States because the prices are set by Double Coin's U.S. affiliate, CMA. We note that the respondent in the *Diamond Sawblades* litigation made similar arguments in that proceeding. The CIT rejected this line of reasoning in *Advanced Technology I*, stating that "the actual setting of price is only one of the four de facto factors described in the Policy Bulletin, whereas governmental manipulation of the cost of inputs,… or rationalization of industry or

[55] Particularly when considering that the Department specifically afforded Double Coin the opportunity to provide examples of any such instance at verification. *See* Double Coin's Verification Report at 11 ("However, when we then asked for an example, within or outside of the POR, of a shareholder's meeting where a Huayi nominee had been voted down by a coalition of minority shareholders or where a Huayi nominee had generally failed to obtain enough votes to ascend to the board, Double Coin officials confirmed that, to their knowledge, this situation had never occurred.").

[56] Moreover, it remains unclear whether these codified rights are actually exerted and, regardless, it is unclear how evidence demonstrating that minority shareholders routinely called meetings or brought suit against managers would plainly rebut the presumption of control on behalf of the majority state-owned shareholder. The third example of minority rights referenced on Double Coin's Case Brief at 32, *i.e.*, the conflict of interest rule, (whereby any decision which contains a conflict of interest to Huayi would require the recusal of Huayi's voting shares) might serve to better rebut this presumption. However, again, there is no indication on the record of any such recusals, nor is there sufficient understanding of how this recusal process actually works in practice.

[57] *See* Double Coin's Preliminary Analysis Memo at 10-14, *citing* Double Coin's Verification Report at Section III.B.4 and Double Coin's 2nd Supplemental ACD Response at Exhibit S2-5.

output are among numerous other scenarios of concern that can affect seller pricing."[58] Similarly, we find that Double Coin's arguments regarding U.S. sales by CMA does not overcome the rebuttable presumption of government control.

Double Coin argues that the evolving practice on government control in the wake of the *Diamond Sawblades* litigation, as presently implemented, is predicated on outdated presumptions with respect to the PRC economy which the Department already reconsidered in, for example, the Georgetown Steel Memo. However, the Department previously noted that the analysis in the Georgetown Steel Memo focused only on the concept of the single economic entity that characterized the economies in *Georgetown Steel* and that it would be incorrect to conflate that concept with the concept of the NME-wide entity for antidumping duty assessment purposes.[59] Given the reforms discussed in the Georgetown Steel Memo, the Department found that a single central authority no longer comprises the PRC's economy and that the policy that gave rise to the *Georgetown Steel* litigation does not prevent the Department from concluding that the PRC government has bestowed a countervailable subsidy upon a PRC producer.
As such, we agree with Petitioners that the analysis in the Georgetown Steel Memo is inapplicable to the issue of the PRC-wide entity in antidumping proceedings.

As explained above, in antidumping proceedings involving NME countries such as the PRC, the Department has a rebuttable presumption that the export activities of all firms within the country are subject to government control and influence. This presumption stems not from an economy comprised entirely of the government (*e.g.*, a firm is nothing more than a government work unit), but rather from the NME-government's use of a variety of legal and administrative levers to exert influence and control (both direct and indirect) over the assembly of economic actors across the economy. As such, this presumption is patently different from a presumption that all firms are one and the same as the government, such that they comprise a monolithic economic entity. Moreover, the presumption underlying the separate rates test was upheld in *Sigma*, where the Federal Circuit affirmed the Department's separate rates test as reasonable, stating that the statute recognizes a close correlation between an NME and government control of prices, output decisions, and the allocation of resources.[60] The Federal Circuit also stated that it was within the Department's authority to employ a presumption of state control for exporters in an NME-country and to place the burden on the exporters to demonstrate an absence of central government control. Firms that do not rebut the presumption are assessed a single antidumping duty rate, *i.e.*, the NME-Entity rate.[61] In recognition that parts of the PRC's economy are transitioning away from the state-controlled economy, the Department developed the separate rates test. In an economy comprised of a single, monolithic state entity, it would be impossible to identify separate firms, let alone rebut government control. Rather, the PRC's economy today is neither command-and-control nor market-based; government control and/or influence is omnipresent (which gives rise to the presumption) but not omnipotent (and hence, the presumption is rebuttable).[62]

---

[58] *See Advanced Technology I*, 885 F. Supp. 2d at 1359-1360.
[59] *See Diamond Sawblades 11-12*, 79 FR 35723, and accompanying IDM at Comment 4.
[60] *See Sigma*, 117 F.3d at 1405-06. (Fed. Cir. 1997)
[61] *See* 19 CFR 351.107(d), which provides that "in an antidumping proceeding involving imports from a non market economy country, 'rates' may consist of a single dumping margin applicable to all exporters and producers."
[62] *See* Georgetown Steel Memo at 9.

With respect to Double Coin's claim that the Department's determination with respect to Double Coin's separate rate is fundamentally unfair in that it effectively changes the rules in the middle of the game, we note that the statute does not afford respondents any expectation that a finding from a prior segment will be upheld in a subsequent segment. Indeed, both the Court and the Department have previously stated that a prior separate rate determination is irrelevant to the decision on the current record.[63] Moreover, the Department has not changed its separate rate criteria, but has analyzed the facts provided by Double Coin in light of the decisions in the *Diamond Sawblades* litigation.[64]

In sum, we continue to find that there is undeniable evidence that the 100 percent SASAC-owned majority-owner of Double Coin exerts considerable influence over the board of directors (and, thus, the management and operations of the company), and that the factual record does not provide sufficient information to rebut the presumption of government control. We note that Double Coin's arguments to the contrary are virtually identical to those made by respondents in other proceedings, which have been similarly rejected by the Department and the CIT. As a result, Double Coin is ineligible for a separate rate and is part of the PRC-wide entity pursuant to the Department's practice, as discussed above.

The only rate ever determined for the PRC-wide entity in this proceeding is 210.48 percent, as first determined in the less-than-fair-value investigation.[65] Petitioners assert that the above-mentioned determination to deny Double Coin's separate rate status should end the individual examination of Double Coin and render its sales behavior meaningless. According to Petitioners, the only rate which may be assigned to Double Coin is the 210.48 percent rate and that the preliminary determination to average the 210.48 percent entity rate with Double Coin's calculated rate is contrary to practice and precedent. We agree with Petitioners that, ordinarily, we would assign the PRC-wide entity rate to any company found to be a part of the entity during the review proceeding and that, in the past, we have applied the existing PRC-wide rate to a respondent once a determination was made to deny said respondent's separate rate.[66] However, this case presents novel circumstances underpinning the Department's decision in this case. In other reviews, the Department may have applied AFA to the entity when a respondent that is

---

[63] *See*, *e.g.*, *Mark David* at 1361 ("{the respondent} had previously qualified for separate rate status, and subsequently lost it in this review, therefore {the respondent}'s previous rate is irrelevant in the instant case."); *Brake Rotors From the People's Republic of China*, 70 Fed. Reg. 69937 (Dep't Commerce 18, 2005) (final 03-04 AD and NSR) and accompanying Issues and Decision Memorandum at Comment 7 (a prior holding that a respondent was eligible for a separate rate did not impact the decision in the current review that it did not, as there were "'even more indicia' of government control" in this review than the prior).

[64] *See, e.g., Advanced Technology I*, 885 F. Supp. 2d 1343 (CIT 2012), remand affirmed in *Advanced Technology II*, 938 F. Supp. 2d 1342 (CIT 2013), aff'd 541 F. App'x 1009 (Fed. Cir. 2014).

[65] *See Certain New Pneumatic Off-The-Road Tires from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances,* 73 FR 40485, 40489 (July 15, 2008).

[66] *See*, *e.g.*, *Certain Activated Carbon From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2011-2012*, 78 FR 26748 (May 8, 2013) and Preliminary Decision Memorandum at 10-11, unchanged in *Certain Activated Carbon From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 78 FR 70533 (November 26, 2013) ("*Activated Carbon from the PRC*"). *See also Brake Rotors 11th AR Final* and accompanying IDM at Comment 7.

deemed to be part of the entity failed to cooperate to the best of its ability.[67] Moreover, instances where the Department denied a separate rate to an otherwise cooperative company that is under review, the Department assigned the pre-existing entity rate to that company, as well as to the entire entity for that review period.[68] Moreover, while the Court established in, for example, *Watanabe*, *Jiangsu Changbao*, and *Advanced Technology II* that the denial of a separate rate (1) ends a respondent's entitlement to an individual inquiry, (2) renders further inquiry meaningless, and (3) justifies the application of the PRC-wide rate, the language does not explicitly require the Department to apply the existing PRC-wide rate, as is, in every circumstance nor does it preclude the Department from using such information to alter the rate as appropriate to the facts of a specific case. Indeed, no case cited by Petitioners addresses the instant fact pattern where part of the PRC-wide entity was selected as a mandatory respondent, provided significant information necessary for a review, and no other part of the entity failed to cooperate. As noted in the *Preliminary Results*, Double Coin provided the Department with requested information, which was subsequently verified, necessary to calculate a margin for part of the PRC-wide entity. Given the unique circumstances of this case where (as discussed below) there is insufficient information on the record with respect to the composition of the PRC-wide entity, and we are able to use the information of the mandatory respondent that is a part of the PRC-wide entity, in calculating a rate for the PRC-wide entity, we continue to find it appropriate to utilize both the previously assigned PRC-wide rate and Double Coin's calculated rate as an appropriate methodology from which to determine the PRC-wide entity rate for the final results.[69]

---

[67] *See, e.g., Steel Wire Garment Hangers From the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 2012-2013*, 80 FR 13332 (March 13, 2015). *See also Certain Cut-to-Length Carbon Steel Plate From the People's Republic of China: Final Results of Administrative Review; 2012-2013*, 80 FR 13522 (March 16, 2015).

[68] *See, e.g., Sodium Hexametaphosphate from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 78 FR 18956 (March 28, 2013). *See also Certain Steel Nails From the People's Republic of China: Final Results and Final Partial Rescission of the Second Antidumping Duty Administrative Review*, 77 FR 12556 (March 1, 2012). Accordingly, we do not find that the ancillary determination to apply the PRC-wide rate to the respondent in the *Brake Rotors 11th AR Final* and IDM at Comment 7 (involving a novel sub-issue with respect to the applicability of local government control in the Department's separate rate analysis) to be informative to the instant circumstance which, itself, must be considered in light of the unique timeframe of this case as related to the Department's evolving practice in light of the *Diamond Sawblades* litigation. Further, we note that, unlike in the instant case, we found at least one component of the PRC-wide entity failed to cooperate in the *Brake Rotors* proceeding. *See Brake Rotors From the People's Republic of China: Preliminary Results and Partial Rescission of the Seventh Administrative Review and Preliminary Results of the Eleventh New Shipper Review*, 70 FR 24382 (May 9, 2005) at 24385 ("As a result of its failure to respond to the Department's questionnaire, Rotec failed to establish its eligibility for a separate rate. Therefore, Rotec is not eligible to receive a separate rate and will be part of the PRC NME entity, subject to the PRC-wide rate. Pursuant to section 776(b) of the Act, we have applied total adverse facts available with respect to the PRC-wide entity, including Rotec"). Moreover, while Petitioners further cite to the *Diamond Sawblades Litigation* Remand Redetermination as an additional instance where the denial of an otherwise cooperative respondent's separate rate resulted in the assigning that respondent the existing PRC-wide rate, we note that the redetermination in question involved the investigation, in which the entity rate was determined based on the failure of other parts of the entity to cooperate in that segment of the proceeding. *Advance Technology I* and *Advanced Technology II*, 938 F. Supp. 2d 1342.

[69] As we are rejecting Petitioners' argument that the Department should completely end its review of Double Coin and apply the unaltered rate to the PRC-wide entity, we similarly reject Petitioners' argument that the Department does not need to address the additional arguments raised in Double Coin's brief concerning the calculation of Double Coin's preliminary margin. As a result of our determination to take Double Coin's behavior into consideration in determining the entity rate, Double Coin's comments and Petitioners' comments with respect to the proper calculation of Double Coin's margin are indeed relevant to these final results and we address all of the relevant comments, below.

In employing this methodology for the *Preliminary Results*, we noted: "The Department lacks information to determine what share of production and exports of subject merchandise Double Coin constitutes as part of the PRC-wide government-controlled entity during the current POR. As a result, we are able to calculate a margin for an unspecified portion of a single PRC-wide entity, but cannot do so for another unspecified portion of the entity."[70]  Because, as established above, the Department must calculate a single margin for the PRC-wide government-controlled entity, we preliminarily calculated a simple average of the previously assigned PRC-wide rate and Double Coin's calculated margin as the rate applicable to the PRC-wide entity.  Double Coin asserts that the Department, indeed, has information with respect to what share of the exports of subject merchandise Double Coin constitutes as part of the entity, as the CBP Data Release released by the Department for the purposes of respondent selection demonstrates that no imports came in under the -000 category.  The CBP Data Release states that "for this administrative review in the event the Department limits the number of respondents for individual examination, the Department intends to select respondents based on U.S. Customs and Border Protection ('CBP') U.S. import data during the POR."[71]  The Department's practice is to request from CBP and release only the import data for the firms specifically requested and initiated upon.[72]  As such, Double Coin is incorrect that the lack of entries identified under the -000 (*i.e.*, PRC-wide) case number in the CBP Data Release demonstrates that there were no such entries during the POR; rather, as stated in the *Preliminary Results*, the record simply does not contain this information.[73]  Accordingly, we continue to find that the Department lacks information to determine what share of production and exports of subject merchandise Double Coin constitutes as part of the PRC-wide government-controlled entity during the current POR. As facts available, because there is insufficient information on the record with respect to the composition of the PRC-wide entity, we continue to find it appropriate to calculate a simple average of the previously assigned PRC-wide rate (210.48 percent) and Double Coin's calculated margin (0.14 percent) as the rate applicable to the PRC-wide entity for these final results. Accordingly, the Department revised the PRC-wide entity rate to 105.31 percent for these final results.

Finally, similar to its arguments with respect to application of an AFA rate (*i.e.*, the PRC-wide rate) to Double Coin above, Double Coin argues that the Department may not apply an uncorroborated rate (*i.e.*, the PRC-wide rate) to Double Coin.  As noted above, the only rate previously determined for the PRC-wide entity in this proceeding is the 210.48 percent rate, as determined in the less-than-fair-value investigation.[74]  This margin has been applied as the PRC-

---

[70] *See* PDM at 12.

[71] *See* CBP Data Release at 1.

[72] *See* Attachment 1 to the CBP Data Release memo.

[73] Double Coin's corollary point that, because no other companies requested or initiated upon were found to be a part of the PRC-wide entity, no other companies that make up the NME entity are subject to this review, and the NME entity was not requested upon and thus not subject to the review (with the implication that Double Coin is then representative of the entire entity) is similarly predicated on an incorrect presumption since, as discuss above, the PRC-wide entity was on notice that it was conditionally subject to review pursuant to the practice in effect at the time.  *See Change in Practice* at 65970.

[74] *See Final LTFV Determinations*, 73 FR at 40489 ("In accordance with section 776(c) of the Act, we corroborated our adverse facts available ('AFA') margin by comparing the U.S. prices and normal values from the petition to the U.S. price and normal values for the respondents… Similarly, for the final determination, we have also compared the U.S. prices and normal values from the petition to the U.S. prices and normal values for the respondents.  We

wide rate in every subsequent review of the *Order*. Double Coin presented no new evidence to suggest that the Petition-based countrywide rate, as corroborated by comparing the U.S. prices and normal values from the petition to the U.S. price and normal values for the respondents during the period of investigation, has lost its probative value. Nevertheless, Double Coin asserts that the SAA holds that the Department may not use an AD rate from a prior period of time as facts available unless such a rate is corroborated as appropriate to the relevant time period and, therefore, the Department may not apply a PRC-wide rate to Double Coin that has not been corroborated in this review. Double Coin's arguments are predicated on the incorrect presumption that it is distinct from the PRC-wide entity, which it is not.[75] As is emphasized throughout this determination, the Department is not assigning the PRC-wide rate to Double Coin as AFA, but determining Double Coin a part of the NME entity to which an entity rate is assigned. The Department does not need to determine whether the 210.48 percent rate is reliable and relevant with respect to Double Coin; rather the PRC-wide rate must only be generally corroborated as to the PRC-wide entity.[76] As discussed above, the Department has corroborated the 210.48 percent PRC-wide entity rate in the initial investigation and applied this rate for the PRC-wide entity multiple times in different segments of the OTR tires proceeding. The PRC-wide rate for non-cooperative respondents need not be corroborated relative to the commercial reality of companies qualifying for a separate rate.[77]

---

found that the U.S. prices and normal values used to calculate the petition margin were within the range of net U.S. prices and normal values, respectively, used in our margin calculations for the mandatory respondents in this investigation. Because no parties commented on the selection of the PRC-wide rate, we continue to find that the margin of 210.48 percent has probative value. Accordingly, we find that the rate of 210.48 percent is corroborated within the meaning of section 776(c) of the Act.")

[75] As such, Double Coin's reliance on the *Gallant Ocean* determination is inapposite, as *Gallant Ocean* involved an exporter of Thai shrimp, where there is no presumption of government control and no NME-wide rate.

[76] *See*, *e.g.*, *Wooden Bedroom Furniture From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and New Shipper Review; 2012*, 79 FR 51954 (September 2, 2014) and accompanying IDM at Comment 4.

[77] *See Certain Frozen Warmwater Shrimp From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012-2013*, 79 FR 57872 (September 26, 2014) and accompanying IDM at Comment 1 ("Accordingly, we find that neither the age of the information used to corroborate the PRC-wide rate used in every segment of this proceeding, nor the fact that lower margins have been calculated for cooperative separate respondents, leads to the conclusion that the PRC-wide rate of 112.81 percent no longer has probative value and is not properly corroborated, a position that has been affirmed by the CIT"), *citing Shanghai Taoen Int'l Trading Co. v. United States*, 360 F. Supp. 2d 1339, at 1347 (CIT 2005) (where the Court explicitly stated that "both this court and the Federal Circuit have determined that in cases in which the respondent fails to provide Commerce with information necessary to calculate an accurate antidumping margin, 'it is within Commerce's discretion to presume that the highest prior margin reflects the current margins.") and *Ad Hoc Shrimp Trade Action Comm. v. United States*, 992 F. Supp. 2d 1285 (CIT 2014) ("where (as here) the non-cooperating respondent is a NME countrywide entity - definitionally presumed to set prices without regard to market conditions - the actual pricing behavior of the cooperative respondents that have demonstrated eligibility for a separate rate (precisely because they have differentiated themselves from the countrywide entity) does not bear upon the credibility of dumping allegations against the NME countrywide entity in the way that the pricing behavior of cooperative market economy respondents reflects on the credibility of dumping allegations against their similarly-situated market participants").

**Comment 2: Whether to Assign a Margin to Trelleborg**

Petitioners' Comments[78]

- Though the Department preliminarily determined that TWS Xingtai had no reviewable transactions during the POR based on Trelleborg's certification thereof and CBP data, record information demonstrates that there were POR shipments of what may be in-scope OTR tires from a producer named "Trelleborg (Hebei)" ("TWS Hebei").
- Record evidence demonstrates that TWS Hebei and TWS Xingtai are co-located and Trelleborg did not dispute that the two entities were, in fact, the same company.
- Though Trelleborg provided information purporting to show that the shipments in question were of non-subject merchandise, it provided invoices for just two of 13 shipments. Because the burden of producing information belongs to the party in possession of such information and Trelleborg did not provide information for the remaining 11 shipments, the Department should determine that TWS Xingtai reviewable transactions during the POR.

Trelleborg's Rebuttal[79]

- Petitioners provide no evidence supporting their assertion that the shipments were of subject merchandise. Rather, CBP data, the absence of contrary information from CBP, and Trelleborg's own information affirmatively demonstrate that the shipments in question were non-subject solid tires.
- Though irrelevant to the ultimate finding, Petitioners' assertion that the entities are not distinct is patently false and their separation is, indeed, indicated on the record.
- In addition to providing two affirmative examples that the precise shipments in question were non-subject merchandise, Trelleborg certified to the fact that all 13 shipments were non-subject, and certified to the fact that the Hebei producer produces and sells non-subject tires.
- Petitioners' lone case citation with respect to the burden of providing information is inapposite, as Trelleborg provided relevant information, unprompted, and the Department did not request or require any further information on the subject.

**Department's Position:** Trelleborg certified that it did not have reviewable transactions during the POR.[80] The absence of entries produced by TWS Xingtai in the Department's CBP data

---

[78] *See* Petitioners' Case Brief at 7-8. Petitioners cite to: *Zenith Electronics. Corp. vs. United States*, 988 F.2d 1573 (Fed. Cir. 1993) ("*Zenith*"). Petitioners reference: Letter from Trelleborg, entitled, "Trelleborg Wheel Systems (Xingtai) China, Co. Ltd. Statement of No Shipments during the POR: New Pneumatic Off-The-Road Tires from the People's Republic of China," dated November 20, 2013 ("Trelleborg No Shipments Letter"); Letter from Petitioners entitled, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off The-Road Tires from China (A–570–912): Petitioners' Comments on Trelleborg Wheel Systems (Xingtai) China's No Shipments Claims," dated December 4, 2013 ("Petitioners' TWS Comments"); Letter from TWS entitled, "Trelleborg Wheel Systems (Xingtai) China, Co. Ltd.: Rebuttal of Factual Information Submitted By Titan Tire Corporation on December 4, 2013," dated December 11, 2013 ("TWS Rebuttal Factual Submission"); Letter from Petitioners entitled, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off-The-Road Tires from China (A–570–912): and Petitioners' Response to Trelleborg Wheel Systems (Xingtai) China's Rebuttal Comments Concerning Its No Shipments Claim," dated December 16, 2013 ("Petitioners' Reply to TWS Rebuttal").

[79] *See* Trelleborg Rebuttal Brief at 1-8. Trelleborg cites to the *Preliminary Results* (October 10, 2014) and accompanying PDM and addresses the *Zenith* (Fed. Cir. 1993) case referenced by Petitioners. Trelleborg references the following record submissions: CBP Message Number 3352302, dated December 18, 2013 ("No Shipments Message"); Trelleborg No Shipments Letter; Petitioners' TWS Comments; TWS's Rebuttal Factual Submission; Petitioners' Reply to TWS Rebuttal; and Petitioners' Case Brief.

inquiry supports this no shipment claim, and CBP did not report contrary information.[81]  In CBP Message 3352302, the Department alerted CBP of Trelleborg's claim of no shipments and requested that CBP officials notify the Department within 10 days should they be in possession of information contrary to this no shipments claim.  CBP officials did not contact the Department with contrary information.  Meanwhile, Trelleborg submitted information to the record (*i.e.*, invoices for two of the thirteen shipments of concern to Petitioners) demonstrating that the shipments were of non-subject merchandise (*i.e.,* solid tires).[82]  Based on this information, we made a preliminary determination of no shipments for Trelleborg.[83]

For these final results, Petitioners assert that the Department should determine that Trelleborg made reviewable shipments during the POR and assign Trelleborg a dumping margin in this review because, though Trelleborg provided information demonstrating that two of the shipments in question were of non-subject tires, the record lacks information with respect to the remaining eleven shipments.  Citing to *Zenith* (Fed. Cir. 1993), Petitioners note that the burden of producing relevant information belongs to the party in possession of the necessary information and the Department should not make an assumption with respect to these shipments absent affirmative information demonstrating that the remaining eleven shipments are also of non-subject tires.[84]

As noted above, the preliminary determination of no shipments was based on a certified statement from Trelleborg and supported by (1) a CBP data inquiry, (2) absence of contrary information from CBP, and (3) transaction-specific invoices.  Moreover, the facts at issue in this case – in which Trelleborg provided relevant information, unprompted by any request (and, thus, any burden) from the Department – are dissimilar from those at issue in *Zenith* (Fed. Cir. 1993), in which the Department placed a specific burden on respondents to provide evidence in support of an assertion (and which respondents failed to do in that case).[85]  Further, Petitioners fail to cite to any record evidence that would bring into question a certification that is supported by the record, nor do they provide sufficient argument that would prompt further examination of the Department's preliminary determination on this issue.  Accordingly, we find that the record continues to support Trelleborg's no shipment certification, and we continue to find that there were no reviewable transactions made by Trelleborg during the POR.

**Comment 3:  Whether to Assign a Margin to Zhongce**

- Petitioners argue that, upon a review of proprietary CBP data and proprietary information submitted by Zhongce in its separate rate application ("SRA"), in the context of the Department's standard *bona fides* analysis, the Department should determine that Zhongce did not have reviewable shipments during the POR and should not assign a margin to Zhongce in this review.[86]

---

[80] *See* Trelleborg No Shipments Letter.
[81] *See* CBP Data Release at Attachment 1 and the No Shipments Message (to which CBP did not provide a reply).
[82] *See* Trelleborg's Rebuttal Factual Submission at Attachment 3.
[83] *See Preliminary Results*.
[84] *See* Zenith, 988 F.2d 1573.
[85] *Id.*
[86] *See* Petitioners' Case Brief at 8-12.  Petitioners cite to:  *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Rescission, in*

- Zhongce rebuts that Petitioners' claims are not supported by the facts and that it is entitled to a separate antidumping duty rate. Zhongce further asserts that Petitioners have waived this issue by failing to raise it in a timely fashion.[87]

**Department's Position:** Zhongce submitted a complete and timely separate rate application, including documentation demonstrating a suspended entry of subject merchandise during the POR, which the Department was able to corroborate using CBP data.[88] Based upon a review of Zhongce's separate rate application, the Department preliminarily determined that Zhongce was eligible for a separate rate, and thus assigned Zhongce a separate rate for the *Preliminary Results*.[89]

Petitioners assert that Zhongce's sales during the POR were non-*bona fide*. However, in making such an assertion, Petitioners rely on case cites where the Department had deemed a mandatory respondent's or a new shipper respondent's sales to be non-*bona fide*. In this case, Zhongce is participating as a separate rate applicant. In light of the Department's resource constraints and decision to limit individual examination of exporters under review, the Department's practice is not to perform a resource-intensive and complex *bona fides* analysis on sales made by separate rate applicants that are not mandatory respondents. Rather, we rely upon CBP data and/or CBP

---

*Part; 2010-2011*, 78 FR 22513 (April 16, 2013) ("*Tires/PRC 10-11*"); *Tires/PRC 2008-2009* (April 25, 2011); *Fresh Garlic From the People's Republic of China: Final Results and Partial Rescission of the 18th Antidumping Duty Administrative Review; 2011-2012*, 79 FR 36721 (June 30, 2014); *Certain Frozen Warmwater Shrimp From the People's Republic of China: Notice of Final Results and Rescission, in Part, of 2004/2006 Antidumping Duty Administrative and New Shipper Reviews*, 72 FR 52049 (September 12, 2007); *Preliminary Results* (October 10, 2014); *Polyethylene Terephthalate Film, Sheet, and Strip From Brazil: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 1827 (January 10, 2014); *Certain Forged Stainless Steel Flanges from India; Rescission of Administrative Review*, 73 FR 44969 (August 1, 2008) ("*Flanges/India Rescission*"), unchanged in *Certain Forged Stainless Steel Flanges from India; Rescission of Administrative Review*, 73 FR 63692 (October 27, 2008); *Tianjin Tiancheng Pharmaceutical Co. Ltd. v. United States*, 366 F. Supp. 2d 1246 (CIT 2005) ("*Tianjin Tiancheng*"); and *Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review and Partial Rescission*, 73 FR 15479 (March 7, 2008). Petitioners reference the following submissions: Letter from Zhongce, entitled, "New Pneumatic Off-the Road Tires from the People's Republic of China (2012-2013): Separate Rate Application," dated January 8, 2014 ("Zhongce SRA") and letter from Zhongce, entitled, "New Pneumatic Off-the Road Tires from the People's Republic of China (2012-2013): Supplement to Zhongce SRA," dated January 14, 2014 ("Zhongce SRA Supplement").

[87] *See* Zhongce's Rebuttal Brief at 1-6. Zhongce addresses the *Flanges/India Rescission* (August 1, 2008) and *Tianjin Tiancheng* (CIT 2005) cases raised by Petitioners, and further cites to the following: *Preliminary Results* and PDM; *Certain Oil Country Tubular Goods From the Republic of Turkey: Final Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances, in Part*, 79 FR 41971 (July 18, 2014); *Certain Orange Juice from Brazil: Final Results of Antidumping Duty Administrative Review, Determination Not To Revoke Antidumping Duty Order in Part, and Final No Shipment Determination*, 76 FR 50176 (August 12, 2011); *Multilayered Wood Flooring From the People's Republic of China; Preliminary Results of Antidumping Duty New Shipper Reviews; 2012-2013*, 79 FR 33723 (June 13, 2014); *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Preliminary Results of Antidumping Duty New Shipper Review*; 2011–2012, 78 FR 14267 (March 5, 2013) ("*Tires/PRC 11-12 NSR Prelim*"); and 19 CFR 351.309(d) of the Department's regulations. Zhongce references the following record submissions: Zhongce SRA; Zhongce SRA Supplement; Petitioners' Case Brief; Petitioners' submission, entitled, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off The-Road Tires from China (A-570-912): Petitioners' Pre-Preliminary Determination Comments," dated September 8, 2014 ("Petitioners' Pre-Prelim Comments").

[88] *See* Zhongce SRA at Exhibit 1 and Zhongce SRA Supplemental at Exhibit 1. *See also* CBP Data Release at Attachment 1.

[89] *See Preliminary Results* at 61293-94 and accompanying PDM at 7-10.

entry documentation to determine if the separate rate applicant had suspended entries during the POR (as we did in this case).[90]

Accordingly, we continue to find Zhongce eligible for a separate rate because its separate rate application shows absence of both *de jure* and *de facto* government control and because Zhongce was able to demonstrate suspended entries during the POR.[91] Petitioners did not provide any arguments challenging the Department's decision on these established criteria. Moreover, because we continue to find Zhongce eligible for a separate rate, we have not addressed the counter-arguments that Zhongce made to Petitioners' arguments.

**Comment 4: Whether to Adjust U.S Prices for Un-refunded Value-Added Tax ("VAT")**

Double Coin's Comments[92]

- Double Coin argues that the VAT in the PRC is a tax imposed only on domestic transactions and not an export tax, duty, or other charge contemplated in section 772(c)(2)(B) of the Act. This statutory limitation is not subject to the Department's discretion and the Department lacks the authority to adjust for non-export taxes such as VAT. Moreover, PRC law states that the tax rate on exports is zero and the company's VAT refund exceeded VAT paid during the POR and there was no VAT liability for export sales.
- Double Coin asserts that the Department's existing calculation of VAT (*i.e.*, subtracting the reimbursement rate from the base rate) misunderstands the VAT system, in that:
    - The methodology ignores the fact that Double Coin did not pay VAT on export sales, which are exempt.
    - The methodology ignores the fact that the only VAT incurred was for raw material purchases.
    - The VAT that Double Coin did incur on certain raw material purchases was based on free on board ("FOB") costs, however, the methodology overstates the actual VAT deduction by applying it to the re-sale invoice U.S. price, which includes freight and profit.
    - The methodology ignores the fact that Double Coin did not incur input VAT on materials consumed at its Rugao factory to produce merchandise for export, as these were imported through a bonded warehouse and thus exempt from input VAT.
- Double Coin notes that, regardless of the above arguments, if the Department continues to apply its current VAT methodology, it should not do so on the CMA re-sale price in the

---

[90] *See, e.g.*, *Aluminum Extrusions From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Rescission, in Part, 2010/12*, 79 FR 96 (January 2, 2014) and accompanying IDM at Comment 8.

[91] *See* PDM at 7-10. *See also* Zhongce SRA and Zhongce SRA Supplemental.

[92] *See* Double Coin's Case Brief at 64-69. Double Coin cites to section 772(c)(2)(B) of the Act and the June 19, 2012 *Section 772(c)(2)(B) Methodological Change* in support of its argument. Double Coin references the following submissions: Letter from Double Coin, entitled, "Section C Response of Double Coin Holdings and China Manufacturers Alliance, LLC: Certain New Pneumatic Off-the-Road Tires from China," dated February 18, 2014 ("Double Coin's SCQR"); Double Coin's Letter, entitled, "VAT Tax Supplemental Questionnaire Response of Double Coin Holdings and China Manufacturers Alliance, LLC, Certain New Pneumatic Off-the-Road Tires from China," dated May 14, 2014 ("Double Coin's VAT Response"); Double Coin's letter, entitled, "Supplemental Questionnaire Response of Double Coin Holdings and China Manufacturers Alliance, LLC Certain New Pneumatic Off-the-Road Tires from China," dated July 3, 2014 ("Double Coin's Supplemental C&D QR").

United States, as this is a U.S. price set by a U.S. company in the United States (which does not have a VAT tax) and should instead apply it to the PRC price.

GTC's Comments[93]

- GTC also argues that the VAT in the PRC is a tax imposed only on domestic transactions and not an export tax, duty, or other charge contemplated in section 772(c)(2)(B) of the Act. This statutory limitation is not subject to the Department's discretion, and the Department lacks the authority to adjust for non-export taxes such as VAT. Moreover, there was no VAT liability for export sales (in accordance with PRC law), and, in fact, the company's VAT refund exceeded VAT paid during the POR and GTC received a refund for the full amount of VAT paid to purchase inputs attributed to exported tires during the POR.
- GTC notes that a simple comparison of percentages applied to U.S. price does not accurately reflect VAT liability and, under the plain language of both the statute and the Department's own policy, the issue is not the rate but the amount of VAT paid and then refunded.
- GTC notes that the Department's reasoning for rejecting respondents' calculation of refunded VAT claims is to disallow allocations across all company sales or across sales of products with different VAT schedules by using the difference between the VAT rate and the refund rate. However:
    - GTC did, in fact, provide an irrecoverable VAT calculation methodology that is associated with the production of subject OTR tires exported to the United States (*i.e.,* GTC's allocation was for tires, which are all subject to the same VAT schedule).
    - GTC provided the exact type of reconciliation to its VAT tax returns that the Department requested, including the most detailed VAT calculation possible based on its books and records, and it has reconciled its computations to its VAT tax returns as requested.

---

[93] *See* GTC's Case Brief at 17-29. GTC cites to the following: section 772(c)(2)(B) of the Act; *Magnesium Corp. of America v. United States*, 166 F.3d 1364 (Fed. Cir. 1999); *Section 772(c)(2)(B) Methodological Change* (June 19, 2012); *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984); *Wind Tower Trade Coalition v. United States*, 741 F.3d 89 (Fed. Cir. 2014); *Dorbest v. United States*, 604 F.3d 1363 (Fed. Cir. 2010); and Exhibit 3 to its Case Brief. GTC references the following submissions: The Department's separate letters to GTC and Double Coin entitled, "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Supplemental Tax Questionnaire," dated April 30, 2014 ("VAT Questionnaires"); GTC's submission entitled, "Supplemental VAT Questionnaire Response: Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated May 28, 2014 ("GTC's VAT Response"); the Department's memorandum entitled, "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Verification of the Sales and Factors Response of Guizhou Tyre Co., Ltd. and Affiliates," dated September 30, 2014 ("GTC's Verification Report"); *Preliminary Results* (October 10, 2014) and PDM; and GTC's submission entitled, "Section C & D Responses. Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated February 19, 2014 ("GTC's SCDQR").

Petitioners' Rebuttal[94]

- The Department has rejected on multiple occasions the claim that it lacks the authority to adjust for irrecoverable VAT imposed by an NME government and addressed arguments that the PRC VAT is not an export tax.
- The Department followed its established practice by applying the difference between the general VAT rate and the export rate specific to the subject merchandise.
- The Department's practice is to reject firm-wide allocations across all company sales or across sales of products with different VAT schedules, as the PRC's VAT regime is product-specific, with VAT schedules that vary by industry and specific products.
- The Department has declined to base irrecoverable VAT adjustments on the total VAT liability of a respondent for well-founded reasons.
- GTC's argument that the Department should make an adjustment to account for the particular input VAT for purchases of certain natural rubber and Double Coin's argument regarding the VAT status of some of its inputs at its Rugao factory are both in error, as each would result in an adjustment based on non-product specific data.
- Neither GTC nor Double Coin make a claim or offered any evidence that they were rebated input VAT at more than the standard nine percent on their export sales. As such, the Department should continue to reject GTC's and Double Coin's arguments that the applicable VAT should be calculated by reference to charges and refunds on all their merchandise rather than the irrecoverable VAT on the subject merchandise in question.

**Department's Position:** For the reasons explained below, we continue to apply the un-refunded (irrecoverable) VAT adjustment that we used in the *Preliminary Results* to deduct an amount for irrecoverable VAT from the reported U.S prices for both respondents. However, we agree with Double Coin that our application of the irrecoverable VAT percentage to the U.S. resale price overstated the adjustment and, therefore, as explained below, we based our determination of Double Coin's irrecoverable VAT adjustment on entered value less international freight for these final results of review.

In 2012, we announced a change of methodology with respect to the calculation of the EP or CEP to include an adjustment of any irrecoverable VAT in certain NME countries, in accordance with section 772(c)(2)(B) of the Act.[95] In this announcement, the Department stated that when a NME government has imposed an export tax, duty, or other charge on subject merchandise or on

---

[94] *See* Petitioners' Rebuttal Brief at 20-24. Petitioners cite the following: *Section 772(c)(2)(B) Methodological Change* (June 19, 2012); *Preliminary Results* (October 10, 2014) and PDM; *Small Diameter Graphite Electrodes From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012-2013*, 79 FR 57508 (September 25, 2014) ("*SDGE/PRC 12-13*"); *Frontseating Service Valves From the People's Republic of China; Final Results of Antidumping Duty Administrative Review; 2012-2013*, 79 FR 71385 (December 2, 2014) ("*FSVs/PRC 12-13*"); *Helical Spring Lock Washers From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2012-2013*, 79 FR 66356 (November 7, 2014); *Diamond Sawblades 11-12*, 79 FR 35723 (June 24, 2014); *Hangers/PRC 12-13 Prelim* (November 5, 2014); *Final Determination of Sales at Less Than Fair Value: Prestressed Concrete Steel Rail Tie Wire From the People's Republic of China*, 79 FR 25572 (May 5, 2014) ("*Prestressed Wire/PRC*"); *Chlorinated Isocyanurates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 4875 (January 30, 2014) ("*Chlorinated Isos/PRC 11-12*"). Petitioners reference Double Coin's Case Brief and GTC's Case Brief.

[95] *See Section 772(c)(2)(B) Methodological Change* (June 19, 2012), 77 FR at 36482.

inputs used to produce subject merchandise, from which the respondent was not exempted, the Department will reduce the respondent's EPs or CEPs accordingly by the amount of the tax, duty or charge paid, but not rebated.[96]

In a typical VAT system, companies do not incur any VAT expense; they receive on export a full rebate of the VAT they pay on purchases of inputs used in the production of exports ("input VAT"), and, in the case of domestic sales, the company can credit the VAT they pay on input purchases for those sales against the VAT they collect from customers.[97] That stands in contrast to the PRC's VAT regime, where some portion of the input VAT that a company pays on purchases of inputs used in the production of exports is not refunded.[98] This amounts to a tax, duty, or other charge imposed on exports that is not imposed on domestic sales and we, thus, disagree with the respondents' assertions that irrecoverable VAT should not be deducted from their U.S. prices. Where the irrecoverable VAT is a fixed percentage of U.S. price, the Department explained that the final step in arriving at a tax-neutral dumping comparison is to reduce the U.S. price downward by this same percentage.[99]

Section 772(c)(2)(B) of the Act authorizes the Department to deduct from EP or CEP the amount, if included in the price, of any "export tax, duty, or other charge imposed by the exporting country on the exportation" of the subject merchandise. We disagree with respondents' claims that we do not have the statutory authority to adjust for irrecoverable VAT, or that our methodology unlawfully re-interprets section 772(c)(2)(B) of the Act. Section 772(c)(2)(B) of the Act authorizes us to deduct from EP or CEP the amount, if included in the price, of any "export tax, duty, or other charge imposed by the exporting country on the exportation" of the subject merchandise. Moreover, respondents argue that they pay no VAT tax upon export and that the PRC VAT is not an export tax, duty or charge but, rather, a charge on domestic purchases of inputs; however, this misstates what is at issue: the issue is the irrecoverable VAT, not VAT *per se*. Irrecoverable VAT, as defined in PRC law, is a net VAT burden that arises solely from, and is specific to, exports. It is VAT paid on inputs and raw materials (used in the production of exports) that is non-refundable and, therefore, a cost.[100] Irrecoverable VAT is, therefore, an "export tax, duty, or other charge imposed" on exportation of the subject merchandise to the United States.[101] The statute does not define the terms "export tax, duty, or other charge imposed" on the exportation of subject merchandise. We find it reasonable to interpret these terms as encompassing irrecoverable VAT because the irrecoverable VAT is a cost that arises as a result of export sales. It is set forth in PRC law and, therefore, can be considered to be "imposed" by the exporting country on exportation of subject merchandise. Further, an adjustment for irrecoverable VAT achieves what is called for under section 772(c)(2)(B) of the Act, as it reduces the gross U.S. price charged to the customer to a tax neutral

---

[96] *Id.*, 77 FR at 36483; *see also Chlorinated Isos/PRC 11-12* (January 30, 2014) and accompanying IDM at Comment 5.
[97] *See*, *e.g.*, *Diamond Sawblades 11-12,* 79 FR 35723 (June 24, 2014) and accompanying IDM at Comment 6; *Section 772(c)(2)(B) Methodological Change*, 77 FR at 36483.
[98] *See* Double Coin's VAT Response at Exhibit SC-1; GTC's VAT Response at Exhibits 1-3; and *Methodological Change*, 77 FR at 36483.
[99] *See Section 772(c)(2)(B) Methodological Change* (June 19, 2012), 77 FR at 36483.
[100] *See SDGE/PRC 12-13* (September 25, 2014) and accompanying IDM at Comment 7.
[101] *See*, *e.g.*, *Diamond Sawblades 11-12*, 79 FR 35723 (June 24, 2014) and accompanying IDM at Comment 6 and *FSVs/PRC 12-13* (December 2, 2014) and accompanying IDM at Comment 5.

net price received by the seller. This deduction is consistent with our longstanding policy, which is consistent with the intent of the statute, that dumping margin calculations be tax-neutral.[102]

In both an initial and supplemental questionnaire, the Department instructed GTC and Double Coin to report value-added taxes on inputs used to produce the merchandise sold to the U.S. and identify the portion of input VAT that was not fully refunded on exportation. In response, both respondents stated their disagreement with our product-specific methodology and reported that their total VAT refund exceeded VAT paid for export sales during the POR and, thus, reported no value in the VAT field of their respective sales databases.[103] However, our practice is that we will not consider allocations across all company sales or across sales of products with different VAT schedules but, rather, to use the difference between the VAT rate and the refund rate, consistent with PRC regulations, unless the company can show otherwise for the subject merchandise.[104] Rather, our irrecoverable VAT calculation methodology, as applied in this review, consists of performing two basic steps: (1) determining the irrecoverable VAT tax on subject merchandise, and (2) reducing U.S. price by the amount determined in step one. Information placed on the record of this review by both GTC and Double Coin indicates that according to the Chinese VAT schedule, the standard VAT levy is 17 percent and the rebate rate for subject merchandise is nine percent.[105] For the purposes of these final results, therefore, we removed from U.S. price the difference between the rates (*i.e.*, eight percent), which is the irrecoverable VAT as defined under PRC tax law and regulation.[106]

For these final results, both Double Coin and GTC argue that the Department should take into account for the calculation of irrecoverable VAT the various alternate (or absent) input VAT rates that they claim are applicable to certain inputs used in the production of subject merchandise: for GTC's purchases of certain natural rubber (which, according to GTC is assessed at a VAT rate of 13 percent for all other inputs); and for Double Coin's raw materials consumed to produce merchandise for export at its Rugao factory that were imported through a bonded warehouse (which Double Coin claims did not incur any input VAT, pursuant to PRC law). In our questionnaires to Double Coin and GTC we asked that if the irrecoverable VAT amount reported is not directly derived as the difference between the VAT tax rate applicable to domestic purchases and inputs and the refund rate for export sales of subject merchandise, then they need to: 1) explain in detail why and provide worksheets demonstrating how to calculate the irrecoverable VAT; 2) reconcile the worksheets to the translated VAT tax returns provided and provide a detailed narrative explanation that describes the calculations shown in the worksheets; and 3) for each reconciling item reported in the worksheets, provide documentation and a citation to the Chinese laws and regulations to fully support the reason for the reconciling item. However, the respondents did not provide this information, and the limited information they did provide would result in an adjustment to irrecoverable VAT based on non-product

[102] *See* Article 5(3) of Circular 39 that states, "(3) Where the Tax Refund Rate is lower than the applicable tax rate, the amount of tax calculated according to the difference in rates shall be included in the costs of the Exported Goods and Services."; *See Section 772(c)(2)(B) Methodological Change* (June 19, 2012), 77 FR at 36483, and *Final Rule* (May 19, 1997) 62 FR at 27369 (citing the SAA).
[103] *See* Double Coin's VAT Response and GTC's VAT Response.
[104] *See, e.g.*, *Diamond Sawblades 11-12* (June 24, 2014) and accompanying IDM at Comment 6.
[105] *See*, *e.g.*, Double Coin's VAT Response at 2-3 and GTC's VAT Response at 1-2.
[106] *See*, *e.g.*, *Prestressed Wire/PRC* (May 5, 2014) and accompanying IDM at Comment 1. *See* the Program Log and Output attached to Double Coin's and GTC's Final Analysis Memoranda for details regarding this calculation.

specific data. For the calculation of irrecoverable VAT we will not consider allocations across all company sales or across sales of products with different VAT schedules.[107] Furthermore, we note that GTC fails to cite to any evidence on record of this specifically lower rate that it claims applies to one of the inputs it consumed, nor did the Department verify the claimed 13 percent VAT rate for natural rubber at verification. Further, Double Coin's argument that it did not pay VAT on certain inputs ignores the fact that it did not receive the full refund from its exports that it would have otherwise received and, thus, the difference in these amounts is a cost arising from exportation. Indeed, neither GTC nor Double Coin make a claim or offered any evidence that they were rebated input VAT at more than the standard nine percent on their export sales. With respect to GTC's assertion that it provided the exact type of reconciliation to its VAT tax returns that the Department requested in its VAT questionnaire, we note that our request was for parties to reconcile the amount of irrecoverable VAT reported to its VAT tax returns, but GTC only reconciled the input and output VAT to their tax returns and, as such, did not provide the reconciliation requested.[108]

Irrecoverable VAT is (1) the free-on-board value of the exported good, applied to the difference between (2) the standard VAT levy rate and (3) the VAT rebate rate applicable to exported goods.[109] The first variable, export value, is unique to each respondent and sale while the rates in (2) and (3), as well as the formula for determining irrecoverable VAT, are each explicitly set forth in Chinese law and regulations.[110]

19 CFR 351.401(c) requires that the Department rely on price adjustments that are "reasonably attributable to the subject merchandise." The PRC's VAT regime is product-specific, with VAT schedules that vary by industry and even across products within the same industry. Irrecoverable VAT is a product-specific export tax, duty, or other charge that is incurred on the exportation of subject merchandise. Thus, our analysis is consistent with our current irrecoverable VAT policy and our treatment of irrecoverable VAT in recently completed NME cases.[111] Therefore, we have not altered our irrecoverable VAT adjustment methodology for these final results.

Finally, Double Coin argues that – notwithstanding its aforementioned arguments regarding the applicability of the Department's irrecoverable VAT methodology – in applying this methodology the Department should not assess irrecoverable VAT on the gross unit price (*i.e.*, CMA's re-sale price in the United States). Instead, Double Coin argues, the Department should instead apply the irrecoverable VAT assessment to the PRC export price less freight expenses, which can be calculated by subtracting reported ocean freight from reported entered value. We agree with Double Coin that the calculation in the *Preliminary Results* overstated the export sales value and that Double Coin's suggested correction to the calculation is appropriate and

---

[107] *See*, *e.g.*, *Prestressed Wire/PRC* (May 5, 2014) and accompanying IDM at Comment 1.
[108] *See* GTC's VAT Response at Exhibit 2.
[109] *See Prestressed Wire/PRC* (May 5, 2014) and accompanying IDM at Comment 1, n. 35.
[110] *Id.* at Comment 1, n. 36.
[111] *See*, *e.g.*, *Certain Polyester Staple Fiber From the People's Republic of China: Final Results of the Antidumping Duty Administrative Review; 2012-2013*, 80 FR 4542 (January 28, 2015) and IDM at Comment 6; *Chlorinated Isocyanurates From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012-2013* (January 28, 2015) and IDM at Comment 4.

consistent with our recent practice.[112]  Accordingly, for Double Coin's CEP sales, we based our determination of the irrecoverable VAT tax offset on entered value less international freight.[113]

**Comment 5:  Use of Adverse Facts Available in Calculating Double Coin's Margin**

Double Coin's Comments[114]
- As a result of the discovery of an unreported CONNUM at verification, Department officials applied the highest CONNUM-specific margin to the percentage of all sales comprised by the missing CONNUM, and applied this to the calculated margin as an adverse inference to account for the amount of unreported sales.  Double Coin argues that there is no basis for applying an adverse inference in accounting for the sales of the unreported CONNUM, as the Department acknowledged and verified that the error was inadvertent.
- CMA offered all relevant information once the error was discovered, and in no way failed to cooperate by not acting to the best of its ability or impeded the proceeding.
- The Department should instead apply the average of all CONNUM-specific margins as facts available ("FA").
- Regardless of whether the Department applies facts available ("FA") or AFA to the unreported sales, the Department must apply this margin only to the percentage of sales shown to have been sold to U.S. customers.  The summary sheet provided at verification clearly shows the breakdown of domestic and export sales, and Department officials verified this information.

Petitioners' Comments[115]
- In past determinations where a respondent did not report all U.S. sales, the Department has held that applying the highest calculated margin as partial AFA is appropriate, even when the respondent claims inadvertence or the missing data is offered during verification.

---

[112] *See Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China: Final Results of the Antidumping Duty Administrative Review and Final Results of the New Shipper Review; 2012-2013*, 80 FR 4244 (January 27, 2015) and accompanying IDM at Comment 9 ("We agree with CPZ/SKF that it is appropriate to use the entered value of its merchandise as the tax base here, given that:  1) it is essentially the same as the company's export value; and 2) the Government of the PRC determines the amount of VAT rebated upon exportation using export values.").  *See also Frontseating Service Valves From the People's Republic of China; Final Results of Antidumping Duty Administrative Review; 2012-2013*, 79 FR 71385 (December 2, 2014) and accompanying IDM at Comment 5 ("{A}s Sanhua noted, in the *Preliminary Results*, the Department overstated the export sales value by deducting only international freight and certain adjustments from CEP.  For these final results, we based our determination of the VAT tax offset, as Sanhua suggested, on entered value, which excludes international freight and U.S. selling expenses.").

[113] *See* Double Coin's Final Analysis Memo for further details on the calculation pursuant to this correction.  As GTC previously provided FOB prices for its sales, and these prices were used for the VAT calculation in the *Preliminary Results*, no such change is needed to GTC's VAT liability calculation.

[114] *See* Double Coin's Case Brief at 59-64.  Double Coin cites to *Jiangsu Changbao* (CIT 2012) and section 776(a) and (b) of the Act.  Double Coin references the following record documents:  Double Coin's Preliminary Analysis Memo and Double Coin's Verification Report.

[115] *See* Petitioners' Rebuttal Brief at 15-18.  Petitioners cite to *Final Determination of Sales at Less Than Fair Value:  Silica Bricks and Shapes From the People's Republic of China*, 78 FR 70918 (November 27, 2013) ("*Bricks/PRC*") and *Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003).  Petitioners reference the following record documents:  Double Coin's Preliminary Analysis Memo, Double Coin's Verification Report, and Double Coin's Case Brief.

- The Department only accepted information at verification to collect information necessary to allow the inclusion of these sales in the average margin calculated for Double Coin and did not verify whether any of the sales were re-exported (regardless of what fields are included on the summary sheet provided). Instead the Department explicitly noted there is nothing on the record to demonstrate that these sales were not entered for U.S. consumption, and should continue to include the total volume of unreported sales in the final calculation.

**Department's Position:** At verification of Double Coin's U.S. sales affiliate, CMA, we discovered an unreported CONNUM that company officials admitted should have been reported as subject merchandise, but claimed was unreported because of an oversight with respect to product lines.[116] As information with respect to these sales was not previously on the record, we declined to take invoices or other sales-specific information regarding sales of this product during the POR, but took a summary sheet which contained the quantity and value information of the sales.[117] Company officials stated that the majority of these sales were to non-U.S. markets and the number of tires sold to downstream U.S. customers represented only about 35 percent of the total number of tires sold of this product. In the *Preliminary Results*, we noted that the record lacked evidence to demonstrate that the entirety of the sales of this CONNUM (*i.e.*, representing all of CMA's sales of this OTR product during the POR, whether to downstream U.S. customers or export sales) was not entered for U.S. consumption. Accordingly, in calculating Double Coin's weighted-average margin for the *Preliminary Results*, we weight-averaged the *ad valorem* margin for Double Coin's reported sales (calculated from our standard antidumping duty program) with a margin determined for all unreported sales.[118] As the record did not contain information for which to calculate a margin for these sales, we assigned the highest CONNUM-specific margin calculated for the reported sales as an adverse inference applicable to the unreported sales.[119]

For these final results, Double Coin asserts that the highest calculated CONNUM-specific margin should not be applied in accounting for these sales, as section 776(b) of the Act only permits the application of an adverse inference when a party fails to cooperate by not acting to the best of its ability to comply with a request for information and is found to have willfully impeded the proceeding, which is not the case in the instant proceeding.

We agree that Double Coin's error was inadvertent and the respondent was cooperative once the omission was discovered at verification. However, we agree with Petitioners that the application of the adverse inference in this situation is proper and well supported by precedent.[120] Section 776(a)(2)(B) and (D) of the Act provides that if an interested party fails to provide information within the established deadlines or provides information but the information cannot be verified, the Department shall use, subject to section 782(d) of the Act, facts otherwise available in reaching the applicable determination. Moreover, section 776(b) of the Act provides that, if the Department finds that an interested party failed to cooperate by not acting to the best of its ability

[116] *See* Double Coin's Verification Report at section VII.A.4.
[117] *Id.,* at Exhibit US-VE 12.
[118] *See* Double Coin's Preliminary Results Analysis Memo at Attachment III.
[119] *Id.*, at 10 and Attachments II and III.
[120] *See Final Determination of Sales at Less Than Fair Value: Silica Bricks and Shapes From the People's Republic Of China*, 78 FR 70918 (November 27, 2013), and accompanying IDM at Comment 7.

to comply with a request for information, the Department may use an inference adverse to the interests of that party in selecting the facts otherwise available. In addition, the SAA accompanying the Uruguay Round Agreements Act explains that the Department may employ an adverse inference "to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully."[121]

In *Nippon Steel*, the Federal Circuit noted that while the statute does not provide an express definition of the "failure to act to the best of its ability" standard, the ordinary meaning of "best" is "one's maximum effort."[122] Thus, according to the Federal Circuit, the statutory mandate that a respondent act to the "best of its ability" requires the respondent to do the maximum it is able to do. The Federal Circuit indicated that inadequate responses to an agency's inquiries would suffice to find that a respondent did not act to the best of its ability.[123] While the Federal Circuit noted that the "best of its ability" standard does not require perfection, it does not condone inattentiveness, carelessness, or inadequate record keeping.[124] The "best of its ability" standard recognizes that mistakes sometimes occur; however, it requires a respondent to, among other things, "have familiarity with all of the records it maintains," and "conduct prompt, careful, and comprehensive investigations of all relevant records that refer or relate to the imports in question to the full extent of" its ability to do so.[125]

The antidumping duty questionnaire issued in this review requires respondents to report all of their relevant U.S. sales during the POR. Double Coin had multiple opportunities to provide the full universe of sales, given that the Department issued multiple supplemental questionnaires to Double Coin, and Double Coin made adjustments to reported sales notwithstanding the unreported CONNUM in its responses to the supplemental questionnaires.[126] Thus, section 782(d) was satisfied with respect to the universe of Double Coin's sales. By not reporting the entire universe of its U.S. sales in its questionnaire and supplemental questionnaire responses, Double Coin failed to provide information within the deadlines established.

The Department previously declined to accept unreported sales information identified at verification and instead relied upon FA or AFA as appropriate.[127] In this case, we find it is

---

[121] *See* SAA, H.R. Rep. No. 103-316, at 870; *see also Notice of Final Results of Antidumping Duty Administrative Review: Stainless Steel Bar from India*, 70 FR 54023, 54025-26 (September 13, 2005); *Notice of Final Determination of Sales at Less Than Fair Value and Final Negative Critical Circumstances: Carbon and Certain Alloy Steel Wire Rod from Brazil*, 67 FR 55792, 55794-96 (August 30, 2002).
[122] *See Nippon Steel v. United States*, 337 F.3d 1373, 1382-83 (Fed. Cir. 2003).
[123] *Id*.
[124] *Id*.
[125] *Id*.
[126] *See*, *e.g.*, Double Coin's Supplemental C&D Response.
[127] *See Final Determination of Sales at Less Than Fair Value; Stainless Steel Sheet and Strip in Coils From Germany*, 64 FR 30710 (June 8, 1999) at Comment 10 ("*SSSS/Germany*"). In this case, the Department noted that the respondent identified the missing sales at the outset of verification (and provided a complete packet containing copies of each of the relevant invoices which the Department included on the record as a verification exhibit), but for the final results the Department noted "that {the respondent} had three opportunities spread over four months to provide the Department with a complete listing of its U.S. sales. In response to its failure to do so, as adverse facts available, we are applying the highest non-aberrational margin calculated based on {the respondent's} correctly reported CEP transactions to the unreported sales and have included these transactions in our calculation of the overall weighted-average margin." *See also*, *Bricks/PRC* (November 27, 2013) at Comment 7, where the respondent similarly claimed its failure to report all U.S. sales was inadvertent after the Department discovered the unreported

appropriate to base dumping margins for these unreported sales on FA pursuant to section 776(a) of the Act. Further, as evidenced by its ability at verification to identify the invoices related to these specific unreported U.S. sales, it is clear that Double Coin possessed the necessary records to provide a complete U.S. sales database but did not conduct a comprehensive investigation of all relevant records to identify the unreported sales in a timely manner. As discussed in prior cases, we note that the purpose of verification is to verify the accuracy of information previously submitted to the record by the respondent, not to collect new sales information that had been previously requested but not reported. Therefore, we find that Double Coin's failure to report all of its U.S. sales of in-scope products during the POR, using the information over which it maintained control at all times, indicates that the respondent did not act to the best of its ability to comply with our request for information.[128] Hence, we find it is appropriate to base the dumping margins for these unreported sales on AFA and continue to assign the highest CONNUM-specific margin to the unreported sales for the final results.[129]

However, we agree with Double Coin that we should only apply this adverse inference to the 35 percent of unreported sales shown to have been sold to U.S. customers. Upon discovery of the omission of sales of this product at verification, Department officials requested information for all sales of this product during the POR. For the sake of completion and in compliance with the Department's request, Double Coin provided all information available for all sales of this tire type, whether sold to a U.S. customer or foreign customer, including original invoices for each sale, along with a cover sheet summarizing all transactions (*i.e.*, the summary sheet provided at US VE-12 of Double Coin's Verification Report). As noted in the verification report, Department officials declined to take new factual information on the specific sales for the record (*i.e.*, copies of invoices). However, in order to have a record of the quantity of the missing sales for any necessary margin calculation, we accepted the summary sheet (*i.e.*, US VE-12). Though Department officials did not take the invoices for the record, we did review the information on these original invoices to ensure the veracity of the information provided in the summary sheet. Thus, after considering Double Coin's comments, we find that the use of the total sales value corresponding to sales of all unreported tires sold by CMA during the POR, regardless of destination, used for the total margin calculation in *Preliminary Results* was in error, and we

---

sales at verification, but the Department nonetheless determined that the respondent failed to act to the best of its ability by not reporting all U.S. sales prior to verification (rejecting the respondent's arguments that an inadvertent omission cannot be viewed as a withholding of information). Citing to *Nippon Steel*, the Department noted that the respondent had all the information in its possession prior to the Department's discovery, and it had been instructed to submit all its U.S. sales and rejected the respondent's arguments that the Department could have accepted information on the unreported sales at verification, stating, "the purpose of verification is to verify the accuracy of information previously submitted to the record by the respondent, not to collect new sales information that had been previously requested but not reported."

[128] *Id.* As in this *Bricks/PRC* (November 27, 2013) case, where the Department held that by reporting U.S. sales based on knowledge of customers' typical purchases rather than thoroughly examining sales records, the respondent had not done the maximum it could have done, we note that, in the instant case, by failing to cross check for subject merchandise across product lines (an error that, while inadvertent, was readily apparent to Department officials quite early in the relevant review process at verification), Double Coin did not do the maximum it could have done to provide the full universe of sales information to Department officials in a timely manner. *See also*, *e.g.*, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2012-2013*, 80 FR 1021 (January 8, 2015), citing to *SSSS/Germany* (June 8, 1999) at Comment 10.

[129] *See* Double Coin's Final Analysis Memo.

instead used the reported sales value of the domestic sales of the tire type in question (*i.e.*, representing 35 percent of all unreported sales) in the calculation of Double Coin's margin for these final results.[130]

**Comment 6: Use of PT Gajah Tunggal's Financial Statement for the Surrogate Financial Ratio Calculation**

GTC's Comments[131]

- The Department should adjust the financial ratios to account for Gajah Tunggal's total cost of labor. Specifically, the Department correctly adjusted Gajah Tunggal's manufacturing expenses to account for the cost of energy using Gajah Tunggal's annual report in the *Preliminary Results*, and should now adopt the same methodology to adjust Gajah Tunggal's total production labor.
- Alternatively, the Department should place Gajah Tunggal's corrected 2013 statements on the record and use these revised statements (the Department should be aware of such corrected statements for Gajah Tunggal, since they are on the record of the *PVLT Tires/PRC LTFV Prelim* (January 27, 2015)).

---

[130] For a further proprietary discussion of our findings at verification and of this calculation, *see* Double Coin's Final Analysis Memo.

[131] *See* GTC's Case Brief at 4-11. GTC cites to the following: *Grobest & I-Mei Indus. (Vietnam) Co. v. United States*, 815 F. Supp. 2d 1342 (CIT 2012); *Chlorinated Isocyanurates From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2010-2011*, 78 FR 4386 (January 22, 2013); *Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value; Preliminary Affirmative Determination of Critical Circumstances; In Part and Postponement of Final Determination*, 80 FR 4250 (January 27, 2015) ("*PVLT Tires/PRC LTFV Prelim*"); *Fresh Garlic From the People's Republic of China: Final Rescission of Antidumping Duty New Shipper Reviews; 2010-2011*, 78 FR 18316 (March 26, 2013); *Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results of the Antidumping Duty Administrative Review and New Shipper Reviews*, 74 FR 11349 (March 17, 2009); *Certain Preserved Mushrooms from the People's Republic of China: Final Results of the Antidumping Duty New Shipper Review*, 71 FR 66910 (November 17, 2006); *Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances: Certain Color Television Receivers From the People's Republic of China*, 69 FR 20594 (April 16, 2004); *Heavy Forged Hand Tools From the People's Republic of China; Final Results and Partial Rescission of Antidumping Duty Administrative Review and Determination Not To Revoke in Part*, 66 FR 48026 (September 17, 2001); *Shakeproof Assembly Components. v. United States*, 268 F.3d 1376 (Fed. Cir. 2001); *Union Camp Corp. v. United States*, 53 F. Supp. 2d 1310 (CIT 1999); and its own analysis of adjusted overhead ratio provided at Exhibit 1to the Case Brief. GTC references the following record documents: The Department's Memorandum to the File, entitled, "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Preliminary Results Surrogate Value Memorandum," dated September 30, 2014 ("Preliminary SV Memo"); and Petitioners' letter, entitled, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off The-Road Tires from China (A–570–912): Petitioners' Initial Surrogate Value Comments," dated April 14, 2014 ("Petitioners' Initial SV Comments") (specifically, the PT Gajah Tunggal Tbk ("Gajah Tunggal") and PT Goodyear Indonesia Tbk ("Goodyear") financial statements provided at Attachment 19 thereto).

Petitioners' Comments[132]

- The Department should not adjust the reported labor costs in Gajah Tunggal's financial ratios using the unaudited annual report, but should continue to rely on the labor value reported in the audited financial statements as the best available information.
- Citing to *HRS/Romania* (June 14, 2005), Petitioners allege that the Department should decline to "take notice" of a corrected financial statement for Gajah Tunggal that was submitted in the ongoing investigation of passenger vehicle and light truck ("PVLT") tires from the PRC because Gajah Tunggal is affiliated with interested parties in that investigation.

**Department's Position:** For the *Preliminary Results*, in order to calculate surrogate financial ratios, we used the financial statements of two Indonesian producers of identical merchandise: Gajah Tunggal and Goodyear. Though Goodyear's financial statements break out energy, Gajah Tunggal's financial statements do not. However, Gajah Tunggal's annual report provides the cost of energy as a percentage of the total cost of production. Thus, for the *Preliminary Results*, we used the percentage provided in Gajah Tunggal's annual report to compute the cost of energy for Gajah Tunggal in the computation of the financial ratios. For these final results, as explained below, we relied solely on Goodyear's financial statements for computation of financial ratios.

As a preliminary matter, no party disputed either the use of Goodyear's financial statements or the manner in which the Department used Goodyear's statements to calculate surrogate financial ratios. Second, we note that Goodyear is a producer of identical merchandise and that its audited financial statements are complete, contemporaneous with the POR, and include detailed expense lines for raw materials, manufacturing labor, manufacturing energy, and manufacturing overhead.

With regards to Gajah Tunggal's financial statements, GTC argues that either (1) the Department should make an adjustment to direct labor, the same way the Department did for Gajah Tunggal's manufacturing energy using Gajah Tunggal's annual report, or (2) that the Department should "take notice" of a corrected version of Gajah Tunggal's financial statements, which were placed on the record of the ongoing investigation of PVLT tires from the PRC.

In this case, because we still have another financial statement (*i.e.*, Goodyear), which no party disputed, we did not use the financial statements of Gajah Tunggal for these final results because Gajah Tunggal's audited financial statements do not contain a line for manufacturing energy. As GTC pointed out, there may be some inconsistency between Gajah Tunggal's annual report and its audited financial statements; thus, rather than rely upon Gajah Tunggal's unaudited annual report to generate a cost for manufacturing energy for Gajah Tunggal as we did in the *Preliminary Results* or to generate a cost for production labor, we discarded Gajah Tunggal's statement in favor of only using Goodyear's complete, audited financial statements which break out all relevant manufacturing costs.

---

[132] *See* Petitioners' Rebuttal Brief at 24-26 and Exhibit 1. Petitioners cite to *HRS/Romania* (June 14, 2005) and section 773(c)(1) of the Act. Petitioners reference the following record documents: Preliminary SV Memo and GTC's Case Brief.

The Department's practice is to rely upon the best, publicly available information when making determinations. As we determined not to use Gajah Tunggal's financial statements, and to rely only on Goodyear's financial statements for calculation of the financial ratios, the Department does not need to examine information not on the instant case record (*i.e.*, the filing in the PVLT tires investigation), since Goodyear's statements represent the best information available for this case.

Additionally, with regards to Petitioners' arguments that the labor percentage suggested by GTC to calculate Gajah Tunggal's financial ratio is not an accurate representation of the actual amount of direct labor used by GTC itself, we note that this argument is moot because the Department decided not to use Gajah Tunggal's financial statements for other reasons.

For the final results, we determined to reject Gajah Tunggal's statement entirely because its financial statements did not include energy and, upon further consideration, the un-audited annual report is not a sufficiently reliable source to derive the energy ratio and, at any rate, Gajah Tunggal's statement is not necessary because we already have a complete and useable statement from Goodyear that does break out energy. Therefore, we relied solely on the Goodyear statement for the calculation of surrogate financial ratios.[133]

**Comment 7: Surrogate Value ("SV") for Coal**

- GTC argues that the Department should value coal using the more product-specific price data from Argus Coalindo rather than Global Trade Atlas ("GTA") import data used in the *Preliminary Results*.[134]

---

[133] *See* Final SV Memo at 2 and Attachments I, II, and III.

[134] *See* GTC's Case Brief at 12-17. GTC cites to the following: *Multilayered Wood Flooring From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 76 FR 64318 (October 18, 2011); *Chlorinated Isocyanurates From the People's Republic of China: Final Results of 2008-2009 Antidumping Duty Administrative Review*, 75 FR 70212 (November 17, 2010); *Certain Hot-Rolled Carbon Steel Flat Products from Romania: Final Results of Antidumping Duty Administrative Review*, 70 FR 34448 (June 14, 2005) ("*HRS/Romania*"); *Taian Ziyang Food Company, Ltd. v. United States*, 783 F. Supp. 2d 1292 (CIT 2011) (as related to the Department's *Policy Bulletin* 04.1); *Chlorinated Isocyanurates From the People's Republic of China: Final Results of June 2008 Through November 2008 Semi-Annual New Shipper Review*, 74 FR 68575 (December 28, 2009); *Certain Tissue Paper Products from the People's Republic of China: Final Results and Final Rescission, in Part, of Antidumping Duty Administrative Review*, 73 FR 58113 (October 6, 2008); *Clearon Corp. v. United States*, Court No. 13-00073, Slip Op. 2014-88 (CIT 2014); *Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*, 366 F. Supp. 2d 1264 (CIT 2005); *Yantai Oriental Juice Co. v. United States*, Court No. 00-07-00309, Slip Op. 2002-56 (CIT 2002); section 773(c)(1) of the Act; and its own summary of the Argus Coalindo information on record, provided at Exhibit 2 to the Case Brief. GTC references the following record documents: GTC's letter entitled, "Surrogate Value Comments for GTC: Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated April 14, 2014 ("GTC's SV Submission") (specifically, the Argus Coalindo data provided at Exhibit 6A thereto); GTC's letter entitled, "GTC's Second Surrogate Value Submission: Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated September 2, 2014 ("GTC's Second SV Submission"); GTC's submission entitled, "GTC's Surrogate Value Rebuttal Submission: Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated May 2, 2014 ("GTC's Rebuttal SV Submission"); and GTC's SCDQR.

- Petitioners rebut that the Department should continue to use GTA import data because it provides a more accurate measure of coal values in Indonesia than the international coal values reported by Argus Coalindo.[135]

**Department's Position:** We do not find Argus Coalindo to be an appropriate source to use to value coal because the Argus Coalindo data represent "prices for Indonesian coal traded on the international spot market" (*i.e.*, prices for Indonesian coal exports) and thus do not accurately represent the price of coal bought or sold in Indonesia.[136] Conversely, the GTA data represent actual prices of coal purchases in Indonesia. When selecting SVs for use in an NME proceeding, the Department's preference is to use, where possible, a range of publicly available, non-export, tax-exclusive, and product-specific prices for the POR, with each of these factors applied non-hierarchically to the case-specific facts and with preference to data from a single surrogate country.[137] As established in the *Preliminary Results*, the Department continues to find that the Indonesia import data obtained from GTA are publicly available, broad market averages, tax-exclusive, and specific to the input in question, satisfying the Department's criteria for selection of a surrogate value. Because the Argus Coalindo data is for export prices paid for Indonesian coal, GTA data is a better, more specific, source to value coal inputs and fulfills the Department's standard SV criteria (non-export, broad-market, *etc*.). Accordingly, we made no changes to the valuation of coal from the *Preliminary Results*.

Additionally, we agree with Petitioners that there is insufficient record data to establish consistent heat values for GTC's coal during the POR (*i.e.*, GTC provided only a handful of coal testing slips with heat values that vary quite widely).[138] Moreover, contrary to GTC's claim that heat value is the most important attribute of its coal purchases and necessarily makes the Argus Coalindo values more specific, we note that the information GTC placed on the record gives equal weight to sulfur content and ash content of the coal. Specifically, the Argus Coalindo report itself has maximum sulfur and ash values for each heat value range and the Platts Coal Pricing Methodologies states that "heat and sulfur content are considered the primary determinants of steam coal price; ash as a secondary determinant."[139] Though GTC did provide a limited selection of coal testing slips with heat values, GTC made no effort to corroborate its

---

[135] *See* Petitioners' Rebuttal Brief at 27-28. Petitioners cite to *Certain Polyester Staple Fiber From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2010-2011*, 78 FR 2366 (January 11, 2013) and *Drill Pipe From the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value and Affirmative Determination of Critical Circumstances, and Postponement of Final Determination*, 75 FR 51004 (August 18, 2010). Petitioners reference the following submissions: GTC's Second SV Submission; GTC's Rebuttal SV Submission; GTC's SCDQR; GTC's Case Brief; and GTC's submission entitled, "GTC Supplemental Section C&D Responses: Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated June 17, 2014 ("GTC's Supplemental SCDQR").
[136] *See* GTC's Second SV Submission at Exhibit 5. Confirming that these are international spot market prices for Indonesian exports of coal (and not prices representative of domestic coal consumption in Indonesia), Argus Coalindo describes its data collection team as consisting of "specialist market reporters/analysts in Singapore, Beijing, Tokyo, Sydney, London, Moscow, Washington, Johannesburg and Bogota, drawing on Argus' global network of energy correspondents."
[137] *See, e.g.*, *Multilayered Wood Flooring From the People's Republic of China: Final Results of Antidumping Duty New Shipper Reviews; 2012-2013*, 79 FR 66355 (November 7, 2014), and accompanying IDM.
[138] *See* GTC's SCDQR at Exhibit SD-7.
[139] *See* GTC's Second SV Submission at Exhibit 5 and GTC's Rebuttal SV Submission at Exhibit 4A.

ash and sulfur levels with those specified in the Argus Coalindo or Platts Coal Pricing Methodologies sources.

Thus, we continue to find that the GTA value for "Bituminous Coal, Not Agglomerated" from Indonesia (HS code 270112) represents the most product-specific, publicly available, tax-exclusive, non-export price on the record with which to value steam coal in Indonesia.

**Comment 8:  Valuation of Labor**

- Petitioners argue that the Department should not use a calculated labor rate that falls below the minimum wage as an SV and should inflate the International Labor Organization ("ILO") wage rate by 250 percent or should use the $232 per month value reported in the World Bank's *Doing Business 2014:  Indonesia* report.[140]
- GTC rebuts that the Department should not adjust the calculated labor SV based on the stated Indonesian minimum wage from a source unrelated to the ILO Yearbook (*i.e.*, the source of the labor SV used for the *Preliminary Results*).[141]
- Double Coin argues that the Department should reject Petitioners' suggested SV for labor rates because they are not based on the best available information and contends that the allegation that the minimum wage in Indonesia has increased by 250 percent is incorrect.[142]

**Department's Position:**  The *Doing Business* wage rates cited by Petitioners bear no relation to the ILO wage rate and are less specific to the production of tires.  Specifically, the data in *Doing Business* do not appear to be derived from any country-wide Indonesian law, but rather from a survey of businesses operating in Jakarta and reporting minimum wages for a 19-year old

---

[140] *See* Petitioners' Case Brief at 12-15.  Petitioners cite to:  *Saccharin from the People's Republic of China:  Final Results of the 2005-2006 Antidumping Duty Administrative Review*, 72 FR 51800 (September 11, 2007); *Steel Wire Garment Hangers From the People's Republic of China:  Preliminary Results of Antidumping Duty Administrative Review; 2012-2013*, 79 FR 65616 (November 5, 2014) ("*Hangers/PRC 12-13 Prelim*"); *Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam:  Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 75 FR 47771 (August 9, 2010) ("*Shrimp/Vietnam 08-09*"); and section 773(c)(1) of the Act.  Petitioners reference the following submissions:  Preliminary SV Memo (specifically, the International Labor Organization's ("ILO") *Yearbook of Labor Statistics* (2008) Chapter 5B data contained therein); GTC's SV Submission (specifically, the World Bank's *Doing Business 2014:  Indonesia* information contained at Exhibit 11); and Petitioners' Initial SV Comments (specifically, the ILO *Yearbook of Labor Statistics* (2009) Chapter 5B data contained at Exhibit 14).

[141] *See* GTC's Rebuttal Brief at 1-8.  GTC discusses the *Shrimp/Vietnam 08-09* (August 9, 2010) and *Hangers/PRC 12-13 Prelim* (November 5, 2014) cases cited by Petitioner and further cites to *Antidumping Methodologies in Proceedings Involving Non-Market Economies:  Valuing the Factor of Production:  Labor*, 76 FR 36092 (June 21, 2011) ("*Labor Methodologies*").  GTC references the following record submissions:  Preliminary SV Memo and *Doing Business 2014: Indonesia* (submitted in GTC's SV Submission at Exhibit 11), and Petitioners' Case Brief.

[142] *See* Double Coin's Rebuttal Brief at 7-13.  Double Coin cites the following:  *Preliminary Results* (October 10, 2014); *Hangers/PRC 12-13 Prelim* (November 5, 2014); *Labor Methodologies* (June 21, 2011); and further discusses Petitioners' use of *Shrimp/Vietnam 08-09* (August 9, 2010) and *Hangers/PRC 12-13 Prelim* (November 5, 2014).  Double Coin references the following record submissions:  Letter from Petitioners' entitled, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off-The-Road Tires from China (A–570–912):  Petitioners' Fourth Surrogate Value Comments," dated September 2, 2014 ("Petitioners' 4th SV Submission"); Petitioners' Initial SV Comments; *Doing Business 2014:  Indonesia* (submitted in GTC's SV Submission at Exhibit 11); Preliminary SV Memo; and Petitioners' Case Brief.

worker/apprentice.[143] Thus, the "minimum wage" in *Doing Business* in not representative of the experience of Indonesian tire producers and does not provide a more reliable indicator of inflation in wages than the "Division: 25 – Manufacture of rubber and plastics products" ILO wage data and Consumer Price Index ("CPI") used in the *Preliminary Results*. Additionally, in response to cases cited by Petitioners, we note that: (1) the ILO data in *Shrimp/Vietnam 08-09* were significantly different from one year to the next and the Department had other ILO data from which to choose;[144] and (2) with regards to *Hangers/PRC 12-13 Prelim*, the Department used more specific, more contemporaneous Thai National Statistical Office data.[145] Thus, we made no change from the *Preliminary Results* and continue to value labor via the Department's standard ILO wage rate methodology, using chapter 25 data for Indonesia, inflated with CPI data.[146]

**Comment 9: Valuation of Domestic Truck Freight**

- Petitioners argue that the Department should recalculate the truck freight rate for Indonesia using a single distance of 16.7 kilometers, representing the distance from the center of Jakarta to the port of Jakarta.[147]
- GTC rebuts that the Department rejected Petitioners' proposed calculation in the recent *MSG/PRC LTFV* (September 29, 2014) case and that the existing calculation is supported by record evidence and current practice.[148]
- Double Coin rebuts that *Doing Business 2014: Indonesia* is clear in defining the distance from the port to a business "located in the periurban area" and, thus, the Department should reject Petitioners' proposed distance. Moreover, Double Coin argues that use of Petitioners' suggested distance would result in an SV for truck freight that does not reflect commercial reality.[149]

---

[143] *See* GTC's SV Submission at Exhibit 11, *Doing Business 2014: Indonesia* at pages 98-99.
[144] *See Shrimp/Vietnam 08-09* and accompanying IDM at Comment 9.
[145] *See Hangers/PRC 12-13 Prelim* and accompanying decision memorandum at 25, unchanged in *Steel Wire Garment Hangers From the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 2012–2013*, 80 FR 13332 (March 13, 2015).
[146] *See Labor Methodologies*.
[147] *See* Petitioners' Case Brief at 15-17. Petitioners cite to: *Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review and New Shipper Review; 2011-2012*, 79 FR 19053 (April 7, 2014) ("*Fish Fillets/Vietnam 11-12*"); *Monosodium Glutamate From the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, and Postponement of Final Determination*, 79 FR 26408 (May 8, 2014); and *Certain Steel Wheels From the People's Republic of China: Notice of Final Determination of Sales at Less Than Fair Value and Partial Affirmative Final Determination of Critical Circumstances*, 77 FR 17021 (March 23, 2012). Petitioners reference the following submissions to the record: Preliminary SV Memo; Petitioners' Initial SV Comments (including *Doing Business 2014: Indonesia*); GTC's SV Submission; Petitioners' Pre-Prelim Comments; GTC's submission entitled, "GTC's Pre-Preliminary Comments: Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated September 9, 2014 ("GTC's Pre-Prelim Comments").
[148] *See* GTC's Rebuttal Brief at 8-10. GTC cites to *Monosodium Glutamate From the People's Republic of China: Final Determination of Sales at Less Than Fair Value and the Final Affirmative Determination of Critical Circumstances*, 79 FR 58326 (September 29, 2014) ("*MSG/PRC LTFV*"). GTC references the following record submissions: *Doing Business 2014: Indonesia* (submitted in GTC's SV Submission at Exhibit 11) and Petitioners' Case Brief.
[149] *See* Double Coin's Rebuttal Brief at 14-19. Double Coin cites to *Certain Frozen Fish Fillets from Vietnam:*

**Department's Position:** *Doing Business* specifies that the business exporting is "located in the periurban area of the economy's largest business city."[150] GTC placed complete evidence on the record of this case establishing the five periurban areas of Jakarta and showing the distance from each area to the port of Jakarta.[151] Following past case precedent, we continued to use an average of five distances from periurban areas of Jakarta to the port of Jakarta.[152] Thus, we made no change to truck freight and continued to calculate freight using a 65.08 kilometer average of distances from the periurban areas of Jakarta to the port of Jakarta.

**Comment 10: Valuation of Electricity**

Petitioners' Comments[153]

- Petitioners contend that the Department should not use electricity rates from the Indonesian utility PT PLN (Persero) ("PLN") as a SV, as information on record and various CVD determinations demonstrate that the PLN rates are heavily subsidized, and the Department must avoid using any prices which it has reason to believe or suspect may be dumped or subsidized.
- The Department should instead use either electricity prices on the record from Thailand or, in the alternative, PLN's cost of production for electricity in Indonesia.

---

*Preliminary Results of AD Administrative Review for 2012-2013*, 79 FR 40059 (July 11, 2014); *Fish Fillets/Vietnam 11-12* (April 7, 2014); *Shandong TTCA Biochemistry Co. v. United States*, 774 F. Supp. 2d 1317 (CIT 2011); *Gallant Ocean* (Fed. Cir. 2010); *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of the 2009-2010 Antidumping Duty Administrative Review and Final Rescission, in Part*, 77 FR 14495 (March 12, 2012); *Tires/PRC 10-11* (April 16, 2013); and *Tires/PRC 11-12 NSR Prelim* (March 5, 2013). Double Coin references the following record submissions: *Doing Business 2014: Indonesia* (submitted in GTC's SV Submission at Exhibit 11) and Petitioners' Case Brief.

[150] *See* GTC's SV Submission at Exhibit 11, *Doing Business 2014: Indonesia* at page 75.

[151] *See* GTC's SV Submission at Exhibit 11.

[152] *See, e.g.*, *MSG/PRC LTFV* and accompanying IDM at Comment 1 and *Fish Fillets/Vietnam 11-12* and accompanying IDM at Comment XIII.

[153] *See* Petitioners' Case Brief at 18-20. Petitioners cite to: Omnibus Trade and Competitiveness Act of 1988, Conf. Report to Accompany H.R. 3, H.R. Rep. No. 576, 100th Cong., 2nd Sess. (1988); *China Nat'l Mach. Imp. & Exp. Corp. v. United States,* 264 F. Supp. 2d 1229 (CIT 2003); *Tianjin Mach. Imp. & Exp. Corp. v. United States*, 806 F. Supp. 1008 (CIT 1992); *Luoyang Bearing Corp. v. United States*, 347 F. Supp. 2d 1326 (CIT 2004); *Xanthan Gum From the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 78 FR 2252 (January 10, 2013); *Notice of Final Determination of Sales at Less Than Fair Value: Certain Small Diameter Carbon and Alloy Seamless Standard, Line and Pressure Pipe From Romania*, 65 FR 39125 (June 23, 2000) ("*Pressure Pipe/Romania LTFV Final*"); *Polyvinyl Alcohol From the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 71 FR 27991 (May 15, 2006). Petitioners reference the following submissions to the record: Petitioners' submission entitled, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off The-Road Tires from China (A–570–912): Petitioners' Additional Surrogate Value Comments," dated May 2, 2014 ("Petitioners' Additional SV Submission"); Preliminary SV Memo; PDM; and Petitioners' Pre-Prelim Comments.

Respondents' Comments[154,155]

- GTC and Double Coin rebut that the Department should continue to value electricity using the PLN rate, because in previous CVD cases the Department examined allegations of sales of electricity for less than adequate remuneration ("LTAR") in Indonesia, and found no benefit from the program.
- GTC avers that there is no evidence establishing that the rate charged by PLN is below its actual production cost. GTC suggests that, if the Department declines to use PLN's data, it could instead use the average electricity price charged to industrial customers in Indonesia published in the 2012 Energy Handbook.
- Double Coin further argues that the Thai electricity value does not constitute "best available information," as it is not specific to the surrogate country, Indonesia.

**Department's Position**: For these final results, we continued to use the PLN electricity prices that we used for the *Preliminary Results* to value respondents' consumption of electricity. First, we prefer to use the same country, where possible, to value all factors of production;[156] in this case, Indonesia is our primary surrogate country. Thus, if we can find an acceptable data source in Indonesia, we would prefer to use the Indonesian value. Second, we prefer to use prices actually paid by producers in the primary surrogate country.[157] Additionally, in countervailing duty cases where the Department examined allegations of sales of electricity for LTAR in Indonesia, the Department determined (as discussed below) that electricity in Indonesia does not provide a countervailable benefit; accordingly, we have no reason to disregard the prices on the record which are charged to industrial customers in Indonesia by PLN.

In the *Shrimp/Indonesia CVD Investigation*, the Department found that PLN charged uniform tariff rates to industrial users. We did not find the provision of electricity to be a countervailable

---

[154] *See* GTC's Rebuttal Brief at 10-14. GTC cites to *Certain Frozen Warmwater Shrimp From Indonesia: Negative Preliminary Countervailing Duty Determination*, 78 FR 33349 (June 4, 2013) ("*Shrimp/Indonesia CVD Prelim*"), sustained in *Certain Frozen Warmwater Shrimp From the Republic of Indonesia: Final Negative Countervailing Duty Determination*, 78 FR 50383 (August 19, 2013) (collectively, "*Shrimp/Indonesia CVD Investigation"*); *Final Affirmative Countervailing Duty Determination: Certain Cut-to-Length Carbon-Quality Steel Plate from Indonesia*, 64 FR 73155 (December 29, 1999) ("*CTL Plate/Indonesia*"); *Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Preliminary Results of the Antidumping Duty Administrative Review and New Shipper Review; 2011-2012*, 78 FR 55676 (September 11, 2013); *Preliminary Results* (October 10, 2014); and *Pressure Pipe/Romania LTFV Final* (June 23, 2000). GTC references the following record submissions: Double Coin's submission entitled, "Double Coin Holdings and China Manufacturers Alliance, LLC 's Surrogate Value Comments: Certain New Pneumatic Off-the-Road Tires from China," dated April 14, 2014 ("Double Coin's SV Comments"), containing the Indonesian Government's 2012 Handbook of Energy & Economic Statistics of Indonesia ("2012 Energy Handbook") at attachment SV-4; Petitioners' Additional SV Submission; and Petitioners' Case Brief.

[155] *See* Double Coin's Rebuttal Brief at 20-22. Double Coin cites to *Pressure Pipe/Romania LTFV Final* (June 23, 2000); *Shrimp/Indonesia CVD Prelim* (June 4, 2013); and *CTL Plate/Indonesia* (December 29, 1999). Double Coin references the following record submissions: Petitioners' Initial SV Comments; GTC's SV Submission; Petitioners' Additional SV Submission; Petitioners' Case Brief.

[156] *See, e.g.*, *Chlorinated Isocyanurates From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2010-2011*, 78 FR 4386 (January 22, 2013) at Comment 4, "the Department prefers to rely on a single surrogate country to value all factors when possible." *See also* 19 CFR 351.408(c)(2), "except for labor, … the Secretary normally will value all factors in a single surrogate country."

[157] *See, e.g.*, *Iron Construction Castings From the People's Republic of China; Final Results of Antidumping Duty Administrative Review*, 56 FR 2742 (January 24, 1991) at Comment 11.

subsidy in Indonesia.[158] Thus, consistent with the Department's findings in *Shrimp/Indonesia CVD Investigation* and the AD investigation of *Pressure Pipe/Romania LTFV Final*, we continue to find the PLN electricity data acceptable.[159] Therefore, we continued to use the PLN electricity prices to value electricity for these final results.

**Comment 11: Container Weight Used in Ocean Freight and Brokerage and Handling Surrogate Value Calculations**

- GTC argues that the Department should remedy the inconsistency between the SV calculations for ocean freight, domestic brokerage and handling ("B&H"), and domestic inland trucking. Specifically, GTC urges the Department to either use:
    - GTC's actual container weight for both B&H and ocean freight; or
    - The assumed weight of 10 tons for the B&H calculation and the quote-specific assumed weights from the Descartes quotes (*i.e.*, the ocean freight SV source) for the ocean freight SV calculation.[160]
- Petitioners rebut that the Department correctly measured movement expenses since the Department's calculations of ocean freight, domestic B&H, and truck freight expenses were based on different facts and, thus, calculated in different ways.[161]

**Department's Position:** The Department's clearly defined practice in calculating the B&H and domestic truck freight SVs from *Doing Business* is to use the 10-ton weight specified in the World Bank's survey methodology.[162] Thus, we have not changed the 10-ton denominator for the calculation of domestic truck freight and B&H.

For ocean freight, the Department preliminarily used an average of actual container weights from GTC and Double Coin to calculate company-specific shipment weights for valuation of ocean freight.[163] While the Descartes ocean freight quotes are issued on a per-container basis, the quotes also provide an assumed weight for each quoted shipment.[164] Therefore, because the quotes include a weight, we find the weights on the Descartes freight quotes to be more specific to the quotes than the average weights of respondents' own shipments. Thus, for these final results, we are using the ocean freight weights provided in the Descartes international ocean freight quotes, on a weighted-average basis, to derive the overall ocean freight surrogate value, rather than relying upon the average of respondent-specific container weights used for the *Preliminary Results*.[165]

---

[158] *See Shrimp/Indonesia CVD Prelim* and accompanying decision memorandum at 20.
[159] *See Pressure Pipe/Romania LTFV Final* and accompanying IDM at Comment 7, citing to *CTL Plate/Indonesia* at 64 FR 73162.
[160] *See* GTC's Case Brief at 29-30. GTC cites to the following: *Pakfood Pub. Co. v. United States*, 724 F. Supp. 2d 1327 (CIT 2011) and *SKF* (Fed. Cir. 2001). GTC references the following submissions: GTC's SV Submission and the Preliminary SV Memo.
[161] *See* Petitioners Rebuttal at 29-30. Petitioners reference the following submissions: GTC's Case Brief; Petitioners' Case Brief; GTC's SV Submission; and the Preliminary SV Memo.
[162] *See, e.g.*, *Certain Steel Threaded Rod From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012-2013*, 79 FR 71743 (December 3, 2014) and accompanying IDM at Comment 5. *See also* Petitioners' Initial SV Comments at Attachment 17.
[163] *See* Preliminary SV Memo at 15-16 and Attachment X.
[164] *See* GTC's SV Submission at Exhibit 8.
[165] *See* Final SV Memo at 2 and Attachments I, II, IV, and V.

**Comment 12:  Whether to Exclude Certain Ocean Freight Charges When Calculating a Surrogate Value for Ocean Freight**

- GTC argues that the Department has double counted certain costs between domestic B&H and ocean freight (*e.g.*, documentation charges, traffic mitigation fees, AMS charges, clean truck fees, chassis usage charges, Shanghai port surcharges, international ship and port security charges, and ISD handling charges) and thus should exclude certain charges from the ocean freight SV calculation.[166]
- Petitioners rebut that the Department correctly determined that B&H charges did not overlap with ocean freight charges.[167]

**Department's Position:**  Consistent with past Department precedent and record evidence, we did not exclude any charges from the Descartes ocean freight quotes, as they appear to be necessary for the shipment of freight and because they do not appear to be double counted (*i.e.*, they do not appear to have already been covered by the B&H surrogate value).

*Doing Business* states that its trading-across-borders methodology measures the "cost necessary to complete every official procedure for exporting and importing" a "standardized cargo of goods by sea transport," but not the "cost for sea transport" itself.[168]  In addition to the surcharges enumerated by GTC, the Descartes freight quotes include numerous other surcharges (*e.g.*, peak season surcharge, bunker surcharge, Panama Canal transit surcharge).[169]  The surcharges on the Descartes quotes do not appear to overlap with the B&H charges related to exporting, but simply appear to be additional fees imposed by the ocean freight company in order to transport the merchandise from the Chinese port of origination to the U.S. destination port. Moreover, GTC does not cite to any record evidence in support of its argument that the Descartes ocean freight surcharges it alleges should be covered by the B&H value from *Doing Business* are, in fact, included in those export costs.  Furthermore, GTC does not cite to a single Department precedent supporting its contention.  To the contrary, in *Stilbenic OBAs*, the Department "included certain additional charges (*i.e.*, fuel surcharges, destination delivery charges, and bill of lading charges) in the ocean freight calculation because these charges, in addition to the base ocean freight charge, are incurred by the surrogate freight forwarders and are not separately covered by the brokerage and handling surrogate value."[170]  Thus, including these charges is both consistent with the Department's practice and with the record evidence in this case.

---

[166] *See* GTC's Case Brief at 31-32.  GTC references the following submissions:  Petitioners' Initial SV Comments, GTC's SV Submission, and the Preliminary SV Memo.

[167] *See* Petitioners Rebuttal at 30-31.  Petitioners reference the following submissions:  GTC's Case Brief; Petitioners' Case Brief; GTC's SV Submission; and the Preliminary SV Memo.

[168] *See* Petitioners' Initial SV Comments at Attachment 17.

[169] *See* GTC's SV Submission at Exhibit 8.

[170] *See Certain Stilbenic Optical Brightening Agents From the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 77 FR 17436 (March 26, 2012) and accompanying IDM at Comment 4.

**Comment 13: Whether to Deflate the Surrogate Value for GTC's Warehouse Costs**

- For the *Preliminary Results*, the Department valued GTC's domestic warehousing expenses using a SV derived from an April 9, 2014 price quote. In accordance with its standard practice, the Department should deflate this value using the average producer price index ("PPI") for the POR of 116.02 compared with the PPI for April 2014.[171]
- No other interested party provided comment on this issue.

**Department's Position:** Though the record information from which this SV was derived shows that the relevant price quote was accessed on April 9, 2014, there is no indication that the quoted price was not in effect during the POR and no party provided a better source of data for the warehouse cost.[172] As such, we did not deflate this value for the final results.

**Comment 14: Whether to Calculate Region-Specific U.S. Delivery Charges for GTC's U.S. Inland Freight Surrogate Value**

- GTC notes that the Department's preliminary calculation of a U.S. inland freight SV accounted for different prices associated with delivery to East Coast or West Coast ports in the United States, but made no distinction based on the distance from the port to the customer for each shipment. GTC asserts that the Department should make this calculation more precise by computing the delivery charge from both the East Coast and West Coast for each of the four geographical regions used for the regional "targeted dumping" test.[173]
- No other interested party provided comment on this issue.

**Department's Position:** Since no party opposed this change in calculation, and because we have adequate information on the record to support and perform such a calculation, and because this calculation is more accurate and specific to the manner in which GTC conducts business, we calculated U.S. inland freight delivery charges for GTC that are specific to the port of import and delivery region for these final results.[174]

**Comment 15: Surrogate Values for GTC's Tackifier Inputs**

- GTC argues that certain of its tackifier inputs are phenolic resins and, as such, should be valued using GTA Indonesia import data for Harmonized Tariff Schedule ("HTS") 3909.40 (*i.e.*, TACKIFIER10, which is a standard phenolic resin, HTS 3909.40 covers "Phenolic Resins, Pr Fms") and HTS 3909.40.9000 (*i.e.*, TACKIFIER 08, 09, and 14, which are "other" phenolic resins, HTS 3909.40.90 covers "Other Phenolic Resins"). Further, GTC argues that TACKIFIER 18, 19, and 20, should be valued under HTS 3909.40.90 (*i.e.*, the "Other Phenolic resins"), which covers products more specific to these "other" resin inputs than the

[171] *See* GTC's Case Brief at 30-31. GTC references the following submissions: Petitioners' Initial SV Comments and the Preliminary SV Memo.
[172] *See* Petitioners' Initial SV Comments at Attachment 18.
[173] *See* GTC's Case Brief at 32-33 and Exhibit 4. GTC further references the Preliminary SV Memo.
[174] *See* Final SV Memo at 2 and Attachments I and IV.

phenolic resins covered in the 3909.40 category used to preliminarily value these tackifier inputs.[175]

- Petitioners rebut that the Department has reasonably valued GTC's TACKIFIER08, 09, 10 and 14 inputs using HTS 3506.99 ("Products Suitable For Use As Adhesives"). Furthermore, GTC has not demonstrated that TACKIFIER18, 19, and 20 belong to an "other" category rather than the broader six digit category that the Department used for the *Preliminary Results*.[176]

**Department's Position:** For proprietary reasons discussed in GTC's analysis memo, we continued to classify GTC's inputs of TACKIFIERs 08, 09, 10, and 14 under HTS 3506.99 ("Products Suitable For Use As Adhesives").[177]

For the *Preliminary Results*, TACKIFIERs 18, 19, and 20, were valued using the broad six-digit category of 3909.40 ("Phenolic Resins, Pr Fms"). However, record evidence shows that there are only two categories under Indonesian HTS code 3909.40: "Phenolic Resins in Moulding Compound" {*sic*} and "Other Phenolic Resins."[178] The descriptions provided by GTC for tackifiers 18, 19, and 20 demonstrate that they are phenolic resins, but do not show them as being in molding compound, so the "other" category is more specific to GTC's tackifiers (because there are only two detailed phenolic resin categories).[179] Thus, for the final results, we valued tackifiers 18, 19, and 20, using the more specific category 3909.40.9000 ("Other Phenolic Resins").

**Comment 16: Freight Distance Applied to GTC's Inputs**

- Petitioners argue that, for GTC's *Sigma* cap distance, the Department should use the same distance from port to factory that GTC provided for its market economy ("ME") inputs rather than the distance reported to the nearest port.[180]
- GTC rebuts that Petitioners' argument to revise GTC's *Sigma* freight cap is contrary to both record evidence and agency practice regarding the *Sigma* cap calculation. Moreover, GTC

---

[175] *See* GTC's Case Brief at 33-36. GTC cites *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 75 FR 59217 (September 27, 2010). GTC further references the Preliminary SV Memo, GTC's Rebuttal SV Submission, GTC's Second SV Submission, Petitioners' Initial SV Comments.
[176] *See* Petitioners' Rebuttal at 31-32. Petitioners reference GTC's Case Brief and the Preliminary SV Memo.
[177] *See* Memorandum titled "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Analysis of the Final Results Margin Calculation for Guizhou Tyre Co., Ltd." at 3.
[178] *See* GTC's Rebuttal SV Submission at Exhibit 5D.
[179] *See* GTC's Supplemental SCDQR at Exhibit SD-5.
[180] *See* Petitioners' Case Brief at 36-37. Petitioners cite to: *Sigma*, 117 F.3d 1401.; *Notice of Final Determination of Sales at Less Than Fair Value, and Affirmative Critical Circumstances, In Part: Certain Lined Paper Products From the People's Republic of China,* 71 FR 53079 (September 8, 2006); and *Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review of the Order on Bars and Wedges*, 68 FR 53347 (September 10, 2003). Petitioners reference: Memorandum entitled "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Analysis of the Preliminary Results Margin Calculation for Guizhou Tyre Co., Ltd.," dated September 30, 2014 ("GTC's Preliminary Analysis Memo"); and GTC's SCDQR.

notes that Petitioners did not offer any precedent for their proposed revision to the *Sigma* cap methodology.[181]

**Department's Position:** The Department's practice when the surrogate value for the material is based on import prices is to use the shorter of the reported distance, or the distance from the nearest port to the producer to value the materials transportation in the surrogate country.[182]

For the *Preliminary Results*, we used GTC's reported distance from the factory to the closest commercial port (*i.e.*, the Port of Fengcheng, at 710 km) as the *Sigma* cap distance. GTC provided evidence suggesting that the Port of Fengcheng is a major commercial Chinese port; Petitioners have not provided any evidence to the contrary and did not dispute GTC's assertion.[183] The record also demonstrates that GTC's ME input purchases and finished good exports predominantly transit through a different port (or ports), which is (are) at a greater distance from GTC's factory.[184] On this basis, Petitioners suggest we should alter the Department's long established practice of capping import distances to the closest port and should instead use the distance to the port actually utilized by GTC during the POR for its ME imports and export sales. As we stated in the PDM, and in accordance with the Department's practice,[185] we:

> adjusted input prices by including freight costs to render them delivered prices. Specifically, the Department added to Indonesian import SVs a surrogate freight cost using the shorter of the reported distance from the domestic supplier to the factory or the distance from the nearest seaport to the factory where it relied on an import value. This adjustment is in accordance with the decision of the Federal Circuit in *Sigma*...[186]

Petitioners' suggestion is without precedent and contrary to long-standing Department practice following the Federal Circuit's holding in *Sigma*; thus, we made no changes to GTC's *Sigma* cap for the final results.

---

[181] *See* GTC's Rebuttal Brief at 14-15. GTC cites to *Sigma*, 117 F.3d 1401 *and Sawblades/PRC LTFV Final* (May 22, 2006). GTC references the following record submissions: GTC's submission entitled, "GTC 2nd and 3rd Supplemental Section C&D Responses: Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated July 14, 2014 ("GTC's 2nd and 3rd SSCDR") and Petitioners' Case Brief.

[182] *See Sigma,* 117 F.3d 1401. Because of the litigation from which this practice arose, this materials transportation value is sometimes referred to as the *Sigma* freight.

[183] *See* GTC's 2nd and 3rd SSCDR at Exhibit S2-4.

[184] *See* GTC's SCDQR at Exhibit D-15 showing ME input purchases and the port of import. *See also* GTC's 2nd and 3rd SSCDR at 5 and 7, where GTC states its warehouse address in Guangzhou and the distances from the warehouse to the actual ports of export. *See also*, GTC's U.S. Sales Database.

[185] *See, e.g.*, *Hand Trucks and Certain Parts Thereof From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 3779 (January 23, 2014) and accompanying decision memorandum, unchanged in *Hand Trucks and Certain Parts Thereof From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 44008 (July 29, 2014).

[186] *See* PDM at 25.

**Comment 17: Calculation of Double Coin's Truck Freight and Distance**

Petitioners' Comments[187]

- The record is unclear whether Double Coin reported supplier distances at the *Sigma* cap, as requested by the Department; therefore, the Department should set the supplier distance to the *Sigma* cap for all NME inputs.
- The Department used the reported simple average of the distance to port for each Double Coin factory to calculate the distance applied for MEP inputs. However, because unique CONNUMs are produced at each facility and the factory-specific distances to port are available, the Department should use the factory-specific distances.
- Double Coin first reported that the Yangshan port was closest to both production facilities but later calculated the *Sigma* cap distance using the average from each factory to two Shanghai ports (Yangshan and Waigaoqiao, of which the latter is closest to each factory). However, Double Coin never stated that merchandise was actually shipped out of Waigaoqiao (or both Yangshan and Waigaoqiao) and record information suggests that Yangshan is the port predominantly used for international container shipping. Therefore, the Department should recalculate the domestic inland freight calculations and *Sigma* distances using only the Waigaoqiao distance.

Double Coin's Rebuttal[188]

- Double Coin complied with the Department's specific request to cap the individual distances for transactions with traders in the underlying supplier worksheets at the *Sigma* distance rather than the distance to the trader.
- The Department used the factory-specific capped distance in its calculation of normal value and domestic inland freight, precisely as Petitioners request.
- The Department verified that Double Coin exported subject merchandise out of both ports.

---

[187] *See* Petitioners' Case Brief at 23-28. Petitioners cite to: *Sigma*, 117 F.3d 1401; and *Lasko Metal Products, Inc. v. United States*, 43 F.3d 1442 (Fed. Cir. 1994). Petitioners also cite to their own freight calculations provided at Exhibit 1 to the Case Brief. Petitioners reference: Department Letter entitled, "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Request for Revised FOP and U.S. Sales Databases," dated September 16, 2014 ("Request for Revised Databases"); Double Coin's submission entitled, "Revised US and FOP Databases Certain New Pneumatic Off-the-Road Tires from China," dated September 23, 2014 ("Double Coin's Post-Verification Corrections"); the Department Letter to Double Coin entitled, "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Questionnaire" dated December 16, 2013 ("Initial Questionnaire"); Letter from Petitioners entitled, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off-The-Road Tires from China (A–570–912): Petitioners' Rebuttal Factual Information and Comments on Double Coin's Supplemental Section C and D Questionnaire Responses," dated July 14, 2014 ("Petitioners' July 14 Rebuttal") at Attachment 2 ("Comparing Shanghai's Major Shipping Ports," by Jeremy Chapman, dated March 22, 2011 ("Shanghai Shipping Ports")); Letter from Double Coin entitled, "Section A Response of Double Coin Holdings and China Manufacturers Alliance, LLC," dated January 22, 2014 ("Double Coin SAQR"); Double Coin's Verification Report; Double Coin's 2nd Supplemental ACD Response; Double Coin's Preliminary Analysis Memo; Double Coin's SCQR; and Double Coin's Supplemental C&D Response.

[188] *See* Double Coin's Rebuttal Brief at 22-25. Double Coin cites to *Sigma*, 117 F.3d 1401 and references the following submissions: Double Coin's Verification Report; the *Shanghai Shipping Ports* article in Petitioners' July 14 Rebuttal; Double Coin's Post-Verification Corrections; and Petitioners' Case Brief.

**Department's Position:** Petitioners note that the record is unclear as to whether Double Coin re-reported supplier distances as instructed in the Department's post-verification Request for Revised Databases. We note that Double Coin certified that it made all requested corrections in its Post-Verification Corrections submission and further confirmed that it capped the underlying line item distances at the distance to the port for the trading companies (rather than the distance to the trading companies), as requested. Though Double Coin's resubmission did not include the underlying worksheets demonstrating the change for every supplier (nor was such information requested), our review of the changes to the overall distances reported for each input between the most recent factors of production ("FOP") database and the preceding database demonstrate that the requested changes were properly reported. As such, we do not agree with Petitioners that the record is sufficiently unclear as to provide compelling reason to further alter the calculation.

Furthermore, as Double Coin points out, our margin calculation used the factory-specific capped distance for each NME-source input, and did not use an average distance of the two factories to calculate freight costs as alleged by Petitioners. As such, we continue to use the factory-specific capped distance where applicable in our NV calculation and for the domestic inland freight distance.

With respect to the specific ports used to calculate the distance from factory to port, Double Coin asserts that the Department's statement in the verification report that "as part of our review of the sales trace packages, we checked the various adjustments and discounts, movement expenses, and other expenses, and we noted no discrepancies from what Double Coin reported" makes "crystal clear" that "the Department has completely verified the distances reported." Double Coin asserts that "{t}hus… the Department verified that Double Coin exported the subject merchandise out of both Yangshan and Waigaoqiao Ports during the POR."[189] As an initial matter, we disagree with Double Coin's characterization of our verification findings. In this case, the Department reviewed with company officials and verified that the distances between the production factories and Shanghai ports was consistent with the distances reported. Our report noted no discrepancies with respect to reported movement expenses in general, including these factory distances. However, "{v}erification is a spot check and is not intended to be an exhaustive examination of the respondent's business. (Commerce) has considerable latitude in picking and choosing which items it will examine in detail,"[190] and we did not specifically spot check that "Double Coin exported the subject merchandise out of both Yangshan and Waigaoqiao Ports during the POR", nor did we make any statement to that effect.[191]

Regardless of our issue with Double Coin's characterization of our findings, as noted above, Double Coin reported and we verified the distance to two Shanghai ports. While Petitioners cite to information suggesting that the Yangshan port is becoming (or is already) the primary port of export for international container cargo shipments and that the Waigaoqio port is increasingly

---

[189] *See* Double Coin's Verification Report at 24 and Rebuttal Brief at 25.

[190] *See F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000); *see also NTN Bearing Corp. of Am. v. United States*, 186 F. Supp. 2d 1257, 1296 (CIT 2002).

[191] Indeed, a review of shipment-related documentation identifying port of export (*e.g.*, invoices, bills of lading, PRC and U.S. customs documentation, *etc.*) shows that the port of export is generally listed only as "Shanghai," and does not identify the specific facility. *See*, *e.g.*, the sales trace packages in Double Coin's Verification Report at PRC VE-5 and US VE-10.

utilized for intra-Asian shipping,[192] there is simply no evidence on the record to confirm that all shipments were shipped from the Yangshan port or that subject merchandise could not have been shipped from the Waigaoqiao port.  As Shanghai contains two international container ports, absent affirmative information that one is the exclusive port of exportation, we find no basis for changing the current calculation.

**Comment 18:  Whether Truck Freight Costs are Over-Counted**

- Double Coin asserts that the Department inadvertently multiplied the truck freight rate SV by the distance and then by the consumption of raw materials, resulting in an exponential over-counting of freight costs.[193]
- Petitioners point out that Double Coin's argument presumes that the freight cost and the SV are first summed and then that sum is multiplied by the amount of the material (which would provide an incorrect result, if true), but the SAS program calculates this correctly and no change is necessary.[194]

**Department's Position:**  Upon review, we confirm that the equation used in the margin calculation did not actually contain the mathematical errors noted by Double Coin and the freight variables are properly calculated on a per tire basis in the program.  While the calculation would indeed over-count freight if the equations operated as argued by Double Coin, Petitioners are correct that this is not the way they actually function in the program.  As such, no change is necessary for these final results.[195]

**Comment 19:  Surrogate Value for Double Coin's Polyester Cord Inputs**

- Double Coin contends that the Department inadvertently utilized an incorrect HTS code for valuing Double Coin's consumption of polyester cord.  Specifically, Double Coin suggested price data for Indonesian imports of HTS subcategory 5902.20 ("Tire Cord Fabric, Of High Tenacity Yarns, Of Nylon Or Other Polyamides, Polyesters Or Viscose Rayon: Of Polyesters") but the Department instead valued the input using price data for Indonesian imports of HTS subcategory 5509.22 ("Yarn, Not Sewing Thread, of Synthetic Staple Fiber Not For Retail Sale Greater Than 85% Weight Of Polyester Staple Fibers Multiple (folded) Or Cabled Yarn"), but offered no explanation for why it deviated from the suggested SV in the Preliminary SV Memo.[196]
- No other interested party provided comment on this issue.

**Department's Position:**  For the final results, we valued Double Coin's polyester cord input using HTS 5902.20, rather than HTS 5509.22, which was used for the *Preliminary Results*.  The description of products included in HTS 5902.20 specifies polyester "tire cord fabric… {made of} polyesters," while HTS 5509.22 pertains to "Yarn, Not Sewing Thread, of Synthetic Staple

---

[192] *See* Comparing Shanghai's Major Shipping Ports, in Petitioners' July 14 Rebuttal at Attachment 2.
[193] *See* Double Coin's Case Brief at 69-72.  Double Coin references the Double Coin Preliminary Analysis Memo.
[194] *See* Petitioners' Rebuttal Brief at 18-19.  Petitioners reference Double Coin's Case Brief.
[195] *See* Double Coin's Final Analysis Memo at Attachment II (*i.e.*, Margin Program Output).
[196] *See* Double Coin's Case Brief at 72-73.  Double Coin references the Preliminary SV Memo and Double Coin's SV Comments.

Fiber Not For Retail Sale Greater Than 85% Weight Of Polyester Staple Fibers Multiple (folded) Or Cabled Yarn." Therefore, as the description of HTS 5902.20 appears to be specific to Double Coin's polyester cord input, was requested for use as the best available category by Double Coin, and there is no contradictory evidence on the record, we are valuing Double Coin's tire cord inputs using Indonesian price data for imports of HTS 5902.20 for the final results.[197]

**Comment 20: Surrogate Values for Double Coin's Cinder and Calcium Oxide By-products**

Double Coin's Comments[198]
- Double Coin argues that, without explanation, the Department valued cinder and calcium oxide byproducts with a coal SV rather than the byproduct-specific price data on the record.
- Double Coin submits that, if the Department finds that an offset cannot exceed input price:
  - It strongly disagrees with this practice, as it is tantamount to cherry-picking data; and
  - Should the Department continue to incorrectly cap the byproduct offset, because both bituminous and anthracite coal were reported as used in production, the cap should reflect the respective values of the each type of coal consumed, rather than just capping the offset at the value of bituminous coal.

Petitioner's Comments[199]
- Petitioners note that the Department has repeatedly recognized the "unreasonable result" of assigning more value to a waste product than to the input material from which the waste is produced and, thus, should continue to apply a SV to Double Coin's coal waste products that is no higher than the lowest SV for its coal inputs.

**Department's Position:** Double Coin submits that the Department's use of price data for Indonesian imports of HTS 2701.12 ("Bituminous Coal, Not Agglomerated", *i.e.*, the SV used to properly value bituminous coal energy inputs) to value Double Coin's reported offset quantities of cinder and calcium oxide byproducts sold during the POR for the *Preliminary Results* must have been a ministerial error, since Double Coin instead reported Indonesian price data for imports of HTS 2620 ("Ash And Residues (Except From Iron Or Steel Manufacture) Containing Arsenic, Metals Or Their Compounds") as the most appropriate information from which to value these byproducts, and the Department did not further explain why it declined to utilize this by-product-specific data. At the outset, we note that the use of the HTS 2701.12 SV to value cinder and calcium oxide by-products was not in error but, rather, consistent with our practice (discussed below) that the surrogate used to value a by-product offset will be capped at the value of the surrogate used to value the input from which that by-product offset was produced if no more appropriate value can be found. However, we acknowledge that we neglected to discuss our reasoning our Preliminary SV Memo.

---

[197] *See* Final Surrogate Value Memo.
[198] *See* Double Coin's Case Brief at 72-73. Double Coin references Double Coin's SV Comments and the Preliminary SV Memo.
[199] *See* Petitioners' Rebuttal Brief at 19-20. Petitioners cite to *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 74 FR 3987 (January 22, 2009). Petitioners reference: Double Coin's SV Comments; Preliminary SV Memo; and Double Coin's Case Brief.

Double Coin reported that it sells the ash and residue by-products (*i.e.*, coal cinder and calcium oxide) resulting from its consumption of coal, which were used as an energy input in the production of subject merchandise.[200] Double Coin consumes two types of coal in the production of subject merchandise, bituminous (valued using HTS 2701.12 import data, with an average unit value ("AUV") of $0.15 USD/Kg) and anthracite (valued using HTS 2701.11 ("Anthracite Coal, Not Agglomerated") with an AUV $0.43 USD/Kg).[201] On the other hand, the AUV of Double Coin suggested data to value the by-product coal waste (*i.e.*, Indonesian price data for imports under the four-digit HTS 2620 category including any type of non-ferrous residue containing metals) is $37.77 USD/Kg: over 250 times greater than the price selected to value the bituminous coal inputs from which this by-product is derived (and over 85 times the value of the SV for anthracite coal).

We find it unreasonable to assign a higher value to a waste product than to its input product. Double Coin asserts that there is no logic to using an HTS code of the raw material as the surrogate value for the byproduct of that raw material, as the Department verified that the by-products in question are by-products of using coal, not coal itself, and that this practice is tantamount to cherry-picking the surrogate data. Despite Double Coin's objections, the Department has a long-standing practice of rejecting or capping the by-product SV in instances where the by-product SV exceeds the SV of the product from which it was derived.[202] Indeed, recent case precedent supports the practice of rejecting and/or capping a scrap SV when it is of a higher price than the SV for the input which created the scrap byproduct in question.[203]

---

[200] *See* Double Coin's SCDQR at Exhibit D-8.

[201] Both Petitioners and Double Coin accept that these are the proper input-specific HTS subcategories from which to value the coal inputs and neither party has provided objection as to the suitability of the Indonesian AUVs for valuing Double Coin's coal FOPs in this review. *See* Double Coin's SV Comments at Attachment I and Petitioners' Initial SV Submission at 10.

[202] *See Certain Steel Nails from the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances,* 73 FR 33977 (June 16, 2008) ("*Steel Nails/PRC*") at Comment 12 ("In the Final Determination Pursuant To The Remand Order From The U.S. Court Of International Trade In Paslode Division of Illinois Tool Works, Inc. v. United States, Ct. No. 9712–02161 (Jan. 15, 1999), the Department stated that "It is clear that our steel scrap value selection produced an unreasonable result – a value for steel wire rod scrap (0.8390 USD/kg) that exceeded the price for steel wire rod (0.3119 USD/kg) – one that cannot be explained by any notes or data..." We find that in this case, the facts match this situation closely in that one of the suggested HTS categories for the valuation of steel scrap (7204.41.00) has a value greater than the value the Department determined in Comment 10 above. While we acknowledge that HTS category 7204.41.00 includes an explicit reference to "shavings" and that "shavings" were clearly identified as among the types of scrap generated by respondents, the HTS description is is {sic} not the only relevant factor for the Department to consider in valuing steel scrap. As discussed above, reliance on this value will produce an unreasonable result. Therefore, we are using only HTS category 7204.49.00 to value steel scrap.")

[203] *See*, *e.g.*, *MSG/PRC LTFV* (September 29, 2014) at Comment 11 ("A by-product by definition is less valuable than the input from which it is derived. Where there is no evidence that the by-product is a value-added by-product, assigning a by-product a value that is higher than the value of the input from which it is derived is unreasonable. In this investigation, the quantity of the by-product reported exceeds the quantity of the primary input consumed in the production of that by-product. Thus the extended value of the by-product exceeds the extended value of the primary input. Therefore, in the instant investigation, the Department finds it appropriate and reasonable to cap the specific by-product quantity at the specific FOP input amount."); *Multilayered Wood Flooring From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 76 FR 64318 (Tuesday, October 18, 2011) ("*MLWF/PRC*") at Comment 24 ("For purposes of this final determination, the Department has valued Layo Wood's byproducts using a simple average of the surrogate values for Layo Wood's wood veneer and wood core inputs… As explained in *Steel Nails* and argued by Petitioner, the Department has found in past cases that it may

Accordingly, we capped the value of the SV used to value coal by-products to the value of the coal input SVs for these final results, as in the *Preliminary Results*, as Double Coin provides no compelling argument to depart from this established practice. However, Double Coin was correct to note that *Preliminary Results* margin calculation capped these SVs only to the value of the bituminous coal SV, though the waste by-products were produced by the consumption of both bituminous and anthracite coal during the POR. Accordingly, for the final results, we used price data for Indonesian imports of merchandise classified under both HTS subcategory 2701.12 and 2701.11 to create a single by-product cap SV (apportioned based on reported consumption of each type of coal input) to value Double Coin's coal waste offset.[204]

**Comment 21: Calculation of Double Coin's Warranty Costs**

- Petitioners note that the Department's margin program is set up to reduce CEP U.S. prices by reported warranty expenses, in accordance with section 772(d)(1)(B). However, because Double Coin reported warranty expenses as a negative number, the calculation improperly added any such reported expenses to U.S. price. Petitioners request the Department correct this inadvertent error for the final results.[205]
- No other interested party provided comment on this issue.

**Department's Position:** As noted by Petitioners, the *Preliminary Results* margin program is correctly set up to reduce CEP U.S. prices by reported warranty expenses. However, because Double Coin reported warranty expenses as a negative number,[206] the calculation of the sum of all CEP selling expenses added a negative number, resulting in the improper subtraction of reported U.S. direct selling expenses (of which the negative warranty expenses are the only

disregard a surrogate value when it is clear that the selection of that surrogate value would yield an unreasonable result. The facts of this case closely match those of *Steel Nails*, in that the AUV of Philippine HTS 4401.30 {*i.e.*, the scrap by–product} would be higher than the surrogate values used for Layo Wood's log, veneer and core inputs {*i.e.*, the inputs from which the scrap by–product is produced}. All parties, including the Petitioner, acknowledge that HTS 4401.30 offers the most specific description of Layo Wood's byproducts. While we agree that the HTS description provided by Philippine HTS 4401.30 includes the terms "sawdust" and "scrap," the HTS description is not the only relevant factor for the Department to consider. In this case, as was the case in Steel Nails, we find that the valuation of a scrap byproduct with a surrogate value higher than the substantive inputs into that scrap product would produce an unreasonable result not explained by the record. Consequently, we have valued Layo Wood's byproducts using a simple average of the surrogate values for Layo Wood's wood veneer and wood core inputs." *See also, Fish Fillets/Vietnam 11–12* (July 2, 2013) at comment VI.B, stating that the Department finds it unreasonable that the surrogate value for fish oil byproducts (derived from whole fish) would be higher than their main input (*i.e*., whole fish). Whereas the "unreasonable" SV was still used to value fish oil, because it was input specific, the fish oil SV was capped at the price of the SV for the whole fish input product. *See also* Certain *Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results and Partial Rescission of the Seventh Antidumping Duty Administrative Review*, 77 FR 15039 (March 14, 2012) (*Fish Fillets/Vietnam 10–11*) at Comment II.B.3, where the Department capped broken fillet by-products at the value for whole live fish because broken fillets were not a value-added byproduct.

[204] *See* Final Surrogate Value Memo for more information regarding the weighted-average calculation of this SV cap.

[205] *See* Petitioners' Case Brief at 20-21. Petitioners cite to: section 772(d)(1)(B) of the Act. Petitioners reference Double Coin's Preliminary Analysis Memo and Double Coin's SCDQR.

[206] *See* Double Coin's SCQR at 42. *See also*, Double Coin's Section C sales database.

component) from total CEP selling expenses.[207] Accordingly, we corrected this error by subtracting the negative U.S. direct selling expenses from the calculation of CEP selling expenses (*i.e.*, subtracting a negative value, resulting in the proper addition of warranty expenses to the sum of all CEP selling expenses).[208]

**Comment 22: Conversion of the Truck Freight Surrogate Value Applied to Double Coin's Coal Consumption**

- Petitioners note that the Department mistakenly applied a per kilogram ("Kg") truck freight rate to determine freight for per metric ton ("MT") coal values; thus, the freight value calculated for the transport of coal to Double Coin's factories is 1000 times lower than it should be. Accordingly, the Department should also adjust the per-Kg coal freight SV to a per-MT unit of measure, consistent with the per-MT manner in which Double Coin reported coal FOPs.[209]
- No other interested party provided comment on this issue.

**Department's Position:** Whereas Double Coin reported its coal consumption on a per MT basis (which we correctly valued using a SV reported on a per-MT unit of measure), we inadvertently applied a per-Kg per-Km SV in valuing the truck freight costs applicable this factor of production in the *Preliminary Results*. Accordingly, for the final results, we corrected this conversion error to report coal truck freight on a per-MT per-Km basis.[210]

**Comment 23: Calculation of Credit Costs for Double Coin's Drop-Shipped Sales**

- Petitioners point out that, for all sales, Double Coin calculated the number of days for which credit was extended by subtracting the reported invoice date by the reported payment date. However, for drop-shipped sales, because CMA does not invoice the customer until the customer receives delivery, the date of sale reported is different from the invoice date. Accordingly, the Department should recalculate credit expenses for drop-shipped sales by using the reported date of sale rather than the invoice date.[211]
- No other interested party provided comment on this issue.

**Department's Position:** For the *Preliminary Results*, as a result of the manner in which Double Coin reported credit expenses, the number of days for which credit was extended for Double

[207] As these total summed CEP expenses are then deducted from the gross unit price, the ultimate effect was to improperly add warranty costs to U.S. price.
[208] *See* Double Coin's Final Analysis Memo (and Program Log at Attachment I thereto) for further details on this change.
[209] *See* Petitioners' Case Brief at 21-22. Petitioners reference Double Coin's Verification Report, Double Coin's Preliminary Analysis Memo, and the Preliminary SV Memo.
[210] *See* Double Coin's Final Analysis Memo (and Program Log at Attachment I thereto) for further details on this change.
[211] *See* Petitioners' Case Brief at 28-29. Petitioners cite to *Certain Hot-Rolled Carbon Steel Flat Products From India: Notice of Final Results of Antidumping Duty Administrative Review*, 73 FR 31961 (June 5, 2008) ("*HRS/India*") and *Notice of Final Results of Antidumping Duty Administrative Review: Carbon and Certain Alloy Steel Wire Rod from Trinidad and Tobago*, 70 FR 12648 (March 15, 2005). Petitioners reference: Double Coin's SAQR, Double Coin's 2nd Supplemental ACD Response; Double Coin's SCQR; and Double Coin's Supplemental C&D Response.

Coin was calculated by subtracting the reported invoice date by the reported payment date, as is the standard practice when the invoice date is reported as the date of sale (as it is in the instant case for Double Coin's sales of merchandise from its U.S. warehouses). However, Petitioners correctly note that, for Double Coin's drop-shipped sales, the date of sale reported is different from the invoice date because CMA does not invoice the customer until the customer receives delivery.[212] Accordingly, to calculate the most accurate margin possible for the final results, we recalculated credit expenses for drop-shipped sales using the reported date of sale rather than the invoice date, consistent with, for example, *HRS/India* (June 5, 2008).[213]

**Comment 24: Calculation of Inventory Carrying Costs for Double Coin's Warehouse Sales**

Petitioners' Comments[214]

- An analysis of the inventory carrying cost ("ICC") information reported by Double Coin shows that the ICC methodology used by Double Coin's results in an average of 13.5 days in inventory for each tire sold.
- Petitioners assert that it is "unclear" why Double Coin did not employ the "typical" methodology employed by respondents that do not track inventory-in (*i.e.*, computing a ratio of the average inventory value during the POR to the total sales during the POR and then applying that ratio to the number of days in a year), but that – when employing this "typical" methodology – the average time in inventory is 290.6 days. Record evidence supports the use of this latter figure, and Petitioners urge the Department to recalculate ICC using this average 290.6 days in inventory figure for the final results.

Double Coin's Comments[215]

- Petitioners' claims run contrary to verified information on the record which demonstrates that products were sold from inventory more quickly than they were being replaced; as such, Double Coin's methodology is acceptable and appropriate.
- Double Coin notes that the calculation espoused by Petitioners (and resulting 290.6 average days in inventory figure) is incorrectly based on total sales information of both subject and non-subject tires. However, in applying Petitioners' methodology only to the movement of subject merchandise (*i.e.*, a negative monthly balance), results in negative average costs and suggests the existing calculation may, in fact, overstate ICCs.

**Department's Position:** Because CMA does not track the movement of individual tires into its warehouse, the inventory carrying cost calculation must necessarily rely on an estimate of average days in inventory. Accordingly, the Department must assess the reasonableness of Double Coin's estimate and whether Petitioners' suggested alternative is a more accurate or otherwise suitable estimate of average days in inventory.

---

[212] *See* Double Coin's Supplemental C&D Response at 16-17 and 39-40.
[213] *See* Double Coin's Final Analysis Memo (and Program Log at Attachment I thereto) for further details on this change.
[214] *See* Petitioners' Case Brief at 30-31. Petitioners cite to their own analysis of the inventory carrying cost calculation provided at Exhibit 2 of the Case Brief. Petitioners reference: Double Coin's Verification Report and Double Coin's SCQR.
[215] *See* Double Coin's Rebuttal Brief at 25-27. Double Coin references the following submissions: Double Coin's Verification Report and Petitioners' Case Brief.

As noted above and, in the verification report, CMA does not track individual tires to a specific shipment into their warehouses, and the accounting for warehouse inventory only tracks the quantity of a given product in and out of inventory.[216] Because they do not know when the first shipment of a tire that has gone out for sale came in, Double Coin utilized a last-in-first-out ("LIFO") method to estimate average days in inventory for reporting its inventory carrying costs because company officials know exactly when a tire went out for sale and exactly when the last instance of that type of tire came in to the warehouse.[217] As support for this method, CMA provided and Department officials reviewed documentation demonstrating that, for certain models of their larger selling tires, the inventory is moving out of inventory at a quicker pace than it is replaced.[218] As noted in our verification report and emphasized in Double Coin's rebuttal brief, our discussion with CMA officials and review of relevant documentation comported with information submitted to the record.[219]

Therefore, we previously found that the methodology used by Double Coin to determine average days in inventory is acceptable and verified that the relevant information was properly reported. Petitioners cite to no information and provide no reasoning as to why this methodology is unusable or unreliable. As such, we continue to find Double Coin's reported inventory carrying costs, based on CMA's LIFO method of estimating average days in inventory, to be acceptable and appropriate for use in these final results.

Petitioners request that the Department instead compute a ratio of the average inventory value during the POR to the total sales during the POR and then apply that ratio to the number of days in a year, arguing that this is the methodology typically employed by respondents that do not track inventory on a product specific basis. Petitioners further argue that record evidence supports the use of this latter figure, and that this methodology is a more accurate measure of days in inventory. First, though Petitioners claim that their suggested methodology is a more typical calculation, they cite to no precedent to support this claim. Furthermore, Petitioners reference no actual record evidence that supports the use of their proposed calculation, except to cite to a single note from CMA's financial statements that reference how inventory is valued for financial reporting purposes but provides no discussion of or insight into the calculation of days in inventory. Finally, aside from noting that Double Coin's methodology results in an average of 13.5 days in inventory and their own methodology results in an average of 290.6 days (with the implication that the large difference between these numbers, alone, represents *prima facie* evidence of the superiority of the latter figure), Petitioners provide no evidence or argument to support the contention that their calculation is more accurate or otherwise representative of Double Coin's commercial reality. As an initial matter, we find this argument insufficient to compel us to change the calculation. Moreover, as noted by Double Coin, this calculation is based on total sales and inventory values for all products both subject and non-subject. Therefore we do not find Petitioners' non-OTR-tire-specific calculation to be a more accurate estimation of the average days in inventory for subject merchandise than the calculation provided by Double Coin and used in the *Preliminary Results* (based on the LIFO movement of only subject OTR tires), and did not alter the ICC calculation for these final results.

---

[216] *See* Double Coin's Verification Report at 25-26 and US-VE 11.
[217] *Id*.
[218] *Id*. at US-VE 11.
[219] *Id*. at 26.

**Comment 25:  Differential Price Calculation**

Petitioners' Comments[220]
- The preliminary margin identified that over 23 percent of Double Coin's sales were price differentiated based on the quarterly comparison of prices.  However, a monthly comparison of prices increases the incidence of targeting to over 33 percent.
- The Department has historically relied upon domestic interested parties for the identification of targeted customers and time periods.  Recently, in *Shrimp/Thailand 11-12*, the Department modified time periods used for this analysis in response to comments from the domestic interested parties.  Accordingly, the Department should use month of sale as the measure of price differentiation for the final results.

Double Coin's Comments[221]
- Double Coin notes the Department's selected a quarterly basis for price analysis as a neutral and fair standard for evaluating differential pricing.  Absent a specific reason to change, the Department should refrain from departing from this reasonable standard.
- Petitioners provide no specific justification, based on market knowledge or otherwise, for switching the analysis from quarters to months.  Nor do they explain why this change is necessary for an analysis of Double Coin's sales, but not requested for other respondents.
- Third, even under monthly analysis, the percentage passing the Cohen's d test remains low and does not justify departure from average-to-average comparisons.

**Department's Position:**  As noted by Petitioners, historically, the Department required an allegation of targeted dumping prior to employing a differential pricing analysis and looked to domestic interested parties as a starting point for information on the appropriate parameters

---

[220] *See* Petitioners' Case Brief at 31-35.  Petitioners cite:  *Differential Pricing Analysis: Request for Comments*, 79 FR 26720 (May 9, 2014) ("*Differential Pricing Comment Request*"); *Strip From the United Arab Emirates: Final Results of Antidumping Duty Administrative Review; 2010-2011*, 78 FR 29700 (May 21, 2013) ("*PET Film/ UAE 10-11*"); *Withdrawal of the Regulatory Provisions Governing Targeted Dumping in Antidumping Duty Investigations*, 73 FR 74930 (December 10, 2008); *Certain Frozen Warmwater Shrimp From Thailand:  Final Results of Antidumping Duty Administrative Review, Partial Rescission of Review, and Revocation of Order (in Part); 2011-2012*, 78 FR 42497 (July 16, 2013) ("*Shrimp/Thailand 11-12*"); *Polyethylene Terephthalate Film, Sheet, and Notice of Final Determination of Sales at Less Than Fair Value: Large Residential Washers From the Republic of Korea*, 77 FR 75988 (December 26, 2012); *Notice of Final Determination of Sales at Less Than Fair Value and Affirmative Critical Circumstances Determination:  Bottom Mount Combination Refrigerator-Freezers From Mexico*, 77 FR 17422 (March 26, 2012) ("*Refrigerators/Mexico*"); *Antidumping Proceedings:  Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings; Final Modification*, 77 FR 8101 (February 14, 2012); *Certain Steel Nails from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 FR 33977 (June 16, 2008); *Certain Steel Nails from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 FR 33977 (June 16, 2008); *Certain Steel Nails from the United Arab Emirates:  Notice of Final Determination of Sales at Not Less Than Fair Value*, 73 FR 33985 (June 16, 2008); *Antidumping Duties; Countervailing Duties*, 62 FR 27295 (May 19, 1997); and their own differential pricing analysis provided at Exhibit 3 to the Case Brief.  Petitioners reference Double Coin's Preliminary Analysis Memo.
[221] *See* Double Coin's Rebuttal Brief at 28-30.  Double Coin cites to the *Differential Pricing Comment Request* (May 9, 2014) and references the following submissions:  PDM and Petitioners' Case Brief.

examined in the resulting analysis.[222] Indeed, the Department cited the domestic industry's product expertise and intimate market knowledge as the basis for the deference given to said parties in establishing the analytical criterion on a case to case basis (*e.g.*, the effects of specific time periods on pricing in the U.S. market).[223] Accordingly, in order to properly focus its analysis in past cases where targeting was alleged, the Department would modify the time periods it examines for targeted dumping based on a domestic party's allegations.[224]

More recently, however, the Department adopted a standard price whereby a differentiation analysis is conducted automatically in each margin program to evaluate the incidence and prevalence of targeted dumping.[225] In adopting this regular methodology, the Department established quarterly time periods as the baseline standards for temporal analysis.[226] Additionally, the Department stated that in the context of ongoing and future proceedings, parties to the particular proceeding will have an opportunity to provide comments that are relevant to the possible use of an alternative comparison method in that proceeding.[227]

We find, however, that, Petitioners provide no concerns with respect to the standard quarterly analysis and cite to no evidence supporting the use of a monthly analysis. Indeed, the only reasoning underlying Petitioners' request appears to be that it would increase the incidence of differential pricing for Double Coin. Petitioners, however, do not request the Department to make this change for the other respondent examined in this review, where a monthly analysis would, presumably, have little effect on the incidence of differential pricing. We find this results-based argument insufficient and, in fact, contrary to the principles underlying the Department's historical deference to domestic parties' market knowledge in cases involving price targeting.

As further support for their request, Petitioners note that in the recent *Shrimp/Thailand 11-12* (July 16, 2013) case, the Department had indeed changed the periods it examined for the final results in a review when a domestic party alleged that different periods resulted in a sufficient showing of a pattern of prices. First, we note that this *Shrimp/Thailand 11-12* (July 16, 2013) case was decided prior to the adoption of the new differential pricing methodology pursuant to the *Differential Pricing Comment Request* (May 9, 2014). Second, while Petitioners are correct that the Department indeed agreed with the domestic party's request to modify the time periods for analysis (and, as in this case, did not cite any specific market knowledge or expertise), the Department's determination to modify the time periods in *Shrimp/Thailand 11-12* (July 16, 2013) simply reflected the Department's agreement with the petitioner that the monthly analysis of pricing employed in the preliminary results was inconsistent with the quarterly analysis initially requested by Petitioners under the former methodology, and thus found the requested quarterly basis to be the appropriate standard for the final results. As such, rather than exemplifying the extent of the deference given to domestic parties by the Department with respect to requests involving differential pricing, the *Shrimp/Thailand 11-12* (July 16, 2013) case

---

[222] *See*, *e.g.*, *PET Film/UAE 10-11* (May 21, 2013) and accompanying IDM at 2-4.
[223] *See Antidumping Duties; Countervailing Duties*, 62 FR 27295 (May 19, 1997)
[224] *See*, *e.g.*, *Refrigerators/Mexico* (March 26, 2012) and accompanying IDM at Comment 16.
[225] *See Differential Pricing Comment Request* (May 9, 2014).
[226] *Id.*, 79 FR at 26720 (May 9, 2014) ("Time periods are defined by the quarter within the period of investigation or administrative review based upon the reported date of sale.").
[227] *Id.*, 79 FR at 26722 (May 9, 2014).

represents a standard correction of an inadvertent error. Further, in changing the standard from a monthly analysis back to a quarterly one, *Shrimp/Thailand 11-12* (July 16, 2013) demonstrates exactly the opposite fact pattern and result than is advocated by Petitioners in the instant case.

As noted above, Petitioners provide no justification as to why a monthly analysis would be superior to existing analysis, based on market expertise or relevant knowledge otherwise, aside from the simple fact that it would increase the incidence of Double Coin's targeted sales above the minimum threshold. We find this insufficient reasoning to deviate from the standard quarterly analysis, and continue to employ the quarterly analysis for these final results. Accordingly, the differential pricing analysis continues to not confirm the existence of a pattern of prices for comparable merchandise that differ significantly among purchasers, regions, or time periods and, therefore, we continue to use the average-to-average ("A-A") method to calculate the weighted-average dumping margin for Double Coin's reported sales.[228]

**RECOMMENDATION**

Based on our analysis of the comments received, we recommend adopting the above positions. If this recommendation is accepted, we will publish the final results of the review and the final weighted-average dumping margins in the *Federal Register*.

Agree ✓ Disagree ____

Ronald K. Lorentzen

Ronald K. Lorentzen
Acting Assistant Secretary
for Enforcement and Compliance

April 8, 2015
Date

[228] *See* Double Coin's Final Analysis Memo at Attachment II.

UNITED STATES DEPARTMENT OF COMMERCE
Office of the General Counsel
OFFICE OF THE CHIEF COUNSEL FOR TRADE ENFORCEMENT & COMPLIANCE
Washington, D.C. 20230

June 21, 2017

**FILED ELECTRONICALLY VIA CM/ECF**

Ms. Tina Potuto Kimble
Clerk of the Court
U.S. Court of International Trade
One Federal Plaza
New York, NY 10278-0001

Re: Redetermination Pursuant to Court Remand Order in *China Manufacturing Alliance, LLC, et al. v. United States*, Consol. Court No. 15-00124

Dear Ms. Potuto Kimble:

Pursuant to the Court's remand order of February 6, 2017, as well as subsequent orders granting extensions of time for the purpose of complying with the Court's remand order, ECF Nos. 195, 199, please find attached the U.S. Department of Commerce's Redetermination Pursuant to Court Remand in the above-captioned action. The Department's remand redetermination is a public document.

In accordance with Rule 56.2(h), filing of the administrative record for the remand proceeding will follow under separate cover. Should you have any questions concerning the matter, please contact me at (202) 482-4044.

Respectfully submitted,

/s Zachary Simmons
Zachary Simmons
Attorney
Office of the Chief Counsel
for Trade Enforcement & Compliance

Attachment

cc:

**John J. Todor**
U.S. Department of Justice
Commerical Litigation Branch - Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 616-2382
Fax: (202) 514-8640
Email: john.todor@usdoj.gov

**Daniel Lewis Porter**
Curtis, Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Avenue, NW.
Washington, DC 20006
(202) 452-7340
Fax: (202) 452-7333
Email: dporter@curtis.com

**William A. Fennell**
Stewart and Stewart
2100 M Street, NW.
Suite 200
Washington, DC 20037
(202) 466-1246
Fax: (202) 466-1286
Email: wfennell@stewartlaw.com

**Andrew Thomas Schutz**
Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP
1201 New York Avenue, NW.
Suite 650
Washington, DC 20005
(202) 661-7795
Fax: (202) 783-0405
Email: aschutz@gdlsk.com

A-570-912
AR: 09/01/12-08/31/13
Remand Redetermination
**Public Document**
E&C Office III: MKM

***China Manufacturing Alliance, LLC, et al. v. United States***
**Consol. Court No. 15-00124; Slip Op. 17-12 (CIT 2017)**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I. SUMMARY

The Department of Commerce (Department) prepared these final results of redetermination pursuant to the remand order of the U.S. Court of International Trade (CIT or the Court) in *China Manufacturers Alliance, LLC et al. v. United States*, 205 F. Supp. 3d 1325 (CIT 2017) (*China Mfr. Alliance* or the Court's Order). These final results of remand redetermination concern the Department's final results of the administrative review of the antidumping duty order on certain new pneumatic off-the-road tires from the People's Republic of China (PRC), covering the period of review (POR) September 1, 2012, through August 31, 2013.[1] Previously, on May 4, 2017, the Department issued to interested parties the draft results of redetermination pursuant to remand (Draft Results of Remand Redetermination).[2]

On remand, the CIT ordered the Department to: (1) reconsider the adjustment for value-added tax (VAT) calculated for Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd. (collectively, GTC);[3] (2) reconsider the calculation of GTC's brokerage and handling

---

[1] *See Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012-2013*, 80 FR 20197 (April 15, 2015), and accompanying Issues and Decision Memorandum (IDM), as amended by *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review; 2012-2013*, 80 FR 26230 (May 7, 2015) (collectively, *Final Results of Review*).
[2] *See* "*China Manufacturers Alliance, LLC et al. v. United States*, Consol. Court No. 15-00124, Slip Op 17-12 (CIT 2017): Draft Results of Redetermination Pursuant to Court Remand," dated May 4, 2017 (Draft Results of Remand Redetermination).
[3] *See China Mfr. Alliance*, 205 F. Supp. 3d at 1351.

and ocean freight costs in light of the potential double-counting of specific charges;[4] (3) reconsider the cost-of-living adjustments applied to GTC's domestic warehouse costs;[5] and (4) assign Double Coin Holdings Ltd. (Double Coin) an individually-calculated margin, specifically, the 0.14 percent *de minimis* margin which was calculated based on Double Coin's own data, rather than the rate assigned to Double Coin as part of the PRC-wide entity.[6]

The Department addresses the Court's Order in "Section II: Final Analysis" and "Section III: Interested Parties' Comments" of these Final Results of Remand Redetermination, and determines: (1) that the Department's VAT adjustment was appropriate and supported by substantial record evidence; (2) that it is appropriate to adjust GTC's brokerage and handling and ocean freight costs to reflect that certain charges may have been double counted; (3) that it is appropriate to revise GTC's domestic warehousing costs for a cost-of-living adjustment; and (4) to assign Double Coin a 0.14 percent *de minimis* margin, pursuant to the Court's Order, under respectful protest.[7] In light of these determinations, the Department made changes to GTC's margin calculation, and changed Double Coin's weighted-average dumping margin from 105.31 percent to 0.14 percent.[8]

---

[4] *Id.*, at 1358.

[5] *Id.*, at 1359.

[6] *Id.*, at 1342-43.

[7] *See Viraj Group, Ltd. v. United States,* 343 F.3d 1371, 1376 (Fed. Cir. 2003) (*Viraj Group*).

[8] *See* memorandum from the Department, "Draft Results of Redetermination Pursuant to Court Remand in the 2012-2013 Antidumping Duty Administrative Review of Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Remand Analysis and Surrogate Value Memorandum for Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd.," dated May 3, 2017 (GTC Draft Results Analysis and SV Memo) and "Draft Results of Redetermination Pursuant to Court Remand in the 2012-2013 Antidumping Duty Administrative Review of Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Draft Liquidation Instructions for Double Coin Holdings Ltd.," dated May 3, 2017 (Double Coin Draft Results Analysis Memo); *see also* memorandum from the Department, "Final Results of Redetermination Pursuant to Court Remand in the 2012-2013 Antidumping Duty Administrative of Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Final Redetermination Analysis and Surrogate Value Memorandum for Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd.," (GTC Final Redetermination Analysis and SV Memo), dated concurrently with this redetermination.

   In the Draft Results of Remand Redetermination, the Department provided new factual information to the record with respect to:  1) the potential double counting of brokerage and handling and ocean freight surrogate value expenses;[9] and 2) the deflator needed to properly calculate the cost-of-living adjustment for warehousing expenses.[10]  The Department provided parties with the opportunity to provide rebuttal factual information and to comment on the Draft Results of Remand Redetermination.  Titan Tire Corporation (Titan) and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC (USW) (collectively, the petitioners) and GTC submitted rebuttal factual information and comments.[11]  No other parties provided rebuttal factual information or comments with respect to the Draft Results of Remand Redetermination.  The petitioners' and GTC's comments are addressed in "Section III:  Interested Party Comments," below.

   As a result of our analysis of the record information and the parties' comments, we have amended the Draft Results of Remand Redetermination to reflect that certain brokerage and handling and ocean freight surrogate value expenses may have been double counted in the *Final Results of Review*.[12]  Beyond this change, the Draft Results of Remand Redetermination remain

---

[9] *See* Draft Results of Remand Redetermination at Attachment 2.
[10] *Id.*, at Attachment 1.
[11] *See* Petitioners' Rebuttal Factual Information, "*China Manufacturing Alliance, LLC, et al. v. United States: Consol. Court No. 15-00124*; Slip Op. 17-12 (CIT 2017): Titan and USW's Remand Factual Submission," dated May 8, 2017 (Petitioners' RFI); *see also* Petitioners' Draft Comments, "*China Manufacturing Alliance, LLC, et al. v. United States: Consol. Court No. 15-00124*; Slip Op. 17-12 (CIT 2017):  Titan and USW's Comments on Draft Redetermination," dated May 12, 2017 (Petitioners' Draft Comments).  *See* GTC's Rebuttal Factual Information, "GTC's Factual Rebuttal Information:  Remand Redetermination pursuant to Litigation in Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated May 8, 2017 (GTC's RFI); *see also* GTC's Draft Comments, "GTC's Comments on the Department's Draft Remand Redetermination – Remand Redetermination pursuant to Litigation in Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the- Road Tires from the People's Republic of China," dated May 12, 2017 (GTC's Draft Comments).
[12] *See* Issue 2 in "Section III:  Interested Parties' Comments," below.  *See also* GTC Final Redetermination Analysis and SV Memo.

substantively unchanged.  Our consideration of parties' factual information and comments, as detailed in "Section III:  Interested Parties' Comments," below, has not otherwise resulted in any substantive changes to the Draft Results of Remand Redetermination, as indicated in "Section II: Final Analysis," below.

## II.    FINAL ANALYSIS

### 1.   Department's Calculation of GTC's Unrefunded/Irrecoverable VAT

Pursuant to section 772(c)(2)(B) of the Tariff Act of 1930, as amended (the Act), when the Department calculates export price, it deducts from its calculation any "export tax, duty or other charge imposed by the exporting country on the exportation of the subject merchandise to the United States."  Notably, the statute does not define "export tax, duty or other charge imposed."[13]  In 2012, the Department, following notice and comment procedures, determined that these terms include, *inter alia*, "an export tax or VAT that is not fully refunded upon exportation."[14]

Interpreting section 772(c)(2)(B) of the Act to include "VAT that is not fully refunded upon exportation," *i.e.*, irrecoverable or unrefunded VAT, is a reasonable interpretation of the statute because, as the Department explained in the IDM, irrecoverable VAT "amounts to a tax, duty or other charge imposed on exports that is not imposed on domestic sales."[15]  In a typical

---

[13] *Id.*; *see also* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, vol 1 (1994) (SAA) at 823; *Final Determination of Sales at Less Than Fair Value:  Prestressed Concrete Steel Rail Tie Wire From the People's Republic of China*, 79 FR 25572 (May 5, 2014) (*Prestressed Wire*), and accompanying IDM at Comment 1 (stating that the statute does not define "export tax, duty or other charge imposed").

[14] *See Methodological Change for Implementation of Section 772(c)(2)(B) of the Tariff Act of 1930, as Amended, in Certain Non-Market Economy Antidumping Proceedings*, 77 FR 36481, 36482 (*Methodological Change*); *see also Proposed Methodology for Implementation of Section 772(c)(2)(B) of the Tariff Act of 1930, as Amended, In Certain Non-Market Economy Antidumping Proceedings; Request for Comment*, 76 FR 4866 (January 27, 2011). "VAT that is not fully refunded upon exportation" refers to irrecoverable, or unrefunded, VAT.

[15] *See* IDM at 27.

VAT system, companies receive, upon exportation, a *full* rebate of the VAT they paid on the purchase of inputs (*i.e.*, input VAT).[16]   For domestic sales, companies deduct the prior-paid input VAT from the VAT imposed on the domestic sales.[17]   That is, in a typical VAT system, for both domestic and foreign sales, companies are able to recover the VAT paid on inputs.

The Chinese system, by contrast, may result in companies having unrefunded or irrecoverable VAT, specifically "some portion of the input VAT that a company pays on purchases of inputs used in the production of exports is not refunded."[18]   That is, under the PRC VAT system, companies do not always receive a full refund of the VAT for exports when the government-mandated VAT refund rate for a particular exported product is less than the government-mandated VAT rate (resulting in unrefunded or irrecoverable VAT).   Where this occurs, irrecoverable VAT "is a net VAT burden that arises solely from, and is specific to, exports."[19]   Therefore, irrecoverable VAT is an export tax.   Under section 772(c)(2)(B) of the Act, the Department may deduct the amount, if included in the price, of any "export tax, duty, or other charge imposed by the exporting country on the exportation" of the subject merchandise.[20]

As the Department explains below, companies who export a good, rather than sell it domestically, build VAT unrefunded by the government into the export price itself.   Adjusting for this irrecoverable VAT, which equates to an export tax, is consistent with section 772(c)(2)(B) of the Act, as it reduces the gross U.S. price charged to the customer (which would

---

[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.*; *see also Diamond Sawblades and Parts Thereof from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 35723 (June 24, 2014) (*Diamond Sawblades 11-12*) and accompanying IDM at Comment 6; and *Multilayered Wood Flooring from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 2011-2012*, 79 FR 26712 (May 9, 2014) (*MWF 11-12*) and accompanying IDM at Comment 3; and *Prestressed Wire IDM* at Comment 1.
[20] *See* IDM at 28.

otherwise include the unrefunded VAT in the amount charged to the U.S. customer) to a net price received. Moreover, this deduction is consistent with the Department's longstanding policy that dumping margin calculations be tax-neutral.[21]

For purposes of this antidumping administrative review, we conducted an analysis of the irrecoverable VAT information GTC placed on the record and followed the methodology set forth in the *Methodological Change*.[22] In both an initial and supplemental questionnaire, the Department instructed GTC to report value-added taxes on merchandise sold to the United States and to identify which taxes are not rebated upon export.[23] In response, GTC stated its disagreement with our product-specific methodology and reported that its total (*i.e.*, non-product-specific) VAT refund exceeded VAT paid for export sales during the POR and, thus, did not report any irrecoverable VAT.[24]

In the *Final Results of Review*, the Department analyzed GTC's submissions and, consistent with its practice not to consider allocations across all company sales or across sales of products with different VAT schedules, calculated the difference between GTC's standard VAT levy rate and the VAT refund rate for the subject merchandise as reported by GTC, and applied

---

[21] During the process leading to the enactment of the original Antidumping Act, the Senate approved a provision that allowed upward adjustment to U.S. price to prevent a dumping margin from arising solely due to a foreign government's forgiveness of taxes on exports. *See* S. Rep. No. 16, 67th Cong., 1st Sess. 2, 12 (1921). The House-Senate Conference Committee responsible for reconciling the bills from the separate houses of Congress adopted the Senate provision, and this version became law. *See* the Antidumping Act, Chapter 14 §§ 203, 204, 42 Stat. 9, 12, 13 (1921) (codified at 19 U.S.C. §§ 1677a(d)(l)(C), 1677b (2005)). Thus, Congress specifically endorsed adjusting U.S. price in an effort to create a tax-neutral comparison between export price and normal value. As the purpose of the Tariff Act is to ensure a measure of tax neutrality, it would be counter to Congressional intent for antidumping duties to create margins where none exist.

[22] *See* IDM at 27-31 (Describing the methodological change the Department made to reduce export price or constructed export price in certain non-market economy antidumping proceedings by the amount of export tax, duty, or other charge, pursuant to section 772(c)(2)(B) of the Act. Provided the NME government imposed an export tax, duty, or other charge on subject merchandise as contemplated by section 772(c)(2)(B) of the Act, from which the respondent was not exempted, under the methodological change, the Department will reduce the respondent's export price and constructed export price accordingly, by the amount of the tax, duty or charge paid, but not rebated).

[23] *Id.*, at 29.

[24] *Id.*

the unrefunded (irrecoverable) VAT formula articulated in the relevant PRC VAT regulations on the record.[25]  The information placed on the record by GTC shows that the standard VAT levy is 17 percent and that the rebate rate for subject merchandise is nine percent.[26]  Therefore, relying on these particular facts and the relevant PRC regulations for the irrecoverable VAT formula, we removed from U.S. price the difference between the rates (*i.e.*, eight percent), which is commensurate with the amount of irrecoverable VAT incurred by GTC.[27]

In its decision, the Court held that the *Final Results of Review* do not include a specific finding that the PRC government imposed a tax, duty, or other charge in an amount equaling eight percent of the free on board (FOB) value of GTC's subject merchandise,[28] and that, accordingly, the Department had applied "a presumption that goods exported from China are subject to 'irrecoverable VAT' in the amount of 8 {percent} of the FOB value of the exported good."[29]  Consequently, the Court held that "{h}aving failed to reach a finding that {section 772(c)(2)(B) of the Act} required, Commerce had no statutory authority to make a deduction from GTC's EP {(export price)} and CEP {(constructed export price)} starting prices."[30]  In addition, the Court held that "{a}ny deduction made under {section 772(c)(2)(B) of the Act} is specific to the EP or CEP starting price.  Generalized conclusions about China's VAT scheme do not suffice.  Commerce may not reduce the starting price by a fixed percentage – no matter how derived – that is not the actual amount of a tax, duty, or other charge that the exporting country is found in fact to have imposed."[31]

---

[25] *Id.*
[26] *See* GTC May 28, 2014 Supplemental VAT Questionnaire Response (GTC May 28, 2014 SQR) at 1-2.
[27] *See* IDM at 27-31 (citing GTC May 28, 2014 SQR at 1-2).
[28] *See China Mfr. Alliance* at 32 and 34.
[29] *Id.* at 33.
[30] *Id.* at 34 and 42.
[31] *Id.* at 41.

***Analysis***

For these Final Results of Remand Redetermination, the Department continues to reduce GTC's U.S. sales prices by eight percent to account for irrecoverable VAT. The Department has reviewed its determination and the record evidence, and expands upon, and further supports, its findings as to the deduction of irrecoverable VAT below.

We find that the relevant statute instructs the Department to reduce the export price or constructed export price by any export tax, duty, or other charge imposed on the subject merchandise. Specifically, it states that the Department shall deduct:

> {T}he amount, if included in such price, of any export tax, duty, or other charge imposed by the exporting country on the exportation of the subject merchandise to the United States, other than an export tax, duty, or other charge described in {section 771(6)(C) of the Act, defining net countervailable subsidies}.[32]

In 2012, following notice and comment and the determination to apply this provision to certain non-market economies (NMEs), the Department determined that "an export tax or VAT that is not fully refunded upon exportation" falls within the ambit of an "export tax, duty, or other charge."[33] The Department further explained that "the export tax, VAT, duty, or other charge" may be "a fixed percentage of the price," in which case the Department would adjust the export price by the same percentage.[34] "VAT that is not fully refunded upon exportation," is irrecoverable VAT (*i.e.*, unrefunded VAT).

Because the statute does not define "export tax, duty, or other charge imposed," the Department receives deference in its interpretation so long as it is reasonable.[35] The Department,

---

[32] *See* section 772(c)(2)(B) of the Act.
[33] *See Methodological Change*, 77 FR at 36482.
[34] *Id*., 77 FR at 36483.
[35] *See Agro Dutch Indus. v. United States,* 508 F.3d 1024, 1029-30 (Fed. Cir. 2007); *see also Fushun Jinly Petrochemical Carbon Co., Ltd. v. United States*, Slip Op. 16-25, Ct. No. 14-00287 (CIT 2016); and *Globe Metallurgical Inc. v. United States*, 781 F. Supp. 2d 1340 (CIT 2011).

therefore, finds that "export tax, duty, or other charges" includes "a cost that arises as the result of export sales," consistent with other cases interpreting the word "charges."[36]

In this case, the record demonstrates that the Chinese VAT system can result in companies having un-refunded or irrecoverable VAT, in which some portion of the VAT that a company pays on purchases of inputs used in the production of exports of subject merchandise is not refunded. In Exhibit C-15 of its response to section C of the Department's questionnaire (the section concerning U.S. sales), GTC provided PRC government Circular 39, which sets out the PRC VAT system and its requirements for irrecoverable VAT. Article 5(3) of Circular 39 of the Chinese tax law clarifies that, "{w}here the Tax Refund Rate is lower than the applicable tax rate, the amount of tax calculated according to the difference in rates shall be included in the costs of the Exported Goods and Services."[37] While companies may still deduct input VAT from output VAT similar to companies in a typical VAT system, in the PRC VAT system, they do not receive a full rebate of the VAT for exports when the VAT refund rate for a particular product is less than the standard VAT levy rate. Circular 39 also states that: (1) the basis for determining the VAT refund of goods and services exported by manufacturing enterprises is the actual FOB price of exported goods and services on the export invoices (Article 4.1); (2) the VAT refund amount is equal to the "FOB price of exported goods x RMB conversion rate x tax refund rate of exported goods" (Article 5.1(2)); and, as discussed above, (3) irrecoverable VAT is included "{w}here the Tax Refund Rate is lower than the applicable tax rate, the amount of tax calculated

[36] *See*, *e.g.*, *Shell Oil Co. v. United States*, 751 F.3d 1282, 1291-92 (Fed. Cir. 2014) (interpreting a contract provision regarding "taxes, fees, or charges" to include "costs.")

[37] *See* GTC's February 19, 2014 Section C and D Response (GTC February 19, 2014 CDQR) at Exhibit C-15. *See also* Memorandum, "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Verification of the Sales and Factors Response of Guizhou Tyre Co., Ltd. and Affiliates," dated September 30, 2014 (GTC Sales Verification Report) at Exhibit 14. The part of the Chinese law specific to VAT was cited at footnote 98 of the IDM at 27.

according to the difference in rates shall be included in the costs of the Exported Goods and Services" (Article 5.3). The record evidence for GTC shows that the applicable standard VAT levy rate for the merchandise at issue is 17 percent, and that the tax refund rate for exports of the subject merchandise is set at nine percent of the FOB export value of the finished merchandise.[38] This results in an eight percent non-refundable VAT rate on the FOB export value of GTC's sales of the subject merchandise. Based on the above, we find that irrecoverable VAT "is a net VAT burden that arises solely from, and is specific to, exports."[39] Accordingly, we find that the costs arise as the result of export sales, as the costs are imposed upon the exportation of the subject merchandise to the United States. Therefore, to the extent that the amount of VAT paid on inputs used to produce subject merchandise is not refunded upon exportation of the finished product, section 772(c)(2)(B) supports our adjustment for irrecoverable VAT.

The purpose of the irrecoverable VAT adjustment is to arrive at a tax-neutral dumping comparison by reducing the U.S. EP or CEP downward by the amount of the irrecoverable VAT. In the underlying review, all of the information that is necessary for calculating GTC's amount of irrecoverable VAT (*i.e.*, the basic calculation formula as established under PRC law;[40] the applicable VAT levy and rebate rates;[41] and the EP data for sales of the subject merchandise[42]) is on the record.

Importantly, GTC has not established that the irrecoverable VAT adjustment the Department made is improper. GTC was not exempt from paying VAT on purchased inputs and

---

[38] *See* GTC May 28, 2014 SQR at 1-2, and the PRC Circular 39, Art. 5.1(2) at Exhibit 1 and GTC Sales Verification Report at Exhibit 14.
[39] *See* GTC February 19, 2014 CDQR at Exhibit C-15; *see also Diamond Sawblades11-12* IDM at Comment 6; and *MWF 11-12* IDM at Comment 3.
[40] *See* GTC May 28, 2014 SQR at Exhibit 1.
[41] *See* GTC May 28, 2014 SQR at 1-2.
[42] *See* GTC February 19, 2014 CDQR.

it did not present verifiable record evidence that an amount other than the standard nine percent rebate rate for the subject merchandise was applicable. GTC claimed that the FOB value of the finished merchandise is substantially higher than the price of the material inputs, asserting that the VAT refund purportedly fully compensates GTC for the input VAT.[43] However, the record evidence does not support this assertion. Specifically, GTC reported VAT paid on inputs used to produce *both* subject and non-subject merchandise, as well as VAT paid on domestic and export sales, and did not tie the VAT paid on inputs used to produce subject merchandise to the overall input VAT, or portion thereof, that it paid.

Moreover, the record of this proceeding is distinguishable from past cases in which the Department has considered information showing exemption of VAT on certain inputs.[44] The Department will adjust its calculation if a respondent can substantiate that it was exempt from paying input VAT on certain items it purchased for the production of the subject merchandise.[45] Otherwise the Department will rely on the amount of the difference between the standard VAT levy rate and the refund rate for exports of the subject merchandise to determine the irrevocable VAT adjustment. In its questionnaire responses, GTC reported a standard VAT refund rate for subject merchandise of nine percent and an input VAT levy rate of 17 percent, and recorded an eight percent unrefunded VAT amount in its own accounting records.[46] At verification, we

---

[43] *See* GTC February 19, 2014 CDQR at 51.
[44] *See Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2013-2014*, 80 FR 61166 (October 5, 2015) (*OTR 13-14 Prelim*), and accompanying Preliminary Decision Memorandum (PDM), unchanged in *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2013-2014,* 81 FR 23272 (April 20, 2016) (*OTR 13-14 Final*), and accompanying IDM. There, respondent Qingdao Qihang Tyre Co. Ltd. indicated that it made market economy purchases of inputs through a bonded warehouse which were used in the production of subject merchandise. The Department found that for these purchases, a bonded import adjustment is made by the PRC Government, which was taken into account in the Department's calculations. Specifically, we removed from the U.S. prices the difference between the VAT levy rate and VAT refund rate (*i.e.*, eight percent), as adjusted for the bonded imports.
[45] *Id.*
[46] *See* GTC May 28, 2014, SQR at 2; and the GTC Sales Verification Report at Exhibit 14.

reviewed GTC's unrefunded VAT as part of the cost reconciliation and observed that GTC itself listed eight percent non-refundable VAT in its cost build up for export sales.[47] We continue to find GTC's argument unpersuasive, as the Department's irrecoverable VAT calculation requires specific, verifiable input VAT exemption documentation that can be tied to the exported subject merchandise. Therefore, in light of the record evidence, the Department finds that only nine percent of the 17 percent standard VAT levy rate was rebated to GTC on its exports of subject merchandise.[48] As such, we find that the portion of irrecoverable VAT for GTC's sales of subject merchandise during the POR is eight percent, which is the appropriate amount for the irrecoverable VAT adjustment.

**2. GTC's Ocean (International) Freight and Brokerage and Handling**

***Background***

For purposes of the antidumping administrative review, we valued international freight paid in RMB or provided by an NME-freight carrier using quotes posted on Descartes.[49] Specifically, in the *Preliminary Results of Review*[50] and *Final Results of Review*, the Department's international freight surrogate value did not encompass only ocean freight, but also all post-exportation expenses incurred to deliver the merchandise to the unaffiliated customer (*i.e.*, ocean freight, U.S. inland freight charges, U.S. brokerage and handling expenses, etc.) – a

---

[47] *See* GTC Sales Verification Report at Exhibit 14, (showing that GTC's actual unrefunded VAT rate is 8 percent). We did not observe the calculated unrefunded VAT GTC presented its GTC February 19, 2014 CDQR response in any of the records reviewed at verification.
[48] *See* GTC May 28, 2014, SQR at 1-2; *see also* GTC Sales Verification Report at Exhibit 14.
[49] *See* http://rates.descartes.com, included in GTC's April 14, 2014 Surrogate Value Submission (GTC SVS) at Exhibit 8.
[50] *See Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2012-2013*, 79 FR 61291 (October 10, 2014) (*Preliminary Results of Review*) and accompanying PDM.

"fully-loaded" transportation charge.[51] For the *Final Results of Review*, we calculated U.S. inland truck freight delivery charges for GTC that were specific to the port of import and delivery region by assigning a region (*i.e.*, Northeast, Midwest, South, and West) for each of GTC's delivery zip codes and for each of the destinations from Descartes.[52] We valued PRC domestic brokerage and handling costs paid in RMB or provided by an NME provider based on prices included in the World Bank's *Doing Business 2014: Thailand, Trading Across Borders* report (*Doing Business*).[53] In the *Final Results of Review*, we did not exclude any charges from the Descartes ocean freight quotes, determining that they appeared to be integral to, and necessary for, the shipment of freight and did not appear to have been included in the brokerage and handling surrogate value.[54]

The Court held that, "{b}ecause the Department's finding that no double-counting occurred is not supported by substantial evidence, the court must remand the Department's decisions as to deductions from CEP for brokerage and handling, and for ocean freight, for reconsideration."[55] Specifically, the Court held that, "in reconsidering these decisions, Commerce should address specifically each of the charges in the Descartes quotes that GTC identifies as charges that may overlap with the charges Commerce obtained from the *Doing*

---

[51] *See* GTC's surrogate value submission dated April 14, 2014 at Exhibit 8 and GTC's Verification Report at Exhibit 11; *see also* Memorandum, "Final Results of the 2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic off-The-Road Tires from the People's Republic of China: Surrogate Value Memorandum," dated April 8, 2015 (Final SV Memo) at 2 and Attachments I and IV; *see also* Memorandum, "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Preliminary Results Surrogate Value Memorandum" (Prelim SV Memo) at 15-16 and Attachments IX and X.
[52] *Id.*
[53] *See* IDM at 44.
[54] *Id.*
[55] *See China Mfr. Alliance* at 54.

*Business* report," *i.e.*, "'Documentation Charges,'[56] 'Traffic Metigation {sic} fee,'[57] 'AMS Charge,'[58] 'Clean Truck Fee,' 'Chassis Usage Charges,' 'Shanghai Port Charges,' 'International Ship & Port Security charges,'[59] and 'ISD Handling Charge.'[60]"[61]

***Analysis***

The Court declined to decide whether "each of the charges identified by GTC necessarily was double counted,"[62] and only required that the Department "address specifically each of the charges in the Descartes quotes that GTC identifies as charges that overlap with the charges Commerce obtained from the *Doing Business* report."[63]

In accordance with the Court's holding, we have reconsidered the costs identified by GTC to determine whether they are being double counted. In the Draft Results of Remand Redetermination, the Department found the "Documentation Charges," "Traffic Mitigation Fee," "Clean Truck Fee," "Shanghai Port Charges," "ISPS – Int'l Ship & Port Security Charges," and "ISD Handling Charges" to be double counted, *i.e.* appeared in both ocean freight and shipping and handling costs. For the Final Results of Remand Redetermination, we further examined the costs included in international freight that were reported by Descartes, as well as those costs listed in the World Bank's *Doing Business* report as part of brokerage and handling, and in light of the record evidence determined that only the "Shanghai Port Surcharges" have been double counted. We have, therefore, removed this charge, already covered in the brokerage and

---

[56] The Descartes quote includes both "Documentation Charges" and "Document Handling Charges."
[57] The Descartes quote incorrectly spelled "Mitigation fee" as "Metigation fee." The Department correctly refers to this fee as a "Mitigation fee" throughout the Final Results of Remand Redetermination.
[58] Automated Manifest System (AMS).
[59] International Ship and Port Security (ISPS) Charges.
[60] Import Surveillance Division (ISD).
[61] *Id.*, at 53-54.
[62] *Id.*, at 54.
[63] *Id.*, at 55.

handling surrogate value, from the international freight surrogate value calculation, using the adjusted international freight value in the margin calculation.

With respect to the seven remaining charges identified by GTC,[64] we determine that these charges are properly covered under international freight, which values all import-related expenses for delivery to the customer, and are not covered by the brokerage and handling costs reported in the World Bank's *Doing Business* report, which captures expenses prior to exportation. We find that the "Automated Manifest System (AMS) Charge," "Chassis Usage Charges," "ISPS- Int'l Ship and Port Security Charges," "ISD Handling Charges," "Traffic Mitigation Fee," "CTF- Clean Truck Fee," and "Documentation Charges," are unique to ocean freight or activities at the U.S. destination. Accordingly, for the Final Results of Remand Redetermination, we have treated these charges as international freight charges, and have not removed these charges and expenses from the surrogate value. In particular:

- The remand record shows,[65] with respect to the **AMS Charge,** that the AMS System:

> "handles manifest information provided by the carrier … when the merchandise can be transported from the port of entry… Vessel AMS allows participants[66] to transmit manifest data electronically prior to vessel arrival. Customs can then determine in advance whether the merchandise merits examination or immediate release. Upon receiving notification from Customs, the carrier can make decisions on staging cargo and the importer can arrange for examination, release, and distribution of the merchandise."[67]

  Accordingly, we find that this cost is an ocean freight expense related arrival at the destination port, and therefore not covered by *Doing Business*. Therefore, we have not removed the AMS Charge from the surrogate value for international freight.

[64] "Documentation Charges," "Doc. Handling Charges," "CTF- Clean Truck Fee," "Traffic Mitigation Fee," "ISPS- Int'l Ship and Post Security," "ISD Handling Charges," "AMS Charge," and "Chassis Usage Charges." *Id.* at 53.
[65] *See* Draft Results of Remand Redetermination at Attachment 2.
[66] *Id.* Sea, air and rail carriers, port authorities, service bureaus, freight forwarders, rail carriers, and container freight stations can participate in AMS.
[67] *Id.*

- The remand record shows that **Chassis Usage Charges** are the additional charges for renting the chassis to support and transport full container loads transported via ocean freight at the destination.[68] Accordingly, we find that these costs are U.S. destination charges related to destination truck freight, and therefore not covered by *Doing Business*. Therefore, we have not removed the Chassis Usage Charges from the surrogate value for international freight.
- The remand record shows that **ISPS – Int'l Ship and Port Security Charges** cover expenses for ship and dock security and that the amount varies depending on the number of ports-of-call made by the vessel.[69] Accordingly, we find that this cost is an ocean transport expense related to all maritime vessels, and not covered by *Doing Business*. Therefore, we have not removed the ISPS Charges from the surrogate value for international freight.
- The remand record shows that **ISD Handling Charges** are not related to on-ocean services, but rather are charged by the U.S. Consumer Product Safety Commission (CPSC) for inspection of cargo entering the United Sates.[70] The CPSC is authorized to charge a user fee of these inspections.[71] Accordingly, we find that this cost is a U.S. port-specific charge, and not covered by *Doing Business*. Therefore, we have not removed the ISD Handling Charges from the surrogate value for international freight.
- The remand record shows that the **Traffic Mitigation Fee** and the **CTF-Clean Truck Fee** are not expenses related to on-ocean services, but, rather, are post-ocean pass-

---

[68] *See* Draft Results of Redetermination at Attachment 2.
[69] *See* Petitioners' RFI at Attachment 3.
[70] *Id.*, at Attachment 2.
[71] *Id.*

through fees specific to the ports of Los Angeles and Long Beach.[72]  Accordingly, we find that this cost is a U.S. port-specific charge related to U.S. truck freight, and not covered by *Doing Business*.  Therefore, we have not removed the Traffic Mitigation Fee and the CTF-Clean Truck Fee from the surrogate value for international freight.

Furthermore, we agree with the petitioners that the **Documentation Charges** can reasonably be attributed to costs associated with ocean freight.  While the Department recognizes that the *Doing Business* report does include documentation fees, document services are not exclusive to pre-shipping activities.[73]  Ocean carriers, like Descartes, require paperwork unique to their services and charge fees to create and process those documents.  Though a bill of lading is created by the freight forwarder, ocean carriers are required to create a master bill of lading to cover all containers aboard their ships.[74]  The remand record also shows that ocean carriers like Descartes have document charges related to U.S. destination document fees.[75]  Accordingly, we find that these charges are not representative of charges that could be incurred on brokerage or handling at the port of exportation, are properly included in the "fully-loaded" international freight surrogate value, and not covered by *Doing Business*.  In light of these findings, we have not removed the Document Charges from the surrogate value for international freight.

Finally, we agree with GTC that the remand record shows that the **Shanghai Port Surcharges** represent a fee that may be incurred on a pre-shipment brokerage/handling activity and could reasonably be covered within one of the general expenses included in the *Doing Business* report.  The Descartes quote lists a Shanghai Port Surcharge originated in Shanghai,

---

[72] *Id.*, at Attachments 1 and 4.
[73] *Id.*, at Attachment 1.
[74] *Id.*
[75] *Id.*

which likely reflects a pre-ocean pass-through surcharge for port congestion specific to the port of Shanghai.[76] The evidence submitted by the petitioners only shows that the rate for this fee was increased, but provides no further details as to what the fee covers. Therefore, the Department continues to find that the Shanghai Port Surcharge is not a sea transport charge, and we excluded this charge from the Descartes surrogate value for international freight to avoid potential double counting.

### 3. Domestic Warehouse Costs

***Background***

For purposes of the antidumping administrative review, the Department valued GTC's domestic warehousing expenses using a publicly-available price quote from GIC Logistics Group in Indonesia.[77] For the *Preliminary Results of Review*[78] and *Final Results of Review*, we determined that the information on the record was contemporaneous with the POR and did not need to be deflated.[79]

The Court found that the Department failed to make a cost-of-living adjustment to domestic warehouse costs using the average producer price index (PPI).[80] The Court held that, as the information was accessed on April 9, 2014, the Department must "reconsider its decision not to make a cost-of-living adjustment and provide a more thorough analysis of the issue that is grounded in whatever relevant evidence exists on the record."[81]

---

[76] *See* GTC SVS at Exhibit 8.
[77] *See* IDM at 45.
[78] *See Preliminary Results of Review* and accompanying PDM.
[79] *Id.* The information was accessed on April 9, 2014, but the source itself was not dated.
[80] *See China Mfr. Alliance* at 55-56.
[81] *Id.*, at 57.

***Analysis***

In accordance with the Court's holding that the Department reconsider its original decision not to deflate GTC's domestic warehousing costs, we have analyzed the evidence on the record and have determined that it does not provide any specific information showing that the surrogate value was, in fact contemporaneous, with the POR. Therefore, the Department has deflated the domestic warehouse costs using the PPI for April 2014 from the International Monetary Fund to match the surrogate value to the POR.[82]

**4. Double Coin's Margin**

***Background***

In the *Final Results of Review*, we stated that it is the Department's policy to assign all exporters of the merchandise subject to review in NME countries a single rate, unless an exporter can affirmatively demonstrate an absence of government control.[83] As the Department discussed in the *Preliminary Results of Review*, and further established in the *Final Results of Review*, we found Double Coin ineligible for a separate rate due to its inability to demonstrate the absence of government control.[84] As such, Double Coin was found to be part of the PRC-wide entity.[85]

In the *Final Results of Review*, the Department did not have certain information, *i.e.*, sales and production data, from the remaining (*i.e.*, non-Double Coin) portion of the PRC-wide entity, and also lacked information on the record with respect to the composition of the PRC-wide entity.[86] Therefore, in calculating a single rate for the PRC-wide entity, we did not consider it reasonable to rely solely on the information provided by Double Coin.[87] Rather,

[82] *See* GTC Remand Draft Analysis and SV Memo.
[83] *See* IDM at 11.
[84] *Id.*, at 12-18, and PDM at 10.
[85] *Id.*
[86] *See* IDM at 18-21.
[87] *Id.*, at 12.

based on the unique circumstances presented in this review, we considered it reasonable to use the information provided by Double Coin, as well as the information for the entire PRC-wide entity (*i.e.*, the investigation PRC-wide entity rate), to calculate a margin for the PRC-wide entity.[88] Specifically, we calculated the final margin for the PRC-wide entity (including Double Coin) using a simple average of the previously assigned PRC-wide rate (210.48 percent) and the calculated final margin for Double Coin (0.14 percent).[89] Accordingly, the Department revised the PRC-wide entity rate to 105.31 percent for the *Final Results of Review*.[90]

The Court held that the Department erred in assigning Double Coin the 105.31 percent rate as opposed to the 0.14 percent *de minimis* margin calculated based on its responses, and that the Department must assign Double Coin the calculated rate.[91] The Court found that the Department "could not rely on its {section 776(b)} authority in applying the 105.31 percent rate to Double Coin" because Double Coin was a cooperative respondent in the fifth review and submitted data sufficient for the calculation of the final *de minimis* margin.[92] Therefore, the Court required the Department to assign that rate to Double Coin, specifically stating that "the policy Commerce cited cannot serve to reconcile two inconsistent decisions: the Department's decision to subject Double Coin to individual examination and its decision not to assign Double Coin an individual margin."[93]

The Court stated that "the finding that Double Coin had failed to rebut the Department's presumption of government control did not prevent Commerce from assigning Double Coin an

---

[88] *Id*.
[89] *Id*.
[90] *Id*.
[91] *See China Mfr. Alliance*, 205 F. Supp. 3d at 1343-44.
[92] *Id.*, at 1338.
[93] *Id.*, at 1337.

individual margin."[94] The Court also held that "the factual information upon which the 210.48 percent rate is based bears no relationship to any sales or import entries – of any party – that are the subject of the fifth review and, in any event, is not on the administrative record of the fifth review."[95] Thus, the Court held that "in using the 210.48 percent rate in determining Double Coin's margin, Commerce impermissibly relied on matters not on the record of the fifth review," and that the Department "acted contrary to law in applying the rate of 105.31 percent to entries of the subject merchandise exported by Double Coin."[96] Therefore, the Court remanded "the contested decision with the directive to assign {the} 0.14 percent {sic} *de minimis* margin to the subject merchandise of Double Coin because that is the appropriate remedy under the statute."[97]

***Analysis***

The Department respectfully disagrees with the Court's rationale and holding in its remand opinion and order in *China Mfr. Alliance* regarding Double Coin's rate. However, under respectful protest,[98] the Department has assigned Double Coin a 0.14 percent *de minimis* margin. Accordingly, pursuant to this Final Results of Remand Redetermination, Double Coin's weighted-average margin is 0.14 percent.

## III. DISCUSSION OF INTERESTED PARTIES' COMMENTS

### Issue 1: The Department's Calculation of GTC's Unrefunded/Irrecoverable VAT

*The Petitioners' Comments*

The petitioners agree that the record supports the eight percent adjustment the Department made to GTC's U.S. prices for irrecoverable VAT, that the adjustment is fully

---

94 *Id.*
95 *Id.*, at 1337.
96 *Id.*, at 1138 and 1342.
97 *Id.*, at 1342-43.
98 *See Viraj Group*, 343 F.3d 1371, 1376 (Fed. Cir. 2003).

consistent with the statute, and that the adjustment is compliant with the Court's Order.[99] The petitioners argue that the Department has complied with the Court's instruction to adjust for the "actual amount... found in fact…"[100] and that the Draft Results of Remand Redetermination cite the pertinent record evidence in determining the "actual amount" of GTC's cost for irrecoverable VAT on its subject exports.[101]

The petitioners note that the statute requires that U.S. prices must be adjusted for any type of charge, in whatever form that charge arises, which is applied simply because the product in question is exported.[102] The petitioners argue that the VAT adjustment made by the Department reflects such an adjustment to U.S. price, and is appropriate because of the charge incurred by GTC on the tires it exported to the United States.[103] As described in the Draft Results of Remand Redetermination, the PRC VAT system, when applied to exports, is a unique, non-tax neutral system. They explain that with respect to domestic sales, companies offset domestic VAT paid on inputs with the VAT collected at the sale of their final products, which results in full recuperation of the VAT paid on inputs.[104] With respect to export sales, most governments allow exporting companies to receive a full rebate credit in the amount of the VAT that would have been collected had the product been sold domestically.[105] The PRC government, however, limits the amount of the VAT tax refund it will provide upon exportation by the type of

[99] *See* Petitioners' Draft Comments at 2.
[100] *Id.*
[101] *Id.*
[102] *Id.*, at 3 (citing section 772(c)(2)(B) of the Act).
[103] *Id.*
[104] *Id.*
[105] *Id.*, at 4-5.

product being exported. Because the exporting company may only claim a lower refund credit, it is able to offset less of the input VAT paid than if the product had been sold domestically.[106]

The petitioners agree that the Department correctly rejected GTC's argument that no net cost occurs under the PRC VAT system purportedly because the output VAT is calculated on the higher value of the finished merchandise, while input VAT is based on the cost of raw materials.[107] The petitioners point out that GTC's own accounting records treat the eight percent irrecoverable VAT rate as a cost of exporting.[108] By exporting, GTC elected to forgo the irrecoverable VAT amount that could have offset any of GTC's input VAT payments or have been carried over into future periods. Not only can GTC carry forward any excess VAT credits, GTC receives larger credits for making domestic sales which are used to offset VAT owed.[109] Basing the VAT adjustment on the overall total of both pools (*i.e.*, PRC input VAT paid, PRC output VAT collected), as GTC is seeking, would make the Department's adjustment reflect the aggregate VAT effects from all of GTC's purchases and sales, instead of VAT paid on inputs used in the production of subject merchandise.[110]

<u>*GTC's Comments*</u>

GTC refers to the Court's remand instructions that "Commerce may not reduce the starting price by a fixed percentage – no matter how derived – that is not the actual amount of a tax, duty, or other charge that the exporting country is found in fact to have imposed."[111] GTC argues that the Department has continued to apply the same VAT calculation to GTC based upon the same presumptions and arguments that the Court has already rejected, and fails to provide

[106] *Id.*, at 5.
[107] *Id.* (citing the Draft Results of Remand Redetermination at 9).
[108] *Id.*, at 6.
[109] *Id.*
[110] *Id.*
[111] *See* GTC's Draft Comments at 1-2.

any persuasive reasoning.[112] Instead, GTC argues that the Department largely relies upon its own rule announcements as authority for its actions.[113]

GTC argues that Circular 39 is not specific to the subject merchandise, and that the Department errs in basing its VAT deduction on a generalized presumption.[114] Also, while Circular 39 states that, in instances where the rate of VAT refund is lower than the applicable VAT rate, the difference of the VAT amount (the amount of irrecoverable VAT) "shall be included in the costs of the Exported Goods," the Department wrongly infers that export prices must include the cost of such irrecoverable VAT by operation of law.[115] Instead, establishing the cost and prices of export goods is an individual exporter's prerogative, and the PRC government cannot mandate what cost elements are used to establish export prices to the U.S. market.[116] The phrase, "shall be included in the costs of the Exported Goods" presumably refers to PRC exporters being afforded an incentive to include an additional presumptive cost to offset their overall reported income in their income statement, so as to reduce their direct tax liability.[117]

GTC also argues that the Department continues to disregard the VAT calculation GTC provided in support of its contention that "during the POR GTC's VAT refund based upon the 9% refund rate for export sales exceeded the amount of VAT paid for inputs attributable to exported merchandise."[118] The Courts have already determined that VAT adjustments should be based upon the amount of VAT paid to prevent a "multiplier effect" if the rate is applied to a

[112] *Id.*, at 3.
[113] *Id.*
[114] *Id.*
[115] *Id.*, at 3-4.
[116] *Id.*
[117] *Id.*
[118] *Id.*, at 4-5 (citing GTC May 28, 2014 SQR at 2-3 and Exhibit 2).

different price.[119]  To comply with this and the Department's instructions, GTC tied specific

numbers within the calculation to its books and records and reconciled this to GTC's monthly

VAT tax returns, included as part of the submission, providing as detailed a calculation as

possible.[120]

**Department's Position:**

As the petitioners noted, the Court directed that the Department "may not reduce the

starting price by a fixed percentage – no matter how derived – that is not the actual amount of a

tax, duty, or other charge that the exporting country is found in fact to have imposed."[121]

Consistent with this directive, the irrecoverable VAT adjustments made by the Department

reflect the unrefunded VAT cost GTC bore – in fact – on subject merchandise exported to the

United States.[122]  The amount is calculated based on the VAT levy rate for the merchandise at

issue (17 percent), and the tax refund rate for exports of the subject merchandise (set at nine

percent of the FOB export value of the finished merchandise).[123]  As noted previously, this

export VAT formula differs significantly from the export VAT systems utilized in most

countries, *i.e.*, where exports receive a full refund of input VAT paid.  Moreover, the amount the

Department deducted is reflected in GTC's own books and records, specifically that GTC

included the eight percent of unrefunded VAT in the cost build up to its U.S. price.[124]

---

[119] *Id.* (citing *Federal Mogul v. United States*, 63 F.3d 1572 (Fed. Cir. 1995) (*Federal Mogul*) and *E. I. DuPont De Nemours & Co. v. United States*, 20 C.I.T. 373 (1996) (*E.I. DuPont*)).
[120] *Id.*, at 5 (citing GTC May 28, 2014 SQR at 2-3 and Exhibit 2).
[121] *See China Mfr. Alliance*, 205 F. Supp. 3d at 1351.
[122] As discussed in Section II.1 above, Circular 39 states that (1) the basis for determining the VAT refund of goods and services exported by manufacturing enterprises is the actual FOB price of exported goods and services on the export invoices (Article 4.1); (2) the VAT refund amount is equal to the "FOB price of exported goods x RMB conversion rate x tax refund rate of exported goods" (Article 5.1(2)); and, as discussed above, (3) irrecoverable VAT is included "{w}here the Tax Refund Rate is lower than the applicable tax rate, the amount of tax calculated according to the difference in rates shall be included in the costs of the Exported Goods and Services" (Article 5.3). *See* GTC May 28, 2014 SQR at 1-2, and the PRC Circular 39 at Exhibit 1.
[123] *Id.*
[124] *See* GTC Sales Verification Report at Exhibit 14.

As directed by the Court, the Department has made specific findings based on record evidence to determine the "actual amount" of GTC's cost for irrecoverable VAT on its exports of subject merchandise.[125]  The record contains specific information on the irrecoverable VAT rate that governs GTC's exports of subject merchandise under PRC law, and demonstrates that GTC's U.S. prices, to which the rate is applied, includes the eight percent unrefunded VAT as a cost of goods sold.[126]  With this information, the Department is able to determine the amount GTC includes in its selling price to its export customers, as described below.

GTC's argument that Circular 39 is not specific to the subject merchandise and, therefore, cannot be used to determine the actual amount of unrefunded VAT is unpersuasive. GTC itself provided Circular 39 when the Department requested the "relevant laws and regulations that explain in detail the Chinese VAT system, in particular with respect to VAT collection, remittance, and refund processes for inputs consumed in production of the subject merchandise, and describe the tax reporting requirements to the Chinese Government."[127] Indeed, GTC cited Circular 39 to explain that "{t}he applicable VAT Refund rate for the merchandise under consideration is 9%.... The calculation to determine the refund is: Unit VAT Price * 9%."[128]  It is, thus, entirely reasonable for the Department to rely on GTC's response to this question when determining the amount of unrefunded VAT.

As the Department explained in Section II.1 above, the typical VAT regime imposes VAT on inputs, but provides mechanisms for companies to recover those VAT payments, whether they export their merchandise or sell domestically.  Under these typical VAT systems,

---

[125] *See* Section II.1.
[126] *See* footnote 98 of the IDM at 27; *see also* GTC February 19, 2014 CDQR at Exhibit C-15, GTC May 28, 2014 SQR at 1-2, and the PRC Circular 39, Art. 5.1(2) at Exhibit 1, and GTC Sales Verification Report at Exhibit 14.
[127] *See* GTC's May 28, 2014 SQR at 1 and Exhibit 1.
[128] *See* GTC's February 19, 2014 CQR at 51 and Exhibit C-15.

companies receive a full rebate upon exportation, and, for domestic sales, recover VAT payments by crediting them against the VAT collected from customers.[129] In a domestic sale, the full VAT bill, based on the final price of that good (*i.e.*, output VAT), falls due on the last purchaser in the chain of commerce (*e.g.* the customer buying the tire for use). The movement of input and output VAT between companies before the final sale is simple accounting.[130] To simplify the collection of tax from each company, the government allows the company to offset the amounts it has paid in input VAT against the amounts it collects on output VAT.[131] Similarly, for export sales, output VAT falls due at the sale to the last purchaser in the chain of commerce (*e.g.* the customer buying the tire for use). However, for export sales, most governments afford exporting companies a full rebate credit in the amount of the VAT that would have been collected if the product had been sold domestically. This means that the exporter can use that rebate to offset its input VAT payable, just as it can with VAT collected on domestic sales.[132]

The PRC's VAT regime differs from VAT systems typical in other countries with respect to exports, because companies do not receive a full rebate on their input VAT payments upon exportation. In the PRC, some portion of the input VAT that a company pays on materials used in the production of exported merchandise is not refunded. The amount refunded differs depending on the product being exported, and can be less than the input VAT amount paid. Put another way, exporting OTR tire companies in the PRC do not collect output VAT on their export sales from the customer (as they would on domestic sales), and, because the VAT refund rate on exported subject merchandise is lower than the actual rate paid (as input VAT) on

[129] *See* Petitioners' Draft Comments at 3-4 citing the Draft Results of Remand Redetermination at 3.
[130] *Id.*
[131] *See* Petitioners' Draft Comments at 3.
[132] *Id.*

materials used in their tire production, exporting OTR tire companies do not recover the entire input VAT remitted to the PRC government, *i.e.*, the irrevocable VAT. Thus, the refunds offset a lower amount of the VAT taxes that the company must pay on purchased inputs compared to the amount that could have been offset had the same product been sold domestically. The amount not refunded upon exportation is therefore a charge imposed by the PRC that arises solely from the act of exporting. Had exportation not occurred, the amount of irrecoverable VAT would not have been incurred by the exporter. Because irrecoverable VAT is a charge imposed only on exports, the Department reasonably concluded that it is a cost specific to "the exportation of the subject merchandise."[133] The Department, thus, makes a corresponding adjustment to the respondent's U.S. prices, to reflect the net (tax-neutral) price received, pursuant to section 772(c)(2)(B) of the Act.

GTC cites *Federal Mogul* and *E.I. Dupont* for the proposition that the Department should not apply the eight percent irrecoverable VAT rate to determine the amount of irrecoverable VAT and should, instead, use a fixed amount (in GTC's proposed calculation, the amount is 0 dollars).[134] In *Federal Mogul*, the Court examined the Department's method of determining dumping margins through a tax-neutral comparison of home market and U.S. sales (*i.e.*, by adding taxes applied in the comparison market sale to the comparable U.S. sale).[135] Specifically, the Court examined whether: (1) the Department should apply the comparison market VAT rate

---

[133] *See* section 772(c)(2)(B) of the Act.
[134] *See* GTC Draft Comments at 4-5, citing GTC May 28, 2014 SQR at Exhibit 2
[135] *See Federal Mogul*, 63 F.3d at 1572 (an action arising from *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Japan Final Results of Antidumping Duty Administrative Reviews*, 56 FR 31754 (July 11, 1991) (*Antifriction Bearings from Japan Final Results*)) and *E.I. Dupont*, 20 C.I.T. at 373 (an action arising from *Final Determination of Sales at Less Than Fair Value: Polyethylene Terephthalate Film, Sheet, and Strip From the Republic of Korea,* 56 FR 16305 (April 22, 1991) and the *Amended Final Determination of Sales at Less Than Fair Value: Polyethylene Terephthalate Film, Sheet, and Strip From the Republic of Korea*, 56 FR 25669 (June 5, 1991)), both cited by GTC's Draft Comments at 5.

(*i.e.*, the VAT rate applied to home market sales) directly to U.S. selling price to determine the VAT addition; or (2) apply the comparison market VAT rate to the comparable comparison market sale and add that amount calculated to the U.S. selling price.[136]  The Court upheld the Department's determination to apply the applicable VAT rate to the sale to which it was originally applied (*i.e.*, the comparison market VAT rate to the comparison market sale) to determine a specific amount to add to the U.S. selling price.[137]  In *E.I. DuPont*, the Court remanded the Department to take "'the tax amount paid in the home market for the same merchandise and {add} that amount to the price actually paid in the United States' in order to achieve a tax-neutral comparison," consistent with the opinion in *Federal Mogul*.[138]

This is precisely the approach adopted by the Department in the instant redetermination. Here, the Department is applying the applicable VAT rate (*i.e.*, the PRC input purchase VAT rate and the PRC export VAT rate) to the sale to which it was applied (*i.e.*, GTC's input purchase and GTC's export sale).  Because the difference between the input VAT paid and the output VAT refunded (*i.e.*, the irrecoverable VAT) is a result of exportation of the merchandise and was included in GTC's export price, deducting the amount of the difference (as an export tax) ensures the U.S. selling price is tax-neutral, and is a reasonable approach.

GTC's argument that it incurs a net zero VAT tax is negated by GTC's own books and records, which form part of the record evidence of this review and were verified by the Department.[139]  GTC states its proposed calculation is based on information reported in its VAT

---

[136] *See Federal Mogul*, 63 F.3d at 1575.
[137] *Id.*, at 1582.
[138] *See E.I. Dupont*, 20 C.I.T. at 381.
[139] *See* GTC Draft Comments at 4-5, claiming its calculation demonstrates that during the POR GTC's VAT refund based upon the 9 percent refund rate for export sales exceeded the amount of VAT paid for inputs attributable to exported merchandise.

Case: 23-2391 Document: 13 Page: 281 Filed: 11/28/2023

tax returns, which are drawn from liability accounts (which a company generally reports on its balance sheet).[140] However, the information GTC provided is a worksheet, which ties to the tax return only, and is not supported by verifiable information, such as audited financial records or GTC's financial system. The worksheet does include a reference to GTC's general ledger VAT liability accounts,[141] but the actual general ledger accounts, beyond the worksheet created for the review, were not provided.[142] Additionally, amounts for VAT inputs and outputs are pooled together in GTC's worksheet, making it impossible to identify or verify VAT amounts paid on inputs used in the production of *subject merchandise* or refunded upon the exportation of *subject merchandise*.[143]

As discussed above, GTC provided a worksheet with a summary of certain lines (domestic sales, export sales, and input VAT) on its VAT tax return and a detailed worksheet of input VAT that contains approximately 8,500 line items with no summary totals, referencing VAT payable accounts, as support for its proposed VAT calculation.[144] While the worksheets reconciled to the provided VAT tax returns, GTC did not provide verifiable evidence that these numbers are actually reflected in its internal accounting records, nor did it demonstrate that they reconcile to these records, *i.e.*, the general ledger or audited financial statements.[145] GTC uses liability accounts rather than its VAT expense accounts because they support its proposed net

---

[140] *See* GTC May 28, 2014 SQR at Exhibit 2, GTC's proposed calculation and VAT tax worksheet, and Exhibit 3, GTC's VAT tax returns.
[141] *See* Memorandum, "Final Results of Redetermination Pursuant to Court Remand in the 2012-2013 Antidumping Duty Administrative of Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Remand Analysis and Surrogate Value Memorandum for Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd.," dated concurrently with this Final Results of Redetermination (GTC Final Results Analysis Memo) for the specific account information.
[142] *Id. See also* GTC Sales Verification Report at Exhibit 4, GTC's chart of accounts.
[143] *Id. See also* Section II.1 above.
[144] *Id.*
[145] *See* GTC May 28, 2014 SQR.

zero calculation. However, liability accounts track *obligations*, not actual *expenses*. In this case, GTC's VAT *liability* accounts do not track its actual VAT expenses, but the VAT obligations GTC expects to pay over a given fiscal period. GTC properly used the VAT *expense* account[146] as verifiable support for including "8 percent unrefunded VAT" in its U.S. price build up. Therefore, had its calculation properly used actual VAT payments and refunds detailed within this *expense* account in its accounting system, based on GTC's own use of the account, it would have shown that the "8 percent unrefunded VAT" expense for each sale is passed through to the customer as part of the U.S. price, as we see in its cost reconciliation verification exhibit.[147]

Finally, GTC treats the eight percent irrevocable VAT (*i.e.*, the amount of unrefunded output VAT) as a cost of exporting OTR tires, and passes the actual unrefunded tax amount (eight percent) on to its customers as part of the U.S. price.[148] In its cost reconciliation provided at verification, GTC included a reconciliation worksheet and demonstrated to the Department the basis for its cost of goods sold (COGS) buildup, tying the total COGS to GTC's 2013 financial statements, and providing supporting documentation (*i.e.*, general ledger accounts) for each line item listed in the cost buildup.[149] The Department treats a company's cost reconciliation as the basis for reviewing the company's factors of production, which is the starting point for its selling price. GTC's cost buildup consisted of manufacturing expenses, such as material, labor and overhead, as well as non-manufacturing expenses, including an "8% non-refunded VAT," which GTC reconciled to a general ledger VAT *expense* account,[150] not a liability account, as discussed

[146] *See* GTC Final Results Analysis Memo for information on the specific account.
[147] *See* GTC Sales Verification Report at Exhibit 14, at item 35; *see also* GTC Sales Verification Report at Exhibit 4, GTC's chart of accounts.
[148] *See* GTC Sales Verification Report at Exhibit 14.
[149] *Id.* The buildup includes direct material costs, labor, manufacturing expenses, electricity, coal, work in progress (WIP) balances and costs, finished goods (FG) balances and costs, purchases of tubes and flaps, goods delivered but not received balances, non-refundable VAT of eight percent, and the COGS of WIP.
[150] *See* GTC Final Results Analysis Memo for information on the specific account.

above.[151] This, again, demonstrates that GTC erred in basing its proposed calculation on VAT *liability* accounts, not VAT *expense* accounts.

The fact that GTC includes unrefunded VAT as part of its COGS demonstrates that GTC itself does not treat the eight percent unrefunded VAT as a net zero balance in its income statement, but instead *seeks to recover this amount by including it as a part of its export price*. Even if, as GTC asserts, "establishing the cost and prices of export goods is an individual exporter's prerogative and the PRC government cannot mandate an exporter to either include or exclude a particular cost element while establishing his export prices to the US market,"[152] record evidence shows that GTC does in fact include an unrefunded VAT amount in its export price, listed in its general ledger at eight percent. Therefore, the Department continues to deduct an eight percent irrecoverable VAT from the U.S. export price.

**Issue 2: GTC's Ocean (International) Freight and Brokerage and Handling**

*The Petitioners' Comments*

First, the petitioners support the Department's determination that the AMS Charge and the Chassis Usage Charges are unique to international freight.[153] Specifically, they agree that the information the Department placed on the record shows that the AMS System handles information provided by the carrier (*i.e.*, the ocean freight provider), and that the Chassis Usage

[151] *Id.* GTC provided a monthly amount derived from the eight percent rate of the unrefunded VAT included in its COGS buildup.
[152] *See* GTC Draft Comments at 4.
[153] *See* Petitioners' Draft Comments at 7.

Charges are "applied at the destination after shipment and therefore would not be considered in the *Doing Business* costs, which are costs incurred in the exporting country before shipment."[154]

Second, the petitioners argue that the rebuttal factual evidence they provided shows that the six additional charges that the Department found to be potentially double counted in the Draft Results of Remand Redetermination are indeed incurred by the ocean carrier and thus cannot be double counted in the brokerage and handling surrogate value source.[155] Further, the petitioners assert that many of these costs are not incurred until arrival in the United States and, thus, would not have been considered in the *Doing Business* report, which covered port costs in Indonesia, and was used by the Department as a surrogate value for brokerage and handling charges at the port of exportation in the PRC.[156] Specifically:

- ISPS - International Ship & Port Security Charges – The petitioners note that record information demonstrates that these charges were "implemented by 'shipping lines/ship operators' in order to cover certain security arrangements with certain ports, which cover such costs as shipboard security officers and security plans at the port."[157] Accordingly, the petitioners conclude that these are charges are imposed by the ocean carriers, exclusive to ocean freight, and not attributable to pre-shipment services.[158]
- ISD Handling Charges – The petitioners cite information which states that ISD charges relate to activities of the U.S. CPSC at the port of Long Beach, who is authorized to charge a user fee.[159] As such, the petitioners assert that these charges are for post-export

[154] *Id.*
[155] *Id.*
[156] *Id.*, at 8-9 (citing Petitioners' April 14, 2014 Initial Surrogate Value Comments at Attachment 17).
[157] *Id.* (citing Petitioners' RFI at Attachment 3).
[158] *Id.*
[159] *Id.*, at 10 (citing Petitioners RFI at Attachment 2).

activities, are charged by the ocean carrier, and do not occur at the port of export covered by the *Doing Business* report.

- Traffic Mitigation Fee – The petitioners cite information demonstrating that this is a fee charged at the ports of Los Angeles and Long Beach, which are destination ports.[160] As such, the petitioners assert that these fees are for post-export activities, are charged by the ocean carrier, and do not occur at the port of export covered by the *Doing Business* report.
- CTF - Clean Truck Fee – The petitioners cite information demonstrating that this is another fee incurred at the ports of Los Angeles and Long Beach.[161] As such, the petitioners assert this is a fee for post-export activities, and is not related covered by the *Doing Business* report.
- Documentation Charges – While the *Doing Business* report includes costs for documents, the petitioners argue that such costs are not exclusive to pre-shipping activities.[162] According to the petitioners, the ocean carrier also charges documentation fees for its documentation activities, which are related to the shipping and destination portions of the freight, not to pre-shipment activities.[163]
- Shanghai Port Surcharge – The petitioners point out that this surcharge is listed on a statement on surcharges from a logistics company along with the Panama Canal

160 *Id.* (citing Petitioners' RFI at Attachment 4 in which the Descartes tariff code report explains that the Clean Truck Fee is another fee incurred at the ports of Los Angeles and Long Beach. The report also demonstrates that the ISD Handling Charge covers requirements from the "'Import Surveillance Division,' a division of the U.S. Consumer Product Safety Commission (CPSC), which inspects import shipments at the port of Long Beach. The CPSC is authorized to charge a user fee of these inspections).
161 *Id.*
162 *Id.*, at 9 (citing Petitioners' RFI at Attachment 1, which includes the DXI Tariff Code Rule Report taken from the Descartes website stating the Documentation Fee is another term for the Bill of Lading Charge and lists a US Destination Documentation Fee).
163 *Id.* (citing Petitioners' RFI at Attachment 1).

Surcharge.[164] The petitioners conclude that this represents evidence that these charges are charged by the ocean carriers, and not by other pre-shipment handlers of goods, as part of their total freight rates.[165]

The petitioners argue these charges are all unique to international freight and are not double counted under in the brokerage and handling fees contained in the *Doing Business* report.

*GTC's Comments*

GTC argues that the Department failed in the Draft Results of Remand Redetermination to show that the AMS Charge and Chassis Usage Charges are components of the ocean freight cost.[166] GTC asserts that the rebuttal factual information it provided directly contradicts the Department's findings with respect to the AMS Charge and Chassis Usage Charges in the Draft Results of Remand Redetermination and shows that, by failing to exclude the two charges from the Descartes price quotes, the Department impermissibly double counted these two charges.[167] Specifically, GTC contends that:

- The Department's reasoning in the Draft Results of Remand Redetermination that Chassis Usage Charges are not port charges is irrelevant and fails to address the crucial question of how the Chassis Usage Charges are a part of ocean freight costs.[168] The rebuttal factual information submitted by GTC shows that chassis usage services are typically provided by truckers and freight forwarders in the U.S. market and that this cost element is included in U.S. inland truck freight charges and, therefore, should be

[164] *Id.*, at 9-10 (citing Petitioners' RFI at Attachment 5).
[165] *Id.*
[166] *See* GTC's Draft Comments at 7.
[167] *Id.*, at 7.
[168] *Id.*, at 7-8.

excluded from the Descartes freight data in order to avoid double counting.[169]

- The Department did not explain why the AMS Charges "are unique to ocean freight" and why "charges related to this system are necessarily charged by the freight forwarder and {are} not a port charge covered by *Doing Business*."[170] Rebuttal factual information shows that the AMS system is an integral part of U.S. Customs and Border Protection and, therefore, the billing of AMS Charges is more appropriate as a U.S. inland truck freight charge. Accordingly, the AMS Charges should be excluded from the Descartes freight data in order to avoid double counting.[171]

**Department's Position:**

The Department determines, based on the record evidence, that all but one of the eight charges identified by GTC and the Court[172] are properly counted as international freight charges within the Descartes quote, and are, thus, not double counted with brokerage and handling expenses from the *Doing Business* report. However, we find that one charge – the Shanghai Port Surcharge – is appropriately characterized as an import-side expense that could potentially be double counted by an equivalent brokerage and handing expense. Accordingly, we have removed only the Shanghai Port Surcharge from the international freight surrogate value.

As discussed in Section II.2 above, in the *Preliminary Results of Review* and *Final Results of Review*, the Department's international freight surrogate value included all post-exportation expenses incurred to deliver the merchandise to the unaffiliated customer (*i.e.*, ocean freight, U.S. inland freight charges, U.S. brokerage and handling expenses, *etc.*), and, thus, is a

[169] *Id*. (citing GTC's RFI at Exhibits 1A, 1B and 1D).
[170] *Id*., at 9 (citing Draft Results of Remand Redetermination at 12-13).
[171] *Id*., at 10.
[172] *See China Mfr. Alliance*, 205 F. Supp. 3d at 1357-58.

"fully-loaded" transportation charge.[173] Thus, GTC's arguments that the AMS Charge and Chassis Usage Fee are more appropriately valued under U.S. inland truck freight expenses than with the Descartes quote (and should be excluded from the surrogate value) are moot, because the Descartes quote covers all post-export transportation – both U.S. inland transportation *in addition to* ocean freight. In particular, the record evidence demonstrates that: 1) these are charges incurred upon importation into the United States and that are not representative of pre-shipment (export-side) fees that might be covered by the *Doing Business* report; and 2) these charges are properly included in the "fully-loaded" surrogate value for international freight.[174]

Likewise, the ISPS - International Ship & Port Security Charges, ISD Handling Charge, Traffic Mitigation Fee, and the CTF - Clean Truck Fee are unique to international freight activities at the U.S. destination. Furthermore, we agree with the petitioners that the Documentation Charges can reasonably be attributed to costs associated with ocean freight. Ocean carriers, like Descartes, require paperwork unique to their services and charge fees to create and process those documents, and have document charges related to U.S. destination

[173] *See* GTC's surrogate value submission dated April 14, 2014 at Exhibit 8 and GTC's Verification Report at Exhibit 11; *see also* Memorandum, "Final Results of the 2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic off-The-Road Tires from the People's Republic of China: Surrogate Value Memorandum," dated April 8, 2015 (Final SV Memo) at 2 and Attachments I and IV; *see also* Memorandum, "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Preliminary Results Surrogate Value Memorandum" (Prelim SV Memo) at 15-16 and Attachments IX and X.

[174] We note that GTC mischaracterizes the "crucial question" as that of whether certain charges are appropriately part of the ocean freight cost. The directive of the Court is clear in instructing the Department to evaluate only brokerage and handling charges that may be double counted between the *Doing Business* and Descartes sources. As such, even though we agree with GTC that the record supports that, for instance, the Chassis Usage Fee may be more reasonably considered to be an U.S. inland freight fee than an ocean freight fee, the scope of the remand permits the Department only the discretion to evaluate fees potentially double counted with the surrogate for PRC brokerage and handling and any question regarding the removal of charges otherwise has not been raised in this litigation and is not considered by the Court. Regardless, the use of a 'fully-loaded' international freight SV renders this question moot.

document fees.[175] Therefore, we have not removed these charges and expenses from the surrogate value for international freight for the reasons stated in Section II.2 above.

Finally, we agree with GTC that the remand record shows that the Shanghai Port Surcharges represent a fee that may be incurred on a pre-shipment brokerage/handling activity and could reasonably be covered within one of the general expenses included in the *Doing Business* report. As discussed in Section II.2 above, the Shanghai Port Surcharges are likely a pre-ocean pass-through surcharge for port congestion specific to the Port of Shanghai.[176] Accordingly, we have excluded the associated charge in the Descartes international freight charges to avoid potential double counting.

**Issue 3: Domestic Warehouse Costs**

No parties commented on this issue. Therefore, the Department continues to deflate the domestic warehouse costs using the PPI for April 2014 from the International Monetary Fund to match the surrogate value to the POR.

**Issue 4: Double Coin's Margin**

*The Petitioners' Comments*

The petitioners respectfully disagree with the Court's holding that Double Coin must be assigned a *de minimis* margin, and support the Department's protest of the outcome directed by the Court for this redetermination.[177] The petitioners also continue to support the position set forth in their case brief in the underlying review, that the Department's revision of the PRC-wide rate (*i.e.*, to average the existing rate with the *de minimis* rate calculated for Double Coin) was

[175] *See* Petitioners' RFI at Attachment 1.
[176] *See* GTC SVS at Exhibit 8.
[177] *See* Petitioners' Draft Comments at 10-11.

improper and should have been maintained at 210.48 percent and applied to Double Coin at that rate.[178]

**Department's Position:**

The petitioners support the Department's decision in the Draft Results of Remand Redetermination to apply the rate identified by the Court under respectful protest, and no other party provided comment. Accordingly, we continue to assign Double Coin a 0.14 percent *de minimis* margin under respectful protest for these Final Results of Remand Redetermination.[179]

With respect to the petitioners' comments on the change made to the PRC-wide rate in the underlying *Final Results of Review*, we note that the Court did not order reconsideration of whether Double Coin is part of the PRC-wide entity.[180] Furthermore, the Court did not remand the calculation of the PRC-wide rate to the Department; rather, the Court denied the petitioners relief on their "claim that the Department's decision to assign the 105.31% rate to Double Coin, instead of the previous PRC-wide rate of 210.48%, was unreasonable and unsupported by substantial record evidence."[181] As such, we have not further addressed these issues.

## IV. FINAL RESULTS OF REDETERMINATION

For the foregoing reasons, the Department made no changes since the Draft Results of Remand Redetermination to the weighted-average dumping margin assigned to Double Coin. The Department revised GTC's dumping margin calculation as a result of its revised analysis of the expenses discussed in Issue 2. These Final Results of Remand Redetermination result in a

---

[178] *Id.*, at 11 (citing the petitioners' December 11, 2014 Case Brief (Petitioners' Case Brief) at 2-6).
[179] *See Viraj Group*, 343 F.3d 1371, 1376 (Fed. Cir. 2003).
[180] *See China Mfr. Allianc*e, 205 F. Supp. 3d at 1343, n. 13 (stating the Department "is free to alter {the finding that Double Coin is a part of the PRC-wide entity} in complying with the court's order, should it choose to do so," and that "the court is not ordering that the finding be reconsidered.").
[181] *Id.*, at 1341.

Case 1:15-cv-00124-TCS Document 20 Filed 06/21/17 Page 42 of 42

final weighted-average dumping margin for Double Coin of 0.14 percent and for GTC of 11.33 percent.

6/21/2017

X Ronald K. Lorentzen

Signed by: RONALD LORENTZEN

_________________________

Ronald K Lorentzen
Acting Assistant Secretary
for Enforcement and Compliance

**Slip Op. 17- 12**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**CHINA MANUFACTURERS ALLIANCE, LLC AND DOUBLE COIN HOLDINGS LTD.,**

Plaintiffs,

**TITAN TIRE CORPORATION, ET AL.,**

Plaintiffs,

and

**GUIZHOU TYRE CO., LTD. AND GUIZHOU TYRE IMPORT AND EXPORT CO., LTD.,**

Plaintiffs,

v.

**UNITED STATES,**

Defendant.

**Before: Timothy C. Stanceu, Chief Judge**

**Consol. Court No. 15-00124**

**OPINION AND ORDER**

[Remanding to the issuing agency a determination in an antidumping duty proceeding]

Dated: February 6, 2017

*Daniel L. Porter*, Curtis Mallet-Prevost, Colt & Mosle LLP, of Washington, D.C., for plaintiffs China Manufacturers Alliance, LLC and Double Coin Holdings Ltd. With him on the brief were *James P. Durling*, *Matthew P. McCullough*, *Claudia Hartleben*, and *Tung Nguyen*.

*William F. Fennell*, Stewart and Stewart, of Washington, D.C., for plaintiffs and defendant-intervenors Titan Tire Corporation and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC. With him on the brief were *Terence P. Stewart* and *Nicholas J. Birch*.

    *Mark E. Pardo*, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, D.C., for plaintiffs Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd. With him on the brief were *Brandon M. Petelin*, *Dharmendra N. Choudhary*, and *Andrew T. Schutz*.

*John J. Todor*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant. With him on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Franklin E. White, Jr.*, Assistant Director. Of counsel on the brief was *Nanda Srikantaiah*, Senior Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

Stanceu, Chief Judge: In this consolidated action,[1] three groups of plaintiffs contest the final determination the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") issued to conclude the fifth periodic administrative review of an antidumping duty order on pneumatic off-the-road tires from the People's Republic of China ("China" or the "PRC"). Finding merit in certain of plaintiffs' claims, the court remands the determination to Commerce for reconsideration and redetermination.

## I. BACKGROUND

### A. The Contested Determination

The determination contested in this litigation is *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review; 2012-2013*, 80 Fed. Reg. 26,230 (Int'l Trade Admin. May 7, 2015) *("Amended Final Results")*; *see Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012-2013*, 80 Fed. Reg. 20,197 (Int'l Trade Admin. Apr. 15, 2015) *("Final Results")*. Commerce issued the

[1] Consolidated under *China Manufacturers Alliance, LLC et al. v. United States,* Consol. Court No. 15-00124, are *Guizhou Tyre Co., Ltd. et al. v. United States*, Court No.15-00128, and *Titan Tire Corporation et al. v. United States*, Court No. 15-00136.

antidumping duty order (the "Order") on off-the-road tires from China (the "subject merchandise") on September 4, 2008. *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Notice of Amended Final Affirmative Determination of Sales at Less Than Fair Value and Antidumping Duty Order*, A-570-912, 73 Fed. Reg. 51,624 (Int'l Trade Admin. Sept. 4, 2008). The fifth administrative review pertained to import entries of subject merchandise made during the period of review ("POR") of September 1, 2012 through August 31, 2013. *Final Results*, 80 Fed. Reg. at 20,197.

B. The Parties to this Consolidated Case

The three groups of plaintiffs in this consolidated case are (1) China Manufacturers Alliance, LLC ("CMA") and Double Coin Holdings Ltd.; (2) Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd.; and (3) Titan Tire Corporation ("Titan"), joined by the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO CLC (the "USW").

Commerce considered Double Coin Holdings Ltd. and two Chinese tire producers affiliated with it to be a single company for the purposes of the review, to which it referred as "Double Coin."[2] *Final Results*, 80 Fed. Reg. at 20,198. CMA is a U.S. importer of Double Coin's subject merchandise. Corrected Br. of Resp. Pls. CMA and Double Coin in Supp. of Mot. for J. on the Agency R. (Oct. 5, 2015) 1, ECF No. 49 ("Double Coin's Br."). Commerce

[2] Commerce ruled that "Double Coin Group Jiangsu Tyre Co., Ltd., Double Coin Group Shanghai Donghai Tyre Co., Ltd., and Double Coin Holdings, Ltd. are affiliated pursuant to section 771(33)(E) of the Act [19 U.S.C. § 1677(33)(E)] and should be collapsed together and treated as a single company (collectively, 'Double Coin'), pursuant to the criteria laid out in 19 CFR 351.401(f)." *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012-2013, 80 Fed. Reg. 20,197, 20,198 (Int'l Trade Admin. Apr. 15 2015) ("Final Results").*

designated Double Coin, an exporter and producer of subject merchandise, as one of two mandatory respondents in the fifth review. *Final Results*, 80 Fed. Reg. at 20,197.

Commerce designated Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd. (collectively, "GTC" or "Guizhou"), another exporter and producer of subject merchandise, as the other mandatory respondent in the review. *Id.*

Titan, a U.S. producer of off-the-road tires, and the USW were the petitioners in the Department's investigation culminating in the issuance of the Order. *Certain New Pneumatic Off-The-Road Tires From the People's Republic of China; Preliminary Determination of Sales at Less than Fair Value and Postponement of Final Determination*, 73 Fed. Reg. 9,278 (Int'l Trade Admin. Feb. 20, 2008). Titan and the USW participated in the fifth administrative review as interested parties. Compl. ¶ 3 (May 6, 2015), ECF No. 6 (Court No. 15-00136).

C. Proceedings before Commerce

Commerce initiated the fifth administrative review on November 8, 2013. *Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part*, 78 Fed. Reg. 67,104 (Int'l Trade Admin. Nov. 8, 2013). Commerce published the preliminary results of the review ("Preliminary Results") on October 10, 2014. *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2012-2013*, 79 Fed. Reg. 61,291 (Int'l Trade Admin. Oct. 10, 2014) ("*Preliminary Results*"), and accompanying *Decision Memorandum for Preliminary Results of Antidumping Duty Administrative Review: Certain New Pneumatic Off-the-Road Tires from the People's Republic of China; 2012-2013*, A-570-912 ARP 12-13 (Int'l Trade Admin. Sept. 30, 2014) (Admin.R.Doc. No. 259), *available at*

http://enforcement.trade.gov/frn/summary/prc/2014-24275-1.pdf (last visited Jan. 25, 2017) ("*Prelim. I&D Mem.*").

In the Preliminary Results, Commerce preliminarily determined that Double Coin made sales of subject merchandise at less than fair value and calculated for it a preliminary dumping margin of 0.69%. *Preliminary Results*, 79 Fed. Reg. at 61,293. However, upon adopting a rebuttable presumption that all Chinese exporters are subject to control by the government of the PRC, Commerce preliminarily ruled Double Coin to have failed to rebut the Department's presumption of government control and, therefore, to have failed to qualify for a "separate rate." On that basis, Commerce considered Double Coin to be part of what it termed the "PRC-wide entity." *Id*. In the Preliminary Results, Commerce preliminarily assigned the PRC-wide entity a rate of 105.59%, which it obtained by taking a simple average of the individual rate Commerce calculated for Double Coin (0.69%) and the rate Commerce assigned to the PRC-wide entity in the original antidumping duty investigation, which was 210.48%. *Id*. Commerce also preliminarily determined that GTC made sales of subject merchandise at less than fair value and qualified for a separate rate, preliminarily assigning GTC an individually-determined margin of 16.18%. *Id.* at 61,294.

On April 15, 2015, Commerce published the Final Results, incorporating by reference an *Issues and Decision Memorandum for Final Results of Antidumping Duty Administrative Review: Certain New Pneumatic Off-the-Road Tires from the People's Republic of China; 2012-2013*, A-570-912 ARP 12-13 (Int'l Trade Admin. Apr. 8, 2015) (Admin.R.Doc. No. 293), *available at* http://enforcement.trade.gov/frn/summary/prc/2015-08673-1.pdf (last visited Jan. 25, 2017) ("*Final I&D Mem.*"). Commerce assigned a margin of 11.34% to GTC and a margin of 105.31% to the PRC-wide entity, which Commerce again determined to include

Double Coin based on a finding that Double Coin had not rebutted the Department's presumption of government control. *Final Results*, 80 Fed. Reg. at 20,199. The PRC-wide rate was the "simple average of the previously assigned PRC-wide rate (210.48 percent) and Double Coin's calculated margin (0.14 percent)." *Id.* (footnotes omitted).

Following a ministerial error allegation, Commerce published amended final results of the review ("Amended Final Results") on May 7, 2015. *See Amended Final Results*, 80 Fed. Reg. at 26,230. In the Amended Final Results, Commerce revised GTC's margin from 11.34% to 11.41%.[3] *Id*. at 26,231.[4] The PRC-wide rate remained 105.31%. *Id.*

D. Proceedings before the Court of International Trade

CMA and Double Coin Holdings Ltd. commenced their action on April 28, 2015. Summons, ECF No. 1; Compl., ECF No. 6. Plaintiffs GTC, and Titan and the USW, commenced their actions thereafter. *See* Compl. (May 1, 2015), ECF No. 6 (Court No. 15-00128); Compl. (May 6, 2015), ECF No. 6 (Court No. 15-00136). Titan and the USW filed a motion to intervene as defendant-intervenors in the cases brought by CMA/Double Coin Holdings Ltd. and GTC. *See* Titan and the USW Consent Mot. to Intervene as of Right

[3] The amended final results were issued following a ministerial error allegation asserting that Commerce failed to include two of GTC's inputs in the total material cost buildup for normal value. *See Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review; 2012-2013, 80 Fed. Reg. 26,230, 26,231 (Int'l Trade Admin. May 7, 2015) ("Amended Final Results")*.

[4] Commerce assigned GTC's margin as the "all-others" rate to the "separate rate" respondents, i.e., those respondents that Commerce considered independent from the government of China but that did not receive an individually-determined margin, which were Zhongce Rubber Group Company Limited and Weihai Zhongwei Rubber Co., Ltd. *See Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2012-2013, 79 Fed. Reg. 61,291, 61,294 (Int'l Trade Admin. Oct. 10, 2014) ("Preliminary Results")*; *Final Results*, 80 Fed. Reg. at 20,199; *Amended Final Results*, 80 Fed. Reg. at 26,231.

(May 12, 2015), ECF No. 12; Titan and the USW Consent Mot. to Intervene as of Right (May 12, 2015), ECF No. 12 (Court No. 15-00128). CMA and Double Coin Holdings Ltd., and GTC, filed motions to intervene as defendant-intervenors in the case brought by Titan and the USW. *See* Double Coin Consent Mot. to Intervene as of Right (May 15, 2015), ECF No. 13 (Court No. 15-00136); Guizhou Consent Mot. to Intervene as of Right (June 2, 2015), ECF No. 18 (Court No. 15-00136).

Before the court are the three motions for judgment on the agency record, filed by each of the three groups of plaintiffs according to USCIT Rule 56.2. *See* Resp. Pls.' Mot. for J. on the Agency R. (Sept. 24, 2015), ECF No. 38; GTC's Mot. for J. on the Agency R. and Br. in Supp. (Sept. 24, 2015), ECF No. 36 ("GTC's Br."); Titan and the USW's Mot. for J. on the Agency R. and Br. in Supp. (Sept. 24, 2015), ECF No. 35 ("Titan's Br."). Defendant opposed all three motions. *See* Def.'s Response to Mots. for J. on the Agency R. (Dec. 7, 2015), ECF No. 60 (Def.'s Opp'n").[5] The court held oral argument on April 27, 2016.

## II. Discussion

### A. Jurisdiction and Standard of Review

The court exercises jurisdiction under section 201 of the Customs Courts Act of 1980, 28 U.S.C. § 1581(c), pursuant to which the court reviews actions commenced under

[5] Double Coin and GTC each filed an opposition to Titan's and the USW's motion. *See* Def.-intervenors' Response in Opp'n of Pls.' Titan and the USW's Mot. for J. on the Agency R. (Dec. 7, 2015), ECF No. 54; GTC's Response to Titan and the USW's Mot. for J. on the Agency R. (Dec. 7, 2015), ECF No. 59. Titan filed an opposition to Double Coin's and GTC's motions. *See* Response Br. of Titan and the USW (Dec. 7, 2015), ECF No. 56. Double Coin, GTC, and Titan and the USW filed reply briefs in response to the opposition briefs. *See* Reply Br. of Resp. Pls.' CMA and Double Coin in Support of Mot. for J. on the Agency R. (Jan. 19, 2016), ECF No. 76; Reply Br. of Titan and the USW (Jan. 19, 2016), ECF No. 71; Consol. Pl. GTC's Reply Br. (Jan. 19, 2016), ECF No. 75.

section 516A of the Tariff Act of 1930 (the "Tariff Act"), *as amended*, 19 U.S.C. § 1516a, including an action contesting a final determination that Commerce issues to conclude an antidumping administrative review.[6] In reviewing a final determination, the court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

B. The Claims of the Three Groups of Plaintiffs

CMA and Double Coin claim that Commerce acted unlawfully in determining a 105.31% rate for the PRC-wide entity and assigning this rate to Double Coin. Double Coin's Br. 8-51. They advance several grounds for this claim, which the court addresses below.

GTC raises five claims. First, it claims that Commerce unlawfully made downward adjustments to account for Chinese value-added tax when determining the export prices and constructed export prices at which GTC's subject merchandise was sold in the United States. GTC's Br. 7-23. Second, GTC challenges the Department's choice from among the record data for determining surrogate financial ratios. *Id.* at 23-31. Third, GTC challenges the surrogate value Commerce used to value steam coal inputs. *Id.* at 31-45. Fourth, GTC contends that Commerce improperly double counted certain costs as domestic brokerage and handling and as ocean freight. *Id.* at 45-51. Finally, GTC claims that the Department's surrogate value for domestic warehouse costs should have been, but was not, adjusted for inflation. *Id.* at 51-54.

Titan and the USW challenge, first, the 105.31% margin Commerce assigned to Double Coin, arguing that Commerce instead should have assigned the 210.48% margin originally

[6] All citations to the United States Code herein are to the 2012 edition and all citations to the Code of Federal Regulations are to the 2015 edition.

determined in the investigation for the PRC-wide entity and applied in reviews prior to the fifth review. Titan's Br. 17-24. Second, they claim that Double Coin reported freight distances incorrectly and that Commerce erred in accepting the misreported data. *Id.* at 24-25. Third, Titan and the USW claim that Commerce erred in accepting Double Coin's reported inventory carrying costs for subject merchandise. *Id.* at 25-27. Finally, they claim that Commerce incorrectly limited ("capped") the distances used to determine GTC's surrogate freight costs for material inputs. *Id.* at 27-29.

C. CMA's and Double Coin's, and Titan's and the USW's, Claims Challenging Assignment of the 105.31% Rate to Double Coin

CMA and Double Coin Holdings Ltd. make four arguments in challenging the 105.31% "PRC-wide" rate Commerce assigned to Double Coin. They argue, first, that Commerce lacked authority to determine a rate for the "PRC-wide entity" because the statute permitted it only to determine a weighted average dumping margin for each individually examined exporter and producer and an estimated "all others" rate for all exporters and producers not individually examined. Double Coin's Br. 8-16. Second, they argue that Commerce had no authority to apply the 105.31% rate to Double Coin because that rate rests on an outdated presumption that that there is a single entity in China consisting of all Chinese exporters under the central control of the PRC government. *Id.* at 16-27. They submit that the presumption, adopted in the early 1990s based on circumstances in China in the late 1980s, is now factually invalid and contradicted by the Department's own determinations since that time, including its determination that China's economy is now sufficiently market-oriented that Commerce now considers it appropriate to subject Chinese exports to countervailing duties. *Id.* at 20-25. Third, they argue that the Department's finding that the government of the PRC controls the export activities of

Double Coin is not supported by the evidence of record. *Id.* at 27-51. Fourth, and finally, they argue that it was unlawful for Commerce to subject Double Coin to the 105.31% rate, rather than a rate determined based on Double Coin's own data, because Commerce, in doing so, applied a rate determined according to "facts otherwise available" and "adverse inferences." *Id.* at 51-59. According to their argument, this was impermissible, *inter alia*, "particularly since Commerce found determined [*sic*] that Double Coin's actual AD [antidumping duty] rate was *de minimis*" and because Commerce found that Double Coin fully cooperated with the review. *Id.* at 51.

CMA and Double Coin Holdings Ltd. have standing to challenge the PRC-wide rate of 105.31% because that rate was applied to Double Coin. The court, therefore, construes their various arguments as constituting a single claim—that Commerce unlawfully assigned this rate to Double Coin—and construes all of its arguments as grounds in support of this claim. For the reasons discussed in this Opinion and Order, the court agrees with the fourth argument they put forth. Therefore, the court does not address the remaining arguments.

Commerce stated in the fifth administrative review that "[t]he Department considers the PRC to be a non-market economy country ["NME"] under section 771(18) of the Act,"[7] and "[i]n antidumping proceedings involving NME countries, such as the PRC, the Department has a rebuttable presumption that the export activities of all firms within the country are subject to government control and influence." *Final I&D Mem.* 10. Commerce further stated that "[i]t is the Department's policy to assign all exporters of the merchandise subject to review in NME

[7] 19 U.S.C. § 1677(18)(A). A "nonmarket economy country" ("NME") is defined therein as "any foreign country that the administering authority determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise."

countries a single rate unless an exporter can affirmatively demonstrate an absence of government control, both in law (*de jure)* and in fact (*de facto*), with respect to exports." *Prelim. I&D Mem* 7.

In the fifth review, Commerce determined that Double Coin failed to rebut the presumption of *de facto* state control and, therefore, found that Double Coin "is a part of the PRC-wide entity." *Final I&D Mem.* 12. From that finding, Commerce proceeded to a conclusion that Double Coin had not established its entitlement to a "separate rate," i.e., a rate separate from the rate Commerce would assign to the PRC-wide entity. *Id.* ("Double Coin is ineligible for a separate rate due to its inability to establish independence from government control."). On this ground, Commerce declined to assign to Double Coin the *de minimis* margin of 0.14%, to which it referred in the Final Results as Double Coin's "calculated margin."[8] *Final Results*, 80 Fed. Reg. at 20,199; *see Final I&D Mem.* 12 (acknowledging that this was the "calculated final margin for Double Coin"). Instead, Commerce assigned Double Coin a rate of 105.31%, a rate Commerce designated as a newly-established rate for "the PRC-wide entity." *Final Results*, 80 Fed. Reg. at 20,199.

Titan and the USW claim that Commerce erred in assigning the 105.31% rate to Double Coin on the ground that on the record before it, Commerce should have left unchanged, and applied to Double Coin, the PRC-wide rate of 210.48% determined upon conclusion of the investigation and continued through previous reviews of the Order.

---

[8] For purposes of depositing and assessing antidumping duties, a margin of 0.14% is disregarded as a *de minimis* margin. *See* 19 C.F.R. § 351.106(c) (weighted-average dumping margins disregarded as *de minimis* if less than 0.5% *ad valorem*).

1. Commerce Erred in Assigning Double Coin the 105.31% Rate Instead of the 0.14% *De Minimis* Margin

The court begins its analysis with the statutory requirements for the conducting of an administrative review of an antidumping duty order. Section 751(a)(1) of the Tariff Act requires Commerce, upon a proper request, to conduct a periodic administrative review at least once during each 12-month period beginning on the anniversary of the date of publication of an antidumping duty order. 19 U.S.C. § 1675(a)(1). In a review, Commerce is directed generally to determine the normal value and U.S. price (i.e., export price or constructed export price) and resulting dumping margin, for "each entry" of the subject merchandise. *See* 19 U.S.C. §§ 1675(a)(2)(A)(i), (ii).

Commerce designated Double Coin, as an exporter and producer of subject merchandise, to serve as one of the two "mandatory respondents" and maintained this designation throughout the fifth review. Having made this designation, Commerce placed itself under a general obligation to assign Double Coin an "individual weighted average dumping margin." That much is clear from Section 777A(c)(1) of the Tariff Act, 19 U.S.C. § 1677f-1(c)(1), which provides as a general rule that Commerce, in determining weighted average dumping margins under § 1675(a), "*shall determine the individual weighted average dumping margin for each known exporter and producer of the subject merchandise*." *Id.* § 1677f-1(c)(1) (emphasis added). There is a statutory exception to this general rule where "it is not practicable to make individual weighted average dumping margin determinations" because "of the large number of exporters or producers involved in the investigation or review." *See id.* § 1677f-1(c)(2). In that circumstance, Commerce

> may determine the weighted average dumping margins for a reasonable number of exporters or producers by limiting its examination to . . . a sample of exporters,

> producers, or types of products that is statistically valid . . . or . . . exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined.

*Id.* § 1677f-1(c)(2). In the fifth review, Commerce expressly invoked this statutory exception, but it did so in deciding to *perform* an individual examination of Double Coin, not to *avoid* doing one. Commerce designated Double Coin and GTC (which Commerce determined was not part of the PRC-wide entity) as its two "mandatory respondents," i.e., the two respondents to each of which, according to § 1677f-1(c)(2), it would "limit[] its examination." Citing 19 U.S.C. § 1677f-1(c)(2), Commerce chose Double Coin and GTC as the two "exporters and producers accounting for the largest volume of the subject merchandise from the exporting country," *id.* § 1677f-1(c)(2)(B). *Prelim. I&D Mem.* 3.

The *de minimis* margin of 0.14% that Commerce calculated for Double Coin qualifies as an "individual weighted average dumping margin" within the meaning of 19 U.S.C. § 1677f-1(c)(1). The rate of 105.31% that Commerce assigned to Double Coin, not having been determined by an individual examination, does not. The record evidence shows that Commerce determined the *de minimis* margin according to the export prices and constructed export prices at which Double Coin's subject merchandise was sold in the United States and the Department's own determination of the normal value of that merchandise on the basis of Double Coin's factors of production and surrogate values, according to the nonmarket economy country procedures of 19 U.S.C. § 1677b(c). As Commerce acknowledged, it was able to calculate an individually-determined margin for Double Coin "[b]ecause Double Coin provided the Department with its verified sales and production data." *Final Results*, 80 Fed. Reg. at 20,199. Commerce "calculated" the 105.31% rate as "a simple average of the previously assigned PRC-wide rate (210.48 percent) and Double Coin's calculated margin (0.14 percent)." *Id.* (footnotes omitted).

Even though it calculated the *de minimis* margin based on Double Coin's own data, during the review Commerce rejected Double Coin's argument that "the statute requires the Department to assign Double Coin a rate based on this information." *Final I&D Mem.* 12. Commerce gave as its reason that "[i]t is the Department's policy to assign all exporters of the merchandise subject to review in NME countries a single rate unless an exporter can affirmatively demonstrate an absence of government control" and that "Double Coin is ineligible for a separate rate due to its inability to demonstrate the absence of government control." *Id.* This reason does not suffice. No "policy" can justify an agency's decision if that policy is applied to conflict with a statutory requirement. Here, the policy Commerce cited cannot serve to reconcile two inconsistent decisions: the Department's decision to subject Double Coin to individual examination and its decision not to assign Double Coin an individual margin. The plain language of 19 U.S.C. § 1677f-1(c) does not permit such a result. The Statement of Administrative Action ("SAA") accompanying the Uruguay Round Agreements Act ("URAA"), which enacted § 1677f-1(c), underscores this point. The SAA clarifies that the provision was intended in large part to reflect U.S. law and practice, which it described as follows:

> Under existing practice, Commerce attempts to calculate individual dumping margins for all producers and exporters of merchandise who are subject to an antidumping investigation or for whom an administrative review is requested. As a practical matter, however, Commerce may not be able to examine all exporters and producers, for example, when there is a large number of exporters and producers. In such situations, Commerce either limits its examination to those firms accounting for the largest volume of exports to the United States or employs sampling techniques. *Commerce will calculate individual dumping margins for those firms selected for examination and an "all others" rate to be applied to those firms not selected for examination.*

Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-316, Vol. 1 at 872 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4200 (emphasis

added).  As the SAA makes clear, an exporter or producer that is "selected for examination"
according to § 1677f-1(c) is one for which Commerce will calculate an individual dumping
margin.  Therefore, whatever rate Commerce chose to apply to Double Coin—whether or not it
also was the rate Commerce chose to apply to whatever it considered to be "the PRC-wide
entity"—was required by statute to be an individual dumping margin for Double Coin, unless
some statutory exception applied.  None did.

Commerce explained, further, that "[t]he Department must calculate a single rate for the
PRC-wide entity, and in this review, we do not have the necessary information, *i.e.*, sales and
production data, from the remaining unspecified portion of the PRC-wide entity." *Final I&D
Mem.* 12; *see also Final Results*, 80 Fed. Reg. at 20,199.  This rationale also fails to justify the
Department's decision not to assign an individually-determined margin to Double Coin.
Commerce is permitted to base an individual weighted average dumping margin on substitute
information by invoking its authority under 19 U.S.C. § 1677e(a), which directs the use of "facts
otherwise available" where "necessary information is not available on the record."  19 U.S.C.
§ 1677e(a)(1).  Commerce expressly invoked this authority in using the 210.48% rate as a
substitute for what it considered to be missing information pertaining to the "unspecified"
portion of the PRC-wide entity that it did not consider to consist of Double Coin. *Final Results*,
80 Fed. Reg. at 20,199.  However, in the fifth review Commerce was not in a position to use
facts otherwise available in determining an individual dumping margin for Double Coin, and
even had it been, it could not have used the 210.48% rate for that purpose.

As to Double Coin, Commerce did not make a valid finding, supported by record
evidence, that "necessary information," within the meaning of 19 U.S.C. § 1677e(a), was
unavailable on the record.  To the contrary, Commerce, by its own acknowledgment, had all the

information it needed to determine an individual weighted average dumping margin for Double Coin.

Under § 1677e(a), the information Commerce would use as a substitute for the missing information is information to be used "in reaching the applicable determination under this subtitle." 19 U.S.C. § 1677e(a). In the Issues and Decision Memorandum for the Final Results, Commerce stated that "[i]n this review, we are seeking to establish a new rate for the [PRC-wide] entity, which is under review, and a *part of which* was selected as a mandatory respondent, but for which we do not have complete information." *Final I&D Mem.* 13 (emphasis added). In other words, Commerce decided to make an entity it described as the "PRC-wide entity" subject to the fifth review but intentionally declined to designate that entire entity as a mandatory respondent.[9] By designating only GTC and Double Coin as mandatory respondents, Commerce decided that it would *not* perform an individual examination upon the PRC-wide entity as a whole. Accordingly, for purposes of 19 U.S.C. § 1677f-1(c)(1), Commerce needed, and obtained, information with which to determine an individual dumping margin for Double Coin, which it designated for individual examination.

On the other hand, because Commerce intentionally declined to designate as a "mandatory," i.e., individually examined, producer or exporter the non-Double Coin portion of

[9] Commerce referred to what it considered the portion of the PRC-wide entity outside of Double Coin as "unspecified." *Final I&D Mem.* 12. The next sentence in the memorandum indicates that Commerce failed to define the entity it was subjecting to review: "Nor is there information on the record with respect to the composition of the PRC-wide entity." *Id.* In the Final Results and the accompanying Issues and Decision Memorandum, Commerce did not identify any exporter of subject merchandise other than Double Coin that it considered to be part of the PRC-wide entity. Commerce was attempting to perform an administrative review, but not an individual examination, upon an entity it failed to define and, aside from Double Coin, about which it did not have record evidence allowing it to conclude that this entity was an exporter or producer of subject merchandise.

what it considered to be the PRC-wide entity, Commerce had no need for information with

which to calculate an individual weighted average dumping margin for that "portion."

Commerce determined that "we do not have the *necessary* information, *i.e.*, sales and production

data, from the remaining unspecified portion of the PRC-wide entity," *Final I&D Mem.* 12

(emphasis added), but this determination of necessity is incorrect.  The "sales and production

data" to which Commerce referred pertain to an individual weighted average dumping margin.

In short, the Department's review of that "remaining unspecified portion" of the PRC, i.e., the

non-Double Coin portion, was governed by an exception authorized by § 1677f-1(c)(2), under

which Commerce exercised its discretion not to perform an individual examination, not the

general rule of § 1677f-1(c)(1), under which it must perform one.  In summary, the finding that

Double Coin had failed to rebut the Department's presumption of government control did not

prevent Commerce from assigning Double Coin an individual margin.  Instead, Commerce relied

on that finding as its sole reason for choosing not to do so.

Even were the court to presume, for the sake of argument, that Commerce could have

invoked its authority under 19 U.S.C. § 1677e(a) to use facts otherwise available in determining

a margin for Double Coin, it would not have been permissible for it to use the 210.48% rate as

facts otherwise available on the record before it.  The factual information upon which that rate is

based bears no relationship to any sales or import entries—of any party—that are the subject of

the fifth review and, in any event, is not on the administrative record of the fifth review.[10]

---

[10] As to the theoretical question of "facts otherwise available" on the record for
determining a weighted average dumping margin for the PRC-wide entity, the court finds on the
record only one set of data that could be said to have qualified for that purpose: the record data
pertaining to an individual examination of the exports of Double Coin, which Commerce actually
        (continued . . .)

Moreover, the 210.48% rate was the result of the Department's invalid attempt to use not only facts otherwise available but also an adverse inference drawn according to 19 U.S.C. § 1677e(b) (to which Commerce refers as "adverse facts available," or "AFA").[11] In the fifth review, Commerce could not rely on its § 1677e(b) authority in applying the 105.31% rate to Double Coin. Commerce found Double Coin to be a cooperative respondent in the fifth review. *Prelim. I&D Mem.* 12. It also found the data Double Coin submitted sufficient for the calculation of the final *de minimis* margin. *See Final Results*, 80 Fed. Reg. at 20,199. Commerce did not find the PRC-wide entity, or any portion of it, to be an uncooperative respondent in the fifth review. Nor did it assert that it submitted any requests for information to what it deemed the "PRC-wide

---

(. . . continued)
did examine when it calculated (but declined to apply) a *de minimis* margin for Double Coin. The record contains no data pertaining to any Chinese exporter's subject merchandise, or even data pertaining to the identity of such an exporter, other than that of Double Coin, that are relevant to the fifth administrative review and that Commerce considered to be a part of the PRC-wide entity. As Commerce conceded, the record did not allow it to know the composition of what it termed the "PRC-wide entity." *Final I&D Mem.* 12.

[11] As the source for "the previously assigned PRC-wide rate (210.48 percent)," Commerce cited the final less-than-fair-value determination it issued upon concluding the original antidumping duty investigation. *Final I&D Mem.* 12 n.44 (citing *Certain New Pneumatic Off-The-Road Tires from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 Fed. Reg. 40,485, 40,489 (Int'l Trade Admin. July 15, 2008) (*"Final LTFV Determination"*)). The cited determination, of which the court takes judicial notice, discloses that the 210.48% rate was the result of the use of facts otherwise available and an adverse inference, *see* 19 U.S.C. § 1677e(b), based on the Department's finding that the PRC-wide entity did not respond to the Department's request for information and thereby failed to cooperate to the best of its ability. *Final LTFV Determination*, 73 Fed. Reg. at 40,487-88. Commerce found Double Coin to be a "Separate Rate Recipient," i.e., a respondent that demonstrated *de jure* and *de facto* absence of government control. *Id.* at 40,487, 40,489. The preliminary LTFV determination, of which the court also takes judicial notice, reveals that the source of the 210.48% rate was "the highest calculated rate from the petition." *Certain New Pneumatic Off-The-Road Tires from the People's Republic of China; Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 73 Fed. Reg. 9,278, 9,285 (Int'l Trade Admin. Feb. 20, 2008).

entity" (other than those it sent to Double Coin). Instead, in using the 210.48% rate in determining Double Coin's margin, Commerce impermissibly relied on matters not on the record of the fifth review, pointing to a lack of cooperation in the original antidumping duty investigation of what it then considered to be the PRC-wide entity (which at that time Commerce found not to include Double Coin). As Commerce explained:

> In this review, to the extent that the application of the pre-existing PRC-wide rate affects the antidumping duties assessed on Double Coin's entries as a result of this review, this rate is not an application of AFA to the entity in this review; rather, it reflects in part the rate applied to the entity based on the actions of the entity in the investigation of which Double Coin is now a part (and unchanged by any subsequent review).

*Final I&D Mem.* 13. While Commerce attempts to characterize the 105.31% rate it applied to Double Coin as something other than a rate determined according to "AFA," this characterization is inaccurate. The 105.31% rate was derived in substantial part from the AFA rate assigned to the PRC-wide entity in the investigation. The authority Congress provided in 19 U.S.C. § 1677e does not extend to the use of an adverse inference against Double Coin, a fully cooperative interested party that Commerce examined individually in the review and for which Commerce calculated (but declined to apply) an individual weighted average dumping margin based on information it found to be sufficient for that purpose.

In the Final Issues and Decision Memorandum, Commerce cited various judicial decisions in an attempt to justify its decision. Commerce relied on a decision of the Court of Appeals for the Federal Circuit ("Court of Appeals"), *Sigma Corp. v. United States*, 117 F.3d 1401, 1405-06 (Fed. Cir. 1997) in arguing that "[t]he Department's practice of assigning a PRC-wide rate has been upheld by the Federal Circuit" and that in *Sigma Corp.* the Court of Appeals "affirmed that it was within the Department's authority to employ a presumption for state control

in a NME country and place the burden on the exporters to demonstrate an absence of central government control." *Final I&D Mem.* 10. The issue of the current factual validity of the presumption, although raised by Double Coin, is one the court need not resolve here. The opinion in *Sigma Corp.* did not address the question the court *does* need to resolve, i.e., whether Commerce may refuse to assign an individual weighted average dumping margin to a cooperative exporter or producer upon which it chose to perform an individual examination of sales of subject merchandise. *Sigma Corp.* involved antidumping duty reviews initiated before the 1995 effective date of the Uruguay Round Agreements Act, which enacted 19 U.S.C. § 1677f-1(c). *See* Pub. L. No. 103-465, § 229(a). That previous version of the Tariff Act of 1930 had provided Commerce authority to use best information available ("BIA") rather than the authority provided by the current 19 U.S.C. § 1677e, and it was under this "best information available" authority that Commerce had imposed a single rate upon respondents who failed to cooperate with the Department's investigation.

Commerce reasoned, further, that in *Transcom, Inc. v. United States*, 294 F.3d 1371, 1381-83 (Fed. Cir. 2002), the Court of Appeals affirmed "[t]he application of a PRC-wide rate to all parties which were not eligible for a separate rate" and that "[i]n *Transcom*, the Federal Circuit also found that a rate based on 'BIA' (the precursor to facts available and AFA under the current statute) is not punitive." *Final I&D Mem.* 11. *Transcom* also involved a review of an antidumping duty order initiated prior to the effective date of the Uruguay Round Agreements Act, which enacted 19 U.S.C. § 1677f-1(c).

Commerce concluded from *Sigma Corp.* and *Transcom*, and from decisions of this Court that cite the opinions in those two cases, that "contrary to Double Coin's assertions, the courts have consistently upheld the Department's authority to apply a presumption of state control in

NME countries and to apply a single rate to all exporters that fail to rebut that presumption." *Final I&D Mem.* 11. Neither case lends support to the decision challenged here, made under a provision of the URAA, in which a cooperative exporter selected for individual examination was not assigned a margin based on the sales of that exporter's own subject merchandise. Commerce took this action on the basis of a review of an entity—the portion of the "PRC-wide enterprise" that did not include Double Coin—that Commerce did not select for individual examination. Nothing in the Tariff Act authorizes Commerce to do this simply upon a Departmental finding that the entity Commerce *did* select for individual examination, i.e., Double Coin, did not rebut its presumption of government control. This is quite different from the Department's established practice of subjecting to a "PRC-wide" rate all Chinese exporters that Commerce found to have failed to demonstrate independence from an uncooperative governmental entity and that Commerce, for that reason, considered not to be entitled to individual examination or to a "separate rate." While the statute does not specify how Commerce is to determine a rate for respondents that, pursuant to 19 U.S.C. § 1677f-1(c)(2), Commerce does not examine individually in an administrative review of an antidumping duty order, it is explicit in directing Commerce to "determine the individual weighted average dumping margin for each known exporter and producer of the subject merchandise" that Commerce selects for individual examination in such a review. 19 U.S.C. § 1677f-1(c)(1). The statute makes no exception to this requirement for exporters or producers Commerce considers controlled by the government of a non-market economy country.

As did Commerce in the Final Issues and Decisions Memorandum, defendant submits that the Department's decision to apply a country-wide rate to Double Coin in the fifth review is consistent with the decision of the Court of International Trade in *Advanced Technology &*

*Materials Co. v. United States*, 37 CIT __, __, 938 F. Supp. 2d 1342, 1350-51 (2013), which, defendant points out, was affirmed by the Court of Appeals pursuant to Fed. Cir. R. 36 in *Advanced Technology & Materials Co. v. United States*, 541 F. App'x. 1002 (Fed. Cir. 2013). The case is neither precedential nor on point. The segment of the opinion of this Court on which Commerce and defendant relied concerned a plaintiff, Advanced Technology & Materials Co., Ltd., that was not selected as a mandatory respondent in the antidumping duty investigation that gave rise to that case. *See Advanced Tech. & Materials Co.*, 37 CIT __ at __, 938 F. Supp. 2d at 1350-51; *Final Determination of Sales at Less Than Fair Value and Final Partial Affirmative Determination of Critical Circumstances: Diamond Sawblades and Parts Thereof From the People's Republic of China*, 71 Fed. Reg. 29,303 (May 22, 2006). As a result, the case did not involve the issue presented by this case, in which Commerce disregarded its obligation under 19 U.S.C. § 1677f-1(c) to assign Double Coin, a respondent Commerce selected for individual examination, an individual weighted average dumping margin.

In the Final Issues and Decision Memorandum, Commerce also relied on its regulation, 19 C.F.R. § 351.107(d), which provides that "[i]n an antidumping proceeding involving imports from a nonmarket economy country, 'rates' may consist of a single dumping margin applicable to all exporters and producers." *Final I&D Mem.* 10. This reliance is misplaced. Double Coin's claim, properly construed, is that Commerce unlawfully assigned Double Coin the 105.31% rate in the particular circumstances of the fifth review. Whether or not another circumstance could allow Commerce to apply a single rate to all exporters and producers of merchandise from a nonmarket economy country is not the issue before the court. Commerce may not exercise the discretion inherent in this regulation, which states that rates "may" consist of a single margin, to apply a single antidumping duty margin to all exporters and producers in a nonmarket economy

country in a way that fails to heed the statutory requirement to assign an individual weighted average dumping margin to a fully cooperative exporter or producer it designated for individual examination pursuant to 19 U.S.C. § 1677f-1(c). The court presumes the validity of the regulation, which Double Coin does not challenge. While a court owes deference to an agency's reasonable construction of its own regulation, a regulation that may be valid on its face is interpreted unreasonably if it is applied contrary to the requirements of the authorizing statute. *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. __, __, 132 S. Ct. 2156, 2166-67 (2012).

Similarly, the court will grant the deference to an agency's reasonable interpretation of a statutory provision in appropriate circumstances. *See Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). Here, however, Commerce has offered no interpretations of the statutory provision chiefly at issue, 19 U.S.C. § 1677f-1(c), for the court's consideration; nor did it analyze 19 U.S.C. § 1677e beyond invoking its authority thereunder to use the 210.48% rate as facts otherwise available. Instead, Commerce has attempted to justify its decision to apply the 105.31% rate to Double Coin according to its inapplicable past practices, a regulation (19 C.F.R. § 351.107(d)) it attempts to apply contrary to a statutory provision, and inapposite judicial decisions.

2. The Court Denies Relief on Titan's and the USW's Claim that as to Double Coin, Commerce Unlawfully Departed from the Previous 210.48% PRC-Wide Rate

Titan and the USW claim that the Department's decision to assign the 105.31% rate to Double Coin, instead of the previous PRC-wide rate of 210.48%, was unreasonable and unsupported by substantial record evidence. They base this claim on the state of the record and

their interpretations of past Commerce practice and various judicial decisions. Titan's Br. 17-24. The court denies relief on this claim.

As grounds in support of its claim, Titan and the USW argue that this Court has recognized that under Department practice involving nonmarket economy cases, the separate sales behavior of a single member of the PRC-wide entity is not meaningful and no individual inquiry into that behavior is warranted. Titan's Br. 18-19 (citing *Watanabe Grp. v. United States*, 34 CIT 1545, 1551 (2010), *Jiangsu Changbao Steel Tube Co. v. United States*, 36 CIT__, __, 884 F. Supp. 2d 1295, 1312 (2012)). This argument fails because in this case, Commerce decided to designate Double Coin under 19 U.S.C. § 1677f-1(c) for individual examination and, thereby, for assignment of an individual weighted average dumping margin. In light of that decision, an individual inquiry into Double Coin's selling behavior is not only meaningful but also necessary.

Titan and the USW next argue that "[f]or Commerce to be able to calculate a new margin for the PRC-wide entity," i.e., a revision of the previous 210.48% rate, "it needed data on factors of production and sales for the entity as a whole" and that where such information is not on the record, the Department's standard practice when reviewing a member of the NME-wide entity, as upheld by the courts, "is to apply an AFA rate to the whole entity." Titan's Br. 20-21. As to the lack of record evidence on the PRC-wide entity as a whole, and alluding to the apparent fact that Commerce did not seek information from the PRC-wide entity as a whole, Titan and the USW argue that "[i]n this review, the onus was on the [PRC-wide] entity, including Double Coin, to submit complete data on the record." Titan's Br. 20 (citing *Chia Far Indus. Factory Co. v. United States,* 28 CIT 1337, 1354, 343 F. Supp. 2d 1344, 1362 (2004)). In support of this argument, Titan and the USW contend that "Double Coin was aware of the government control it

was under, and on notice it was likely to be held to be part of the PRC-wide entity" but that "Double Coin and that entity chose not to submit a complete set of information for Commerce to review the activities of the entire PRC-wide entity." Titan's Br. 20-21. These arguments ignore the record fact that Commerce, although naming Double Coin for individual examination as a mandatory respondent, specifically declined to so designate the PRC-wide entity as a whole.

Notably, Titan and the USW do not claim that the Department's decision to designate only Double Coin, and not the PRC-wide entity as a whole, as a mandatory respondent was unlawful. Instead, they claim that Commerce was required on the record before it to assign the whole entity, including Double Coin, the 210.48% rate in the fifth review. In support of its argument, these plaintiffs cite *Transcom*, 294 F.3d at 1382, and *Advanced Technology & Materials Co.*, 37 CIT at __, 938 F. Supp. 2d at 1351, but these cases are inapposite for the reasons the court discussed previously. They also cite *Shandong Huanri (Group) General Co. v. United States*, 31 CIT 1029, 1040, 493 F. Supp. 2d 1353, 1364 (2007), but this decision does not address the issue posed by this case. The discussion in the opinion relates to the Department's finding of control of the plaintiffs by the PRC government. There is no discussion in the opinion of designation of plaintiffs as mandatory respondents and, accordingly, no discussion of the issue this case presents as to 19 U.S.C. § 1677f-1(c). The decision challenged in the case, *Brake Rotors From the People's Republic of China: Final Results and Partial Rescission of the Seventh Administrative Review; Final Results of the Eleventh New Shipper Review*, 70 Fed. Reg. 69,937 (Int'l Trade Admin. Nov. 18, 2005), does not discuss the process of selection of mandatory respondents.

Finally, Titan and the USW argue that the 210.48% rate permissibly could be used as facts otherwise available in the application of a rate to the PRC-wide entity, and that the

105.31% rate could not, because only the former, being based on the petition, and not the latter, was relevant to the PRC-wide entity as a whole. Titan's Br. 22-24. According to Titan and the USW, the rate Commerce selected "was not based on any fact, available or otherwise, but was only an assumption." *Id.* at 22. They maintain that "[i]n selection among facts otherwise available, 19 U.S.C. § 1677e(b)(2) allows Commerce to select from among (1) the petition, (2) the final determination, (3) any prior review, and (4) any other information on the record" and that "[t]he new PRC-wide margin calculated was based on none of these permissible choices for facts available." *Id.* Here again, Titan and the USW overlook the point that Commerce designated Double Coin for individual examination and did not so designate the PRC-wide entity. As the court discussed previously, it was not permissible for Commerce to use facts otherwise available in determining a weighted average dumping margin for Double Coin.

　　　3.  Commerce Must Assign Double Coin the *De Minimis* Margin Because This Is the
Appropriate Remedy for Double Coin's Claim Contesting the Assignment of the 105.31% Rate

　　　In conclusion, Commerce acted contrary to law in applying the rate of 105.31% to entries of the subject merchandise exported by Double Coin. As a remedy, Double Coin argues that the decision to impose this rate must be set aside, Double Coin's Br. 59, and the court agrees. Double Coin seeks that the court remand the Department's decision with instructions for reissuance "consistent with the court's decision." *Id.* Double Coin thus leaves to the court the specific instructions to be issued in remanding the Department's decision.

　　　Whether or not it was lawful for Commerce to deem Double Coin to be part of what it deemed "the PRC-wide entity," Commerce was required by 19 U.S.C. § 1677f-1(c)(1) to apply to Double Coin's subject merchandise an individual weighted average dumping margin calculated according to the statutory requirements. The only information available on the record

of the fifth administrative review that can be used for this purpose is the information provided by Double Coin.  This was the information Commerce used to determine the *de minimis* margin that Commerce described as a "calculated" and a "final" margin.  Commerce found the information sufficient for that purpose.  The court is remanding the contested decision with the directive to assign this 0.14% *de minimis* margin to the subject merchandise of Double Coin because that is the appropriate remedy under the statute.

It might be argued that the court should issue a more general order that does not direct Commerce to assign Double Coin the *de minimis* margin but leaves to Commerce the determination of what margin to assign, so long as that margin is, as the statute requires, an individual weighted average dumping margin.  According to such an argument, the court should not foreclose the possibility that Commerce might choose to conduct the review anew as to the PRC-wide entity, reopening the record as necessary to remedy what it acknowledged, *see Final I&D Mem.* 12, as a lack of record evidence on the composition of this entity and on sales and production data pertaining to it.  The court decides against this course of action.

As the court discussed previously, Commerce designated Double Coin as a mandatory, i.e., individually examined, respondent, but it expressly avoided this designation for what it considered to be the remainder of the PRC-wide entity, thereby deciding that it would *not* perform an individual examination upon the PRC-wide entity as a whole.  Upon judicial review, it is axiomatic that a court may adjudicate only claims that are properly before it.  In actions contesting an agency determination, such as this one, the court may adjudicate only claims challenging findings, determinations, and conclusions Commerce reached in the Final Results. The court's remand order, therefore, may include only those directives that are needed to correct the *contested* findings, determinations, and conclusions the court determines to be contrary to

law. The court's procedures reflect this limitation on judicial review; *see, e.g.*, USCIT R. 56.2(c).

In this litigation, no party contested the Department's designation of GTC and Double Coin as mandatory respondents. Moreover, no party contested the Department's decision in the Final Results not to also designate as a "mandatory," i.e., individually examined, producer or exporter the entire PRC-wide entity or, precisely, what Commerce considered to be the "unspecified" portion of the PRC-wide entity beyond Double Coin.[12] However illogical it might seem that Commerce found the PRC-wide entity to be a single entity yet also reached a decision to examine individually only what it deemed a portion of it, i.e., Double Coin, that decision is unchallenged in this litigation and, therefore, final and conclusive.[13] As a result, any prospect of the Department's calculating, in a remand proceeding, an individual weighted average dumping margin for the PRC-wide entity is foreclosed as beyond the scope of this litigation. Accordingly, the court refrains from issuing an order under which Commerce may revisit its final decision and

[12] Although CMA and Double Coin Holdings Ltd. argue that Commerce lacked the authority to issue a "PRC-wide" rate in the fifth review, *see* Double Coin's Br. 8-16, the court may not construe this argument as objecting to the Department's selection or non-selection of mandatory respondents. As the court noted earlier, their standing results from the Department's applying the 105.31% margin to Double Coin. Therefore, their claim is properly construed as limited by their standing, under which they may challenge the Department's assignment of the 105.31% rate to Double Coin, and not to any other respondent, real or hypothetical. As a result, CMA and Double Coin Holdings Ltd. are not entitled to a remedy under which the court would order Commerce not to assign an antidumping duty rate to the PRC-wide entity. Under the court's construction of, and adjudication of, their claim, such a rate could have no effect on CMA and Double Coin Holdings Ltd.

[13] In contrast, the Department's finding that Double Coin is part of the PRC-wide entity *is* challenged in this litigation. Commerce, therefore, is free to alter that finding in complying with the court's order, should it choose to do so, even though a decision to do so or not to do so can have no effect on the margin Double Coin must be assigned in the redetermination. Because the court's adjudication of the claim of CMA and Double Coin Holdings Ltd. does not require review of the validity of that finding, the court is not ordering that the finding be reconsidered.

reopen the record with the objective of obtaining information that might be used for that purpose. The court is ordering Commerce to assign the 0.14% *de minimis* margin to Double Coin because it is the only possible result that, on the record of the fifth administrative review, could comply with all statutory requirements, in particular 19 U.S.C. § 1677f-1(c).[14]

D. GTC's Claims

1. The Department's Deductions for Value-Added Tax Were Contrary to the Statute

Section 772(c)(2)(B) of the Tariff Act directs Commerce to reduce "[t]he price used to establish export price and constructed export price" by "the amount, if included in such price, of any export tax, duty, or other charge imposed by the exporting country on the exportation of the subject merchandise to the United States."[15] 19 U.S.C. § 1677a(c)(2)(B). GTC claims that Commerce exceeded its authority under section 772(c)(2)(B) when it made certain deductions from the starting prices Commerce used to establish the export price ("EP") and constructed export price ("CEP") for GTC's subject merchandise.[16] Commerce made the deductions for what it considered to be Chinese unrefunded value-added tax ("VAT") incurred on the subject tires that GTC exported to the United States. GTC argues that the Department's deductions were unauthorized by the plain language of the statute, GTC's Br. 13-17, and that, even had they been

[14] Titan and the USW direct two claims to the Department's calculation of the 0.14% margin. As discussed later in this Opinion and Order, the court does not find merit in either of these claims.

[15] According to 19 U.S.C. 1677a(c)(2)(B), no deduction is made if the export tax, duty or other charge is one described in 19 U.S.C. § 1677(6)(c), which is an export tax, duty, or other charge "levied on the export of merchandise to the United States specifically intended to offset the countervailable subsidy received." GTC does not contend that this exception applies.

[16] Commerce refers to the unadjusted sales price used to establish export price or constructed export price as the "starting price." *See* 19 C.F.R. § 351.402(a).

authorized, the methodology Commerce used to calculate them was unreasonable and contrary to record evidence, *id.* at 17-23.

For the Final Results, Commerce described the Chinese VAT system as one in which "some portion of the input VAT that a company pays on purchases of inputs used in the production of exports is not refunded." *Final I&D Mem.* 28 (footnote omitted).  According to Commerce, "[t]his amounts to a tax, duty, or other charge on exports that is not imposed on domestic sales"; Commerce referred to this portion as "irrecoverable VAT." *Id.*  Commerce explained that "[i]rrecoverable VAT, as defined in PRC law, is a net VAT burden that arises solely from, and is specific to, exports" and "is VAT paid on inputs and raw materials (used in the production of exports) that is nonrefundable and, therefore, a cost." *Id.* (footnote omitted). Commerce concluded that, for purposes of 19 U.S.C. § 1677a(c)(2)(B), "[i]rrecoverable VAT is, therefore, an 'export tax, duty, or other charge imposed' on exportation of the subject merchandise to the United States."  *Id.* (footnote omitted).

In the Final Issues and Decisions Memorandum, Commerce defined "irrecoverable VAT" as follows: "Irrecoverable VAT is (1) the free-on-board value of the exported good, applied to the difference between (2) the standard VAT levy rate and (3) the VAT rebate rate applicable to exported goods." *Id.* at 30 (footnote omitted).  Commerce stated therein that "[i]nformation placed on the record of this review by both GTC and Double Coin," which consisted of GTC's and Double Coin's responses to the Department's questionnaire on VAT, "indicates that according to the Chinese VAT schedule, the standard VAT levy is 17 percent and the rebate rate for subject merchandise is nine percent." *Final I&D Mem.* 28 (footnote omitted).  To apply 19 U.S.C. § 1677a(c)(2)(B), Commerce "removed from U.S. price the difference between the rates (*i.e.*, eight percent), which is the irrecoverable VAT as defined under PRC tax law and

regulation." *Id.* at 29. Because GTC had both EP and CEP sales, *see Prelim. I&D Mem.* 19, 22-23, Commerce made the 8% downward adjustments to the starting prices used to calculate both EP and CEP. GTC argues that § 1677a(c)(2)(B) did not allow Commerce to make these deductions from its starting prices for irrecoverable VAT because, under Chinese law, GTC pays no VAT on its exports of subject merchandise and instead pays VAT only on its domestic purchases of inputs used to produce its tires. GTC's Br. 14-15.

     GTC relies on regulations of the PRC, which it placed on the record, as providing that "'for taxpayers that export goods, *the tax rate shall be zero.*'" *Id.* at 14 (quoting Article 2.3 of the *Interim Regulations of the People's Republic of China on Value-Added Taxes* (2008) and citing GTC's Section C Response. at 49-50 and Exhibit C-15 (emphasis in GTC's Br.)). According to GTC, "[t]his is an *internal tax* related to the cost of acquiring inputs within China, and it is obviously not a tax that is 'imposed on the exportation of the subject merchandise.'" *Id.* at 15. GTC argues, further, that "since the record plainly shows that the VAT rate for export sales is zero, there is no support for any assumption that VAT is 'included in the price' of the export sale as required before Commerce can make any adjustment pursuant to 19 U.S.C. § 1677a(c)(2)(B)." *Id.* at 15 n.16.

     GTC maintains that even were Commerce, as a general matter, permitted to make a deduction for irrecoverable VAT, its deduction in this instance was impermissible because "[c]omputing an adjustment based upon the difference between the VAT *rates* paid and refunded is obviously not the same as computing the actual *amount* paid if the applicable input VAT rate and refund rate are applied to a different value basis." *Id.* at 18 (emphasis in original). Asserting that "the 17% VAT input rate being used by Commerce is only applied to the value of inputs purchased by GTC for the production of its tires, while the 9% refund rate is being applied to the

much higher basis of the FOB [free-on-board] value of the finished merchandise," GTC adds that

"it is obvious that 9% of the FOB value of the finished tires could equal or exceed the 17% VAT

amount paid on the cost of material inputs (as GTC showed in its VAT supplemental response)."

*Id.* (footnote omitted).

For the Final Results, Commerce included in the Final Issues and Decision Memorandum

an interpretation of § 1677a(c)(2)(B) that the court reviews according to the analysis outlined by

the U.S. Supreme Court in *Chevron*, 467 U.S. at 842-43.  The first step in the court's review is to

determine whether Congress has spoken to the precise question presented, because if so, then the

answer Congress gave is binding on the agency and on the court.  *Id.*  If the statutory language is

ambiguous or silent on the precise question presented, then a court, upon reviewing an

interpretation of a statute made by the agency charged by Congress with its administration, is to

give deference to a reasonable interpretation of the statute, even if the interpretation is not the

one the court would have preferred.  *Id.* at 843-44.

Neither the Final Results nor the incorporated Final Issues and Decision Memorandum

includes a specific finding that the PRC government imposed a tax, duty, or other charge in an

amount equaling 8% of the free-on-board ("FOB") value of GTC's subject merchandise.

Therefore, the statutory language presents two questions of interpretation.  One question is

whether, in the absence of a finding that any sort of "tax, duty or other charge" equivalent to 8%

of the FOB value of the exported merchandise actually was "imposed by the exporting country,"

it was permissible for Commerce to construe the statute to authorize it to make that deduction

from the starting price for EP or CEP.  If, and only if, the answer to the first question is yes, does

the second question arise.  That question is whether a VAT tax imposed on a producer's

domestic manufacturing inputs but not refunded upon the exportation of the finished good can be

construed to be an "*export* tax, duty, or other charge" that was "*on the exportation* of the subject merchandise." 19 U.S.C. § 1677a(c)(2)(B) (emphasis added).

The answer to the court's first question of interpretation is found in the unambiguous language of the statute. Under that language, the deduction from the EP or CEP starting price must be in the actual "amount" of the tax, duty, or other charge that was "imposed" by the government of the country of export. *Id.* (requiring that the price used to establish EP and CEP be reduced by "the *amount* . . . of any . . . tax, duty, or other charge *imposed* by the exporting country . . .") (emphasis added). If Commerce finds that a tax, duty, or other charge was so imposed in relation to the subject merchandise, it then would make a finding as to whether the tax, duty, or other charge was "included in such price," i.e., the starting price. If a charge was *not* found to have been so imposed, then under the statute, and as a matter of logic, it cannot be found to have been "included" in that price. Commerce never made either of these two specific findings. Under step one of the *Chevron* analysis, the court must give effect to the unambiguous language of the statute. Because the answer to the court's first question of statutory interpretation is no, the court need not reach the second question.

Instead of finding as a fact that the PRC imposed a tax, duty, or charge—of whatever character—in an amount equivalent to 8% of the FOB value of GTC's subject merchandise, Commerce applied a presumption that goods exported from China are subject to "irrecoverable VAT" in the amount of 8% of the FOB value of the exported good. *Final I&D Mem.* 30 ("Irrecoverable VAT is (1) the free-on-board value of the exported good, applied to the difference between (2) the standard VAT levy rate and (3) the VAT rebate rate applicable to exported goods."). A presumption is, of course, different than a finding of fact. Commerce neither found that China imposed a tax, duty, or other charge on GTC's subject merchandise in

an amount equivalent to 8% of the FOB value nor found that China had imposed on that merchandise a charge in any other specific amount.  Instead, it stated in the Final Issues and Decisions Memorandum a general finding that "under the PRC's VAT regime, . . . *some portion* of the input VAT that a company pays on purchases of inputs used in the production of exports is not refunded." *Id.* at 28 (emphasis added) (footnote omitted).  Later in the memorandum, Commerce further found that "[i]nformation placed on the record by both GTC and Double Coin indicates that according to the Chinese VAT schedule, the standard VAT levy is 17 percent and the rebate rate for subject merchandise is nine percent." *Final I&D Mem.* 29 (footnote omitted). Under the plain language of 19 U.S.C. § 1677a(c)(2)(B), these findings do not suffice.  They are not findings of an "amount" of a tax, duty, or other charge that was imposed by the exporting government in relation to GTC's exported merchandise.  Commerce next stated that "[f]or purposes of these final results, therefore, we removed from U.S. price the difference between the rates (*i.e.*, eight percent), which is the irrecoverable VAT as defined under PRC tax law and regulations." *Id.* (footnote omitted).  This also was insufficient as it is not a finding of any specific amount of a tax, duty, or other charge imposed in relation to GTC's subject exports. Having failed to reach a finding that § 1677a(c)(2)(B) required, Commerce had no statutory authority to make a deduction from GTC's EP and CEP starting prices.  Those deductions, therefore, were contrary to law and must be set aside.  Defendant, and Titan and the USW, put forth arguments to the contrary, but the court finds their arguments unpersuasive.  The court addresses their principal arguments below.

    After discussing record evidence consisting of GTC's responses to the Department's questionnaires on VAT, defendant argues that "Commerce properly relied on the information on the record, which demonstrated that the irrecoverable VAT for the subject merchandise was eight

percent." Def.'s Opp'n. 60. This argument is erroneous. Having failed to state the finding the

statute required as to GTC's subject merchandise, Commerce cannot be said to have relied on

record information "which demonstrated that the irrecoverable VAT *for the subject merchandise*

was eight percent." *Id.* (emphasis added). In the absence of the statutorily-required finding, the

decision to make the deductions from the EP and CEP starting prices cannot be sustained. The

court, therefore, need not reach the question of whether Commerce *could* have made such a

finding on the record before it. Without deciding that question, the court notes that Commerce

refused to consider certain record evidence probative on the question and, overall, failed to

provide an adequate explanation of the reasoning underlying its decision to make the 8%

deductions from the EP and CEP starting prices.

   Commerce concluded that under Chinese law irrecoverable VAT "is VAT paid on inputs

and raw materials (used in the production of exports) . . . ." *Final I&D Mem.* 28 (footnote

omitted). Commerce also concluded that under Chinese law "the standard VAT levy is

17 percent and the rebate rate for subject merchandise is nine percent." *Id.* at 29 (footnote

omitted). Commerce fails to explain how, in light of these two conclusions, a presumption of

GTC's having incurred an "irrecoverable VAT" charge in the amount of 8% of the value of the

subject exports could have been plausible. A simplified example illustrates this point. Based on

the Department's two conclusions about Chinese VAT, as stated above, a subject off-the-road

tire exported from China to the United States with an FOB export value of $100 (to take a round

number) would contain "inputs and raw materials" that were subject to VAT at the rate of 17%

applicable to those inputs and raw materials, and the exportation of the tire would have qualified

GTC for a VAT rebate of $9.00. In order for GTC to have incurred a "tax, duty, or other

charge," based on unrefunded VAT, of $8.00 (in accordance with the Department's presumption

that the irrecoverable VAT was 8% of export value), the actual VAT imposed on the "inputs and

raw materials" used in the production of the tire would have had to have been $17.00, i.e., the

$9.00 in refunded VAT plus the $8.00 in unrefunded VAT.  But for the VAT on the inputs and

raw materials to have been $17.00, those VAT-subject inputs and raw materials would have had

to have been valued at $100, which was the *entire FOB value of the exported tire*.  The FOB

export values could have included no other costs (for example, no cost of labor, no factory

overhead, no selling, general, administrative, or any other expenses), and no profit.  In other

words, the implication of the Department's presumption that GTC incurred a net VAT charge of

8% on the value of its subject exported tires is that the 17% standard VAT levy was applied to

the entire FOB export value of the tire, with 9% subsequently rebated (for a net VAT charge of

8% of the export value), and not merely to the VAT-subject inputs and raw materials used in

production.  This appears to be in contradiction with the Department's own conclusion that the

VAT was "paid on inputs and raw materials (used in the production of exports)."  *Id.* at 28.  The

Issues and Decision Memorandum offers no explanation to resolve this apparent contradiction.

Moreover, the record contains evidence consisting of GTC's responses to the

Department's VAT questionnaires that is probative on the issue of whether GTC possibly could

have incurred a net charge for VAT that was in an amount equivalent to 8% of the FOB value of

its subject merchandise.  This evidence included twelve monthly VAT tax returns (copies of

which GTC submitted to Commerce for the record), a calculation of the total VAT incurred on

production inputs, and an allocation of that amount to export sales on the basis of sales value.

*GTC's Supplemental VAT Questionnaire Response* 1-3 & Exhibits 2-3 (May 28, 2014), ECF

No. 45-1.  In the review, GTC informed Commerce that " . . . during the POR GTC's VAT

refund based upon the 9% refund rate for export sales exceeded the amount of VAT paid for

inputs attributable to exported merchandise." *Id.* at 3; *see* GTC's Br. 18. Commerce refused to consider this evidence because it concluded that GTC "did not provide the reconciliation" the Department requested, that the reconciliation it did provide "would result in an adjustment to irrecoverable VAT based on non-product specific data" and that "[f]or the calculation of irrecoverable VAT we will not consider allocations across all company sales or across products with different VAT schedules." *Final I&D Mem.* 30 (footnote omitted).

The record evidence indicates that the Department's refusal to consider GTC's submitted evidence was, at least in part, the result of the way that GTC maintained its VAT-related business records in the company's SAP accounting system.[17] In this regard, GTC points out that VAT was owed on domestic sales, not export sales, on which the VAT rate was zero. GTC's Reply 4-5. It argues that, consequently, its monthly VAT tax returns necessarily reflect VAT payments on domestic sales made each month and, as a result, "a reconciliation limited to subject

---

[17] Commerce stated as follows:

> In our questionnaires to Double Coin and GTC we asked that if the irrecoverable VAT amount reported is not directly derived as the difference between the VAT tax rate applicable to domestic purchases and inputs and the refund rate for export sales of subject merchandise, then they need to: 1) explain in detail why and provide worksheets demonstrating how to calculate the irrecoverable VAT; 2) reconcile the worksheets to the translated VAT tax returns provided and provide a detailed narrative explanation that describes the calculations shown in the worksheets; and 3) for each reconciling item reported in the worksheets, provide documentation and a citation to Chinese laws and regulations to fully support the reason for the reconciling item. However, the respondents did not provide this information, and the limited information they did provide would result in an adjustment to irrecoverable VAT based on non-product specific data. For the calculation of irrecoverable VAT we will not consider allocations across all company sales or across products with different VAT schedules.

*Final I&D Mem.* 30 (footnote omitted). Commerce rejected "GTC's assertion that it provided the exact type of reconciliation to its VAT tax returns that the Department requested" on the ground that the reconciliation was to GTC's tax returns and not its VAT tax returns. *Id.*

merchandise would not be possible"; it also argues that Commerce did not request such.  *Id.* at 8.
GTC disputes the Department's finding that GTC's allocation was over multiple products with
different VAT rates and asserts that, with the exception of certain natural rubber (for which GTC
alleges there was a lower VAT rate) the VAT rate for its domestic input purchases was 17%.
*Id.* at 7.  Also, GTC argues that the Department's refusal to consider GTC's VAT reconciliation
conflicted with 19 C.F.R. 351.401(g)(4) ("The Secretary will not reject an allocation method
solely because the method includes expenses incurred . . . with respect to sales of merchandise
that does not constitute subject merchandise.").  *Id.* at 8.

It is not necessary that the court accept or reject each of these various arguments as to
GTC's VAT reconciliation.  As the court concluded above, Commerce, contrary to the premise
of defendant's argument, relied on a presumption rather than an actual finding of fact that GTC
incurred a net VAT charge equivalent to 8% of the FOB value of its subject exports.  Had
Commerce made an actual finding, such a finding would have been subjected to judicial review
based on the record evidence viewed as a whole, including the evidence Commerce refused to
consider.

Defendant also argues that the Department's construction of 19 U.S.C. § 1677a(c)(2)(B)
warrants *Chevron* deference, Def.'s Opp'n. 53-57, and that "[n]either the statute nor the statute's
legislative history defines 'export tax, duty or other charge imposed' for purposes of this
provision," *id.* at 54.  This argument does not address the flaw the court has identified, i.e., the
absence of a finding that a charge, of any character, in an amount equal to 8% of export value
was imposed and was specific to GTC's subject merchandise.  That is why the court need not
reach the question of whether any unrefunded VAT charge that Commerce might have found to
have been incurred would have qualified as an "export" tax, duty, or other charge within the

meaning of the statute. The statute is not reasonably construed to allow Commerce to substitute a presumption for a finding required by the plain statutory language.

Titan and the USW argue that the statute is silent on how Commerce is to adjust EP and CEP prices for export duties, taxes, and other charges and, in particular, "is silent on how this adjustment should be applied to exports from a non-market economy." Resp. Br. of Titan and the USW (Dec. 7, 2015) 38, ECF No. 55 ("Titan's Opp'n"). According to Titan and the USW, having "examined the Chinese VAT system to determine how best to implement the statute and [having] reviewed GTC's VAT payments and refunds in this case," Commerce "has made a reasonable determination to apply a rate-based adjustment to U.S. prices for the Chinese government's imposition of irrecoverable VAT specifically to GTC's exports of subject merchandise." *Id.* This argument, too, is unpersuasive.

The presumptive "rate-based adjustment" to which Titan and the USW refer was contrary to the statute, under which a reduction from the starting price for EP or CEP must be in the *amount* of a tax, duty, or other charge imposed by the exporting country in relation to the subject merchandise. Their argument that the statute is silent on how the adjustment is applied to exports from a nonmarket economy country is unavailing because 19 U.S.C. § 1677a(c)(2)(B) makes no mention of nonmarket economy countries. Although the statute has an exception allowing normal value to be determined differently when the exports are from a nonmarket economy country, *see* 19 U.S.C. § 1677b(c), there is no parallel exception for export price or constructed export price, *see* 19 U.S.C. § 1677a(c)(2)(B). In other words, § 1677a(c)(2)(B) applies to a "tax, duty, or other charge imposed by the exporting country" without regard to whether or not that country is a nonmarket economy country. In either event, Commerce must base any deduction from the EP or CEP starting price on a finding of an amount of a tax, duty, or

other charge that is specific to the subject exported merchandise. Rather than do so, Commerce employed a general presumption based on a formula it gleaned from Chinese regulations.

Nor can the court conclude that Commerce has made, in Titan's and the USW's words, a "reasonable determination." The court has discussed certain flaws in the Final Issues and Decision Memorandum, including the lack of an essential finding of fact, but another flaw is the inconsistency in describing the effect of the Department's presumption. At certain points, the memorandum appears to treat the presumption as irrebuttable for any Chinese exporter, as is demonstrated by the following blanket statement:

> Irrecoverable VAT is (1) the free-on-board value of the exported good, applied to the difference between (2) the standard VAT levy rate and (3) the VAT rebate rate applicable to exported goods. The first variable, export value, is unique to each respondent and sale while the rates in (2) and (3), as well the formula for determining irrecoverable VAT, are each explicitly set forth in Chinese law and regulations.

*Final I&D Mem.* 30. This "formula for determining irrecoverable VAT" appears to leave no possibility for a Chinese exporter to rebut the presumption that it has incurred a net VAT cost equal to 8% of the value of the exported goods.[18] The Final Issues and Decision Memorandum also cites a 2012 issuance, *Methodological Change for Implementation of Section 772(c)(2)(B) of*

---

[18] As a source for the presumption and the formula, Commerce cited its own decision in *Prestressed Concrete Steel Rail Tie Wire from the People's Republic of China: Issues and Decision Memorandum for the Final Determination of Sales at Less Than Fair Value*, A-570-990, POI 12-13, 5, 9 n.35 (Apr. 28, 2014), *available at* http://enforcement.trade.gov/frn/summary/prc/2014-10240-1.pdf) (last visited Jan. 25, 2017). The decision cites a "Circular," Article III.3.4 of Circular 7, as setting forth the formula for calculating irrecoverable VAT on export sales as follows: "irrecoverable VAT = (FOB export value – bonded imports) * (standard VAT levy rate – VAT rebate applicable to exported goods)." The decision memorandum in the cited antidumping duty investigation is not substantial evidence establishing that China imposed a tax, duty, or fee *on GTC's exported merchandise* that amounted to 8% of the value of that merchandise.

*the Tariff Act of 1930, as Amended, In Certain Non-Market Economy Antidumping Proceedings*, 77 Fed. Reg. 36,481, 36,482-83 (June 19, 2012), in which Commerce announced a methodology by which it would begin making section 772(c)(2)(B) deductions from export price or constructed export price for goods exported from nonmarket economy countries, including China. In citing this issuance, the Final Issues and Decision Memorandum states that "[w]here the irrecoverable VAT is a fixed percentage of U.S. price, the Department explained [in the 2012 issuance] that the final step in arriving at a tax-neutral dumping comparison is to reduce the U.S. price downward by this same percentage." *Final I&D Mem.* 28. Elsewhere, the Issues and Decision Memorandum describes imposition of an 8% irrecoverable VAT tax as a presumption that a respondent can rebut. *Id.* at 29 (explaining that Commerce will "use the difference between the [17%] VAT rate and the [9%] refund rate, consistent with PRC regulations, unless the company can show otherwise for the subject merchandise").

In summary, Commerce substituted a presumption—whether rebuttable or irrebutable—for an actual finding. The Department's decision violated 19 U.S.C. § 1677a(c)(2)(B), which reduces an EP or CEP starting price by the amount of the tax, duty, or other charge that is found to have been imposed by the exporting country in relation to the subject exported merchandise, if included in that price. Any deduction made under § 1677a(c)(2)(B) is specific to the EP or CEP starting price. Generalized conclusions about China's VAT scheme do not suffice. Commerce may not reduce the starting price by a fixed percentage—no matter how derived—that is not the actual amount of a tax, duty, or other charge that the exporting country is found in fact to have imposed. Because Commerce, based on an impermissible construction of 19 U.S.C. § 1677a(c)(2)(B), did exactly that, the court rejects the arguments of defendant and of Titan and

the USW and cannot sustain upon judicial review the VAT deductions Commerce made from the starting prices for GTC's subject merchandise.

2. The Department's Selection of Financial Statements for Calculating Surrogate Financial Ratios Was Supported by Substantial Evidence

According to section 773(c)(1) of the Tariff Act, 19 U.S.C. § 1677b(c)(1), Commerce, as a general matter, is to determine the normal value of subject merchandise from a nonmarket economy country "on the basis of the value of the factors of production utilized in producing the merchandise," plus "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses." 19 U.S.C. § 1677b(c)(1). To implement the statutory directive to add amounts for "general expenses and profit," Commerce typically calculates surrogate values for factory overhead expenses, for selling, general & administrative ("SG&A") and interest expenses, and for profit, by calculating and applying "financial ratios" derived from the financial statements of one or more producers of comparable merchandise in the primary surrogate country. *See* 19 C.F.R. § 351.408(c)(4).

In selecting financial statements to calculate the surrogate financial ratios, the Department's policy is to use audited and complete statements, which are contemporaneous with the period of review, from one or more market economy producers of identical merchandise. *See Final I&D Mem.* 36; *Prelim. I&D Mem.* 17-18. In the fifth review, the petitioners placed on the record financial statements for two producers in Indonesia, the Department's chosen surrogate country, of merchandise identical to the subject merchandise: PT Gajah Tunggal Tbk ("Gajah Tunggal") and PT Goodyear Indonesia Tbk ("Goodyear"). *See Petitioners' 4th Surrogate Value Comments*, Attachments 3, 4 (Sept. 2, 2014), ECF Nos. 89-19, 89-20, 89-21. In the Preliminary Results, Commerce used both of these financial statements to calculate the surrogate financial

ratios.[19] *Preliminary Results Surrogate Value Mem.*, A-570-912, ARP 13-14 (Sept. 30, 2014), (Admin.R.Doc. No. 265) ECF No. 108-1 ("*Prelim. Surrogate Value Mem.*").

In the Final Results, Commerce decided to calculate the surrogate financial ratios using only the statements of Goodyear, concluding that "its audited financial statements are complete, contemporaneous with the POR, and include detailed expense lines for raw materials, manufacturing labor, manufacturing energy, and manufacturing overhead." *Final I&D Mem.* 36. Commerce decided not to use the Gajah Tunggal statements "because Gajah Tunggal's audited financial statements do not contain a line for manufacturing energy." *Id.* In the Preliminary Results, Commerce computed a cost of energy for Gajah Tunggal using the company's 2013 annual report, which was also on the record and which provided the company's cost of energy as a percentage of the total cost of production. *Id.* However, in the Final Results, Commerce determined that "there may be some inconsistency between Gajah Tunggal's annual report and its audited financial statements." *Id.* Accordingly, Commerce decided against using the Gajah Tunggal statements and calculated the surrogate financial ratios "only using Goodyear's complete, audited financial statements which break out all relevant manufacturing costs." *Id.*

GTC argues that Commerce erred in rejecting the Gajah Tunggal statements. *See* GTC's Br. 26. Specifically, GTC argues that "Commerce has a well-established preference for using multiple financial statements in its surrogate ratio calculations so that the resulting ratios provide a more accurate representation of the industry as a whole rather than a single company." *Id.* GTC also argues that there was record evidence that could be used to calculate Gajah Tunggal's

[19] From these two financial statements, Commerce calculated separate factory overhead expenses, SG&A and interest, and profit ratios for each company and then averaged those ratios to derive a single set of financial ratios.

energy costs, namely the company's 2013 annual report, and the Department's determination that

the annual report was unreliable is unsupported by substantial evidence. *Id.* at 27. Finally, GTC

argues that Commerce could have taken notice of Gajah Tunggal's revised 2013 financial

statements, which do contain a line item for energy costs. *Id.* at 28-30. The revised 2013

financial statements were not on the record in this review but were on the record in another

antidumping proceeding. *Id.*

　　　The court rejects GTC's arguments. The Department has a statutory obligation to

calculate surrogate values using the best available information, *see* 19 U.S.C. § 1677b(c)(1), but

the statute also "accords Commerce wide discretion in the valuation of factors of production."

*Shakeproof Assembly Components v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001)

(quoting *Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999)). The

Department exercised its discretion in deciding that the Goodyear financial statements were the

best available information on the record for calculating surrogate financial ratios.

　　　Commerce acted within its discretion in deciding against the Gajah Tunggal financial

statements because of the lack of a breakdown for energy costs. While Commerce adjusted for

this deficiency in the Preliminary Results using information from the company's annual report, it

was under no obligation to do so in the Final Results. Nor was Commerce under an obligation to

take steps allowing it to use Gajah Tunggal's revised 2013 financial statements, which were not

on the record in this review, when it had a complete, audited, and contemporaneous set of

financial statements from Goodyear on the record. As to the use of only the Goodyear

statements, Commerce permissibly balanced the advantage of using financial statements of two

companies with the advantage of ensuring consistent reporting of the various costs. Upon

judicial review, it is not the role of the court to disturb the valid exercise of an agency's

discretion where it discerns no error in fact or law. Therefore, the court sustains the Department's determination to reject the Gajah Tunggal statements and calculate the surrogate financial ratios using only the Goodyear financial statements.

3. The Department's Choice of Surrogate Data for Coal Was Supported by Substantial Evidence

Commerce applied a surrogate value of $0.15/kg. for steam coal, which GTC used to manufacture the subject merchandise, which value Commerce calculated from Global Trade Atlas ("GTA") import data for "Bituminous Coal, Not Agglomerated" from Indonesia, Harmonized System subheading 2701.12. *Prelim. Surrogate Value Mem.* 12. In making this calculation, Commerce excluded imports of coal originating in nonmarket economy countries, unspecified countries, and the countries Commerce considered to maintain non-specific export subsidies, which were India, Indonesia, South Korea, and Thailand. *Id.* GTC claims that the Department's finding that the Indonesian import data were the best available data on the record for valuing steam coal was not supported by substantial evidence. Based on its review of the record evidence available to support that finding, the court declines to grant relief on this claim.

"Congress has vested Commerce with considerable discretion in selecting the 'best available information' for use in valuing factors of production." *Allied Pacific Food (Dalian) Co. Ltd. v. United States*, 32 CIT 1328, 1342, 587 F. Supp. 2d 1330, 1339 (2008) (citing *Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999)). Commerce stated for the Final Results that "[w]hen selecting SVs [i.e., surrogate values] for use in an NME proceeding, the Department's preference is to use, where possible, a range of publicly available, non-export, tax-exclusive, and product-specific prices for the POR, with each of these factors applied non-hierarchically to the case-specific facts and with preference to data from a single surrogate country." *Final I&D Mem.* 38 (footnote omitted).

Commerce chose Indonesia as the surrogate country for valuation of factors of production, a decision GTC does not contest. The record contained two possible sources of Indonesian data for valuing coal: the Global Trade Atlas import data and the price indices published by Argus Coalindo, a source of information on prices for Indonesian coal. *See Final I&D Mem.* 37-39. Commerce determined the Global Trade Atlas data superior to the Argus Coalindo data, concluding that "the GTA data represent actual prices of coal purchases in Indonesia" whereas the Argus Coalindo data represent prices on the international spot market "and thus do not accurately represent the price of coal bought or sold in Indonesia." *Id.* at 38. Commerce added that "[b]ecause the Argus Coalindo data is for export prices paid for Indonesian coal, GTA data is a better, more specific, source to value coal inputs and fulfills the Department's standard SV criteria (non-export, broad-market, *etc*.)." *Id.*

GTC makes three arguments in claiming that the Department's selection of the Global Trade Atlas import data as the best available information was unlawful. GTC argues, first, that the Department's finding that the Argus Coalindo data reflect only export prices is unsupported by record evidence. GTC's Br. 39. Second, GTC argues that Commerce should have found that the Argus Coalindo data are more specific to the input than are the import data and that Commerce "did not have a valid basis for rejecting the Argus/Coalindo price data" when it found insufficient certain "testing slips" for coal samples that GTC submitted for the record to show the heat values of the coal it used. *Id.* at 42. Finally, GTC argues that Commerce incorrectly rejected the Argus Coalindo data on the ground that GTC did not "corroborate the ash and sulfur levels with those specified in the Argus Coalindo or Platts Coal Pricing Methodologies sources." *Id.* at 43 (citing *Final I&D Mem.* 38-39).

GTC bases its first argument, i.e., that Commerce incorrectly found the Argus Coalindo data to be based solely on export data, on record evidence that the Argus Coalindo data are derived from two separate services, Argus and Coalindo.  According to GTC, the Department's conclusion regarding prices for Indonesian coal traded on the international spot market "refers only to the Argus data collection methodology; it has nothing to do with the Coalindo data collection methodology," which GTC describes as having been founded to develop specialist pricing services for the Indonesian coal markets and as deriving prices using panels comprised of Indonesian coal producers, consumers and traders.  *Id.* at 39-40.  GTC also argues that according to the record information on Argus Coalindo, the prices are for deliveries on an FOB Kalimantan basis, apply as much "to a coal buyer (or trader) located in Indonesia as one located elsewhere," and, therefore, should not be considered prices for export only.  *Id.* at 40.

It is possible to interpret the Department's finding that "the Argus Coalindo data is for export prices paid for Indonesian coal," as GTC does, to mean that the data are derived *entirely* from export prices.  However, it also is possible to interpret the finding as meaning that the data are derived only partly from export prices.  But even if the court were to interpret the statement of the finding as GTC does, the court would not conclude that the choice of the Global Trade Atlas import data was not based on substantial evidence.  Regarding export prices, the Department's criterion is that surrogate values be "non-export average values," *Prelim. Surrogate Value Mem.*, i.e., averages that are exclusive of export prices.  *See also Final I&D Mem.* 38 ("non-export . . . prices").  Regardless of how the finding is interpreted, the Argus Coalindo data, according to record evidence, did not satisfy the criterion.  Commerce cited the "Argus Coalindo Methodology and Specifications Guide," which describes the Argus data collection team as consisting of "specialist market reporters/analysts in Singapore, Beijing,

Tokyo, Sydney, London, Moscow, Washington, Johannesburg and Bogota, drawing on Argus' global network of energy correspondents." *Final I&D Mem.* 38 n.135 (citing *GTC's Second Surrogate Value Submission*, Exhibit 5 (Sept. 2, 2014), ECF No. 89-29). The guide goes on to state:

> The market reporters/analysts ask market participants in the survey whether they have bought or sold any Indonesian coal, whether they have heard of any trade in Indonesian coal, and whether they have received or made any bids or offers for Indonesian coal. The participants are asked where they see the level of prices for Indonesian coal traded on the international spot market.

*GTC's Second Surrogate Value Submission*, Exhibit 5 (Sept. 2, 2014), ECF No. 89-29. The record evidence supports a finding that the Argus Coalindo database is at least derived in some way from prices on the international spot market. Commerce validly could conclude on the basis of this evidence that export prices influenced the prices in that database. Commerce also determined that Indonesia maintains non-specific export subsidies, *Prelim. Surrogate Value Mem.* 12, a determination GTC does not contest. Seeking to use price data derived solely from the Indonesian market and avoid data on prices of coal exported from Indonesia to other markets, the Department permissibly concluded that its "non-export" criterion had not been satisfied.

For its second argument, GTC maintains that Commerce should have found that the Argus Coalindo data to be more specific to the input it consumed in producing the subject merchandise. *See* GTC's Br. 35-38. Specifically, GTC argues that "Commerce has *repeatedly recognized* a preference for published sources that provide values specific to the coal input used by respondents (particularly with respect to useful heat values ('UHV')), and it has repeatedly relied on such sources instead of the less-specific import price data." *Id.* at 36 (emphasis in original; citations omitted). GTC argues, further, that it "provided the Department with ample evidence of the specific UHV ranges for the coal it uses in the production of subject

merchandise, including a summary of characteristics (including UHV) for 48 of GTC's coal

testing reports." *Id.* at 38. According to GTC, "[u]sing this information in conjunction with the

Argus/Coalindo pricing data, Commerce had the ability to assign a surrogate value for coal

specific to the heat value of the actual coal input used by GTC." *Id.*

      The court does not agree with GTC that Commerce was *required* by the record data or its

past decisions to choose the Argus Coalindo data based on specificity to the input. Commerce

concluded that "there is insufficient record data to establish consistent heat values for GTC's

coal during the POR (*i.e.*, GTC provided only a handful of coal testing slips with heat values that

vary quite widely)." *Final I&D Mem.* 38. The finding that the submitted testing results vary

widely is supported by the record evidence, which shows, for both the minimum and the

maximum heat values in the samples, that the highest value is considerably higher than the

lowest value. *See GTC's Supplemental Section C&D Responses*, Exhibit SD-8 (Conf.)

(June 17, 2014), ECF No. 45-3. Referring to a simple average of the minimum and maximum

heat values in its coal testing slips, respectively, GTC states that "[u]sing the summary sheet [i.e.,

for its testing reports] and underlying coal test reports to calculate a simple average, it is evident

that the UHV for GTC's coal is in the 4748-4996 Kcal/Kg range." GTC's Br. 41. But the two

simple averages do not demonstrate that the heat values consistently were in a narrow range, and

according to the record data, they were not.

      Further to its argument on useful heat values, GTC argues that Commerce had an

obligation under 19 U.S.C. § 1677m(d) to inform GTC that its heat value data were deficient and

provide GTC the opportunity to remedy or explain the deficiency. GTC's Br. 41-42. This

argument is unconvincing. Commerce never found the heat value data "deficient" for purposes

of § 1677m(d). Had it done so, it would have been required to give GTC the opportunity to

remedy or explain before using substitute information, i.e., "facts otherwise available," or an "adverse inference," according to 19 U.S.C. § 1677e; here, Commerce did not invoke that authority and simply used other available record evidence to make its determination. Commerce was not obligated by § 1677m(d) to inform GTC that ultimately it would consider the GTC's submitted heat value data insufficiently probative on the issue for which GTC offered it and, on that ground, disagree with GTC's argument that the Argus Coalindo data should be preferred to the import data.

GTC's third argument takes issue with the Department's statement in the Final Issues and Decision Memorandum that "[t]hough GTC did provide a limited selection of coal testing slips with heat values, GTC made no effort to corroborate its ash and sulfur levels with those specified in the Argus Coalindo or Platts Coal Pricing Methodologies sources." *Id.* at 43 (citing *Final I&D Mem.* 38-39). GTC argues that "[t]his reasoning must be rejected" because Commerce, in past cases in which it valued coal, did not raise the same objection as to ash and sulfur levels and in this case "fails to cite a *single instance* in which it rejected coal prices specific by heat value because the record lacked information regarding sulfur or ash content." *Id.* at 43. GTC adds that "to say that UHV is not a key component for categorizing GTC's coal runs counter to the Department's own practice." *Id.* It also asserts that Platts Coal Pricing Methodologies is another information service unrelated to Argus Coalindo and that the importance of heat values is shown by the Argus Coalindo data because "while Argus/Coalindo does reference sulfur and ash content in its specifications, the pricing data is provided by grade with specific reference to heat value alone." *Id.* at 44. GTC then reasserts, as to the ash and sulfur issue it raises, its unconvincing argument that "if Commerce believed that there was a deficiency with respect to this information, it had an obligation to notify GTC and provide GTC with an opportunity to

provide such information." *Id.* GTC adds that "[i]t is undisputed that GTA import data fails to

provide prices specific to heat values, *or* sulfur and ash content, whereas it is clear that the

Argus/Coalindo prices are specific to heat values." *Id.* (emphasis in original),

      The court is unconvinced by GTC's third argument. Neither the record data on sulfur and

ash content, nor the Department's comments on those data, are sufficient to cause the court to

disallow as unsupported by record evidence the finding that the Global Trade Atlas import data

were the best available information for valuing GTC's coal input. Commerce did not conclude

that heat value information was unimportant as to the issue of specificity. Nevertheless, given

the limitation posed by the significant variation in the heat value test data GTC submitted,

Commerce was justified by the record evidence in rejecting GTC's argument, as made during the

review, that the Argus Coalindo must be preferred to the Global Trade Atlas import data because

of specificity to the input. GTC summarizes its arguments by asserting that "the record

demonstrates that the Argus/Coalindo data satisfy the Department's surrogate value criteria and

are more product specific than any other source available on the record," *id.* at 45, but this

argument ignores that the Argus Coalindo data, according to record data, did not meet the

Department's criterion that the data it uses be based on averages that are exclusive of export

prices. Commerce was justified in finding the heat value data GTC submitted insufficiently

probative on the question of specificity to the input when weighed against the record data

showing that the Argus Coalindo data were not exclusive of data derived from prices for coal

exported from Indonesia.

      For the foregoing reasons, the court does not grant relief on GTC's claim challenging the

steam coal surrogate value.

    4.  The Department's Finding that its Calculations of GTC's Brokerage & Handling and Ocean Freight Costs Were Free of Double-Counting Is Not Supported by Substantial Evidence

    Under section 772(c)(2) of the Tariff Act, 19 U.S.C. § 1677a(c)(2), Commerce is to reduce constructed export price by "the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, and United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States."  19 U.S.C. § 1677a(c)(2)(A).  Among the Department's deductions from the CEP starting prices were surrogate amounts representing the nonmarket economy cost incurred in China for export brokerage and handling ("B&H") and the nonmarket economy cost of trans-Pacific ocean freight from China to the United States.  *See Prelim. I&D Mem.* 23.  GTC claims that the deductions Commerce made in these two categories were improper because they double-counted certain costs.  GTC's Br. 47-51.

    Commerce valued the trans-Pacific ocean freight using price quotes submitted by GTC and obtained from a website listing ocean freight costs, http://rates.descartes.com.  *Prelim. Surrogate Value Mem.* 15.  Commerce valued export brokerage and handling using information in a report published in 2013 by the World Bank as *Doing Business 2014: Indonesia*, "Trading Across Borders Indicators."  *Id.* at 16.  From the World Bank publication, Commerce used prices for what it described as "a price list of export procedures necessary to export a standardized cargo of goods from Indonesia."  *Prelim I&D Mem.* 27.  Commerce concluded that there was no double-counting between the two data sources, noting that "*Doing Business* states that its trading-across-borders methodology measures the 'cost necessary to complete every official

procedure for exporting and importing' a 'standardized cargo of goods by seaport,' but not the 'cost for sea transport' itself." *Final I&D Mem.* 44 (footnotes omitted).[20]

The price list Commerce assembled from the data in *Doing Business 2014: Indonesia* consisted of the following three costs: "Documents preparation" at "$165"; "Customs clearance and technical control" at "$125"; and "Ports and terminal handling" at "$165." *Doing Business 2014: Indonesia* 81. Commerce divided the total of the three costs, $455, by the weight of the "standardized cargo of goods from Indonesia," which, based on information concerning the Trading Across Borders methodology provided by Titan and the USW, it determined to be 10,000 kilograms, to calculate "a cost of 0.0455 USD per kilogram in brokerage and handling fees for goods exported from Indonesia," its chosen surrogate country. *Id.* at 16. GTC does not contest the Department's method of calculation *per se*; its claim, instead, is that several cost elements included in the Descartes ocean freight price quotes are also included in the brokerage and handling costs Commerce derived from the *Doing Business* report.

As double-counted costs, GTC points to the following "'Documentation Charges,' 'Traffic Metigation [sic] fee,' 'AMS Charge,' 'Clean Truck Fee,' 'Chassis Usage Charges,' 'Shanghai Port Charges,' 'International Ship & Port Security charges,' and 'ISD Handling Charge.'" GTC's Br. 49. These items are listed separately in one or more of the Descartes quotes. On each quote, separate from these items, is a cost item for "Ocean Freight." GTC Mot. Appx. Part 3, Document 7, Exhibit 9, ECF No. 45-3 ("Descartes quotes").

---

[20] Although *Doing Business* included costs for both exporting out of Indonesia, and importing into Indonesia, a standard fully loaded cargo container, Commerce used only the charges listed therein for exporting.

Commerce stated in the Preliminary Surrogate Value Memorandum that "[w]e did not exclude any ocean freight handling costs" from the Descartes quotes "as they appeared to be necessary for the shipment of freight and did not appear to have been covered by other brokerage and handling calculations." *Prelim. Surrogate Value Mem.* 15. Commerce also stated in the Final Decision Memorandum that "[t]he surcharges on the Descartes quotes do not appear to overlap with the B&H charge related to exporting, but simply appear to be additional fees imposed by the ocean freight company in order to transport the merchandise from the Chinese port of origin to the U.S. destination port." *Final I&D Mem.* 44.

Upon examining the record evidence consisting of the *Doing Business 2014: Indonesia* report and the documentation showing the Descartes quotes, the court cannot sustain the Department's finding that there was no double counting in the Department's use of the two data sources. The court does not decide that each of the charges identified by GTC necessarily was double counted, but it notes that Commerce stated its finding of no double-counting only generally and not specifically as to each of the charges in the Descartes quotes that GTC identified during the review and to which it now directs the court's attention. Commerce, therefore, did not address the specific question of whether certain charges in the Descartes quotes overlap those in the *Doing Business* report. As an example, one of the three cost elements in the Department's calculation of the $455 brokerage and handling cost from that report is "Documents preparation" at $165. Commerce did not address the specific question of whether this charge overlapped with the item identified on certain of the Descartes quotes as "Documentation Charges" of $45 and the item listed on one of the quotes as "Doc. Handling Charges" of $60. As another example, Commerce also included in the $455 total a charge for "Ports and terminal handling" at $165. Commerce does not explain its reasoning for its apparent

conclusion that this had no overlap with "Shanghai Port Charges" of $66, which is listed on one

of the Descartes quotes.  Because the Department's finding that no double-counting occurred is

not supported by substantial evidence, the court must remand the Department's decisions as to

deductions from CEP for brokerage and handling, and for ocean freight, for reconsideration.  In

reconsidering these decisions, Commerce should address specifically each of the charges in the

Descartes quotes that GTC identifies as charges that overlap with the charges Commerce

obtained from the *Doing Business* report.

5.  The Department's Decision Not to Make a Cost-of-Living Adjustment to the Surrogate Value
    for Domestic Warehouse Costs Was Unsupported by Substantial Evidence

GTC challenges the Department's surrogate valuation of domestic (Chinese) warehouse

costs.  In the Preliminary and Final Results, Commerce calculated a surrogate value for domestic

warehouse costs using a publicly available price quote from GIC Logistics Group, an Indonesian

warehousing and logistics provider.  *Prelim. I&D Mem.* 29; *Final I&D Mem.* 45.  Because they

are not considered publicly available, Commerce prefers not to use price quotes, but "[w]hen

there are no better alternatives, . . . Commerce may use price quotes." *Vinh Quang Fisheries

Corp. v. United States*, 33 CIT 1277, 637 F. Supp. 2d 1352, 1358 (2009).  In this case, the price

quote Commerce used was the only evidence for valuing domestic warehouse costs that was

submitted for the record.  *See Final I&D Mem.* 45.

GTC is not arguing that Commerce should have refrained from using the price quote,

only that Commerce should have adjusted it for inflation so as to make it contemporaneous with

the period of review.  GTC argues that the date given for the price quote used to value domestic

warehouse costs was April 9, 2014 and that because that date was more than seven months after

the end of the period of review on August 31, 2013, Commerce should have deflated it using the

Producers Price Index (PPI) to make it contemporaneous with the period of review.  *See* GTC's

Br. 51.  GTC argues further that "Commerce's view that the cost for warehousing during the

POR may have been the same as the cost reflected in the April 2014 price quote is nothing more

than unfounded conjecture" and "[i]t is improper for Commerce to base its decisions on such

speculation rather than actual record evidence." *Id.* at 53.

Commerce regards contemporaneousness with the POR as important to its ensuring it is

valuing factors of production as accurately as possible.  *See Jinan Yipin Corp. Ltd. v. United

States*, 35 CIT __, 800 F. Supp. 2d 1226, 1292 n.76 (2011).  The price quote itself is undated, but

the website from which the quote originated was accessed on April 9, 2014.  *See Petitioner's

Initial Surrogate Value Comments*, Attachment 18 (Apr. 14, 2014), ECF No. 86-43.  The date the

site was accessed is not itself contemporaneous with the period of review, which began on

September 1, 2012 (19 months before the date the site was accessed) and ended on August 31,

2013 (7 months before that date).  In the Preliminary Surrogate Value Memorandum, Commerce

stated that "[w]e did not inflate [*sic*]" the value calculated for domestic warehouse costs

"because it is contemporaneous with the POR." *Prelim. Surrogate Value Mem.* 15.  In the Final

Results, Commerce justified its decision not to deflate the surrogate value for domestic

warehouse costs on the ground that "there is no indication that the quoted price was not in effect

during the POR and no party provided a better source of data for the warehouse cost." *Final

I&D Mem.* 45.

"[I]t is not sufficient for Commerce to simply rely on the absence of evidence to reach its

decision." *Shandong Huarong Machinery Co. v. United States*, 29 CIT 484, 498 (2005).

Commerce does not explain whether, or why, its decision not to adjust the surrogate value for

inflation should be considered to have produced a more accurate margin.  For example,

Commerce offers no discussion of evidence on price trends in Indonesia during the period in question as context for its decision, or on whether the record even contained such evidence. Without deciding the question of whether Commerce should have deflated the value according to the date the site was accessed, a date that was of limited probativity on the question of contemporaneity with the POR, the court directs Commerce to reconsider its decision not to make a cost-of-living adjustment and provide a more thorough analysis of the issue that is grounded in whatever relevant evidence exists on the record.

E. The Remaining Claims of Titan and the USW

1. Commerce Did Not Err in Finding that Double Coin Complied with Its Instruction to Revise the Reporting of Freight Distances for Materials

Titan and the USW argue that Double Coin failed to comply with the Department's instruction for submitting corrected reporting of the travel distances for manufacturing inputs, which Commerce used in the calculation of surrogate freight expenses as a component of the determination of the normal value of Double Coin's merchandise. They claim the Department's finding that Double Coin's revised reporting complied with the Department's instruction was not supported by substantial evidence on the record. Titan's Br. 24-25. The court denies relief on this claim.

In calculating normal value for the subject merchandise of GTC and Double Coin, Commerce added surrogate freight costs to the surrogate values for Double Coin's materials inputs so that these prices would represent prices as delivered to the point of tire manufacturing. *See Prelim. I&D Mem.* 25. Commerce calculated these freight expenses by applying to the reported distances an Indonesian surrogate value for the cost of freight. In doing so, Commerce applied what it described as its *"Sigma"* methodology, which involves "assuming the input price is equal between different suppliers and a respondent will select the preferred supplier based

upon minimizing freight costs."[21] Def.'s Opp'n 47 (citing *Amended Final Results of Redeterm. Pursuant to Court Remand, Sigma Corp. v. United States*, Consol. Court Nos. 91-02-00154, 92-04-00283 (Jan. 30, 1998)). As explained by defendant, the Department's practice of calculating surrogate domestic inland freight costs is to use the shorter of: (1) the distance from the respondent's domestic supplier to the respondent's production facility; or (2) the distance from the nearest ocean port to the respondent's production facility, which Commerce calls the "*Sigma* cap distance." Def.'s Opp'n 46-47, 77. In explaining its methodology in the fifth review, Commerce stated that "[i]f there are multiple suppliers for one input, the Department caps the distance for each supplier before calculating a weighted-average distance for purchases of that input." *Prelim. Surrogate Value Mem.* 14.

The issue underlying Titan's and the USW's claim arose because "at verification, the Department observed and Double Coin acknowledged that the sub-*Sigma* cap distances reported for certain suppliers corresponded to trading companies from which certain inputs were purchased and not the actual producer/supplier of that input." *Letter from Dep't Commerce to Curtis, Mallet-Prevost, Colt & Mosle LLP re: Request for Revised FOP and U.S. Sales Databases* 1 (Sept. 16, 2014) (Admin.R.Doc. No. 253), ECF No. 89-42 (*"Commerce Letter"*). Commerce instructed as follows: "Accordingly, please re-report the supplier distances for all uncapped sub-*Sigma* suppliers to the *Sigma*-capped distance, as appropriate." *Id.*

In their brief, Titan and the USW state that "[i]n the *Final Results*, Commerce agreed that Double Coin had not shown that it had revised the distances in its database as instructed, but

[21] In *Sigma Corp. v. United States*, the Court of Appeals for the Federal Circuit employed a presumption that a nonmarket economy producer would seek inputs with lower freight costs when deciding between domestically-produced and imported inputs. 117 F.3d at 1408.

stated that Commerce's 'review of the changes. . . demonstrate{d} that the requested changes were properly reported.'" Titan's Br. 13 (quoting *Final I&D Mem.* 49). Titan's and the USW's statement informing the court that "Commerce agreed that Double Coin had not shown that it had revised the distances in its database as instructed" does not accurately characterize the record. The relevant statements in the Final Issues and Decision Memorandum are as follows:

> We note that Double Coin certified that it made all requested corrections in its Post-Verification Corrections submission and further confirmed that it capped the underlying line item distances at the distance to the port for the trading companies (rather than the distance to the trading companies), as requested. Though Double Coin's resubmission did not include the underlying worksheets demonstrating the change for every supplier (nor was such information requested), our review of the changes to the overall distances reported for each input between the most recent factors of production ("FOP") database and the preceding database demonstrate that the requested changes were properly reported.

*Final I&D Mem.* 49. The Final Issues and Decision Memorandum does not indicate the Department's agreement with the notion that Double Coin had not shown it had revised the freight distances as Commerce had instructed. Any reasonable inference that can be drawn is to the contrary.

In the statement of facts in their Rule 56.2 brief, Titan and the USW state that "[p]er Commerce's instructions, the freight distance for each of Double Coin's FOPs should have been calculated as the weight-averaged *Sigma* distances." Titan's Br. 10. They later repeat this alleged fact in their argument, stating that "[a]s discussed above, Commerce instructed Double Coin to report all its freight distances using the capped *Sigma* distances once it discovered that Double Coin had misreported the freight distances." Titan's Br. 24. The court does not accept this allegation as the uncontested fact Titan and the USW allege it to be. The Department's instruction was that Double Coin "re-report the supplier distances for all uncapped sub-*Sigma* suppliers to the *Sigma*-capped distance, *as appropriate*." *Commerce Letter* 1. Although this

sentence can be interpreted to mean, as Titan and the USW do, that Commerce wanted Double

Coin to re-report all of its freight distances to the *Sigma*-capped distance, i.e., the distance from

the nearest port to the tire plant rather than the distance from the material supplier to the tire

plant, several considerations caution against acceptance of Titan's and the USW's interpretation.

The first consideration is the language Commerce used in the instruction.  In addition to the

words "as appropriate," the previous sentence suggests a more limited context: "at verification,

the Department observed and Double Coin acknowledged that the sub-*Sigma* distances reported

for certain suppliers corresponded to trading companies from which certain inputs were

purchased and not the actual producer/supplier of that input."  *Id.*

Second, the problem Commerce identified involved distances from trading companies.

Therefore, it is not clear to the court why Commerce would have required Double Coin to use the

distance between the tire plant and the port in all cases, even if there was a shorter distance from

the tire factory to a material supplier that was *not* a trading company.  Had Commerce done so, it

would have imposed a requirement that would have departed from its established *Sigma*-derived

practice of using the shorter of the two distances.

Finally, Commerce itself was in the best position to interpret its instruction (as well as

whether Double Coin complied with it), and Commerce did not interpret the instruction as Titan

and the USW do.  Commerce stated in the Final Issues and Decision Memorandum that Double

Coin "confirmed that it capped the underlying line item distances at the distance to the port for

the trading companies (rather than the distance to the trading companies), as requested."  *Final

I&D Mem.* 49 ("our review of the changes to the overall distances reported for each input

between the most recent factors of production ('FOP') database and the preceding database

demonstrate that the requested changes were properly reported.").

Titan and the USW include in the fact section of their brief a recalculation of Double

Coin's freight distances in which they attempt to demonstrate that Double Coin did not follow

the Department's instructions and continued to misreport the freight distances. Titan's Br.

12-13. Their recalculation, however, is based on their own interpretation of the Department's

instructions. *Id.* at 10.

In summary, the court finds no error in the Department's determination that Double Coin

complied with the instructions Commerce issued to obtain a re-reporting of Double Coin's

freight distance data base.

 2.  The Court Denies Relief on Titan's and the USW's Claim Contesting the Inventory Carrying
Cost Deduction for Sales by CMA

Because Double Coin's U.S. sales were made to an affiliated entity, CMA, Commerce

calculated CEP based on the first sale from CMA to an unaffiliated customer, as provided under

19 U.S.C. § 1677a(b). Commerce adjusted the CEP starting prices for expenses related to

commercial activity in the United States, including inventory carrying costs, as provided under

19 U.S.C. § 1677a(d)(1). Titan and the USW claim that Commerce acted contrary to the record

evidence in accepting Double Coin's and CMA's method of estimating time in inventory for

purposes of calculating the inventory carrying cost deduction. Titan's Br. 3. According to their

argument, "[t]he record showed that Double Coin's methodology produced an inaccurate and

severe under-counting of time spent in inventory." *Id.*

In the Final Issues and Decision Memorandum, Commerce concluded that "[b]ecause

CMA does not track the movement of individual tires into its warehouse, the inventory carrying

cost calculation must necessarily rely on an estimate of average days in inventory." *Final I&D

Mem.* 55. Commerce explained, further, that CMA "does not track individual tires to a specific

shipment into their warehouses, and the accounting for warehouse inventory only tracks the quantity of a given product in and out of inventory." *Id.* at 56 (footnote omitted). Commerce also stated:

> Because they do not know when the first shipment of a tire that has gone out for sale came in, Double Coin utilized a last-in-first-out ("LIFO") method to estimate average days in inventory for reporting its inventory carrying costs because company officials know exactly when a tire went out for sale and exactly when the last instance of that type of tire came in to the warehouse.

*Id.* Commerce found, further, that "[a]s support for this method, CMA provided and Department officials reviewed documentation demonstrating that, for certain models of their larger selling tires, the inventory is moving out of inventory at a quicker pace than it is replaced." *Id.* (footnote omitted).

Commerce stated for the Final Results that "we previously found that the methodology used by Double Coin to determine average days in inventory is acceptable and verified that the relevant information was properly reported." *Id.* Commerce further stated that "we continue to find Double Coin's reported inventory carrying costs, based on CMA's LIFO method of estimating average days in inventory, to be acceptable and appropriate for use in these final results." *Id.*

During the fifth review, the petitioners, Titan and the USW, argued to Commerce that according to what they termed a "typical" methodology for determining time in inventory, the average time in inventory should have been calculated as 290.6 days. *Id.* at 55. Commerce described the methodology favored as "typical" by Titan and the USW as "computing a ratio of the average inventory value during the POR to the total sales during the POR and then applying that ratio to the number of days in a year." *Id.* Titan and the USW argued to Commerce that this estimate is supported by record evidence and that the estimate resulting from the LIFO

methodology reported by Double Coin, which according to Titan and the USW "results in an average of 13.5 days in inventory for each tire sold," was not. *Id*. Commerce rejected this position in the Final Results, concluding, *inter alia*, that "Petitioners provide no evidence or argument to support their contention that their calculation is more accurate or otherwise representative of Double Coin's commercial reality." *Id.* at 56. Commerce concluded, further, that the calculation offered by Titan and the USW "is based on total sales and inventory values for all products[,] both subject and nonsubject." *Id*. Titan and the USW make the same argument before the court. Titan's Br. 25 ("As has been explained, using the commonly accepted method of calculating average time in inventory based on average inventory levels and total sales during the period, the average time Double Coin's products spent in inventory was 290.6 days, over 21 times the 13.5 day average period submitted by Double Coin.") (citing *Final I&D Mem.* 55-56).

Because neither the statute, 19 U.S.C. § 1677a(d)(1), nor the regulations specify a method for calculating inventory carrying costs, the court reviews the Department's decision to accept CMA's method of estimating average time in inventory according to an abuse of discretion standard. That decision was supported by the finding that CMA's method was directed to subject merchandise while the suggested alternative considered all CMA merchandise, a finding Titan and the USW do not contest. The decision to choose CMA's method over the suggested alternative was also supported by the uncontested finding that "CMA provided and Department officials reviewed documentation demonstrating that, for certain models of their larger selling tires, the inventory is moving out of inventory at a quicker pace than it is replaced." *Final I&D Mem.* 56 (footnote omitted). Commerce grounded its decision in an explanation of its findings

and its reasoning. The court concludes that Commerce acted within its discretion in adopting the CMA method rather than the only alternative Titan and the USW put forth.

3. The Court Denies Relief on Titan's and the USW's Claim that Commerce Miscalculated the Freight Expenses for GTC

Titan and the USW challenge the Department's calculation of surrogate freight costs for GTC's material inputs. They argue that Commerce erred in using as its cap on freight distance the *"Sigma"* distance, i.e., the distance from the tire plant to the nearest port, rather than the distance to a port GTC used in importing its market-economy ("ME") purchases of materials. Titan's Br. 27. According to their argument, the Department's decision was not supported by substantial evidence because "Commerce recognized that the record showed that GTC did not in fact use the nearest port for imports." *Id.* They argue, further, that Commerce "used the nearest port as the *Sigma* cap distance because it was its practice to make this presumption, which presumption Commerce argues was directed by the Federal Circuit in *Sigma*." *Id.* They argue that the Court of Appeals "did not direct this particular outcome" in *Sigma*, which in their view did not direct Commerce "to apply a particular method" but "only directed Commerce to consider how a producer would act in sourcing inputs." *Id.* at 27-28.

In the Preliminary and Final Results, Commerce "used GTC's reported distance from the factory to the closest commercial port (*i.e.*, the Port of Fengcheng, at 710 km) as the *Sigma* cap distance." *Final I&D Mem.* 47. Commerce determined that "[t]he record also demonstrates that GTC's ME input purchases and finished goods exports predominantly transit through a different port (or ports), which is (are) at a greater distance from GTC's factory." *Id.*

In support of their claim, Titan and the USW summarize their arguments by asserting that "Commerce's reliance on its practice as an irrebuttable presumption was not directed by the

Federal Circuit, is contrary to substantial evidence on the record, and is otherwise not in accordance with the law." Titan's Br. 29. The court disagrees with these three arguments.

For the Final Results, Commerce stated that it considered, and declined to follow, the petitioners' suggestion that Commerce "alter the Department's long established practice of capping import distances to the closest port . . . for its ME imports and export sales." *Final I&D Mem.* 47. Titan's and the USW's argument that the *Sigma* decision did not require the particular methodology Commerce used is unpersuasive because Commerce, in the Final Results, did not state that the holding in *Sigma* compelled it to apply that particular methodology. Instead, in the Final Issues and Decision Memorandum, Commerce described its adherence to its prior practice as follows:

> Specifically, the Department added to Indonesian import SVs [surrogate values] a surrogate freight cost using the shorter of the reported distance from the domestic supplier to the factory or the distance from the nearest seaport to the factory where it relied on an import value. This adjustment is in accordance with the decision of the Federal Circuit in *Sigma* . . .

*Id.* (footnote omitted). Commerce did not describe its decision as based on a conclusion that the holding in *Sigma* would permit no other method. Instead, Commerce grounded its decision in its "*long-standing Department practice* following the Federal Circuit's holding in *Sigma.*" *Id.* (emphasis added).

Nor can the court agree that the Department's decision was not supported by substantial evidence on the record. Titan and the USW do not point to a finding of fact Commerce made that they allege to be unsupported by record evidence; instead, they argue that the decision on the whole was not supported by substantial evidence because "Commerce recognized that the record showed that GTC did not in fact use the nearest port for imports." Titan's Br. 27. Properly construed, their claim is not that Commerce reached an invalid finding of fact but that Commerce

should have used a different methodology. As Titan and the USW implicitly acknowledge, Commerce found that GTC used a port other than the nearest port for its *market economy* inputs (as well as export sales). *See Final I&D Mem.* 47. Commerce simply chose not to adopt the petitioners' suggestion that the distance to this farther port be adopted as the *Sigma* cap distance for the nonmarket economy inputs.

Finally, the court rejects Titan's and the USW's vague assertion that the Department's decision not to adopt their suggestion on GTC's freight costs was "otherwise not in accordance with the law." Titan's Br. 29. Because the statute and the regulations are silent on how Commerce is to determine freight distances when calculating surrogate freight costs for a respondent's nonmarket economy input purchases, the court considers the Department's decision according to an abuse of discretion standard. The court discerns no violation of law in the Department's decision not to depart from its standard methodology in the circumstance presented.

## III. CONCLUSION

For the reasons discussed in the foregoing, the court remands the determination of the International Trade Administration, U.S. Department of Commerce published as *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review; 2012-2013*, 80 Fed. Reg. 26,230 (Int'l Trade Admin. May 7, 2015) for reconsideration and redetermination. Therefore, upon consideration of all papers and proceedings in this case, and upon due deliberation, it is hereby

**ORDERED** that the *Amended Final Results* be, and hereby are, set aside as unlawful and remanded for reconsideration and redetermination in accordance with this Opinion and Order; it is further

 **ORDERED** that Commerce shall issue, within ninety (90) days of the date of this Opinion and Order, a new determination upon remand ("Remand Redetermination") that conforms to this Opinion and Order; specifically, the Remand Redetermination shall assign the individual weighted-average dumping margin to Double Coin as directed in this Opinion and Order and shall redetermine GTC's margin as necessary; it is further

**ORDERED** that plaintiffs and intervenors may file comments on the Remand Redetermination within thirty (30) days from the date on which the Remand Redetermination is filed with the court; and it is further

**ORDERED** that defendant may file a response within fifteen (15) days from the date on which the last of any such comments is filed with the court.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Chief Judge

Dated: February 6, 2017
New York, New York



**UNITED STATES DEPARTMENT OF COMMERCE**
**International Trade Administration**
Washington, D.C. 20230

A-570-990
Investigation
10/01/2012 - 03/31/2013
**Public Document**
ITA/E&C/Office II: BCS/SA

April 28, 2014

**MEMORANDUM TO:** Paul Piquado
Assistant Secretary
for Enforcement and Compliance

**FROM:** Christian Marsh
for Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations

**SUBJECT:** Prestressed Concrete Steel Rail Tie Wire from the People's Republic of China: Issues and Decision Memorandum for the Final Determination of Sales at Less Than Fair Value

## I. SUMMARY

We analyzed the case and rebuttal briefs submitted by interested parties in the antidumping duty investigation of prestressed concrete steel rail tie wire (PC tie wire) from the People's Republic of China (PRC). As a result of our analysis, we made changes to the Preliminary Determination.[1]

We recommend that you approve the positions described in the "Discussion of the Issues" section of this memorandum. Below is the complete list of the issues in this investigation on which we received comments.

1. Value Added Tax
2. Withdrawal of Targeted Dumping Regulation and Application of Differential Pricing Analysis
3. Inclusion of Brokerage and Handling Expenses in the Calculation of Input Surrogate Values
4. Truck Freight Surrogate Value
5. Weight Adjustment Made to the Brokerage and Handling Surrogate Value
6. Marine Insurance Surrogate Value
7. Polypropylene Fabric Surrogate Value

[1] See Prestressed Concrete Steel Rail Tie Wire from the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination, 78 FR 75545 (December 12, 2013) (Preliminary Determination).

INTERNATIONAL

8. Electricity Surrogate Value
9. Electricity Consumption Factor Adjustment
10. Treatment of Social Security/Workman's Compensation in Surrogate Financial Ratio Calculations
11. Treatment of Transportation Expenses in Surrogate Financial Ratio Calculations

## II. BACKGROUND

The Department of Commerce (Department) published its preliminary determination of sales at less than fair value and postponement of final determination on December 12, 2013.[2] Between January 8 and 14, 2014, the Department conducted a verification of Silvery Dragon Group Technology and Trading Co., Ltd.,[3] Silvery Dragon Prestressed Materials Co., Ltd. Tianjin, and Silvery Dragon Prestressed Materials Co., Ltd. Tianjin – Hejian Branch[4] (collectively, "Silvery Dragon").[5]

On March 18, 2014, the petitioners[6] withdrew their request for a hearing.[7] As no other party in this proceeding requested a hearing, no hearing was held.

On March 21, 2014, Silvery Dragon and the petitioners submitted case briefs.[8] On March 28, 2014, both interested parties submitted rebuttal briefs.[9]

---

[2] See id.

[3] Silvery Dragon Group Technology and Trading Co., Ltd. is the exporter of the subject merchandise and is referred to as SD Tech where necessary in this memorandum.

[4] Silvery Dragon Prestressed Materials Co., Ltd. Tianjin – Hejian Branch is the producer of the subject merchandise and is referred to as SD Hejian where necessary in this memorandum.

[5] See Memorandum to the File through James Maeder, Office Director, AD/CVD Operations, Office 2 and Irene Darzenta Tzafolias, Program Manager, AD/CVD Operations, Office 2, from Brian Smith, Senior International Trade Analyst, AD/CVD Operations, Office 2 and Stephanie Arthur, Senior Accountant, Office of Accounting, "Verification of the Sales and Factors Response of Silvery Dragon Group Technology and Trading Co., Ltd., Silvery Dragon Prestressed Materials Co., Ltd. Tianjin, and Silvery Dragon Prestressed Materials Co., Ltd. Tianjin – Hejian Branch in the Antidumping Duty Investigation of Prestressed Concrete Steel Rail Tie Wire from the People's Republic of China (PRC)," dated March 13, 2014 (Verification Report).

[6] The petitioners are Davis Wire Corporation and Insteel Wire Products Company.

[7] See Letter from the Petitioners to the Secretary of Commerce, "Investigation of Prestressed Concrete Steel Rail Tie Wire from the People's Republic of China – Request for Rebuttal Brief Extension and Withdrawal of Hearing Request," dated March 18, 2014.

[8] See Letter from Silvery Dragon to the Secretary of Commerce, "Silvery Dragon Case Brief: Antidumping Duty Investigation of Prestressed Concrete Steel Rail Tie Wire from the People's Republic of China," dated March 21, 2014; see also Letter from the Petitioners to the Secretary of Commerce, "Investigation of Prestressed Concrete Steel Rail Tie Wire from the People's Republic of China: Petitioners' Case Brief," dated March 21, 2014.

[9] See Letter from Silvery Dragon to the Secretary of Commerce, "Silvery Dragon Rebuttal Case Brief: Antidumping Duty Investigation of Prestressed Concrete Steel Rail Tie Wire from the People's Republic of China," dated March 28, 2014; see also Letter from the Petitioners to the Secretary of Commerce, "Investigation of Prestressed Concrete Steel Rail Tie Wire from the People's Republic of China: Petitioners' Rebuttal Case Brief," dated March 28, 2014.

As explained in the memorandum from the Assistant Secretary for Enforcement and Compliance, the Department exercised its discretion to toll deadlines for the duration of the closure of the Federal Government from October 1, through October 16, 2013.[10] Therefore, all deadlines in this proceeding have been extended by 16 days. If the new deadline falls on a non-business day, the deadline will become the next business day. Thus, the revised deadline for the final determination in this investigation is April 28, 2014.

## III. SCOPE OF INVESTIGATION

The product covered by the scope of this investigation is high carbon steel wire; stress relieved or low relaxation; indented or otherwise deformed; meeting at a minimum the physical, mechanical, and chemical requirements of the American Society of Testing Materials (ASTM) A881/A881M specification; regardless of shape, size or alloy element levels; suitable for use as prestressed tendons in concrete railroad ties (PC tie wire). High carbon steel is defined as steel that contains 0.6 percent or more of carbon by weight.

PC tie wire is classified under the Harmonized Tariff Schedule of the United States (HTSUS) subheading 7217.10.8045, but may also be classified under subheadings 7217.10.7000, 7217.10.8025, 7217.10.8030, 7217.10.8090, 7217.10.9000, 7229.90.1000, 7229.90.5016, 7229.90.5031, 7229.90.5051, 7229.90.9000, and 7312.10.3012. Although the HTSUS subheadings are provided for convenience and customs purposes, the written description of the scope of the investigation is dispositive.

## IV. SCOPE COMMENTS

In conjunction with the Preliminary Determination, the Department modified the scope of the investigation by revising the phrase "meeting at a minimum the American Society of Testing Materials (ASTM) A881/A881M specification" to "meeting at a minimum the physical, mechanical, and chemical requirements of the American Society of Testing Materials (ASTM) A881/A881M specification" and by including two additional HTSUS numbers.[11] No interested party commented on these modifications. Therefore, we made no changes to the scope language as stated in the Preliminary Determination.

## V. USE OF ADVERSE FACTS AVAILABLE

In the Preliminary Determination, we determined that Wuxi Jinyang Metal Products Co., Ltd. (Wuxi Jinyang) and Shanxi New-Mile International Trade Co., Ltd. (Shanxi New-Mile) were part of the PRC-wide entity because neither company demonstrated its eligibility for a separate rate. Further, we found that the PRC-wide entity, which includes Wuxi Jinyang and Shanxi New Mile, withheld necessary information within the meaning of section 776(a) of the Tariff Act of 1930, as amended (the Act), and that each failed to act to the best of its ability to comply with the Department's requests for information within the meaning of section 776(b) of the Act, because

[10] See Memorandum for the Record from Paul Piquado, Assistant Secretary for Enforcement and Compliance, "Deadlines Affected by the Shutdown of the Federal Government" (October 18, 2013).
[11] See Memorandum to Christian Marsh, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, "Scope Modification Requests" (December 5, 2013).

neither company responded to the Department's antidumping duty questionnaire. As the PRC-wide entity did not provide the Department with requested information, pursuant to section 776(a)(2)(A) of the Act, the Department found it appropriate to base the PRC-wide rate on AFA. As AFA, we assigned the PRC-wide entity (including Wuxi Jinyang and Shanxi New-Mile) a dumping margin equal to the highest transaction-specific dumping margin calculated for Silvery Dragon, as we were unable to corroborate, pursuant to section 776(c) of the Act, the highest margin on the record of the proceeding, the dumping margin in the petition.[12]

We received no comments on our Preliminary Determination with respect to Wuxi Jinyang, Shanxi New-Mile, and the PRC-wide entity. Therefore, we continued to assign to the PRC-wide entity (including Wuxi Jinyang and Shanxi New-Mile) a dumping margin equal to the highest transaction-specific dumping margin calculated for Silvery Dragon in the final determination. While we made certain changes to the margin calculation for Silvery Dragon since the Preliminary Determination, as outlined in the Issues and Decision Memorandum, these changes did not alter our preliminary corroboration analysis.[13]

## VI. MARGIN CALCULATIONS

We calculated export price (EP) and normal value (NV) using the same methodology stated in the Preliminary Determination, except as follows:

- We made an adjustment to Silvery Dragon's reported U.S. prices for irrecoverable value added tax (VAT), consistent with the calculation formula reflected in the Verification Report. See Comment 1.
- We used the Global Trade Atlas (GTA) import data from both Harmonized Tariff Schedule (HTS) subheadings (i.e., 5512.990000 and 5407.20) and derived a simple-average price to value polypropylene (PP) fabric. See Comment 7.
- We adjusted Silvery Dragon's electricity factor usage based on our verification findings. See Comment 9.

See also Memorandum from Brian Smith, Senior International Trade Analyst, AD/CVD Operations, Office II, through Irene Darzenta Tzafolias, Program Manager, AD/CVD Operations, Office II, to The File, "Antidumping Duty Investigation of Prestressed Concrete Rail Tie Wire from the People's Republic of China: Factor Valuation Memorandum," dated concurrently with this memorandum (Final Factor Valuation Memorandum); and Memorandum

[12] See the Memorandum from Case Analysts to James P. Maeder, Jr., Office Director, AD/CVD Operations, Office II, "Prestressed Concrete Steel Rail Tie Wire from the People's Republic of China: Corroboration of Margin Based on Adverse Facts Available," dated December 12, 2013 (Corroboration Memorandum).

[13] See Memorandum from Brian Smith, Senior International Trade Analyst, AD/CVD Operations, Office II through Irene Darzenta Tzafolias, Program Manager, AD/CVD Operations, Office II, to The File, "Prestressed Concrete Steel Rail Tie Wire from the People's Republic of China (PRC): Corroboration of Final Margin Assigned to the PRC-Wide Entity," dated concurrently with this memorandum .

from Brian Smith, Senior International Trade Analyst, AD/CVD Operations, Office II through Irene Darzenta Tzafolias, Program Manager, AD/CVD Operations, Office II, to The File, "Analysis of the Final Determination Margin Calculation for Silvery Dragon Group Technology and Trading Co., Ltd. Tianjin ('Silvery Dragon Tech')," dated concurrently with this memorandum (Final Analysis Memorandum).

## VII. DISCUSSION OF ISSUES

**Comment 1: Value-Added Tax**

Based on Silvery Dragon's claim that it did not incur value-added tax (VAT) on its exports of subject merchandise during the POI, in the Preliminary Determination, we did not subtract an amount for irrecoverable VAT from the reported U.S. prices. As part of examining Silvery Dragon's claim, we issued Silvery Dragon a supplemental questionnaire and examined the data provided in its response at verification.

For VAT reporting purposes, Silvery Dragon reported the VAT which SD Tech (the exporter of the subject merchandise) and SD Hejian (SD Tech's affiliated producer of the subject merchandise) paid on a consolidated and company-wide basis. To support its claim that the companies as a whole paid zero VAT on SD Tech's exports during the POI, Silvery Dragon provided at verification a VAT calculation worksheet showing that what SD Tech and SD Hejian owed in VAT was less than what the two companies paid in VAT on a consolidated basis during the POI.

Based on our review of the companies' consolidated (net) VAT rate calculation methodology at verification, we noted in the Verification Report that Silvery Dragon's calculation offsets the amount of VAT paid by SD Hejian on inputs by the VAT refund received by SD Tech, but does not appear to take into account, among other things, the VAT paid by SD Tech on its purchases of subject merchandise.[14] We also restated in the Verification Report that for purposes of calculating SD Tech's VAT cost, it may have been more appropriate, as evidenced in SD Tech's VAT refund applications, to calculate the VAT as follows: (SD Tech export sales value) * (SD Tech purchase VAT rate - SD Tech export VAT refund rate).[15] We noted further that this calculation method is reflected in section 3.4 of the "Ministry of Finance and State Administration of Taxation, Circular on Further Promotion of Methodology of "Exemption, Deduction, and Refund of Tax" for Exported Merchandises," CAISHUI (2002) No. 7 (Circular). Our review of SD Tech's documentation at verification showed that SD Tech paid 17 percent VAT on its purchases of subject merchandise and received a five percent VAT refund on its exports of subject merchandise, resulting in a net 12 percent irrecoverable VAT.[16]

Silvery Dragon argues that: (1) the Department does not have the legal authority to adjust export price by deducting an amount of irrecoverable VAT; (2) the Department's computation of irrecoverable VAT is contradicted by substantial record evidence; and (3) assuming that the

---

[14] See Verification Report at 23.
[15] See id., at 23-24.
[16] See id., at 24.

Department adjusts U.S. price for irrecoverable VAT, it should not use the formula laid out in the Verification Report.

Regarding its first claim, Silvery Dragon argues that the Department's policy change with respect to the treatment of VAT[17] for all non-market economy (NME) proceedings involving the PRC is erroneously based on the premise that the Department has the authority under section 772(c)(2)(B) of the Act[18] to adjust U.S. price for export tax, duties or other charges (including VAT not rebated upon export) imposed by the exporting country on subject merchandise. However, Silvery Dragon argues that a VAT is not an export tax (i.e., a charge imposed by the exporting country on the exportation of the subject merchandise). Therefore, Silvery Dragon contends that the Department does not have the authority under section 772(c)(2)(B) of the Act to adjust for taxes, duties or charges that are not export taxes, and has no basis upon which to expand the scope of the statute in this regard.[19]

Moreover, Silvery Dragon argues that to the extent it incurs a net cost for VAT, any residual liability it has (i.e., irrecoverable VAT) results from the purchase of the merchandise and not from the exportation of the merchandise. Furthermore, Silvery Dragon contends that exports of its PC tie wire from the PRC to the United States are exempt from the payment of VAT pursuant to Article 2.(3) of the Provisional Regulations of the PRC on Value-Added Tax.[20] Finally, Silvery Dragon concludes that because the Department has not applied the same policy and rationale in market economy antidumping duty proceedings, it is singling out the PRC and Vietnam as NME countries and applying a special, extra-statutory adjustment with the sole purpose of increasing dumping margins.

With respect to Silvery Dragon's second argument regarding the Department's computation of irrecoverable VAT, Silvery Dragon states that SD Tech did not pay 17 percent VAT on its purchases of PC tie wire from SD Hejian for export to the U.S. market. Specifically, Silvery Dragon maintains that Article 4 of the VAT regulation on the record of this proceeding[21] clearly explains that the VAT amount which SD Hejian is required to pay is the difference between a calculated value based on product sales values and the applicable VAT rate (i.e., VAT-out), and a calculated value based on the purchase value of materials used in the production of products sold and the applicable VAT rate for each of the purchased materials (i.e., VAT-in). In the case of SD Tech, Silvery Dragon claims that this same VAT payable formula applies where VAT-out is the export sales value times the applicable VAT rate, and VAT-in is the purchase value times the applicable VAT rate. Silvery Dragon maintains that neither the VAT-in nor the VAT-out is actually paid by the taxpayer to the tax authority. According to Silvery Dragon, these VAT

[17] See Methodological Change for Implementation of Section 772(c)(2)(B) of the Tariff Act of 1930, as Amended, In Certain Non-Market Economy Antidumping Proceedings, 77 FR 36481 (June 19, 2012) (Methodological Change).
[18] The corresponding provision under Title 19 of the United States Code is 19 U.S.C. § 1677a(c)(2)(B).
[19] In support of its argument, Silvery Dragon cites to Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984); Dorbest v. United States, 604 F.3d 1363, 1371-1372 (Fed. Cir. 2010); and Wind Tower Trade Coalition v. United States, 741 F.3d 89 (Fed. Cir. 2014).
[20] See Silvery Dragon's August 12, 2013, submission at Exhibit C-4, and December 23, 2013, submission at Exhibit 2SC-1.
[21] See Silvery Dragon's December 23, 2013, submission at Exhibit 2SC-1 for Article 4 of the Provisional Regulations of the People's Republic of China on Value-added Tax.

amounts represent theoretical values required for use when calculating the actual VAT payable by the tax payer to the tax authority. With respect to SD Tech, Silvery Dragon contends that Article 2.(3) of the VAT regulation states that "the applicable VAT rate for exports is zero." According to Silvery Dragon, the VAT payable for SD Tech's exports is actually a negative value.[22] Based on this information, Silvery Dragon contends that SD Tech does not have to pay VAT on its exports of finished goods (including the subject merchandise) because the VAT-out is always zero for exports. For this reason, Silvery Dragon maintains that although the invoices issued by SD Hejian to SD Tech all show a 17 percent VAT rate, it is just a theoretical figure of VAT-in (for SD Tech) and a theoretical figure for VAT-out (for SD Hejian). According to Silvery Dragon, the VAT amount on the invoices SD Hejian issued to SD Tech is neither actually collected by SD Hejian nor paid by SD Tech to the tax authority, and the data examined at verification confirm this claim. Therefore, Silvery Dragon claims that, contrary to the Department's verification findings, it correctly did not take into account in its VAT calculation worksheet (examined at verification) any VAT paid by SD Tech on purchases of subject merchandise from SD Hejian, as SD Tech did not pay a 17 percent VAT on those purchases.

Finally, Silvery Dragon argues that if the Department decides to adjust U.S. price for an irrecoverable VAT amount (despite information on the record indicating no adjustment is warranted), then the calculation formula in the Verification Report, [23] which would yield an adjustment of 12 percent to U.S. price, is in error and should be modified. First, Silvery Dragon claims that the Department's calculation formula, which was referenced in the Circular,[24] is simply a mathematical formula which is intended to obtain a non-exemptible and non-deductible VAT for purposes of calculating the exemption, deduction, and refund of tax (EDR) under PRC VAT law. According to Silvery Dragon, this calculation formula is not used to determine the actual amount of VAT that remains unrefunded. Silvery Dragon claims that the documentation examined at verification by Department officials supports this conclusion as well.

To determine the irrecoverable VAT amount, Silvery Dragon contends that the Department must not only correct the calculation formula in the Verification Report but also must take into account its verification findings that SD Tech paid 17 percent on its purchases of subject merchandise and received a five percent VAT refund on its exports of subject merchandise. Therefore, Silvery Dragon proposes that the calculation formula be modified to determine SD Tech's irrecoverable VAT as follows: (SD Tech Purchase Value * SD Tech Purchase VAT rate) - (SD Tech export value * SD Tech export VAT refund rate).

The petitioners contend that the Department's verification findings indicate that while Silvery Dragon paid 17 percent VAT to purchase the PC tie wire, it only received a five percent VAT refund upon exportation of the PC tie wire. According to the Department's new policy to reduce an exporter's U.S. price by the amount of irrecoverable VAT, the petitioners maintain that the Department is required to make an adjustment to Silvery Dragon's U.S. prices to account for the irrecoverable VAT amount (i.e., 17 percent – 5 percent = 12 percent) in the final determination.

---

[22] Silvery Dragon provides the following calculation for illustration purposes: VAT payable for SD Tech's exports = (export sales value * 0 percent) - (purchase value * 17 percent) = negative value.
[23] This calculation formula is: (SD Tech export sales value) * (SD Tech purchase VAT rate of 17 percent - SD Tech export VAT refund rate of five percent).
[24] See Circular included in Attachment 1 of the Verification Report.

With respect to Silvery Dragon's objections to the VAT adjustment proposed by the Department, the petitioners claim that these objections were already addressed by the Department in the Federal Register notice which announced the Department's new VAT adjustment policy in NME antidumping proceedings.[25] Moreover, the petitioners point out that the Department's proposed VAT adjustment in this case has already been implemented in other recently completed NME antidumping duty cases.[26]

**Department's Position:**

For the reasons explained below, we applied the VAT adjustment formula reflected in the Verification Report to deduct from Silvery Dragon's reported U.S. prices an amount for irrecoverable VAT.

In 2012, the Department announced a change of methodology with respect to the calculation of the EP or CEP to include an adjustment of any un-refunded (irrecoverable) VAT in certain NME countries, in accordance with section 772(c)(2)(B) of the Act.[27] In this announcement, the Department stated that when a NME government has imposed an export tax, duty, or other charge on subject merchandise, or on inputs used to produce subject merchandise, from which the respondent was not exempted, the Department will reduce the respondent's EP or CEP prices accordingly, by the amount of the tax, duty or charge paid, but not rebated.[28] Where the irrecoverable VAT is a fixed percentage of export price, the Department explained that the final step in arriving at a tax-neutral dumping comparison is to reduce the U.S. price downward by this same percentage.[29]

In response to Silvery Dragon's claim that the Department does not have the authority under the statute to adjust for VAT, we note that section 772(c)(2)(B) of the Act authorizes the Department to deduct from EP or CEP the amount, if included in the price, of any "export tax, duty, or other charge imposed by the exporting country on the exportation" of the subject merchandise. Silvery Dragon argues that Chinese VAT is not an export tax, duty or charge, but Silvery Dragon misstates what is at issue. The issue is the irrecoverable VAT, not VAT *per se*. In this context, irrecoverable VAT, as defined in Chinese law, is a net VAT burden that arises solely from, and is, specific to exports. It is VAT paid on inputs and raw materials (used in the production of exports) that is non-refundable and, therefore, a cost. Irrecoverable VAT is, therefore, an "export tax, duty, or other charge imposed" on exportation of the subject merchandise to the United States. We note that the statute does not define the term(s) "export tax, duty, or other charge imposed" on the exportation of subject merchandise. We find it reasonable to interpret these terms as encompassing irrecoverable VAT, because the irrecoverable VAT is a cost that arises as a result of export sales. It is set forth in Chinese law and, therefore, can be considered to be "imposed" by the exporting country on exportation of subject merchandise. Further, an

[25] See Methodological Change, 77 FR at 36481.
[26] In support of their argument, the petitioners cite to Chlorinated Isocyanurates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012, 79 FR 4875 (January 30, 2014) and accompanying Issues and Decision Memorandum at Comment 5 (Chlorinated Isocyanurates).
[27] See Methodological Change, 77 FR at 36482.
[28] See id., 77 FR at 36483; see also Chlorinated Isocyanurates.
[29] See Methodological Change, 77 FR at 36483.

adjustment for irrecoverable VAT achieves what is called for under section 772(c)(2)(B) of the Act, as it reduces the gross price charged to the customer to a net price received. This deduction is consistent with the Department's longstanding policy, which is consistent with the intent of the statute, that dumping margin calculations be tax-neutral.[30]

Silvery Dragon's claim that the Department is singling out certain NME countries by applying a special, extra-statutory adjustment is misplaced. As the Department stated in the Methodological Change, this adjustment simply reflects that the statute calls for the Department to adjust U.S. price for export taxes, duties, or other charges that are included in the price, irrespective of whether they are levied in a market economy or NME context.[31] Given the changes in our practice with regard to the PRC and Vietnam (i.e., the application of the CVD law), we are simply acknowledging that we can now apply section 772(c)(2)(B) of the Act in proceedings involving merchandise from the PRC and Vietnam to ensure tax neutrality in our dumping margin calculations.[32] Tax neutrality is no less a concern in market-economy antidumping proceedings where, as in this case, a VAT in the exporting country affects NV and U.S. price asymmetrically. But in market-economy antidumping proceedings, because it is home market sales, not export sales, that bear the tax, it is NV, not U.S. price, that the Department adjusts downward. However, in both market economy and NME antidumping proceedings, the effect of the downward price adjustment is a tax-neutral dumping margin calculation.

The Department's methodology, as explained above, essentially amounts to performing two basic steps: (1) determining the irrecoverable VAT tax on subject merchandise, and (2) reducing U.S. price by the amount determined in step one. Information placed on the record of this review by Silvery Dragon and verified by the Department indicates that according to the Chinese VAT schedule, the standard VAT levy on the subject merchandise is 17 percent and the VAT rebate rate for the subject merchandise is five percent.[33] For the purposes of this final determination, therefore, we removed from U.S. price an amount calculated based on the difference between these rates (i.e., 12 percent) applied to the export sales value (i.e., U.S. price net of international movement expenses), consistent with the definition of irrecoverable VAT under Chinese tax law and regulation.[34]

Pursuant to the Circular, irrecoverable VAT is defined as (1) the free-on-board (FOB) value of the exported good, applied to the difference between (2) the standard VAT levy rate and (3) the VAT rebate rate applicable to exported goods.[35] Only the first variable, export value, is unique

---

[30] See id., 77 FR at 36483; and Antidumping Duties; Countervailing Duties, 62 FR 27296, 27369 (May 19, 1997) (citing Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-106, vol. 1, 827, reprinted in 1995 U.S.C.C.A.N. 3773, 4172).
[31] See Methodological Change at 77 FR 36482.
[32] In this regard, we note that the Department's change of methodology in 2012 applied only to NME antidumping proceedings because the Department's previous administrative practice had been to apply section 772(c)(2)(B) of the Act only in market-economy antidumping proceedings and not in NME antidumping proceedings. See Methodological Change at 77 FR 36482 for a complete discussion.
[33] See Silvery Dragon's December 23, 2013, submission at Exhibit 2SC-4.
[34] See Verification Report at Attachment 1.
[35] See Circular at Article III.3.4., which specifies that irrecoverable VAT = (F.O.B. export value – bonded imports) * (standard VAT levy rate – VAT rebate applicable to exported goods). It is important to note that the Circular allows

to Silvery Dragon while the rates in (2) and (3), as well as the formula for determining irrecoverable VAT, are each explicitly set forth in Chinese law and regulation.[36]

With respect to step one in the Department's methodology, we note that Silvery Dragon submitted on a consolidated company-wide basis an irrecoverable VAT calculation for the U.S. price adjustment pursuant to section 772(c)(2)(B) of the Act. Silvery Dragon's calculation yields a negative net VAT amount based on the VAT paid by the producer (SD Hejian) and by the exporter (SD Tech) using the formula VAT-out - VAT-in (i.e., VAT paid on sales - VAT paid on input materials). Essentially, Silvery Dragon claims that its irrecoverable VAT calculation is more consistent with Chinese law and regulation or a more accurate reflection of its consolidated books and records. The Department disagrees. First, the Department's methodology is based on removing irrecoverable VAT on exports, which is product-specific and is explicitly defined in Chinese tax regulations.[37] Silvery Dragon's proposal to calculate a "net" or "effective" VAT position company-wide[38] significantly reduces the impact of this product-specific tax by spreading it across products with potentially different VAT schedules and across domestic sales. The Department's deduction of product-specific irrecoverable VAT from the price of the subject merchandise is a more reasonable and accurate methodology because the export tax, duty, or other charge is a product-specific expense that is directly linked with the exportation of the subject merchandise. Silvery Dragon's methodology, in contrast, effectively ignores this direct link and dilutes the product-specific tax effect as previously explained. Additionally, Silvery Dragon's methodology is distorted by timing differences that occur between the VAT-in value, the VAT-out value and the receipt of the VAT refund, as well as the varying rebate rates on subject and non-subject merchandise. Therefore, employing such a methodology would introduce distortion into the dumping margin calculation and obfuscate the true "apples-to-apples" comparison of U.S. price with NV on a product-specific, tax-exclusive basis.

Furthermore, the Department finds that the most straightforward, consistent, and verifiable method to make this adjustment under section 772(c)(2)(B) of the Act is by relying on the standard formula provided for under Chinese tax law and regulation. In that respect, the Department notes that the irrecoverable VAT formula for taxation purposes is solely a function of the rates under Chinese regulation and the respondent-specific export value of subject merchandise. There could be any number of differences between the irrecoverable VAT reported for Chinese tax purposes and how the irrecoverable VAT is actually recorded in a given respondent's records. For all of the reasons stated above, we will not consider allocations across all company sales or across sales of products with different VAT schedules. The irrecoverable VAT liability is determined on a product-specific basis, and it is on this basis that the Department will consider respondent-specific claims for adjustments to the standard formula,

---

the deduction from export value for the portion of bonded raw material imports used for export; however, the respondent in this investigation did not claim to use bonded imports to produce subject merchandise.

[36] See Circular at Article III.3.4.

[37] As our verification findings confirm, China's VAT regime is product-specific, with VAT schedules that vary by industry and even across products within the same industry. See Verification Report at 23, and Silvery Dragon's December 23, 2013, response at Exhibit 2SC-4 for the official VAT rate according to the HTS code for the subject merchandise.

[38] See, e.g., Silvery Dragon's December 23, 2013, submission at Exhibit 2SC-3.

taking into account whether such adjustments are permitted under Chinese law and regulation and supported with record evidence.

Although Silvery Dragon disagrees that any adjustment for irrecoverable VAT is warranted, the respondent states that if an adjustment is to be made, then the Department must modify the calculation formula as presented in the Verification Report to take into account SD Tech's purchase value. Specifically, it proposes that the calculation formula be modified as follows: (SD Tech purchase value * 17 percent) – (SD Tech's export sales value * 5 percent). We disagree with Silvery Dragon's proposed modification and argument that the VAT calculation formula in the Verification Report is not reflective of the actual amount of irrecoverable VAT on SD Tech's exports of the subject merchandise. As indicated above, the Chinese tax regulations explicitly define how irrecoverable VAT is calculated based on the FOB value of the exported good applied to the difference in the VAT levy and refund rates. There is no reference in this formula anywhere to the purchase price or purchase value of inputs or raw materials used in production.[39] Moreover, Silvery Dragon did not cite to any relevant provision under Chinese tax law on this record that supports relying on a different formula or basis for determining irrecoverable VAT. In addition, we note that the calculation formula in the Verification Report properly calculates VAT based on an FOB export value because this FOB value is based on the net FOB U.S. price, exclusive of all expenses and adjustments incurred after the merchandise left the port of exportation in China. Accordingly, we find no support for Silvery Dragon's argument that the Department improperly calculated irrecoverable VAT.

In sum, based on the foregoing analysis, we calculated EP, exclusive of the irrecoverable VAT, calculated as described above, for purposes of the final determination.[40] Our analysis is consistent with our current VAT policy and our treatment of VAT in recently completed NME cases.[41]

Comment 2: Withdrawal of Targeted Dumping Regulation and Application of Differential Pricing Analysis

In the Preliminary Determination, the Department applied a "differential pricing" analysis for determining whether application of average-to-transaction (A-to-T) comparisons is appropriate pursuant to 19 CFR 351.414(c)(1) and consistent with section 777A(d)(1)(B) of the Act. Based on the results of the differential pricing analysis, the Department found that over 66 percent of Silvery Dragon's export sales confirm the existence of a pattern of export prices for comparable merchandise that differ significantly among time periods.[42] However, the Department determined that there was not a meaningful difference in the weighted-average dumping margins when calculated using the average-to-average (A-to-A) and an appropriate alternative comparison method. Accordingly, the Department applied the A-to-A method in the Preliminary

---

[39] See Circular.

[40] For details of the irrecoverable VAT calculation, see Silvery Dragon's Final Analysis Memorandum.

[41] See Chlorinated Isocyanurates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012, 79 FR 4875 (January 30, 2014), and accompanying Issues and Decision Memorandum at Comment 5A.

[42] See Preliminary Decision Memorandum at 13.

Determination for all U.S. sales to calculate the weighted-average dumping margin for Silvery Dragon.

Silvery Dragon challenges the Department's differential pricing analysis. In doing so, Silvery Dragon first claims that the Department unlawfully withdrew its targeted dumping methodology under 19 CFR 351.414(f)(2) in 2008,[43] without demonstrating that there was good cause, and without providing the required notice and comment. In support of its claim, Silvery Dragon cites to the Court of International Trade (CIT) decision in Gold East Paper[44], where the Court invalidated the Department's decision to repeal 19 CFR 351.414 because the Department "failed to provide notice and comments before withdrawing the Limiting Rule." Silvery Dragon further notes that the Department issued a Federal Register notice calling for comments regarding the withdrawn regulation (i.e., 19 CFR 351.414(f)(2))[45] pursuant to the Court's ruling.[46]

Silvery Dragon contends that the Department should perform a targeted dumping analysis consistent with 19 CFR 351.414(f)(2) and ahead of reviewing comments from interested parties on the withdrawn regulation. According to Silvery Dragon, such an analysis would: a) limit the application of the A-to-T comparison methodology to only those sales found to be target dumped; b) not consider a particular sale as targeted unless it was made at dumped prices; and c) permit Silvery Dragon to address whether there are any commercial reasons that explain the price variations for the sales that the Department found in the Preliminary Determination to be target dumped based on significant price differences over time periods alone. In particular, Silvery Dragon emphasizes that the Department should seek comments to determine "why" prices may vary by customer, time period or region, and if the variance is based on a valid business reason, the Department should conclude that the merchandise is not target dumped.

Furthermore, in challenging the Department's differential pricing analysis, Silvery Dragon asserts that changes to the statistical methodology are required in order to properly determine whether targeted dumping has taken place. More specifically, Silvery Dragon proposes that:

- The Cohen's *d* test is not "a recognized statistical measure for identifying 'targeted sales'" and its real use is simply to measure the difference between two mean values when comparing the effect across various statistical studies.
- In applying the Cohen's *d* test,[47] the Department should consider only positive values of the Cohen's *d* coefficient (i.e.,. where the weighted-average sales prices of the test group is less than the weighted-average price of the comparison group) as passing the Cohen's *d*

[43] See Withdrawal of the Regulatory Provisions Governing Targeted Dumping in Antidumping Duty Investigations, 73 FR 74930 (December 10, 2008) (2008 Withdrawal).
[44] See Gold East Paper (Jiangsu) Co. v. United States, 918 F. Supp. 2d 1317, 1319-1334 (CIT 2013) (Gold East Paper).
[45] See Non-Application of Previously Withdrawn Regulatory Provisions Governing Targeted Dumping in Antidumping Duty Investigations, 78 FR 60240 (October 1, 2013).
[46] We note that the Department recently published a final rule in response to the Court's ruling. See Non-Application of Previously Withdrawn Regulatory Provisions Governing Targeted Dumping in Antidumping Duty Investigations, 79 FR 22371 (April 22, 2014).
[47] See "Decision Memorandum for the Preliminary Determination in the Antidumping Duty Investigation of Prestressed Concrete Steel Rail Tie Wire from the People's Republic of China," from Christian Marsh, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, to Paul Piquado, Assistant Secretary for Enforcement and Compliance, dated December 5, 2013 (Preliminary Decision Memorandum) at 12.

test. Only prices that are below that of the comparison group can be considered "targeted."

- Weighted-averages, rather than simple averages, should be used to determine the pooled standard deviation based on the variances of the test and comparison groups.
- The Cohen's *d* test should control for differences in time when performed by purchaser or region.
- The Department must consider whether individual U.S. prices are sufficiently lower than the mean price of the comparison group because even though the mean price of the test group may be sufficiently lower than the mean price of the comparison group, individual prices within the test group may be much higher and not dumped.
- The Cohen's *d* test "says nothing about the relative magnitude of the difference between the two mean values" but only measures this difference against the variability within the overall population. Silvery Dragon recommends that the Department also consider the difference between the mean prices relative to the mean price of the comparison group.
- Based upon statements from the Department's final determination in Coated Free Sheet,[48] the Department must address all relevant factors which may cause differences in prices.
- Furthermore, as done in Coated Free Sheet, as well as numerous other proceedings, the Department must limit its application of the A-to-T method to those U.S. sales that constitute a pattern of prices that differ significantly.

The petitioner dismisses Silvery Dragon's opposition to the Department's differential pricing methodology, stating that such objections have been raised and addressed in prior decisions, including Plywood from China.[49] The petitioner supports the Department's reasoning in these prior decisions and advocates its continuation in the final determination of this investigation.

**Department's Position:**

Because the Department applied its standard methodology (the A-to-A method) in the Preliminary Determination and in this final determination to calculate Silvery Dragon's weighted-average dumping margin, Silvery Dragon's arguments are moot.[50]

**Comment 3: Inclusion of Brokerage and Handling Expenses in the Calculation of Input Surrogate Values**

In the Preliminary Determination, we did not add an amount for brokerage and handling to the import values (inclusive of the cost of insurance and freight (CIF)) obtained from GTA, because

---

[48] See Notice of Final Determination of Sales at Less Than Fair Value: Coated Free Sheet Paper from the Republic of Korea, 72 FR 60630 (October 25, 2007) (Coated Free Sheet).

[49] See Hardwood and Decorative Plywood From the People's Republic of China: Final Determination of Sales at Less Than Fair Value, 78 FR 58273 (September 23, 2013), and accompanying Issues and Decision Memorandum at Comment 5 (Plywood from China).

[50] See Chlorinated Isocyanurates at Comment 4; see also Final Analysis Memorandum for the final results of the differential pricing test.

we found no evidence on the record that such expenses are incurred on all importations into Thailand.[51]

The petitioners argue that the Department's practice is to include all applicable freight and handling costs when it uses import prices to value factors of production (FOPs) and that it should reverse its preliminary determination decision and add brokerage and handling expenses to the Thai CIF import values obtained from GTA in the final determination. Specifically, the petitioners argue that when the FOPs are valued using import price data which do not include foreign movement expenses, the Department's practice is to add international freight and brokerage and handling charges to the import value. The petitioners cite to Policy Bulletin Number 10.2, "Inclusion of International Freight Costs When Import Prices Constitute Normal Value" (Policy Bulletin) in support of their argument.

In this case, the petitioners maintain that because the Thai import values from GTA are reported on a CIF basis, the Department must include an amount for brokerage and handling (i.e., all movement expenses out of the country of origin including foreign inland freight, brokerage charges for the goods to be moved from the ship and clear customs at the port of entry, and any handling and documentation charges). The petitioners claim that in a recent case, the Department determined that the GTA Thai import values do not include brokerage and handling.[52] Based on this determination and the assertion that all brokerage and handling expenses must by necessity be incurred for imported goods, the petitioners contend that the Department's rationale for not adding such expenses to the GTA import values is flawed. Moreover, the petitioners claim that the Department's rationale for not including brokerage and handling expenses to the GTA import values is also in error because it is not based on the fact that the Chinese producers incurred brokerage and handling charges when purchasing imported goods. In light of these alleged facts, the petitioners contend that the Department's decision not to include an amount for brokerage and handling to the GTA import values is based on unreasonable and unexplained assumptions, and the courts have overturned Department decisions with the same fact pattern.[53]

Silvery Dragon asserts that there is no record evidence to support the petitioners' claim that the GTA Thai import values do not include brokerage and handling expenses. Moreover, Silvery Dragon notes that the petitioners fail to cite to any final decision where the Department followed the methodology they suggest. As Silvery Dragon points out, the sole case the petitioners cite to in support of their position is an initiation notice, and that notice does not have precedential value because it is neither an outcome of a proceeding nor based on a reasoned finding by the Department.

---

[51] See Memorandum from Brian Smith, Senior International Trade Analyst, AD/CVD Operations, Office II, through Irene Darzenta Tzafolias, Program Manager, AD/CVD Operations, Office II, to The File, "Antidumping Duty Investigation of Prestressed Concrete Rail Tie Wire from the People's Republic of China: Factor Valuation Memorandum," dated December 5, 2013 (Prelim Factor Valuation Memorandum) at 6.

[52] See Grain-Oriented Electrical Steel From the People's Republic of China, the Czech Republic, Germany, Japan, the Republic of Korea, Poland, and the Russian Federation: Initiation of Antidumping Duty Investigations, 78 FR 65283, 65286 (October 31, 2013) (GOES from the PRC).

[53] See Taian Ziyang Food Company, Ltd., et. al. v. United States, et. al., 637 F. Supp. 2d 1093, 1159 (CIT 2009).

Regarding the petitioners' interpretation of the Department's Policy Bulletin on this matter, Silvery Dragon claims that the Policy Bulletin actually states that the Department will add international freight and foreign brokerage and handling charges to the import value if the surrogate country import statistics do not include international freight costs. In Silvery Dragon's view, foreign brokerage and handling expenses are the charges incurred in the country of export and not the charges incurred in the surrogate country. Moreover, Silvery Dragon notes that the Policy Bulletin also does not suggest adding an amount for either inland freight or brokerage and handling expenses in the surrogate country to import values. Rather, the Department's practice does not support the addition of brokerage and handling expenses incurred in the surrogate country to adjust CIF-based import average unit values (AUVs).[54]

Finally, Silvery Dragon argues that its own production experience does not support adding Thai brokerage and handling expenses to the GTA Thai import AUVs. Silvery Dragon points out that the petitioners' argument to add an amount for foreign brokerage and handling to the surrogate input values contravenes the intent of the Department's NME surrogate value methodology to duplicate the respondent's supply, production and sales experience. Specifically, Silvery Dragon contends that in establishing a respondent's NV as accurately as possible, the Department attempts to mirror the respondent's production experience in the surrogate country. For this reason, Silvery Dragon claims that the Department only substitutes the actual costs of the respondent with corresponding surrogate values. With respect to its own experience, Silvery Dragon states that the record clearly shows it sourced all of its direct material and packing inputs from domestic suppliers in the PRC.[55] In applying its standard surrogate valuation methodology, Silvery Dragon maintains that the Department correctly valued its input usage amounts as if Silvery Dragon sourced them from a supplier in the surrogate country located the same distance away as its supplier in the PRC. Instead of using the prices it paid for the inputs, Silvery Dragon points out that the Department in this case used surrogate values based on GTA Thai import AUVs. Because it purchased all of its inputs from domestic suppliers and did not incur brokerage and handling expenses, Silvery Dragon agrees that the Department correctly determined not to add brokerage and handling expenses to its domestically-purchased inputs.

**Department's Position:**

For the reasons explained below, we agree with Silvery Dragon and have not added an amount for brokerage and handling expenses to the inputs we valued using Thai GTA import data for the final determination.

The Policy Bulletin states that "…in situations where the surrogate country import statistics do not include international freight costs, the Department will add international freight and foreign brokerage and handling charges to the import value."[56] As the data on the record confirm, the

---

[54] In support of its argument, Silvery Dragon cites to Taper Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results of 1988-1999 Administrative Review. Partial Rescission of Review, and Determination NotTo Revoke Order in Part, 66 FR 1953, 1956 (January 10, 2001); and Wooden Bedroom Furniture from the People's Republic of China: Final Results of Administrative Review, 75 FR 50992, 50999 (August 18, 2010).
[55] See Silvery Dragon's August 12, 2013, Section C and D Questionnaire Response at Exhibit D-4.
[56] See Policy Bulletin at 1.

GTA Thai import values are reported on a CIF basis which means they include international freight costs and insurance. Normally, international freight costs include not only the ocean freight portion of transporting the merchandise from one location to another but also the other expenses associated with moving the goods as well.

The Policy Bulletin also states that "When relying on surrogate country import statistics to value inputs, the Department normally obtains import prices that include the international freight costs of shipping the product to the port of the importing country...However, when the import statistics of the surrogate country do not include such costs, the Department has added surrogate values for international freight and brokerage and handling charges to the calculation of normal value."[57] As mentioned above, because the GTA Thai import values are reported on a CIF basis, they include international freight costs. We have no basis for assuming that all international movement expenses are not already included in the GTA Thai import values.

For these reasons, we considered all international movement expenses to be included in the GTA Thai import values we used to value material inputs, and have not added an amount for brokerage and handling expenses to these values.

With respect to Silvery Dragon's argument that adding an amount for brokerage and handling expense to the import values would not reflect its supply, production and sales experience, this argument is moot as we are not adding such an amount for the reasons outlined above.

**Comment 4: Truck Freight Surrogate Value**

In the Preliminary Determination, we valued truck freight expenses using data from the World Bank's Doing Business 2013: Thailand (Doing Business 2013) and used a calculation methodology based on a 20-foot container weighing 10 metric tons (MT) and an average distance of 76.67 kilometers, to derive a weight- and distance-based freight rate. The average distance calculation incorporated the following two distances: (1) the distance from the industrial park area in greater Bangkok to the Bangkok port (i.e., 43.33 kilometers); and (2) the distance from the industrial park area in greater Bangkok to Laem Chabang port (i.e., 110 kilometers). We did not inflate this freight rate because it is contemporaneous with the POI.[58]

We also stated in the Preliminary Determination that we selected the information from Doing Business 2013 to value truck freight because it was used in recent NME cases.[59] We did not use the truck freight rate data from www.dxplace.com because the data from this source appear to apply to a single date in June 2010, and it is unclear if the prices are six-month averages or a snapshot in time.

---

[57] See id., at 1-2.
[58] See Prelim Factor Valuation Memorandum at 6.
[59] See id.; Xanthan Gum From the PRC: Final Determination of Sales at Less Than Fair Value, 78 FR 33350 (June 4, 2013) and accompanying Issues and Decision Memorandum at Comment 6-A (Xanthan Gum); and Seamless Refined Copper Pipe and Tube From the People's Republic of China: Preliminary Results and Partial Rescission of Administrative Review 2011-2012, 78 FR 69820 (November 21, 2013), and accompanying Preliminary Decision Memorandum at 18.

Silvery Dragon claims that we should use the data from www.dxplace.com to value truck freight because this resource meets all of the criteria established by the Department for selecting the best surrogate value. For the reasons summarized below, Silvery Dragon argues that the Department's rationale and use of a truck freight surrogate value from Doing Business 2013 in the Preliminary Determination fails to comport with the statute, is unsupported by substantial evidence, and is inconsistent with established judicial precedent.

Specifically, Silvery Dragon claims that the Department departed from its longstanding policy governing the selection of surrogate values by not using the data from www.dxplace.com to value truck freight, as this source provides a broad market average rate covering a range of prices for transportation of cargo over several different routes. Instead, Silvery Dragon claims that the truck freight data from Doing Business 2013 cover only one price point (i.e., from the largest Thai city to the nearest port of exportation) and assume that a company would pay the same amount for a small delivery no matter the distance or delivery destination. In contrast, Silvery Dragon claims, the data from www.dxplace.com provide detailed price statistics for road transportation of cargo by truck from Bangkok to different cities throughout Thailand during June 2010. Silvery Dragon maintains that this resource contains freight data collected from several freight forwarders who are located in different provinces and service areas, and who use different vehicle types and ship different products.

Silvery Dragon points out that the freight rate data in Doing Business 2013 lack specificity with respect to the weight basis (i.e., 10 MT per a 20-foot container). Specifically, Silvery Dragon argues that the 20-foot container weight (i.e., 10 MT) the Department used to derive a weight- and distance-based truck freight rate from Doing Business 2013 is not specific to the transportation experience of Silvery Dragon, which ships, on average, more weight in a 20-foot container. Moreover, Silvery Dragon argues that the 10 MT weight is not commercially viable as it does not represent a 20-foot full container load weight. To support this claim, Silvery Dragon provided for consideration data from the Maersk shipping line, which indicate the weight of a 20-foot container is as much as 28.2 MT, and bills of lading at verification that show how much on average the 20-foot containers it used for its shipments weigh.

Moreover, Silvery Dragon notes that the distance information the Department relied on from Doing Business 2013 to derive a freight rate lacks specificity. In particular, Silvery Dragon argues that the Department had to use secondary information and make assumptions to identify the largest city and nearest port mentioned in Doing Business 2013 in order to derive a distance-based freight rate. Silvery Dragon also points out that the distance information from Doing Business 2013 provides only a single route from a single point of origin, whereas the www.dxplace.com data provide 228 price points along with actual distances and location information.[60]

In light of the above-noted data deficiencies in Doing Business 2013, Silvery Dragon maintains that the data from www.dxplace.com are far more broad and reliable because they provide a

[60] In support of its argument that the Department prefers to use more complete information in its calculations, Silvery Dragon cites to High Pressure Steel Cylinders from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, 77 FR 26739, 26742 (May 7, 2012).

central database of truck freight data drawn from multiple vendors located throughout Thailand and cover different products and services by using a variety of trucks. According to Silvery Dragon, this makes the www.dxplace.com data more representative of a broad geographical market average than the Doing Business 2013 data. Although the www.dxplace.com data are not as contemporaneous to the POI as the data from Doing Business 2013, Silvery Dragon claims that the Department is simply glossing over significant shortcomings with respect to Doing Business 2013, as well as record evidence indicating that the www.dxplace.com data are broader and more accurate than the Doing Business 2013 data.[61] Moreover, Silvery Dragon argues that the Department cannot select one data source instead of another simply because it identifies flaws in the data it is rejecting.[62] Furthermore, Silvery Dragon argues that in prior cases, the Department determined that the best surrogate truck freight value was from a source that was more broad-based but less contemporaneous, and it should do so in this case as well.[63] Finally, Silvery Dragon argues that the Department used the www.dxplace.com data in recent cases and it should continue to do so in this case as well.[64]

If, despite its objections, the Department continues to use Doing Business 2013 to value truck freight in the final determination, then Silvery Dragon points out that the Department needs to make two adjustments to the data. First, Silvery Dragon argues that the Department should revise the weight load per 20-foot container used in the calculation from 10 MT to 28.2 MT based on the Maersk shipping line data, consistent with what Silvery Dragon claims was done in recent cases.[65] Second, Silvery Dragon argues that the Department should use the actual distance travelled from the industrial park area in the largest city to the nearest leading seaport to derive the average freight charge. Specifically, Silvery Dragon claims that instead of assuming Bangkok is the nearest leading seaport, the Department should consider Laem Chabang port as the main deep seaport based on the information placed on the record and use the distance of 133 kilometers (from Bangkok to Laem Chabang) in the calculation, instead of an average of the two distances as was done in the Preliminary Determination.

The petitioners argue that the contemporaneity of the Doing Business 2013 data is very important due to the significant time lag between the www.dxplace.com data and the POI, and the dramatic shift in demand for trucking from the time the www.dxplace.com data were

---

[61] In support of its argument, Silvery Dragon cites to Clearon Corp. v. United States, 800 F. Supp. 2d 1355 (CIT 2011); and Jinan Yipin Corp. v. United States, 800 F. Supp. 2d 1226, 1295-1303 (CIT 2011).
[62] In support of its argument, Silvery Dragon cites to Guangdong Chems. Imp. & Exp. Corp. v. United States, 35 CIT 1412, 1417 (2006).
[63] In support of its argument, Silvery Dragon cites to Glycine from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 73 FR 55814 (September 26, 2008), and accompanying Issues and Decision Memorandum at Comment 6.
[64] In support of its argument, Silvery Dragon cites to Drawn Stainless Steel Sinks from the People's Republic of China: Preliminary Determination of Less Than Fair Value, 77 FR 60673, 60675 (October 4, 2012) (unchanged in Drawn Stainless Steel Sinks From the People's Republic of China: Investigation, Final Determination, 78 FR 13019 (February 26, 2013)) (Steel Sinks); and Steel Wire Garment Hangers from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and New Shipper Review; 2011-2012, 78 FR 70271, 70274 (November 25, 2013) (Garment Hangers).
[65] In support of its argument, Silvery Dragon cites to Certain Frozen Fish Fillets from the Socialist Republic of Vietnam; Galvanized Steel Wire from China; and Baroque Timber Indus. (Zhongshan) Co. v. United States, 925 F. Supp. 2d 1332, 1347-1348 (CIT 2013) (Zhongshan).

applicable (i.e., 2010) to the POI. According to the petitioners, the lack of contemporaneity with the POI is significant with respect to the selection of the freight surrogate value because of the impact of volatile energy costs such as diesel fuel between 2010 and 2013, and a shortage of qualified drivers.[66]

The petitioners also give other reasons for why the Doing Business 2013 data are superior to the www.dxplace.com data. Specifically, with respect to the single freight route, the petitioners assert that when surrogate values are based on import data, the Sigma[67] ruling requires that the freight be capped by the distance between the factory and the nearest seaport. According to the petitioners, the single freight route provided by Doing Business 2013 is methodologically consistent with the Sigma rule.[68] The petitioners note further that Doing Business 2013 reflects the actual business experience of many different "local freight forwarders, shipping lines, customs brokers, port officials and banks" in Thailand's capital (Bangkok). By contrast, the petitioners contend, the www.dxplacecom data are unknown in terms of the data collection source and may reflect 2010 offers for back-haul rates from only one freight forwarder.

Furthermore, the petitioners contend that although the type of truck used is not mentioned in Doing Business 2013, this is because the freight load weight has been provided and the source indicates that the information is based on the movement of 10 MT of merchandise. According to the petitioners, this condition is superior to patching together multiple sources to estimate what rate applies to which truck and to which load. By contrast, the petitioners claim that one has to make assumptions about the freight carried by the trucks named in the www.dxplace.com data because no documentation has been provided regarding freight load weights. In fact, the petitioners allege that the truck load weight used as the basis for the www.dxplace.com data originates from trucks provided by Tasai Kanok for hauling soil rather than trucks used for commercial merchandise.

Moreover, the petitioners state that the Doing Business 2013 data are not based on assumptions, but rather on compiled data obtained by instructing case study participants to report their actual business experience in moving 10 MT of material. Although Doing Business 2013 does state that "to make the data comparable across economies, several assumptions about the business and the traded goods are used," the petitioners claim that the study's use of the term "assumptions" is in the statistical sense of a known parameter or condition. For this purpose, the petitioners note that 10 MT serves as the basis for the Doing Business 2013 data collected by the World Bank. In using this source to value truck freight, the petitioners contend that the Department knows for certain (1) the route for the freight cost, (2) the specific freight weight which the participants in the study used to express their cost, and (3) the currency in which the costs were reported.

With respect to Silvery Dragon's allegation that the Doing Business 2013 data are incomplete and lack detail, the petitioners contend that this source is actually superior in quality to www.dxplace.com because of the nature of the data collected. For example, contrary to Silvery Dragon's claim that the former source does not identify the city used as the basis for the distance,

---

[66] See petitioners' August 28, 2013, submission at 8-9 and Attachment 3.
[67] See Sigma Corp. v. United States, 117 F.3d 1401, 1407-08 (Fed. Cir. 1997) (Sigma).
[68] In support of their argument, the petitioners cite to Preliminary Results of 2011-2012 Antidumping Duty Administrative Review: Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China, 78 FR 78333 (December 26, 2013).

the petitioners assert that it actually names Bangkok as the city location where information was collected from case study participants.[69]

With respect to the quality of the www.dxplace.com data, the petitioners point out, contrary to Silvery Dragon's assertion, that this source does not provide a broader market average of commercial freight rates but instead provides outdated offers to establish deeply discounted back-haul rates. Regarding the 228 data points in the www.dxplace.com data, the petitioners contend that the quantity of the data points does not translate to quality, as these data points do not represent actual prices or commercial freight costs. Rather, the petitioners claim that the data points simply help guide bidding by parties that access the www.dxplace.com website, which according to the petitioners, functions as a business portal where freight providers and freight customers offer and bid on the unused back-haul space. Therefore, according to the petitioners, www.dxplace.com is an inferior source because it only provides offers rather than actual freight costs. Accordingly, the petitioners contend that Silvery Dragon's claim that this source provides a central database of truck freight data drawn from multiple vendors is not supported by record evidence.

Regarding Silvery Dragon's reliance on other Department cases (i.e., Steel Sinks and Garment Hangers) to support its arguments for using the www.dxplace.com data to value truck freight, the petitioners note that in those cases, the period of investigation and/or review was much closer in terms of contemporaneity. Also, the petitioners note that in both Steel Sinks and Garment Hangers, there does not appear to be any discussion or consideration of alternative freight sources, indicating that the selection of a truck freight surrogate value in those cases was (or is) not an issue.

With respect to Silvery Dragon's insistence that the Department adjust the 20-foot container weight used in the truck freight calculation because the 10 MT figure is allegedly hypothetical, the petitioners argue that Silvery Dragon's reliance on Zhongshan as a basis for the Department making the requested weight adjustment is misplaced. Specifically, the petitioners claim that the ruling in Zhongshan centered on whether a letter of credit expense was an actual element of the reporting of brokerage and handling costs or not. In other words, the petitioners contend, the focus of this case was whether a specific parameter (i.e., a letter of credit rather than a container weight load) was part of the World Bank's survey methodology. In the instant case, the petitioners note that all parties agree that the parameter of a 10 MT container weight load is the basis for the survey used to compile the Doing Business 2013 data.

Regarding Silvery Dragon's insistence that the Department use only the distance it provided (i.e., the 133 kilometer distance from Bangkok to Laem Chabang port) in the freight calculation, the petitioners argue that Silvery Dragon is incorrect to assume that Laem Chabang has overtaken Bangkok in importance or that Bangkok is no longer a port in use. In fact, the petitioners point to record evidence which confirms that both Laem Chabang and Bangkok are Thailand's two largest ports and both are in operation.[70] The petitioners maintain that the Doing Business 2013 data are clearly based on data obtained from the Bangkok port and from businesses operating in the industrial park area of greater Bangkok. If the Doing Business 2013 data hypothetically

[69] See Doing Business 2013 at 82, submitted in the petitioners' August 21, 2013, submission.
[70] See Silvery Dragon's August 21, 2013, submission at Exhibit 8.

relied on information from businesses located in Eastern Thailand near the Gulf of Thailand, then the petitioners agree that the distance for the freight calculation should be based on the distance from the industrial park area in greater Bangkok to Laem Chabang port.

Regarding the distance itself (i.e., 133 kilometers), which Silvery Dragon claims should be used in the freight calculation, the petitioners note that this distance is from Bangkok city center to Laem Chabang port, and not from the industrial park location in greater Bangkok where businesses which participated in the survey used to compile the Doing Business 2013 data would be located. For this reason, the petitioners claim that the distance (i.e., 110 kilometers) they provided from the greater Bangkok industrial park area to Laem Chabang port would be more appropriate to use if the Department continues to use a weighted-average distance in its freight calculation.

**Department's Position:**

We agree with the petitioners and continued to use the data in Doing Business 2013 to value truck freight for the reasons explained below.

In selecting surrogate values for inputs, section 773(c)(1) of the Act directs us to use the "best available information." In determining the "best available information," it is the Department's practice to consider the following five factors: (1) broad market average; (2) public availability; (3) product specificity; (4) tax and duty exclusivity; and (5) contemporaneity of the data.[71] In this case, we find that the Doing Business 2013 data are the best available information on our record for valuing truck freight because it is more reliable than the www.dxplace.com data in terms of the quality of the data and its contemporaneity with the POI. Moreover, the Doing Business 2013 data provide a publicly available, broad market average freight rate, and we determined it is more appropriate to use this data to value truck freight in past NME proceedings.[72]

As explained in past NME proceedings, the Doing Business 2013 data provide information for the inland freight cost of shipping a container from Bangkok to a leading port in Thailand, and this freight cost is based on data collected from multiple vendors and users (i.e., shipping lines, customs brokers, and banks).[73] Based on these facts and given that Doing Business 2013 is a World Bank publication, we find the quality of the data in this publication to be reliable, consistent with our findings in other NME cases.[74]

Although the www.dxplace.com data appear to provide multiple freight rates from multiple locations in Thailand, we find that the data from this resource come from a single date in June

---

[71] See Fresh Garlic from the People's Republic of China: Final Results of the 2009-2010 Administrative Review of the Antidumping Duty Order, 77 FR 34346 (June 11, 2012), and accompanying Issues and Decision Memorandum at Comment 4.
[72] See Xanthan Gum at Comment 6-A, wherein the Department determined that the Doing Business 2013 data are superior to the www.dxplace.com data based on data quality and contemporaneity considerations, and between the two data, Doing Business 2013 is the best available information to value truck freight.
[73] See id.
[74] See e.g., Certain Polyester Staple Fiber From the People's Republic of China: Final Results of Antidumping Duty Administrative Review 2010-2011, 78 FR 2366 (January 11, 2013) and accompanying Issues and Decision Memorandum at Comment 3.

2010 and it remains unclear, despite Silvery Dragon's argument to the contrary, whether the prices are six-month averages or a snapshot in time. Absent evidence indicating whether this resource provides historical price data, we cannot consider this resource more reliable than Doing Business 2013.

Moreover, as both interested parties acknowledge, the freight rate data in Doing Business 2013 are contemporaneous with the POI in this case. Conversely, the June 2010 www.dxplace.com data are not contemporaneous with the POI. We find that the lack of contemporaneity of the www.dxplace.com data is important to consider given that freight rates may be affected by various factors over time (e.g., changes in demand for truck services and increasing energy costs) for which the wholesale price data used for inflating a value to the POI will not necessarily account.

Regarding the 20-foot container weight (i.e., 10 MT) which serves as the basis for the freight rate in Doing Business 2013, the Department established in prior NME cases in which Doing Business 2013 was used to value truck freight that the weight of the 20-foot container in this publication is 10 MT.[75] See Comment 5 below for further discussion.

Regarding the distance in the freight rate calculation, we note that Doing Business 2013 does not specify to which major port it is referring and there are at least two major ports in Thailand (i.e., Bangkok and Laem Chabang) based on the record evidence in this case. While the accuracy of the distance from Bangkok's industrial park area to the Bangkok port (i.e., 44.33 kilometers) is not at issue with the parties in this case,[76] the distance from Bangkok's industrial park area to the Laem Chabang port is. In the Preliminary Determination, we relied on the Laem Chabang port distance (i.e., 110 kilometers) based on information timely submitted by the petitioners from www.thailand.com which clearly establishes the distance from Bangkok's industrial park area.[77] Regarding the Laem Chabang port distance provided by Silvery Dragon (i.e., 133 kilometers), the record evidence indicates that this distance is from Bangkok city center, and not from Bangkok's industrial park area, to Laem Chabang port. Therefore, for the final determination, we continued to use an average distance of 76.67 kilometers (i.e., the average of the 44.33 and 110 distances) to convert the truck freight rate in Doing Business 2013 to a distance-based rate.

**Comment 5: Weight Adjustment Made to the Brokerage and Handling Surrogate Value**

In the Preliminary Determination, we valued brokerage and handling using data from the World Bank's Doing Business 2013 and a calculation methodology based on a 20-foot container weighing 10 MT to derive a U.S. dollar-per-kilogram value.[78]

As mentioned in Comment 4 above, Silvery Dragon points out that the 20-foot container weight information in the World Bank publication is a hypothetical weight figure which is not specific to Silvery Dragon's transportation experience. In contrast, Silvery Dragon provided for

---

[75] See e.g., Certain Steel Nails From the People's Republic of China; Final Results of Third Antidumping Duty Administrative Review; 2010-2011, 78 FR 16651 (March 18, 2013), and accompanying Issues and Decision Memorandum at Comment R.
[76] See the petitioners' August 21, 2013, submission at Exhibit 6.
[77] See the petitioners' August 28, 2013, submission at Exhibit 5.
[78] See Prelim Factor Valuation Memorandum at 7.

consideration data published by Maersk shipping line which indicates the weight of a 20-foot container is as much as 28.2 MT and is consistent with its own bills of lading provided at verification that show how much on average the 20-foot containers it uses for its shipments weigh. Silvery Dragon requests that the Department adjust the brokerage and handling surrogate value from the preliminary determination by using a full 20-foot container weight of 28.2 MT. Alternatively, Silvery Dragon requests that the Department use its container weight experience (as reflected in the 20-foot container weight data extracted from its bills of lading examined by the Department at verification) as the basis for deriving a U.S. dollar-per-kilogram value for brokerage and handling expenses from Doing Business 2013.

The petitioners claim that in a recent case dealing with this very same issue, the Department confirmed the applicability of the 20-foot container weight in Doing Business 2013.[79] Moreover, the petitioners point out that the businesses surveyed in this publication, including freight forwarders, reported the cost of doing business in Bangkok based on the parameter of 10 MT of goods being shipped. Therefore, the petitioners maintain that the Department should continue to calculate this expense based on the 20-foot container weight information in the World Bank's Doing Business 2013.

**Department's Position:**

For the reasons explained below, we agree with the petitioners and continued to value brokerage and handling using a 20-foot container weight of 10 MT from Doing Business 2013.

We find that the weight (i.e., 10 MT) mentioned as a parameter in the World Bank's Doing Business 2013 publication also serves as the basis for the brokerage and handling expense data collected for the World Bank's study. The Department addressed this same issue in Steel Nails and determined in that case that the explanatory note regarding the container weight in the Doing Business 2013 publication (i.e., "(t)he traded product travels in a dry cargo, 20-foot, full container load. It weighs 10 tons…") is the parameter used by the World Bank to collect the brokerage and handling expense data contained in that study.[80] This same information is also on the record of this case.[81] Therefore, we find it unnecessary to adjust the brokerage and handling surrogate value on any other weight basis, as suggested by Silvery Dragon.

**Comment 6: Marine Insurance Surrogate Value**

In the Preliminary Determination, we valued marine insurance using the broad average rate quote for shipments of comparable merchandise (i.e., steel sheets, coils and bars) outside the United States obtained from PAF Shipping Insurance's (PAF's) website (http://www.grw-products.com) (PAF public quote).[82] We did not use the shipment-specific quote[83] which Silvery Dragon

---

[79] In support of its argument, the petitioners cite to Certain Steel Nails from the People's Republic of China: Final Results of the Third Antidumping Duty Administrative Review, 78 FR 16651 (March 18, 2013) and accompanying Issues and Decision Memorandum at Comment 3R (Steel Nails).
[80] See id.
[81] See the petitioners' November 15, 2013, submission at Exhibit 5.
[82] See Prelim Factor Valuation Memorandum at 7. The actual website is http://www.pafinsurance.com, but the price quote document shows the website source as http://www.grw-products.com/onlinerates.htm.

obtained directly from PAF because we considered that rate quote to be less representative than the selected broad average rate quote obtained from PAF's website, and because we relied on broad average rate quotes rather than shipment-specific quotes in recent NME cases.[84] We also did not use the general rate from RJG Consultants (RJG rate)[85] provided by Silvery Dragon because that rate (from October 2010), unlike the PAF rate, was not contemporaneous with the POI.

Silvery Dragon contends that the Department should use the price quote it obtained directly from PAF which it included in its November 5, 2013, submission, because it includes risk coverage and is specific for shipping containerized PC tie wire from the PRC to the United States. Despite the petitioners' contention that this price quote is not publicly available and is based on a party-specific transaction, Silvery Dragon maintains that price quotes, by their very nature, are party-specific and tailored to the shipment of specific goods. Moreover, Silvery Dragon claims that Department has a longstanding policy of accepting specific price quotes. In addition, Silvery Dragon points out that its price quote is corroborated by other information on the record of this proceeding – namely, the price quote obtained from RJG – as the two price quotes only differ by 14 percent. Finally, Silvery Dragon claims that because the petitioners did not submit any comments challenging the validity of this price quote, this must mean that the petitioners support its use in this case.[86]

By contrast, Silvery Dragon argues that the PAF public quote used in the Preliminary Determination is abnormally high when compared to Silvery Dragon's price quote from the same source or to the RJG price quote. Moreover, Silvery Dragon points out that the PAF public quote also lacks specificity, as it is not specific to the subject merchandise.

The petitioners argue that the Department should continue to value marine insurance using the public quote from PAF and not a proprietary email quote which Silvery Dragon obtained in private correspondence with PAF or the outdated and non-specific RJG published rate. Regarding the PAF email quote provided by Silvery Dragon, the petitioners point out that the private nature of the quote should disqualify it from consideration. The petitioners add that this proprietary price quote is not a historical price between two disinterested parties but a private quote obtained by the respondent under investigation. For these reasons, the petitioners claim that neither the Department nor the petitioners can know the totality of the circumstances or conditions under which Silvery Dragon obtained the quote. Such unknown elements in private transactions and, in particular, single transactions involving an interested party, are, according to the petitioners, the very reason why the Department has a longstanding preference to use public data when valuing factors of production and/or transportation services provided by NME

[83] See Silvery Dragon's November 5, 2013, submission at Exhibit 4.
[84] See Prelim Factor Valuation Memorandum at 7; and e.g., Certain Kitchen Appliance Shelving and Racks from the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination, 74 FR 9591, 9601 (March 5, 2009), unchanged in Certain Kitchen Appliance Shelving and Racks From the People's Republic of China: Final Determination of Sales at Less Than Fair Value, 74 FR 36656 (July 24, 2009).
[85] See Silvery Dragon's August 28, 2013, submission at Exhibit 1C.
[86] In support of its argument, Silvery Dragon cites to Jinan Yipin Corp. v. United States, 800 F. Supp. 2d 1226, 1280 (CIT 2011) and Zhengzhou Harmoni Spice Co. v. United States, 617 F. Supp. 2d 1281 (CIT 2009) (Harmoni).

suppliers. Regarding the PAF rate, the petitioners maintain that it is superior in all respects and the Department relied on published PAF insurance rates for U.S. inland insurance in prior proceedings.[87]

**Department's Position:**

We agree with the petitioners and continued to use the PAF public quote to value marine insurance in the final determination.

The Department has stated a preference that when selecting surrogate values for use in NME proceedings, it will select, to the extent practicable, surrogate values which are publicly available, product-specific, representative of a broad market average, tax- and duty-exclusive and contemporaneous with the POI.[88] These surrogate value selection criteria identify "all" of the factors the Department considers when selecting the best available information for surrogate valuation purposes.

In applying these surrogate value selection criteria for purposes of selecting the best available information for marine insurance on the record of the case, we find that the PAF rate is publicly available, specific to steel products, representative of a broad market average and contemporaneous with the POI. Specifically, this rate can presently be downloaded directly from the PAF website. The website information indicates that this rate is applicable for steel products (i.e., steel sheets, coils and bars) and was applicable during the POI. Because this rate is actually based on a percentage of the value, the tax- and duty-exclusive consideration does not apply.

Although the RJG rate has also been considered publicly available and been used by the Department in prior cases, it is non-specific in terms of the product and is outdated (i.e., October 2010). Therefore, we find that although the PAF and RJG rates are both publicly available, the PAF rate is superior to the RJG rate both in terms of product specificity and contemporaneity. Moreover, we find no basis to suggest that this PAF rate is not representative of an exporter's experience in general and Silvery Dragon's experience in particular.

Regarding the rate quote proffered by Silvery Dragon, which was also obtained from PAF, the information Silvery Dragon provided for this rate quote indicates that counsel for Silvery Dragon contacted PAF directly and obtained a rate quote from PAF on behalf of Silvery Dragon. This information is not publicly available on the PAF website and could not be obtained without direct correspondence with PAF. Moreover, the information accompanying this rate quote appears to indicate that PAF is seeking Silvery Dragon's business and, thus, PAF may have

[87] In support of its argument, the petitioners cite to Certain Kitchen Appliance Shelving and Racks from the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination, 74 FR 9591, 9601 (March 5, 2009), unchanged in Certain Kitchen Appliance Shelving and Racks From the People's Republic of China: Final Determination of Sales at Less Than Fair Value, 74 FR 36656 (July 24, 2009).

[88] See, e.g., Final Determination of Sales at Less Than Fair Value: Certain Artist Canvas from the People's Republic of China, 71 FR 16116 (March 30, 2006), and accompanying Issues and Decision Memorandum at Comment 2.

offered Silvery Dragon a special rate in order to obtain its business. In fact, the note on the correspondence between PAF and Silvery Dragon's counsel indicates that PAF will beat any quote by 10 percent.[89]

The Department's stated preference is to rely on publicly available broad market average price data rather than on price quotes obtained by interested parties, because price quotes obtained by interested parties are subject to information collection and accessibility concerns. For example, the Department has concerns about relying on price quotes obtained by interested parties in an antidumping proceeding because in order to obtain this information, an interested party may need to conduct private correspondence with the information source and this action calls into question the public availability of the data are publicly available. In addition, the Department cannot be certain that it could obtain the same price quote. Finally, price quotes are generally proprietary in nature and, as such, the Department does not know the conditions under which the information is obtained. For these reasons, the Department does not normally rely on price quote information solicited by interested parties for purposes of an antidumping case when it has alternative surrogate value information on the record which is publicly available, product-specific, representative of a broad market average, tax- and duty-exclusive, and contemporaneous with the POI.

In response to Silvery Dragon's claim that the Department is required to consider price quotes rather than broad market average surrogate values to value inputs based on the Harmoni decision, as we explained above, in this case the "best available information" is the PAF public rate and not the PAF price quote submitted by Silvery Dragon based on the totality of the Department's surrogate value selection criteria.

**Comment 7: Polypropylene Fabric Surrogate Value**

In the Preliminary Determination, we valued PP fabric using Thai import data from GTA reported under HTS subheading 5512.99.00000 for the POI.[90] This information was submitted by Silvery Dragon.[91] For input valuation purposes, we did not include in the PP fabric surrogate value calculation import data from countries the Department had previously determined to be an NME country and imports from countries that the Department had reason to believe or suspect may be dumped or subsidized.[92]

---

[89] See Silvery Dragon's November 5, 2013, submission at Exhibit 4.
[90] See Prelim Factor Valuation Memorandum at 6.
[91] See Silvery Dragon's August 21, 2013, submission at Exhibit 3.
[92] These countries include India, Indonesia, South Korea and Thailand. See China Nat'l Mach. Import & Export Corp., 293 F. Supp. 2d 1334, 1336 (CIT 2003); Certain Cut-to-Length Carbon Steel Plate from Romania: Notice of Final Results and Partial Rescission of Antidumping Duty Administrative Review, 70 FR 12651 (March 15, 2005); Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination: Chlorinated Isocyanurates From the People's Republic of China, 69 FR 75294, 75301 (December 16, 2004), unchanged in Notice of Final Determination of Sales at Less Than Fair Value: Chlorinated Isocyanurates From the People's Republic of China, 70 FR 24502 (May 10, 2005); see also Citric Acid and Certain Citrate Salts From the People's Republic of China: Preliminary Results of the First Administrative Review of the Antidumping Duty Order; and Partial Rescission of Administrative Review, 76 FR 34048, 34051 (June 10, 2011), unchanged in Citric Acid and Certain Citrate Salts from the People's Republic of China: Final Results of the First Administrative Review of the Antidumping Duty Order, 76 FR 77772 (December 14, 2011).

Silvery Dragon now claims that the Thai import data obtained from HTS sub-heading 5512.99.00000 were not specific to PP fabric, and that the price per kilogram derived from this HTS subheading is aberrational when compared to wire rod prices and to the import data provided for another HTS subheading for the input at issue (i.e., HTS subheading 5407.20) which the petitioners submitted for consideration prior to the issuance of the Preliminary Determination.[93]  Therefore, Silvery Dragon contends that the Department should use only the Thai import data from HTS subheading 5407.20 to derive a PP fabric surrogate value because the data from this HTS subheading are for "woven fabrics of synthetic filament yarn obtained from the strip or the like," which is more specific to PP fabric, and also because the price per kilogram is more reasonable and probative of an actual price.  Alternatively, Silvery Dragon requests that the Department weight average the data from both HTS subheadings (i.e., 5407.20 and 5512.99.00000) to derive a PP fabric surrogate value, as this approach is supported by the Department's consistent practice, case precedent and practical considerations.[94]

The petitioners point out that it was Silvery Dragon that submitted the Thai import data for PP fabric from HTS subheading 5512.99.00000 in its August 21, 2013, submission for consideration in the Department's preliminary determination, and claimed that these data were the most accurate for surrogate valuation purposes.  The petitioners note that Silvery Dragon submitted this data with full knowledge of the exact characteristics of the PP fabric its uses to pack the subject merchandise.  To support this claim, the petitioners explain that because the description of the four-digit HTS subheading (i.e., 5512) pertains to nylon or polyethylene, it follows that other plastics such as polypropylene (i.e., PP) have to be accounted for in the Nesoi category in the description of the HTS subheading 5512.99.00000 (i.e., Woven Fabrics Of Synthetic Staple Fibers, Containing 85% Or More By Weight Of Synthetic Staple Fibers, Nesoi (Not Elsewhere Specified or Included), Printed, Dyed or Colored, other).

On the other hand, the petitioners contend that the Thai import data for PP fabric from HTS subheading 5407.20 were included in their August 28, 2013, submission and were their best estimate of the proper tariff category absent knowledge of the format, shape, construction, color or other characteristics of the PP fabric used by Silvery Dragon.

The petitioners also contend that the only reason Silvery Dragon is no longer advocating the use of data from HTS subheading 5512.99.00000 is because it now finds that the value derived from this data is too high.  However, the petitioners argue that this reasoning is not a sufficient basis to invalidate a value.[95]  Not only is Silvery Dragon's comparison of plastic fabric and wire rod prices inapposite for purposes of showing the PP fabric price derived from HTS subheading 5512.99.00000 is abnormal, the petitioners argue, but so is Silvery Dragon's comparison of PP fabric prices based on data from the two subheading numbers (i.e., 5407.20 versus 5512.99.00000).  Specifically, the petitioners note that Silvery Dragon fails to identify anything

---

[93] See the petitioners' August 21, 2013, submission at Exhibit 8.

[94] In support of its argument, Silvery Dragon cites to Hand Trucks and Certain Parts Thereof from the People's Republic of China:  Final Results of Administrative Review and Final Results of New Shipper Review, 72 FR 27287 (May 15, 2007) (in which the Department valued the bearing or axis of rotation input by weight averaging the data reported under two different HTS headings) (Hand Trucks).

[95] In support of its argument, the petitioners cite to Pure Magnesium from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 73 FR 76336 (December 16, 2008), and accompanying Issues and Decision Memorandum at Comment 2.

deficient in the import data obtained from HTS subheading 5512.99.00000 (e.g., quantity amount, outlier considerations) which would disqualify the use of this data.

Finally, with respect to Silvery Dragon's request that Department weight average the data from both HTS sub-headings (i.e., 5407.20 and 5512.99.00000) to derive a PP fabric surrogate value, the petitioners claim that if the Department agrees with this approach then it must correct an error present in Silvery Dragon's suggested calculation.

**Department's Position:**

When the Department applies its surrogate value selection methodology in NME proceedings, it does so with the goal of selecting the most accurate single surrogate value for the input at issue based on the information submitted on the record. In this case, Silvery Dragon proffered a PP fabric surrogate value obtained from Thai import GTA data for HTS subheading 5512.99.00000, and requested the Department to consider its use in the preliminary determination. The Department used the data from the HTS subheading 5512.99.00000 to value the input subject to verification. At verification, we were unable to obtain any more specific information relevant to the PP fabric Silvery Dragon used to pack the subject merchandise. Since the preliminary determination, Silvery Dragon has withdrawn its advocacy of the GTA import data from HTS subheading 5512.99.00000 because it claims the value is aberrational when compared to the GTA import data from HTS subheading 5407.20 which the petitioners originally suggested be used to value PP fabric.

After re-examining the descriptions of and prices obtained from both HTS subheadings, we find that it is appropriate to consider both sets of data for use in the final determination. The descriptions for each HTS subheading (i.e., 5512.99.00000 and 5407.20) indicate the product is woven fabric of a synthetic fiber. The PP fabric used by Silvery Dragon could fall under either category and Silvery Dragon did not have information available at verification to indicate otherwise. Thus, because there is no additional information on the product used by Silvery Dragon on the record of this proceeding, we find that both sets of data are equally specific to the input at issue. Regarding Silvery Dragon's allegation that the price obtained from HTS subheading 5512.99.00000 is now aberrational (when before it was not), we find this argument without merit. The description of HTS subheading 5512.99.00000 (i.e., "Woven Fabric of Synthetic Staple Fibers, Containing 85% Or More By Weight Of Synthetic Staple Fibers Nesoi, Printed Dyed Or Colored, Other") reflects a much more specific dimension and type of PP fabric than the type of PP fabric reflected in HTS subheading 5407.20 (i.e., "Woven Fabrics Of Synthetic Filament Yarn Obtained From The Strip Or The Like"). As such, it is not reasonable to compare the price data between the two subheadings, as Silvery Dragon attempts to do.

Therefore, for the final determination, we used the GTA import data from both HTS sub-headings and derived a simple-average price to value PP fabric. Should this investigation result in an antidumping duty order and an administrative review is subsequently requested, we will revisit the valuation of this input with the goal of identifying a single surrogate value that is specific to the input used by the respondent, consistent with our above-stated preference to use the most accurate single surrogate value for input valuation purposes.

**Comment 8: Electricity Surrogate Value**

In the Preliminary Determination, we valued electricity using the calculation methodology applied in Drawn Sinks, Sodium Hexametaphosphate, and Silicon Metal.[96] The electricity calculation we performed is based on the tariff rates applied by the Thailand Metropolitan Electricity Authority (MEA) during the POI for "large general service" companies. We stated in the Preliminary Determination that we find this methodology represents the "best available" information within the meaning of the statute because the MEA rates are from an approved surrogate country, are publicly available, specific to the input, contemporaneous, and exclusive of taxes.[97]

We did not use the data from the Electricity Generating Authority of Thailand, Annual Report 2010 (EGAT Report)[98] because the 2011 Annual Report describes EGAT as a producer, transmitter and seller of electricity to distributing authorities which, in turn, sell electricity to end-users.[99] The EGAT Report provides only wholesale electricity rates for the following five segments (or customer groups) of the Thai economy: MEA, Provincial Electricity Authority (PEA), Direct Customers, Standby Power Supply, and Other Minor Customers. Thus, EGAT sells electricity at a wholesale price to a public utility which then sells electricity at a retail price to end-users. Further, while the EGAT Report does identify a price to direct customers, it does not indicate whether the EGAT Report's direct customer price is exclusive of VAT.[100]

We also stated in the Preliminary Determination that the EGAT's electricity prices do not represent broad market averages to end-users such as Silvery Dragon. In their November 15, 2013, submission, the petitioners proposed using EGAT but adjusting the wholesale values in that source to retail values based on the data obtained from MEA.[101] However, we relied solely on the MEA data to derive a surrogate electricity value in the preliminary determination, consistent with the methodology applied in recent cases.[102]

The petitioners reiterate their request to use the EGAT data applicable during 2012, which contain electricity wholesale rates for the various segments of the Thai economy including MEA, but convert those segment-specific wholesale rates in the EGAT Report to retail rates by

---

[96] See Drawn Stainless Steel Sinks From the People's Republic of China: Antidumping Duty Investigation, 77 FR 60673 (October 4, 2012), unchanged in Drawn Stainless Steel Sinks From the People's Republic of China: Investigation, Final Determination, 78 FR 13019 (February 26, 2013) (Drawn Sinks); see also Sodium Hexametaphosphate from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 77 FR 59375 (September 27, 2012) and accompanying Issues and Decision Memorandum at Comment II (Sodium Hexametaphosphate); see also Silicon Metal from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 77 FR 54563 (September 5, 2012) (Silicon Metal).

[97] See Prelim Factor Valuation Memorandum at 4.

[98] See the Petitioners' August 21, 2013, submission at Exhibit 9.

[99] See id.

[100] See Prelim Factor Valuation Memorandum at 4.

[101] See the Petitioners' November 15, 2013, submission.

[102] See Certain Kitchen Appliance Shelving and Racks from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review: 2011-2012, 78 FR 54450 (September 4, 2013), and accompanying Preliminary Decision Memorandum at 16, unchanged in Certain Kitchen Appliance Shelving and Racks from the People's Republic of China: Final Results and Partial Rescission of Antidumping Duty Administrative Review; 2011-2012, 79 FR 3176 (January 17, 2014).

applying an adjustment factor based on the MEA retail rate data obtained from the MEA publication. According to the petitioners, this adjustment method would yield the best broad, national, tax-free, retail-level, electricity rate tailored to Silvery Dragon's operations.

Silvery Dragon states that the Department should not adjust the electricity surrogate value used in the Preliminary Determination as requested by the petitioners because their method is flawed. Specifically, Silvery Dragon points out that only the segment rates for PEA and MEA in the EGAT Report represent broad market segments, whereas the other three segment rates in the EGAT Report are fringe customer classes. Based on this observation and the price range difference between the PEA/MEA price data and the price data for the other three customer classes, Silvery Dragon concludes that the rates in EGAT for the three fringe customer classes may be unrepresentative of the average unit price of electricity charged to a producer such as SD Hejian.

Silvery Dragon also argues that the Department should not adopt the petitioners' electricity surrogate value adjustment method because how they propose determining the surrogate electricity value based on averaging the prices charged to a broader category of non-comparable customer classes is inconsistent with their suggestion to determine the factor of production (FOP) of electricity based on a higher degree of specificity.

**Department's Position:**

We agree with Silvery Dragon and continued to use the MEA electricity value from the MEA publication for the final determination.

As mentioned in the Preliminary Determination, the MEA rate from the MEA publication is a retail rate applicable to industrial users such as Silvery Dragon. This rate is also tax-exclusive and contemporaneous with the POI. While the five segment rates in the EGAT Report are retail rates, three of those rates are overly broad in that they appear to apply to non-industrial segments of the Thai economy.

With respect to the petitioners' suggestion to make an adjustment to each segment's retail rate data in the EGAT Report using MEA's data from the MEA publication, we consider this approach to be unnecessary given that the MEA publication provides retail industrial user rate information from MEA, and we would be making an assumption unsupported by any record evidence that the adjustment based on the MEA data should apply to the other segments listed in the EGAT Report. Given that some of the segments in the EGAT Report do not even appear to relate to industrial usage customers, we find that the best available information on this record to value electricity is the industrial retail value contained in the MEA publication.

**Comment 9: Electricity Consumption Factor Adjustment**

Silvery Dragon developed its reported electricity FOP based in part on the results of a study conducted in 2007, which measured electricity consumption for different grades of steel wire products of varying diameters.[103] In its Verification Report, the Department noted the following:

[103] See Silvery Dragon's October 17, 2013 submission at 11-13.

> "Given that the electricity standards developed by the company provide a more specific measure of consumption for individual product diameters, it may be appropriate to adjust the reported FOP based on the standard electricity consumption of the steel wire product that is most similar to the U.S. CONNUM."[104]

The petitioners agree that an adjustment to Silvery Dragon's reported FOP for electricity should be made for the final determination.

Silvery Dragon responds that the Department should accept its electricity FOP as reported. The respondent points out that its reported electricity FOP was based on the average consumption of different grades of steel wires with various diameters. For purposes of the electricity study, Silvery Dragon measured the consumption for wire products with different diameters, and used the average of the consumption amount for three tested diameters in reporting the electricity FOP. Silvery Dragon believes that the Department's finding in the verification report – that we would consider revising the reported FOP because one of the individual products that is included in the average consumption amount is very close to the diameter of the U.S. CONNUM and therefore provides a more specific measure of electricity usage – is based on the erroneous presumption that the diameter of wire has a one-to-one correlation with the per-unit consumption of electricity. Silvery Dragon argues, however, that information on the record establishes that there is no such correlation. The respondent asserts that the petitioners failed to explain, beyond merely citing the Department's findings, how tying the consumption of electricity to the production of a single dimension of steel wire diameter would automatically produce a more accurate result. Because certain information related to this issue is proprietary in nature, a more detailed summary and discussion is provided in the Final Analysis Memorandum.

**Department's Position:**

We agree with the petitioners and made an adjustment to the respondent's electricity FOP for this final determination.

As noted, Silvery Dragon undertook a study in 2007 to measure the standard per-unit electricity usage for different diameters of PC steel wire products.[105] To report its electricity FOP to the Department, the company relied on the average per-unit consumption of three individually-tested products within a given diameter range.[106] As discussed in the Verification Report, the diameter of the PC tie wire sold by Silvery Dragon in the United States is very close to the diameter of one of the three individual products tested by the company that was included in the average per-unit electricity consumption used for reporting the FOP. Therefore, we find that the record in this case provides a more specific measure with which to better approximate electricity usage for the

---

[104] See Verification Report at 36-37.

[105] With regard to the production of the merchandise under consideration (i.e., low-relaxation, or heat treated, PC tie wire), electricity consumption is in large part a function of the nominal diameter of the finished product. That is, more electricity is required as the wire is drawn to smaller diameters.

[106] See Silvery Dragon's August 12, 2013, submission at 13, and October 17, 2013, submission at 11-13 and Exhibit SD-21.

U.S. product than does the average consumption based on a range of product diameters. We acknowledge that the increase or decrease in electricity usage is not necessarily exactly proportional to the change in product dimensions. However, given that the average per-unit electricity consumption used for the reported FOP also reflects usage for two wire products that are quite different, in terms of nominal diameter, from the U.S. product, we do not find it unreasonable in this instance to instead rely on the electricity consumption of the tested wire product from the broad averaging group that is closest to the U.S. product in physical characteristics.

For this final determination, therefore, we used the more specific per-unit consumption figure from Silvery Dragon's 2007 electricity study for the individual product most similar to that sold in the United States. As certain information related to this issue is business proprietary in nature, please refer to the Final Analysis Memorandum for further discussion and analysis.

**Comment 10: Treatment of Social Security/Workman's Compensation in Surrogate Financial Ratio Calculations**

For the Preliminary Determination, the Department used the 2012 financial statements of Vongthong Steel Wire Co. Ltd. (Vongthong) and Rayong Wire Co. (Rayong) to calculate surrogate financial ratios. Silvery Dragon argues that the Department improperly allocated the line item from Vongthong's income statement entitled "social securities fund and workmen's compensation" to the numerator of the selling, general, and administrative (SG&A) expense ratio. The respondent asserts that the Department should have classified these expenses as "labor" in its surrogate financial ratio calculations. Silvery Dragon posits that, even though the expenses at issue are classified under "administrative expenses," they necessarily include the cost of social security and workmen's compensation for all employees, including factory workers. Silvery Dragon points out that the Department fine-tuned its labor cost valuation policy to apply a surrogate value that includes the cost of direct, as well as indirect, labor. The respondent states the Department used data from the Thai National Statistics Office (NSO) to value labor costs for the preliminary determination. Silvery Dragon further notes that the NSO data are inclusive of wages and salaries, fringe benefits, and employer's contribution to social security. Because all of the elements of indirect labor costs, including contributions to social security, are included in the NSO data that were applied as the surrogate value for factory labor, Silvery Dragon believes that the inclusion of these costs in the numerator of the SG&A ratio (to the extent that they relate to manufacturing labor) amounts to double-counting of indirect labor costs.[107]

The petitioners respond that the line item in Vongthong's financial statement for social security and workmen's compensation does not distinguish between expenses incurred for manufacturing employees and administrative employees. The petitioners argue that, given that these expenses include both types of labor costs, the Department's calculations in this respect were correct. In the event the Department decides to reapportion some of these expenses, the petitioners submit

[107] In support of its claims, Silvery Dragon cites to Steel Nails, where the Department classified welfare and social security funds under "labor" instead of "SG&A."

that they should be allocated to SG&A and factory labor based on the relative salary and wages costs of factory employees and administrative personnel.

The petitioners also argue that, if the Department is unable to determine the exact nature of the Vongthong line-item expenses, it should not guess as to the proper classification of these expenses but should decide that it cannot rely on this financial statement. Under these circumstances, the petitioners assert, the Department should use the financial statements of Rayong to calculate surrogate ratios for the final determination.

**Department's Position:**

We disagree with Silvery Dragon that the "social securities fund and workmen's compensation" line item from the Vongthong financial statements should be reclassified as factory labor expenses in the surrogate financial ratio calculations. The Vongthong financial statements provide a separate and clear classification for manufacturing costs and for selling and administrative expenses.[108] Because the expenses at issue are classified on those financial statements as "administrative" costs, we included them in the numerator of our SG&A surrogate ratio calculation for the preliminary determination.

Given the nature of the information that serves as the source for financial ratio calculations in NME cases (i.e., that it is based on surrogate financial data from a company that is not a party to the proceeding), we cannot "go behind" a surrogate financial statement to determine precisely what each item includes or to what activity it relates.[109] Therefore, when assigning the various expenses to particular categories for our financial ratio calculations, we prefer to rely on the classification of expenses from the surrogate financial statements, unless there is good reason to believe the classification is not accurate.[110] In this case, as noted above, manufacturing costs and selling and administrative expenses are clearly identified in the surrogate financial statements, and the accompanying notes provide rather detailed schedules of the expenses included in each category.[111] It is not unreasonable to assume that the expenses at issue relate only to administrative personnel, as they are classified specifically as such in the financial statements.[112] Nor is it unreasonable to expect that social security and workmen's compensation expenses are already included in the factory labor amounts, even though they are not separately itemized in the schedule of manufacturing costs. Moreover, there is no other information in the Vongthong financial statements or elsewhere on the record of this case suggesting that the financial statement classifications are not accurate.

---

[108] See Silvery Dragon's August 21, 2013, Submission at Exhibit 9.

[109] See, e.g., Diamond Saw Blades and Parts Thereof from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 78 FR 11143 (February 15, 2013) and accompanying Issues and Decision Memorandum at Comment 16.

[110] See, e.g., Chlorinated Isocyanurates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 79 FR 4875 (January 30, 2014) and accompanying Issues and Decision Memorandum at Comment 6D (Chlorinated Isocyanurates) (where the Department classified employee and retirement benefits as SG&A expenses because these items were classified as such in the surrogate financial statements).

[111] See Silvery Dragon's August 21, 2013, Submission at Exhibit 9.

[112] See, e.g., Chlorinated Isocyanurates at Comment 6D.

Regarding the petitioners' argument that the Department should only use the financial statements of Rayong if we are unable to determine the nature of the various line items at issue from the Vongthong financial statements, the Department cannot know with complete certainty the exact nature of each and every line item in a surrogate financial statement. This fact does not, however, render a particular financial statement unusable as a surrogate.

Therefore, for this final determination, we continued to use both the Vongthong and Rayong financial statements for our surrogate financial ratio calculation, and made no changes with respect to the classification of either "social securities and workmen's compensation" or, as discussed below in Comment 11, "transportation" expenses, in our surrogate financial ratio calculations.

**Comment 11: Treatment of Transportation Expenses in Surrogate Financial Ratio Calculations**

As noted above, for the Preliminary Determination, the Department used the 2012 financial statements of Rayong and Vongthong to calculate surrogate financial ratios. Silvery Dragon argues that the Department improperly classified the "transportation" expense line item from the Vongthong financial statements as manufacturing overhead (MOH) in the financial ratio calculations. Silvery Dragon maintains that the Department should have considered "transportation" to be freight-in expenses related to the transport of raw materials to the factory, and, accordingly, should have accounted for this expense in the financial ratio calculations as a component of raw materials. The respondent argues that the Department's practice is to include inward transportation expense in the cost of materials for the surrogate financial ratios.[113] The respondent asserts that because transportation expenses are listed under the "Cost of Sales and Services" in the Vongthong financial statements, it must relate to the transportation of raw materials rather than finished goods. Silvery Dragon continues that the other line items classified by the Department as MOH in the financial ratio calculations are clearly related to the process of manufacture and have been properly allocated as such. The respondent surmises that, given the relatively simple process of the production of subject merchandise, there is little, if any, cost associated with transporting raw materials within the factory. Silvery Dragon also asserts that the fact that the transportation expenses are itemized alongside the cost of raw materials confirms that they are related to inward transportation of raw materials.

The petitioners respond that the Department properly treated transportation costs as part of MOH. Regarding Silvery Dragon's assertion that the expenses at issue must relate to the transportation of raw materials and that there would be little cost in transporting materials in the factory, the petitioners argue that these statements are speculative and unsupported by any record evidence. In fact, the petitioners assert, there is no evidence that the generic "transportation" expenses were related to freight costs for raw materials. The petitioners assert that these expenses could include various types of typical factory overhead expenses that are not otherwise accounted for in Vongthong's financial statement, and that it is more reasonable to presume that

---

[113] In support of its argument, Silvery Dragon cites to Seamless Refined Copper Pipe and Tube from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, 75 FR 60725, 60730 (October 1, 2010) (Seamless Pipe),

Case: 23-2391 Document: 13 Page: 393 Filed: 11/28/2023

these transportation expenses related to overhead or SG&A expenses. The petitioners argue that Vongthong's substantial raw material line item should be the full delivered value of material inputs consumed.

The petitioners note that the Vongthong financial statements include an amount for "delivery costs," an expense that was already excluded from the financial ratio calculations. The petitioners assert that it is more reasonable to assume that the freight-in costs are already included in raw materials and that the freight-out costs are reflected in the delivery costs line item. The petitioners argue that the Department's treatment of the transportation expenses from the Vongthong financial statements is consistent with its past practice.[114] The petitioners assert that the facts of the Seamless Pipe case cited by the respondent can be distinguished from those in the present case. In that case, the petitioners state the surrogate financial statement identified the costs at issue specifically as "freight" expenses and not the more generic term "transportation."

**Department's Position:**

In our financial ratio calculations for Vongthong, we included the "raw materials" line item from the cost of sales schedule in the materials, labor, and energy denominator, and classified "transportation" expenses from the schedule as MOH (i.e., we included the item in the numerator of the MOH ratio).[115] Silvery Dragon asserts that the classification of transportations expenses as MOH was improper, arguing that the costs at issue "must relate to the transportation of raw materials" and that the fact the expenses were itemized alongside raw materials confirms that this is in fact the case.[116] We disagree with the respondent and, for the reasons set forth below, continued to classify transportation expenses as MOH.

In the Vongthong financial statements, apart from the fact that the transportation expense line item is included as a component of the cost of sales, there is no indication, either on the face of the income statement itself or in the accompanying notes, as to what specifically this item includes or to what activities it relates. As discussed, in the Preliminary Determination, we included this line item in the numerator of the MOH ratio, reasoning that freight related to transporting purchased raw materials is typically included in the raw material expenses on the financial statement. Thus, the separate "transportation" line item likely relates to other activities (e.g., within-factory transportation, vehicles used by factory management, etc.) more appropriately classified as overhead. Accounting practice prescribes generally that raw materials inventory on a company's balance sheet is to be valued at a cost that includes all necessary expenditures to acquire such materials and bring them to the desired condition and location for use in the manufacturing process.[117] This valuation includes not only the purchase price of the

---

[114] In support of their argument, the petitioners cite to Wooden Bedroom Furniture from the People's Republic of China; Final Results and Final Rescission in Part, 76 FR 49729 (August 11, 2011) and accompanying Issues and Decision Memorandum at Comment 19; and Certain Steel Nails from the People's Republic of China: Final Results of Third Antidumping Duty Administrative Review; 2010-2011, 78 FR 16651 (March 18, 2013) and accompanying Issues and Decision Memorandum at Comment 2.
[115] See Prelim Factor Valuation Memorandum at Attachment 2.
[116] See Silvery Dragon's March 21, 2013, Case Brief at 2
[117] See, e.g., Spiceland, J. David, et. al., Intermediate Accounting (6th ed.) McGraw Hill (2011), at 401.

raw material, but also freight charges (most commonly referred to as "freight-in") on incoming materials and other miscellaneous expenses such as handling or insurance incurred by the buyer related to the purchase.[118]  Therefore, the raw material inventory value on a company's financial statement will necessarily include all of these attendant charges in addition to the material itself. Given the foregoing, it is reasonable for our purposes to presume that the raw material line item in the Vongthong financial statements is likewise inclusive of freight-in expenses, and that the transportation expenses at issue represent overhead charges.  Faced with uncertainty as to the exact nature of this line item, and lacking conclusive evidence that the expenses at issue are in fact related to the transport of raw material to the factory, we must make reasonable conclusions based on the available information in classifying this item for our surrogate financial ratio calculations.  In this case, the assumptions we made with regard to the Vongthong financial statement line items (i.e., that the expenses at issue are more appropriately classified as overhead because the raw material value likely includes incoming freight) are both reasonable and solidly grounded in accounting practice and procedure.

Silvery Dragon cites to the Seamless Pipe case as support for its claim that the Department previously classified "transportation" as a raw material expense.  However, in that case, the description of the charges at issue (i.e., "freight, clearing, and handling") was considerably more specific.  The record in this case lacks such specificity, and, as noted above, there is no information at all in the Vongthong financial statements or in the notes to those statements to indicate that the expenses in question relate to the transport of raw materials.  Moreover, there are likewise no details in the financial statements to indicate that the transportation expenses are somehow unrelated to MOH activities.

For this final determination, therefore, we continued to treat transportation expenses from the Vongthong financial statements as an MOH item in our surrogate financial ratio calculations.

---

[118] Occasionally, a separate, temporary "freight-in" account is used to record incoming freight costs, but for purposes of stating the value of "raw material inventory" on the balance sheet, this amount is added to the purchase price of the materials. Id.

**RECOMMENDATION**:

Based on our analysis of the comments received, we recommend adopting all of the above positions. If accepted, we will publish the final determination of this investigation and the final weighted-average dumping margins in the Federal Register.

AGREE ✓ DISAGREE __________

Paul Piquado
Assistant Secretary
for Enforcement and Compliance

28 APRIL 2014
Date



UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-912
AR: 09/01/12 - 8/31/13
**Public Document**
E&C AD/CVD OIII: BQ

September 30, 2014

**MEMORANDUM TO:** Paul Piquado
Assistant Secretary
for Enforcement and Compliance

**FROM:** Christian Marsh
Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations

**SUBJECT:** Decision Memorandum for Preliminary Results of Antidumping Duty Administrative Review: Certain New Pneumatic Off-the-Road Tires from the People's Republic of China; 2012-2013

---

SUMMARY

In response to requests from interested parties, the Department of Commerce ("Department") is conducting an administrative review of the antidumping duty order on certain new pneumatic off-the-road tires ("OTR tires") from the People's Republic of China ("PRC") in accordance with section 751(a)(1) of the Tariff Act of 1930, as amended ("the Act"). The period of review ("POR") is September 1, 2012, through August 31, 2013. The review covers the following exporters of subject merchandise: mandatory respondents Double Coin Holdings Ltd. ("Double



Coin")[1] and Guizhou Tyre Co., Ltd. / Guizhou Tyre Import and Export Co., Ltd. ("collectively, GTC")[2]; separate rates applicants Zhongce Rubber Group Company Limited ("Zhongce") and Weihai Zhongwei Rubber Co., Ltd. ("Zhongwei"); and Trelleborg Wheel System (Xingtai) China, Co. Ltd. ("Trelleborg"). The Department preliminarily finds that GTC made sales of subject merchandise at less than normal value ("NV"), Zhongce and Zhongwei are eligible for a separate rate, Double Coin failed to demonstrate eligibility for separate rate status and thus has been included in the PRC-wide entity, and Trelleborg had no shipments during the POR.

If these preliminary results are adopted in our final results of review, we will instruct U.S. Customs and Border Protection ("CBP") to assess antidumping duties on all appropriate entries of subject merchandise during the POR in accordance with 19 CFR 351.212(b)(1). Interested parties are invited to comment on these preliminary results. Unless otherwise extended, we intend to issue final results no later than 120 days from the date of publication of this notice, pursuant to section 751(a)(3)(A) of the Act.

<u>Background</u>

On September 3, 2013, the Department published a notice of opportunity to request an administrative review of the antidumping duty order on OTR tires from the PRC for the period of

---

[1] In *Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part*, 78 FR 67104, 67108 (November 8, 2013) ("*Initiation Notice*"), the review was initiated on Double Coin Group Rugao Tyre Co., Ltd. – renamed Double Coin Group Jiangsu Tyre Co., Ltd. – ("DC Rugao/Jiangsu"), Double Coin Group Shanghai Donghai Tyre Co., Ltd. ("DC Donghai"), and Double Coin Holdings, Ltd. ("DCH" or "Double Coin"). The respondent in this review is DCH, which exported all subject merchandise produced by both its wholly-owned and affiliate factories during the POR. DC Donghai is an affiliated producer of subject merchandise that did not produce OTR tires for export in the POR. *See*, *e.g.*, Letter from Double Coin entitled, "Section A Response of Double Coin Holdings and China Manufacturers Alliance, LLC," dated January 22, 2014 ("Double Coin SAQR"). DC Rugao/Jiangsu is a majority DCH-owned subsidiary factory which, along with the 100 percent DCH-owned production factory (*i.e.*, Double Coin Lorry Tyre Branch, *a.k.a.*, Shanghai Heavy Tire), produced the subject merchandise in question during the POR. *Id*. The International Trade Department of DCH is responsible for all export sales of merchandise under consideration produced by both DCH's Shanghai Heavy Tire factory and the DC Rugao/Jiangsu factory. *Id*. Additionally, the China Manufacturers Alliance ("CMA") is DCH's U.S. sales affiliate for all POR sales, and has provided and certified to relevant and requested sales-related information on behalf of the respondent. *Id*. Accordingly, for ease of reference we use "Double Coin" to collectively refer to each of the above production, export, and sales entities that comprise the respondent in this review, but note that DCH is the actual exporter-respondent. Furthermore, as discussed below, we collapsed DCH, Shanghai Heavy Tire, DC Rugao/Jiangsu, and DC Donghai into a single entity for the purposes of this review.

[2] In the *Initiation Notice*, the review was initiated on Guizhou Advance Rubber Co., Ltd. ("GAR"), Guizhou Tyre Co., Ltd., and Guizhou Tyre Import and Export Co., Ltd.. *See* Letter from GTC, entitled, "Section A Response: Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated January 29, 2014 ("GTC's SAQR"). These three companies were collapsed into a collective entity, "GTC", in the investigation. *See Certain New Pneumatic Off-The-Road Tires From the People's Republic of China; Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 73 FR 9278, 9283 (February 20, 2008), unchanged in *Certain New Pneumatic Off-The-Road Tires from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 FR 40485 (July 15, 2008). As such, we refer to the respondent, collectively, as "GTC" throughout this memorandum.

September 1, 2012, through August 31, 2013.[3] The Department initiated a review of nine exporters of subject merchandise.[4]

On November 20, 2013, Trelleborg submitted a timely-filed certification indicating that it had no shipments of subject merchandise to the United States during the POR.[5] On December 13, 2013, the Department determined, pursuant to section 777(c)(2) of the Act, that it was not practicable to fully investigate each of the companies for whom the Department initiated an administrative review and, in accordance with section 777(c)(2)(B) of the Act selected as mandatory respondents the two companies accounting for the largest volume of exports during the POR for which reviews were requested.[6] The largest two exporters of the merchandise that were selected as mandatory respondents were GTC and Double Coin.

On May 7, 2014, we extended the time limit for the preliminary results of review by 120 days, pursuant to section 751(a)(3)(A) of the Act, to September 30, 2014.[7]

The Department conducted a verification of GTC's questionnaire responses at GTC and its affiliates from August 11 through August 15, 2014, in Guiyang, Guizhou Province, PRC, and at GTC North America, Inc., on August 26, 2014, in Canton, Ohio, U.S.A. The Department conducted a verification of Double Coin's questionnaire responses at DCH and DC Rugao/Jiangsu, at DCH's headquarters in Shanghai, PRC, on August 19, 2014, and at DC Rugao/Jiangsu in Rugao City, Jiangsu Province, PRC, from August 20, 2014, to August 22, 2014. The Department then conducted the verification of DCH's U.S. sales affiliate, CMA, in Monrovia, California, U.S.A., on August 28 and August 29, 2014.[8]

Scope of the Order

The products covered by the order are new pneumatic tires designed for off-the-road and off-highway use, subject to exceptions identified below. Certain OTR tires are generally designed, manufactured and offered for sale for use on off-road or off-highway surfaces, including but not limited to, agricultural fields, forests, construction sites, factory and

---

[3] *See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity To Request Administrative Review*, 78 FR 54235, 54236 (September 3, 2013).

[4] *See Initiation Notice*, 78 FR at 67108. The Department initiated on the aforementioned three Double Coin companies and three GTC companies, as well as Zhongce, Zhongwei, and Trelleborg.

[5] *See* Letter from Trelleborg, entitled, "Trelleborg Wheel Systems (Xingtai) China, Co. Ltd. Statement of No Shipments during the POR: New Pneumatic Off-The-Road Tires from the People's Republic of China," dated November 20, 2013 ("Trelleborg No Shipments Letter").

[6] *See* Memorandum to Melissa Skinner, Director, Office III, entitled "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Respondent Selection," dated December 13, 2013.

[7] *See* Memorandum to Gary Taverman entitled, "Extension of Deadline for Preliminary Results of Antidumping Duty Administrative Review," dated May 7, 2014.

[8] *See* Memorandum to the File, entitled, "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Verification of the Sales and Factors Response of Guizhou Tyre Co., Ltd. and Affiliates," dated concurrently with this memorandum, and Memorandum to the File, entitled, "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Verification of the Sales and Factors Response of Double Coin Holdings and China Manufacturers Alliance," dated concurrently with this memorandum ("Double Coin's Verification Report").

warehouse interiors, airport tarmacs, ports and harbors, mines, quarries, gravel yards, and steel mills. The vehicles and equipment for which certain OTR tires are designed for use include, but are not limited to: (1) agricultural and forestry vehicles and equipment, including agricultural tractors,[9] combine harvesters,[10] agricultural high clearance sprayers,[11] industrial tractors,[12] log-skidders,[13] agricultural implements, highway-towed implements, agricultural logging, and agricultural, industrial, skid-steers/mini-loaders;[14] (2) construction vehicles and equipment, including earthmover articulated dump products, rigid frame haul trucks,[15] front end loaders,[16] dozers,[17] lift trucks, straddle carriers,[18] graders,[19] mobile cranes,[20] compactors; and (3) industrial vehicles and equipment, including smooth floor, industrial, mining, counterbalanced lift trucks, industrial and mining vehicles other than smooth floor, skid-steers/mini-loaders, and smooth floor off-the-road counterbalanced lift trucks. The foregoing list of vehicles and equipment generally have in common that they are used for hauling, towing, lifting, and/or loading a wide variety of equipment and materials in agricultural, construction and industrial settings. Such vehicles and equipment, and the descriptions contained in the footnotes are illustrative of the types of vehicles and equipment that use certain OTR tires, but are not necessarily all-inclusive. While the physical characteristics of certain OTR tires will vary depending on the specific applications and conditions for which the tires are designed (*e.g.*, tread pattern and depth), all of the tires within the scope have in common that they are designed for off-road and off-highway use. Except as discussed below, OTR tires included in the scope of the order range in size (rim diameter) generally but not exclusively from 8 inches to 54 inches. The tires may be either tube-type[21] or tubeless, radial or non-radial, and intended for sale either to original equipment

---

[9] Agricultural tractors are dual-axle vehicles that typically are designed to pull farming equipment in the field and that may have front tires of a different size than the rear tires.

[10] Combine harvesters are used to harvest crops such as corn or wheat.

[11] Agricultural sprayers are used to irrigate agricultural fields

[12] Industrial tractors are dual-axle vehicles that typically are designed to pull industrial equipment and that may have front tires of a different size than the rear tires.

[13] A log-skidder has a grappling lift arm that is used to grasp, lift and move trees that have been cut down to a truck or trailer for transport to a mill or other destination.

[14] Skid-steer loaders are four-wheel drive vehicles with the left-side drive wheels independent of the right-side drive wheels and lift arms that lie alongside the driver with the major pivot points behind the driver's shoulders. Skid-steer loaders are used in agricultural, construction and industrial settings.

[15] Haul trucks, which may be either rigid frame or articulated (*i.e.*, able to bend in the middle) are typically used in mines, quarries and construction sites to haul soil, aggregate, mined ore, or debris.

[16] Front loaders have lift arms in front of the vehicle. They can scrape material from one location to another, carry material in their buckets, or load material into a truck or trailer.

[17] A dozer is a large four-wheeled vehicle with a dozer blade that is used to push large quantities of soil, sand, rubble, *etc.*, typically around construction sites. They can also be used to perform "rough grading" in road construction.

[18] A straddle carrier is a rigid frame, engine-powered machine that is used to load and offload containers from container vessels and load them onto (or off of) tractor trailers.

[19] A grader is a vehicle with a large blade used to create a flat surface. Graders are typically used to perform "finish grading." Graders are commonly used in maintenance of unpaved roads and road construction to prepare the base course on to which asphalt or other paving material will be laid.

[20] *I.e.,* "on-site" mobile cranes designed for off-highway use.

[21] While tube-type tires are subject to the scope of this proceeding, tubes and flaps are not subject merchandise and therefore are not covered by the scope of this proceeding, regardless of the manner in which they are sold (*e.g.,* sold with or separately from subject merchandise).

manufacturers or the replacement market. The subject merchandise is currently classifiable under Harmonized Tariff Schedule of the United States ("HTSUS") subheadings: 4011.20.10.25, 4011.20.10.35, 4011.20.50.30, 4011.20.50.50, 4011.61.00.00, 4011.62.00.00, 4011.63.00.00, 4011.69.00.00, 4011.92.00.00, 4011.93.40.00, 4011.93.80.00, 4011.94.40.00, and 4011.94.80.00. While HTSUS subheadings are provided for convenience and customs purposes, our written description of the scope is dispositive.

Specifically excluded from the scope are new pneumatic tires designed, manufactured and offered for sale primarily for on-highway or on-road use, including passenger cars, race cars, station wagons, sport utility vehicles, minivans, mobile homes, motorcycles, bicycles, on-road or on-highway trailers, light trucks, and trucks and buses. Such tires generally have in common that the symbol "DOT" must appear on the sidewall, certifying that the tire conforms to applicable motor vehicle safety standards. Such excluded tires may also have the following designations that are used by the Tire and Rim Association:

Prefix letter designations:
- P - Identifies a tire intended primarily for service on passenger cars;
- LT - Identifies a tire intended primarily for service on light trucks; and,
- ST - Identifies a special tire for trailers in highway service.

Suffix letter designations:
- TR - Identifies a tire for service on trucks, buses, and other vehicles with rims having specified rim diameter of nominal plus 0.156" or plus 0.250";
- MH - Identifies tires for Mobile Homes;
- HC - Identifies a heavy duty tire designated for use on "HC" 15" tapered rims used on trucks, buses, and other vehicles. This suffix is intended to differentiate among tires for light trucks, and other vehicles or other services, which use a similar designation.
- Example: 8R17.5 LT, 8R17.5 HC;
- LT - Identifies light truck tires for service on trucks, buses, trailers, and multipurpose passenger vehicles used in nominal highway service; and
- MC - Identifies tires and rims for motorcycles.

The following types of tires are also excluded from the scope: pneumatic tires that are not new, including recycled or retreaded tires and used tires; non-pneumatic tires, including solid rubber tires; tires of a kind designed for use on aircraft, all-terrain vehicles, and vehicles for turf, lawn and garden, golf and trailer applications. Also excluded from the scope are radial and bias tires of a kind designed for use in mining and construction vehicles and equipment that have a rim diameter equal to or exceeding 39 inches. Such tires may be distinguished from other tires of similar size by the number of plies that the construction and mining tires contain (minimum of 16) and the weight of such tires (minimum 1500 pounds).

Affiliation and Collapsing

We preliminarily determine that DCH (including DCH's production factory Shanghai Heavy Tire), DC Rugao/Jiangsu, and DC Donghai are affiliated, pursuant to section 771(33)(E) of the Act.[22] In addition, based on the evidence provided in Double Coin's questionnaire responses, we also preliminarily determine that DCH (including its Shanghai Heavy Tire factory), DC Rugao/Jiangsu, and DC Donghai should be collapsed and treated as a single entity in this administrative review (collectively, the "DCH Single Entity"). This finding is based on the determination that the level of ownership management overlap, and intertwined operations of DCH, DC Rugao/Jiangsu, and DC Donghai result in a significant potential for manipulation of price or production of subject merchandise, pursuant to 19 CFR 351.401(f).[23] This preliminary finding is further supported by Double Coin's own acknowledgement of the "high-level cross-ownership and management between {Double Coin Holdings and} Double Coin Lorry Tyre Branch and Double Coin Group Jiangsu Tyre Co., Ltd., as well as Double Coin Group Shanghai Donghai Tyre Co., Ltd."[24]

Preliminary Determination of No Shipments

On November 20, 2013, Trelleborg submitted a timely-filed certification indicating that it had no shipments of subject merchandise to the United States during the POR.[25] Consistent with our practice, the Department asked CBP to conduct a query on potential shipments made by Trelleborg during the POR.[26] CBP did not provide any evidence to contradict Trelleborg's claim of no shipments. Based on Trelleborg's certification and our analysis of CBP information, we preliminarily determine that Trelleborg did not have any reviewable transactions during the POR. The Department preliminarily finds that consistent with its practice in non-market economy ("NME") cases, it is appropriate not to rescind the review in part in this circumstance but, rather, to complete the review with respect to the above named company and issue appropriate instructions to CBP based on a finding of no shipments.[27]

---

[22] Double Coin acknowledges these affiliations in its submissions. *See*, *e.g.*, Double Coin's SAQR. *See* Memorandum to the File, entitled, "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Double Coin Affiliation and Collapsing Memorandum," dated concurrently with this memorandum.

[23] *Id*.

[24] *See* Letter from Double Coin, entitled, "Supplemental Section A Response of Double Coin Holdings and China Manufacturers Alliance, LLC Certain New Pneumatic Off-the-Road Tires from China," dated June 16, 2014 at 10.

[25] *See* Trelleborg No Shipments Letter.

[26] *See* CBP Message Number 3352302, dated December 18, 2013.

[27] *See Non-Market Economy Antidumping Proceedings: Assessment of Antidumping Duties*, 76 FR 65694, 65694-95 (October 24, 2011).

DISCUSSION OF THE METHODOLOGY

Nonmarket Economy Country

The Department considers the PRC to be a NME country.[28] In accordance with section 771(18)(C)(i) of the Act, any determination that a foreign country is an NME country shall remain in effect until revoked by the administering authority. Therefore, we continue to treat the PRC as an NME country for purposes of these preliminary results.

Separate Rates

In the *Initiation Notice*, the Department notified parties of the application process by which exporters may obtain separate rate status in an NME proceeding.[29] It is the Department's policy to assign all exporters of the merchandise subject to review in NME countries a single rate unless an exporter can affirmatively demonstrate an absence of government control, both in law (*de jure)* and in fact (*de facto*), with respect to exports. To establish whether a company is sufficiently independent to be entitled to a separate, company-specific rate, the Department analyzes each exporting entity in an NME country under the test established in *Sparklers*,[30] as further developed by *Silicon Carbide*.[31] However, if the Department determines that a company is wholly foreign-owned, then an analysis of the *de jure* and *de facto* criteria is not necessary to determine whether it is independent from government control.[32]

In the instant review, the Department received timely-filed separate rate applications or certifications from the DCH Single Entity, GTC, Zhongce, and Zhongwei, and each company was able to demonstrate that they had suspended entries during the POR.[33] These companies have variously stated that they are joint ventures between Chinese and foreign companies or are wholly Chinese-owned companies, and none are wholly foreign-owned. Therefore, the Department must analyze whether these respondents demonstrate an absence of both *de jure* and *de facto* governmental control over export activities, as appropriate.

*Absence of De Jure Control*

The Department considers the following *de jure* criteria in determining whether an individual company may be granted a separate rate: (1) an absence of restrictive stipulations associated

---

[28] *See, e.g., Certain Kitchen Appliance Shelving and Racks From the People's Republic of China: Preliminary Results of the First Administrative Review, Preliminary Rescission, in Part, and Extension of Time Limits for the Final Results*, 76 FR 62765, 62767-68 (October 11, 2011), unchanged in *Certain Kitchen Appliance Shelving and Racks From the People's Republic of China: Final Results and Partial Rescission of First Antidumping Duty Administrative Review*, 77 FR 21734 (April 11, 2012).

[29] *See Initiation Notice*, 78 FR at 67104-05.

[30] *See Final Determination of Sales at Less Than Fair Value: Sparklers From the People's Republic of China*, 56 FR 20588 (May 6, 1991) ("*Sparklers*").

[31] *See Notice of Final Determination of Sales at Less Than Fair Value: Silicon Carbide From the People's Republic of China*, 59 FR 22585 (May 2, 1994) ("*Silicon Carbide*").

[32] *See, e.g., Final Results of Antidumping Duty Administrative Review: Petroleum Wax Candles From the People's Republic of China,* 72 FR 52355, 52356 (September 13, 2007).

[33] The Department also received a timely-filed SRA from Trelleborg. However, this SRA was submitted only as a precaution and, as noted above, Trelleborg certified to having no shipments during the POR.

with an individual exporter's business and export licenses; (2) any legislative enactments decentralizing control of companies; and (3) other formal measures by the government decentralizing control of companies.[34]

The evidence provided by each separate rate company supports a preliminary finding the absence of *de jure* governmental control based on the following: (1) an absence of restrictive stipulations associated with the individual exporters' business and export licenses; (2) there are applicable legislative enactments decentralizing control of the companies; and (3) and there are formal measures by the government decentralizing control of companies.[35]

*Absence of De Facto Control*

Typically, the Department considers four factors in evaluating whether each respondent is subject to *de facto* government control of its export functions: (1) whether the export prices are set by or are subject to the approval of a government agency; (2) whether the respondent has authority to negotiate and sign contracts and other agreements; (3) whether the respondent has autonomy from the government in making decisions regarding the selection of management; and (4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses.[36] The Department determined that an analysis of *de facto* control is critical in determining whether respondents are, in fact, subject to a degree of government control which would preclude the Department from granting a separate rate.

The Department continues to evaluate its practice with regard to the separate rates analysis in light of the diamond sawblades from the PRC antidumping duty proceeding, and Commerce's determinations therein.[37] In particular, we note that in litigation involving the diamond sawblades proceeding, the U.S. Court of International Trade found the Department's existing separate rates analysis deficient in the circumstances of that case, in which a government-

---

[34] *See Sparklers*, 56 FR at 20589.

[35] For (1) Double Coin, *see* its submissions entitled, "Double Coin's Separate Rate Certification Response," dated January 2, 2014 ("Double Coin's SRC") and Double Coin's SAQR; for (2) Zhongwei, *see* its submission entitled, "New Pneumatic Off-the-Road Tires from the People's Republic of China Separate Rate Certification," dated January 7, 2014 ("Zhongwei's SRC"); for (3) Zhongce, *see* its submission entitled, "New Pneumatic Off-the Road Tires from the People's Republic of China (2012-2013): Separate Rate Application," dated January 8, 2014 ("Zhongce's SRA"); for (4) GTC, *see* GTC's SAQR.

[36] *See Silicon Carbide*, 59 FR at 22586-87; *see also Notice of Final Determination of Sales at Less Than Fair Value: Furfuryl Alcohol From the People's Republic of China*, 60 FR 22544, 22545 (May 8, 1995).

[37] *See* Final Results of Redetermination Pursuant to Remand Order for Diamond Sawblades and Parts Thereof from the People's Republic of China (May 6, 2013) in *Advanced Technology & Materials Co., Ltd., et al. v. United States*, 885 F. Supp. 2d 1343 (CIT 2012), sustained in *Advanced Technology & Materials Co., Ltd., et al. v. United States*, 938 F. Supp. 2d 1342 (CIT 2013) ("*Sawblades Redetermination*"). This remand redetermination is on the Enforcement and Compliance website at http://enforcement.trade.gov/remands/12-147.pdf; *see also Diamond Sawblades and Parts Thereof from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2011-2012*, 78 FR 77098 (December 20, 2013) and accompanying Preliminary Decision Memo at 7, unchanged in *Diamond Sawblades and Parts Thereof from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 35723 (June 24, 2014) and accompanying Issues and Decision Memorandum at Comment 1.

controlled entity had significant ownership in the respondent exporter.[38] We concluded that where a government entity holds a majority ownership share, either directly or indirectly, in the respondent exporter, the majority ownership holding in and of itself means that the government exercises or has the potential to exercise control over the company's operations generally, which may include control over, for example, the selection of management, a key factor in determining whether a company has sufficient independence in its export activities to merit a separate rate. Consistent with normal business practices, we would expect any majority shareholder, including a government, to have the ability to control, and an interest in controlling, the operations of its company, including the selection of management and the profitability of the company. Accordingly, we have considered the level of government ownership where necessary.

In this review, all respondent companies asserted the following: (1) that the export prices are not set by, and are not subject to, the approval of a governmental agency; (2) they have authority to negotiate and sign contracts and other agreements; (3) they have autonomy from the government in making decisions regarding the selection of management; and (4) they retain the proceeds of their export sales and make independent decisions regarding disposition of profits or financing of losses.[39] Additionally, the separate rate companies' responses indicate that their pricing during the POR does not involve coordination among exporters.[40] However, as a result of the Department's evolving practice on this issue in light of the aforementioned diamond sawblades litigation and the facts on the record of this case with respect to partial ownership of certain respondents by government entities, we have further scrutinized the level of government ownership and *de facto* control with respect to each respondent:

1) Non-selected Applicants' Separate Rate Status

The evidence provided in Zhongce's separate rate application and Zhongwei's separate rate certification supports a preliminary finding of an absence of *de facto* government control based on record statements and supporting documentation and certification showing that the companies: (1) set their own export prices independent of the government and without the approval of a government authority; (2) have the authority to negotiate and sign contracts and other agreements; (3) maintain autonomy from the government in making decisions regarding the selection of management; and (4) retain the proceeds of their respective export sales and make independent decisions regarding the disposition of profits or financing of losses.[41]

---

[38] *See, e.g., Advanced Technology & Materials Co., Ltd. v. United States*, 885 F. Supp. 2d 1343, 1349 (CIT 2012) ("The court remains concerned that Commerce has failed to consider important aspects of the problem and offered explanations that run counter to the evidence before it."); *id.* at 1351 ("Further substantial evidence of record does not support the inference that SASAC's {state-owned assets supervision and administration commission} 'management' of its 'state-owned assets' is restricted to the kind of passive-investor *de jure* 'separation' that Commerce concludes.") (footnotes omitted); *Id.* at 1355 ("The point here is that 'governmental control' in the context of the separate rate test appears to be a fuzzy concept, at least to this court, since a 'degree' of it can obviously be traced from the controlling shareholder, to the board, to the general manager, and so on along the chain to 'day-to-day decisions of export operations,' including terms, financing, and inputs into finished product for export."); *id.* at 1357 ("AT&M *itself* identifies its 'controlling shareholder' as CISRI {owned by SASAC} in its financial statements and the power to veto nomination does not equilibrate the power of control *over* nomination.") (footnotes omitted).

[39] *See* Double Coin's SRC and SAQR, Zhongwei's SRC, Zhongce's SRA, and GTC's SAQR.

[40] *Id*.

[41] *See* Zhongwei's SRC at 7-8 and Zhongce's SRA at 9-16.

Therefore, the evidence placed on the record of this investigation by Zhongce and Zhongwei demonstrates an absence of *de jure* and *de facto* government control under the criteria identified in *Sparklers* and *Silicon Carbide*. Accordingly, the Department preliminarily grants separate rates to Zhongce and Zhongwei.[42]

2) The DCH Single Entity's Separate Rate Status

DCH is majority-owned by the Huayi Group ("Huayi").[43] Huayi is wholly-owned by the Shanghai State-owned Assets Supervision and Administration Commission of the State Council ("SASAC"), a central governmental body that oversees important state assets.[44] Because of this level of government ownership, and the control that such ownership on its own establishes, we preliminarily conclude that DCH and, thus the DCH Single Entity, does not satisfy the criteria demonstrating an absence of *de facto* government control over export activities, consistent with our determination in the *Sawblades Redetermination*.[45] Consequently, we preliminarily determine that the DCH Single Entity is ineligible for a separate rate. We note that evidence demonstrates that, through its 100-percent SASAC-owned Huayi assets, the PRC government exercises its rights inherent in majority ownership as would be expected. For instance, Huayi has control over the composition of DCH's board of directors, which in turn chooses the company's management.[46] Furthermore, DCH and Huayi have extensively intertwined management and board members.[47]

3) GTC's Separate Rate Status

GTC's largest shareholder, is a SASAC administered entity. However, we find that the facts with respect to GTC do not suggest any intertwining of GTC's board or management and that of its largest shareholder, which is under supervision of the Guiyang SASAC office. Moreover, several proprietary considerations with respect to type of share ownership and the limits to shareholder power in appointing and influencing the Board of Directors and Board of Supervisors, as codified by the company's articles of association, demonstrate that a single shareholder is unable to control GTC's export activities or significantly influence the selection of management.[48] Therefore, the evidence placed on the record of this review by GTC demonstrates an absence of *de jure* and *de facto* government control under the criteria identified

---

[42] *See* "Margin for the Separate Rate Companies" section below.

[43] *See* Double Coin's SAQR.

[44] *Id.* SASAC, which is a PRC-government agency, is tasked with, *inter alia*, the responsibilities of the investor, as specified in the Company Law, with regard to state-owned enterprises.

[45] For further analysis, including business proprietary information, with respect to the denial of Double Coin's separate rate, *see* Memorandum entitled "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Analysis of the Preliminary Results Margin Calculation for Double Coin Holdings, Ltd.," dated concurrently with this memorandum ("Double Coin's Preliminary Analysis Memo").

[46] *Id.*

[47] *Id.*

[48] For further analysis, including business proprietary information, with respect to granting GTC a separate rate, *see* Memorandum entitled "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Analysis of the Preliminary Results Margin Calculation for Guizhou Tyre Co., Ltd.," dated concurrently with this memorandum ("GTC's Preliminary Analysis Memo").

in *Sparklers* and *Silicon Carbide*. Accordingly, the Department is preliminarily granting GTC a separate rate.

Margin for the Separate Rate Companies

The statute and the Department's regulations do not address the establishment of a rate to be applied to individual respondents not selected for examination when the Department limits its examination in an administrative review pursuant to section 777A(c)(2) of the Act. Generally, the Department looks to section 735(c)(5) of the Act, which provides instructions for calculating the all-others rate in an investigation, for guidance when calculating the rate for respondents which we did not examine in an administrative review. Section 735(c)(5)(A) of the Act establishes a preference to avoid using rates which are zero, *de minimis*, or based entirely on facts available in calculating an all others rate. Accordingly, the Department's usual practice has been to average the weighted-average dumping margins for the companies selected for individual examination, excluding rates that are zero, *de minimis*, or based entirely on facts available.[49] In this case, one mandatory respondent, Double Coin, is preliminarily found to be part of the PRC-wide entity; the rate we have preliminarily determined for the entity is described below. The other mandatory respondent, GTC, is receiving a separate rate for these preliminary results calculated from its own sales and production data. To determine a rate for the unselected separate rate companies, we find it appropriate to use the margin calculated for GTC, which was also found to be separate from the PRC-wide entity with respect to its export activities, and which rate is not zero or de minimis nor based entirely on facts available. Therefore, we preliminarily assign to Zhongce and Zhongwei a margin of, 16.18 percent (*i.e.*, the rate calculated for GTC) as the separate rate for this review.

PRC-Wide Entity

Upon initiation of the administrative review, we provided the opportunity for all companies upon which the review was initiated to complete either the separate-rates application or certification.[50] We preliminarily determine that Double Coin did not demonstrate its eligibility for a separate rate and is properly considered part of the PRC-wide entity. In NME proceedings, "'rates' may consist of a single dumping margin applicable to all exporters and producers."[51] As explained above in the "Separate Rates" section, all companies within the PRC are considered to be subject to government control unless they are able to demonstrate an absence of government control with respect to their export activities. Such companies are assigned a single antidumping duty rate distinct from the separate rate(s) determined for companies that are found to be independent of government control with respect to their export activities. We consider the influence that the government has been found to have over the economy to warrant determining a rate for the entity that is distinct from the rates found for companies that provided sufficient evidence to establish

---

[49] *See Ball Bearings and Parts Thereof From France, Germany, Italy, Japan, and the United Kingdom: Final Results of Antidumping Duty Administrative Reviews and Rescission of Reviews in Part*, 73 FR 52823, 52824 (September 11, 2008), and accompanying Issues and Decision Memorandum at Comment 16.

[50] The separate-rate application and certification are available at: http:// http://enforcement.trade.gov/nme/nme-sep-rate.html.

[51] *See* 19 CFR 351.107(d).

that they operate freely with respect to their export activities.[52] In this regard, no record evidence indicates that such government influence is no longer present or that our treatment of the PRC-wide entity is otherwise incorrect.

The only rate ever determined for the PRC-wide entity in this proceeding is 210.48 percent, as determined in the less-than-fair-value investigation.[53] Ordinarily, we would assign the PRC-wide entity that same rate in this administrative review.[54] Double Coin, however, provided the Department with all requested information, which was subsequently verified, necessary to calculate a margin for at least a part of the PRC-wide entity. The Department lacks information to determine what share of production and exports of subject merchandise Double Coin constitutes as part of the PRC-wide government-controlled entity during the current POR. As a result, we are able to calculate a margin for an unspecified portion of a single PRC-wide entity, but cannot do so for another unspecified portion of the entity. As the Department must calculate a single margin for the PRC-wide government controlled entity and there is insufficient information on the record with respect to the composition of the PRC-wide entity, we thus preliminarily calculated a simple average of the previously assigned PRC-wide rate (210.48 percent) and Double Coin's calculated margin (0.69 percent) as the rate applicable to the PRC-wide entity. Accordingly, the Department revised the PRC-wide entity rate to 105.59 percent for these preliminary results.

Surrogate Country and Surrogate Value Data

On January 30, 2014, the Department sent interested parties a letter inviting comments on the concurrently released list of potential surrogate countries and primary surrogate country selection, as well as surrogate value ("SV") data.[55] On February 6, 2014, Double Coin provided comments on the economic comparability of the countries listed on the Surrogate Country List, noting agreement that all countries included on the list were comparable and declining to propose

---

[52] *See, e.g.*, *Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, from the People's Republic of China: Final Results of 2005-2006 Administrative Review and Partial Rescission of Review*, 72 FR 56724 (October 4, 2007) and accompanying Issues and Decision Memorandum at Comment 2.

[53] *See Certain New Pneumatic Off-The-Road Tires from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances,* 73 FR 40485, 40489 (July 15, 2008).

[54] *See, e.g.*, *Certain Activated Carbon From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2011-2012*, 78 FR 26748 (May 8, 2013) and Preliminary Decision Memorandum at 10-11, unchanged in *Certain Activated Carbon From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 78 FR 70533 (November 26, 2013) ("*Activated Carbon from the PRC*").

[55] *See* the Department's Letter to All Interested Parties entitled "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Request for Surrogate Country and Surrogate Value Comments and Information," dated January 30, 2014, which contained the Memorandum from Carole Showers, Director, Office of Policy, Enforcement and Compliance, to Brendan Quinn, Acting Program Manager, Office 3, Enforcement and Compliance, entitled, "Request for a List of Surrogate Countries for an Administrative Review of the Antidumping Duty Order on Certain Pneumatic Off-the-Road Tires ("OTR") from the People's Republic of China ("China")," dated January 22, 2014 ("Surrogate Country List").

that other non-listed countries be considered.[56] No other party provided comment on the comparability of potential surrogate countries. On March 14, 2014, the Department received comments on the selection of the primary surrogate country from the list of potential surrogates from Titan Tire Corporation and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO-CLC ("Petitioners"), Double Coin, and GTC.[57] On March 24, 2014, both Petitioners and GTC submitted rebuttal comments on the initial surrogate country selection submissions.[58] On April 14, 2014, Petitioners, Double Coin, and GTC provided initial comment on and information for SV selection.[59] On May 2, 2014, Petitioners, Double Coin, and GTC provided rebuttal SV information and comment.[60] Since these initial submissions, Petitioners, Double Coin, and GTC

---

[56] *See* Letter from Double Coin entitled, "Comments on the Department's List of Countries at the Same Level of Economic Development as China: Certain New Pneumatic Off-the-Road Tires from China," dated February 6, 2014.

[57] *See* Letter from Petitioners, entitled, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off-The-Road Tires from China (A-570-912): Petitioners' Comments on Surrogate Country Selection," dated March 14, 2014; Letter from Double Coin, entitled, "CMA's and Double Coin's Surrogate Country Comments Certain New Pneumatic Off-the-Road Tires from China," dated March 14, 2014; Letter from GTC, entitled, "Surrogate Country Comments for GTCIE: Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated March 14, 2014.

[58] *See* Letter from Petitioners, entitled, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off-The-Road Tires from China (A-570-912): Petitioners' Rebuttal Comments on Surrogate Country Selection," dated March 24, 2014, and Letter from GTC, entitled, "Surrogate Country Rebuttal Comments for GTC: Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated March 24, 2014.

[59] *See* Letter from Petitioners, entitled, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off-The-Road Tires from China (A-570-912): Petitioners' Initial Surrogate Value Comments," dated April 14, 2014 ("Petitioners' Initial SV Submission"); Letter from Double Coin, entitled, "Double Coin Holdings and China Manufacturers Alliance, LLC's Surrogate Value Comments: Certain New Pneumatic Off-the-Road Tires from China," dated April 14, 2014 ("Double Coin's Initial SV Submission"); Letter from GTC, entitled, "Surrogate Value Comments for GTC: Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated April 14, 2014 ("GTC's Initial SV Submission").

[60] *See* Letter from Petitioners, entitled, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off-The-Road Tires from China (A-570-912): Petitioners' Rebuttal Surrogate Value Comments," dated May 2, 2014 ("Petitioners' Rebuttal SV Submission"); Letter from Double Coin, entitled, "Double Coin's Rebuttal SV Information: Off-the Road Tires from China," dated May 2, 2014; Letter from GTC, entitled, "GTC's Surrogate Value Rebuttal Submission: Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated May 2, 2014.

each provided additional SV information on the record,[61] including rebuttal information to the additional SV data from Petitioners and GTC.[62]

Surrogate Country

When the Department is investigating imports from an NME country, section 773(c)(1) of the Act directs it to base NV, in most circumstances, on the NME producer's factors of production ("FOP"), valued in a surrogate market economy ("ME") country or countries considered to be appropriate by the Department. In accordance with section 773(c)(4) of the Act, in valuing the FOPs, the Department shall utilize, to the extent possible, the prices or costs of FOPs in one or more ME countries that are: (1) at a level of economic development comparable to that of the NME country; and (2) significant producers of comparable merchandise.[63] The Department determined that Bulgaria, Colombia, Ecuador, Indonesia, South Africa and Thailand are countries whose per capita gross national incomes ("GNI") are comparable to the PRC in terms of economic development.[64]

Petitioners, in their surrogate country comments and comments for the preliminary results, submit that the Department should select Thailand as the primary surrogate country, noting that Thailand is a significant producer of comparable merchandise at a level of development similar to the PRC. They also note that Thailand provides publicly available information to value all costs relevant to this review and, of the potential surrogates, Thailand's GNI is closest to that of the PRC. Additionally, Petitioners assert that: 1) Thailand is a net exporter of OTR tires, whereas Indonesia is a net importer; 2) Thailand provides SVs for all inputs, including multiple sources from which to value rubber; and 3) Thai labor data are more specific to tire production than that of Indonesia.[65]

[61] *See* Letter from Petitioners, entitled, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off-The-Road Tires from China (A-570-912): Petitioners' Additional Surrogate Value Comments," dated May 2, 2014; Letter from Petitioners, entitled, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off-The-Road Tires from China (A-570-912): Petitioners' Third Surrogate Value Comments," dated August 29, 2014; Letter from Double Coin, entitled, "Additional Surrogate Value Information Certain New Pneumatic Off-the-Road Tires from China," dated September 2, 2014; Letter from Petitioners, entitled, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off-The-Road Tires from China (A-570-912): Petitioners' Fourth Surrogate Value Comments," dated September 2, 2014 ("Petitioners' September SV Submission"); Letter from GTC, entitled, "GTC's Second Surrogate Value Comments: Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated September 2, 2014 ("GTC's Second SV Submission").

[62] *See* Letter from GTC, entitled, "GTC's Second Surrogate Value Rebuttal Submission: Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated September 9, 2014, and Letter from Petitioners, entitled, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off-The-Road Tires from China (A-570-912): Petitioners' Second Rebuttal Surrogate Value Information," dated September 12, 2014.

[63] *See* Policy Bulletin 04.1: Non-Market Economy Surrogate Country Selection Process (March 1, 2004) ("Policy Bulletin").

[64] *See* Surrogate Country List.

[65] *See* Petitioners' Surrogate Country Comments, Petitioners' Rebuttal Surrogate Country Comments, and Letter from Petitioners, entitled, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off-The-Road Tires from China (A-570-912): Petitioners' Pre-Preliminary Determination Comments," dated September 8, 2014 at 11-14.

In their respective comments on surrogate country, both respondents Double Coin and GTC propose that the Department select Indonesia as the primary surrogate country because Indonesia is a significant producer of comparable merchandise and because there is reliable data from Indonesia available to value all FOPs. Specifically, they note that Indonesian data provide more specific Harmonized Tariff Schedule ("HTS") categories from which to value the major natural rubber inputs than do Thai data. They additionally assert that financial statements are available for three Indonesian producers of identical merchandise and two producers of comparable merchandise, whereas Thai statements are only available for one identical producer and one comparable producer.[66]

Economic Comparability

As discussed above, the Department considers Bulgaria, Colombia, Ecuador, Indonesia, South Africa and Thailand all comparable to the PRC in terms of economic development.[67] Accordingly, unless we find that all of these countries are not significant producers of comparable merchandise, do not provide a reliable source of publicly available surrogate data, or are unsuitable for use for other reasons, or we find that another equally comparable country is an appropriate surrogate, we will rely on data from one of these countries.[68] Therefore, we consider all six countries identified on the Surrogate Country List as having met this prong of the surrogate country selection criteria.

Significant Producers of Identical or Comparable Merchandise

Section 773(c)(4)(B) of the Act requires the Department to value FOPs in a surrogate country that is a significant producer of comparable merchandise. Neither the statute nor the Department's regulations provide further guidance on what may be considered comparable merchandise. Given the absence of any definition in the statute or regulations, the Department looks to other sources such as the Policy Bulletin for guidance on defining comparable merchandise. The Policy Bulletin states that "in all cases, if identical merchandise is produced, the country qualifies as a producer of comparable merchandise."[69] Conversely, if identical merchandise is not produced, then a country producing comparable merchandise is sufficient in selecting a surrogate country.[70] Further, when selecting a surrogate country, the statute requires the Department to consider the comparability of the merchandise, not the comparability of the

---

[66] *See* GTC's Surrogate Country Comments, GTC's Rebuttal Surrogate Country Comments, Double Coin's Surrogate Country Comments, and Letter from GTC, entitled, "GTC's Pre-Preliminary Comments: Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated September 9, 2014 at 1-4.

[67] *See* Surrogate Country List.

[68] *See*, *e.g.*, *Certain Cased Pencils From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Intent Not To Revoke Order In Part; 2010-2011,* 78 FR 2363 (January 11, 2013) and accompanying Preliminary Decision Memorandum at 6, unchanged in *Certain Cased Pencils From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Determination To Revoke Order In Part; 2010-2011*, 78 FR 42932 (July 18, 2013).

[69] *See* Policy Bulletin at 2.

[70] The Policy Bulletin also states that "if considering a producer of identical merchandise leads to data difficulties, the operations team may consider countries that produce a broader category of reasonably comparable merchandise." *Id.* at note 6.

industry.[71] "In cases where the identical merchandise is not produced, the Department must determine if other merchandise that is comparable is produced. How the Department does this depends on the subject merchandise."[72] In this regard, the Department recognizes that any analysis of comparable merchandise must be done on a case-by-case basis:

> In other cases, however, where there are major inputs, *i.e.*, inputs that are specialized or dedicated or used intensively, in the production of the subject merchandise, *e.g.*, processed agricultural, aquatic and mineral products, comparable merchandise should be identified narrowly, on the basis of a comparison of the major inputs, including energy, where appropriate.[73]

Further, the statute grants the Department discretion to examine various data sources for determining the best available information.[74] Moreover, while the legislative history provides that the term "significant producer" includes any country that is a significant "net exporter,"[75] it does not preclude reliance on additional or alternative metrics.

In this case, because production data of comparable merchandise was not available, we analyzed exports of comparable merchandise from both Indonesia and Thailand, as a proxy for production data. We obtained export data using the Global Trade Atlas ("GTA") for the following HTS categories: 4011.20: New Pneumatic Tires, Of Rubber, Of A Kind Used On Buses Or Trucks; 4011.61: New Pneumatic Tires Or Rubber, Having Herring-Bone Or Similar Tread, Of A Kind Used On Agriculture Or Forestry Vehicles And Machines; 4011.62: New Pneumatic Tires Of Rubber, Herring-Bone Or Sim. Tread, Used On Construction/Industrial Vehicles, Rim Size No More Than 61 Cm, 4011.63: New Pneumatic Tires Of Rubber, Herring-Bone Or Sim. Tread, Used On Construction/Industrial Vehicles, Rim Size Exceeding 61 Cm; 4011.69: New Pneumatic Tires Of Rubber, Having Herring-Bone Or Similar Tread, Nesoi; 4011.92: New Pneumatic Tires, Of Rubber, Of A Kind Used On Agricultural Or Forestry Vehicles And Machines; 4011.93: New Pneumatic Tires, Of Rubber, Of A Kind Used On Construction/Industrial Handling Vehicles/Machines & Having Rim Size < 61 Cm; 4011.94: New Pneumatic Tires, Of Rubber, Of A Kind Used On Construction/Industrial Handling Vehicles/Machines And Having A Rim Size > 61 Cm.

Both Indonesia and Thailand had significant exports of merchandise under HTS categories identified in the scope of the order.[76] Because neither of the potential surrogate countries has

[71] *See Sebacic Acid from the People's Republic of China; Final Results of Antidumping Duty Administrative Review*, 62 FR 65674, 65676 (December 15, 1997) ("{T}o impose a requirement that merchandise must be produced by the same process and share the same end uses to be considered comparable would be contrary to the intent of the statute.").

[72] *See* Policy Bulletin at 2.

[73] *Id.* at 3.

[74] *See* section 773(c) of the Act; *see also Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1990).

[75] *See* Conference Report to the 1988 Omnibus Trade & Competitiveness Act, H.R. Rep. No. 100-576, at 590 (1988).

[76] *See* Memorandum to the File, entitled, "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Preliminary Results Surrogate Value Memorandum," dated concurrently with this memorandum ("Preliminary SV Memo"), at 1-3 and Attachment XIV.

been definitively disqualified through the above analysis, the Department looks to the availability of SV data to determine the most appropriate surrogate country.

Data Availability

When evaluating SV data, the Department considers several factors including whether the SV is publicly available, contemporaneous with the POR, represents a broad-market average, from an approved surrogate country, tax and duty-exclusive, and specific to the input.[77] There is no hierarchy among these criteria.[78] It is the Department's practice to carefully consider the available evidence in light of the particular facts of each industry when undertaking its analysis.[79] In this case, because there are neither data nor surrogate financial statements for Bulgaria, Colombia, Ecuador or South Africa on the record, these countries will not be considered for primary surrogate country selection purposes at this time. Thus, the Department is left with Indonesia or Thailand as a potential surrogate country.

Indonesia has good quality import price data available for all raw materials in GTA, including sufficient import data for natural rubber inputs. Thailand has good quality data available for all raw materials except natural rubber, the primary input in OTR tires. In general, during the POR, Thailand did not have sufficient import data for input-specific natural rubber inputs (*i.e.*, no data for input-specific HTS 4001.21 category for smoked rubber and limited data for imports of HTS 4001.22 used to value "technically-specified" inputs, resulting in Petitioners suggesting that the broad-basket four-digit 4001 category, along with the limited 4001.22 category be used to value rubber inputs).[80] Whereas Double Coin placed on the record natural rubber data from the website of the International Rubber Consortium and Agricultural Futures Exchange of Thailand as an alternative SV source for rubber inputs should the Department select Thailand as the primary surrogate country, the record is unclear as to how the data are calculated and whether they represent prices of actual sales transactions or if they are commodities indices.[81] As such, we find that Indonesia provides superior price information from which to value the major rubber inputs in comparison to the information available from Thailand.

Petitioners placed two complete financial statements from Thailand onto the record.[82] One of the financial statements is from a producer of identical merchandise while the other is from a producer of comparable merchandise.[83] Petitioners, Double Coin, and GTC placed five complete financial statements from Indonesia onto the record.[84] Three of these statements are

[77] *See*, *e.g.*, *Utility Scale Wind Towers From the Socialist Republic of Vietnam: Final Determination of Sales at Less Than Fair Value*, 77 FR 75984 (December 26, 2012) and accompanying Issues and Decision Memorandum at Comment 1.

[78] *See*, *e.g.*, *Certain Preserved Mushrooms from the People's Republic of China: Final Results and Final Partial Rescission of the Sixth Administrative Review*, 71 FR 40477 (July 17, 2006) and accompanying Issues and Decision Memorandum at Comment 1.

[79] *See* Policy Bulletin.

[80] *See* Petitioners' Initial SV Comments.

[81] For further discussion, *see* Preliminary SV Memo.

[82] *See* Petitioners' Initial SV Submission and September SV Submission.

[83] For further discussion, *see* Preliminary SV Memo.

[84] *See* Petitioners' Initial SV Submission, Petitioners' Rebuttal SV Submission, Petitioners' September SV Submission, Double Coin's Initial SV Submission, GTC's Initial SV Submission, and GTC's Second SV Submission.

from producers of identical merchandise, while the other two are from producers of comparable merchandise.[85] After examining the useable Indonesian and Thai financial statements, the Department preliminarily determined that the multiple financial statements from Indonesian producers of identical merchandise are preferable to the single set of Thai statements from a producer of identical merchandise.[86]

With respect to the valuation of labor, Petitioners provided Thailand National Statistics Office's 2007 Industrial Census data specific to the "Manufacture of rubber tyres and tubes; retreading and rebuilding of rubber tyres."[87] Alternatively, the most industry-specific labor data available for Indonesia is 2008 ILO Chapter 5B information for "Manufacture of Rubber and Plastics Products."[88] Upon examination of available labor data, we agree with Petitioners that the Thai labor information offers more industry-specific (albeit not as current) data with respect to the valuation of labor used in the tire production industry than that of Indonesia, and from a preferable source.[89]

However, the Department preliminarily does not find that that the relative specificity of Thai labor data outweigh the fact that – as discussed above – Indonesia provides superior financial statement information from which to calculate financial ratios derived from multiple producers of identical merchandise and provides superior information to value one of the main FOPs (*i.e.*, natural rubber) from the GTA source. As such, we preliminarily determine that the data availability of SV information from Indonesia is superior to that of Thailand.

Therefore, the Department preliminarily finds Indonesia to be a reliable source for SVs because Indonesia is at a comparable level of economic development pursuant to 773(c)(4) of the Act, is a significant producer of comparable merchandise, and has publicly available and reliable data for all inputs. Given the above facts, the Department preliminarily selects Indonesia as the primary surrogate country for this review.[90] A detailed explanation of the SVs is provided below in the "Normal Value" section of this notice.

---

[85] For further discussion, *see* Preliminary SV Memo.

[86] *Id*. Of the five Indonesian statements on the record, we determine that two are usable for the purpose of calculating surrogate financial ratios. First in accordance with our preference for using statements from producers of identical merchandise, where statements from both identical and comparable producers are on the record, we will calculate ratios using only statements from producers of identical products. *See, e.g.*, *Hand Trucks and Certain Parts Thereof From the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 77 FR 41744 (July 16, 2012) and accompanying Issues and Decision Memorandum at Comment 2. Furthermore, of the three statements from identical producers, two broke out energy costs, whereas one did not. *See* Petitioners' Initial SV Submission, Petitioners' Rebuttal SV Submission, Petitioners' September SV Submission, Double Coin's Initial SV Submission, GTC's Initial SV Submission, and GTC's Second SV Submission, as discussed in the Preliminary SV Memo. As the break-out of energy costs allows the Department to calculate such expenses in accordance with our NV practice of using SVs and actual consumption on a CONNUM-specific basis, we disregarded the set of statements which were unable to break-out energy costs. *See* Preliminary SV Memo. In contrast there is only one set of statements from an identical producer from Thailand on the record (albeit one with energy costs broken out). *See* Petitioners' Initial SV Submission and September SV Submission, as discussed in the Preliminary SV Memo.

[87] *See* Petitioners' Initial SV Submission.

[88] *See*, *e.g.*, *id*.

[89] For further discussion, *see* Preliminary SV Memo.

[90] *Id*.

Date of Sale

The Department's regulations at 19 CFR 351.401(i) state as follows:

> In identifying the date of sale of the subject merchandise or foreign like product, the Secretary normally will use the date of invoice, as recorded in the exporter or producer's records kept in the ordinary course of business. However, the Secretary may use a date other than the date of invoice if the Secretary is satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale.[91]

Both Double Coin and GTC indicated invoice date as the date of sale in accordance with the manner in which revenues are reported in its audited financial statements and the Department's expressed preference for invoice date, noting that the invoice finalizes the essential terms of each sale.[92] Double Coin later clarified that, while invoice date is the appropriate date of sale for all sales from the U.S. warehouse, for direct-shipped sales made by CMA but shipped directly from the PRC to the U.S. customer, the shipment date from the PRC is the more appropriate date of sale, given the Department's practice of not allowing date of sale to be after shipment date.[93] Accordingly, Double Coin reported the shipment date as the date of sale for all direct shipped sales. At verification, we confirmed that the terms of sale are set by the shipment date and Double Coin appropriately reported the date of sale for all sales in accordance with the Department's standard practice.[94]

Therefore, we preliminarily find that the invoice date is the most appropriate date of sale for GTC's sales and Double Coin's sales from U.S. inventory and shipment date is the most appropriate date of sale for Double Coin's direct shipped sales, as record evidence indicates that the terms of sale were set on these dates.

Comparisons to Normal Value

To determine whether Double Coin and GTC's sales of OTR tires to the United States were made at less than fair value, we compared GTC's export price ("EP") or constructed export price ("CEP") sales and Double Coin's CEP sales to NV, as described in the "Export Price and Constructed Export Price" and "Normal Value" sections, below.

---

[91] 19 CFR 351.401(i); *see also Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances: Certain Frozen and Canned Warmwater Shrimp From Thailand*, 69 FR 76918 (December 23, 2004), and accompanying Issues and Decision Memorandum at Comment 10; *Allied Tube and Conduit Corp. v. United States*, 132 F. Supp. 2d 1087, 1090-1092 (CIT 2001) (upholding the Department's rebuttable presumption that invoice date is the appropriate date of sale).

[92] *See* Double Coin's SAQR at 17 and GTC's SAQR at 16.

[93] *See* Letter from Double Coin, entitled, "Section C Response of Double Coin Holdings and China Manufacturers Alliance, LLC: Certain New Pneumatic Off-the-Road Tires from China," dated February 18, 2014 ("Double Coin's SCQR") at17.

[94] *See* Double Coin's Verification Report.

A. Determination of Comparison Method

Pursuant to 19 CFR 351.414(c)(1), the Department calculates dumping margins by comparing weighted-average NVs to weighted-average prices ("the average-to-average ('A-A') method") unless the Secretary determines that another method is appropriate in a particular situation. In less-than-fair-value investigations, the Department examines whether to compare weighted-average NVs to the prices of individual export transactions (the average-to-transaction ("A-T") method) as an alternative comparison method using an analysis consistent with section 777A(d)(l)(B) of the Act. Although section 777A(d)(1)(B) of the Act does not strictly govern the Department's examination of this question in the context of administrative reviews, the Department finds that the issue arising under 19 CFR 351.414(c)(1) in administrative reviews is, in fact, analogous to the issue in less-than-fair-value investigations.[95] In recent investigations, the Department applied a "differential pricing" analysis for determining whether application of A-T comparisons is appropriate in a particular situation pursuant to 19 CFR 351.414(c)(1) and consistent with section 777A(d)(1)(B) of the Act.[96] The Department finds that the differential pricing analysis used in those recent investigations may be instructive for purposes of examining whether to apply an alternative comparison method in this administrative review.[97] The Department will continue to develop its approach in this area based on comments received in this and other proceedings, and on the Department's additional experience with addressing the potential masking of dumping that can occur when the Department uses the A-A method in calculating weighted-average dumping margins.

The differential pricing analysis used in these preliminary results requires a finding of a pattern of prices for comparable merchandise that differs significantly among purchasers, regions, or time periods. If such a pattern is found, then the differential pricing analysis evaluates whether such differences can be taken into account when using the A-A method to calculate the weighted-average dumping margin. The differential pricing analysis used here evaluates all purchasers, regions, and time periods to determine whether a pattern of prices that differ significantly exists. The analysis incorporates default group definitions for purchasers, regions, time periods, and comparable merchandise. Purchasers are based on the reported customer codes. Regions are defined using the reported destination code (*i.e.*, zip codes) and are grouped into regions based upon standard definitions published by the U.S. Census Bureau. Time periods are defined by the quarter within the POR being examined based upon the reported date of sale. For purposes of analyzing sales transactions by purchaser, region and time period, comparable merchandise is considered using the product control number and any characteristics of the sales, other than purchaser, region and time period, that the Department uses in making comparisons between EP or CEP and NV for the individual dumping margins.

---

[95] *See Ball Bearings and Parts Thereof From France, Germany, and Italy: Final Results of Antidumping Duty Administrative Reviews; 2010–2011,* 77 FR 73415 (December 10, 2012) and accompanying Issues and Decision Memorandum at Comment 1.

[96] *See, e.g., Xanthan Gum From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 78 FR 33350 (June 4, 2013) and accompanying Issues and Decision Memorandum at Comment 3, and *Hardwood and Decorative Plywood From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 78 FR 58273 (September 23, 2013), and accompanying Issues and Decision Memorandum at Comment 3.

[97] *See*, *e.g.*, *Activated Carbon from the PRC,* and accompanying Issues and Decision Memorandum at Comment 2.

In the first stage of the differential pricing analysis used here, the "Cohen's *d* test" is applied. The Cohen's *d* test is a generally recognized statistical measure of the extent of the difference between the mean of a test group and the mean of a comparison group. First, for comparable merchandise, the Cohen's *d* coefficient is calculated when the test and comparison groups of data each have at least two observations, and when the sales quantity for the comparison group accounts for at least five percent of the total sales quantity of the comparable merchandise. Then, the Cohen's *d* coefficient is used to evaluate the extent to which the net prices to a particular purchaser, region or time period differ significantly from the net prices of all other sales of comparable merchandise. The extent of these differences can be quantified by one of three fixed thresholds defined by the Cohen's *d* test: small, medium or large. Of these thresholds, the large threshold provides the strongest indication that there is a significant difference between the means of the test and comparison groups, while the small threshold provides the weakest indication that such a difference exists. For this analysis, the difference was considered significant, and the sales in the test group were found to have passed the Cohen's *d* test, if the calculated Cohen's *d* coefficient is equal to or exceeds the large (*i.e.*, 0.8) threshold.

Next, the "ratio test" assesses the extent of the significant price differences for all sales as measured by the Cohen's *d* test. If the value of sales to purchasers, regions, and time periods that pass the Cohen's *d* test account for 66 percent or more of the value of total sales, then the identified pattern of prices that differ significantly supports the consideration of the application of the A-T method to all sales as an alternative to the A-A method. If the value of sales to purchasers, regions, and time periods that pass the Cohen's *d* test accounts for more than 33 percent and less than 66 percent of the value of total sales, then the results support consideration of the application of an A-T method to those sales identified as passing the Cohen's *d* test as an alternative to the A-A method, and application of the A-A method to those sales identified as not passing the Cohen's *d* test. If 33 percent or less of the value of total sales passes the Cohen's *d* test, then the results of the Cohen's *d* test do not support consideration of an alternative to the A-A method.

If both tests in the first stage (*i.e.,* the Cohen's *d* test and the ratio test) demonstrate the existence of a pattern of prices that differ significantly such that an alternative comparison method should be considered, then in the second stage of the differential pricing analysis, we examine whether using only the A-A method can appropriately account for such differences. In considering this question, the Department tests whether using an alternative method, based on the results of the Cohen's *d* and ratio tests described above, yields a meaningful difference in the weighted-average dumping margin as compared to that resulting from the use of the A-A method only. If the difference between the two calculations is meaningful, this demonstrates that the A-A method cannot account for differences such as those observed in this analysis, and, therefore, an alternative method would be appropriate. A difference in the weighted-average dumping margins is considered meaningful if 1) there is a 25 percent relative change in the weighted-average dumping margin between the A-A method and the appropriate alternative method where both rates are above the *de minimis* threshold, or 2) the resulting weighted-average dumping margin moves across the *de minimis* threshold.

Interested parties may present arguments in relation to the above-described differential pricing approach used in these preliminary results, including arguments for modifying the group definitions used in this proceeding.

B.  Results of the Differential Pricing Analysis

For GTC, based on the results of the differential pricing analysis, the Department preliminarily finds that 65.1 percent of GTC's export sales pass the Cohen's *d* test, thus confirming the existence of a pattern of prices for comparable merchandise that differ significantly among purchasers, regions, or time periods.  Further, the Department determines that the A-A method can appropriately account for such differences because there is no significant difference between the A-A, the A-T, or the mixed alternative margins.[98]  Therefore, the Department did not consider an alternative comparison method to the A-A method, and no additional argument to the contrary has been placed on the record.  Accordingly, the Department preliminarily determined to use the A-A method to calculate the weighted-average dumping margin for GTC.[99]

For Double Coin, based on the results of the differential pricing analysis, the Department preliminarily finds that 23.31 percent of Double Coin's export sales pass the Cohen's *d* test, and does not confirm the existence of a pattern of prices for comparable merchandise that differ significantly among purchasers, regions, or time periods.[100]  Therefore, the Department did not consider an alternative comparison method to the A-A method, and no additional argument to the contrary has been placed on the record.  Accordingly, the Department preliminarily determined to use the A-A method to calculate the weighted-average dumping margin for Double Coin.

Export Price and Constructed Export Price

*Export Price*

Pursuant to section 772(a) of the Act, the EP is "the price at which subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States," as adjusted under section 772(c) of the Act.  The Department considers the U.S. prices of certain sales by GTC to be EPs in accordance with section 772(a) of the Act because they were the prices at which the subject merchandise was first sold before the date of importation by the exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States.  We calculated EPs based on the sales price to unaffiliated purchaser(s) in the United States.

---

[98] *See* GTC's Preliminary Analysis Memo.
[99] In these preliminary results, the Department applied to GTC and Double Coin the weighted-average dumping margin calculation method adopted in *Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings; Final Modification*, 77 FR 8101 (February 14, 2012).  In particular, the Department compared monthly weighted-average EPs and/or CEPs with monthly weighted-average NVs and granted offsets for non-dumped comparisons in the calculation of the weighted-average dumping margin.
[100] *See* Double Coin's Preliminary Analysis Memo.

In accordance with section 772(c)(2)(A) of the Act, where appropriate, we made deductions from the sales price for various PRC expenses such as foreign inland freight, brokerage and handling, and international movement costs. Where such expenses were provided by PRC service providers or paid for in renminbi, we based those charges on SV rates from Indonesia. *See* "Factor Valuation" section below for further discussion of SV rates.

*Constructed Export Price*

In accordance with section 772(b) of the Act, the CEP is "the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter," as adjusted under sections 772(c) and (d) of the Act. In accordance with section 772(b) of the Act, we used CEP for certain of GTC's sales and all of Double Coin's sales because the sales were made by U.S. sales affiliates in the United States (GTC North America, Inc. and CMA, respectively).

We calculated CEP based on delivered prices to unaffiliated purchasers in the United States. We made adjustments, where applicable, to the reported gross unit prices for billing adjustments and early payment discounts, to arrive at the price at which the subject merchandise is first sold in the United States to an unaffiliated customer. We made deductions from the U.S. sales price for movement expenses in accordance with section 772(c)(2) of the Act. These included, where applicable, foreign inland freight from plant to the port of exportation, foreign brokerage and handling, ocean freight, marine insurance, U.S. inland freight from port of importation to the warehouse, U.S. freight from warehouse to customer, U.S. warehousing, U.S. customs duties, and U.S. brokerage and handling. In accordance with section 772(d)(1) of the Act, the Department deducted, where applicable, commissions, credit expenses, inventory carrying costs, and indirect selling expenses from the U.S. price, all of which relate to commercial activity in the United States. In accordance with section 772(d) of the Act, we calculated CMA and GTC North America's credit expenses and inventory carrying costs based on its short-term interest rate. In addition, we deducted CEP profit in accordance with sections 772(d)(3) and 772(f) of the Act.[101]

Value-Added Tax

In 2012, the Department announced a change of methodology with respect to the calculation of EP and CEP to include an adjustment of any un-refunded (herein "irrecoverable") value-added tax ("VAT") in certain non-market economies in accordance with section 772(c)(2)(B) of the Act.[102] The Department explained that when an NME government imposes an export tax, duty, or other charge on subject merchandise, or on inputs used to produce subject merchandise, from which the respondent was not exempted, the Department will reduce the respondent's EP and

---

[101] For a detailed description of all adjustments, *see* Double Coin's Preliminary Analysis Memo and GTC's Preliminary Analysis Memo.

[102] *See Methodological Change for Implementation of Section 772(c)(2)(B) of the Tariff Act of 1930, as Amended, In Certain Non-Market Economy Antidumping Proceedings*, 77 FR 36481 (June 19, 2012).

CEP prices accordingly, by the amount of the tax, duty or charge paid, but not rebated.[103] Where the irrecoverable VAT is a fixed percentage of EP or CEP, the Department explained that the final step in arriving at a tax neutral dumping comparison is to reduce the U.S. EP or CEP downward by this same percentage.[104]

In both an initial and supplemental questionnaire, the Department instructed GTC and Double Coin to report value-added taxes on merchandise sold to the U.S. and identify which taxes are not rebated upon export.[105] In response, both respondents stated their disagreement with our product-specific methodology and reported that their total VAT refund exceeded VAT paid for export sales during the POR and, thus, reported no value in the VAT field of their respective sales databases.[106]

However, our practice is that we will not consider allocations across all company sales or across sales of products with different VAT schedules but, rather, to use the difference between the VAT rate and the refund rate, consistent with PRC regulations, unless the company can show otherwise for the subject merchandise.[107] Instead, the Department's methodology, as explained above and applied in this review, incorporates two basic steps: (1) determine the irrecoverable VAT on subject merchandise, and (2) reduce U.S. price by the amount determined in step one. Information placed on the record of this review by both GTC and Double Coin indicates that according to the Chinese VAT schedule, the standard VAT levy is 17 percent and the rebate rate for subject merchandise is 9 percent.[108] For the purposes of these preliminary results, therefore, we removed from U.S. price the difference between the rates (*i.e.*, 8 percent), which is the irrecoverable VAT as defined under Chinese tax law and regulation.[109]

Normal Value

Section 773(c)(1) of the Act provides that the Department shall determine NV using an FOP methodology if: (1) the merchandise is exported from an NME country; and (2) the information does not permit the calculation of NV using home-market prices, third-country prices, or constructed value under section 773(e) of the Act. When determining NV in an NME context, the Department will base NV on FOPs because the presence of government controls on various

---

[103] *Id.*; *see also Chlorinated Isocyanurates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*; 2011-2012, 79 FR 4875 (January 30, 2014) and accompanying Issues and Decision Memorandum at Comment 5.A.

[104] *Id.*

[105] *See* the Department's Letter to both Double Coin and GTC, entitled, "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Supplemental Tax Questionnaire," dated April 30, 2014.

[106] *See* Double Coin's Letter, entitled, "VAT Tax Supplemental Questionnaire Response of Double Coin Holdings and China Manufacturers Alliance, LLC, Certain New Pneumatic Off-the-Road Tires from China," dated May 14, 2014 ("Double Coin VAT Response"), and GTC's Letter, entitled, "Supplemental VAT Questionnaire Response: Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated May 28, 2014 ("GTC VAT Response").

[107] *See, e.g.*, *Diamond Sawblades and Parts Thereof From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 35723 (June 24, 2014) and accompanying Issues and Decision Memorandum at Comment 6.

[108] *See*, *e.g.*, Double Coin's VAT Response at 2-3 and GTC's VAT Response at 1-2.

[109] *See* Double Coin's and GTC's Preliminary Analysis Memoranda.

aspects of these economies renders price comparisons and the calculation of production costs invalid under our normal methodologies. The Department's questionnaire requires that a respondent provide information regarding the weighted-average FOPs across all of the company's plants and/or suppliers that produce the merchandise under consideration, not just the FOPs from a single plant or supplier. This methodology ensures that the Department's calculations are as accurate as possible.[110]

The Department calculated NV based on FOPs in accordance with sections 773(c)(3) and (4) of the Act and 19 CFR 351.408(c). Under section 773(c)(3) of the Act, FOPs used by Double Coin and GTC in the production of OTR Tires include, but are not limited to, (1) hours of labor required; (2) quantities of raw materials employed; (3) amounts of energy and other utilities consumed; and (4) representative capital costs. The Department based NV on Double Coin's and GTC's reported FOPs for materials, energy, and labor.

<u>Factor Valuations</u>

In accordance with section 773(c) of the Act, for subject merchandise produced by Double Coin and GTC, the Department calculated NV based on the FOPs reported by Double Coin and GTC for the POR. The Department used Indonesian import data and other publicly available Indonesian sources in order to calculate SVs for Double Coin and GTC's FOPs. To calculate NV, the Department multiplied Double Coin's and GTC's reported per-unit FOP quantities by publicly available SVs.[111] The Department's practice when selecting the best available information for valuing FOPs is to select, to the extent practicable, SVs which are product-specific, representative of a broad market average, publicly available, contemporaneous with the POR, and exclusive of taxes and duties.[112]

As appropriate, the Department adjusted input prices by including freight costs to render them delivered prices. Specifically, the Department added to Indonesian import SVs a surrogate freight cost using the shorter of the reported distance from the domestic supplier to the factory or the distance from the nearest seaport to the factory where it relied on an import value. This adjustment is in accordance with the decision of the Federal Circuit in *Sigma Corp. v. United States*, 117 F.3d 1401, 1408 (Fed. Cir. 1997). Additionally, where necessary, the Department adjusted SVs for inflation and exchange rates, and the Department converted all applicable FOPs to a per-kilogram basis.

Furthermore, with regard to the Indonesian import-based SVs, we have disregarded import prices that we have reason to believe or suspect may be subsidized. We have reason to believe or suspect that prices of inputs from Indonesia, India, South Korea, and Thailand may have been subsidized because we have found in other proceedings that these countries maintain broadly

[110] *See*, *e.g.*, *Final Determination of Sales at Less Than Fair Value: Prestressed Concrete Steel Rail Tie Wire From the People's Republic of China,* 79 FR 25572 (May 5, 2014) and accompanying Issues and Decision Memorandum at Comment 7.

[111] *See* Preliminary SV Memo at Attachments I and II.

[112] *See*, *e.g.*, *Electrolytic Manganese Dioxide From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 73 FR 48195 (August 18, 2008) and accompanying Issues and Decision Memorandum at Comment 2.

available, non-industry-specific export subsidies.[113] Therefore, it is reasonable to infer that all exports to all markets from these countries may be subsidized.[114] Further, guided by the legislative history, it is the Department's practice not to conduct a formal investigation to ensure that such prices are not subsidized.[115] Rather, the Department bases its decision on information that is available to it at the time it makes its determination. Additionally, consistent with our practice, we disregarded prices from NME countries and excluded imports labeled as originating from an "unspecified" country from the average value, because the Department could not be certain that they were not from either an NME country or a country with general export subsidies.[116] Therefore, we have not used prices from these countries either in calculating the Indonesian import-based SVs or in calculating ME input values.

Pursuant to 19 CFR 351.408(c)(1), when a respondent sources inputs from an ME supplier in meaningful quantities (*i.e.*, not insignificant quantities) and pays in an ME currency, the Department uses the actual price paid by the respondent to value those inputs, except when prices may have been distorted by findings of dumping and/or subsidization.[117] Where the Department finds ME purchases to be of significant quantities (*i.e.*, 85 percent or more), in accordance with our statement of policy as outlined in *Antidumping Methodologies: Market Economy Inputs*,[118] the Department uses the actual purchase prices to value the inputs. Alternatively, when the volume of an NME firm's purchases of an input from ME suppliers during the period is below 85 percent of its total volume of purchases of the input during the period, but where these purchases are otherwise valid and there is no reason to disregard the prices, the Department will weight-average the ME purchase price with an appropriate SV, according to their respective shares of the total volume of purchases, unless case-specific facts

---

[113] *See*, *e.g.*, *Steel Threaded Rod From India: Final Affirmative Countervailing Duty Determination and Partial Final Affirmative Determination of Critical Circumstances*, 79 FR 40712 (July 14, 2014); *Certain Frozen Warmwater Shrimp From the Republic of Indonesia: Final Negative Countervailing Duty Determination*, 78 FR 50383 (August 19, 2013); *Corrosion-Resistant Carbon Steel Flat Products From the Republic of Korea: Preliminary Results of Countervailing Duty Administrative Review; 2011*, 78 FR 55241 (September 10, 2013), unchanged in final *Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2011*, 79 FR 5378 (January 31, 2014); *Large Residential Washers From the Republic of Korea: Final Affirmative Countervailing Duty Determination*, 77 FR 75975 (December 26, 2012); *Bottom Mount Combination Refrigerator-Freezers From the Republic of Korea: Final Affirmative Countervailing Duty Determination*, 77 FR 17410 (March 26, 2012); *Certain Frozen Warmwater Shrimp From Thailand: Final Negative Countervailing Duty Determination*, 78 FR 50379 (August 19, 2013).

[114] *See*, *e.g.*, *Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances: Certain Color Television Receivers From the People's Republic of China*, 69 FR 20594 (April 16, 2004) and accompanying Issues and Decision Memorandum at Comment 7.

[115] *See* Conference Report to the 1988 Omnibus Trade & Competitiveness Act, H.R. Rep. No. 100-576, at 590 (1988); *see also Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination: Coated Free Sheet Paper from the People's Republic of China*, 72 FR 30758, 30763 (June 4, 2007), unchanged in *Final Determination of Sales at Less Than Fair Value: Coated Free Sheet Paper from the People's Republic of China*, 72 FR 60632 (October 25, 2007).

[116] *See*, *e.g.*, *Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination: Chlorinated Isocyanurates From the People's Republic of China*, 69 FR 75294, 75301 (December 16, 2004), unchanged in *Notice of Final Determination of Sales at Less Than Fair Value: Chlorinated Isocyanurates From the People's Republic of China*, 70 FR 24502 (May 10, 2005).

[117] *See, e.g., Antidumping Duties; Countervailing Duties; Final Rule*, 62 FR 27296, 27366 (May 19, 1997).

[118] *See Use of Market Economy Input Prices in Nonmarket Economy Proceedings*, 78 FR 46799 (August 2, 2013) ("*Market Economy Inputs*").

provide adequate grounds to rebut the presumption.[119] When a firm has made ME input purchases that may have been dumped or subsidized, are not *bona fide,* or are otherwise not acceptable for use in a dumping calculation, the Department will exclude them from the numerator of the ratio to ensure a fair determination of whether valid ME purchases meet the 85 percent threshold.[120]

Information reported by Double Coin and GTC demonstrates that certain inputs were sourced from an ME country and paid for in ME currencies both in excess of the 85 percent threshold for certain inputs and below the 85 percent threshold for other inputs. Accordingly, the Department implemented its ME purchase methodology (outlined above) to value Double Coin and GTC's ME purchases, as appropriate, and applied freight expenses to the ME prices of the inputs where necessary.[121] The information reported by each respondent also demonstrates that certain inputs were purchased from countries which maintain broadly available, non-industry-specific export subsidies; thus, consistent with our practice and the legislative history, we have not used the actual price paid for these inputs (or portion of inputs) and instead valued them using an SV.[122]

The Department used Indonesian Import Statistics from GTA to value all raw materials, all packing inputs, and certain energy inputs that Double Coin and GTC used to produce subject merchandise during the POR, except as listed below.[123]

We valued trans-Pacific ocean freight (from the PRC to the United States) paid in RMB or provided by an NME-freight carrier using quotes posted on Descartes (http://rates.descartes.com).[124] Because the international shipping terms for certain sales by both respondents includes both the ocean freight and U.S. inland freight, but Descartes quotes are only applicable to port-to-port ocean freight, we added an additional average inland freight value (from Descartes) to account for U.S. freight to the customer for these certain sales.[125]

We valued electricity and water using values from Indonesian utilities. Specifically, we valued electricity using an average value from an Indonesian electricity company, PT PLN (Persero). We valued water using a value from an Indonesian water utility, Pam Jaya, specifically "Group IV B," which includes factories and industry.[126]

We valued brokerage and handling ("B&H") using a price list of export procedures necessary to export a standardized cargo of goods in Indonesia. The price list is compiled based on a survey case study of the procedural requirements for trading a standard shipment of goods by ocean transport in Indonesia that is published in *Doing Business 2014: Indonesia* by the World Bank.[127]

---

[119] *Id*.
[120] *Id*.
[121] *See* Preliminary SV Memo.
[122] *Id*.
[123] *Id*.
[124] *Id*.
[125] *Id*.
[126] *Id*.
[127] *Id*.

We used Indonesian transport information in order to value the freight-in cost of the raw materials. The Department preliminarily determined the best available information for valuing truck freight to be from *Doing Business 2014: Indonesia*. This World Bank report gathers information concerning the distance and cost to transport products in a 20-foot container, weighing 10 metric tons, from the largest city in Indonesia to the nearest seaport. We calculated the per-unit inland freight costs using the distance from Jakarta to the nearest seaport. We calculated a per-kg, per-kilometer surrogate inland freight rate based on the methodology used by the World Bank.[128]

The Department preliminarily determined the best available information for valuing rail freight to be a rate from the "The Market for Railways in Indonesia" report published by the Australia Indonesia Partnership. Rates were given on a metric ton basis per kilometer basis, and we calculated a per-kg, per-kilometer surrogate railway freight rate using this data.[129] We then inflated the average rate to be contemporaneous with the POR, using the Producer Price Index for Indonesia, as published by the International Monetary Fund.

In NME antidumping duty proceedings, the Department prefers to value labor solely based on data from the primary surrogate country.[130] In *Labor Methodologies*, the Department explained that industry-specific wage data from the primary surrogate country was the best available information because it is consistent with how the Department values all other FOPs, and it results in the use of a uniform basis for FOP valuation – the use of data from a primary surrogate country.[131] It is the Department's practice to value labor using industry-specific data reported by the International Labor Organization's ("ILO") in Chapter 6A of the *Yearbook of Labor Statistics* ("ILO Chapter 6A"), which reflects all costs related to labor (*i.e.*, wages, benefits, housing, training, etc.). It is the Department's preference to value labor using ILO Chapter 6A data under the rebuttable presumption that ILO Chapter 6A data better accounts for all direct and indirect labor costs.[132]

In these preliminary results, because Indonesia does not report labor data to the ILO under Chapter 6A, we are unable to use ILO's Chapter 6A data to value the respondents' labor wage and instead will use the industry-specific wage rate using earnings or wage data reported under ILO's Chapter 5B. The labor rate category which most closely matches OTR tires is ISIC-Revision 3 "Division: 25 - Manufacture of Rubber and Plastics Products." As a consequence, for the preliminary results, the Department finds that the best available information for valuing labor is Indonesia Chapter 5B, Revision 3, Division 25 data from 2008, which is relatively specific to the industry being examined, a broad-market average, closely contemporaneous with the POR, and covers the entire industry.[133]

---

[128] *Id*.

[129] *Id*.

[130] *See Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing The Factor of Production: Labor*, 76 FR 36092 (June 21, 2011) ("*Labor Methodologies*").

[131] *Id*.

[132] *Id.* at 36093.

[133] For more information on the labor SV calculations, *see* Preliminary SV Memo.

We valued the cost of insuring goods transported from the PRC to the United States using the marine insurance rate published by RJG Consultants on October 4, 2010.[134] We did not inflate this value since it is a percent of the value of goods shipped.

We valued the cost of warehousing using a publicly available price quote from GIC Logistics Group in Indonesia.[135] We converted the rate from cubic meters per month to cubic meters per day and applied a conversion factor for kilograms per cubic meter to determine an average rate in kilograms per day.

To value factory overhead, selling, general and administrative expenses ("SG&A"), and profit, we used information from the financial statements of Indonesian OTR tire producers PT Gajah Tunggal Tbk ("Gajah Tunggal") and PT Goodyear Indonesia Tbk ("Goodyear"), both for the year ending on December 31, 2013.[136] From these Indonesian financial statements we were able to determine factory overhead as a percentage of the total raw materials, labor, and energy ("ML&E") costs; SG&A as a percentage of ML&E plus overhead (*i.e.*, cost of manufacture); and the profit rate as a percentage of the cost of manufacture plus SG&A.[137]

For a complete listing of all the inputs and a detailed discussion about our SV selections, *see* the Preliminary SV Memo.

Adjustment Under Section 777A(f) of the Act

In applying section 777A(f) of the Act in this administrative review, the Department examines: (1) whether a countervailable subsidy (other than an export subsidy) has been provided with respect to a class or kind of merchandise, (2) whether such countervailable subsidy has been demonstrated to have reduced the average price of imports of the class or kind of merchandise during the relevant period, and (3) whether the Department can reasonably estimate the extent to which that countervailable subsidy, in combination with the use of NV determined pursuant to section 773(c) of the Act, has increased the weighted average dumping margin for the class or kind of merchandise.[138] For a subsidy meeting these criteria, the statute requires the Department to reduce the antidumping duty by the estimated amount of the increase in the weighted average dumping margin subject to a specified cap.[139]

In order to examine the effects of concurrent countervailable subsidies in calculating antidumping margins for respondents in this review, the Department requested that both Double Coin and GTC submit information with respect to subsidies relevant to their eligibility for an adjustment to the calculated weighted-average dumping margin.[140] However, both Double Coin and GTC each indicated that they would not submit a response to this questionnaire, due to the

---

[134] *See* Preliminary SV Memo.
[135] *Id*.
[136] *Id*.
[137] *Id.,* at Attachments VI and VII.
[138] *See* section 777A(f)(1)(A)-(C) of the Act.
[139] *See* section 777A(f)(1)-(2) of the Act.
[140] *See* Letter from the Department separately addressed to Double Coin and GTC, entitled, "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Double Remedies Questionnaire," dated July 17, 2014.

significant administrative burden the preparation of such a submission would require in comparison to the small benefit likely to be received.[141] Because respondents did not avail themselves of this opportunity to demonstrate eligibility for any such adjustment, the Department is not making adjustments to the calculation of assessment rates for antidumping duties pursuant to section 777A(f) of the Act.

Currency Conversion

Where necessary, the Department made currency conversions into U.S. dollars, in accordance with section 773A(a) of the Act, based on the exchange rates in effect on the dates of the U.S. sales, as certified by the Federal Reserve Bank.

Recommendation

We recommend applying the above methodology for these preliminary results.

✓
Agree

Disagree

Paul Piquado
Assistant Secretary
for Enforcement and Compliance

30 September 2014
Date

[141] *See* Letter from Double Coin, entitled, "CMA's and Double Coin's Double Remedies Questionnaire: Certain New Pneumatic Off-the-Road Tires from China," dated July 31, 2014, and Letter from GTC, entitled, "GTC Double Remedies QRE Response: Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated July 23, 2014.

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-912
AR: 09/01/12 - 8/31/13
**Public Document**
E&C AD/CVD OIII: BCQ/AMM

April 8, 2015

**MEMORANDUM TO:** Ronald K. Lorentzen
Acting Assistant Secretary
for Enforcement and Compliance

**FROM:** Christian Marsh
Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations

**SUBJECT:** Issues and Decision Memorandum for Final Results of Antidumping Duty Administrative Review: Certain New Pneumatic Off-the-Road Tires from the People's Republic of China; 2012-2013

---

**SUMMARY**

The Department of Commerce ("Department") analyzed the case and rebuttal briefs of interested parties in the fifth administrative review of the antidumping duty ("AD") order on certain new pneumatic off-the-road tires ("OTR Tires") from the People's Republic of China ("PRC") for the period of review ("POR") September 1, 2012, through August 30, 2013. The review covers the following exporters of subject merchandise: mandatory respondents Double Coin Holdings Ltd. ("Double Coin")[1] and Guizhou Tyre Co., Ltd. / Guizhou Tyre Import and Export Co., Ltd. (collectively, "GTC");[2] separate rates applicants Zhongce Rubber Group Company Limited

[1] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part*, 78 FR 67104, 67108 (November 8, 2013) ("*Initiation Notice*"). The review was initiated on Double Coin Group Rugao Tyre Co., Ltd. – renamed Double Coin Group Jiangsu Tyre Co., Ltd. – ("DC Rugao/Jiangsu"), Double Coin Group Shanghai Donghai Tyre Co., Ltd. ("DC Donghai"), and Double Coin Holdings, Ltd. ("DCH" or "Double Coin"). The respondent in this review is DCH, which exported all subject merchandise produced by both its wholly-owned and affiliated factories during the POR. We collapsed DCH (including its Shanghai Heavy Tire factory), DC Rugao/Jiangsu, and DC Donghai into a single entity for the purposes of this review. *See* Memorandum to the File, entitled, "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Double Coin Affiliation and Collapsing Memorandum," dated September 30, 2014 ("Double Coin Affiliation and Collapsing Memo"). Our collapsing determination remains unchallenged and unchanged for these final results. The China Manufacturers' Alliance ("CMA") is DCH's U.S. sales affiliate for all POR sales, and provided and certified to relevant and requested sales-related information on behalf of the respondent. *See* Double Coin Affiliation and Collapsing Memo. Accordingly, for ease of reference we use "Double Coin" to collectively refer to each of the above-mentioned production, export, and sales entities that comprise the respondent in this review, but note that DCH is the actual exporter-respondent.

[2] *See Initiation Notice*. The review was initiated on Guizhou Advance Rubber Co., Ltd. ("GAR"), Guizhou Tyre Co., Ltd., and Guizhou Tyre Import and Export Co., Ltd. *See* Letter from GTC, entitled, "Section A Response: Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated January 29, 2014 ("GTC's SAQR"). These three companies were collapsed

("Zhongce") and Weihai Zhongwei Rubber Co., Ltd.; and Trelleborg Wheel System (Xingtai) China, Co. Ltd. ("Trelleborg" or "TWS Xingtai"). We recommend that you approve the positions we developed in the "Discussion of the Issues" section of this memorandum.

**BACKGROUND**

On September 30, 2014, the Department published the *Preliminary Results* of this administrative review.[3] At that time, the Department invited interested parties to comment on the *Preliminary Results*.[4]

On December 11, 2014, the Department received timely filed case briefs from Double Coin,[5] GTC,[6] and Titan Tire Corporation and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("Petitioners").[7] Trelleborg provided a timely filed rebuttal brief on December 19, 2014.[8] On December 23, 2014, the Department received timely filed rebuttal briefs from Petitioners,[9] Double Coin,[10] GTC,[11] and Zhongce.[12]

---

into a collective entity, "GTC," in the investigation. *See Certain New Pneumatic Off-The-Road Tires From the People's Republic of China; Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 73 FR 9278, 9283 (February 20, 2008), unchanged in *Certain New Pneumatic Off-The-Road Tires from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 FR 40485 (July 15, 2008). As such, we refer to the respondent, collectively, as "GTC" throughout this memorandum.

[3] *See Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2012–2013*, 79 FR 61291 (October 10, 2014) ("*Preliminary Results*") and accompanying memorandum to Paul Piquado, entitled "Decision Memorandum for Preliminary Results of Antidumping Duty Administrative Review: Certain New Pneumatic Off-the-Road Tires from the People's Republic of China; 2012-2013," dated September 30, 2014 ("PDM").

[4] *See Preliminary Results*, 79 FR at 61291.

[5] *See* Letter from Double Coin entitled, "Case Brief of Double Coin Holdings and China Manufacturers Alliance Certain New Pneumatic Off-the-Road Tires from China," dated December 11, 2014 ("Double Coin's Case Brief").

[6] *See* Letter from GTC entitled, "GTC Direct Case Brief: Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated December 11, 2014 ("GTC's Case Brief").

[7] *See* Letter from Petitioners entitled, "Case Brief Of Titan Tire Corporation And The United Steel, Paper And Forestry, Rubber, Manufacturing, Energy, Allied Industrial And Service Workers International Union, AFL-CIO, CLC," dated December 11, 2014 ("Petitioners' Case Brief").

[8] *See* Letter from Trelleborg entitled, "Trelleborg Wheel Systems (Xingtai) Co. Ltd.'s Rebuttal Brief in the 12/13 Administrative Review of New Pneumatic Off-The-Road Tires from the People's Republic of China," dated December 18, 2014 ("Trelleborg's Rebuttal").

[9] *See* Letter from Petitioners entitled, "Rebuttal Brief Of Titan Tire Corporation And The United Steel, Paper And Forestry, Rubber, Manufacturing, Energy, Allied Industrial And Service Workers International Union, AFL-CIO, CLC," dated December 23, 2014 ("Petitioners' Rebuttal Brief").

[10] *See* Letter from Double Coin entitled, "Rebuttal Brief of Double Coin Holdings and China Manufacturers Alliance Certain New Pneumatic Off-the-Road Tires from China," dated December 23, 2014 ("Double Coin's Rebuttal Brief").

[11] *See* Letter from GTC entitled, "GTC Rebuttal Case Brief: Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated December 23, 2014 ("GTC's Rebuttal Brief").

[12] *See* Letter from Zhongce entitled, "Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Rebuttal Brief of Zhongce Rubber Group Company Limited," dated December 23, 2014 ("Zhongce's Rebuttal").

On December 30, 2014, the Department extended the deadline for the final results until April 8, 2015.[13] In accordance with timely requests from parties, the Department conducted a hearing on February 25, 2015.[14]

**SCOPE OF THE ORDER**

The products covered by the order are new pneumatic tires designed for off-the-road and off-highway use, subject to exceptions identified below. Certain OTR tires are generally designed, manufactured and offered for sale for use on off-road or off-highway surfaces, including but not limited to, agricultural fields, forests, construction sites, factory and warehouse interiors, airport tarmacs, ports and harbors, mines, quarries, gravel yards, and steel mills. The vehicles and equipment for which certain OTR tires are designed for use include, but are not limited to: (1) agricultural and forestry vehicles and equipment, including agricultural tractors,[15] combine harvesters,[16] agricultural high clearance sprayers,[17] industrial tractors,[18] log-skidders,[19] agricultural implements, highway-towed implements, agricultural logging, and agricultural, industrial, skid-steers/mini-loaders;[20] (2) construction vehicles and equipment, including earthmover articulated dump products, rigid frame haul trucks,[21] front end loaders,[22] dozers,[23] lift trucks, straddle carriers,[24] graders,[25] mobile cranes,[26] compactors; and (3) industrial vehicles and equipment, including smooth floor, industrial, mining, counterbalanced lift trucks, industrial and mining vehicles other than smooth floor, skid-steers/mini-loaders, and smooth floor off-the-road counterbalanced lift trucks. The foregoing list of vehicles and equipment generally have in common that they are used for hauling, towing, lifting, and/or loading a wide variety of

---

[13] *See* "Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Extension of Deadline for Final Results of Antidumping Duty Administrative Review," dated December 30, 2014.

[14] *See "*Hearing Transcript," filed onto the record by Lisa Dennis Court Reporting on March 25, 2015.

[15] Agricultural tractors are dual-axle vehicles that typically are designed to pull farming equipment in the field and that may have front tires of a different size than the rear tires.

[16] Combine harvesters are used to harvest crops such as corn or wheat.

[17] Agricultural sprayers are used to irrigate agricultural fields

[18] Industrial tractors are dual-axle vehicles that typically are designed to pull industrial equipment and that may have front tires of a different size than the rear tires.

[19] A log-skidder has a grappling lift arm that is used to grasp, lift and move trees that have been cut down to a truck or trailer for transport to a mill or other destination.

[20] Skid-steer loaders are four-wheel drive vehicles with the left-side drive wheels independent of the right-side drive wheels and lift arms that lie alongside the driver with the major pivot points behind the driver's shoulders. Skid-steer loaders are used in agricultural, construction and industrial settings.

[21] Haul trucks, which may be either rigid frame or articulated (*i.e.*, able to bend in the middle) are typically used in mines, quarries and construction sites to haul soil, aggregate, mined ore, or debris.

[22] Front loaders have lift arms in front of the vehicle. They can scrape material from one location to another, carry material in their buckets, or load material into a truck or trailer.

[23] A dozer is a large four-wheeled vehicle with a dozer blade that is used to push large quantities of soil, sand, rubble, *etc.*, typically around construction sites. They can also be used to perform "rough grading" in road construction.

[24] A straddle carrier is a rigid frame, engine-powered machine that is used to load and offload containers from container vessels and load them onto (or off of) tractor trailers.

[25] A grader is a vehicle with a large blade used to create a flat surface. Graders are typically used to perform "finish grading." Graders are commonly used in maintenance of unpaved roads and road construction to prepare the base course on to which asphalt or other paving material will be laid.

[26] *I.e.,* "on-site" mobile cranes designed for off-highway use.

equipment and materials in agricultural, construction and industrial settings. Such vehicles and equipment, and the descriptions contained in the footnotes are illustrative of the types of vehicles and equipment that use certain OTR tires, but are not necessarily all-inclusive. While the physical characteristics of certain OTR tires will vary depending on the specific applications and conditions for which the tires are designed (*e.g.*, tread pattern and depth), all of the tires within the scope have in common that they are designed for off-road and off-highway use. Except as discussed below, OTR tires included in the scope of the order range in size (rim diameter) generally but not exclusively from 8 inches to 54 inches. The tires may be either tube-type[27] or tubeless, radial or non-radial, and intended for sale either to original equipment manufacturers or the replacement market. The subject merchandise is currently classifiable under Harmonized Tariff Schedule of the United States ("HTSUS") subheadings: 4011.20.10.25, 4011.20.10.35, 4011.20.50.30, 4011.20.50.50, 4011.61.00.00, 4011.62.00.00, 4011.63.00.00, 4011.69.00.00, 4011.92.00.00, 4011.93.40.00, 4011.93.80.00, 4011.94.40.00, and 4011.94.80.00. While HTSUS subheadings are provided for convenience and customs purposes, our written description of the scope is dispositive.

Specifically excluded from the scope are new pneumatic tires designed, manufactured and offered for sale primarily for on-highway or on-road use, including passenger cars, race cars, station wagons, sport utility vehicles, minivans, mobile homes, motorcycles, bicycles, on-road or on-highway trailers, light trucks, and trucks and buses. Such tires generally have in common that the symbol "DOT" must appear on the sidewall, certifying that the tire conforms to applicable motor vehicle safety standards. Such excluded tires may also have the following designations that are used by the Tire and Rim Association:

Prefix letter designations:

- P - Identifies a tire intended primarily for service on passenger cars;
- LT - Identifies a tire intended primarily for service on light trucks; and,
- ST - Identifies a special tire for trailers in highway service.

Suffix letter designations:

- TR - Identifies a tire for service on trucks, buses, and other vehicles with rims having specified rim diameter of nominal plus 0.156" or plus 0.250";
- MH - Identifies tires for Mobile Homes;
- HC - Identifies a heavy duty tire designated for use on "HC" 15" tapered rims used on trucks, buses, and other vehicles. This suffix is intended to differentiate among tires for light trucks, and other vehicles or other services, which use a similar designation.
- Example: 8R17.5 LT, 8R17.5 HC;
- LT - Identifies light truck tires for service on trucks, buses, trailers, and multipurpose passenger vehicles used in nominal highway service; and
- MC - Identifies tires and rims for motorcycles.

[27] While tube-type tires are subject to the scope of this proceeding, tubes and flaps are not subject merchandise and therefore are not covered by the scope of this proceeding, regardless of the manner in which they are sold (*e.g.,* sold with or separately from subject merchandise).

The following types of tires are also excluded from the scope: pneumatic tires that are not new, including recycled or retreaded tires and used tires; non-pneumatic tires, including solid rubber tires; tires of a kind designed for use on aircraft, all-terrain vehicles, and vehicles for turf, lawn and garden, golf and trailer applications. Also excluded from the scope are radial and bias tires of a kind designed for use in mining and construction vehicles and equipment that have a rim diameter equal to or exceeding 39 inches. Such tires may be distinguished from other tires of similar size by the number of plies that the construction and mining tires contain (minimum of 16) and the weight of such tires (minimum 1500 pounds).

**DISCUSSION OF THE ISSUES**

**Comment 1: Whether to Include Double Coin in the PRC-Wide Entity and Adjust the Entity Rate**

Double Coin's Brief[28]

[28] *See* Double Coin's Case Brief at 9-58. In support of its arguments, Double Coin cites to: *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1331(Fed. Cir. 2011); *Transcom, Inc. v. United States*, 182 F.3d 876 (Fed. Cir. 1999); *Sigma Corp v. United States*, 117 F.3d 1401 (Fed. Cir. 1997) ("*Sigma*"); *Georgetown Steel v. United States*, 801 F.2d 1308 (Fed. Cir. 1986) ("*Georgetown Steel*"); *Jiangsu Changbao Steel Tube Co., Ltd. v. United States*, 884 F. Supp.2d, 1295 (CIT 2012) ("*Jiangsu Changbao*"); *Advanced Tech. & Materials Co. v. United States*, Court No. 09-00511, Slip Op. 2011 (CIT 2011); *Qingdao Taifa Group Co. v. United States*, 637 F. Supp. 2d 1231 (CIT 2009); *Peer Bearing Company – Changshan v. United States*, 587 F. Supp. 2d 1319 (CIT 2008) ("*Peer Bearing*"); *Hontex Enters. Inc. v. United States*, 248 F. Supp. 2d 1323 (CIT 2003); *UCF America v. United States*, 919 F. Supp. 435 (CIT 1996); Panel Report, *United States – Antidumping Measures on Certain Shrimp from Viet Nam*, WT/DS429/R (November 17, 2014); Panel Report, *United States – Antidumping Measures on Certain Shrimp from Vietnam*, WT/DS404/R (September 2, 2011); Panel Report, *United States – Antidumping Measures on Certain Shrimp from Vietnam*, WT/DS429/R (November 17, 2014) (currently before the WTO Appellate Body); *Announcement of Change in Department Practice for Respondent Selection in Antidumping Duty Proceedings and Conditional Review of the Nonmarket Economy Entity in NME Antidumping Duty Proceedings*, 78 FR 65963 (November 4, 2013) ("*Change in Practice*"); *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of Antidumping Duty New Shipper Review; 2011-2012*, 78 FR 33341 (June 4, 2013); *Utility Scale Wind Towers From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 77 FR 75992 (December 26, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part*, 77 FR 63791 (October 17, 2012); *Methodological Change for Implementation of Section 772(c)(2)(B) of the Tariff Act of 1930, as Amended, In Certain Non-Market Economy Antidumping Proceedings*, 77 FR 36481 (June 19, 2012) ("*Section 772(c)(2)(B) Methodological Change*"); *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of the 2008-2009 Antidumping Duty Administrative Review*, 76 FR 22871 (April 25, 2011) ("*Tires/PRC 2008-2009*"); *Certain Cut-to-Length Carbon Steel Plate From the People's Republic of China: Final Results of the 2007-2008 Administrative Review of the Antidumping Duty Order*, 75 FR 8301 (February 24, 2010); *Certain New Pneumatic Off-The-Road Tires from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 FR 40485 (July 15, 2008); *Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, From the People's Republic of China: Final Results of Antidumping Duty Administrative Reviews and Final Rescission and Partial Rescission of Antidumping Duty Administrative Reviews*, 71 FR 54269 (September 14, 2006); *Final Determination of Sales at Less Than Fair Value and Final Partial Affirmative Determination of Critical Circumstances: Diamond Sawblades and Parts Thereof from the People's Republic of China*, 71 FR 29303 (May 22, 2006) ("*Sawblades/PRC LTFV Final*"); *Honey From the People's Republic of China: Preliminary Results, Partial Rescission, and Extension of Final Results of Second Antidumping Duty Administrative Review*, 69 FR 77184 (December 27, 2004); *Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination: Structural Steel Beams From Germany*, 66 FR 67190 (December 28, 2001); *Notice of Preliminary Determination of Sales at Less Than Fair Value: Foundry*

- The Department does not have the authority to apply a country-wide entity rate that meets neither the statutory requirements for an "individually investigated" or "all others" rate.
- The determination to apply the PRC-wide rate to Double Coin in the *Preliminary Results* presumed that there was another state-owned entity producing and exporting OTR tires to the United States during the POR and that Double Coin was affiliated with said entity without any factual basis and despite verified evidence to the contrary.
- The Department proceeded to apply a rate in excess of the ceiling applicable to companies that are not individually investigated.
- Even if the Department had the authority to issue a country-wide rate, there was no written request for review of the NME entity and, thus, the PRC-wide entity is not under review.
- Given that Double Coin fully participated in this review and obtained a calculated margin, the Department lacks the authority to issue anything other than that company-specific rate and, regardless, cannot apply a country-wide rate based on adverse facts available ("AFA") to a fully cooperative exporter if the statutory requirements for AFA have not been met.
- PRC law, regulations, and Double Coin's Articles of Association plainly disallow government control of Double Coin's day-to-day operations.

---

*Coke From the People's Republic of China*, 66 FR 13885 (March 8, 2001); *Notice of Final Rule, Antidumping Duties, Countervailing Duties*, 62 FR 27296 (May 19, 1997) ("*Final Rule*"); *Notice of Proposed Rulemaking and Request for Public Comment*, 61 FR 7308 (February 27, 1996); *Final Determination of Sales at Less Than Fair Value: Silicon Carbide from the People's Republic of China*, 59 FR 22585 (May 2, 1994); *Iron Construction Castings From the People's Republic of China; Final Results of Antidumping Duty Administrative Review*, 56 FR 2742 (January 24, 1991); *Final Determinations of Sales at Less Than Fair Value: Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, From the People's Republic of China*, 56 FR 241 (January 3, 1991); Department Memorandum regarding "Countervailing Duty Investigation of Coated Free Sheet Paper from the People's Republic of China - Whether the Analytical Elements of the Georgetown Steel Opinion are Applicable to China's Present-Day Economy," dated March 29, 2007 ("Georgetown Steel Memorandum"); Department's *Policy Bulletin 05.1: Separate-Rates Practice and Application of Combination Rates in Antidumping Investigation involving Non-Market Economy Countries*, dated April 5, 2005 ("Policy Bulletin 05.1"); and Alagari, Reform, Reality, and Recognition: Reassessing U.S. Antidumping Policy Toward China, 26 L. Pol'y Int'l Bus. 1061 (1995). Double Coin further cites to 19 CFR 351.213(b) and 19 CFR. 351.213 of the Department's regulations and the following sections of the Tariff Act of 1930, as amended ("the Act"): 735(c), 777A(c), 782(a), 701(d), 751, 776(a), and 776(b).

Double Coin references the following submissions: Department Memorandum to the File, entitled, "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Verification of the Sales and Factors Response of Double Coin Holdings and China Manufacturers Alliance," dated concurrently with this memorandum ("Double Coin's Verification Report"); PDM; Department Memorandum to the file entitled, "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Analysis of the Preliminary Results Margin Calculation for Double Coin," dated September 30, 2014 ("Double Coin's Preliminary Analysis Memo"); Double Coin's Submission entitled, "Response to the Department's 2nd Sections A, C, and D Supplemental Questionnaire for Double Coin Holdings Ltd. and China Manufacturers Alliance, LLC (collectively, "Double Coin") Certain New Pneumatic Off-the-Road Tires from China," dated July 31, 2014 ("Double Coin's 2nd Supplemental ACD Response"); Department Memorandum to Melissa Skinner entitled, "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Respondent Selection," dated December 13, 2013 ("Respondent Selection Memo"); Department Letter to Interested Parties entitled, "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: U.S. Customs and Border Protection Import Data for Use in Respondent Selection," dated November 12, 2013 ("CBP Data Release"); and Double Coin Affiliation and Collapsing Memo.

- The Department failed to cite a single instance in which Huayi, Double Coin's state-owned parent company, exercised control and, rather, relies on hypotheticals with no basis in fact.
- There is direct and verified evidence that the PRC government did not exercise any control over Double Coin's export activities, as all export prices were negotiated by American employees of CMA, Double Coin's U.S. affiliate.
- The Department's policy with respect to PRC government control is based on outdated 25 year old presumptions which are contrary to the Department's own factual findings about changes in the PRC economy that have already been revisited in a countervailing duty ("CVD") context.
- Questions regarding government control bear no relevance to the primary question of whether Double Coin is exporting to the United States at below fair value. In this case, that question has been demonstrably settled, as the Department's calculations show that – even if the PRC government were controlling operations – Double Coin is not selling tires to the United States at less than fair value.
- The Department's decision to reverse its 20 year policy concerning separate rate eligibility in this review is fundamentally unfair, considering that Double Coin was previously determined eligible for a separate rate, underwent no material changes in ownership or management selection processes since this eligibility determination and, therefore, had every reason to assume that this separate rate finding would be upheld prior to making its export shipments for the POR. The Department effectively changed the rules in the middle of the game.

Petitioners' Rebuttal Brief[29]

- The Department maintains the authority to issue a PRC-entity rate, and this long-standing practice has been upheld by the courts, as has been the practice of assigning the entity rate to individually investigated respondents that fail to demonstrate eligibility for separate rates. The Department should dismiss Double Coin's arguments to the contrary.
- Double Coin failed to rebut the presumption of state control; thus, its individual behavior is no longer relevant to this review and the country-wide rate is the relevant margin.
- The Department explicitly put all interested parties on notice that the PRC-wide entity would be reviewed if one of the named exporters did not qualify for a separate rate. The change in practice with respect to the conditional review cited by Double Coin took effect subsequent to the initiation of the instant review.
- The non-market economy ("NME")-entity rate does not constitute an AFA rate when applied to individual members, as this is not an adverse inference applied to a specific company, but based on the actions of the entity regardless of the specific actions of its constituent members.
- Contrary to Double Coin's claims, the Department is correct to state that the record does not contain information to determine the percentage of PRC-wide activity Double Coin accounted for in the POR.
- The Department's findings with respect government control and relevant PRC laws are consistent with the guidance from the Court of International Trade ("CIT" or "Court") and Court of Appeals for the Federal Circuit ("Federal Circuit") in the recent *Diamond Sawblades* litigation, which addressed and dismissed many of Double Coin's arguments.

---

[29] *See* Petitioners' Rebuttal Brief at 2-15. Petitioners cite to the following: *Advanced Technology & Materials Co., Ltd., et al. v. United States*, 885 F. Supp. 2d 1343 (CIT 2012) ("*Advanced Technology I*"), remand affirmed in *Advanced Technology & Materials Co., Ltd., et al. v. United States*, 938 F. Supp. 2d 1342 (CIT 2013), aff'd 541 F. App'x 1009 (Fed. Cir. 2014) ("*Advanced Technology II*") (collectively, "*Diamond Sawblades* litigation"); *Transcom* (Fed. Cir. 1999); *Sigma*, 117 F.3d 1401 (Fed. Cir. 1997); *David v. United States*, 24 F. Supp. 3d 1355 (CIT 2014) ("*Mark David*"); *Michaels Stores, Inc. v. United States*, 931 F. Supp. 2d 1308 (CIT 2013) ("*Michaels Stores*"); *SKF USA Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001) ("*SKF*"); *Jiangsu Changbao* (CIT 2012); *Watanabe Group v. United States*, 2010 Ct. Intl. Trade LEXIS 144 (CIT 2010) ("*Watanabe*"); *Peer Bearing* (CIT 2008); *Coalition for the Preservation of American Brake Drum and Rotor Aftermarket Manufacturers v. United States v. United States*, 44 F.Supp. 2d 229 (CIT 1999) ("*CPABDRAM*"); *Diamond Sawblades and Parts Thereof From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 35723 (June 24, 2014) ("*Diamond Sawblades 11-12*"); *Preliminary Results* (October 10, 2014) and PDM; *Galvanized Steel Wire From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 77 FR 17430 (March 26, 2012) ("*Steel Wire/PRC LTFV Final*"); *Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review*, 78 FR 54235 (September 3, 2013) ("*Opportunity to Request*"); *Change in Practice*; *Initiation Notice* (November 8, 2013); and *Brake Rotors From the People's Republic of China: Final Results and Partial Rescission of the Seventh Administrative Review; Final Results of the Eleventh New Shipper Review*, 70 FR 69937 (November 18, 2005) ("*Brake Rotors 11th AR Final*"). Petitioners reference the following record submissions: Double Coin's Case Brief; Petitioners' Case Brief; CBP Data Release; Respondent Selection Memo; Letter from Petitioners' entitled, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off-The-Road Tires from China (A-570-912): Titan and the USW's Request for Administrative Reviews," dated September 30, 2013 ("Petitioners' Review Request"); Letter from Petitioners' entitled, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off-The-Road Tires from China (A–570–912): Petitioners' Rebuttal Factual Information to Double Coin's Supplemental Section A Questionnaire Response," dated June 23, 2014 ("Petitioners' June 23 Submission"); and Letter from Double Coin, entitled, "Supplemental Section A Response of Double Coin Holdings and China Manufacturers Alliance, LLC Certain New Pneumatic Off-the-Road Tires from China," dated June 16, 2014 ("Double Coin's SSAQR").

- The fact that the record lacks affirmative evidence showing government intervention in operations is irrelevant, as the standard is that there is a rebuttable presumption of control, which Double Coin has not overcome.
- Finally, Petitioners maintain that, should the Department continue to deny Double Coin's separate rate and agree to not calculate a margin for Double Coin for these final results (*i.e.*, apply a 210.48 percent margin, unadjusted by Double Coin's calculated rate, to the entirety of the entity, including Double Coin), the Department need not address the arguments in Double Coin's case brief, as these concerns are moot.

Petitioners' Brief[30]

- Once the Department has determined that an NME respondent is ineligible for a separate rate, the individual examination of said respondent should end, no margin should be calculated, and there should be no subsequent revision to the PRC-wide rate.
- The calculation of a margin for Double Coin conflicts with past practice (*i.e.*, *Diamond Sawblades* litigation Remand Redetermination, *Brake Rotors 11th AR Prelim* (May 9, 2005), etc.) where the inability of a respondent to overcome the presumption of government control resulted in the application of a PRC-wide rate.
- The idea that a respondent's sales behavior ceases to be meaningful if it is found to be part of the PRC-wide entity has been supported by the Court (*e.g.*, *Watanabe* (CIT 2010), *Jiangsu Changbao* (CIT 2012), and *Mark David* (CIT 2014)) and is reflected in the Department's standard practice.
- The Department maintains reasonable concerns that allowing a focus on the activities of only one member of the PRC-wide entity would create the potential for the larger entity to manipulate AD results by selectively providing data on the record and dictating what data would be verified from review to review.

---

[30] *See* Petitioners' Case Brief at 2-6. Petitioners cite to: *Mark David*, 24 F. Supp. 3d 1355 (CIT 2014); *Jiangsu Changbao*, 884 F. Supp.2d 1295; *Watanabe*, 2010 Ct. Intl. Trade LEXIS 144 (CIT 2010); *Peer Bearing Company* (CIT 2008); *Preliminary Results* (October 10, 2014); *Change in Practice,* 78 FR 65963; Final Results of Redetermination Pursuant to Remand Order for Diamond Sawblades and Parts Thereof from the People's Republic of China, Court No. 09-00511, Slip Op. 12-147 (CIT 2012), dated May 6, 2013 ("*Diamond Sawblades* litigation Remand Redetermination") in *Advanced Technology I* (CIT 2012), affirmed in *Advanced Technology II,* 938 F. Supp. 2d 1342 ; *Steel Wire/PRC LTFV Final* (March 26, 2012); *Brake Rotors From the People's Republic of China: Preliminary Results and Partial Rescission of the Seventh Administrative Review and Preliminary Results of the Eleventh New Shipper Review*, 70 FR 24382 (May 9, 2005) ("*Brake Rotors 11th AR Prelim*"), unchanged in *Brake Rotors 11th AR Final* (November 18, 2005); *Porcelain-on-Steel Cooking Ware from the People's Republic of China: Notice of Preliminary Results of Antidumping Duty Administrative Review*, 70 FR 76027 (December 22, 2005) ("*Porcelain Cookware/PRC*"), unchanged in *Porcelain-on-Steel Cooking Ware from the People's Republic of China: Notice of Final Results of Antidumping Duty Administrative Review*, 71 FR 24641 (April 26, 2006); and *Notice of Final Determination of Sales at Less Than Fair Value: Certain Cut-to-Length Carbon Steel Plate From Ukraine*, 62 FR 61754 (November 19, 1997). Petitioners further reference the PDM.

Double Coin's Rebuttal Brief[31]

- For the reasons stated in Double Coin's Case Brief, there is no justification for the Department to assign the PRC-wide rate to Double Coin.
- Even should the Department disagree and believe that Double Coin is ineligible for a separate rate, the Department lacks justification to impose the 210 percent AFA rate, because:
  - The Department has not undertaken in this review any corroboration of the AFA rate.
  - The cases cited by Petitioners purporting to show a "prior practice" of automatically assigning the PRC-wide entity rate to any company that fails to attain separate-rate status, are inapposite, as they either concern original investigations (*Wantanabe* (CIT 2010) and the *Diamond Sawblades* litigation) or uncooperative respondents (*Mark David* (CIT 2014)).

**Department's Position:** As an initial matter, we disagree with Double Coin's contention that the Department has no authority to issue a rate for the NME entity. Rather, the Department's NME practice, including its assignment of a specific rate to all NME exporters that do not establish their eligibility for a separate rate is well-established[32] and has been upheld by the courts.[33]

The Department considers the PRC to be a non-market economy country under section 771(18) of the Act. In antidumping proceedings involving NME countries, such as the PRC, the Department has a rebuttable presumption that the export activities of all firms within the country are subject to government control and influence. Therefore, in PRC cases, the Department uses a rate established for the PRC-wide entity, which it applies to all imports from an exporter that has not established its eligibility for a separate rate. Section 351.107(d) of the Department's regulations, provides that "in an antidumping proceeding involving imports from a nonmarket economy country, 'rates' may consist of a single dumping margin applicable to all exporters and producers."[34] The Department's practice of assigning a PRC-wide rate has been upheld by the Federal Circuit. In *Sigma*, the Federal Circuit affirmed that it was within the Department's authority to employ a presumption for state control in a NME country and place the burden on the exporters to demonstrate an absence of central government control.[35] The Federal Circuit

---

[31] *See* Double Coin's Rebuttal Brief at 1-6. Double Coin cites to: *Hubbell Power Sys., Inc. v. United States*, 884 F. Supp. 2d 1283 (CIT 2012); *Qingdao Taifa Grp. Co. v. United States*, 760 F. Supp. 2d 1379 (CIT 2010); section 776(c) of the Act; Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, vol. 1 (1994) ("SAA"); and *Gallant Ocean (Thailand) Co., Ltd v. United States*, 602 F.3d 1319 (Fed. Cir. 2010) ("*Gallant Ocean*"). Double Coin further addresses the following cases cited in Petitioners' Case Brief: *Mark David,* 24 F. Supp. 3d 1355 (CIT 2014); *Watanabe*, 2010 Ct. Intl. Trade LEXIS 144 (CIT 2010); and *Advanced Technology II*, 938 F. Supp. 2d 1342. Double Coin references Petitioners' Case Brief and Double Coin's Case Brief.

[32] *See*, *e.g.*, *Steel Wire/PRC LTFV Final* and accompanying IDM at 8.

[33] *See*, *e.g.*, *Sigma*, 117 F.3d at 1405.

[34] *See 1,1,1,2-Tetrafluroethane From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 79 FR 62597 (October 20, 2014) and the accompanying IDM at Comment 1 (explaining the Department's practice with respect to separate rates as upheld by the Federal Circuit in *Sigma*, 117 F.3d at 1405-06, and describing the Department's practice with respect to the rate assigned to the PRC-wide entity).

[35] *See Sigma*, 117 F.3d at 1405-1406 ("We agree with the government that it was within Commerce's authority to employ a presumption of state control for exporters in a nonmarket economy, and to place the burden on the exporters to demonstrate an absence of central government control. The antidumping statute recognizes a close

recognized that sections 771(18)(B)(iv)-(v) of the Act recognized a close correlation between an NME economy and government control of prices, output decisions, and allocation of resources and, therefore, the Department's presumption was reasonable.[36] The application of a PRC-wide rate to all parties which were not eligible for a separate rate was also affirmed by the Federal Circuit in *Transcom* in 2002.[37] In *Transcom*, the Federal Circuit also found that a rate based on "BIA" (the precursor to facts available and AFA under the current statute) is not punitive.[38] Thus, contrary to Double Coin's assertions, the courts have consistently upheld the Department's authority to apply a presumption of state control in NME countries and to apply a single rate to all exporters that fail to rebut that presumption.

Double Coin claims that the Department has no authority to issue a PRC-wide rate in this review since a review was not properly initiated on the PRC-wide entity. Double Coin's insistence that the PRC entity is not under review in the instant case appears to rely, in part, on the November 2013 *Change in Practice* which, indeed, requires an explicit request prior to initiating a review of the NME entity. However, the Department specifically stated that this change in practice announced would apply to "administrative reviews for which the notice of opportunity to request an administrative review is published on or after December 4, 2013."[39] The opportunity to request a review for this review was published September 3, 2013 and, as such, the change in practice noted by Double Coin is inapplicable in this review.[40] Rather, for administrative reviews for which the notice of opportunity was published before December 4, 2013 (as in the instant case), the Department conditionally reviewed the NME entity; therefore, even absent a

---

correlation between a nonmarket economy and government control of prices, output decisions, and the allocation of resources. Moreover, because exporters have the best access to information pertinent to the 'state control' issue, Commerce is justified in placing on them the burden of showing a lack of state control.") (internal citations omitted).

[36] *Id*. *See also CPABDRAM*, 44 F.Supp. 2d at 243, quoting *Sigma*, 117 F.3d at 1405 ("Under the broad authority delegated to it from Congress, Commerce has employed 'a presumption of state control for exporters in a non-market economy'… Under this presumption, all exporters receive one non-market economy country ('NME') rate, or country-wide rate, unless an exporter can 'affirmatively demonstrate' its entitlement to a separate, company-specific margin by showing 'an absence of central government control, both in law and in fact, with respect to exports.'"); *Michaels Stores*, 931 F. Supp. 2d at 1315, quoting *SKF*, 263 F.3d at 1030 ("The regulations clarify, however, that for non-market economies, 'rates may consist of a single dumping margin applicable to all exporters and producers.' Moreover, whenever the statute is silent on a particular issue, it is well-settled that Commerce may 'formulate policy' and make rules 'to fill any gap left, implicitly or explicitly, by Congress.'") (internal citations omitted).

[37] *See Transcom v. United States*, 294 F.3d 1371, 1381-83 (Fed. Cir. 2002) ("*Transcom*"). (The PRC-wide rate, and its adverse inference are applicable to all companies which were initiated on yet failed to show their entitlement to a separate rate. "Accordingly, while section 1677e provides that Commerce may not assign a {best information available}-based rate to a particular party unless that party has failed to provide information to Commerce or has otherwise failed to cooperate, the statue says nothing about whether Commerce may presume that parties are entitled to *independent* treatment under 1677e in the first place" {*emphasis added*}). *See* also *Transcom*, 294 F.3d at 1376 citing *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990) (Instead, the objective of best information available ("BIA") is to aid Commerce in determining dumping margins as accurately as possible). The litigation in *Transcom* covered three periods of review between June 1990 and May 1993. *See Transcom*, 294 F.3d at 1374-75, and *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China: Final Results of Antidumping Duty Administrative Reviews,* 61 FR 65527 (Dec. 13, 1996). The term BIA is now referred to under the statute as facts available or AFA. *Id.*

[38] *See Transcom*, 294 F.3d at 1376.

[39] *See Change in Practice*, 78 FR at 65964.

[40] *See Opportunity to Request*, 78 FR at 54235.

request, the NME entity can be subject to the review if an exporter subject to the review does not demonstrate that it is separate from the entity.[41]  Though Double Coin notes that the NME entity is not listed as one of the companies for which review was requested in the *Initiation Notice*, the *Initiation Notice* plainly states that "If one of the above-named companies does not qualify for a separate rate, all other exporters of Certain New Pneumatic Off-the-Road Tires {from} the PRC who have not qualified for a separate rate are deemed to be covered by this review as part of the single PRC entity of which the named exporters are a part."[42]  Thus, the Department explicitly put the PRC-wide entity and all other interested parties on notice that the PRC-wide entity would be reviewed if one of the named exporters did not qualify for a separate rate.  Thus, pursuant to Double Coin's failure to demonstrate a lack of *de facto* government control, the PRC-wide entity is subject to review.  In *Transcom*, the Federal Circuit held that, in addition to the named companies in an initiation notice, conditionally reviewed companies also received sufficient notice in the initiation.[43]  Accordingly, we find Double Coin's claims with respect to the NME-entity not being subject to review are unfounded.

We further disagree with Double Coin's argument that, because Double Coin was selected as a mandatory respondent and provided information from which the Department was able to calculate an antidumping margin, the statute requires the Department to assign Double Coin a rate based on this information.  It is the Department's policy to assign all exporters of the merchandise subject to review in NME countries a single rate unless an exporter can affirmatively demonstrate an absence of government control.  As discussed in the *Preliminary Results* and further established below, we found that Double Coin is ineligible for a separate rate due to its inability to demonstrate the absence of government control.  As such, Double Coin is a part of the PRC-wide entity.  The Department must calculate a single rate for the PRC-wide entity, and in this review, we do not have the necessary information, *i.e.*, sales and production data, from the remaining unspecified portion of the PRC-wide entity.  Nor is there information on the record with respect to the composition of the PRC-wide entity.  As such, we do not consider it reasonable to determine a rate for the PRC-wide entity based solely on the information provided for Double Coin.  Rather, based on the unique circumstances presented in this review, we consider it reasonable to use the information provided by Doubly Coin as well as the only information we have regarding the entire PRC-wide entity, to calculate a new margin for the PRC-wide entity.  Specifically, we calculated the final margin for the PRC-wide entity, which includes Double Coin, using a simple average of the previously assigned PRC-wide rate (210.48 percent)[44] and the calculated final margin for Double Coin (0.14 percent).  Accordingly, the Department revised the PRC-wide entity rate to 105.31 percent for these final results.

Further, Double Coin's contention ignores the Department's well-established practice of assigning the PRC-wide entity rate to individually investigated respondents who participated in an investigation or review but do not qualify for a separate rate.[45]  Indeed, the courts have agreed

---

[41] *See Change in Practice*, 78 FR at 65970.

[42] *See Initiation Notice*, 78 FR at 67111, footnote 10.

[43] *See Transcom*, 294 F.3d at 1379.

[44] *See Certain New Pneumatic Off-The-Road Tires from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 FR 40485, 40489 (July 15, 2008) ("*LTFV Determinations*").

[45] *See, e.g.*, *Certain Activated Carbon From the People's Republic of China:  Preliminary Results of Antidumping Duty Administrative Review; 2011-2012*, 78 FR 26748 (May 8, 2013) and PDM at 10-11, unchanged in *Certain*

that, once a respondent has been held to be part of the NME-wide entity, inquiring into said respondent's separate sales behavior ceases to be meaningful.[46] Therefore, because Double Coin has failed to rebut the presumption of state control, as discussed further below, the Department is no longer required to base the margin assigned to the PRC-wide entity, of which Double Coin is a part, solely on Double Coin's behavior.

Double Coin also objects to the application of the 210.48 percent PRC-wide rate to Double Coin, at least in part, on the basis that this NME entity rate is an AFA rate. Double Coin argues that section 776(b) of the Act requires a party to fail to cooperate to the best of its ability as a prerequisite before the Department is permitted to apply an adverse inference. Therefore, because Double Coin has been fully cooperative, as acknowledged by the Department, the statutory requirements for AFA have not been met and the Department is not permitted to apply the 210.48 percent PRC-entity rate (which is based on AFA) in any manner with respect to Double Coin's margin. However, in *Advanced Technology II*, the Court addressed the issue as to whether the PRC-wide is an adverse rate, stating "Commerce did not apply adverse facts available to AT&M, Commerce rather found that AT&M had not rebutted the presumption of state control and assigned it the PRC-wide rate. These are two distinct legal concepts: a separate AFA rate applies to a respondent who has received a separate rate but has otherwise failed to cooperate fully whereas the PRC-wide rate applies to a respondent who has not received a separate rate."[47] In the investigation at issue in that case, the PRC-wide entity received a rate based on AFA.[48] In this review, to the extent that the application of the pre-existing PRC-wide rate affects the antidumping duties assessed on Double Coin's entries as a result of this review, this rate is not an application of AFA to the entity in this review; rather, it reflects in part the rate applied to the entity based on the actions of the entity in the investigation of which Double Coin is now a part (and unchanged by any subsequent review). In this review, we are seeking to establish a new rate for the entity, which is under review, and a part of which was selected as a mandatory respondent, but for which we do not have complete information. Regardless, as discussed below, as a result of our instant determination, the portion of the PRC-wide entity calculation that is based on its pre-existing rate is reasonably representative only of the unspecified non-Double Coin portion of the single NME-entity, whereas the Double Coin portion of the single entity is reasonably represented by Double Coin's own data.

---

*Activated Carbon From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 78 FR 70533 (November 26, 2013) ("*Activated Carbon/PRC*"); *Brake Rotors 11th AR Final* and accompanying IDM at Comment 7. *See also*, *Advanced Technology II*, 938 F. Supp. 2d 1342.

[46] *See Advanced Technology II*, 938 F. Supp. 2d at 1351, citing *Watanabe,*2010 Ct. Intl. Trade LEXIS 144 at 8 ("Commerce's permissible determination that {a respondent} is part of the PRC-wide entity means that inquiring into {that respondent}'s separate sales behavior ceases to be meaningful.") and *Jiangsu Changbao* at 1312 (referencing *Watanabe* at 8) ("losing all entitlement to an individualized inquiry appears to be a necessary consequence of the way in which Commerce applies the presumption of government control… applying a countrywide AFA rate without individualized findings of failure to cooperate is no different from applying such a countrywide AFA rate without individualized corroboration.").

[47] *Advanced Technology II*, 938 F. Supp. 2d at 1351, citing *Watanabe*, 2010 Ct. Intl. Trade LEXIS 144 at 9, footnote 8. *See also Peer* at 1327 ("… there is no requirement that the PRC-wide entity rate based on AFA relate specifically to the individual company. It is not directly analogous to the process used in a market economy, where there is no countrywide rate. Here, the rate must be corroborated according to its reliability and relevance to the countrywide entity as a whole.")

[48] *See Sawblades/PRC LTFV Final*, 71 FR 29303 (May 22, 2006).

Further, Double Coin argues that the Department has no basis to apply the PRC-wide rate to Double Coin based either on other parties' inability to cooperate or the failure of a party to provide information with respect to the PRC-wide entity because such information was never requested by the Department. As mentioned above, in *Sigma*, the Federal Circuit affirmed that it was within the Department's authority to employ a presumption for state control in a NME country and found the presumption reasonable, noting that sections 771(18)(B)(iv)-(v) of the Act recognized a close correlation between a NME economy and government control of prices, output decisions, and allocation of resources.[49] Having not demonstrated the absence of *de facto* control from the government over selection of its management, Double Coin constitutes a part of the PRC-wide entity. Further, the PRC-wide entity is comprised of producers and exporters that can provide answers to questions, as evidenced by Double Coin in this review.

Double Coin then asserts that, setting aside all prior arguments with respect to the permissibility of the Department's application of the PRC-wide rate to Double Coin, the Department was further incorrect on the underlying factual finding that Double Coin failed to rebut the presumption of government control and that neither the Huayi Group (*i.e.*, Double Coin's majority owner), the State Owned Assets Supervision Committee ("SASAC") (which owns 100 percent of the Huayi Group), nor any other government entity maintains control over its day to day activities. However, in making our preliminary finding on this issue, we were – and continue to be – guided by the Court's findings in the *Diamond Sawblades* litigation, which dismissed many of the same arguments that Double Coin currently presents in this proceeding. For example, Double Coin claims that under PRC law, the Huayi Group cannot exercise control over Double Coin. The respondent involved in the *Diamond Sawblades* litigation made the same argument during the administrative proceeding. In rejecting those arguments, the Court found that the PRC Company Law provides evidence rebutting the presumption of *de jure* control "is inadequate … and it lacks … common business sense."[50] For Article 20 of the PRC Company Law in particular, it "does not appear that this {article} may reasonably be construed to 'limit' the power of the state in the companies in which the state invests."[51] Further, the Court found the structure of the PRC Company Law provides controlling shareholders direct and effectual control as "{s}hareholders have the ability to hire and fire each board member and decide their pay pursuant to Article 38, and each board member is thereby beholden. That amounts to delegation, as opposed to separation…. since the general manager, in point of fact, is selected by the same board of directors 'in charge of overall business planning and the selection of upper management' that is 'responsible to the shareholders' and can readily be replaced at their whim."[52] Furthermore, the Court addressed Articles 22-27 of the PRC Code of Governance for Listed Companies, noting that these articles "reveal little to an inquiry into 'governmental control' in the running of a company including its export operations."[53]

The Department finds that the PRC laws and regulations at issue (*i.e.*, the Interim Regulations, and the PRC Company Law) are not dispositive with regard to control of export activities. The PRC laws and regulations at issue provide a framework for various corporate entities to form and

---

[49] *See Sigma*, 117 F.3d at 1405-1406.
[50] *See Advanced Technology I*, 885 F. Supp. 2d at 1353.
[51] *Id.*, at 1354.
[52] *Id.*, at 1355.
[53] *Id.*, at 1358.

operate at some distance from the central government. While the Interim Regulations also indicate the existence of some degree of government control, the Department continues to find that the overall legal environment is permissive of individual firms maintaining independent operations with respect to export activities.

In the Department's experience applying the separate rate test, the *de jure* factors are not overridingly indicative of the absence of control of export activities in the typical case, but rather they demonstrate an ability on the part of the exporter to control its own commercial decision making. In large part, the laws and regulations that the Department has examined over the years, such as the laws referenced above, indicate that a certain level of control has devolved in that the commercial decision-making can lie with the various corporate entities operating under these laws and regulations, which in turn, merits an analysis of the record evidence to ensure that there is an absence of *de facto* aspects of government control over export activities. This is supported by our findings over the years that numerous PRC respondents operating under such laws also maintain *de facto* control over their export functions. These situations where parties are found to be entitled to a separate rate are, however, based on the individual facts with respect to each such party. Because of the centralized control inherent in the PRC's status as a NME country, we presume that decision making of an enterprise in an NME country is under a form of centralized government control (whether at the central, provincial, or local level). Nevertheless, the PRC Company Law and other laws and regulations demonstrate that, within the PRC's NME, distance can exist between decisions made at the central government level and decisions made at the firm level with respect to exports.

Thus, an analysis of *de facto* control is critical in determining whether respondents are, in fact, subject to a degree of government control which would preclude the Department from granting a separate rate.

With respect to Double Coin's assertions that its Articles of Association and other company documents make clear that managers control the day-to-day operations, the Court addressed similar arguments made as part of the *Diamond Sawblades* litigation. Specifically, the Court rejected arguments made by the respondent in that proceeding regarding its management and control of daily operations. The Court stated that managers should be presumed "to be beholden to the board that controls their pay, in particular to the chairman of the board as the *de facto* company head under the PRC model," until proven otherwise.[54] Similarly, we find that as Huayi is the controlling shareholder, it is the entity controlling Double Coin's board and management.

Double Coin then argues the fact that no minority shareholder has ever nominated a director and no Huayi nominee has ever been rejected (facts which supplemented the Department's preliminary finding) simply means that such an event has never occurred and by no means confirms Huayi's control over Double Coin. Moreover, Double Coin asserts that minority shareholders indeed have *bona fide* rights pursuant to the company's Articles of Association. Double Coin's assertions, however, do not demonstrate that it should be given separate rate status. The standard for determining such a status is that an NME exporter is presumed to be

[54] *Id.*, at 1359. *See also*, *id.*, at 1352 ("…the exclusion of 'day to day operations' from 'oversight' responsibility is a straw man.").

under government control until such a presumption is sufficiently rebutted. As such, the absence of evidence of control or other demonstrable action on behalf of a minority shareholder does nothing to rebut this presumption[55], nor does the existence of certain minority shareholder rights (such as the ability to bring suit against a board member or manager who acts against the interests of the company, and the right of minority shareholders to call a shareholder meeting) prove the absence of government control.[56] Moreover, Double Coin's general argument that the Department cannot cite a single example in which Huayi actually exercised its legal right to control or influence a day-to-day decision about the manner in which Double Coin sold subject merchandise to the United States is similarly unconvincing, as this also ignores the fact that the burden to rebut the presumption of government control is on the party seeking separate rate status.

With respect to Double Coin's assertion that that the Department is setting up an improper standard based on a notion of potential control rather than examples of actual control, and concerns that such examples of potential control are virtually limitless, we find that the facts on the record counter Double Coin's arguments regarding potential or theoretical control. Specifically, as noted in Double Coin's Preliminary Analysis Memo, regardless of the restrictions of PRC law and the protections afforded to minority shareholders, Double Coin's Articles of Association demonstrate that a majority shareholder – and particularly one with 65.66 percent ownership – has near complete control over any shareholder decisions, including decisions which may affect the management and operations of the company.[57] Whether or not the Huayi Group, which is the majority owner of Double Coin, demonstrably exercised control over Double Coin's day-to-day operations does not refute the fact that a government-owned entity has near complete control of shareholder decisions of Double Coin.

Double Coin further argues that Huayi's control of Double Coin's board cannot be equated to control of Double Coin's export activity and that the PRC ownership structure has no effect on sales prices in the United States because the prices are set by Double Coin's U.S. affiliate, CMA. We note that the respondent in the *Diamond Sawblades* litigation made similar arguments in that proceeding. The CIT rejected this line of reasoning in *Advanced Technology I*, stating that "the actual setting of price is only one of the four de facto factors described in the Policy Bulletin, whereas governmental manipulation of the cost of inputs,… or rationalization of industry or

---

[55] Particularly when considering that the Department specifically afforded Double Coin the opportunity to provide examples of any such instance at verification. *See* Double Coin's Verification Report at 11 ("However, when we then asked for an example, within or outside of the POR, of a shareholder's meeting where a Huayi nominee had been voted down by a coalition of minority shareholders or where a Huayi nominee had generally failed to obtain enough votes to ascend to the board, Double Coin officials confirmed that, to their knowledge, this situation had never occurred.").

[56] Moreover, it remains unclear whether these codified rights are actually exerted and, regardless, it is unclear how evidence demonstrating that minority shareholders routinely called meetings or brought suit against managers would plainly rebut the presumption of control on behalf of the majority state-owned shareholder. The third example of minority rights referenced on Double Coin's Case Brief at 32, *i.e.*, the conflict of interest rule, (whereby any decision which contains a conflict of interest to Huayi would require the recusal of Huayi's voting shares) might serve to better rebut this presumption. However, again, there is no indication on the record of any such recusals, nor is there sufficient understanding of how this recusal process actually works in practice.

[57] *See* Double Coin's Preliminary Analysis Memo at 10-14, *citing* Double Coin's Verification Report at Section III.B.4 and Double Coin's 2nd Supplemental ACD Response at Exhibit S2-5.

output are among numerous other scenarios of concern that can affect seller pricing."[58]
Similarly, we find that Double Coin's arguments regarding U.S. sales by CMA does not overcome the rebuttable presumption of government control.

Double Coin argues that the evolving practice on government control in the wake of the *Diamond Sawblades* litigation, as presently implemented, is predicated on outdated presumptions with respect to the PRC economy which the Department already reconsidered in, for example, the Georgetown Steel Memo. However, the Department previously noted that the analysis in the Georgetown Steel Memo focused only on the concept of the single economic entity that characterized the economies in *Georgetown Steel* and that it would be incorrect to conflate that concept with the concept of the NME-wide entity for antidumping duty assessment purposes.[59] Given the reforms discussed in the Georgetown Steel Memo, the Department found that a single central authority no longer comprises the PRC's economy and that the policy that gave rise to the *Georgetown Steel* litigation does not prevent the Department from concluding that the PRC government has bestowed a countervailable subsidy upon a PRC producer.
As such, we agree with Petitioners that the analysis in the Georgetown Steel Memo is inapplicable to the issue of the PRC-wide entity in antidumping proceedings.

As explained above, in antidumping proceedings involving NME countries such as the PRC, the Department has a rebuttable presumption that the export activities of all firms within the country are subject to government control and influence. This presumption stems not from an economy comprised entirely of the government (*e.g.*, a firm is nothing more than a government work unit), but rather from the NME-government's use of a variety of legal and administrative levers to exert influence and control (both direct and indirect) over the assembly of economic actors across the economy. As such, this presumption is patently different from a presumption that all firms are one and the same as the government, such that they comprise a monolithic economic entity. Moreover, the presumption underlying the separate rates test was upheld in *Sigma*, where the Federal Circuit affirmed the Department's separate rates test as reasonable, stating that the statute recognizes a close correlation between an NME and government control of prices, output decisions, and the allocation of resources.[60] The Federal Circuit also stated that it was within the Department's authority to employ a presumption of state control for exporters in an NME-country and to place the burden on the exporters to demonstrate an absence of central government control. Firms that do not rebut the presumption are assessed a single antidumping duty rate, *i.e.*, the NME-Entity rate.[61] In recognition that parts of the PRC's economy are transitioning away from the state-controlled economy, the Department developed the separate rates test. In an economy comprised of a single, monolithic state entity, it would be impossible to identify separate firms, let alone rebut government control. Rather, the PRC's economy today is neither command-and-control nor market-based; government control and/or influence is omnipresent (which gives rise to the presumption) but not omnipotent (and hence, the presumption is rebuttable).[62]

---

[58] *See Advanced Technology I*, 885 F. Supp. 2d at 1359-1360.
[59] *See Diamond Sawblades 11-12*, 79 FR 35723, and accompanying IDM at Comment 4.
[60] *See Sigma*, 117 F.3d at 1405-06. (Fed. Cir. 1997)
[61] *See* 19 CFR 351.107(d), which provides that "in an antidumping proceeding involving imports from a non market economy country, 'rates' may consist of a single dumping margin applicable to all exporters and producers."
[62] *See* Georgetown Steel Memo at 9.

Case 1:15-cv-00324-TCS    Document 192-3    Filed 02/16/17    Page 18 of 59

With respect to Double Coin's claim that the Department's determination with respect to Double Coin's separate rate is fundamentally unfair in that it effectively changes the rules in the middle of the game, we note that the statute does not afford respondents any expectation that a finding from a prior segment will be upheld in a subsequent segment. Indeed, both the Court and the Department have previously stated that a prior separate rate determination is irrelevant to the decision on the current record.[63] Moreover, the Department has not changed its separate rate criteria, but has analyzed the facts provided by Double Coin in light of the decisions in the *Diamond Sawblades* litigation.[64]

In sum, we continue to find that there is undeniable evidence that the 100 percent SASAC-owned majority-owner of Double Coin exerts considerable influence over the board of directors (and, thus, the management and operations of the company), and that the factual record does not provide sufficient information to rebut the presumption of government control. We note that Double Coin's arguments to the contrary are virtually identical to those made by respondents in other proceedings, which have been similarly rejected by the Department and the CIT. As a result, Double Coin is ineligible for a separate rate and is part of the PRC-wide entity pursuant to the Department's practice, as discussed above.

The only rate ever determined for the PRC-wide entity in this proceeding is 210.48 percent, as first determined in the less-than-fair-value investigation.[65] Petitioners assert that the above-mentioned determination to deny Double Coin's separate rate status should end the individual examination of Double Coin and render its sales behavior meaningless. According to Petitioners, the only rate which may be assigned to Double Coin is the 210.48 percent rate and that the preliminary determination to average the 210.48 percent entity rate with Double Coin's calculated rate is contrary to practice and precedent. We agree with Petitioners that, ordinarily, we would assign the PRC-wide entity rate to any company found to be a part of the entity during the review proceeding and that, in the past, we have applied the existing PRC-wide rate to a respondent once a determination was made to deny said respondent's separate rate.[66] However, this case presents novel circumstances underpinning the Department's decision in this case. In other reviews, the Department may have applied AFA to the entity when a respondent that is

---

[63] *See*, *e.g.*, *Mark David* at 1361 ("{the respondent} had previously qualified for separate rate status, and subsequently lost it in this review, therefore {the respondent}'s previous rate is irrelevant in the instant case."); *Brake Rotors From the People's Republic of China*, 70 Fed. Reg. 69937 (Dep't Commerce 18, 2005) (final 03-04 AD and NSR) and accompanying Issues and Decision Memorandum at Comment 7 (a prior holding that a respondent was eligible for a separate rate did not impact the decision in the current review that it did not, as there were "'even more indicia' of government control" in this review than the prior).

[64] *See, e.g., Advanced Technology I*, 885 F. Supp. 2d 1343 (CIT 2012), remand affirmed in *Advanced Technology II*, 938 F. Supp. 2d 1342 (CIT 2013), aff'd 541 F. App'x 1009 (Fed. Cir. 2014).

[65] *See Certain New Pneumatic Off-The-Road Tires from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances,* 73 FR 40485, 40489 (July 15, 2008).

[66] *See*, *e.g.*, *Certain Activated Carbon From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2011-2012*, 78 FR 26748 (May 8, 2013) and Preliminary Decision Memorandum at 10-11, unchanged in *Certain Activated Carbon From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 78 FR 70533 (November 26, 2013) ("*Activated Carbon from the PRC*"). *See also Brake Rotors 11th AR Final* and accompanying IDM at Comment 7.

deemed to be part of the entity failed to cooperate to the best of its ability.[67]  Moreover, instances where the Department denied a separate rate to an otherwise cooperative company that is under review, the Department assigned the pre-existing entity rate to that company, as well as to the entire entity for that review period.[68]  Moreover, while the Court established in, for example, *Watanabe*, *Jiangsu Changbao*, and *Advanced Technology II* that the denial of a separate rate (1) ends a respondent's entitlement to an individual inquiry, (2) renders further inquiry meaningless, and (3) justifies the application of the PRC-wide rate, the language does not explicitly require the Department to apply the existing PRC-wide rate, as is, in every circumstance nor does it preclude the Department from using such information to alter the rate as appropriate to the facts of a specific case.  Indeed, no case cited by Petitioners addresses the instant fact pattern where part of the PRC-wide entity was selected as a mandatory respondent, provided significant information necessary for a review, and no other part of the entity failed to cooperate.  As noted in the *Preliminary Results*, Double Coin provided the Department with requested information, which was subsequently verified, necessary to calculate a margin for part of the PRC-wide entity.  Given the unique circumstances of this case where (as discussed below) there is insufficient information on the record with respect to the composition of the PRC-wide entity, and we are able to use the information of the mandatory respondent that is a part of the PRC-wide entity, in calculating a rate for the PRC-wide entity, we continue to find it appropriate to utilize both the previously assigned PRC-wide rate and Double Coin's calculated rate as an appropriate methodology from which to determine the PRC-wide entity rate for the final results.[69]

---

[67] *See, e.g., Steel Wire Garment Hangers From the People's Republic of China:  Final Results of Antidumping Duty Administrative Review, 2012-2013*, 80 FR 13332 (March 13, 2015).  *See also Certain Cut-to-Length Carbon Steel Plate From the People's Republic of China:  Final Results of Administrative Review; 2012-2013*, 80 FR 13522 (March 16, 2015).

[68] *See, e.g., Sodium Hexametaphosphate from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2011-2012*, 78 FR 18956 (March 28, 2013).  *See also Certain Steel Nails From the People's Republic of China: Final Results and Final Partial Rescission of the Second Antidumping Duty Administrative Review*, 77 FR 12556 (March 1, 2012).  Accordingly, we do not find that the ancillary determination to apply the PRC-wide rate to the respondent in the *Brake Rotors 11th AR Final* and IDM at Comment 7 (involving a novel sub-issue with respect to the applicability of local government control in the Department's separate rate analysis) to be informative to the instant circumstance which, itself, must be considered in light of the unique timeframe of this case as related to the Department's evolving practice in light of the *Diamond Sawblades* litigation.  Further, we note that, unlike in the instant case, we found at least one component of the PRC-wide entity failed to cooperate in the *Brake Rotors* proceeding.  *See Brake Rotors From the People's Republic of China:  Preliminary Results and Partial Rescission of the Seventh Administrative Review and Preliminary Results of the Eleventh New Shipper Review*, 70 FR 24382 (May 9, 2005) at 24385 ("As a result of its failure to respond to the Department's questionnaire, Rotec failed to establish its eligibility for a separate rate.  Therefore, Rotec is not eligible to receive a separate rate and will be part of the PRC NME entity, subject to the PRC-wide rate.  Pursuant to section 776(b) of the Act, we have applied total adverse facts available with respect to the PRC-wide entity, including Rotec").  Moreover, while Petitioners further cite to the *Diamond Sawblades Litigation* Remand Redetermination as an additional instance where the denial of an otherwise cooperative respondent's separate rate resulted in the assigning that respondent the existing PRC-wide rate, we note that the redetermination in question involved the investigation, in which the entity rate was determined based on the failure of other parts of the entity to cooperate in that segment of the proceeding. *Advance Technology I* and *Advanced Technology II*, 938 F. Supp. 2d 1342.

[69] As we are rejecting Petitioners' argument that the Department should completely end its review of Double Coin and apply the unaltered rate to the PRC-wide entity, we similarly reject Petitioners' argument that the Department does not need to address the additional arguments raised in Double Coin's brief concerning the calculation of Double Coin's preliminary margin.  As a result of our determination to take Double Coin's behavior into consideration in determining the entity rate, Double Coin's comments and Petitioners' comments with respect to the proper calculation of Double Coin's margin are indeed relevant to these final results and we address all of the relevant comments, below.

In employing this methodology for the *Preliminary Results*, we noted: "The Department lacks information to determine what share of production and exports of subject merchandise Double Coin constitutes as part of the PRC-wide government-controlled entity during the current POR. As a result, we are able to calculate a margin for an unspecified portion of a single PRC-wide entity, but cannot do so for another unspecified portion of the entity." [70] Because, as established above, the Department must calculate a single margin for the PRC-wide government-controlled entity, we preliminarily calculated a simple average of the previously assigned PRC-wide rate and Double Coin's calculated margin as the rate applicable to the PRC-wide entity. Double Coin asserts that the Department, indeed, has information with respect to what share of the exports of subject merchandise Double Coin constitutes as part of the entity, as the CBP Data Release released by the Department for the purposes of respondent selection demonstrates that no imports came in under the -000 category. The CBP Data Release states that "for this administrative review in the event the Department limits the number of respondents for individual examination, the Department intends to select respondents based on U.S. Customs and Border Protection ('CBP') U.S. import data during the POR."[71] The Department's practice is to request from CBP and release only the import data for the firms specifically requested and initiated upon.[72] As such, Double Coin is incorrect that the lack of entries identified under the -000 (*i.e.*, PRC-wide) case number in the CBP Data Release demonstrates that there were no such entries during the POR; rather, as stated in the *Preliminary Results*, the record simply does not contain this information.[73] Accordingly, we continue to find that the Department lacks information to determine what share of production and exports of subject merchandise Double Coin constitutes as part of the PRC-wide government-controlled entity during the current POR. As facts available, because there is insufficient information on the record with respect to the composition of the PRC-wide entity, we continue to find it appropriate to calculate a simple average of the previously assigned PRC-wide rate (210.48 percent) and Double Coin's calculated margin (0.14 percent) as the rate applicable to the PRC-wide entity for these final results. Accordingly, the Department revised the PRC-wide entity rate to 105.31 percent for these final results.

Finally, similar to its arguments with respect to application of an AFA rate (*i.e.*, the PRC-wide rate) to Double Coin above, Double Coin argues that the Department may not apply an uncorroborated rate (*i.e.*, the PRC-wide rate) to Double Coin. As noted above, the only rate previously determined for the PRC-wide entity in this proceeding is the 210.48 percent rate, as determined in the less-than-fair-value investigation.[74] This margin has been applied as the PRC-

---

[70] *See* PDM at 12.

[71] *See* CBP Data Release at 1.

[72] *See* Attachment 1 to the CBP Data Release memo.

[73] Double Coin's corollary point that, because no other companies requested or initiated upon were found to be a part of the PRC-wide entity, no other companies that make up the NME entity are subject to this review, and the NME entity was not requested upon and thus not subject to the review (with the implication that Double Coin is then representative of the entire entity) is similarly predicated on an incorrect presumption since, as discuss above, the PRC-wide entity was on notice that it was conditionally subject to review pursuant to the practice in effect at the time. *See Change in Practice* at 65970.

[74] *See Final LTFV Determinations*, 73 FR at 40489 ("In accordance with section 776(c) of the Act, we corroborated our adverse facts available ('AFA') margin by comparing the U.S. prices and normal values from the petition to the U.S. price and normal values for the respondents… Similarly, for the final determination, we have also compared the U.S. prices and normal values from the petition to the U.S. prices and normal values for the respondents. We

wide rate in every subsequent review of the *Order*. Double Coin presented no new evidence to suggest that the Petition-based countrywide rate, as corroborated by comparing the U.S. prices and normal values from the petition to the U.S. price and normal values for the respondents during the period of investigation, has lost its probative value. Nevertheless, Double Coin asserts that the SAA holds that the Department may not use an AD rate from a prior period of time as facts available unless such a rate is corroborated as appropriate to the relevant time period and, therefore, the Department may not apply a PRC-wide rate to Double Coin that has not been corroborated in this review. Double Coin's arguments are predicated on the incorrect presumption that it is distinct from the PRC-wide entity, which it is not.[75] As is emphasized throughout this determination, the Department is not assigning the PRC-wide rate to Double Coin as AFA, but determining Double Coin a part of the NME entity to which an entity rate is assigned. The Department does not need to determine whether the 210.48 percent rate is reliable and relevant with respect to Double Coin; rather the PRC-wide rate must only be generally corroborated as to the PRC-wide entity.[76] As discussed above, the Department has corroborated the 210.48 percent PRC-wide entity rate in the initial investigation and applied this rate for the PRC-wide entity multiple times in different segments of the OTR tires proceeding. The PRC-wide rate for non-cooperative respondents need not be corroborated relative to the commercial reality of companies qualifying for a separate rate.[77]

---

found that the U.S. prices and normal values used to calculate the petition margin were within the range of net U.S. prices and normal values, respectively, used in our margin calculations for the mandatory respondents in this investigation. Because no parties commented on the selection of the PRC-wide rate, we continue to find that the margin of 210.48 percent has probative value. Accordingly, we find that the rate of 210.48 percent is corroborated within the meaning of section 776(c) of the Act.")

[75] As such, Double Coin's reliance on the *Gallant Ocean* determination is inapposite, as *Gallant Ocean* involved an exporter of Thai shrimp, where there is no presumption of government control and no NME-wide rate.

[76] *See*, *e.g.*, *Wooden Bedroom Furniture From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and New Shipper Review; 2012*, 79 FR 51954 (September 2, 2014) and accompanying IDM at Comment 4.

[77] *See Certain Frozen Warmwater Shrimp From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012-2013*, 79 FR 57872 (September 26, 2014) and accompanying IDM at Comment 1 ("Accordingly, we find that neither the age of the information used to corroborate the PRC-wide rate used in every segment of this proceeding, nor the fact that lower margins have been calculated for cooperative separate respondents, leads to the conclusion that the PRC-wide rate of 112.81 percent no longer has probative value and is not properly corroborated, a position that has been affirmed by the CIT"), *citing Shanghai Taoen Int'l Trading Co. v. United States*, 360 F. Supp. 2d 1339, at 1347 (CIT 2005) (where the Court explicitly stated that "both this court and the Federal Circuit have determined that in cases in which the respondent fails to provide Commerce with information necessary to calculate an accurate antidumping margin, 'it is within Commerce's discretion to presume that the highest prior margin reflects the current margins.") and *Ad Hoc Shrimp Trade Action Comm. v. United States*, 992 F. Supp. 2d 1285 (CIT 2014) ("where (as here) the non-cooperating respondent is a NME countrywide entity - definitionally presumed to set prices without regard to market conditions - the actual pricing behavior of the cooperative respondents that have demonstrated eligibility for a separate rate (precisely because they have differentiated themselves from the countrywide entity) does not bear upon the credibility of dumping allegations against the NME countrywide entity in the way that the pricing behavior of cooperative market economy respondents reflects on the credibility of dumping allegations against their similarly-situated market participants").

**Comment 2: Whether to Assign a Margin to Trelleborg**

Petitioners' Comments[78]

- Though the Department preliminarily determined that TWS Xingtai had no reviewable transactions during the POR based on Trelleborg's certification thereof and CBP data, record information demonstrates that there were POR shipments of what may be in-scope OTR tires from a producer named "Trelleborg (Hebei)" ("TWS Hebei").
- Record evidence demonstrates that TWS Hebei and TWS Xingtai are co-located and Trelleborg did not dispute that the two entities were, in fact, the same company.
- Though Trelleborg provided information purporting to show that the shipments in question were of non-subject merchandise, it provided invoices for just two of 13 shipments. Because the burden of producing information belongs to the party in possession of such information and Trelleborg did not provide information for the remaining 11 shipments, the Department should determine that TWS Xingtai reviewable transactions during the POR.

Trelleborg's Rebuttal[79]

- Petitioners provide no evidence supporting their assertion that the shipments were of subject merchandise. Rather, CBP data, the absence of contrary information from CBP, and Trelleborg's own information affirmatively demonstrate that the shipments in question were non-subject solid tires.
- Though irrelevant to the ultimate finding, Petitioners' assertion that the entities are not distinct is patently false and their separation is, indeed, indicated on the record.
- In addition to providing two affirmative examples that the precise shipments in question were non-subject merchandise, Trelleborg certified to the fact that all 13 shipments were non-subject, and certified to the fact that the Hebei producer produces and sells non-subject tires.
- Petitioners' lone case citation with respect to the burden of providing information is inapposite, as Trelleborg provided relevant information, unprompted, and the Department did not request or require any further information on the subject.

**Department's Position:** Trelleborg certified that it did not have reviewable transactions during the POR.[80] The absence of entries produced by TWS Xingtai in the Department's CBP data

---

[78] *See* Petitioners' Case Brief at 7-8. Petitioners cite to: *Zenith Electronics. Corp. vs. United States*, 988 F.2d 1573 (Fed. Cir. 1993) ("*Zenith*"). Petitioners reference: Letter from Trelleborg, entitled, "Trelleborg Wheel Systems (Xingtai) China, Co. Ltd. Statement of No Shipments during the POR: New Pneumatic Off-The-Road Tires from the People's Republic of China," dated November 20, 2013 ("Trelleborg No Shipments Letter"); Letter from Petitioners entitled, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off The-Road Tires from China (A–570–912): Petitioners' Comments on Trelleborg Wheel Systems (Xingtai) China's No Shipments Claims," dated December 4, 2013 ("Petitioners' TWS Comments"); Letter from TWS entitled, "Trelleborg Wheel Systems (Xingtai) China, Co. Ltd.: Rebuttal of Factual Information Submitted By Titan Tire Corporation on December 4, 2013," dated December 11, 2013 ("TWS Rebuttal Factual Submission"); Letter from Petitioners entitled, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off-The-Road Tires from China (A–570–912): and Petitioners' Response to Trelleborg Wheel Systems (Xingtai) China's Rebuttal Comments Concerning Its No Shipments Claim," dated December 16, 2013 ("Petitioners' Reply to TWS Rebuttal").

[79] *See* Trelleborg Rebuttal Brief at 1-8. Trelleborg cites to the *Preliminary Results* (October 10, 2014) and accompanying PDM and addresses the *Zenith* (Fed. Cir. 1993) case referenced by Petitioners. Trelleborg references the following record submissions: CBP Message Number 3352302, dated December 18, 2013 ("No Shipments Message"); Trelleborg No Shipments Letter; Petitioners' TWS Comments; TWS's Rebuttal Factual Submission; Petitioners' Reply to TWS Rebuttal; and Petitioners' Case Brief.

inquiry supports this no shipment claim, and CBP did not report contrary information.[81]  In CBP Message 3352302, the Department alerted CBP of Trelleborg's claim of no shipments and requested that CBP officials notify the Department within 10 days should they be in possession of information contrary to this no shipments claim.  CBP officials did not contact the Department with contrary information.  Meanwhile, Trelleborg submitted information to the record (*i.e.*, invoices for two of the thirteen shipments of concern to Petitioners) demonstrating that the shipments were of non-subject merchandise (*i.e.,* solid tires).[82]  Based on this information, we made a preliminary determination of no shipments for Trelleborg.[83]

For these final results, Petitioners assert that the Department should determine that Trelleborg made reviewable shipments during the POR and assign Trelleborg a dumping margin in this review because, though Trelleborg provided information demonstrating that two of the shipments in question were of non-subject tires, the record lacks information with respect to the remaining eleven shipments.  Citing to *Zenith* (Fed. Cir. 1993), Petitioners note that the burden of producing relevant information belongs to the party in possession of the necessary information and the Department should not make an assumption with respect to these shipments absent affirmative information demonstrating that the remaining eleven shipments are also of non-subject tires.[84]

As noted above, the preliminary determination of no shipments was based on a certified statement from Trelleborg and supported by (1) a CBP data inquiry, (2) absence of contrary information from CBP, and (3) transaction-specific invoices.  Moreover, the facts at issue in this case – in which Trelleborg provided relevant information, unprompted by any request (and, thus, any burden) from the Department – are dissimilar from those at issue in *Zenith* (Fed. Cir. 1993), in which the Department placed a specific burden on respondents to provide evidence in support of an assertion (and which respondents failed to do in that case).[85]  Further, Petitioners fail to cite to any record evidence that would bring into question a certification that is supported by the record, nor do they provide sufficient argument that would prompt further examination of the Department's preliminary determination on this issue.  Accordingly, we find that the record continues to support Trelleborg's no shipment certification, and we continue to find that there were no reviewable transactions made by Trelleborg during the POR.

**Comment 3:  Whether to Assign a Margin to Zhongce**

- Petitioners argue that, upon a review of proprietary CBP data and proprietary information submitted by Zhongce in its separate rate application ("SRA"), in the context of the Department's standard *bona fides* analysis, the Department should determine that Zhongce did not have reviewable shipments during the POR and should not assign a margin to Zhongce in this review.[86]

---

[80] *See* Trelleborg No Shipments Letter.
[81] *See* CBP Data Release at Attachment 1 and the No Shipments Message (to which CBP did not provide a reply).
[82] *See* Trelleborg's Rebuttal Factual Submission at Attachment 3.
[83] *See Preliminary Results*.
[84] *See* Zenith, 988 F.2d 1573.
[85] *Id.*
[86] *See* Petitioners' Case Brief at 8-12.  Petitioners cite to:  *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Rescission, in*

- Zhongce rebuts that Petitioners' claims are not supported by the facts and that it is entitled to a separate antidumping duty rate. Zhongce further asserts that Petitioners have waived this issue by failing to raise it in a timely fashion.[87]

**Department's Position:** Zhongce submitted a complete and timely separate rate application, including documentation demonstrating a suspended entry of subject merchandise during the POR, which the Department was able to corroborate using CBP data.[88] Based upon a review of Zhongce's separate rate application, the Department preliminarily determined that Zhongce was eligible for a separate rate, and thus assigned Zhongce a separate rate for the *Preliminary Results*.[89]

Petitioners assert that Zhongce's sales during the POR were non-*bona fide*. However, in making such an assertion, Petitioners rely on case cites where the Department had deemed a mandatory respondent's or a new shipper respondent's sales to be non-*bona fide*. In this case, Zhongce is participating as a separate rate applicant. In light of the Department's resource constraints and decision to limit individual examination of exporters under review, the Department's practice is not to perform a resource-intensive and complex *bona fides* analysis on sales made by separate rate applicants that are not mandatory respondents. Rather, we rely upon CBP data and/or CBP

---

*Part; 2010-2011*, 78 FR 22513 (April 16, 2013) ("*Tires/PRC 10-11*"); *Tires/PRC 2008-2009* (April 25, 2011); *Fresh Garlic From the People's Republic of China: Final Results and Partial Rescission of the 18th Antidumping Duty Administrative Review; 2011-2012*, 79 FR 36721 (June 30, 2014); *Certain Frozen Warmwater Shrimp From the People's Republic of China: Notice of Final Results and Rescission, in Part, of 2004/2006 Antidumping Duty Administrative and New Shipper Reviews*, 72 FR 52049 (September 12, 2007); *Preliminary Results* (October 10, 2014); *Polyethylene Terephthalate Film, Sheet, and Strip From Brazil: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 1827 (January 10, 2014); *Certain Forged Stainless Steel Flanges from India; Rescission of Administrative Review*, 73 FR 44969 (August 1, 2008) ("*Flanges/India Rescission*"), unchanged in *Certain Forged Stainless Steel Flanges from India; Rescission of Administrative Review*, 73 FR 63692 (October 27, 2008); *Tianjin Tiancheng Pharmaceutical Co. Ltd. v. United States*, 366 F. Supp. 2d 1246 (CIT 2005) ("*Tianjin Tiancheng*"); and *Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review and Partial Rescission*, 73 FR 15479 (March 7, 2008). Petitioners reference the following submissions: Letter from Zhongce, entitled, "New Pneumatic Off-the Road Tires from the People's Republic of China (2012-2013): Separate Rate Application," dated January 8, 2014 ("Zhongce SRA") and letter from Zhongce, entitled, "New Pneumatic Off-the Road Tires from the People's Republic of China (2012-2013): Supplement to Zhongce SRA," dated January 14, 2014 ("Zhongce SRA Supplement").

[87] *See* Zhongce's Rebuttal Brief at 1-6. Zhongce addresses the *Flanges/India Rescission* (August 1, 2008) and *Tianjin Tiancheng* (CIT 2005) cases raised by Petitioners, and further cites to the following: *Preliminary Results* and PDM; *Certain Oil Country Tubular Goods From the Republic of Turkey: Final Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances, in Part*, 79 FR 41971 (July 18, 2014); *Certain Orange Juice from Brazil: Final Results of Antidumping Duty Administrative Review, Determination Not To Revoke Antidumping Duty Order in Part, and Final No Shipment Determination*, 76 FR 50176 (August 12, 2011); *Multilayered Wood Flooring From the People's Republic of China; Preliminary Results of Antidumping Duty New Shipper Reviews; 2012-2013*, 79 FR 33723 (June 13, 2014); *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Preliminary Results of Antidumping Duty New Shipper Review*; 2011–2012, 78 FR 14267 (March 5, 2013) ("*Tires/PRC 11-12 NSR Prelim*"); and 19 CFR 351.309(d) of the Department's regulations. Zhongce references the following record submissions: Zhongce SRA; Zhongce SRA Supplement; Petitioners' Case Brief; Petitioners' submission, entitled, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off The-Road Tires from China (A-570-912): Petitioners' Pre-Preliminary Determination Comments," dated September 8, 2014 ("Petitioners' Pre-Prelim Comments").

[88] *See* Zhongce SRA at Exhibit 1 and Zhongce SRA Supplemental at Exhibit 1. *See also* CBP Data Release at Attachment 1.

[89] *See Preliminary Results* at 61293-94 and accompanying PDM at 7-10.

entry documentation to determine if the separate rate applicant had suspended entries during the POR (as we did in this case).[90]

Accordingly, we continue to find Zhongce eligible for a separate rate because its separate rate application shows absence of both *de jure* and *de facto* government control and because Zhongce was able to demonstrate suspended entries during the POR.[91] Petitioners did not provide any arguments challenging the Department's decision on these established criteria. Moreover, because we continue to find Zhongce eligible for a separate rate, we have not addressed the counter-arguments that Zhongce made to Petitioners' arguments.

**Comment 4: Whether to Adjust U.S Prices for Un-refunded Value-Added Tax ("VAT")**

<u>Double Coin's Comments</u>[92]

- Double Coin argues that the VAT in the PRC is a tax imposed only on domestic transactions and not an export tax, duty, or other charge contemplated in section 772(c)(2)(B) of the Act. This statutory limitation is not subject to the Department's discretion and the Department lacks the authority to adjust for non-export taxes such as VAT. Moreover, PRC law states that the tax rate on exports is zero and the company's VAT refund exceeded VAT paid during the POR and there was no VAT liability for export sales.
- Double Coin asserts that the Department's existing calculation of VAT (*i.e.*, subtracting the reimbursement rate from the base rate) misunderstands the VAT system, in that:
  - The methodology ignores the fact that Double Coin did not pay VAT on export sales, which are exempt.
  - The methodology ignores the fact that the only VAT incurred was for raw material purchases.
  - The VAT that Double Coin did incur on certain raw material purchases was based on free on board ("FOB") costs, however, the methodology overstates the actual VAT deduction by applying it to the re-sale invoice U.S. price, which includes freight and profit.
  - The methodology ignores the fact that Double Coin did not incur input VAT on materials consumed at its Rugao factory to produce merchandise for export, as these were imported through a bonded warehouse and thus exempt from input VAT.
- Double Coin notes that, regardless of the above arguments, if the Department continues to apply its current VAT methodology, it should not do so on the CMA re-sale price in the

[90] *See, e.g.*, *Aluminum Extrusions From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Rescission, in Part, 2010/12*, 79 FR 96 (January 2, 2014) and accompanying IDM at Comment 8.
[91] *See* PDM at 7-10. *See also* Zhongce SRA and Zhongce SRA Supplemental.
[92] *See* Double Coin's Case Brief at 64-69. Double Coin cites to section 772(c)(2)(B) of the Act and the June 19, 2012 *Section 772(c)(2)(B) Methodological Change* in support of its argument. Double Coin references the following submissions: Letter from Double Coin, entitled, "Section C Response of Double Coin Holdings and China Manufacturers Alliance, LLC: Certain New Pneumatic Off-the-Road Tires from China," dated February 18, 2014 ("Double Coin's SCQR"); Double Coin's Letter, entitled, "VAT Tax Supplemental Questionnaire Response of Double Coin Holdings and China Manufacturers Alliance, LLC, Certain New Pneumatic Off-the-Road Tires from China," dated May 14, 2014 ("Double Coin's VAT Response"); Double Coin's letter, entitled, "Supplemental Questionnaire Response of Double Coin Holdings and China Manufacturers Alliance, LLC Certain New Pneumatic Off-the-Road Tires from China," dated July 3, 2014 ("Double Coin's Supplemental C&D QR").

United States, as this is a U.S. price set by a U.S. company in the United States (which does not have a VAT tax) and should instead apply it to the PRC price.

GTC's Comments[93]

- GTC also argues that the VAT in the PRC is a tax imposed only on domestic transactions and not an export tax, duty, or other charge contemplated in section 772(c)(2)(B) of the Act. This statutory limitation is not subject to the Department's discretion, and the Department lacks the authority to adjust for non-export taxes such as VAT. Moreover, there was no VAT liability for export sales (in accordance with PRC law), and, in fact, the company's VAT refund exceeded VAT paid during the POR and GTC received a refund for the full amount of VAT paid to purchase inputs attributed to exported tires during the POR.

- GTC notes that a simple comparison of percentages applied to U.S. price does not accurately reflect VAT liability and, under the plain language of both the statute and the Department's own policy, the issue is not the rate but the amount of VAT paid and then refunded.

- GTC notes that the Department's reasoning for rejecting respondents' calculation of refunded VAT claims is to disallow allocations across all company sales or across sales of products with different VAT schedules by using the difference between the VAT rate and the refund rate. However:
  - GTC did, in fact, provide an irrecoverable VAT calculation methodology that is associated with the production of subject OTR tires exported to the United States (*i.e.,* GTC's allocation was for tires, which are all subject to the same VAT schedule).
  - GTC provided the exact type of reconciliation to its VAT tax returns that the Department requested, including the most detailed VAT calculation possible based on its books and records, and it has reconciled its computations to its VAT tax returns as requested.

---

[93] *See* GTC's Case Brief at 17-29. GTC cites to the following: section 772(c)(2)(B) of the Act; *Magnesium Corp. of America v. United States*, 166 F.3d 1364 (Fed. Cir. 1999); *Section 772(c)(2)(B) Methodological Change* (June 19, 2012); *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984); *Wind Tower Trade Coalition v. United States*, 741 F.3d 89 (Fed. Cir. 2014); *Dorbest v. United States*, 604 F.3d 1363 (Fed. Cir. 2010); and Exhibit 3 to its Case Brief. GTC references the following submissions: The Department's separate letters to GTC and Double Coin entitled, "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Supplemental Tax Questionnaire," dated April 30, 2014 ("VAT Questionnaires"); GTC's submission entitled, "Supplemental VAT Questionnaire Response: Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated May 28, 2014 ("GTC's VAT Response"); the Department's memorandum entitled, "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Verification of the Sales and Factors Response of Guizhou Tyre Co., Ltd. and Affiliates," dated September 30, 2014 ("GTC's Verification Report"); *Preliminary Results* (October 10, 2014) and PDM; and GTC's submission entitled, "Section C & D Responses. Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated February 19, 2014 ("GTC's SCDQR").

Petitioners' Rebuttal[94]

- The Department has rejected on multiple occasions the claim that it lacks the authority to adjust for irrecoverable VAT imposed by an NME government and addressed arguments that the PRC VAT is not an export tax.
- The Department followed its established practice by applying the difference between the general VAT rate and the export rate specific to the subject merchandise.
- The Department's practice is to reject firm-wide allocations across all company sales or across sales of products with different VAT schedules, as the PRC's VAT regime is product-specific, with VAT schedules that vary by industry and specific products.
- The Department has declined to base irrecoverable VAT adjustments on the total VAT liability of a respondent for well-founded reasons.
- GTC's argument that the Department should make an adjustment to account for the particular input VAT for purchases of certain natural rubber and Double Coin's argument regarding the VAT status of some of its inputs at its Rugao factory are both in error, as each would result in an adjustment based on non-product specific data.
- Neither GTC nor Double Coin make a claim or offered any evidence that they were rebated input VAT at more than the standard nine percent on their export sales. As such, the Department should continue to reject GTC's and Double Coin's arguments that the applicable VAT should be calculated by reference to charges and refunds on all their merchandise rather than the irrecoverable VAT on the subject merchandise in question.

**Department's Position:** For the reasons explained below, we continue to apply the un-refunded (irrecoverable) VAT adjustment that we used in the *Preliminary Results* to deduct an amount for irrecoverable VAT from the reported U.S prices for both respondents. However, we agree with Double Coin that our application of the irrecoverable VAT percentage to the U.S. resale price overstated the adjustment and, therefore, as explained below, we based our determination of Double Coin's irrecoverable VAT adjustment on entered value less international freight for these final results of review.

In 2012, we announced a change of methodology with respect to the calculation of the EP or CEP to include an adjustment of any irrecoverable VAT in certain NME countries, in accordance with section 772(c)(2)(B) of the Act.[95] In this announcement, the Department stated that when a NME government has imposed an export tax, duty, or other charge on subject merchandise or on

[94] *See* Petitioners' Rebuttal Brief at 20-24. Petitioners cite the following: *Section 772(c)(2)(B) Methodological Change* (June 19, 2012); *Preliminary Results* (October 10, 2014) and PDM; *Small Diameter Graphite Electrodes From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012-2013*, 79 FR 57508 (September 25, 2014) ("*SDGE/PRC 12-13*"); *Frontseating Service Valves From the People's Republic of China; Final Results of Antidumping Duty Administrative Review; 2012-2013*, 79 FR 71385 (December 2, 2014) ("*FSVs/PRC 12-13*"); *Helical Spring Lock Washers From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2012-2013*, 79 FR 66356 (November 7, 2014); *Diamond Sawblades 11-12*, 79 FR 35723 (June 24, 2014); *Hangers/PRC 12-13 Prelim* (November 5, 2014); *Final Determination of Sales at Less Than Fair Value: Prestressed Concrete Steel Rail Tie Wire From the People's Republic of China*, 79 FR 25572 (May 5, 2014) ("*Prestressed Wire/PRC*"); *Chlorinated Isocyanurates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 4875 (January 30, 2014) ("*Chlorinated Isos/PRC 11-12*"). Petitioners reference Double Coin's Case Brief and GTC's Case Brief.

[95] *See Section 772(c)(2)(B) Methodological Change* (June 19, 2012), 77 FR at 36482.

inputs used to produce subject merchandise, from which the respondent was not exempted, the Department will reduce the respondent's EPs or CEPs accordingly by the amount of the tax, duty or charge paid, but not rebated.[96]

In a typical VAT system, companies do not incur any VAT expense; they receive on export a full rebate of the VAT they pay on purchases of inputs used in the production of exports ("input VAT"), and, in the case of domestic sales, the company can credit the VAT they pay on input purchases for those sales against the VAT they collect from customers.[97] That stands in contrast to the PRC's VAT regime, where some portion of the input VAT that a company pays on purchases of inputs used in the production of exports is not refunded.[98] This amounts to a tax, duty, or other charge imposed on exports that is not imposed on domestic sales and we, thus, disagree with the respondents' assertions that irrecoverable VAT should not be deducted from their U.S. prices. Where the irrecoverable VAT is a fixed percentage of U.S. price, the Department explained that the final step in arriving at a tax-neutral dumping comparison is to reduce the U.S. price downward by this same percentage.[99]

Section 772(c)(2)(B) of the Act authorizes the Department to deduct from EP or CEP the amount, if included in the price, of any "export tax, duty, or other charge imposed by the exporting country on the exportation" of the subject merchandise. We disagree with respondents' claims that we do not have the statutory authority to adjust for irrecoverable VAT, or that our methodology unlawfully re-interprets section 772(c)(2)(B) of the Act. Section 772(c)(2)(B) of the Act authorizes us to deduct from EP or CEP the amount, if included in the price, of any "export tax, duty, or other charge imposed by the exporting country on the exportation" of the subject merchandise. Moreover, respondents argue that they pay no VAT tax upon export and that the PRC VAT is not an export tax, duty or charge but, rather, a charge on domestic purchases of inputs; however, this misstates what is at issue: the issue is the irrecoverable VAT, not VAT *per se*. Irrecoverable VAT, as defined in PRC law, is a net VAT burden that arises solely from, and is specific to, exports. It is VAT paid on inputs and raw materials (used in the production of exports) that is non-refundable and, therefore, a cost.[100] Irrecoverable VAT is, therefore, an "export tax, duty, or other charge imposed" on exportation of the subject merchandise to the United States.[101] The statute does not define the terms "export tax, duty, or other charge imposed" on the exportation of subject merchandise. We find it reasonable to interpret these terms as encompassing irrecoverable VAT because the irrecoverable VAT is a cost that arises as a result of export sales. It is set forth in PRC law and, therefore, can be considered to be "imposed" by the exporting country on exportation of subject merchandise. Further, an adjustment for irrecoverable VAT achieves what is called for under section 772(c)(2)(B) of the Act, as it reduces the gross U.S. price charged to the customer to a tax neutral

---

[96] *Id.*, 77 FR at 36483; *see also Chlorinated Isos/PRC 11-12* (January 30, 2014) and accompanying IDM at Comment 5.
[97] *See*, *e.g.*, *Diamond Sawblades 11-12,* 79 FR 35723 (June 24, 2014) and accompanying IDM at Comment 6; *Section 772(c)(2)(B) Methodological Change*, 77 FR at 36483.
[98] *See* Double Coin's VAT Response at Exhibit SC-1; GTC's VAT Response at Exhibits 1-3; and *Methodological Change*, 77 FR at 36483.
[99] *See Section 772(c)(2)(B) Methodological Change* (June 19, 2012), 77 FR at 36483.
[100] *See SDGE/PRC 12-13* (September 25, 2014) and accompanying IDM at Comment 7.
[101] *See*, *e.g.*, *Diamond Sawblades 11-12*, 79 FR 35723 (June 24, 2014) and accompanying IDM at Comment 6 and *FSVs/PRC 12-13* (December 2, 2014) and accompanying IDM at Comment 5.

net price received by the seller. This deduction is consistent with our longstanding policy, which is consistent with the intent of the statute, that dumping margin calculations be tax-neutral.[102]

In both an initial and supplemental questionnaire, the Department instructed GTC and Double Coin to report value-added taxes on inputs used to produce the merchandise sold to the U.S. and identify the portion of input VAT that was not fully refunded on exportation. In response, both respondents stated their disagreement with our product-specific methodology and reported that their total VAT refund exceeded VAT paid for export sales during the POR and, thus, reported no value in the VAT field of their respective sales databases.[103] However, our practice is that we will not consider allocations across all company sales or across sales of products with different VAT schedules but, rather, to use the difference between the VAT rate and the refund rate, consistent with PRC regulations, unless the company can show otherwise for the subject merchandise.[104] Rather, our irrecoverable VAT calculation methodology, as applied in this review, consists of performing two basic steps: (1) determining the irrecoverable VAT tax on subject merchandise, and (2) reducing U.S. price by the amount determined in step one. Information placed on the record of this review by both GTC and Double Coin indicates that according to the Chinese VAT schedule, the standard VAT levy is 17 percent and the rebate rate for subject merchandise is nine percent.[105] For the purposes of these final results, therefore, we removed from U.S. price the difference between the rates (*i.e.*, eight percent), which is the irrecoverable VAT as defined under PRC tax law and regulation.[106]

For these final results, both Double Coin and GTC argue that the Department should take into account for the calculation of irrecoverable VAT the various alternate (or absent) input VAT rates that they claim are applicable to certain inputs used in the production of subject merchandise: for GTC's purchases of certain natural rubber (which, according to GTC is assessed at a VAT rate of 13 percent for all other inputs); and for Double Coin's raw materials consumed to produce merchandise for export at its Rugao factory that were imported through a bonded warehouse (which Double Coin claims did not incur any input VAT, pursuant to PRC law). In our questionnaires to Double Coin and GTC we asked that if the irrecoverable VAT amount reported is not directly derived as the difference between the VAT tax rate applicable to domestic purchases and inputs and the refund rate for export sales of subject merchandise, then they need to: 1) explain in detail why and provide worksheets demonstrating how to calculate the irrecoverable VAT; 2) reconcile the worksheets to the translated VAT tax returns provided and provide a detailed narrative explanation that describes the calculations shown in the worksheets; and 3) for each reconciling item reported in the worksheets, provide documentation and a citation to the Chinese laws and regulations to fully support the reason for the reconciling item. However, the respondents did not provide this information, and the limited information they did provide would result in an adjustment to irrecoverable VAT based on non-product

[102] *See* Article 5(3) of Circular 39 that states, "(3) Where the Tax Refund Rate is lower than the applicable tax rate, the amount of tax calculated according to the difference in rates shall be included in the costs of the Exported Goods and Services."; *See Section 772(c)(2)(B) Methodological Change* (June 19, 2012), 77 FR at 36483, and *Final Rule* (May 19, 1997) 62 FR at 27369 (citing the SAA).
[103] *See* Double Coin's VAT Response and GTC's VAT Response.
[104] *See, e.g.*, *Diamond Sawblades 11-12* (June 24, 2014) and accompanying IDM at Comment 6.
[105] *See*, *e.g.*, Double Coin's VAT Response at 2-3 and GTC's VAT Response at 1-2.
[106] *See*, *e.g.*, *Prestressed Wire/PRC* (May 5, 2014) and accompanying IDM at Comment 1. *See* the Program Log and Output attached to Double Coin's and GTC's Final Analysis Memoranda for details regarding this calculation.

specific data. For the calculation of irrecoverable VAT we will not consider allocations across all company sales or across sales of products with different VAT schedules.[107] Furthermore, we note that GTC fails to cite to any evidence on record of this specifically lower rate that it claims applies to one of the inputs it consumed, nor did the Department verify the claimed 13 percent VAT rate for natural rubber at verification. Further, Double Coin's argument that it did not pay VAT on certain inputs ignores the fact that it did not receive the full refund from its exports that it would have otherwise received and, thus, the difference in these amounts is a cost arising from exportation. Indeed, neither GTC nor Double Coin make a claim or offered any evidence that they were rebated input VAT at more than the standard nine percent on their export sales. With respect to GTC's assertion that it provided the exact type of reconciliation to its VAT tax returns that the Department requested in its VAT questionnaire, we note that our request was for parties to reconcile the amount of irrecoverable VAT reported to its VAT tax returns, but GTC only reconciled the input and output VAT to their tax returns and, as such, did not provide the reconciliation requested.[108]

Irrecoverable VAT is (1) the free-on-board value of the exported good, applied to the difference between (2) the standard VAT levy rate and (3) the VAT rebate rate applicable to exported goods.[109] The first variable, export value, is unique to each respondent and sale while the rates in (2) and (3), as well as the formula for determining irrecoverable VAT, are each explicitly set forth in Chinese law and regulations.[110]

19 CFR 351.401(c) requires that the Department rely on price adjustments that are "reasonably attributable to the subject merchandise." The PRC's VAT regime is product-specific, with VAT schedules that vary by industry and even across products within the same industry. Irrecoverable VAT is a product-specific export tax, duty, or other charge that is incurred on the exportation of subject merchandise. Thus, our analysis is consistent with our current irrecoverable VAT policy and our treatment of irrecoverable VAT in recently completed NME cases.[111] Therefore, we have not altered our irrecoverable VAT adjustment methodology for these final results.

Finally, Double Coin argues that – notwithstanding its aforementioned arguments regarding the applicability of the Department's irrecoverable VAT methodology – in applying this methodology the Department should not assess irrecoverable VAT on the gross unit price (*i.e.*, CMA's re-sale price in the United States). Instead, Double Coin argues, the Department should instead apply the irrecoverable VAT assessment to the PRC export price less freight expenses, which can be calculated by subtracting reported ocean freight from reported entered value. We agree with Double Coin that the calculation in the *Preliminary Results* overstated the export sales value and that Double Coin's suggested correction to the calculation is appropriate and

---

[107] *See*, *e.g.*, *Prestressed Wire/PRC* (May 5, 2014) and accompanying IDM at Comment 1.
[108] *See* GTC's VAT Response at Exhibit 2.
[109] *See Prestressed Wire/PRC* (May 5, 2014) and accompanying IDM at Comment 1, n. 35.
[110] *Id.* at Comment 1, n. 36.
[111] *See*, *e.g., Certain Polyester Staple Fiber From the People's Republic of China: Final Results of the Antidumping Duty Administrative Review; 2012-2013*, 80 FR 4542 (January 28, 2015) and IDM at Comment 6; *Chlorinated Isocyanurates From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012-2013* (January 28, 2015) and IDM at Comment 4.

consistent with our recent practice.[112] Accordingly, for Double Coin's CEP sales, we based our determination of the irrecoverable VAT tax offset on entered value less international freight.[113]

**Comment 5: Use of Adverse Facts Available in Calculating Double Coin's Margin**

Double Coin's Comments[114]

- As a result of the discovery of an unreported CONNUM at verification, Department officials applied the highest CONNUM-specific margin to the percentage of all sales comprised by the missing CONNUM, and applied this to the calculated margin as an adverse inference to account for the amount of unreported sales. Double Coin argues that there is no basis for applying an adverse inference in accounting for the sales of the unreported CONNUM, as the Department acknowledged and verified that the error was inadvertent.
- CMA offered all relevant information once the error was discovered, and in no way failed to cooperate by not acting to the best of its ability or impeded the proceeding.
- The Department should instead apply the average of all CONNUM-specific margins as facts available ("FA").
- Regardless of whether the Department applies facts available ("FA") or AFA to the unreported sales, the Department must apply this margin only to the percentage of sales shown to have been sold to U.S. customers. The summary sheet provided at verification clearly shows the breakdown of domestic and export sales, and Department officials verified this information.

Petitioners' Comments[115]

- In past determinations where a respondent did not report all U.S. sales, the Department has held that applying the highest calculated margin as partial AFA is appropriate, even when the respondent claims inadvertence or the missing data is offered during verification.

---

[112] *See Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China: Final Results of the Antidumping Duty Administrative Review and Final Results of the New Shipper Review; 2012-2013*, 80 FR 4244 (January 27, 2015) and accompanying IDM at Comment 9 ("We agree with CPZ/SKF that it is appropriate to use the entered value of its merchandise as the tax base here, given that: 1) it is essentially the same as the company's export value; and 2) the Government of the PRC determines the amount of VAT rebated upon exportation using export values."). *See also Frontseating Service Valves From the People's Republic of China; Final Results of Antidumping Duty Administrative Review; 2012-2013*, 79 FR 71385 (December 2, 2014) and accompanying IDM at Comment 5 ("{A}s Sanhua noted, in the *Preliminary Results*, the Department overstated the export sales value by deducting only international freight and certain adjustments from CEP. For these final results, we based our determination of the VAT tax offset, as Sanhua suggested, on entered value, which excludes international freight and U.S. selling expenses.").

[113] *See* Double Coin's Final Analysis Memo for further details on the calculation pursuant to this correction. As GTC previously provided FOB prices for its sales, and these prices were used for the VAT calculation in the *Preliminary Results*, no such change is needed to GTC's VAT liability calculation.

[114] *See* Double Coin's Case Brief at 59-64. Double Coin cites to *Jiangsu Changbao* (CIT 2012) and section 776(a) and (b) of the Act. Double Coin references the following record documents: Double Coin's Preliminary Analysis Memo and Double Coin's Verification Report.

[115] *See* Petitioners' Rebuttal Brief at 15-18. Petitioners cite to *Final Determination of Sales at Less Than Fair Value: Silica Bricks and Shapes From the People's Republic of China*, 78 FR 70918 (November 27, 2013) ("*Bricks/PRC*") and *Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003). Petitioners reference the following record documents: Double Coin's Preliminary Analysis Memo, Double Coin's Verification Report, and Double Coin's Case Brief.

- The Department only accepted information at verification to collect information necessary to allow the inclusion of these sales in the average margin calculated for Double Coin and did not verify whether any of the sales were re-exported (regardless of what fields are included on the summary sheet provided). Instead the Department explicitly noted there is nothing on the record to demonstrate that these sales were not entered for U.S. consumption, and should continue to include the total volume of unreported sales in the final calculation.

**Department's Position:** At verification of Double Coin's U.S. sales affiliate, CMA, we discovered an unreported CONNUM that company officials admitted should have been reported as subject merchandise, but claimed was unreported because of an oversight with respect to product lines.[116] As information with respect to these sales was not previously on the record, we declined to take invoices or other sales-specific information regarding sales of this product during the POR, but took a summary sheet which contained the quantity and value information of the sales.[117] Company officials stated that the majority of these sales were to non-U.S. markets and the number of tires sold to downstream U.S. customers represented only about 35 percent of the total number of tires sold of this product. In the *Preliminary Results*, we noted that the record lacked evidence to demonstrate that the entirety of the sales of this CONNUM (*i.e.*, representing all of CMA's sales of this OTR product during the POR, whether to downstream U.S. customers or export sales) was not entered for U.S. consumption. Accordingly, in calculating Double Coin's weighted-average margin for the *Preliminary Results*, we weight-averaged the *ad valorem* margin for Double Coin's reported sales (calculated from our standard antidumping duty program) with a margin determined for all unreported sales.[118] As the record did not contain information for which to calculate a margin for these sales, we assigned the highest CONNUM-specific margin calculated for the reported sales as an adverse inference applicable to the unreported sales.[119]

For these final results, Double Coin asserts that the highest calculated CONNUM-specific margin should not be applied in accounting for these sales, as section 776(b) of the Act only permits the application of an adverse inference when a party fails to cooperate by not acting to the best of its ability to comply with a request for information and is found to have willfully impeded the proceeding, which is not the case in the instant proceeding.

We agree that Double Coin's error was inadvertent and the respondent was cooperative once the omission was discovered at verification. However, we agree with Petitioners that the application of the adverse inference in this situation is proper and well supported by precedent.[120] Section 776(a)(2)(B) and (D) of the Act provides that if an interested party fails to provide information within the established deadlines or provides information but the information cannot be verified, the Department shall use, subject to section 782(d) of the Act, facts otherwise available in reaching the applicable determination. Moreover, section 776(b) of the Act provides that, if the Department finds that an interested party failed to cooperate by not acting to the best of its ability

---

[116] *See* Double Coin's Verification Report at section VII.A.4.

[117] *Id.,* at Exhibit US-VE 12.

[118] *See* Double Coin's Preliminary Results Analysis Memo at Attachment III.

[119] *Id.*, at 10 and Attachments II and III.

[120] *See Final Determination of Sales at Less Than Fair Value: Silica Bricks and Shapes From the People's Republic Of China*, 78 FR 70918 (November 27, 2013), and accompanying IDM at Comment 7.

to comply with a request for information, the Department may use an inference adverse to the interests of that party in selecting the facts otherwise available. In addition, the SAA accompanying the Uruguay Round Agreements Act explains that the Department may employ an adverse inference "to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully."[121]

In *Nippon Steel*, the Federal Circuit noted that while the statute does not provide an express definition of the "failure to act to the best of its ability" standard, the ordinary meaning of "best" is "one's maximum effort."[122] Thus, according to the Federal Circuit, the statutory mandate that a respondent act to the "best of its ability" requires the respondent to do the maximum it is able to do. The Federal Circuit indicated that inadequate responses to an agency's inquiries would suffice to find that a respondent did not act to the best of its ability.[123] While the Federal Circuit noted that the "best of its ability" standard does not require perfection, it does not condone inattentiveness, carelessness, or inadequate record keeping.[124] The "best of its ability" standard recognizes that mistakes sometimes occur; however, it requires a respondent to, among other things, "have familiarity with all of the records it maintains," and "conduct prompt, careful, and comprehensive investigations of all relevant records that refer or relate to the imports in question to the full extent of" its ability to do so.[125]

The antidumping duty questionnaire issued in this review requires respondents to report all of their relevant U.S. sales during the POR. Double Coin had multiple opportunities to provide the full universe of sales, given that the Department issued multiple supplemental questionnaires to Double Coin, and Double Coin made adjustments to reported sales notwithstanding the unreported CONNUM in its responses to the supplemental questionnaires.[126] Thus, section 782(d) was satisfied with respect to the universe of Double Coin's sales. By not reporting the entire universe of its U.S. sales in its questionnaire and supplemental questionnaire responses, Double Coin failed to provide information within the deadlines established.

The Department previously declined to accept unreported sales information identified at verification and instead relied upon FA or AFA as appropriate.[127] In this case, we find it is

---

[121] *See* SAA, H.R. Rep. No. 103-316, at 870; *see also Notice of Final Results of Antidumping Duty Administrative Review: Stainless Steel Bar from India*, 70 FR 54023, 54025-26 (September 13, 2005); *Notice of Final Determination of Sales at Less Than Fair Value and Final Negative Critical Circumstances: Carbon and Certain Alloy Steel Wire Rod from Brazil*, 67 FR 55792, 55794-96 (August 30, 2002).
[122] *See Nippon Steel v. United States*, 337 F.3d 1373, 1382-83 (Fed. Cir. 2003).
[123] *Id*.
[124] *Id*.
[125] *Id*.
[126] *See*, *e.g.*, Double Coin's Supplemental C&D Response.
[127] *See Final Determination of Sales at Less Than Fair Value; Stainless Steel Sheet and Strip in Coils From Germany*, 64 FR 30710 (June 8, 1999) at Comment 10 ("*SSSS*/*Germany*"). In this case, the Department noted that the respondent identified the missing sales at the outset of verification (and provided a complete packet containing copies of each of the relevant invoices which the Department included on the record as a verification exhibit), but for the final results the Department noted "that {the respondent} had three opportunities spread over four months to provide the Department with a complete listing of its U.S. sales. In response to its failure to do so, as adverse facts available, we are applying the highest non-aberrational margin calculated based on {the respondent's} correctly reported CEP transactions to the unreported sales and have included these transactions in our calculation of the overall weighted-average margin." *See also*, *Bricks/PRC* (November 27, 2013) at Comment 7, where the respondent similarly claimed its failure to report all U.S. sales was inadvertent after the Department discovered the unreported

appropriate to base dumping margins for these unreported sales on FA pursuant to section 776(a) of the Act. Further, as evidenced by its ability at verification to identify the invoices related to these specific unreported U.S. sales, it is clear that Double Coin possessed the necessary records to provide a complete U.S. sales database but did not conduct a comprehensive investigation of all relevant records to identify the unreported sales in a timely manner. As discussed in prior cases, we note that the purpose of verification is to verify the accuracy of information previously submitted to the record by the respondent, not to collect new sales information that had been previously requested but not reported. Therefore, we find that Double Coin's failure to report all of its U.S. sales of in-scope products during the POR, using the information over which it maintained control at all times, indicates that the respondent did not act to the best of its ability to comply with our request for information.[128] Hence, we find it is appropriate to base the dumping margins for these unreported sales on AFA and continue to assign the highest CONNUM-specific margin to the unreported sales for the final results.[129]

However, we agree with Double Coin that we should only apply this adverse inference to the 35 percent of unreported sales shown to have been sold to U.S. customers. Upon discovery of the omission of sales of this product at verification, Department officials requested information for all sales of this product during the POR. For the sake of completion and in compliance with the Department's request, Double Coin provided all information available for all sales of this tire type, whether sold to a U.S. customer or foreign customer, including original invoices for each sale, along with a cover sheet summarizing all transactions (*i.e.*, the summary sheet provided at US VE-12 of Double Coin's Verification Report). As noted in the verification report, Department officials declined to take new factual information on the specific sales for the record (*i.e.*, copies of invoices). However, in order to have a record of the quantity of the missing sales for any necessary margin calculation, we accepted the summary sheet (*i.e.*, US VE-12). Though Department officials did not take the invoices for the record, we did review the information on these original invoices to ensure the veracity of the information provided in the summary sheet. Thus, after considering Double Coin's comments, we find that the use of the total sales value corresponding to sales of all unreported tires sold by CMA during the POR, regardless of destination, used for the total margin calculation in *Preliminary Results* was in error, and we

---

sales at verification, but the Department nonetheless determined that the respondent failed to act to the best of its ability by not reporting all U.S. sales prior to verification (rejecting the respondent's arguments that an inadvertent omission cannot be viewed as a withholding of information). Citing to *Nippon Steel*, the Department noted that the respondent had all the information in its possession prior to the Department's discovery, and it had been instructed to submit all its U.S. sales and rejected the respondent's arguments that the Department could have accepted information on the unreported sales at verification, stating, "the purpose of verification is to verify the accuracy of information previously submitted to the record by the respondent, not to collect new sales information that had been previously requested but not reported."

[128] *Id.* As in this *Bricks/PRC* (November 27, 2013) case, where the Department held that by reporting U.S. sales based on knowledge of customers' typical purchases rather than thoroughly examining sales records, the respondent had not done the maximum it could have done, we note that, in the instant case, by failing to cross check for subject merchandise across product lines (an error that, while inadvertent, was readily apparent to Department officials quite early in the relevant review process at verification), Double Coin did not do the maximum it could have done to provide the full universe of sales information to Department officials in a timely manner. *See also*, *e.g.*, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2012-2013*, 80 FR 1021 (January 8, 2015), citing to *SSSS/Germany* (June 8, 1999) at Comment 10.

[129] *See* Double Coin's Final Analysis Memo.

instead used the reported sales value of the domestic sales of the tire type in question (*i.e.*, representing 35 percent of all unreported sales) in the calculation of Double Coin's margin for these final results.[130]

**Comment 6: Use of PT Gajah Tunggal's Financial Statement for the Surrogate Financial Ratio Calculation**

GTC's Comments[131]

- The Department should adjust the financial ratios to account for Gajah Tunggal's total cost of labor. Specifically, the Department correctly adjusted Gajah Tunggal's manufacturing expenses to account for the cost of energy using Gajah Tunggal's annual report in the *Preliminary Results*, and should now adopt the same methodology to adjust Gajah Tunggal's total production labor.
- Alternatively, the Department should place Gajah Tunggal's corrected 2013 statements on the record and use these revised statements (the Department should be aware of such corrected statements for Gajah Tunggal, since they are on the record of the *PVLT Tires/PRC LTFV Prelim* (January 27, 2015)).

---

[130] For a further proprietary discussion of our findings at verification and of this calculation, *see* Double Coin's Final Analysis Memo.

[131] *See* GTC's Case Brief at 4-11. GTC cites to the following: *Grobest & I-Mei Indus. (Vietnam) Co. v. United States*, 815 F. Supp. 2d 1342 (CIT 2012); *Chlorinated Isocyanurates From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2010-2011*, 78 FR 4386 (January 22, 2013); *Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value; Preliminary Affirmative Determination of Critical Circumstances; In Part and Postponement of Final Determination*, 80 FR 4250 (January 27, 2015) ("*PVLT Tires/PRC LTFV Prelim*"); *Fresh Garlic From the People's Republic of China: Final Rescission of Antidumping Duty New Shipper Reviews; 2010-2011*, 78 FR 18316 (March 26, 2013); *Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results of the Antidumping Duty Administrative Review and New Shipper Reviews*, 74 FR 11349 (March 17, 2009); *Certain Preserved Mushrooms from the People's Republic of China: Final Results of the Antidumping Duty New Shipper Review*, 71 FR 66910 (November 17, 2006); *Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances: Certain Color Television Receivers From the People's Republic of China*, 69 FR 20594 (April 16, 2004); *Heavy Forged Hand Tools From the People's Republic of China; Final Results and Partial Rescission of Antidumping Duty Administrative Review and Determination Not To Revoke in Part*, 66 FR 48026 (September 17, 2001); *Shakeproof Assembly Components. v. United States*, 268 F.3d 1376 (Fed. Cir. 2001); *Union Camp Corp. v. United States*, 53 F. Supp. 2d 1310 (CIT 1999); and its own analysis of adjusted overhead ratio provided at Exhibit 1to the Case Brief. GTC references the following record documents: The Department's Memorandum to the File, entitled, "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Preliminary Results Surrogate Value Memorandum," dated September 30, 2014 ("Preliminary SV Memo"); and Petitioners' letter, entitled, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off The-Road Tires from China (A–570–912): Petitioners' Initial Surrogate Value Comments," dated April 14, 2014 ("Petitioners' Initial SV Comments") (specifically, the PT Gajah Tunggal Tbk ("Gajah Tunggal") and PT Goodyear Indonesia Tbk ("Goodyear") financial statements provided at Attachment 19 thereto).

Petitioners' Comments[132]

- The Department should not adjust the reported labor costs in Gajah Tunggal's financial ratios using the unaudited annual report, but should continue to rely on the labor value reported in the audited financial statements as the best available information.
- Citing to *HRS/Romania* (June 14, 2005), Petitioners allege that the Department should decline to "take notice" of a corrected financial statement for Gajah Tunggal that was submitted in the ongoing investigation of passenger vehicle and light truck ("PVLT") tires from the PRC because Gajah Tunggal is affiliated with interested parties in that investigation.

**Department's Position:** For the *Preliminary Results*, in order to calculate surrogate financial ratios, we used the financial statements of two Indonesian producers of identical merchandise: Gajah Tunggal and Goodyear. Though Goodyear's financial statements break out energy, Gajah Tunggal's financial statements do not. However, Gajah Tunggal's annual report provides the cost of energy as a percentage of the total cost of production. Thus, for the *Preliminary Results*, we used the percentage provided in Gajah Tunggal's annual report to compute the cost of energy for Gajah Tunggal in the computation of the financial ratios. For these final results, as explained below, we relied solely on Goodyear's financial statements for computation of financial ratios.

As a preliminary matter, no party disputed either the use of Goodyear's financial statements or the manner in which the Department used Goodyear's statements to calculate surrogate financial ratios. Second, we note that Goodyear is a producer of identical merchandise and that its audited financial statements are complete, contemporaneous with the POR, and include detailed expense lines for raw materials, manufacturing labor, manufacturing energy, and manufacturing overhead.

With regards to Gajah Tunggal's financial statements, GTC argues that either (1) the Department should make an adjustment to direct labor, the same way the Department did for Gajah Tunggal's manufacturing energy using Gajah Tunggal's annual report, or (2) that the Department should "take notice" of a corrected version of Gajah Tunggal's financial statements, which were placed on the record of the ongoing investigation of PVLT tires from the PRC.

In this case, because we still have another financial statement (*i.e.*, Goodyear), which no party disputed, we did not use the financial statements of Gajah Tunggal for these final results because Gajah Tunggal's audited financial statements do not contain a line for manufacturing energy. As GTC pointed out, there may be some inconsistency between Gajah Tunggal's annual report and its audited financial statements; thus, rather than rely upon Gajah Tunggal's unaudited annual report to generate a cost for manufacturing energy for Gajah Tunggal as we did in the *Preliminary Results* or to generate a cost for production labor, we discarded Gajah Tunggal's statement in favor of only using Goodyear's complete, audited financial statements which break out all relevant manufacturing costs.

---

[132] *See* Petitioners' Rebuttal Brief at 24-26 and Exhibit 1. Petitioners cite to *HRS/Romania* (June 14, 2005) and section 773(c)(1) of the Act. Petitioners reference the following record documents: Preliminary SV Memo and GTC's Case Brief.

Case: 23-2391 Document: 13 Page: 462 Filed: 11/28/2023

The Department's practice is to rely upon the best, publicly available information when making determinations. As we determined not to use Gajah Tunggal's financial statements, and to rely only on Goodyear's financial statements for calculation of the financial ratios, the Department does not need to examine information not on the instant case record (*i.e.*, the filing in the PVLT tires investigation), since Goodyear's statements represent the best information available for this case.

Additionally, with regards to Petitioners' arguments that the labor percentage suggested by GTC to calculate Gajah Tunggal's financial ratio is not an accurate representation of the actual amount of direct labor used by GTC itself, we note that this argument is moot because the Department decided not to use Gajah Tunggal's financial statements for other reasons.

For the final results, we determined to reject Gajah Tunggal's statement entirely because its financial statements did not include energy and, upon further consideration, the un-audited annual report is not a sufficiently reliable source to derive the energy ratio and, at any rate, Gajah Tunggal's statement is not necessary because we already have a complete and useable statement from Goodyear that does break out energy. Therefore, we relied solely on the Goodyear statement for the calculation of surrogate financial ratios.[133]

**Comment 7: Surrogate Value ("SV") for Coal**

- GTC argues that the Department should value coal using the more product-specific price data from Argus Coalindo rather than Global Trade Atlas ("GTA") import data used in the *Preliminary Results*.[134]

[133] *See* Final SV Memo at 2 and Attachments I, II, and III.

[134] *See* GTC's Case Brief at 12-17. GTC cites to the following: *Multilayered Wood Flooring From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 76 FR 64318 (October 18, 2011); *Chlorinated Isocyanurates From the People's Republic of China: Final Results of 2008-2009 Antidumping Duty Administrative Review*, 75 FR 70212 (November 17, 2010); *Certain Hot-Rolled Carbon Steel Flat Products from Romania: Final Results of Antidumping Duty Administrative Review*, 70 FR 34448 (June 14, 2005) ("*HRS/Romania*"); *Taian Ziyang Food Company, Ltd. v. United States*, 783 F. Supp. 2d 1292 (CIT 2011) (as related to the Department's *Policy Bulletin* 04.1); *Chlorinated Isocyanurates From the People's Republic of China: Final Results of June 2008 Through November 2008 Semi-Annual New Shipper Review*, 74 FR 68575 (December 28, 2009); *Certain Tissue Paper Products from the People's Republic of China: Final Results and Final Rescission, in Part, of Antidumping Duty Administrative Review*, 73 FR 58113 (October 6, 2008); *Clearon Corp. v. United States*, Court No. 13-00073, Slip Op. 2014-88 (CIT 2014); *Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*, 366 F. Supp. 2d 1264 (CIT 2005); *Yantai Oriental Juice Co. v. United States*, Court No. 00-07-00309, Slip Op. 2002-56 (CIT 2002); section 773(c)(1) of the Act; and its own summary of the Argus Coalindo information on record, provided at Exhibit 2 to the Case Brief. GTC references the following record documents: GTC's letter entitled, "Surrogate Value Comments for GTC: Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated April 14, 2014 ("GTC's SV Submission") (specifically, the Argus Coalindo data provided at Exhibit 6A thereto); GTC's letter entitled, "GTC's Second Surrogate Value Submission: Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated September 2, 2014 ("GTC's Second SV Submission"); GTC's submission entitled, "GTC's Surrogate Value Rebuttal Submission: Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated May 2, 2014 ("GTC's Rebuttal SV Submission"); and GTC's SCDQR.

- Petitioners rebut that the Department should continue to use GTA import data because it provides a more accurate measure of coal values in Indonesia than the international coal values reported by Argus Coalindo.[135]

**Department's Position:** We do not find Argus Coalindo to be an appropriate source to use to value coal because the Argus Coalindo data represent "prices for Indonesian coal traded on the international spot market" (*i.e.*, prices for Indonesian coal exports) and thus do not accurately represent the price of coal bought or sold in Indonesia.[136] Conversely, the GTA data represent actual prices of coal purchases in Indonesia. When selecting SVs for use in an NME proceeding, the Department's preference is to use, where possible, a range of publicly available, non-export, tax-exclusive, and product-specific prices for the POR, with each of these factors applied non-hierarchically to the case-specific facts and with preference to data from a single surrogate country.[137] As established in the *Preliminary Results*, the Department continues to find that the Indonesia import data obtained from GTA are publicly available, broad market averages, tax-exclusive, and specific to the input in question, satisfying the Department's criteria for selection of a surrogate value. Because the Argus Coalindo data is for export prices paid for Indonesian coal, GTA data is a better, more specific, source to value coal inputs and fulfills the Department's standard SV criteria (non-export, broad-market, *etc*.). Accordingly, we made no changes to the valuation of coal from the *Preliminary Results*.

Additionally, we agree with Petitioners that there is insufficient record data to establish consistent heat values for GTC's coal during the POR (*i.e.*, GTC provided only a handful of coal testing slips with heat values that vary quite widely).[138] Moreover, contrary to GTC's claim that heat value is the most important attribute of its coal purchases and necessarily makes the Argus Coalindo values more specific, we note that the information GTC placed on the record gives equal weight to sulfur content and ash content of the coal. Specifically, the Argus Coalindo report itself has maximum sulfur and ash values for each heat value range and the Platts Coal Pricing Methodologies states that "heat and sulfur content are considered the primary determinants of steam coal price; ash as a secondary determinant."[139] Though GTC did provide a limited selection of coal testing slips with heat values, GTC made no effort to corroborate its

---

[135] *See* Petitioners' Rebuttal Brief at 27-28. Petitioners cite to *Certain Polyester Staple Fiber From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2010-2011*, 78 FR 2366 (January 11, 2013) and *Drill Pipe From the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value and Affirmative Determination of Critical Circumstances, and Postponement of Final Determination*, 75 FR 51004 (August 18, 2010). Petitioners reference the following submissions: GTC's Second SV Submission; GTC's Rebuttal SV Submission; GTC's SCDQR; GTC's Case Brief; and GTC's submission entitled, "GTC Supplemental Section C&D Responses: Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated June 17, 2014 ("GTC's Supplemental SCDQR").
[136] *See* GTC's Second SV Submission at Exhibit 5. Confirming that these are international spot market prices for Indonesian exports of coal (and not prices representative of domestic coal consumption in Indonesia), Argus Coalindo describes its data collection team as consisting of "specialist market reporters/analysts in Singapore, Beijing, Tokyo, Sydney, London, Moscow, Washington, Johannesburg and Bogota, drawing on Argus' global network of energy correspondents."
[137] *See, e.g.*, *Multilayered Wood Flooring From the People's Republic of China: Final Results of Antidumping Duty New Shipper Reviews; 2012-2013*, 79 FR 66355 (November 7, 2014), and accompanying IDM.
[138] *See* GTC's SCDQR at Exhibit SD-7.
[139] *See* GTC's Second SV Submission at Exhibit 5 and GTC's Rebuttal SV Submission at Exhibit 4A.

ash and sulfur levels with those specified in the Argus Coalindo or Platts Coal Pricing Methodologies sources.

Thus, we continue to find that the GTA value for "Bituminous Coal, Not Agglomerated" from Indonesia (HS code 270112) represents the most product-specific, publicly available, tax-exclusive, non-export price on the record with which to value steam coal in Indonesia.

**Comment 8: Valuation of Labor**

- Petitioners argue that the Department should not use a calculated labor rate that falls below the minimum wage as an SV and should inflate the International Labor Organization ("ILO") wage rate by 250 percent or should use the $232 per month value reported in the World Bank's *Doing Business 2014: Indonesia* report.[140]
- GTC rebuts that the Department should not adjust the calculated labor SV based on the stated Indonesian minimum wage from a source unrelated to the ILO Yearbook (*i.e.*, the source of the labor SV used for the *Preliminary Results*).[141]
- Double Coin argues that the Department should reject Petitioners' suggested SV for labor rates because they are not based on the best available information and contends that the allegation that the minimum wage in Indonesia has increased by 250 percent is incorrect.[142]

**Department's Position:** The *Doing Business* wage rates cited by Petitioners bear no relation to the ILO wage rate and are less specific to the production of tires. Specifically, the data in *Doing Business* do not appear to be derived from any country-wide Indonesian law, but rather from a survey of businesses operating in Jakarta and reporting minimum wages for a 19-year old

[140] *See* Petitioners' Case Brief at 12-15. Petitioners cite to: *Saccharin from the People's Republic of China: Final Results of the 2005-2006 Antidumping Duty Administrative Review*, 72 FR 51800 (September 11, 2007); *Steel Wire Garment Hangers From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2012-2013*, 79 FR 65616 (November 5, 2014) ("*Hangers/PRC 12-13 Prelim*"); *Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam: Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 75 FR 47771 (August 9, 2010) ("*Shrimp/Vietnam 08-09*"); and section 773(c)(1) of the Act. Petitioners reference the following submissions: Preliminary SV Memo (specifically, the International Labor Organization's ("ILO") *Yearbook of Labor Statistics* (2008) Chapter 5B data contained therein); GTC's SV Submission (specifically, the World Bank's *Doing Business 2014: Indonesia* information contained at Exhibit 11); and Petitioners' Initial SV Comments (specifically, the ILO *Yearbook of Labor Statistics* (2009) Chapter 5B data contained at Exhibit 14).

[141] *See* GTC's Rebuttal Brief at 1-8. GTC discusses the *Shrimp/Vietnam 08-09* (August 9, 2010) and *Hangers/PRC 12-13 Prelim* (November 5, 2014) cases cited by Petitioner and further cites to *Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor*, 76 FR 36092 (June 21, 2011) ("*Labor Methodologies*"). GTC references the following record submissions: Preliminary SV Memo and *Doing Business 2014: Indonesia* (submitted in GTC's SV Submission at Exhibit 11), and Petitioners' Case Brief.

[142] *See* Double Coin's Rebuttal Brief at 7-13. Double Coin cites the following: *Preliminary Results* (October 10, 2014); *Hangers/PRC 12-13 Prelim* (November 5, 2014); *Labor Methodologies* (June 21, 2011); and further discusses Petitioners' use of *Shrimp/Vietnam 08-09* (August 9, 2010) and *Hangers/PRC 12-13 Prelim* (November 5, 2014). Double Coin references the following record submissions: Letter from Petitioners' entitled, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off-The-Road Tires from China (A–570–912): Petitioners' Fourth Surrogate Value Comments," dated September 2, 2014 ("Petitioners' 4th SV Submission"); Petitioners' Initial SV Comments; *Doing Business 2014: Indonesia* (submitted in GTC's SV Submission at Exhibit 11); Preliminary SV Memo; and Petitioners' Case Brief.

worker/apprentice.[143] Thus, the "minimum wage" in *Doing Business* in not representative of the experience of Indonesian tire producers and does not provide a more reliable indicator of inflation in wages than the "Division: 25 – Manufacture of rubber and plastics products" ILO wage data and Consumer Price Index ("CPI") used in the *Preliminary Results*. Additionally, in response to cases cited by Petitioners, we note that: (1) the ILO data in *Shrimp/Vietnam 08-09* were significantly different from one year to the next and the Department had other ILO data from which to choose;[144] and (2) with regards to *Hangers/PRC 12-13 Prelim*, the Department used more specific, more contemporaneous Thai National Statistical Office data.[145] Thus, we made no change from the *Preliminary Results* and continue to value labor via the Department's standard ILO wage rate methodology, using chapter 25 data for Indonesia, inflated with CPI data.[146]

**Comment 9: Valuation of Domestic Truck Freight**

- Petitioners argue that the Department should recalculate the truck freight rate for Indonesia using a single distance of 16.7 kilometers, representing the distance from the center of Jakarta to the port of Jakarta.[147]
- GTC rebuts that the Department rejected Petitioners' proposed calculation in the recent *MSG/PRC LTFV* (September 29, 2014) case and that the existing calculation is supported by record evidence and current practice.[148]
- Double Coin rebuts that *Doing Business 2014: Indonesia* is clear in defining the distance from the port to a business "located in the periurban area" and, thus, the Department should reject Petitioners' proposed distance. Moreover, Double Coin argues that use of Petitioners' suggested distance would result in an SV for truck freight that does not reflect commercial reality.[149]

---

[143] *See* GTC's SV Submission at Exhibit 11, *Doing Business 2014: Indonesia* at pages 98-99.
[144] *See Shrimp/Vietnam 08-09* and accompanying IDM at Comment 9.
[145] *See Hangers/PRC 12-13 Prelim* and accompanying decision memorandum at 25, unchanged in *Steel Wire Garment Hangers From the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 2012–2013*, 80 FR 13332 (March 13, 2015).
[146] *See Labor Methodologies*.
[147] *See* Petitioners' Case Brief at 15-17. Petitioners cite to: *Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review and New Shipper Review; 2011-2012*, 79 FR 19053 (April 7, 2014) ("*Fish Fillets/Vietnam 11-12*"); *Monosodium Glutamate From the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, and Postponement of Final Determination*, 79 FR 26408 (May 8, 2014); and *Certain Steel Wheels From the People's Republic of China: Notice of Final Determination of Sales at Less Than Fair Value and Partial Affirmative Final Determination of Critical Circumstances*, 77 FR 17021 (March 23, 2012). Petitioners reference the following submissions to the record: Preliminary SV Memo; Petitioners' Initial SV Comments (including *Doing Business 2014: Indonesia*); GTC's SV Submission; Petitioners' Pre-Prelim Comments; GTC's submission entitled, "GTC's Pre-Preliminary Comments: Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated September 9, 2014 ("GTC's Pre-Prelim Comments").
[148] *See* GTC's Rebuttal Brief at 8-10. GTC cites to *Monosodium Glutamate From the People's Republic of China: Final Determination of Sales at Less Than Fair Value and the Final Affirmative Determination of Critical Circumstances*, 79 FR 58326 (September 29, 2014) ("*MSG/PRC LTFV*"). GTC references the following record submissions: *Doing Business 2014: Indonesia* (submitted in GTC's SV Submission at Exhibit 11) and Petitioners' Case Brief.
[149] *See* Double Coin's Rebuttal Brief at 14-19. Double Coin cites to *Certain Frozen Fish Fillets from Vietnam:*

**Department's Position:** *Doing Business* specifies that the business exporting is "located in the periurban area of the economy's largest business city."[150] GTC placed complete evidence on the record of this case establishing the five periurban areas of Jakarta and showing the distance from each area to the port of Jakarta.[151] Following past case precedent, we continued to use an average of five distances from periurban areas of Jakarta to the port of Jakarta.[152] Thus, we made no change to truck freight and continued to calculate freight using a 65.08 kilometer average of distances from the periurban areas of Jakarta to the port of Jakarta.

**Comment 10: Valuation of Electricity**

Petitioners' Comments[153]

- Petitioners contend that the Department should not use electricity rates from the Indonesian utility PT PLN (Persero) ("PLN") as a SV, as information on record and various CVD determinations demonstrate that the PLN rates are heavily subsidized, and the Department must avoid using any prices which it has reason to believe or suspect may be dumped or subsidized.
- The Department should instead use either electricity prices on the record from Thailand or, in the alternative, PLN's cost of production for electricity in Indonesia.

---

*Preliminary Results of AD Administrative Review for 2012-2013*, 79 FR 40059 (July 11, 2014); *Fish Fillets/Vietnam 11-12* (April 7, 2014); *Shandong TTCA Biochemistry Co. v. United States*, 774 F. Supp. 2d 1317 (CIT 2011); *Gallant Ocean* (Fed. Cir. 2010); *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of the 2009-2010 Antidumping Duty Administrative Review and Final Rescission, in Part*, 77 FR 14495 (March 12, 2012); *Tires/PRC 10-11* (April 16, 2013); and *Tires/PRC 11-12 NSR Prelim* (March 5, 2013). Double Coin references the following record submissions: *Doing Business 2014: Indonesia* (submitted in GTC's SV Submission at Exhibit 11) and Petitioners' Case Brief.

[150] *See* GTC's SV Submission at Exhibit 11, *Doing Business 2014: Indonesia* at page 75.

[151] *See* GTC's SV Submission at Exhibit 11.

[152] *See, e.g.*, *MSG/PRC LTFV* and accompanying IDM at Comment 1 and *Fish Fillets/Vietnam 11-12* and accompanying IDM at Comment XIII.

[153] *See* Petitioners' Case Brief at 18-20. Petitioners cite to: Omnibus Trade and Competitiveness Act of 1988, Conf. Report to Accompany H.R. 3, H.R. Rep. No. 576, 100th Cong., 2nd Sess. (1988); *China Nat'l Mach. Imp. & Exp. Corp. v. United States,* 264 F. Supp. 2d 1229 (CIT 2003); *Tianjin Mach. Imp. & Exp. Corp. v. United States*, 806 F. Supp. 1008 (CIT 1992); *Luoyang Bearing Corp. v. United States*, 347 F. Supp. 2d 1326 (CIT 2004); *Xanthan Gum From the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 78 FR 2252 (January 10, 2013); *Notice of Final Determination of Sales at Less Than Fair Value: Certain Small Diameter Carbon and Alloy Seamless Standard, Line and Pressure Pipe From Romania*, 65 FR 39125 (June 23, 2000) ("*Pressure Pipe/Romania LTFV Final*"); *Polyvinyl Alcohol From the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 71 FR 27991 (May 15, 2006). Petitioners reference the following submissions to the record: Petitioners' submission entitled, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off The-Road Tires from China (A–570–912): Petitioners' Additional Surrogate Value Comments," dated May 2, 2014 ("Petitioners' Additional SV Submission"); Preliminary SV Memo; PDM; and Petitioners' Pre-Prelim Comments.

Respondents' Comments[154,155]

- GTC and Double Coin rebut that the Department should continue to value electricity using the PLN rate, because in previous CVD cases the Department examined allegations of sales of electricity for less than adequate remuneration ("LTAR") in Indonesia, and found no benefit from the program.
- GTC avers that there is no evidence establishing that the rate charged by PLN is below its actual production cost. GTC suggests that, if the Department declines to use PLN's data, it could instead use the average electricity price charged to industrial customers in Indonesia published in the 2012 Energy Handbook.
- Double Coin further argues that the Thai electricity value does not constitute "best available information," as it is not specific to the surrogate country, Indonesia.

**Department's Position**: For these final results, we continued to use the PLN electricity prices that we used for the *Preliminary Results* to value respondents' consumption of electricity. First, we prefer to use the same country, where possible, to value all factors of production;[156] in this case, Indonesia is our primary surrogate country. Thus, if we can find an acceptable data source in Indonesia, we would prefer to use the Indonesian value. Second, we prefer to use prices actually paid by producers in the primary surrogate country.[157] Additionally, in countervailing duty cases where the Department examined allegations of sales of electricity for LTAR in Indonesia, the Department determined (as discussed below) that electricity in Indonesia does not provide a countervailable benefit; accordingly, we have no reason to disregard the prices on the record which are charged to industrial customers in Indonesia by PLN.

In the *Shrimp/Indonesia CVD Investigation*, the Department found that PLN charged uniform tariff rates to industrial users. We did not find the provision of electricity to be a countervailable

---

[154] *See* GTC's Rebuttal Brief at 10-14. GTC cites to *Certain Frozen Warmwater Shrimp From Indonesia: Negative Preliminary Countervailing Duty Determination*, 78 FR 33349 (June 4, 2013) ("*Shrimp/Indonesia CVD Prelim*"), sustained in *Certain Frozen Warmwater Shrimp From the Republic of Indonesia: Final Negative Countervailing Duty Determination*, 78 FR 50383 (August 19, 2013) (collectively, "*Shrimp/Indonesia CVD Investigation*"); *Final Affirmative Countervailing Duty Determination: Certain Cut-to-Length Carbon-Quality Steel Plate from Indonesia*, 64 FR 73155 (December 29, 1999) ("*CTL Plate/Indonesia*"); *Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Preliminary Results of the Antidumping Duty Administrative Review and New Shipper Review; 2011-2012*, 78 FR 55676 (September 11, 2013); *Preliminary Results* (October 10, 2014); and *Pressure Pipe/Romania LTFV Final* (June 23, 2000). GTC references the following record submissions: Double Coin's submission entitled, "Double Coin Holdings and China Manufacturers Alliance, LLC 's Surrogate Value Comments: Certain New Pneumatic Off-the-Road Tires from China," dated April 14, 2014 ("Double Coin's SV Comments"), containing the Indonesian Government's 2012 Handbook of Energy & Economic Statistics of Indonesia ("2012 Energy Handbook") at attachment SV-4; Petitioners' Additional SV Submission; and Petitioners' Case Brief.

[155] *See* Double Coin's Rebuttal Brief at 20-22. Double Coin cites to *Pressure Pipe/Romania LTFV Final* (June 23, 2000); *Shrimp/Indonesia CVD Prelim* (June 4, 2013); and *CTL Plate/Indonesia* (December 29, 1999). Double Coin references the following record submissions: Petitioners' Initial SV Comments; GTC's SV Submission; Petitioners' Additional SV Submission; Petitioners' Case Brief.

[156] *See, e.g.*, *Chlorinated Isocyanurates From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2010-2011*, 78 FR 4386 (January 22, 2013) at Comment 4, "the Department prefers to rely on a single surrogate country to value all factors when possible." *See also* 19 CFR 351.408(c)(2), "except for labor, … the Secretary normally will value all factors in a single surrogate country."

[157] *See, e.g.*, *Iron Construction Castings From the People's Republic of China; Final Results of Antidumping Duty Administrative Review*, 56 FR 2742 (January 24, 1991) at Comment 11.

subsidy in Indonesia.[158]   Thus, consistent with the Department's findings in *Shrimp/Indonesia CVD Investigation* and the AD investigation of *Pressure Pipe/Romania LTFV Final*, we continue to find the PLN electricity data acceptable.[159]   Therefore, we continued to use the PLN electricity prices to value electricity for these final results.

**Comment 11: Container Weight Used in Ocean Freight and Brokerage and Handling Surrogate Value Calculations**

- GTC argues that the Department should remedy the inconsistency between the SV calculations for ocean freight, domestic brokerage and handling ("B&H"), and domestic inland trucking.  Specifically, GTC urges the Department to either use:
  - GTC's actual container weight for both B&H and ocean freight; or
  - The assumed weight of 10 tons for the B&H calculation and the quote-specific assumed weights from the Descartes quotes (*i.e.*, the ocean freight SV source) for the ocean freight SV calculation.[160]
- Petitioners rebut that the Department correctly measured movement expenses since the Department's calculations of ocean freight, domestic B&H, and truck freight expenses were based on different facts and, thus, calculated in different ways.[161]

**Department's Position:**  The Department's clearly defined practice in calculating the B&H and domestic truck freight SVs from *Doing Business* is to use the 10-ton weight specified in the World Bank's survey methodology.[162]   Thus, we have not changed the 10-ton denominator for the calculation of domestic truck freight and B&H.

For ocean freight, the Department preliminarily used an average of actual container weights from GTC and Double Coin to calculate company-specific shipment weights for valuation of ocean freight.[163]   While the Descartes ocean freight quotes are issued on a per-container basis, the quotes also provide an assumed weight for each quoted shipment.[164]   Therefore, because the quotes include a weight, we find the weights on the Descartes freight quotes to be more specific to the quotes than the average weights of respondents' own shipments.  Thus, for these final results, we are using the ocean freight weights provided in the Descartes international ocean freight quotes, on a weighted-average basis, to derive the overall ocean freight surrogate value, rather than relying upon the average of respondent-specific container weights used for the *Preliminary Results*.[165]

---

[158] *See Shrimp/Indonesia CVD Prelim* and accompanying decision memorandum at 20.

[159] *See Pressure Pipe/Romania LTFV Final* and accompanying IDM at Comment 7, citing to *CTL Plate/Indonesia* at 64 FR 73162.

[160] *See* GTC's Case Brief at 29-30.  GTC cites to the following:  *Pakfood Pub. Co. v. United States*, 724 F. Supp. 2d 1327 (CIT 2011) and *SKF* (Fed. Cir. 2001).  GTC references the following submissions:  GTC's SV Submission and the Preliminary SV Memo.

[161] *See* Petitioners Rebuttal at 29-30.  Petitioners reference the following submissions:  GTC's Case Brief; Petitioners' Case Brief; GTC's SV Submission; and the Preliminary SV Memo.

[162] *See, e.g.*, *Certain Steel Threaded Rod From the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2012-2013*, 79 FR 71743 (December 3, 2014) and accompanying IDM at Comment 5.  *See also* Petitioners' Initial SV Comments at Attachment 17.

[163] *See* Preliminary SV Memo at 15-16 and Attachment X.

[164] *See* GTC's SV Submission at Exhibit 8.

[165] *See* Final SV Memo at 2 and Attachments I, II, IV, and V.

**Comment 12: Whether to Exclude Certain Ocean Freight Charges When Calculating a Surrogate Value for Ocean Freight**

- GTC argues that the Department has double counted certain costs between domestic B&H and ocean freight (*e.g.*, documentation charges, traffic mitigation fees, AMS charges, clean truck fees, chassis usage charges, Shanghai port surcharges, international ship and port security charges, and ISD handling charges) and thus should exclude certain charges from the ocean freight SV calculation.[166]
- Petitioners rebut that the Department correctly determined that B&H charges did not overlap with ocean freight charges.[167]

**Department's Position:** Consistent with past Department precedent and record evidence, we did not exclude any charges from the Descartes ocean freight quotes, as they appear to be necessary for the shipment of freight and because they do not appear to be double counted (*i.e.*, they do not appear to have already been covered by the B&H surrogate value).

*Doing Business* states that its trading-across-borders methodology measures the "cost necessary to complete every official procedure for exporting and importing" a "standardized cargo of goods by sea transport," but not the "cost for sea transport" itself.[168] In addition to the surcharges enumerated by GTC, the Descartes freight quotes include numerous other surcharges (*e.g.*, peak season surcharge, bunker surcharge, Panama Canal transit surcharge).[169] The surcharges on the Descartes quotes do not appear to overlap with the B&H charges related to exporting, but simply appear to be additional fees imposed by the ocean freight company in order to transport the merchandise from the Chinese port of origination to the U.S. destination port. Moreover, GTC does not cite to any record evidence in support of its argument that the Descartes ocean freight surcharges it alleges should be covered by the B&H value from *Doing Business* are, in fact, included in those export costs. Furthermore, GTC does not cite to a single Department precedent supporting its contention. To the contrary, in *Stilbenic OBAs*, the Department "included certain additional charges (*i.e.*, fuel surcharges, destination delivery charges, and bill of lading charges) in the ocean freight calculation because these charges, in addition to the base ocean freight charge, are incurred by the surrogate freight forwarders and are not separately covered by the brokerage and handling surrogate value."[170] Thus, including these charges is both consistent with the Department's practice and with the record evidence in this case.

---

[166] *See* GTC's Case Brief at 31-32. GTC references the following submissions: Petitioners' Initial SV Comments, GTC's SV Submission, and the Preliminary SV Memo.
[167] *See* Petitioners Rebuttal at 30-31. Petitioners reference the following submissions: GTC's Case Brief; Petitioners' Case Brief; GTC's SV Submission; and the Preliminary SV Memo.
[168] *See* Petitioners' Initial SV Comments at Attachment 17.
[169] *See* GTC's SV Submission at Exhibit 8.
[170] *See Certain Stilbenic Optical Brightening Agents From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 77 FR 17436 (March 26, 2012) and accompanying IDM at Comment 4.

**Comment 13: Whether to Deflate the Surrogate Value for GTC's Warehouse Costs**

- For the *Preliminary Results*, the Department valued GTC's domestic warehousing expenses using a SV derived from an April 9, 2014 price quote. In accordance with its standard practice, the Department should deflate this value using the average producer price index ("PPI") for the POR of 116.02 compared with the PPI for April 2014.[171]
- No other interested party provided comment on this issue.

**Department's Position:** Though the record information from which this SV was derived shows that the relevant price quote was accessed on April 9, 2014, there is no indication that the quoted price was not in effect during the POR and no party provided a better source of data for the warehouse cost.[172] As such, we did not deflate this value for the final results.

**Comment 14: Whether to Calculate Region-Specific U.S. Delivery Charges for GTC's U.S. Inland Freight Surrogate Value**

- GTC notes that the Department's preliminary calculation of a U.S. inland freight SV accounted for different prices associated with delivery to East Coast or West Coast ports in the United States, but made no distinction based on the distance from the port to the customer for each shipment. GTC asserts that the Department should make this calculation more precise by computing the delivery charge from both the East Coast and West Coast for each of the four geographical regions used for the regional "targeted dumping" test.[173]
- No other interested party provided comment on this issue.

**Department's Position:** Since no party opposed this change in calculation, and because we have adequate information on the record to support and perform such a calculation, and because this calculation is more accurate and specific to the manner in which GTC conducts business, we calculated U.S. inland freight delivery charges for GTC that are specific to the port of import and delivery region for these final results.[174]

**Comment 15: Surrogate Values for GTC's Tackifier Inputs**

- GTC argues that certain of its tackifier inputs are phenolic resins and, as such, should be valued using GTA Indonesia import data for Harmonized Tariff Schedule ("HTS") 3909.40 (*i.e.*, TACKIFIER10, which is a standard phenolic resin, HTS 3909.40 covers "Phenolic Resins, Pr Fms") and HTS 3909.40.9000 (*i.e.*, TACKIFIER 08, 09, and 14, which are "other" phenolic resins, HTS 3909.40.90 covers "Other Phenolic Resins"). Further, GTC argues that TACKIFIER 18, 19, and 20, should be valued under HTS 3909.40.90 (*i.e.*, the "Other Phenolic resins"), which covers products more specific to these "other" resin inputs than the

[171] *See* GTC's Case Brief at 30-31. GTC references the following submissions: Petitioners' Initial SV Comments and the Preliminary SV Memo.
[172] *See* Petitioners' Initial SV Comments at Attachment 18.
[173] *See* GTC's Case Brief at 32-33 and Exhibit 4. GTC further references the Preliminary SV Memo.
[174] *See* Final SV Memo at 2 and Attachments I and IV.

phenolic resins covered in the 3909.40 category used to preliminarily value these tackifier inputs.[175]

- Petitioners rebut that the Department has reasonably valued GTC's TACKIFIER08, 09, 10 and 14 inputs using HTS 3506.99 ("Products Suitable For Use As Adhesives"). Furthermore, GTC has not demonstrated that TACKIFIER18, 19, and 20 belong to an "other" category rather than the broader six digit category that the Department used for the *Preliminary Results*.[176]

**Department's Position:** For proprietary reasons discussed in GTC's analysis memo, we continued to classify GTC's inputs of TACKIFIERs 08, 09, 10, and 14 under HTS 3506.99 ("Products Suitable For Use As Adhesives").[177]

For the *Preliminary Results*, TACKIFIERs 18, 19, and 20, were valued using the broad six-digit category of 3909.40 ("Phenolic Resins, Pr Fms"). However, record evidence shows that there are only two categories under Indonesian HTS code 3909.40: "Phenolic Resins in Moulding Compound" {*sic*} and "Other Phenolic Resins."[178] The descriptions provided by GTC for tackifiers 18, 19, and 20 demonstrate that they are phenolic resins, but do not show them as being in molding compound, so the "other" category is more specific to GTC's tackifiers (because there are only two detailed phenolic resin categories).[179] Thus, for the final results, we valued tackifiers 18, 19, and 20, using the more specific category 3909.40.9000 ("Other Phenolic Resins").

**Comment 16: Freight Distance Applied to GTC's Inputs**

- Petitioners argue that, for GTC's *Sigma* cap distance, the Department should use the same distance from port to factory that GTC provided for its market economy ("ME") inputs rather than the distance reported to the nearest port.[180]
- GTC rebuts that Petitioners' argument to revise GTC's *Sigma* freight cap is contrary to both record evidence and agency practice regarding the *Sigma* cap calculation. Moreover, GTC

---

[175] *See* GTC's Case Brief at 33-36. GTC cites *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 75 FR 59217 (September 27, 2010). GTC further references the Preliminary SV Memo, GTC's Rebuttal SV Submission, GTC's Second SV Submission, Petitioners' Initial SV Comments.
[176] *See* Petitioners' Rebuttal at 31-32. Petitioners reference GTC's Case Brief and the Preliminary SV Memo.
[177] *See* Memorandum titled "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Analysis of the Final Results Margin Calculation for Guizhou Tyre Co., Ltd." at 3.
[178] *See* GTC's Rebuttal SV Submission at Exhibit 5D.
[179] *See* GTC's Supplemental SCDQR at Exhibit SD-5.
[180] *See* Petitioners' Case Brief at 36-37. Petitioners cite to: *Sigma*, 117 F.3d 1401.; *Notice of Final Determination of Sales at Less Than Fair Value, and Affirmative Critical Circumstances, In Part: Certain Lined Paper Products From the People's Republic of China,* 71 FR 53079 (September 8, 2006); and *Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review of the Order on Bars and Wedges*, 68 FR 53347 (September 10, 2003). Petitioners reference: Memorandum entitled "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Analysis of the Preliminary Results Margin Calculation for Guizhou Tyre Co., Ltd.," dated September 30, 2014 ("GTC's Preliminary Analysis Memo"); and GTC's SCDQR.

notes that Petitioners did not offer any precedent for their proposed revision to the *Sigma* cap methodology.[181]

**Department's Position:** The Department's practice when the surrogate value for the material is based on import prices is to use the shorter of the reported distance, or the distance from the nearest port to the producer to value the materials transportation in the surrogate country.[182]

For the *Preliminary Results*, we used GTC's reported distance from the factory to the closest commercial port (*i.e.*, the Port of Fengcheng, at 710 km) as the *Sigma* cap distance. GTC provided evidence suggesting that the Port of Fengcheng is a major commercial Chinese port; Petitioners have not provided any evidence to the contrary and did not dispute GTC's assertion.[183] The record also demonstrates that GTC's ME input purchases and finished good exports predominantly transit through a different port (or ports), which is (are) at a greater distance from GTC's factory.[184] On this basis, Petitioners suggest we should alter the Department's long established practice of capping import distances to the closest port and should instead use the distance to the port actually utilized by GTC during the POR for its ME imports and export sales. As we stated in the PDM, and in accordance with the Department's practice,[185] we:

> adjusted input prices by including freight costs to render them delivered prices. Specifically, the Department added to Indonesian import SVs a surrogate freight cost using the shorter of the reported distance from the domestic supplier to the factory or the distance from the nearest seaport to the factory where it relied on an import value. This adjustment is in accordance with the decision of the Federal Circuit in *Sigma*...[186]

Petitioners' suggestion is without precedent and contrary to long-standing Department practice following the Federal Circuit's holding in *Sigma*; thus, we made no changes to GTC's *Sigma* cap for the final results.

---

[181] *See* GTC's Rebuttal Brief at 14-15. GTC cites to *Sigma*, 117 F.3d 1401 *and Sawblades/PRC LTFV Final* (May 22, 2006). GTC references the following record submissions: GTC's submission entitled, "GTC 2nd and 3rd Supplemental Section C&D Responses: Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated July 14, 2014 ("GTC's 2nd and 3rd SSCDR") and Petitioners' Case Brief.

[182] *See Sigma,* 117 F.3d 1401. Because of the litigation from which this practice arose, this materials transportation value is sometimes referred to as the *Sigma* freight.

[183] *See* GTC's 2nd and 3rd SSCDR at Exhibit S2-4.

[184] *See* GTC's SCDQR at Exhibit D-15 showing ME input purchases and the port of import. *See also* GTC's 2nd and 3rd SSCDR at 5 and 7, where GTC states its warehouse address in Guangzhou and the distances from the warehouse to the actual ports of export. *See also*, GTC's U.S. Sales Database.

[185] *See, e.g.*, *Hand Trucks and Certain Parts Thereof From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 3779 (January 23, 2014) and accompanying decision memorandum, unchanged in *Hand Trucks and Certain Parts Thereof From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 44008 (July 29, 2014).

[186] *See* PDM at 25.

**Comment 17: Calculation of Double Coin's Truck Freight and Distance**

Petitioners' Comments[187]

- The record is unclear whether Double Coin reported supplier distances at the *Sigma* cap, as requested by the Department; therefore, the Department should set the supplier distance to the *Sigma* cap for all NME inputs.
- The Department used the reported simple average of the distance to port for each Double Coin factory to calculate the distance applied for MEP inputs. However, because unique CONNUMs are produced at each facility and the factory-specific distances to port are available, the Department should use the factory-specific distances.
- Double Coin first reported that the Yangshan port was closest to both production facilities but later calculated the *Sigma* cap distance using the average from each factory to two Shanghai ports (Yangshan and Waigaoqiao, of which the latter is closest to each factory). However, Double Coin never stated that merchandise was actually shipped out of Waigaoqiao (or both Yangshan and Waigaoqiao) and record information suggests that Yangshan is the port predominantly used for international container shipping. Therefore, the Department should recalculate the domestic inland freight calculations and *Sigma* distances using only the Waigaoqiao distance.

Double Coin's Rebuttal[188]

- Double Coin complied with the Department's specific request to cap the individual distances for transactions with traders in the underlying supplier worksheets at the *Sigma* distance rather than the distance to the trader.
- The Department used the factory-specific capped distance in its calculation of normal value and domestic inland freight, precisely as Petitioners request.
- The Department verified that Double Coin exported subject merchandise out of both ports.

---

[187] *See* Petitioners' Case Brief at 23-28. Petitioners cite to: *Sigma*, 117 F.3d 1401; and *Lasko Metal Products, Inc. v. United States*, 43 F.3d 1442 (Fed. Cir. 1994). Petitioners also cite to their own freight calculations provided at Exhibit 1 to the Case Brief. Petitioners reference: Department Letter entitled, "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Request for Revised FOP and U.S. Sales Databases," dated September 16, 2014 ("Request for Revised Databases"); Double Coin's submission entitled, "Revised US and FOP Databases Certain New Pneumatic Off-the-Road Tires from China," dated September 23, 2014 ("Double Coin's Post-Verification Corrections"); the Department Letter to Double Coin entitled, "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Questionnaire" dated December 16, 2013 ("Initial Questionnaire"); Letter from Petitioners entitled, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off-The-Road Tires from China (A–570–912): Petitioners' Rebuttal Factual Information and Comments on Double Coin's Supplemental Section C and D Questionnaire Responses," dated July 14, 2014 ("Petitioners' July 14 Rebuttal") at Attachment 2 ("Comparing Shanghai's Major Shipping Ports," by Jeremy Chapman, dated March 22, 2011 ("Shanghai Shipping Ports")); Letter from Double Coin entitled, "Section A Response of Double Coin Holdings and China Manufacturers Alliance, LLC," dated January 22, 2014 ("Double Coin SAQR"); Double Coin's Verification Report; Double Coin's 2nd Supplemental ACD Response; Double Coin's Preliminary Analysis Memo; Double Coin's SCQR; and Double Coin's Supplemental C&D Response.

[188] *See* Double Coin's Rebuttal Brief at 22-25. Double Coin cites to *Sigma*, 117 F.3d 1401 and references the following submissions: Double Coin's Verification Report; the *Shanghai Shipping Ports* article in Petitioners' July 14 Rebuttal; Double Coin's Post-Verification Corrections; and Petitioners' Case Brief.

**Department's Position:** Petitioners note that the record is unclear as to whether Double Coin re-reported supplier distances as instructed in the Department's post-verification Request for Revised Databases. We note that Double Coin certified that it made all requested corrections in its Post-Verification Corrections submission and further confirmed that it capped the underlying line item distances at the distance to the port for the trading companies (rather than the distance to the trading companies), as requested. Though Double Coin's resubmission did not include the underlying worksheets demonstrating the change for every supplier (nor was such information requested), our review of the changes to the overall distances reported for each input between the most recent factors of production ("FOP") database and the preceding database demonstrate that the requested changes were properly reported. As such, we do not agree with Petitioners that the record is sufficiently unclear as to provide compelling reason to further alter the calculation.

Furthermore, as Double Coin points out, our margin calculation used the factory-specific capped distance for each NME-source input, and did not use an average distance of the two factories to calculate freight costs as alleged by Petitioners. As such, we continue to use the factory-specific capped distance where applicable in our NV calculation and for the domestic inland freight distance.

With respect to the specific ports used to calculate the distance from factory to port, Double Coin asserts that the Department's statement in the verification report that "as part of our review of the sales trace packages, we checked the various adjustments and discounts, movement expenses, and other expenses, and we noted no discrepancies from what Double Coin reported" makes "crystal clear" that "the Department has completely verified the distances reported." Double Coin asserts that "{t}hus… the Department verified that Double Coin exported the subject merchandise out of both Yangshan and Waigaoqiao Ports during the POR."[189] As an initial matter, we disagree with Double Coin's characterization of our verification findings. In this case, the Department reviewed with company officials and verified that the distances between the production factories and Shanghai ports was consistent with the distances reported. Our report noted no discrepancies with respect to reported movement expenses in general, including these factory distances. However, "{v}erification is a spot check and is not intended to be an exhaustive examination of the respondent's business. (Commerce) has considerable latitude in picking and choosing which items it will examine in detail,"[190] and we did not specifically spot check that "Double Coin exported the subject merchandise out of both Yangshan and Waigaoqiao Ports during the POR", nor did we make any statement to that effect.[191]

Regardless of our issue with Double Coin's characterization of our findings, as noted above, Double Coin reported and we verified the distance to two Shanghai ports. While Petitioners cite to information suggesting that the Yangshan port is becoming (or is already) the primary port of export for international container cargo shipments and that the Waigaoqio port is increasingly

---

[189] *See* Double Coin's Verification Report at 24 and Rebuttal Brief at 25.
[190] *See F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000); *see also NTN Bearing Corp. of Am. v. United States*, 186 F. Supp. 2d 1257, 1296 (CIT 2002).
[191] Indeed, a review of shipment-related documentation identifying port of export (*e.g.*, invoices, bills of lading, PRC and U.S. customs documentation, *etc.*) shows that the port of export is generally listed only as "Shanghai," and does not identify the specific facility. *See*, *e.g.*, the sales trace packages in Double Coin's Verification Report at PRC VE-5 and US VE-10.

utilized for intra-Asian shipping,[192] there is simply no evidence on the record to confirm that all shipments were shipped from the Yangshan port or that subject merchandise could not have been shipped from the Waigaoqiao port. As Shanghai contains two international container ports, absent affirmative information that one is the exclusive port of exportation, we find no basis for changing the current calculation.

**Comment 18: Whether Truck Freight Costs are Over-Counted**

- Double Coin asserts that the Department inadvertently multiplied the truck freight rate SV by the distance and then by the consumption of raw materials, resulting in an exponential over-counting of freight costs.[193]
- Petitioners point out that Double Coin's argument presumes that the freight cost and the SV are first summed and then that sum is multiplied by the amount of the material (which would provide an incorrect result, if true), but the SAS program calculates this correctly and no change is necessary.[194]

**Department's Position:** Upon review, we confirm that the equation used in the margin calculation did not actually contain the mathematical errors noted by Double Coin and the freight variables are properly calculated on a per tire basis in the program. While the calculation would indeed over-count freight if the equations operated as argued by Double Coin, Petitioners are correct that this is not the way they actually function in the program. As such, no change is necessary for these final results.[195]

**Comment 19: Surrogate Value for Double Coin's Polyester Cord Inputs**

- Double Coin contends that the Department inadvertently utilized an incorrect HTS code for valuing Double Coin's consumption of polyester cord. Specifically, Double Coin suggested price data for Indonesian imports of HTS subcategory 5902.20 ("Tire Cord Fabric, Of High Tenacity Yarns, Of Nylon Or Other Polyamides, Polyesters Or Viscose Rayon: Of Polyesters") but the Department instead valued the input using price data for Indonesian imports of HTS subcategory 5509.22 ("Yarn, Not Sewing Thread, of Synthetic Staple Fiber Not For Retail Sale Greater Than 85% Weight Of Polyester Staple Fibers Multiple (folded) Or Cabled Yarn"), but offered no explanation for why it deviated from the suggested SV in the Preliminary SV Memo.[196]
- No other interested party provided comment on this issue.

**Department's Position:** For the final results, we valued Double Coin's polyester cord input using HTS 5902.20, rather than HTS 5509.22, which was used for the *Preliminary Results*. The description of products included in HTS 5902.20 specifies polyester "tire cord fabric… {made of} polyesters," while HTS 5509.22 pertains to "Yarn, Not Sewing Thread, of Synthetic Staple

---

[192] *See* Comparing Shanghai's Major Shipping Ports, in Petitioners' July 14 Rebuttal at Attachment 2.
[193] *See* Double Coin's Case Brief at 69-72. Double Coin references the Double Coin Preliminary Analysis Memo.
[194] *See* Petitioners' Rebuttal Brief at 18-19. Petitioners reference Double Coin's Case Brief.
[195] *See* Double Coin's Final Analysis Memo at Attachment II (*i.e.*, Margin Program Output).
[196] *See* Double Coin's Case Brief at 72-73. Double Coin references the Preliminary SV Memo and Double Coin's SV Comments.

Fiber Not For Retail Sale Greater Than 85% Weight Of Polyester Staple Fibers Multiple (folded) Or Cabled Yarn." Therefore, as the description of HTS 5902.20 appears to be specific to Double Coin's polyester cord input, was requested for use as the best available category by Double Coin, and there is no contradictory evidence on the record, we are valuing Double Coin's tire cord inputs using Indonesian price data for imports of HTS 5902.20 for the final results.[197]

**Comment 20: Surrogate Values for Double Coin's Cinder and Calcium Oxide By-products**

Double Coin's Comments[198]
- Double Coin argues that, without explanation, the Department valued cinder and calcium oxide byproducts with a coal SV rather than the byproduct-specific price data on the record.
- Double Coin submits that, if the Department finds that an offset cannot exceed input price:
  - It strongly disagrees with this practice, as it is tantamount to cherry-picking data; and
  - Should the Department continue to incorrectly cap the byproduct offset, because both bituminous and anthracite coal were reported as used in production, the cap should reflect the respective values of the each type of coal consumed, rather than just capping the offset at the value of bituminous coal.

Petitioner's Comments[199]
- Petitioners note that the Department has repeatedly recognized the "unreasonable result" of assigning more value to a waste product than to the input material from which the waste is produced and, thus, should continue to apply a SV to Double Coin's coal waste products that is no higher than the lowest SV for its coal inputs.

**Department's Position:** Double Coin submits that the Department's use of price data for Indonesian imports of HTS 2701.12 ("Bituminous Coal, Not Agglomerated", *i.e.*, the SV used to properly value bituminous coal energy inputs) to value Double Coin's reported offset quantities of cinder and calcium oxide byproducts sold during the POR for the *Preliminary Results* must have been a ministerial error, since Double Coin instead reported Indonesian price data for imports of HTS 2620 ("Ash And Residues (Except From Iron Or Steel Manufacture) Containing Arsenic, Metals Or Their Compounds") as the most appropriate information from which to value these byproducts, and the Department did not further explain why it declined to utilize this by-product-specific data. At the outset, we note that the use of the HTS 2701.12 SV to value cinder and calcium oxide by-products was not in error but, rather, consistent with our practice (discussed below) that the surrogate used to value a by-product offset will be capped at the value of the surrogate used to value the input from which that by-product offset was produced if no more appropriate value can be found. However, we acknowledge that we neglected to discuss our reasoning our Preliminary SV Memo.

---

[197] *See* Final Surrogate Value Memo.
[198] *See* Double Coin's Case Brief at 72-73. Double Coin references Double Coin's SV Comments and the Preliminary SV Memo.
[199] *See* Petitioners' Rebuttal Brief at 19-20. Petitioners cite to *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 74 FR 3987 (January 22, 2009). Petitioners reference: Double Coin's SV Comments; Preliminary SV Memo; and Double Coin's Case Brief.

Case 1:15-cv-00124-TCS   Document 192-3   Filed 02/06/17   Page 52 of 59

Double Coin reported that it sells the ash and residue by-products (*i.e.*, coal cinder and calcium oxide) resulting from its consumption of coal, which were used as an energy input in the production of subject merchandise.[200] Double Coin consumes two types of coal in the production of subject merchandise, bituminous (valued using HTS 2701.12 import data, with an average unit value ("AUV") of $0.15 USD/Kg) and anthracite (valued using HTS 2701.11 ("Anthracite Coal, Not Agglomerated") with an AUV $0.43 USD/Kg).[201] On the other hand, the AUV of Double Coin suggested data to value the by-product coal waste (*i.e.*, Indonesian price data for imports under the four-digit HTS 2620 category including any type of non-ferrous residue containing metals) is $37.77 USD/Kg: over 250 times greater than the price selected to value the bituminous coal inputs from which this by-product is derived (and over 85 times the value of the SV for anthracite coal).

We find it unreasonable to assign a higher value to a waste product than to its input product. Double Coin asserts that there is no logic to using an HTS code of the raw material as the surrogate value for the byproduct of that raw material, as the Department verified that the by-products in question are by-products of using coal, not coal itself, and that this practice is tantamount to cherry-picking the surrogate data. Despite Double Coin's objections, the Department has a long-standing practice of rejecting or capping the by-product SV in instances where the by-product SV exceeds the SV of the product from which it was derived.[202] Indeed, recent case precedent supports the practice of rejecting and/or capping a scrap SV when it is of a higher price than the SV for the input which created the scrap byproduct in question.[203]

---

[200] *See* Double Coin's SCDQR at Exhibit D-8.

[201] Both Petitioners and Double Coin accept that these are the proper input-specific HTS subcategories from which to value the coal inputs and neither party has provided objection as to the suitability of the Indonesian AUVs for valuing Double Coin's coal FOPs in this review. *See* Double Coin's SV Comments at Attachment I and Petitioners' Initial SV Submission at 10.

[202] *See Certain Steel Nails from the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances,* 73 FR 33977 (June 16, 2008) ("*Steel Nails/PRC*") at Comment 12 ("In the Final Determination Pursuant To The Remand Order From The U.S. Court Of International Trade In Paslode Division of Illinois Tool Works, Inc. v. United States, Ct. No. 9712–02161 (Jan. 15, 1999), the Department stated that "It is clear that our steel scrap value selection produced an unreasonable result – a value for steel wire rod scrap (0.8390 USD/kg) that exceeded the price for steel wire rod (0.3119 USD/kg) – one that cannot be explained by any notes or data..." We find that in this case, the facts match this situation closely in that one of the suggested HTS categories for the valuation of steel scrap (7204.41.00) has a value greater than the value the Department determined in Comment 10 above. While we acknowledge that HTS category 7204.41.00 includes an explicit reference to "shavings" and that "shavings" were clearly identified as among the types of scrap generated by respondents, the HTS description is is {sic} not the only relevant factor for the Department to consider in valuing steel scrap. As discussed above, reliance on this value will produce an unreasonable result. Therefore, we are using only HTS category 7204.49.00 to value steel scrap.")

[203] *See*, *e.g.*, *MSG/PRC LTFV* (September 29, 2014) at Comment 11 ("A by-product by definition is less valuable than the input from which it is derived. Where there is no evidence that the by-product is a value-added by-product, assigning a by-product a value that is higher than the value of the input from which it is derived is unreasonable. In this investigation, the quantity of the by-product reported exceeds the quantity of the primary input consumed in the production of that by-product. Thus the extended value of the by-product exceeds the extended value of the primary input. Therefore, in the instant investigation, the Department finds it appropriate and reasonable to cap the specific by-product quantity at the specific FOP input amount."); *Multilayered Wood Flooring From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 76 FR 64318 (Tuesday, October 18, 2011) ("*MLWF/PRC*") at Comment 24 ("For purposes of this final determination, the Department has valued Layo Wood's byproducts using a simple average of the surrogate values for Layo Wood's wood veneer and wood core inputs… As explained in *Steel Nails* and argued by Petitioner, the Department has found in past cases that it may

Accordingly, we capped the value of the SV used to value coal by-products to the value of the coal input SVs for these final results, as in the *Preliminary Results*, as Double Coin provides no compelling argument to depart from this established practice. However, Double Coin was correct to note that *Preliminary Results* margin calculation capped these SVs only to the value of the bituminous coal SV, though the waste by-products were produced by the consumption of both bituminous and anthracite coal during the POR. Accordingly, for the final results, we used price data for Indonesian imports of merchandise classified under both HTS subcategory 2701.12 and 2701.11 to create a single by-product cap SV (apportioned based on reported consumption of each type of coal input) to value Double Coin's coal waste offset.[204]

**Comment 21: Calculation of Double Coin's Warranty Costs**

- Petitioners note that the Department's margin program is set up to reduce CEP U.S. prices by reported warranty expenses, in accordance with section 772(d)(1)(B). However, because Double Coin reported warranty expenses as a negative number, the calculation improperly added any such reported expenses to U.S. price. Petitioners request the Department correct this inadvertent error for the final results.[205]
- No other interested party provided comment on this issue.

**Department's Position:** As noted by Petitioners, the *Preliminary Results* margin program is correctly set up to reduce CEP U.S. prices by reported warranty expenses. However, because Double Coin reported warranty expenses as a negative number,[206] the calculation of the sum of all CEP selling expenses added a negative number, resulting in the improper subtraction of reported U.S. direct selling expenses (of which the negative warranty expenses are the only

---

disregard a surrogate value when it is clear that the selection of that surrogate value would yield an unreasonable result. The facts of this case closely match those of *Steel Nails*, in that the AUV of Philippine HTS 4401.30 {*i.e.*, the scrap by–product} would be higher than the surrogate values used for Layo Wood's log, veneer and core inputs {*i.e.*, the inputs from which the scrap by–product is produced}. All parties, including the Petitioner, acknowledge that HTS 4401.30 offers the most specific description of Layo Wood's byproducts. While we agree that the HTS description provided by Philippine HTS 4401.30 includes the terms "sawdust" and "scrap," the HTS description is not the only relevant factor for the Department to consider. In this case, as was the case in Steel Nails, we find that the valuation of a scrap byproduct with a surrogate value higher than the substantive inputs into that scrap product would produce an unreasonable result not explained by the record. Consequently, we have valued Layo Wood's byproducts using a simple average of the surrogate values for Layo Wood's wood veneer and wood core inputs." *See also, Fish Fillets/Vietnam 11–12* (July 2, 2013) at comment VI.B, stating that the Department finds it unreasonable that the surrogate value for fish oil byproducts (derived from whole fish) would be higher than their main input (*i.e*., whole fish). Whereas the "unreasonable" SV was still used to value fish oil, because it was input specific, the fish oil SV was capped at the price of the SV for the whole fish input product. *See also* Certain *Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results and Partial Rescission of the Seventh Antidumping Duty Administrative Review*, 77 FR 15039 (March 14, 2012) (*Fish Fillets/Vietnam 10–11*) at Comment II.B.3, where the Department capped broken fillet by-products at the value for whole live fish because broken fillets were not a value-added byproduct.

[204] *See* Final Surrogate Value Memo for more information regarding the weighted-average calculation of this SV cap.

[205] *See* Petitioners' Case Brief at 20-21. Petitioners cite to: section 772(d)(1)(B) of the Act. Petitioners reference Double Coin's Preliminary Analysis Memo and Double Coin's SCDQR.

[206] *See* Double Coin's SCQR at 42. *See also*, Double Coin's Section C sales database.

component) from total CEP selling expenses.[207] Accordingly, we corrected this error by subtracting the negative U.S. direct selling expenses from the calculation of CEP selling expenses (*i.e.*, subtracting a negative value, resulting in the proper addition of warranty expenses to the sum of all CEP selling expenses).[208]

**Comment 22: Conversion of the Truck Freight Surrogate Value Applied to Double Coin's Coal Consumption**

- Petitioners note that the Department mistakenly applied a per kilogram ("Kg") truck freight rate to determine freight for per metric ton ("MT") coal values; thus, the freight value calculated for the transport of coal to Double Coin's factories is 1000 times lower than it should be. Accordingly, the Department should also adjust the per-Kg coal freight SV to a per-MT unit of measure, consistent with the per-MT manner in which Double Coin reported coal FOPs.[209]
- No other interested party provided comment on this issue.

**Department's Position:** Whereas Double Coin reported its coal consumption on a per MT basis (which we correctly valued using a SV reported on a per-MT unit of measure), we inadvertently applied a per-Kg per-Km SV in valuing the truck freight costs applicable this factor of production in the *Preliminary Results*. Accordingly, for the final results, we corrected this conversion error to report coal truck freight on a per-MT per-Km basis.[210]

**Comment 23: Calculation of Credit Costs for Double Coin's Drop-Shipped Sales**

- Petitioners point out that, for all sales, Double Coin calculated the number of days for which credit was extended by subtracting the reported invoice date by the reported payment date. However, for drop-shipped sales, because CMA does not invoice the customer until the customer receives delivery, the date of sale reported is different from the invoice date. Accordingly, the Department should recalculate credit expenses for drop-shipped sales by using the reported date of sale rather than the invoice date.[211]
- No other interested party provided comment on this issue.

**Department's Position:** For the *Preliminary Results*, as a result of the manner in which Double Coin reported credit expenses, the number of days for which credit was extended for Double

---

[207] As these total summed CEP expenses are then deducted from the gross unit price, the ultimate effect was to improperly add warranty costs to U.S. price.

[208] *See* Double Coin's Final Analysis Memo (and Program Log at Attachment I thereto) for further details on this change.

[209] *See* Petitioners' Case Brief at 21-22. Petitioners reference Double Coin's Verification Report, Double Coin's Preliminary Analysis Memo, and the Preliminary SV Memo.

[210] *See* Double Coin's Final Analysis Memo (and Program Log at Attachment I thereto) for further details on this change.

[211] *See* Petitioners' Case Brief at 28-29. Petitioners cite to *Certain Hot-Rolled Carbon Steel Flat Products From India: Notice of Final Results of Antidumping Duty Administrative Review*, 73 FR 31961 (June 5, 2008) ("*HRS/India*") and *Notice of Final Results of Antidumping Duty Administrative Review: Carbon and Certain Alloy Steel Wire Rod from Trinidad and Tobago*, 70 FR 12648 (March 15, 2005). Petitioners reference: Double Coin's SAQR, Double Coin's 2nd Supplemental ACD Response; Double Coin's SCQR; and Double Coin's Supplemental C&D Response.

Coin was calculated by subtracting the reported invoice date by the reported payment date, as is the standard practice when the invoice date is reported as the date of sale (as it is in the instant case for Double Coin's sales of merchandise from its U.S. warehouses). However, Petitioners correctly note that, for Double Coin's drop-shipped sales, the date of sale reported is different from the invoice date because CMA does not invoice the customer until the customer receives delivery.[212] Accordingly, to calculate the most accurate margin possible for the final results, we recalculated credit expenses for drop-shipped sales using the reported date of sale rather than the invoice date, consistent with, for example, *HRS/India* (June 5, 2008).[213]

**Comment 24: Calculation of Inventory Carrying Costs for Double Coin's Warehouse Sales**

Petitioners' Comments[214]

- An analysis of the inventory carrying cost ("ICC") information reported by Double Coin shows that the ICC methodology used by Double Coin's results in an average of 13.5 days in inventory for each tire sold.
- Petitioners assert that it is "unclear" why Double Coin did not employ the "typical" methodology employed by respondents that do not track inventory-in (*i.e.*, computing a ratio of the average inventory value during the POR to the total sales during the POR and then applying that ratio to the number of days in a year), but that – when employing this "typical" methodology – the average time in inventory is 290.6 days. Record evidence supports the use of this latter figure, and Petitioners urge the Department to recalculate ICC using this average 290.6 days in inventory figure for the final results.

Double Coin's Comments[215]

- Petitioners' claims run contrary to verified information on the record which demonstrates that products were sold from inventory more quickly than they were being replaced; as such, Double Coin's methodology is acceptable and appropriate.
- Double Coin notes that the calculation espoused by Petitioners (and resulting 290.6 average days in inventory figure) is incorrectly based on total sales information of both subject and non-subject tires. However, in applying Petitioners' methodology only to the movement of subject merchandise (*i.e.*, a negative monthly balance), results in negative average costs and suggests the existing calculation may, in fact, overstate ICCs.

**Department's Position:** Because CMA does not track the movement of individual tires into its warehouse, the inventory carrying cost calculation must necessarily rely on an estimate of average days in inventory. Accordingly, the Department must assess the reasonableness of Double Coin's estimate and whether Petitioners' suggested alternative is a more accurate or otherwise suitable estimate of average days in inventory.

---

212 *See* Double Coin's Supplemental C&D Response at 16-17 and 39-40.

213 *See* Double Coin's Final Analysis Memo (and Program Log at Attachment I thereto) for further details on this change.

214 *See* Petitioners' Case Brief at 30-31. Petitioners cite to their own analysis of the inventory carrying cost calculation provided at Exhibit 2 of the Case Brief. Petitioners reference: Double Coin's Verification Report and Double Coin's SCQR.

215 *See* Double Coin's Rebuttal Brief at 25-27. Double Coin references the following submissions: Double Coin's Verification Report and Petitioners' Case Brief.

As noted above and, in the verification report, CMA does not track individual tires to a specific shipment into their warehouses, and the accounting for warehouse inventory only tracks the quantity of a given product in and out of inventory.[216] Because they do not know when the first shipment of a tire that has gone out for sale came in, Double Coin utilized a last-in-first-out ("LIFO") method to estimate average days in inventory for reporting its inventory carrying costs because company officials know exactly when a tire went out for sale and exactly when the last instance of that type of tire came in to the warehouse.[217] As support for this method, CMA provided and Department officials reviewed documentation demonstrating that, for certain models of their larger selling tires, the inventory is moving out of inventory at a quicker pace than it is replaced.[218] As noted in our verification report and emphasized in Double Coin's rebuttal brief, our discussion with CMA officials and review of relevant documentation comported with information submitted to the record.[219]

Therefore, we previously found that the methodology used by Double Coin to determine average days in inventory is acceptable and verified that the relevant information was properly reported. Petitioners cite to no information and provide no reasoning as to why this methodology is unusable or unreliable. As such, we continue to find Double Coin's reported inventory carrying costs, based on CMA's LIFO method of estimating average days in inventory, to be acceptable and appropriate for use in these final results.

Petitioners request that the Department instead compute a ratio of the average inventory value during the POR to the total sales during the POR and then apply that ratio to the number of days in a year, arguing that this is the methodology typically employed by respondents that do not track inventory on a product specific basis. Petitioners further argue that record evidence supports the use of this latter figure, and that this methodology is a more accurate measure of days in inventory. First, though Petitioners claim that their suggested methodology is a more typical calculation, they cite to no precedent to support this claim. Furthermore, Petitioners reference no actual record evidence that supports the use of their proposed calculation, except to cite to a single note from CMA's financial statements that reference how inventory is valued for financial reporting purposes but provides no discussion of or insight into the calculation of days in inventory. Finally, aside from noting that Double Coin's methodology results in an average of 13.5 days in inventory and their own methodology results in an average of 290.6 days (with the implication that the large difference between these numbers, alone, represents *prima facie* evidence of the superiority of the latter figure), Petitioners provide no evidence or argument to support the contention that their calculation is more accurate or otherwise representative of Double Coin's commercial reality. As an initial matter, we find this argument insufficient to compel us to change the calculation. Moreover, as noted by Double Coin, this calculation is based on total sales and inventory values for all products both subject and non-subject. Therefore we do not find Petitioners' non-OTR-tire-specific calculation to be a more accurate estimation of the average days in inventory for subject merchandise than the calculation provided by Double Coin and used in the *Preliminary Results* (based on the LIFO movement of only subject OTR tires), and did not alter the ICC calculation for these final results.

---

[216] *See* Double Coin's Verification Report at 25-26 and US-VE 11.
[217] *Id*.
[218] *Id*. at US-VE 11.
[219] *Id*. at 26.

**Comment 25:  Differential Price Calculation**

Petitioners' Comments[220]
- The preliminary margin identified that over 23 percent of Double Coin's sales were price differentiated based on the quarterly comparison of prices.  However, a monthly comparison of prices increases the incidence of targeting to over 33 percent.
- The Department has historically relied upon domestic interested parties for the identification of targeted customers and time periods.  Recently, in *Shrimp/Thailand 11-12*, the Department modified time periods used for this analysis in response to comments from the domestic interested parties.  Accordingly, the Department should use month of sale as the measure of price differentiation for the final results.

Double Coin's Comments[221]
- Double Coin notes the Department's selected a quarterly basis for price analysis as a neutral and fair standard for evaluating differential pricing.  Absent a specific reason to change, the Department should refrain from departing from this reasonable standard.
- Petitioners provide no specific justification, based on market knowledge or otherwise, for switching the analysis from quarters to months.  Nor do they explain why this change is necessary for an analysis of Double Coin's sales, but not requested for other respondents.
- Third, even under monthly analysis, the percentage passing the Cohen's d test remains low and does not justify departure from average-to-average comparisons.

**Department's Position:**  As noted by Petitioners, historically, the Department required an allegation of targeted dumping prior to employing a differential pricing analysis and looked to domestic interested parties as a starting point for information on the appropriate parameters

---

[220] *See* Petitioners' Case Brief at 31-35.  Petitioners cite:  *Differential Pricing Analysis: Request for Comments*, 79 FR 26720 (May 9, 2014) ("*Differential Pricing Comment Request*"); *Strip From the United Arab Emirates: Final Results of Antidumping Duty Administrative Review; 2010-2011*, 78 FR 29700 (May 21, 2013) ("*PET Film/ UAE 10-11*"); *Withdrawal of the Regulatory Provisions Governing Targeted Dumping in Antidumping Duty Investigations*, 73 FR 74930 (December 10, 2008); *Certain Frozen Warmwater Shrimp From Thailand:  Final Results of Antidumping Duty Administrative Review, Partial Rescission of Review, and Revocation of Order (in Part); 2011-2012*, 78 FR 42497 (July 16, 2013) ("*Shrimp/Thailand 11-12*"); *Polyethylene Terephthalate Film, Sheet, and Notice of Final Determination of Sales at Less Than Fair Value: Large Residential Washers From the Republic of Korea*, 77 FR 75988 (December 26, 2012); *Notice of Final Determination of Sales at Less Than Fair Value and Affirmative Critical Circumstances Determination:  Bottom Mount Combination Refrigerator-Freezers From Mexico*, 77 FR 17422 (March 26, 2012) ("*Refrigerators/Mexico*"); *Antidumping Proceedings:  Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings; Final Modification*, 77 FR 8101 (February 14, 2012); *Certain Steel Nails from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 FR 33977 (June 16, 2008); *Certain Steel Nails from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 FR 33977 (June 16, 2008); *Certain Steel Nails from the United Arab Emirates:  Notice of Final Determination of Sales at Not Less Than Fair Value*, 73 FR 33985 (June 16, 2008); *Antidumping Duties; Countervailing Duties*, 62 FR 27295 (May 19, 1997); and their own differential pricing analysis provided at Exhibit 3 to the Case Brief.  Petitioners reference Double Coin's Preliminary Analysis Memo.
[221] *See* Double Coin's Rebuttal Brief at 28-30.  Double Coin cites to the *Differential Pricing Comment Request* (May 9, 2014) and references the following submissions:  PDM and Petitioners' Case Brief.

examined in the resulting analysis.[222] Indeed, the Department cited the domestic industry's product expertise and intimate market knowledge as the basis for the deference given to said parties in establishing the analytical criterion on a case to case basis (*e.g.*, the effects of specific time periods on pricing in the U.S. market).[223] Accordingly, in order to properly focus its analysis in past cases where targeting was alleged, the Department would modify the time periods it examines for targeted dumping based on a domestic party's allegations.[224]

More recently, however, the Department adopted a standard price whereby a differentiation analysis is conducted automatically in each margin program to evaluate the incidence and prevalence of targeted dumping.[225] In adopting this regular methodology, the Department established quarterly time periods as the baseline standards for temporal analysis.[226] Additionally, the Department stated that in the context of ongoing and future proceedings, parties to the particular proceeding will have an opportunity to provide comments that are relevant to the possible use of an alternative comparison method in that proceeding.[227]

We find, however, that, Petitioners provide no concerns with respect to the standard quarterly analysis and cite to no evidence supporting the use of a monthly analysis. Indeed, the only reasoning underlying Petitioners' request appears to be that it would increase the incidence of differential pricing for Double Coin. Petitioners, however, do not request the Department to make this change for the other respondent examined in this review, where a monthly analysis would, presumably, have little effect on the incidence of differential pricing. We find this results-based argument insufficient and, in fact, contrary to the principles underlying the Department's historical deference to domestic parties' market knowledge in cases involving price targeting.

As further support for their request, Petitioners note that in the recent *Shrimp/Thailand 11-12* (July 16, 2013) case, the Department had indeed changed the periods it examined for the final results in a review when a domestic party alleged that different periods resulted in a sufficient showing of a pattern of prices. First, we note that this *Shrimp/Thailand 11-12* (July 16, 2013) case was decided prior to the adoption of the new differential pricing methodology pursuant to the *Differential Pricing Comment Request* (May 9, 2014). Second, while Petitioners are correct that the Department indeed agreed with the domestic party's request to modify the time periods for analysis (and, as in this case, did not cite any specific market knowledge or expertise), the Department's determination to modify the time periods in *Shrimp/Thailand 11-12* (July 16, 2013) simply reflected the Department's agreement with the petitioner that the monthly analysis of pricing employed in the preliminary results was inconsistent with the quarterly analysis initially requested by Petitioners under the former methodology, and thus found the requested quarterly basis to be the appropriate standard for the final results. As such, rather than exemplifying the extent of the deference given to domestic parties by the Department with respect to requests involving differential pricing, the *Shrimp/Thailand 11-12* (July 16, 2013) case

---

[222] *See*, *e.g.*, *PET Film/UAE 10-11* (May 21, 2013) and accompanying IDM at 2-4.
[223] *See Antidumping Duties; Countervailing Duties*, 62 FR 27295 (May 19, 1997)
[224] *See*, *e.g.*, *Refrigerators/Mexico* (March 26, 2012) and accompanying IDM at Comment 16.
[225] *See Differential Pricing Comment Request* (May 9, 2014).
[226] *Id.*, 79 FR at 26720 (May 9, 2014) ("Time periods are defined by the quarter within the period of investigation or administrative review based upon the reported date of sale.").
[227] *Id.*, 79 FR at 26722 (May 9, 2014).

represents a standard correction of an inadvertent error. Further, in changing the standard from a monthly analysis back to a quarterly one, *Shrimp/Thailand 11-12* (July 16, 2013) demonstrates exactly the opposite fact pattern and result than is advocated by Petitioners in the instant case.

As noted above, Petitioners provide no justification as to why a monthly analysis would be superior to existing analysis, based on market expertise or relevant knowledge otherwise, aside from the simple fact that it would increase the incidence of Double Coin's targeted sales above the minimum threshold. We find this insufficient reasoning to deviate from the standard quarterly analysis, and continue to employ the quarterly analysis for these final results. Accordingly, the differential pricing analysis continues to not confirm the existence of a pattern of prices for comparable merchandise that differ significantly among purchasers, regions, or time periods and, therefore, we continue to use the average-to-average ("A-A") method to calculate the weighted-average dumping margin for Double Coin's reported sales.[228]

**RECOMMENDATION**

Based on our analysis of the comments received, we recommend adopting the above positions. If this recommendation is accepted, we will publish the final results of the review and the final weighted-average dumping margins in the *Federal Register*.

Agree ✓ Disagree _____

Ronald K. Lorentzen

Ronald K. Lorentzen
Acting Assistant Secretary
for Enforcement and Compliance

April 8, 2015

Date

[228] *See* Double Coin's Final Analysis Memo at Attachment II.

Bahrain is not circumventing the order of PET Film from the UAE,[1] pursuant to section 781(b) of the Tariff Act of 1930, as amended (the Act).

**DATES:** *Effective:* May 7, 2015.

**FOR FURTHER INFORMATION CONTACT:** Andrew Huston, AD/CVD Operations, Office VII, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230; telephone: (202) 482–4261.

**SUPPLEMENTARY INFORMATION:**

### Scope of the Order

The products covered by the order are all gauges of raw, pre-treated, or primed polyethylene terephthalate film, whether extruded or co-extruded. Excluded are metallized films and other finished films that have had at least one of their surfaces modified by the application of a performance-enhancing resinous or inorganic layer more than 0.00001 inches thick. Also excluded is roller transport cleaning film which has at least one of its surfaces modified by application of 0.5 micrometers of SBR latex. Tracing and drafting film is also excluded. Polyethylene terephthalate film is classifiable under subheading 3920.62.00.90 of the Harmonized Tariff Schedule of the United States (HTSUS). While HTSUS subheadings are provided for convenience and customs purposes, our written description of the scope of the order is dispositive.[2]

### Scope of the Anti-Circumvention Inquiry

This anti-circumvention inquiry covers PET Film produced in Bahrain by JBF Bahrain from inputs (PET chips and silica chips) manufactured in the UAE, and that is subsequently exported from Bahrain to the United States.

### Methodology

The Department has conducted this preliminary determination of circumvention in accordance with section 781(b) of the Act and 19 CFR 351.225(h). For a full description of the methodology underlying our conclusions, *see* the Preliminary Decision Memorandum.[3] The Preliminary Decision Memorandum is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (''ACCESS''). ACCESS is available to registered users at *http://access.trade.gov,* and it is available to all parties in the Central Records Unit in room 7046 of the main Commerce building. In addition, a complete version of the Preliminary Decision Memorandum can be accessed directly at *http://enforcement.trade.gov/frn/.* The signed Preliminary Decision Memorandum and electronic versions of the Preliminary Decision Memorandum are identical in content.

### Preliminary Findings

As detailed in the Preliminary Decision Memorandum, the Department has preliminarily determined that the process of completion or assembly of PET Film produced by JBF Bahrain is not minor or insignificant, pursuant to section 781(b)(2) of the Act, nor is the value of the merchandise produced in the UAE a significant portion of the value of PET film exported from Bahrain to the United States, pursuant to section 781(b)(1)(D) of the Act. Therefore, the Department preliminarily determines that PET Film produced by JBF Bahrain in Bahrain using inputs from the UAE, and exported from Bahrain to the United States, is not circumventing the *Order.*

### Public Comment

The Department intends to disclose the analysis used in these preliminary findings within five days of publication of this notice. Interested parties are invited to comment on the preliminary results of this review. Pursuant to 19 CFR 351.309(b)(2), interested parties may submit case briefs not later than 30 days after the date of publication of this notice. Rebuttal briefs, limited to issues raised in the case briefs, may not be filed later than five days after the time limit for filing case briefs.[4] Case and rebuttal briefs, when submitted, must comport with the requirements contained in 19 CPR 351.309(c)(2) and (d)(2).

Any interested party who wishes to request a hearing, or to participate if one is requested, must submit a written request to the Assistant Secretary for Enforcement and Compliance within 30 days after the day of publication of this notice pursuant to 19 CFR 351.310(c). A request should contain: (1) The party's name, address, and telephone number; (2) the number of participants; and (3) a list of issues to be discussed.[5] Issues raised in the hearing will be limited to those raised in case briefs.

### Final Determination

According to 19 CFR 351.225(f)(5), the Department will normally issue a final scope ruling in a circumvention inquiry within 300 days of the date of the initiation inquiry. Because of the extensive cost, investment, and research and development information required for this analysis from JBF, the Department is extending the deadline for the final ruling in this inquiry. The final determination with respect to this anti-circumvention inquiry, including results of the Department's analysis of any written comments, will be issued no later than July 31, 2015.

This preliminary negative circumvention determination is published in accordance with section 781(b) of the Act and 19 CFR 351.225.

Dated: May 1, 2015.

**Paul Piquado,**

*Assistant Secretary for Enforcement and Compliance.*

### Appendix—List of Topics Discussed in the Preliminary Decision Memorandum

1. Summary
2. Background
3. Scope of the Order
4. Scope of the Anticircumvention Inquiry
5. Statutory Framework
6. Statutory Analysis
7. Summary of Statutory Analysis

[FR Doc. 2015–11085 Filed 5–6–15; 8:45 am]

BILLING CODE 3510–DS–P

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

**[A–570–912]**

## Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review; 2012–2013

**AGENCY:** Enforcement and Compliance, International Trade Administration, Commerce.

**SUMMARY:** The Department of Commerce (''Department'') is amending the *Final Results*[1] of the administrative review of

---

[1] *See Polyethylene Terephthalate Film, Sheet, and Strip From Brazil, the People's Republic of China and the United Arab Emirates: Antidumping Duty Orders and Amended Final Determination of Sales at Less Than Fair Value for the United Arab Emirates,* 73 FR 66595 (November 10, 2008) (*Order*).

[2] *See* Memorandum to Paul Piquado, Assistant Secretary for Enforcement and Compliance, from Christian Marsh, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, ''Preliminary Decision Memorandum for Anti-circumvention Inquiry of the Antidumping Duty Order on Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates'' (Preliminary Decision Memorandum), dated concurrently with these results and herby adopted by this notice.

[3] *Id.*

[4] *See* 19 CFR 351.309(d)(1).

[5] *See* 19 CFR 351.310(c).

[1] *See Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012–2013,* 80 FR 20197 (April 15, 2015) (''*Final Results*'') and accompanying Memorandum from

the antidumping duty order on certain new pneumatic off-the-road tires (''OTR Tires'') from the People's Republic of China (''PRC'') to correct a ministerial error. The period of review (''POR'') is September 1, 2012, through August 31, 2013.

**DATES:** *Effective:* May 7, 2015.

**FOR FURTHER INFORMATION CONTACT:** Andrew Medley, AD/CVD Operations, Office III, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230; telephone 202–482–4987.

**SUPPLEMENTARY INFORMATION:**

## Background

On April 10, 2015, the Department disclosed to interested parties its calculations for the *Final Results.*[2] On April 15, 2015, we received a ministerial error allegation from Petitioners[3] regarding the Department's margin calculation for Guizhou Tyre Co., Ltd./Guizhou Tyre Import and Export Co., Ltd. (collectively, ''GTC'').[4]

## Scope of the Order

The merchandise covered by this order includes new pneumatic tires designed for off-the-road and off-highway use, subject to certain exceptions. The subject merchandise is currently classifiable under Harmonized Tariff Schedule of the United States (''HTSUS'') subheadings: 4011.20.10.25, 4011.20.10.35, 4011.20.50.30, 4011.20.50.50, 4011.61.00.00, 4011.62.00.00, 4011.63.00.00, 4011.69.00.00, 4011.92.00.00, 4011.93.40.00, 4011.93.80.00, 4011.94.40.00, and 4011.94.80.00. The HTSUS subheadings are provided for convenience and customs purposes only; the written product description of the scope of the order is dispositive.[5]

## Ministerial Error

Section 751(h) of the Tariff Act of 1930, as amended (''the Act''), and 19 CFR 351.224(f) define a ''ministerial error'' as an error ''in addition, subtraction, or other arithmetic function, clerical error resulting from inaccurate copying, duplication, or the like, and any similar type of unintentional error which the Secretary considers ministerial.'' We analyzed Petitioners' ministerial error comments and determined, in accordance with section 751(h) of the Act and 19 CFR 351.224(e), that we made a ministerial error in our calculation of GTC's margin for the *Final Results* by inadvertently neglecting to include two of GTC's inputs in the total material cost buildup for normal value.[6]

In accordance with section 751(h) of the Act and 19 CFR 351.224(e), we are amending the *Final Results.*[7] The revised weighted-average dumping margins are detailed below.

## Amended Final Results

As a result of correcting this ministerial error, we determine that the following weighted-average dumping margins exist for the POR:

| Exporter | Weighted average dumping margin (percent) |
|---|---|
| Guizhou Tyre Co., Ltd./Guizhou Tyre Import and Export Co., Ltd | 11.41 |
| Zhongce Rubber Group Company Limited | 11.41 |
| Weihai Zhongwei Rubber Co., Ltd | 11.41 |
| PRC-Wide Entity[8] | 105.31 |

## Assessment Rates

The Department shall determine, and the U.S. Customs and Border Protection (''CBP'') shall assess, antidumping duties on all appropriate entries covered by this review pursuant to section 751(a)(2)(C) of the Act and 19 CFR 351.212(b).[9] The Department intends to issue assessment instructions to CBP 15 days after the date of publication of these amended final results of review.

For customers or importers of GTC for which we do not have entered value, we calculated importer- (or customer-) specific antidumping duty assessment amounts based on the ratio of the total amount of dumping duties calculated for the examined sales of subject merchandise to the total sales quantity of those same sales.[10] For customers or importers of GTC for which we received entered-value information, we have calculated importer- (or customer-) specific antidumping duty assessment rates based on importer- (or customer-) specific *ad valorem* rates.[11] For the non-examined separate rate companies, we will instruct CBP to liquidate all appropriate entries at 11.41 percent. For the PRC-wide entity, including Double Coin, we will instruct CBP to liquidate all appropriate entries at 105.31 percent.

Consistent with the Department's assessment practice in non-market economy cases,[12] for entries that were not reported in the U.S. sales databases submitted by companies individually examined during this review, the Department will instruct CBP to liquidate such entries at the PRC-wide rate. In addition, if the Department determines that an exporter under review had no shipments of subject merchandise, any suspended entries that entered under that exporter's case number (*i.e.,* at that exporter's rate) will be liquidated at the PRC-wide rate.

## Cash Deposit Requirements

The following cash deposit requirements will be effective for all shipments of the subject merchandise entered, or withdrawn from warehouse, for consumption on or after the publication date of the amended final results of this administrative review, as provided by section 751(a)(2)(C) of the Act: (1) For the exporters listed above, the cash deposit rate will be equal to the weighted-average dumping margin identified in the ''Amended Final Results'' section; (2) for previously

Christian Marsh, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, to Ronald K. Lorentzen, Acting Assistant Secretary for Enforcement and Compliance, titled ''Issues and Decision Memorandum for Final Results of Antidumping Duty Administrative Review: Certain New Pneumatic Off-the-Road Tires from the People's Republic of China; 2012–2013'' (''Issues and Decision Memorandum'').

[2] *See* Memorandum, ''2012–2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Disclosure of Calculations for Final Results,'' dated April 10, 2015.

[3] Titan Tire Corporation and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL–CIO–CLC (collectively, ''Petitioners'').

[4] *See* Letter from the Petitioners to the Department, titled ''Administrative Review of the Antidumping Duty Order on New Pneumatic Off-The-Road Tires from China (A–570–912): Petitioners' Clerical Error Comments, GTC,'' dated April 15, 2015. *See also* Memorandum to the File, titled ''2012–2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Analysis of the Final Results Margin Calculation for Guizhou Tyre Co., Ltd.,'' dated April 8, 2015 (''GTC's Analysis Memorandum'').

[5] For a complete description of the scope of the order, *see* Issues and Decision Memorandum.

[6] *See* GTC's Analysis Memorandum at Attachment I.

[7] *See* Memorandum to Melissa G. Skinner, Director, AD/CVD Operations, Office III, titled ''2012–2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Ministerial Error Allegation for the Final Results,'' dated concurrently with this notice.

[8] The PRC-Wide Entity includes Double Coin Holdings Ltd. (''Double Coin'').

[9] *See Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings; Final Modification,* 77 FR 8103 (February 14, 2012) (''*NME Antidumping Proceedings*'').

[10] *See* 19 CFR 351.212(b)(1).

[11] *Id.*

[12] *See Non-Market Economy Antidumping Proceedings: Assessment of Antidumping Duties,* 76 FR 65694 (October 24, 2011).

investigated or reviewed PRC and non-PRC exporters that are not under review in this segment of the proceeding but that received a separate rate in a previous segment, the cash deposit rate will continue to be the exporter-specific rate (or exporter-producer chain rate) published for the most recently completed segment of this proceeding; (3) for all PRC exporters of subject merchandise which have not been found to be entitled to a separate rate, the cash deposit rate will be the PRC-wide rate of 105.31 percent; [13] and (4) for all non-PRC exporters of subject merchandise which have not received their own rate, the cash deposit rate will be the rate applicable to the PRC exporter(s) that supplied that non-PRC exporter. The cash deposit requirements, when imposed, shall remain in effect until further notice.

**Notification to Importers**

This notice serves as a final reminder to importers of their responsibility under 19 CFR 351.402(f)(2) to file a certificate regarding the reimbursement of antidumping and/or countervailing duties prior to liquidation of the relevant entries during this review period. Failure to comply with this requirement could result in the Secretary's presumption that reimbursement of the antidumping and/or countervailing duties occurred and the subsequent assessment of double antidumping duties.

**Notification to Interested Parties**

This notice also serves as a reminder to parties subject to administrative protective order (''APO'') of their responsibility concerning the return or destruction of proprietary information disclosed under the APO in accordance with 19 CFR 351.305(a)(3), which continues to govern business proprietary information in this segment of the proceeding. Timely written notification of the return/destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and terms of an APO is a violation which is subject to sanction.

**Disclosure**

We will disclose the calculations performed for these amended final results to interested parties within five days of the date of publication of this notice in accordance with 19 CFR 351.224(b).

[13] In the ''Cash Deposit Requirements'' section of the *Final Results,* the Department inadvertently listed the PRC-wide cash deposit rate as 105.24 percent. The correct PRC-wide cash deposit rate is 105.31 percent.

These amended final results of review are issued and published in accordance with section 751(h) of the Tariff Act of 1930 Act and 19 CFR 351.224(f).

Dated: May 1, 2015.

**Paul Piquado,**

*Assistant Secretary for Enforcement and Compliance.*

[FR Doc. 2015–11086 Filed 5–6–15; 8:45 am]

BILLING CODE 3510–DS–P

## DEPARTMENT OF COMMERCE

### International Trade Administration

### Advisory Committee on Supply Chain Competitiveness: Notice of Public Meetings

**AGENCY:** International Trade Administration, U.S. Department of Commerce.

**ACTION:** Notice of open meetings.

**SUMMARY:** This notice sets forth the schedule and proposed topics of discussion for public meetings of the Advisory Committee on Supply Chain Competitiveness (Committee).

**DATES:** This conference call meeting will be held on May 21, 2015, from 10:00 a.m. to 11:00 a.m., Eastern Standard Time (EST).

*Call In Information:* The conference call will have webinar capabilities. Participants can join the event directly at: *https://www.mymeetings.com/nc/join.php?i=PW3670392&p=4490607&t=c.* For those whose computers are compatible to the webinar system, this will give you both the ability to look at the document and hear the conversations of the meeting participants. For those that do not hear the audio from this site, you will have to call 1–877–951–7311 and input the passcode: 4490607 for audio.

**FOR FURTHER INFORMATION CONTACT:** Richard Boll, Office of Supply Chain, Professional & Business Services, International Trade Administration. (Phone: (202) 482–1135 or Email: *richard.boll@trade.gov*)

**SUPPLEMENTARY INFORMATION:**

**Background**

The Committee was established under the discretionary authority of the Secretary of Commerce and in accordance with the Federal Advisory Committee Act (5 U.S.C. App. 2). It provides advice to the Secretary of Commerce on the necessary elements of a comprehensive policy approach to supply chain competitiveness designed to support U.S. export growth and national economic competitiveness, encourage innovation, facilitate the movement of goods, and improve the competitiveness of U.S. supply chains for goods and services in the domestic and global economy; and provides advice to the Secretary on regulatory policies and programs and investment priorities that affect the competitiveness of U.S. supply chains. For more information about the Committee visit: *http://trade.gov/td/services/oscpb/supplychain/acscc/.*

**Matters To Be Considered**

Committee members are expected to deliberate and vote on the Trade and Competitiveness subcommittee's recommendation to Secretary Pritzker, which generally urges the Administration to expand market access for U.S. firms to international markets, implement the WTO Trade Facilitation Agreement (TFA), support customs trade transformation initiatives, and ensure our trading partners' compliance with our trade agreements. This recommendation, available at: *http://trade.gov/td/services/oscpb/supplychain/acscc/documents/May%2021%202015%20Conf%20Call/ACSCC%20trade%20ltr%20to%20SPP%20TC%20Subcomm.pdf,* has been reviewed and discussed over the last several open meetings of the ACSCC, most recently at the April 16 meeting. The Office of Supply Chain, Professional & Business Services will post the final agenda and the recommendation on its Web site at least one week prior to the meeting. The conference call will be open to the public and press on a first-come, first-served basis. Access lines are limited. The minutes of the meetings will be posted on the Committee Web site within 60 days of the meeting.

Dated: May 1, 2015.

**David Long,**

*Director, Office of Supply Chain, Professional & Business Services.*

[FR Doc. 2015–11073 Filed 5–6–15; 8:45 am]

BILLING CODE 3510–DR–P

## DEPARTMENT OF COMMERCE

### National Oceanic and Atmospheric Administration

**RIN 0648–XD925**

### Mid-Atlantic Fishery Management Council (MAFMC); Fisheries of the Northeastern United States; Public Meeting.

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Notice; public meeting.



UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-912
AR: 09/01/12 - 8/31/13
**Public Document**
E&C AD/CVD OIII: BCQ/AMM

April 8, 2015

**MEMORANDUM TO:** Ronald K. Lorentzen
Acting Assistant Secretary
for Enforcement and Compliance

**FROM:** Christian Marsh
Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations

**SUBJECT:** Issues and Decision Memorandum for Final Results of Antidumping Duty Administrative Review: Certain New Pneumatic Off-the-Road Tires from the People's Republic of China; 2012-2013

---

## SUMMARY

The Department of Commerce ("Department") analyzed the case and rebuttal briefs of interested parties in the fifth administrative review of the antidumping duty ("AD") order on certain new pneumatic off-the-road tires ("OTR Tires") from the People's Republic of China ("PRC") for the period of review ("POR") September 1, 2012, through August 30, 2013. The review covers the following exporters of subject merchandise: mandatory respondents Double Coin Holdings Ltd. ("Double Coin")[1] and Guizhou Tyre Co., Ltd. / Guizhou Tyre Import and Export Co., Ltd. (collectively, "GTC");[2] separate rates applicants Zhongce Rubber Group Company Limited

[1] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part*, 78 FR 67104, 67108 (November 8, 2013) ("*Initiation Notice*"). The review was initiated on Double Coin Group Rugao Tyre Co., Ltd. – renamed Double Coin Group Jiangsu Tyre Co., Ltd. – ("DC Rugao/Jiangsu"), Double Coin Group Shanghai Donghai Tyre Co., Ltd. ("DC Donghai"), and Double Coin Holdings, Ltd. ("DCH" or "Double Coin"). The respondent in this review is DCH, which exported all subject merchandise produced by both its wholly-owned and affiliated factories during the POR. We collapsed DCH (including its Shanghai Heavy Tire factory), DC Rugao/Jiangsu, and DC Donghai into a single entity for the purposes of this review. *See* Memorandum to the File, entitled, "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Double Coin Affiliation and Collapsing Memorandum," dated September 30, 2014 ("Double Coin Affiliation and Collapsing Memo"). Our collapsing determination remains unchallenged and unchanged for these final results. The China Manufacturers' Alliance ("CMA") is DCH's U.S. sales affiliate for all POR sales, and provided and certified to relevant and requested sales-related information on behalf of the respondent. *See* Double Coin Affiliation and Collapsing Memo. Accordingly, for ease of reference we use "Double Coin" to collectively refer to each of the above-mentioned production, export, and sales entities that comprise the respondent in this review, but note that DCH is the actual exporter-respondent.

[2] *See Initiation Notice*. The review was initiated on Guizhou Advance Rubber Co., Ltd. ("GAR"), Guizhou Tyre Co., Ltd., and Guizhou Tyre Import and Export Co., Ltd. *See* Letter from GTC, entitled, "Section A Response: Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated January 29, 2014 ("GTC's SAQR"). These three companies were collapsed

Filed By: Andrew Medley, Filed Date: 4/9/15 12:19 PM, Submission Status: Approved

("Zhongce") and Weihai Zhongwei Rubber Co., Ltd.; and Trelleborg Wheel System (Xingtai) China, Co. Ltd. ("Trelleborg" or "TWS Xingtai"). We recommend that you approve the positions we developed in the "Discussion of the Issues" section of this memorandum.

**BACKGROUND**

On September 30, 2014, the Department published the *Preliminary Results* of this administrative review.[3] At that time, the Department invited interested parties to comment on the *Preliminary Results*.[4]

On December 11, 2014, the Department received timely filed case briefs from Double Coin,[5] GTC,[6] and Titan Tire Corporation and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("Petitioners").[7] Trelleborg provided a timely filed rebuttal brief on December 19, 2014.[8] On December 23, 2014, the Department received timely filed rebuttal briefs from Petitioners,[9] Double Coin,[10] GTC,[11] and Zhongce.[12]

---

into a collective entity, "GTC," in the investigation. *See Certain New Pneumatic Off-The-Road Tires From the People's Republic of China; Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 73 FR 9278, 9283 (February 20, 2008), unchanged in *Certain New Pneumatic Off-The-Road Tires from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 FR 40485 (July 15, 2008). As such, we refer to the respondent, collectively, as "GTC" throughout this memorandum.

[3] *See Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2012–2013*, 79 FR 61291 (October 10, 2014) ("*Preliminary Results*") and accompanying memorandum to Paul Piquado, entitled "Decision Memorandum for Preliminary Results of Antidumping Duty Administrative Review: Certain New Pneumatic Off-the-Road Tires from the People's Republic of China; 2012-2013," dated September 30, 2014 ("PDM").

[4] *See Preliminary Results*, 79 FR at 61291.

[5] *See* Letter from Double Coin entitled, "Case Brief of Double Coin Holdings and China Manufacturers Alliance Certain New Pneumatic Off-the-Road Tires from China," dated December 11, 2014 ("Double Coin's Case Brief").

[6] *See* Letter from GTC entitled, "GTC Direct Case Brief: Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated December 11, 2014 ("GTC's Case Brief").

[7] *See* Letter from Petitioners entitled, "Case Brief Of Titan Tire Corporation And The United Steel, Paper And Forestry, Rubber, Manufacturing, Energy, Allied Industrial And Service Workers International Union, AFL-CIO, CLC," dated December 11, 2014 ("Petitioners' Case Brief").

[8] *See* Letter from Trelleborg entitled, "Trelleborg Wheel Systems (Xingtai) Co. Ltd.'s Rebuttal Brief in the 12/13 Administrative Review of New Pneumatic Off-The-Road Tires from the People's Republic of China," dated December 18, 2014 ("Trelleborg's Rebuttal").

[9] *See* Letter from Petitioners entitled, "Rebuttal Brief Of Titan Tire Corporation And The United Steel, Paper And Forestry, Rubber, Manufacturing, Energy, Allied Industrial And Service Workers International Union, AFL-CIO, CLC," dated December 23, 2014 ("Petitioners' Rebuttal Brief").

[10] *See* Letter from Double Coin entitled, "Rebuttal Brief of Double Coin Holdings and China Manufacturers Alliance Certain New Pneumatic Off-the-Road Tires from China," dated December 23, 2014 ("Double Coin's Rebuttal Brief").

[11] *See* Letter from GTC entitled, "GTC Rebuttal Case Brief: Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated December 23, 2014 ("GTC's Rebuttal Brief").

[12] *See* Letter from Zhongce entitled, "Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Rebuttal Brief of Zhongce Rubber Group Company Limited," dated December 23, 2014 ("Zhongce's Rebuttal").

On December 30, 2014, the Department extended the deadline for the final results until April 8, 2015.[13] In accordance with timely requests from parties, the Department conducted a hearing on February 25, 2015.[14]

**SCOPE OF THE ORDER**

The products covered by the order are new pneumatic tires designed for off-the-road and off-highway use, subject to exceptions identified below. Certain OTR tires are generally designed, manufactured and offered for sale for use on off-road or off-highway surfaces, including but not limited to, agricultural fields, forests, construction sites, factory and warehouse interiors, airport tarmacs, ports and harbors, mines, quarries, gravel yards, and steel mills. The vehicles and equipment for which certain OTR tires are designed for use include, but are not limited to: (1) agricultural and forestry vehicles and equipment, including agricultural tractors,[15] combine harvesters,[16] agricultural high clearance sprayers,[17] industrial tractors,[18] log-skidders,[19] agricultural implements, highway-towed implements, agricultural logging, and agricultural, industrial, skid-steers/mini-loaders;[20] (2) construction vehicles and equipment, including earthmover articulated dump products, rigid frame haul trucks,[21] front end loaders,[22] dozers,[23] lift trucks, straddle carriers,[24] graders,[25] mobile cranes,[26] compactors; and (3) industrial vehicles and equipment, including smooth floor, industrial, mining, counterbalanced lift trucks, industrial and mining vehicles other than smooth floor, skid-steers/mini-loaders, and smooth floor off-the-road counterbalanced lift trucks. The foregoing list of vehicles and equipment generally have in common that they are used for hauling, towing, lifting, and/or loading a wide variety of

---

[13] *See* "Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Extension of Deadline for Final Results of Antidumping Duty Administrative Review," dated December 30, 2014.
[14] *See* "Hearing Transcript," filed onto the record by Lisa Dennis Court Reporting on March 25, 2015.
[15] Agricultural tractors are dual-axle vehicles that typically are designed to pull farming equipment in the field and that may have front tires of a different size than the rear tires.
[16] Combine harvesters are used to harvest crops such as corn or wheat.
[17] Agricultural sprayers are used to irrigate agricultural fields
[18] Industrial tractors are dual-axle vehicles that typically are designed to pull industrial equipment and that may have front tires of a different size than the rear tires.
[19] A log-skidder has a grappling lift arm that is used to grasp, lift and move trees that have been cut down to a truck or trailer for transport to a mill or other destination.
[20] Skid-steer loaders are four-wheel drive vehicles with the left-side drive wheels independent of the right-side drive wheels and lift arms that lie alongside the driver with the major pivot points behind the driver's shoulders. Skid-steer loaders are used in agricultural, construction and industrial settings.
[21] Haul trucks, which may be either rigid frame or articulated (*i.e.*, able to bend in the middle) are typically used in mines, quarries and construction sites to haul soil, aggregate, mined ore, or debris.
[22] Front loaders have lift arms in front of the vehicle. They can scrape material from one location to another, carry material in their buckets, or load material into a truck or trailer.
[23] A dozer is a large four-wheeled vehicle with a dozer blade that is used to push large quantities of soil, sand, rubble, *etc.*, typically around construction sites. They can also be used to perform "rough grading" in road construction.
[24] A straddle carrier is a rigid frame, engine-powered machine that is used to load and offload containers from container vessels and load them onto (or off of) tractor trailers.
[25] A grader is a vehicle with a large blade used to create a flat surface. Graders are typically used to perform "finish grading." Graders are commonly used in maintenance of unpaved roads and road construction to prepare the base course on to which asphalt or other paving material will be laid.
[26] *I.e.,* "on-site" mobile cranes designed for off-highway use.

equipment and materials in agricultural, construction and industrial settings.  Such vehicles and equipment, and the descriptions contained in the footnotes are illustrative of the types of vehicles and equipment that use certain OTR tires, but are not necessarily all-inclusive.  While the physical characteristics of certain OTR tires will vary depending on the specific applications and conditions for which the tires are designed (*e.g.*, tread pattern and depth), all of the tires within the scope have in common that they are designed for off-road and off-highway use.  Except as discussed below, OTR tires included in the scope of the order range in size (rim diameter) generally but not exclusively from 8 inches to 54 inches.  The tires may be either tube-type[27] or tubeless, radial or non-radial, and intended for sale either to original equipment manufacturers or the replacement market.  The subject merchandise is currently classifiable under Harmonized Tariff Schedule of the United States ("HTSUS") subheadings:  4011.20.10.25, 4011.20.10.35, 4011.20.50.30, 4011.20.50.50, 4011.61.00.00, 4011.62.00.00, 4011.63.00.00, 4011.69.00.00, 4011.92.00.00, 4011.93.40.00, 4011.93.80.00, 4011.94.40.00, and 4011.94.80.00.  While HTSUS subheadings are provided for convenience and customs purposes, our written description of the scope is dispositive.

Specifically excluded from the scope are new pneumatic tires designed, manufactured and offered for sale primarily for on-highway or on-road use, including passenger cars, race cars, station wagons, sport utility vehicles, minivans, mobile homes, motorcycles, bicycles, on-road or on-highway trailers, light trucks, and trucks and buses.  Such tires generally have in common that the symbol "DOT" must appear on the sidewall, certifying that the tire conforms to applicable motor vehicle safety standards. Such excluded tires may also have the following designations that are used by the Tire and Rim Association:

Prefix letter designations:
- P - Identifies a tire intended primarily for service on passenger cars;
- LT - Identifies a tire intended primarily for service on light trucks; and,
- ST - Identifies a special tire for trailers in highway service.

Suffix letter designations:
- TR - Identifies a tire for service on trucks, buses, and other vehicles with rims having specified rim diameter of nominal plus 0.156" or plus 0.250";
- MH - Identifies tires for Mobile Homes;
- HC - Identifies a heavy duty tire designated for use on "HC" 15" tapered rims used on trucks, buses, and other vehicles.  This suffix is intended to differentiate among tires for light trucks, and other vehicles or other services, which use a similar designation.
- Example: 8R17.5 LT, 8R17.5 HC;
- LT - Identifies light truck tires for service on trucks, buses, trailers, and multipurpose passenger vehicles used in nominal highway service; and
- MC - Identifies tires and rims for motorcycles.

---

[27] While tube-type tires are subject to the scope of this proceeding, tubes and flaps are not subject merchandise and therefore are not covered by the scope of this proceeding, regardless of the manner in which they are sold (*e.g.,* sold with or separately from subject merchandise).

The following types of tires are also excluded from the scope: pneumatic tires that are not new, including recycled or retreaded tires and used tires; non-pneumatic tires, including solid rubber tires; tires of a kind designed for use on aircraft, all-terrain vehicles, and vehicles for turf, lawn and garden, golf and trailer applications. Also excluded from the scope are radial and bias tires of a kind designed for use in mining and construction vehicles and equipment that have a rim diameter equal to or exceeding 39 inches. Such tires may be distinguished from other tires of similar size by the number of plies that the construction and mining tires contain (minimum of 16) and the weight of such tires (minimum 1500 pounds).

## DISCUSSION OF THE ISSUES

### Comment 1: Whether to Include Double Coin in the PRC-Wide Entity and Adjust the Entity Rate

Double Coin's Brief[28]

[28] *See* Double Coin's Case Brief at 9-58. In support of its arguments, Double Coin cites to: *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1331(Fed. Cir. 2011); *Transcom, Inc. v. United States*, 182 F.3d 876 (Fed. Cir. 1999); *Sigma Corp v. United States*, 117 F.3d 1401 (Fed. Cir. 1997) ("*Sigma*"); *Georgetown Steel v. United States*, 801 F.2d 1308 (Fed. Cir. 1986) ("*Georgetown Steel*"); *Jiangsu Changbao Steel Tube Co., Ltd. v. United States*, 884 F. Supp.2d, 1295 (CIT 2012) ("*Jiangsu Changbao*"); *Advanced Tech. & Materials Co. v. United States*, Court No. 09-00511, Slip Op. 2011 (CIT 2011); *Qingdao Taifa Group Co. v. United States*, 637 F. Supp. 2d 1231 (CIT 2009); *Peer Bearing Company – Changshan v. United States*, 587 F. Supp. 2d 1319 (CIT 2008) ("*Peer Bearing*"); *Hontex Enters. Inc. v. United States*, 248 F. Supp. 2d 1323 (CIT 2003); *UCF America v. United States*, 919 F. Supp. 435 (CIT 1996); Panel Report, *United States – Antidumping Measures on Certain Shrimp from Viet Nam*, WT/DS429/R (November 17, 2014); Panel Report, *United States – Antidumping Measures on Certain Shrimp from Vietnam*, WT/DS404/R (September 2, 2011); Panel Report, *United States – Antidumping Measures on Certain Shrimp from Vietnam*, WT/DS429/R (November 17, 2014) (currently before the WTO Appellate Body); *Announcement of Change in Department Practice for Respondent Selection in Antidumping Duty Proceedings and Conditional Review of the Nonmarket Economy Entity in NME Antidumping Duty Proceedings*, 78 FR 65963 (November 4, 2013) ("*Change in Practice*"); *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of Antidumping Duty New Shipper Review; 2011-2012*, 78 FR 33341 (June 4, 2013); *Utility Scale Wind Towers From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 77 FR 75992 (December 26, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part*, 77 FR 63791 (October 17, 2012); *Methodological Change for Implementation of Section 772(c)(2)(B) of the Tariff Act of 1930, as Amended, In Certain Non-Market Economy Antidumping Proceedings*, 77 FR 36481 (June 19, 2012) ("*Section 772(c)(2)(B) Methodological Change*"); *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of the 2008-2009 Antidumping Duty Administrative Review*, 76 FR 22871 (April 25, 2011) ("*Tires/PRC 2008-2009*"); *Certain Cut-to-Length Carbon Steel Plate From the People's Republic of China: Final Results of the 2007-2008 Administrative Review of the Antidumping Duty Order*, 75 FR 8301 (February 24, 2010); *Certain New Pneumatic Off-The-Road Tires from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 FR 40485 (July 15, 2008); *Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, From the People's Republic of China: Final Results of Antidumping Duty Administrative Reviews and Final Rescission and Partial Rescission of Antidumping Duty Administrative Reviews*, 71 FR 54269 (September 14, 2006); *Final Determination of Sales at Less Than Fair Value and Final Partial Affirmative Determination of Critical Circumstances: Diamond Sawblades and Parts Thereof from the People's Republic of China*, 71 FR 29303 (May 22, 2006) ("*Sawblades/PRC LTFV Final*"); *Honey From the People's Republic of China: Preliminary Results, Partial Rescission, and Extension of Final Results of Second Antidumping Duty Administrative Review*, 69 FR 77184 (December 27, 2004); *Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination: Structural Steel Beams From Germany*, 66 FR 67190 (December 28, 2001); *Notice of Preliminary Determination of Sales at Less Than Fair Value: Foundry*

Filed By: Andrew Medley, Filed Date: 4/9/15 12:19 PM, Submission Status: Approved

- The Department does not have the authority to apply a country-wide entity rate that meets neither the statutory requirements for an "individually investigated" or "all others" rate.
- The determination to apply the PRC-wide rate to Double Coin in the *Preliminary Results* presumed that there was another state-owned entity producing and exporting OTR tires to the United States during the POR and that Double Coin was affiliated with said entity without any factual basis and despite verified evidence to the contrary.
- The Department proceeded to apply a rate in excess of the ceiling applicable to companies that are not individually investigated.
- Even if the Department had the authority to issue a country-wide rate, there was no written request for review of the NME entity and, thus, the PRC-wide entity is not under review.
- Given that Double Coin fully participated in this review and obtained a calculated margin, the Department lacks the authority to issue anything other than that company-specific rate and, regardless, cannot apply a country-wide rate based on adverse facts available ("AFA") to a fully cooperative exporter if the statutory requirements for AFA have not been met.
- PRC law, regulations, and Double Coin's Articles of Association plainly disallow government control of Double Coin's day-to-day operations.

---

*Coke From the People's Republic of China*, 66 FR 13885 (March 8, 2001); *Notice of Final Rule, Antidumping Duties, Countervailing Duties*, 62 FR 27296 (May 19, 1997) ("*Final Rule*"); *Notice of Proposed Rulemaking and Request for Public Comment*, 61 FR 7308 (February 27, 1996); *Final Determination of Sales at Less Than Fair Value: Silicon Carbide from the People's Republic of China*, 59 FR 22585 (May 2, 1994); *Iron Construction Castings From the People's Republic of China; Final Results of Antidumping Duty Administrative Review*, 56 FR 2742 (January 24, 1991); *Final Determinations of Sales at Less Than Fair Value: Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, From the People's Republic of China*, 56 FR 241 (January 3, 1991); Department Memorandum regarding "Countervailing Duty Investigation of Coated Free Sheet Paper from the People's Republic of China - Whether the Analytical Elements of the Georgetown Steel Opinion are Applicable to China's Present-Day Economy," dated March 29, 2007 ("Georgetown Steel Memorandum"); Department's *Policy Bulletin 05.1: Separate-Rates Practice and Application of Combination Rates in Antidumping Investigation involving Non-Market Economy Countries*, dated April 5, 2005 ("Policy Bulletin 05.1"); and Alagari, Reform, Reality, and Recognition: Reassessing U.S. Antidumping Policy Toward China, 26 L. Pol'y Int'l Bus. 1061 (1995). Double Coin further cites to 19 CFR 351.213(b) and 19 CFR. 351.213 of the Department's regulations and the following sections of the Tariff Act of 1930, as amended ("the Act"): 735(c), 777A(c), 782(a), 701(d), 751, 776(a), and 776(b).

Double Coin references the following submissions: Department Memorandum to the File, entitled, "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Verification of the Sales and Factors Response of Double Coin Holdings and China Manufacturers Alliance," dated concurrently with this memorandum ("Double Coin's Verification Report"); PDM; Department Memorandum to the file entitled, "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Analysis of the Preliminary Results Margin Calculation for Double Coin," dated September 30, 2014 ("Double Coin's Preliminary Analysis Memo"); Double Coin's Submission entitled, "Response to the Department's 2nd Sections A, C, and D Supplemental Questionnaire for Double Coin Holdings Ltd. and China Manufacturers Alliance, LLC (collectively, "Double Coin") Certain New Pneumatic Off-the-Road Tires from China," dated July 31, 2014 ("Double Coin's 2nd Supplemental ACD Response"); Department Memorandum to Melissa Skinner entitled, "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Respondent Selection," dated December 13, 2013 ("Respondent Selection Memo"); Department Letter to Interested Parties entitled, "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: U.S. Customs and Border Protection Import Data for Use in Respondent Selection," dated November 12, 2013 ("CBP Data Release"); and Double Coin Affiliation and Collapsing Memo.

- The Department failed to cite a single instance in which Huayi, Double Coin's state-owned parent company, exercised control and, rather, relies on hypotheticals with no basis in fact.
- There is direct and verified evidence that the PRC government did not exercise any control over Double Coin's export activities, as all export prices were negotiated by American employees of CMA, Double Coin's U.S. affiliate.
- The Department's policy with respect to PRC government control is based on outdated 25 year old presumptions which are contrary to the Department's own factual findings about changes in the PRC economy that have already been revisited in a countervailing duty ("CVD") context.
- Questions regarding government control bear no relevance to the primary question of whether Double Coin is exporting to the United States at below fair value. In this case, that question has been demonstrably settled, as the Department's calculations show that – even if the PRC government were controlling operations – Double Coin is not selling tires to the United States at less than fair value.
- The Department's decision to reverse its 20 year policy concerning separate rate eligibility in this review is fundamentally unfair, considering that Double Coin was previously determined eligible for a separate rate, underwent no material changes in ownership or management selection processes since this eligibility determination and, therefore, had every reason to assume that this separate rate finding would be upheld prior to making its export shipments for the POR. The Department effectively changed the rules in the middle of the game.

Petitioners' Rebuttal Brief[29]

- The Department maintains the authority to issue a PRC-entity rate, and this long-standing practice has been upheld by the courts, as has been the practice of assigning the entity rate to individually investigated respondents that fail to demonstrate eligibility for separate rates. The Department should dismiss Double Coin's arguments to the contrary.
- Double Coin failed to rebut the presumption of state control; thus, its individual behavior is no longer relevant to this review and the country-wide rate is the relevant margin.
- The Department explicitly put all interested parties on notice that the PRC-wide entity would be reviewed if one of the named exporters did not qualify for a separate rate. The change in practice with respect to the conditional review cited by Double Coin took effect subsequent to the initiation of the instant review.
- The non-market economy ("NME")-entity rate does not constitute an AFA rate when applied to individual members, as this is not an adverse inference applied to a specific company, but based on the actions of the entity regardless of the specific actions of its constituent members.
- Contrary to Double Coin's claims, the Department is correct to state that the record does not contain information to determine the percentage of PRC-wide activity Double Coin accounted for in the POR.
- The Department's findings with respect government control and relevant PRC laws are consistent with the guidance from the Court of International Trade ("CIT" or "Court") and Court of Appeals for the Federal Circuit ("Federal Circuit") in the recent *Diamond Sawblades* litigation, which addressed and dismissed many of Double Coin's arguments.

---

[29] *See* Petitioners' Rebuttal Brief at 2-15. Petitioners cite to the following: *Advanced Technology & Materials Co., Ltd., et al. v. United States*, 885 F. Supp. 2d 1343 (CIT 2012) ("*Advanced Technology I*"), remand affirmed in *Advanced Technology & Materials Co., Ltd., et al. v. United States*, 938 F. Supp. 2d 1342 (CIT 2013), aff'd 541 F. App'x 1009 (Fed. Cir. 2014) ("*Advanced Technology II*") (collectively, "*Diamond Sawblades* litigation"); *Transcom* (Fed. Cir. 1999); *Sigma*, 117 F.3d 1401 (Fed. Cir. 1997); *David v. United States*, 24 F. Supp. 3d 1355 (CIT 2014) ("*Mark David*"); *Michaels Stores, Inc. v. United States*, 931 F. Supp. 2d 1308 (CIT 2013) ("*Michaels Stores*"); *SKF USA Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001) ("*SKF*"); *Jiangsu Changbao* (CIT 2012); *Watanabe Group v. United States*, 2010 Ct. Intl. Trade LEXIS 144 (CIT 2010) ("*Watanabe*"); *Peer Bearing* (CIT 2008); *Coalition for the Preservation of American Brake Drum and Rotor Aftermarket Manufacturers v. United States v. United States*, 44 F.Supp. 2d 229 (CIT 1999) ("*CPABDRAM*"); *Diamond Sawblades and Parts Thereof From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 35723 (June 24, 2014) ("*Diamond Sawblades 11-12*"); *Preliminary Results* (October 10, 2014) and PDM; *Galvanized Steel Wire From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 77 FR 17430 (March 26, 2012) ("*Steel Wire/PRC LTFV Final*"); *Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review*, 78 FR 54235 (September 3, 2013) ("*Opportunity to Request*"); *Change in Practice*; *Initiation Notice* (November 8, 2013); and *Brake Rotors From the People's Republic of China: Final Results and Partial Rescission of the Seventh Administrative Review; Final Results of the Eleventh New Shipper Review*, 70 FR 69937 (November 18, 2005) ("*Brake Rotors 11th AR Final*"). Petitioners reference the following record submissions: Double Coin's Case Brief; Petitioners' Case Brief; CBP Data Release; Respondent Selection Memo; Letter from Petitioners' entitled, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off-The-Road Tires from China (A-570-912): Titan and the USW's Request for Administrative Reviews," dated September 30, 2013 ("Petitioners' Review Request"); Letter from Petitioners' entitled, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off-The-Road Tires from China (A–570–912): Petitioners' Rebuttal Factual Information to Double Coin's Supplemental Section A Questionnaire Response," dated June 23, 2014 ("Petitioners' June 23 Submission"); and Letter from Double Coin, entitled, "Supplemental Section A Response of Double Coin Holdings and China Manufacturers Alliance, LLC Certain New Pneumatic Off-the-Road Tires from China," dated June 16, 2014 ("Double Coin's SSAQR").

- The fact that the record lacks affirmative evidence showing government intervention in operations is irrelevant, as the standard is that there is a rebuttable presumption of control, which Double Coin has not overcome.
- Finally, Petitioners maintain that, should the Department continue to deny Double Coin's separate rate and agree to not calculate a margin for Double Coin for these final results (*i.e.*, apply a 210.48 percent margin, unadjusted by Double Coin's calculated rate, to the entirety of the entity, including Double Coin), the Department need not address the arguments in Double Coin's case brief, as these concerns are moot.

Petitioners' Brief[30]

- Once the Department has determined that an NME respondent is ineligible for a separate rate, the individual examination of said respondent should end, no margin should be calculated, and there should be no subsequent revision to the PRC-wide rate.
- The calculation of a margin for Double Coin conflicts with past practice (*i.e.*, *Diamond Sawblades* litigation Remand Redetermination, *Brake Rotors 11th AR Prelim* (May 9, 2005), etc.) where the inability of a respondent to overcome the presumption of government control resulted in the application of a PRC-wide rate.
- The idea that a respondent's sales behavior ceases to be meaningful if it is found to be part of the PRC-wide entity has been supported by the Court (*e.g.*, *Watanabe* (CIT 2010), *Jiangsu Changbao* (CIT 2012), and *Mark David* (CIT 2014)) and is reflected in the Department's standard practice.
- The Department maintains reasonable concerns that allowing a focus on the activities of only one member of the PRC-wide entity would create the potential for the larger entity to manipulate AD results by selectively providing data on the record and dictating what data would be verified from review to review.

---

[30] *See* Petitioners' Case Brief at 2-6. Petitioners cite to: *Mark David*, 24 F. Supp. 3d 1355 (CIT 2014); *Jiangsu Changbao*, 884 F. Supp.2d 1295; *Watanabe*, 2010 Ct. Intl. Trade LEXIS 144 (CIT 2010); *Peer Bearing Company* (CIT 2008); *Preliminary Results* (October 10, 2014); *Change in Practice,* 78 FR 65963; Final Results of Redetermination Pursuant to Remand Order for Diamond Sawblades and Parts Thereof from the People's Republic of China, Court No. 09-00511, Slip Op. 12-147 (CIT 2012), dated May 6, 2013 ("*Diamond Sawblades* litigation Remand Redetermination") in *Advanced Technology I* (CIT 2012), affirmed in *Advanced Technology II,* 938 F. Supp. 2d 1342 ; *Steel Wire/PRC LTFV Final* (March 26, 2012); *Brake Rotors From the People's Republic of China: Preliminary Results and Partial Rescission of the Seventh Administrative Review and Preliminary Results of the Eleventh New Shipper Review*, 70 FR 24382 (May 9, 2005) ("*Brake Rotors 11th AR Prelim*"), unchanged in *Brake Rotors 11th AR Final* (November 18, 2005); *Porcelain-on-Steel Cooking Ware from the People's Republic of China: Notice of Preliminary Results of Antidumping Duty Administrative Review*, 70 FR 76027 (December 22, 2005) ("*Porcelain Cookware/PRC*"), unchanged in *Porcelain-on-Steel Cooking Ware from the People's Republic of China: Notice of Final Results of Antidumping Duty Administrative Review*, 71 FR 24641 (April 26, 2006); and *Notice of Final Determination of Sales at Less Than Fair Value: Certain Cut-to-Length Carbon Steel Plate From Ukraine*, 62 FR 61754 (November 19, 1997). Petitioners further reference the PDM.

Double Coin's Rebuttal Brief[31]

- For the reasons stated in Double Coin's Case Brief, there is no justification for the Department to assign the PRC-wide rate to Double Coin.
- Even should the Department disagree and believe that Double Coin is ineligible for a separate rate, the Department lacks justification to impose the 210 percent AFA rate, because:
  - The Department has not undertaken in this review any corroboration of the AFA rate.
  - The cases cited by Petitioners purporting to show a "prior practice" of automatically assigning the PRC-wide entity rate to any company that fails to attain separate-rate status, are inapposite, as they either concern original investigations (*Wantanabe* (CIT 2010) and the *Diamond Sawblades* litigation) or uncooperative respondents (*Mark David* (CIT 2014)).

**Department's Position:** As an initial matter, we disagree with Double Coin's contention that the Department has no authority to issue a rate for the NME entity. Rather, the Department's NME practice, including its assignment of a specific rate to all NME exporters that do not establish their eligibility for a separate rate is well-established[32] and has been upheld by the courts.[33]

The Department considers the PRC to be a non-market economy country under section 771(18) of the Act. In antidumping proceedings involving NME countries, such as the PRC, the Department has a rebuttable presumption that the export activities of all firms within the country are subject to government control and influence. Therefore, in PRC cases, the Department uses a rate established for the PRC-wide entity, which it applies to all imports from an exporter that has not established its eligibility for a separate rate. Section 351.107(d) of the Department's regulations, provides that "in an antidumping proceeding involving imports from a nonmarket economy country, 'rates' may consist of a single dumping margin applicable to all exporters and producers."[34] The Department's practice of assigning a PRC-wide rate has been upheld by the Federal Circuit. In *Sigma*, the Federal Circuit affirmed that it was within the Department's authority to employ a presumption for state control in a NME country and place the burden on the exporters to demonstrate an absence of central government control.[35] The Federal Circuit

[31] *See* Double Coin's Rebuttal Brief at 1-6. Double Coin cites to: *Hubbell Power Sys., Inc. v. United States*, 884 F. Supp. 2d 1283 (CIT 2012); *Qingdao Taifa Grp. Co. v. United States*, 760 F. Supp. 2d 1379 (CIT 2010); section 776(c) of the Act; Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, vol. 1 (1994) ("SAA"); and *Gallant Ocean (Thailand) Co., Ltd v. United States*, 602 F.3d 1319 (Fed. Cir. 2010) ("*Gallant Ocean*"). Double Coin further addresses the following cases cited in Petitioners' Case Brief: *Mark David,* 24 F. Supp. 3d 1355 (CIT 2014); *Watanabe*, 2010 Ct. Intl. Trade LEXIS 144 (CIT 2010); and *Advanced Technology II*, 938 F. Supp. 2d 1342. Double Coin references Petitioners' Case Brief and Double Coin's Case Brief.

[32] *See*, *e.g.*, *Steel Wire/PRC LTFV Final* and accompanying IDM at 8.

[33] *See*, *e.g.*, *Sigma*, 117 F.3d at 1405.

[34] *See 1,1,1,2-Tetrafluroethane From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 79 FR 62597 (October 20, 2014) and the accompanying IDM at Comment 1 (explaining the Department's practice with respect to separate rates as upheld by the Federal Circuit in *Sigma*, 117 F.3d at 1405-06, and describing the Department's practice with respect to the rate assigned to the PRC-wide entity).

[35] *See Sigma*, 117 F.3d at 1405-1406 ("We agree with the government that it was within Commerce's authority to employ a presumption of state control for exporters in a nonmarket economy, and to place the burden on the exporters to demonstrate an absence of central government control. The antidumping statute recognizes a close

recognized that sections 771(18)(B)(iv)-(v) of the Act recognized a close correlation between an NME economy and government control of prices, output decisions, and allocation of resources and, therefore, the Department's presumption was reasonable.[36] The application of a PRC-wide rate to all parties which were not eligible for a separate rate was also affirmed by the Federal Circuit in *Transcom* in 2002.[37] In *Transcom*, the Federal Circuit also found that a rate based on "BIA" (the precursor to facts available and AFA under the current statute) is not punitive.[38] Thus, contrary to Double Coin's assertions, the courts have consistently upheld the Department's authority to apply a presumption of state control in NME countries and to apply a single rate to all exporters that fail to rebut that presumption.

Double Coin claims that the Department has no authority to issue a PRC-wide rate in this review since a review was not properly initiated on the PRC-wide entity. Double Coin's insistence that the PRC entity is not under review in the instant case appears to rely, in part, on the November 2013 *Change in Practice* which, indeed, requires an explicit request prior to initiating a review of the NME entity. However, the Department specifically stated that this change in practice announced would apply to "administrative reviews for which the notice of opportunity to request an administrative review is published on or after December 4, 2013."[39] The opportunity to request a review for this review was published September 3, 2013 and, as such, the change in practice noted by Double Coin is inapplicable in this review.[40] Rather, for administrative reviews for which the notice of opportunity was published before December 4, 2013 (as in the instant case), the Department conditionally reviewed the NME entity; therefore, even absent a

---

correlation between a nonmarket economy and government control of prices, output decisions, and the allocation of resources. Moreover, because exporters have the best access to information pertinent to the 'state control' issue, Commerce is justified in placing on them the burden of showing a lack of state control.") (internal citations omitted).

[36] *Id*. *See also CPABDRAM*, 44 F.Supp. 2d at 243, quoting *Sigma*, 117 F.3d at 1405 ("Under the broad authority delegated to it from Congress, Commerce has employed 'a presumption of state control for exporters in a non-market economy'… Under this presumption, all exporters receive one non-market economy country ('NME') rate, or country-wide rate, unless an exporter can 'affirmatively demonstrate' its entitlement to a separate, company-specific margin by showing 'an absence of central government control, both in law and in fact, with respect to exports.'"); *Michaels Stores*, 931 F. Supp. 2d at 1315, quoting *SKF*, 263 F.3d at 1030 ("The regulations clarify, however, that for non-market economies, 'rates may consist of a single dumping margin applicable to all exporters and producers.' Moreover, whenever the statute is silent on a particular issue, it is well-settled that Commerce may 'formulate policy' and make rules 'to fill any gap left, implicitly or explicitly, by Congress.'") (internal citations omitted).

[37] *See Transcom v. United States*, 294 F.3d 1371, 1381-83 (Fed. Cir. 2002) ("*Transcom*"). (The PRC-wide rate, and its adverse inference are applicable to all companies which were initiated on yet failed to show their entitlement to a separate rate. "Accordingly, while section 1677e provides that Commerce may not assign a {best information available}-based rate to a particular party unless that party has failed to provide information to Commerce or has otherwise failed to cooperate, the statue says nothing about whether Commerce may presume that parties are entitled to *independent* treatment under 1677e in the first place" {*emphasis added*}). *See* also *Transcom*, 294 F.3d at 1376 citing *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990) (Instead, the objective of best information available ("BIA") is to aid Commerce in determining dumping margins as accurately as possible). The litigation in *Transcom* covered three periods of review between June 1990 and May 1993. *See Transcom*, 294 F.3d at 1374-75, and *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China: Final Results of Antidumping Duty Administrative Reviews,* 61 FR 65527 (Dec. 13, 1996). The term BIA is now referred to under the statute as facts available or AFA. *Id.*

[38] *See Transcom*, 294 F.3d at 1376.

[39] *See Change in Practice*, 78 FR at 65964.

[40] *See Opportunity to Request*, 78 FR at 54235.

request, the NME entity can be subject to the review if an exporter subject to the review does not demonstrate that it is separate from the entity.[41]  Though Double Coin notes that the NME entity is not listed as one of the companies for which review was requested in the *Initiation Notice*, the *Initiation Notice* plainly states that "If one of the above-named companies does not qualify for a separate rate, all other exporters of Certain New Pneumatic Off-the-Road Tires {from} the PRC who have not qualified for a separate rate are deemed to be covered by this review as part of the single PRC entity of which the named exporters are a part."[42]  Thus, the Department explicitly put the PRC-wide entity and all other interested parties on notice that the PRC-wide entity would be reviewed if one of the named exporters did not qualify for a separate rate.  Thus, pursuant to Double Coin's failure to demonstrate a lack of *de facto* government control, the PRC-wide entity is subject to review.  In *Transcom*, the Federal Circuit held that, in addition to the named companies in an initiation notice, conditionally reviewed companies also received sufficient notice in the initiation.[43]  Accordingly, we find Double Coin's claims with respect to the NME-entity not being subject to review are unfounded.

We further disagree with Double Coin's argument that, because Double Coin was selected as a mandatory respondent and provided information from which the Department was able to calculate an antidumping margin, the statute requires the Department to assign Double Coin a rate based on this information.  It is the Department's policy to assign all exporters of the merchandise subject to review in NME countries a single rate unless an exporter can affirmatively demonstrate an absence of government control.  As discussed in the *Preliminary Results* and further established below, we found that Double Coin is ineligible for a separate rate due to its inability to demonstrate the absence of government control.  As such, Double Coin is a part of the PRC-wide entity.  The Department must calculate a single rate for the PRC-wide entity, and in this review, we do not have the necessary information, *i.e.*, sales and production data, from the remaining unspecified portion of the PRC-wide entity.  Nor is there information on the record with respect to the composition of the PRC-wide entity.  As such, we do not consider it reasonable to determine a rate for the PRC-wide entity based solely on the information provided for Double Coin.  Rather, based on the unique circumstances presented in this review, we consider it reasonable to use the information provided by Doubly Coin as well as the only information we have regarding the entire PRC-wide entity, to calculate a new margin for the PRC-wide entity.  Specifically, we calculated the final margin for the PRC-wide entity, which includes Double Coin, using a simple average of the previously assigned PRC-wide rate (210.48 percent)[44] and the calculated final margin for Double Coin (0.14 percent).  Accordingly, the Department revised the PRC-wide entity rate to 105.31 percent for these final results.

Further, Double Coin's contention ignores the Department's well-established practice of assigning the PRC-wide entity rate to individually investigated respondents who participated in an investigation or review but do not qualify for a separate rate.[45]  Indeed, the courts have agreed

---

[41] *See Change in Practice*, 78 FR at 65970.

[42] *See Initiation Notice*, 78 FR at 67111, footnote 10.

[43] *See Transcom*, 294 F.3d at 1379.

[44] *See Certain New Pneumatic Off-The-Road Tires from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 FR 40485, 40489 (July 15, 2008) ("*LTFV Determinations*").

[45] *See, e.g.*, *Certain Activated Carbon From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2011-2012*, 78 FR 26748 (May 8, 2013) and PDM at 10-11, unchanged in *Certain*

that, once a respondent has been held to be part of the NME-wide entity, inquiring into said respondent's separate sales behavior ceases to be meaningful.[46] Therefore, because Double Coin has failed to rebut the presumption of state control, as discussed further below, the Department is no longer required to base the margin assigned to the PRC-wide entity, of which Double Coin is a part, solely on Double Coin's behavior.

Double Coin also objects to the application of the 210.48 percent PRC-wide rate to Double Coin, at least in part, on the basis that this NME entity rate is an AFA rate. Double Coin argues that section 776(b) of the Act requires a party to fail to cooperate to the best of its ability as a prerequisite before the Department is permitted to apply an adverse inference. Therefore, because Double Coin has been fully cooperative, as acknowledged by the Department, the statutory requirements for AFA have not been met and the Department is not permitted to apply the 210.48 percent PRC-entity rate (which is based on AFA) in any manner with respect to Double Coin's margin. However, in *Advanced Technology II*, the Court addressed the issue as to whether the PRC-wide is an adverse rate, stating "Commerce did not apply adverse facts available to AT&M, Commerce rather found that AT&M had not rebutted the presumption of state control and assigned it the PRC-wide rate. These are two distinct legal concepts: a separate AFA rate applies to a respondent who has received a separate rate but has otherwise failed to cooperate fully whereas the PRC-wide rate applies to a respondent who has not received a separate rate."[47] In the investigation at issue in that case, the PRC-wide entity received a rate based on AFA.[48] In this review, to the extent that the application of the pre-existing PRC-wide rate affects the antidumping duties assessed on Double Coin's entries as a result of this review, this rate is not an application of AFA to the entity in this review; rather, it reflects in part the rate applied to the entity based on the actions of the entity in the investigation of which Double Coin is now a part (and unchanged by any subsequent review). In this review, we are seeking to establish a new rate for the entity, which is under review, and a part of which was selected as a mandatory respondent, but for which we do not have complete information. Regardless, as discussed below, as a result of our instant determination, the portion of the PRC-wide entity calculation that is based on its pre-existing rate is reasonably representative only of the unspecified non-Double Coin portion of the single NME-entity, whereas the Double Coin portion of the single entity is reasonably represented by Double Coin's own data.

---

*Activated Carbon From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 78 FR 70533 (November 26, 2013) ("*Activated Carbon/PRC*"); *Brake Rotors 11th AR Final* and accompanying IDM at Comment 7. *See also*, *Advanced Technology II*, 938 F. Supp. 2d 1342.

[46] *See Advanced Technology II*, 938 F. Supp. 2d at 1351, citing *Watanabe,*2010 Ct. Intl. Trade LEXIS 144 at 8 ("Commerce's permissible determination that {a respondent} is part of the PRC-wide entity means that inquiring into {that respondent}'s separate sales behavior ceases to be meaningful.") and *Jiangsu Changbao* at 1312 (referencing *Watanabe* at 8) ("losing all entitlement to an individualized inquiry appears to be a necessary consequence of the way in which Commerce applies the presumption of government control… applying a countrywide AFA rate without individualized findings of failure to cooperate is no different from applying such a countrywide AFA rate without individualized corroboration.").

[47] *Advanced Technology II*, 938 F. Supp. 2d at 1351, citing *Watanabe*, 2010 Ct. Intl. Trade LEXIS 144 at 9, footnote 8. *See also Peer* at 1327 ("… there is no requirement that the PRC-wide entity rate based on AFA relate specifically to the individual company. It is not directly analogous to the process used in a market economy, where there is no countrywide rate. Here, the rate must be corroborated according to its reliability and relevance to the countrywide entity as a whole.")

[48] *See Sawblades/PRC LTFV Final*, 71 FR 29303 (May 22, 2006).

Further, Double Coin argues that the Department has no basis to apply the PRC-wide rate to Double Coin based either on other parties' inability to cooperate or the failure of a party to provide information with respect to the PRC-wide entity because such information was never requested by the Department. As mentioned above, in *Sigma*, the Federal Circuit affirmed that it was within the Department's authority to employ a presumption for state control in a NME country and found the presumption reasonable, noting that sections 771(18)(B)(iv)-(v) of the Act recognized a close correlation between a NME economy and government control of prices, output decisions, and allocation of resources.[49] Having not demonstrated the absence of *de facto* control from the government over selection of its management, Double Coin constitutes a part of the PRC-wide entity. Further, the PRC-wide entity is comprised of producers and exporters that can provide answers to questions, as evidenced by Double Coin in this review.

Double Coin then asserts that, setting aside all prior arguments with respect to the permissibility of the Department's application of the PRC-wide rate to Double Coin, the Department was further incorrect on the underlying factual finding that Double Coin failed to rebut the presumption of government control and that neither the Huayi Group (*i.e.*, Double Coin's majority owner), the State Owned Assets Supervision Committee ("SASAC") (which owns 100 percent of the Huayi Group), nor any other government entity maintains control over its day to day activities. However, in making our preliminary finding on this issue, we were – and continue to be – guided by the Court's findings in the *Diamond Sawblades* litigation, which dismissed many of the same arguments that Double Coin currently presents in this proceeding. For example, Double Coin claims that under PRC law, the Huayi Group cannot exercise control over Double Coin. The respondent involved in the *Diamond Sawblades* litigation made the same argument during the administrative proceeding. In rejecting those arguments, the Court found that the PRC Company Law provides evidence rebutting the presumption of *de jure* control "is inadequate … and it lacks … common business sense."[50] For Article 20 of the PRC Company Law in particular, it "does not appear that this {article} may reasonably be construed to 'limit' the power of the state in the companies in which the state invests."[51] Further, the Court found the structure of the PRC Company Law provides controlling shareholders direct and effectual control as "{s}hareholders have the ability to hire and fire each board member and decide their pay pursuant to Article 38, and each board member is thereby beholden. That amounts to delegation, as opposed to separation…. since the general manager, in point of fact, is selected by the same board of directors 'in charge of overall business planning and the selection of upper management' that is 'responsible to the shareholders' and can readily be replaced at their whim."[52] Furthermore, the Court addressed Articles 22-27 of the PRC Code of Governance for Listed Companies, noting that these articles "reveal little to an inquiry into 'governmental control' in the running of a company including its export operations." [53]

The Department finds that the PRC laws and regulations at issue (*i.e.*, the Interim Regulations, and the PRC Company Law) are not dispositive with regard to control of export activities. The PRC laws and regulations at issue provide a framework for various corporate entities to form and

[49] *See Sigma*, 117 F.3d at 1405-1406.
[50] *See Advanced Technology I*, 885 F. Supp. 2d at 1353.
[51] *Id.*, at 1354.
[52] *Id.*, at 1355.
[53] *Id.*, at 1358.

operate at some distance from the central government. While the Interim Regulations also indicate the existence of some degree of government control, the Department continues to find that the overall legal environment is permissive of individual firms maintaining independent operations with respect to export activities.

In the Department's experience applying the separate rate test, the *de jure* factors are not overridingly indicative of the absence of control of export activities in the typical case, but rather they demonstrate an ability on the part of the exporter to control its own commercial decision making. In large part, the laws and regulations that the Department has examined over the years, such as the laws referenced above, indicate that a certain level of control has devolved in that the commercial decision-making can lie with the various corporate entities operating under these laws and regulations, which in turn, merits an analysis of the record evidence to ensure that there is an absence of *de facto* aspects of government control over export activities. This is supported by our findings over the years that numerous PRC respondents operating under such laws also maintain *de facto* control over their export functions. These situations where parties are found to be entitled to a separate rate are, however, based on the individual facts with respect to each such party. Because of the centralized control inherent in the PRC's status as a NME country, we presume that decision making of an enterprise in an NME country is under a form of centralized government control (whether at the central, provincial, or local level). Nevertheless, the PRC Company Law and other laws and regulations demonstrate that, within the PRC's NME, distance can exist between decisions made at the central government level and decisions made at the firm level with respect to exports.

Thus, an analysis of *de facto* control is critical in determining whether respondents are, in fact, subject to a degree of government control which would preclude the Department from granting a separate rate.

With respect to Double Coin's assertions that its Articles of Association and other company documents make clear that managers control the day-to-day operations, the Court addressed similar arguments made as part of the *Diamond Sawblades* litigation. Specifically, the Court rejected arguments made by the respondent in that proceeding regarding its management and control of daily operations. The Court stated that managers should be presumed "to be beholden to the board that controls their pay, in particular to the chairman of the board as the *de facto* company head under the PRC model," until proven otherwise.[54] Similarly, we find that as Huayi is the controlling shareholder, it is the entity controlling Double Coin's board and management.

Double Coin then argues the fact that no minority shareholder has ever nominated a director and no Huayi nominee has ever been rejected (facts which supplemented the Department's preliminary finding) simply means that such an event has never occurred and by no means confirms Huayi's control over Double Coin. Moreover, Double Coin asserts that minority shareholders indeed have *bona fide* rights pursuant to the company's Articles of Association. Double Coin's assertions, however, do not demonstrate that it should be given separate rate status. The standard for determining such a status is that an NME exporter is presumed to be

---

[54] *Id.*, at 1359. *See also*, *id.*, at 1352 ("…the exclusion of 'day to day operations' from 'oversight' responsibility is a straw man.").

under government control until such a presumption is sufficiently rebutted. As such, the absence of evidence of control or other demonstrable action on behalf of a minority shareholder does nothing to rebut this presumption[55], nor does the existence of certain minority shareholder rights (such as the ability to bring suit against a board member or manager who acts against the interests of the company, and the right of minority shareholders to call a shareholder meeting) prove the absence of government control.[56] Moreover, Double Coin's general argument that the Department cannot cite a single example in which Huayi actually exercised its legal right to control or influence a day-to-day decision about the manner in which Double Coin sold subject merchandise to the United States is similarly unconvincing, as this also ignores the fact that the burden to rebut the presumption of government control is on the party seeking separate rate status.

With respect to Double Coin's assertion that that the Department is setting up an improper standard based on a notion of potential control rather than examples of actual control, and concerns that such examples of potential control are virtually limitless, we find that the facts on the record counter Double Coin's arguments regarding potential or theoretical control. Specifically, as noted in Double Coin's Preliminary Analysis Memo, regardless of the restrictions of PRC law and the protections afforded to minority shareholders, Double Coin's Articles of Association demonstrate that a majority shareholder – and particularly one with 65.66 percent ownership – has near complete control over any shareholder decisions, including decisions which may affect the management and operations of the company.[57] Whether or not the Huayi Group, which is the majority owner of Double Coin, demonstrably exercised control over Double Coin's day-to-day operations does not refute the fact that a government-owned entity has near complete control of shareholder decisions of Double Coin.

Double Coin further argues that Huayi's control of Double Coin's board cannot be equated to control of Double Coin's export activity and that the PRC ownership structure has no effect on sales prices in the United States because the prices are set by Double Coin's U.S. affiliate, CMA. We note that the respondent in the *Diamond Sawblades* litigation made similar arguments in that proceeding. The CIT rejected this line of reasoning in *Advanced Technology I*, stating that "the actual setting of price is only one of the four de facto factors described in the Policy Bulletin, whereas governmental manipulation of the cost of inputs,… or rationalization of industry or

[55] Particularly when considering that the Department specifically afforded Double Coin the opportunity to provide examples of any such instance at verification. *See* Double Coin's Verification Report at 11 ("However, when we then asked for an example, within or outside of the POR, of a shareholder's meeting where a Huayi nominee had been voted down by a coalition of minority shareholders or where a Huayi nominee had generally failed to obtain enough votes to ascend to the board, Double Coin officials confirmed that, to their knowledge, this situation had never occurred.").

[56] Moreover, it remains unclear whether these codified rights are actually exerted and, regardless, it is unclear how evidence demonstrating that minority shareholders routinely called meetings or brought suit against managers would plainly rebut the presumption of control on behalf of the majority state-owned shareholder. The third example of minority rights referenced on Double Coin's Case Brief at 32, *i.e.*, the conflict of interest rule, (whereby any decision which contains a conflict of interest to Huayi would require the recusal of Huayi's voting shares) might serve to better rebut this presumption. However, again, there is no indication on the record of any such recusals, nor is there sufficient understanding of how this recusal process actually works in practice.

[57] *See* Double Coin's Preliminary Analysis Memo at 10-14, *citing* Double Coin's Verification Report at Section III.B.4 and Double Coin's 2nd Supplemental ACD Response at Exhibit S2-5.

output are among numerous other scenarios of concern that can affect seller pricing."[58] Similarly, we find that Double Coin's arguments regarding U.S. sales by CMA does not overcome the rebuttable presumption of government control.

Double Coin argues that the evolving practice on government control in the wake of the *Diamond Sawblades* litigation, as presently implemented, is predicated on outdated presumptions with respect to the PRC economy which the Department already reconsidered in, for example, the Georgetown Steel Memo. However, the Department previously noted that the analysis in the Georgetown Steel Memo focused only on the concept of the single economic entity that characterized the economies in *Georgetown Steel* and that it would be incorrect to conflate that concept with the concept of the NME-wide entity for antidumping duty assessment purposes.[59] Given the reforms discussed in the Georgetown Steel Memo, the Department found that a single central authority no longer comprises the PRC's economy and that the policy that gave rise to the *Georgetown Steel* litigation does not prevent the Department from concluding that the PRC government has bestowed a countervailable subsidy upon a PRC producer.
As such, we agree with Petitioners that the analysis in the Georgetown Steel Memo is inapplicable to the issue of the PRC-wide entity in antidumping proceedings.

As explained above, in antidumping proceedings involving NME countries such as the PRC, the Department has a rebuttable presumption that the export activities of all firms within the country are subject to government control and influence. This presumption stems not from an economy comprised entirely of the government (*e.g.*, a firm is nothing more than a government work unit), but rather from the NME-government's use of a variety of legal and administrative levers to exert influence and control (both direct and indirect) over the assembly of economic actors across the economy. As such, this presumption is patently different from a presumption that all firms are one and the same as the government, such that they comprise a monolithic economic entity. Moreover, the presumption underlying the separate rates test was upheld in *Sigma*, where the Federal Circuit affirmed the Department's separate rates test as reasonable, stating that the statute recognizes a close correlation between an NME and government control of prices, output decisions, and the allocation of resources.[60] The Federal Circuit also stated that it was within the Department's authority to employ a presumption of state control for exporters in an NME-country and to place the burden on the exporters to demonstrate an absence of central government control. Firms that do not rebut the presumption are assessed a single antidumping duty rate, *i.e.*, the NME-Entity rate.[61] In recognition that parts of the PRC's economy are transitioning away from the state-controlled economy, the Department developed the separate rates test. In an economy comprised of a single, monolithic state entity, it would be impossible to identify separate firms, let alone rebut government control. Rather, the PRC's economy today is neither command-and-control nor market-based; government control and/or influence is omnipresent (which gives rise to the presumption) but not omnipotent (and hence, the presumption is rebuttable).[62]

---

[58] *See Advanced Technology I*, 885 F. Supp. 2d at 1359-1360.
[59] *See Diamond Sawblades 11-12*, 79 FR 35723, and accompanying IDM at Comment 4.
[60] *See Sigma*, 117 F.3d at 1405-06. (Fed. Cir. 1997)
[61] *See* 19 CFR 351.107(d), which provides that "in an antidumping proceeding involving imports from a non market economy country, 'rates' may consist of a single dumping margin applicable to all exporters and producers."
[62] *See* Georgetown Steel Memo at 9.

With respect to Double Coin's claim that the Department's determination with respect to Double Coin's separate rate is fundamentally unfair in that it effectively changes the rules in the middle of the game, we note that the statute does not afford respondents any expectation that a finding from a prior segment will be upheld in a subsequent segment. Indeed, both the Court and the Department have previously stated that a prior separate rate determination is irrelevant to the decision on the current record.[63] Moreover, the Department has not changed its separate rate criteria, but has analyzed the facts provided by Double Coin in light of the decisions in the *Diamond Sawblades* litigation.[64]

In sum, we continue to find that there is undeniable evidence that the 100 percent SASAC-owned majority-owner of Double Coin exerts considerable influence over the board of directors (and, thus, the management and operations of the company), and that the factual record does not provide sufficient information to rebut the presumption of government control. We note that Double Coin's arguments to the contrary are virtually identical to those made by respondents in other proceedings, which have been similarly rejected by the Department and the CIT. As a result, Double Coin is ineligible for a separate rate and is part of the PRC-wide entity pursuant to the Department's practice, as discussed above.

The only rate ever determined for the PRC-wide entity in this proceeding is 210.48 percent, as first determined in the less-than-fair-value investigation.[65] Petitioners assert that the above-mentioned determination to deny Double Coin's separate rate status should end the individual examination of Double Coin and render its sales behavior meaningless. According to Petitioners, the only rate which may be assigned to Double Coin is the 210.48 percent rate and that the preliminary determination to average the 210.48 percent entity rate with Double Coin's calculated rate is contrary to practice and precedent. We agree with Petitioners that, ordinarily, we would assign the PRC-wide entity rate to any company found to be a part of the entity during the review proceeding and that, in the past, we have applied the existing PRC-wide rate to a respondent once a determination was made to deny said respondent's separate rate.[66] However, this case presents novel circumstances underpinning the Department's decision in this case. In other reviews, the Department may have applied AFA to the entity when a respondent that is

---

[63] *See*, *e.g.*, *Mark David* at 1361 ("{the respondent} had previously qualified for separate rate status, and subsequently lost it in this review, therefore {the respondent}'s previous rate is irrelevant in the instant case."); *Brake Rotors From the People's Republic of China*, 70 Fed. Reg. 69937 (Dep't Commerce 18, 2005) (final 03-04 AD and NSR) and accompanying Issues and Decision Memorandum at Comment 7 (a prior holding that a respondent was eligible for a separate rate did not impact the decision in the current review that it did not, as there were "'even more indicia' of government control" in this review than the prior).

[64] *See, e.g., Advanced Technology I*, 885 F. Supp. 2d 1343 (CIT 2012), remand affirmed in *Advanced Technology II*, 938 F. Supp. 2d 1342 (CIT 2013), aff'd 541 F. App'x 1009 (Fed. Cir. 2014).

[65] *See Certain New Pneumatic Off-The-Road Tires from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances,* 73 FR 40485, 40489 (July 15, 2008).

[66] *See*, *e.g.*, *Certain Activated Carbon From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2011-2012*, 78 FR 26748 (May 8, 2013) and Preliminary Decision Memorandum at 10-11, unchanged in *Certain Activated Carbon From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 78 FR 70533 (November 26, 2013) ("*Activated Carbon from the PRC*"). *See also Brake Rotors 11th AR Final* and accompanying IDM at Comment 7.

deemed to be part of the entity failed to cooperate to the best of its ability.[67] Moreover, instances where the Department denied a separate rate to an otherwise cooperative company that is under review, the Department assigned the pre-existing entity rate to that company, as well as to the entire entity for that review period.[68] Moreover, while the Court established in, for example, *Watanabe*, *Jiangsu Changbao*, and *Advanced Technology II* that the denial of a separate rate (1) ends a respondent's entitlement to an individual inquiry, (2) renders further inquiry meaningless, and (3) justifies the application of the PRC-wide rate, the language does not explicitly require the Department to apply the existing PRC-wide rate, as is, in every circumstance nor does it preclude the Department from using such information to alter the rate as appropriate to the facts of a specific case. Indeed, no case cited by Petitioners addresses the instant fact pattern where part of the PRC-wide entity was selected as a mandatory respondent, provided significant information necessary for a review, and no other part of the entity failed to cooperate. As noted in the *Preliminary Results*, Double Coin provided the Department with requested information, which was subsequently verified, necessary to calculate a margin for part of the PRC-wide entity. Given the unique circumstances of this case where (as discussed below) there is insufficient information on the record with respect to the composition of the PRC-wide entity, and we are able to use the information of the mandatory respondent that is a part of the PRC-wide entity, in calculating a rate for the PRC-wide entity, we continue to find it appropriate to utilize both the previously assigned PRC-wide rate and Double Coin's calculated rate as an appropriate methodology from which to determine the PRC-wide entity rate for the final results.[69]

---

[67] *See, e.g., Steel Wire Garment Hangers From the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 2012-2013*, 80 FR 13332 (March 13, 2015). *See also Certain Cut-to-Length Carbon Steel Plate From the People's Republic of China: Final Results of Administrative Review; 2012-2013*, 80 FR 13522 (March 16, 2015).

[68] *See, e.g., Sodium Hexametaphosphate from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 78 FR 18956 (March 28, 2013). *See also Certain Steel Nails From the People's Republic of China: Final Results and Final Partial Rescission of the Second Antidumping Duty Administrative Review*, 77 FR 12556 (March 1, 2012). Accordingly, we do not find that the ancillary determination to apply the PRC-wide rate to the respondent in the *Brake Rotors 11th AR Final* and IDM at Comment 7 (involving a novel sub-issue with respect to the applicability of local government control in the Department's separate rate analysis) to be informative to the instant circumstance which, itself, must be considered in light of the unique timeframe of this case as related to the Department's evolving practice in light of the *Diamond Sawblades* litigation. Further, we note that, unlike in the instant case, we found at least one component of the PRC-wide entity failed to cooperate in the *Brake Rotors* proceeding. *See Brake Rotors From the People's Republic of China: Preliminary Results and Partial Rescission of the Seventh Administrative Review and Preliminary Results of the Eleventh New Shipper Review*, 70 FR 24382 (May 9, 2005) at 24385 ("As a result of its failure to respond to the Department's questionnaire, Rotec failed to establish its eligibility for a separate rate. Therefore, Rotec is not eligible to receive a separate rate and will be part of the PRC NME entity, subject to the PRC-wide rate. Pursuant to section 776(b) of the Act, we have applied total adverse facts available with respect to the PRC-wide entity, including Rotec"). Moreover, while Petitioners further cite to the *Diamond Sawblades Litigation* Remand Redetermination as an additional instance where the denial of an otherwise cooperative respondent's separate rate resulted in the assigning that respondent the existing PRC-wide rate, we note that the redetermination in question involved the investigation, in which the entity rate was determined based on the failure of other parts of the entity to cooperate in that segment of the proceeding. *Advance Technology I* and *Advanced Technology II*, 938 F. Supp. 2d 1342.

[69] As we are rejecting Petitioners' argument that the Department should completely end its review of Double Coin and apply the unaltered rate to the PRC-wide entity, we similarly reject Petitioners' argument that the Department does not need to address the additional arguments raised in Double Coin's brief concerning the calculation of Double Coin's preliminary margin. As a result of our determination to take Double Coin's behavior into consideration in determining the entity rate, Double Coin's comments and Petitioners' comments with respect to the proper calculation of Double Coin's margin are indeed relevant to these final results and we address all of the relevant comments, below.

In employing this methodology for the *Preliminary Results*, we noted: "The Department lacks information to determine what share of production and exports of subject merchandise Double Coin constitutes as part of the PRC-wide government-controlled entity during the current POR. As a result, we are able to calculate a margin for an unspecified portion of a single PRC-wide entity, but cannot do so for another unspecified portion of the entity." [70]  Because, as established above, the Department must calculate a single margin for the PRC-wide government-controlled entity, we preliminarily calculated a simple average of the previously assigned PRC-wide rate and Double Coin's calculated margin as the rate applicable to the PRC-wide entity.  Double Coin asserts that the Department, indeed, has information with respect to what share of the exports of subject merchandise Double Coin constitutes as part of the entity, as the CBP Data Release released by the Department for the purposes of respondent selection demonstrates that no imports came in under the -000 category.  The CBP Data Release states that "for this administrative review in the event the Department limits the number of respondents for individual examination, the Department intends to select respondents based on U.S. Customs and Border Protection ('CBP') U.S. import data during the POR."[71]  The Department's practice is to request from CBP and release only the import data for the firms specifically requested and initiated upon.[72]  As such, Double Coin is incorrect that the lack of entries identified under the -000 (*i.e.*, PRC-wide) case number in the CBP Data Release demonstrates that there were no such entries during the POR; rather, as stated in the *Preliminary Results*, the record simply does not contain this information.[73]  Accordingly, we continue to find that the Department lacks information to determine what share of production and exports of subject merchandise Double Coin constitutes as part of the PRC-wide government-controlled entity during the current POR.  As facts available, because there is insufficient information on the record with respect to the composition of the PRC-wide entity, we continue to find it appropriate to calculate a simple average of the previously assigned PRC-wide rate (210.48 percent) and Double Coin's calculated margin (0.14 percent) as the rate applicable to the PRC-wide entity for these final results.  Accordingly, the Department revised the PRC-wide entity rate to 105.31 percent for these final results.

Finally, similar to its arguments with respect to application of an AFA rate (*i.e.*, the PRC-wide rate) to Double Coin above, Double Coin argues that the Department may not apply an uncorroborated rate (*i.e.*, the PRC-wide rate) to Double Coin.  As noted above, the only rate previously determined for the PRC-wide entity in this proceeding is the 210.48 percent rate, as determined in the less-than-fair-value investigation.[74]  This margin has been applied as the PRC-

---

[70] *See* PDM at 12.

[71] *See* CBP Data Release at 1.

[72] *See* Attachment 1 to the CBP Data Release memo.

[73] Double Coin's corollary point that, because no other companies requested or initiated upon were found to be a part of the PRC-wide entity, no other companies that make up the NME entity are subject to this review, and the NME entity was not requested upon and thus not subject to the review (with the implication that Double Coin is then representative of the entire entity) is similarly predicated on an incorrect presumption since, as discuss above, the PRC-wide entity was on notice that it was conditionally subject to review pursuant to the practice in effect at the time.  *See Change in Practice* at 65970.

[74] *See Final LTFV Determinations*, 73 FR at 40489 ("In accordance with section 776(c) of the Act, we corroborated our adverse facts available ('AFA') margin by comparing the U.S. prices and normal values from the petition to the U.S. price and normal values for the respondents… Similarly, for the final determination, we have also compared the U.S. prices and normal values from the petition to the U.S. prices and normal values for the respondents.  We

wide rate in every subsequent review of the *Order*. Double Coin presented no new evidence to suggest that the Petition-based countrywide rate, as corroborated by comparing the U.S. prices and normal values from the petition to the U.S. price and normal values for the respondents during the period of investigation, has lost its probative value. Nevertheless, Double Coin asserts that the SAA holds that the Department may not use an AD rate from a prior period of time as facts available unless such a rate is corroborated as appropriate to the relevant time period and, therefore, the Department may not apply a PRC-wide rate to Double Coin that has not been corroborated in this review. Double Coin's arguments are predicated on the incorrect presumption that it is distinct from the PRC-wide entity, which it is not.[75] As is emphasized throughout this determination, the Department is not assigning the PRC-wide rate to Double Coin as AFA, but determining Double Coin a part of the NME entity to which an entity rate is assigned. The Department does not need to determine whether the 210.48 percent rate is reliable and relevant with respect to Double Coin; rather the PRC-wide rate must only be generally corroborated as to the PRC-wide entity.[76] As discussed above, the Department has corroborated the 210.48 percent PRC-wide entity rate in the initial investigation and applied this rate for the PRC-wide entity multiple times in different segments of the OTR tires proceeding. The PRC-wide rate for non-cooperative respondents need not be corroborated relative to the commercial reality of companies qualifying for a separate rate.[77]

---

found that the U.S. prices and normal values used to calculate the petition margin were within the range of net U.S. prices and normal values, respectively, used in our margin calculations for the mandatory respondents in this investigation. Because no parties commented on the selection of the PRC-wide rate, we continue to find that the margin of 210.48 percent has probative value. Accordingly, we find that the rate of 210.48 percent is corroborated within the meaning of section 776(c) of the Act.")

[75] As such, Double Coin's reliance on the *Gallant Ocean* determination is inapposite, as *Gallant Ocean* involved an exporter of Thai shrimp, where there is no presumption of government control and no NME-wide rate.

[76] *See*, *e.g.*, *Wooden Bedroom Furniture From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and New Shipper Review; 2012*, 79 FR 51954 (September 2, 2014) and accompanying IDM at Comment 4.

[77] *See Certain Frozen Warmwater Shrimp From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012-2013*, 79 FR 57872 (September 26, 2014) and accompanying IDM at Comment 1 ("Accordingly, we find that neither the age of the information used to corroborate the PRC-wide rate used in every segment of this proceeding, nor the fact that lower margins have been calculated for cooperative separate respondents, leads to the conclusion that the PRC-wide rate of 112.81 percent no longer has probative value and is not properly corroborated, a position that has been affirmed by the CIT"), *citing Shanghai Taoen Int'l Trading Co. v. United States*, 360 F. Supp. 2d 1339, at 1347 (CIT 2005) (where the Court explicitly stated that "both this court and the Federal Circuit have determined that in cases in which the respondent fails to provide Commerce with information necessary to calculate an accurate antidumping margin, 'it is within Commerce's discretion to presume that the highest prior margin reflects the current margins.") and *Ad Hoc Shrimp Trade Action Comm. v. United States*, 992 F. Supp. 2d 1285 (CIT 2014) ("where (as here) the non-cooperating respondent is a NME countrywide entity - definitionally presumed to set prices without regard to market conditions - the actual pricing behavior of the cooperative respondents that have demonstrated eligibility for a separate rate (precisely because they have differentiated themselves from the countrywide entity) does not bear upon the credibility of dumping allegations against the NME countrywide entity in the way that the pricing behavior of cooperative market economy respondents reflects on the credibility of dumping allegations against their similarly-situated market participants").

**Comment 2: Whether to Assign a Margin to Trelleborg**

Petitioners' Comments[78]

- Though the Department preliminarily determined that TWS Xingtai had no reviewable transactions during the POR based on Trelleborg's certification thereof and CBP data, record information demonstrates that there were POR shipments of what may be in-scope OTR tires from a producer named "Trelleborg (Hebei)" ("TWS Hebei").
- Record evidence demonstrates that TWS Hebei and TWS Xingtai are co-located and Trelleborg did not dispute that the two entities were, in fact, the same company.
- Though Trelleborg provided information purporting to show that the shipments in question were of non-subject merchandise, it provided invoices for just two of 13 shipments. Because the burden of producing information belongs to the party in possession of such information and Trelleborg did not provide information for the remaining 11 shipments, the Department should determine that TWS Xingtai reviewable transactions during the POR.

Trelleborg's Rebuttal[79]

- Petitioners provide no evidence supporting their assertion that the shipments were of subject merchandise. Rather, CBP data, the absence of contrary information from CBP, and Trelleborg's own information affirmatively demonstrate that the shipments in question were non-subject solid tires.
- Though irrelevant to the ultimate finding, Petitioners' assertion that the entities are not distinct is patently false and their separation is, indeed, indicated on the record.
- In addition to providing two affirmative examples that the precise shipments in question were non-subject merchandise, Trelleborg certified to the fact that all 13 shipments were non-subject, and certified to the fact that the Hebei producer produces and sells non-subject tires.
- Petitioners' lone case citation with respect to the burden of providing information is inapposite, as Trelleborg provided relevant information, unprompted, and the Department did not request or require any further information on the subject.

**Department's Position:** Trelleborg certified that it did not have reviewable transactions during the POR.[80] The absence of entries produced by TWS Xingtai in the Department's CBP data

---

[78] *See* Petitioners' Case Brief at 7-8. Petitioners cite to: *Zenith Electronics. Corp. vs. United States*, 988 F.2d 1573 (Fed. Cir. 1993) ("*Zenith*"). Petitioners reference: Letter from Trelleborg, entitled, "Trelleborg Wheel Systems (Xingtai) China, Co. Ltd. Statement of No Shipments during the POR: New Pneumatic Off-The-Road Tires from the People's Republic of China," dated November 20, 2013 ("Trelleborg No Shipments Letter"); Letter from Petitioners entitled, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off The-Road Tires from China (A–570–912): Petitioners' Comments on Trelleborg Wheel Systems (Xingtai) China's No Shipments Claims," dated December 4, 2013 ("Petitioners' TWS Comments"); Letter from TWS entitled, "Trelleborg Wheel Systems (Xingtai) China, Co. Ltd.: Rebuttal of Factual Information Submitted By Titan Tire Corporation on December 4, 2013," dated December 11, 2013 ("TWS Rebuttal Factual Submission"); Letter from Petitioners entitled, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off-The-Road Tires from China (A–570–912): and Petitioners' Response to Trelleborg Wheel Systems (Xingtai) China's Rebuttal Comments Concerning Its No Shipments Claim," dated December 16, 2013 ("Petitioners' Reply to TWS Rebuttal").

[79] *See* Trelleborg Rebuttal Brief at 1-8. Trelleborg cites to the *Preliminary Results* (October 10, 2014) and accompanying PDM and addresses the *Zenith* (Fed. Cir. 1993) case referenced by Petitioners. Trelleborg references the following record submissions: CBP Message Number 3352302, dated December 18, 2013 ("No Shipments Message"); Trelleborg No Shipments Letter; Petitioners' TWS Comments; TWS's Rebuttal Factual Submission; Petitioners' Reply to TWS Rebuttal; and Petitioners' Case Brief.

inquiry supports this no shipment claim, and CBP did not report contrary information.[81] In CBP Message 3352302, the Department alerted CBP of Trelleborg's claim of no shipments and requested that CBP officials notify the Department within 10 days should they be in possession of information contrary to this no shipments claim. CBP officials did not contact the Department with contrary information. Meanwhile, Trelleborg submitted information to the record (*i.e.*, invoices for two of the thirteen shipments of concern to Petitioners) demonstrating that the shipments were of non-subject merchandise (*i.e.,* solid tires).[82] Based on this information, we made a preliminary determination of no shipments for Trelleborg.[83]

For these final results, Petitioners assert that the Department should determine that Trelleborg made reviewable shipments during the POR and assign Trelleborg a dumping margin in this review because, though Trelleborg provided information demonstrating that two of the shipments in question were of non-subject tires, the record lacks information with respect to the remaining eleven shipments. Citing to *Zenith* (Fed. Cir. 1993), Petitioners note that the burden of producing relevant information belongs to the party in possession of the necessary information and the Department should not make an assumption with respect to these shipments absent affirmative information demonstrating that the remaining eleven shipments are also of non-subject tires.[84]

As noted above, the preliminary determination of no shipments was based on a certified statement from Trelleborg and supported by (1) a CBP data inquiry, (2) absence of contrary information from CBP, and (3) transaction-specific invoices. Moreover, the facts at issue in this case – in which Trelleborg provided relevant information, unprompted by any request (and, thus, any burden) from the Department – are dissimilar from those at issue in *Zenith* (Fed. Cir. 1993), in which the Department placed a specific burden on respondents to provide evidence in support of an assertion (and which respondents failed to do in that case).[85] Further, Petitioners fail to cite to any record evidence that would bring into question a certification that is supported by the record, nor do they provide sufficient argument that would prompt further examination of the Department's preliminary determination on this issue. Accordingly, we find that the record continues to support Trelleborg's no shipment certification, and we continue to find that there were no reviewable transactions made by Trelleborg during the POR.

**Comment 3: Whether to Assign a Margin to Zhongce**

- Petitioners argue that, upon a review of proprietary CBP data and proprietary information submitted by Zhongce in its separate rate application ("SRA"), in the context of the Department's standard *bona fides* analysis, the Department should determine that Zhongce did not have reviewable shipments during the POR and should not assign a margin to Zhongce in this review.[86]

---

[80] *See* Trelleborg No Shipments Letter.
[81] *See* CBP Data Release at Attachment 1 and the No Shipments Message (to which CBP did not provide a reply).
[82] *See* Trelleborg's Rebuttal Factual Submission at Attachment 3.
[83] *See Preliminary Results*.
[84] *See* Zenith, 988 F.2d 1573.
[85] *Id.*
[86] *See* Petitioners' Case Brief at 8-12. Petitioners cite to: *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Rescission, in*

- Zhongce rebuts that Petitioners' claims are not supported by the facts and that it is entitled to a separate antidumping duty rate. Zhongce further asserts that Petitioners have waived this issue by failing to raise it in a timely fashion.[87]

**Department's Position:** Zhongce submitted a complete and timely separate rate application, including documentation demonstrating a suspended entry of subject merchandise during the POR, which the Department was able to corroborate using CBP data.[88] Based upon a review of Zhongce's separate rate application, the Department preliminarily determined that Zhongce was eligible for a separate rate, and thus assigned Zhongce a separate rate for the *Preliminary Results*.[89]

Petitioners assert that Zhongce's sales during the POR were non-*bona fide*. However, in making such an assertion, Petitioners rely on case cites where the Department had deemed a mandatory respondent's or a new shipper respondent's sales to be non-*bona fide*. In this case, Zhongce is participating as a separate rate applicant. In light of the Department's resource constraints and decision to limit individual examination of exporters under review, the Department's practice is not to perform a resource-intensive and complex *bona fides* analysis on sales made by separate rate applicants that are not mandatory respondents. Rather, we rely upon CBP data and/or CBP

---

*Part; 2010-2011*, 78 FR 22513 (April 16, 2013) ("*Tires/PRC 10-11*"); *Tires/PRC 2008-2009* (April 25, 2011); *Fresh Garlic From the People's Republic of China: Final Results and Partial Rescission of the 18th Antidumping Duty Administrative Review; 2011-2012*, 79 FR 36721 (June 30, 2014); *Certain Frozen Warmwater Shrimp From the People's Republic of China: Notice of Final Results and Rescission, in Part, of 2004/2006 Antidumping Duty Administrative and New Shipper Reviews*, 72 FR 52049 (September 12, 2007); *Preliminary Results* (October 10, 2014); *Polyethylene Terephthalate Film, Sheet, and Strip From Brazil: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 1827 (January 10, 2014); *Certain Forged Stainless Steel Flanges from India; Rescission of Administrative Review*, 73 FR 44969 (August 1, 2008) ("*Flanges/India Rescission*"), unchanged in *Certain Forged Stainless Steel Flanges from India; Rescission of Administrative Review*, 73 FR 63692 (October 27, 2008); *Tianjin Tiancheng Pharmaceutical Co. Ltd. v. United States*, 366 F. Supp. 2d 1246 (CIT 2005) ("*Tianjin Tiancheng*"); and *Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review and Partial Rescission*, 73 FR 15479 (March 7, 2008). Petitioners reference the following submissions: Letter from Zhongce, entitled, "New Pneumatic Off-the Road Tires from the People's Republic of China (2012-2013): Separate Rate Application," dated January 8, 2014 ("Zhongce SRA") and letter from Zhongce, entitled, "New Pneumatic Off-the Road Tires from the People's Republic of China (2012-2013): Supplement to Zhongce SRA," dated January 14, 2014 ("Zhongce SRA Supplement").

[87] *See* Zhongce's Rebuttal Brief at 1-6. Zhongce addresses the *Flanges/India Rescission* (August 1, 2008) and *Tianjin Tiancheng* (CIT 2005) cases raised by Petitioners, and further cites to the following: *Preliminary Results* and PDM; *Certain Oil Country Tubular Goods From the Republic of Turkey: Final Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances, in Part*, 79 FR 41971 (July 18, 2014); *Certain Orange Juice from Brazil: Final Results of Antidumping Duty Administrative Review, Determination Not To Revoke Antidumping Duty Order in Part, and Final No Shipment Determination*, 76 FR 50176 (August 12, 2011); *Multilayered Wood Flooring From the People's Republic of China; Preliminary Results of Antidumping Duty New Shipper Reviews; 2012-2013*, 79 FR 33723 (June 13, 2014); *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Preliminary Results of Antidumping Duty New Shipper Review*; 2011–2012, 78 FR 14267 (March 5, 2013) ("*Tires/PRC 11-12 NSR Prelim*"); and 19 CFR 351.309(d) of the Department's regulations. Zhongce references the following record submissions: Zhongce SRA; Zhongce SRA Supplement; Petitioners' Case Brief; Petitioners' submission, entitled, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off The-Road Tires from China (A-570-912): Petitioners' Pre-Preliminary Determination Comments," dated September 8, 2014 ("Petitioners' Pre-Prelim Comments").

[88] *See* Zhongce SRA at Exhibit 1 and Zhongce SRA Supplemental at Exhibit 1. *See also* CBP Data Release at Attachment 1.

[89] *See Preliminary Results* at 61293-94 and accompanying PDM at 7-10.

entry documentation to determine if the separate rate applicant had suspended entries during the POR (as we did in this case).[90]

Accordingly, we continue to find Zhongce eligible for a separate rate because its separate rate application shows absence of both *de jure* and *de facto* government control and because Zhongce was able to demonstrate suspended entries during the POR.[91] Petitioners did not provide any arguments challenging the Department's decision on these established criteria. Moreover, because we continue to find Zhongce eligible for a separate rate, we have not addressed the counter-arguments that Zhongce made to Petitioners' arguments.

**Comment 4: Whether to Adjust U.S Prices for Un-refunded Value-Added Tax ("VAT")**

<u>Double Coin's Comments</u>[92]

- Double Coin argues that the VAT in the PRC is a tax imposed only on domestic transactions and not an export tax, duty, or other charge contemplated in section 772(c)(2)(B) of the Act. This statutory limitation is not subject to the Department's discretion and the Department lacks the authority to adjust for non-export taxes such as VAT. Moreover, PRC law states that the tax rate on exports is zero and the company's VAT refund exceeded VAT paid during the POR and there was no VAT liability for export sales.
- Double Coin asserts that the Department's existing calculation of VAT (*i.e.*, subtracting the reimbursement rate from the base rate) misunderstands the VAT system, in that:
  - The methodology ignores the fact that Double Coin did not pay VAT on export sales, which are exempt.
  - The methodology ignores the fact that the only VAT incurred was for raw material purchases.
  - The VAT that Double Coin did incur on certain raw material purchases was based on free on board ("FOB") costs, however, the methodology overstates the actual VAT deduction by applying it to the re-sale invoice U.S. price, which includes freight and profit.
  - The methodology ignores the fact that Double Coin did not incur input VAT on materials consumed at its Rugao factory to produce merchandise for export, as these were imported through a bonded warehouse and thus exempt from input VAT.
- Double Coin notes that, regardless of the above arguments, if the Department continues to apply its current VAT methodology, it should not do so on the CMA re-sale price in the

[90] *See, e.g.*, *Aluminum Extrusions From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Rescission, in Part, 2010/12*, 79 FR 96 (January 2, 2014) and accompanying IDM at Comment 8.
[91] *See* PDM at 7-10. *See also* Zhongce SRA and Zhongce SRA Supplemental.
[92] *See* Double Coin's Case Brief at 64-69. Double Coin cites to section 772(c)(2)(B) of the Act and the June 19, 2012 *Section 772(c)(2)(B) Methodological Change* in support of its argument. Double Coin references the following submissions: Letter from Double Coin, entitled, "Section C Response of Double Coin Holdings and China Manufacturers Alliance, LLC: Certain New Pneumatic Off-the-Road Tires from China," dated February 18, 2014 ("Double Coin's SCQR"); Double Coin's Letter, entitled, "VAT Tax Supplemental Questionnaire Response of Double Coin Holdings and China Manufacturers Alliance, LLC, Certain New Pneumatic Off-the-Road Tires from China," dated May 14, 2014 ("Double Coin's VAT Response"); Double Coin's letter, entitled, "Supplemental Questionnaire Response of Double Coin Holdings and China Manufacturers Alliance, LLC Certain New Pneumatic Off-the-Road Tires from China," dated July 3, 2014 ("Double Coin's Supplemental C&D QR").

United States, as this is a U.S. price set by a U.S. company in the United States (which does not have a VAT tax) and should instead apply it to the PRC price.

GTC's Comments[93]

- GTC also argues that the VAT in the PRC is a tax imposed only on domestic transactions and not an export tax, duty, or other charge contemplated in section 772(c)(2)(B) of the Act. This statutory limitation is not subject to the Department's discretion, and the Department lacks the authority to adjust for non-export taxes such as VAT. Moreover, there was no VAT liability for export sales (in accordance with PRC law), and, in fact, the company's VAT refund exceeded VAT paid during the POR and GTC received a refund for the full amount of VAT paid to purchase inputs attributed to exported tires during the POR.
- GTC notes that a simple comparison of percentages applied to U.S. price does not accurately reflect VAT liability and, under the plain language of both the statute and the Department's own policy, the issue is not the rate but the amount of VAT paid and then refunded.
- GTC notes that the Department's reasoning for rejecting respondents' calculation of refunded VAT claims is to disallow allocations across all company sales or across sales of products with different VAT schedules by using the difference between the VAT rate and the refund rate. However:
  - GTC did, in fact, provide an irrecoverable VAT calculation methodology that is associated with the production of subject OTR tires exported to the United States (*i.e.,* GTC's allocation was for tires, which are all subject to the same VAT schedule).
  - GTC provided the exact type of reconciliation to its VAT tax returns that the Department requested, including the most detailed VAT calculation possible based on its books and records, and it has reconciled its computations to its VAT tax returns as requested.

---

[93] *See* GTC's Case Brief at 17-29. GTC cites to the following: section 772(c)(2)(B) of the Act; *Magnesium Corp. of America v. United States*, 166 F.3d 1364 (Fed. Cir. 1999); *Section 772(c)(2)(B) Methodological Change* (June 19, 2012); *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984); *Wind Tower Trade Coalition v. United States*, 741 F.3d 89 (Fed. Cir. 2014); *Dorbest v. United States*, 604 F.3d 1363 (Fed. Cir. 2010); and Exhibit 3 to its Case Brief. GTC references the following submissions: The Department's separate letters to GTC and Double Coin entitled, "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Supplemental Tax Questionnaire," dated April 30, 2014 ("VAT Questionnaires"); GTC's submission entitled, "Supplemental VAT Questionnaire Response: Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated May 28, 2014 ("GTC's VAT Response"); the Department's memorandum entitled, "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Verification of the Sales and Factors Response of Guizhou Tyre Co., Ltd. and Affiliates," dated September 30, 2014 ("GTC's Verification Report"); *Preliminary Results* (October 10, 2014) and PDM; and GTC's submission entitled, "Section C & D Responses. Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated February 19, 2014 ("GTC's SCDQR").

Petitioners' Rebuttal[94]

- The Department has rejected on multiple occasions the claim that it lacks the authority to adjust for irrecoverable VAT imposed by an NME government and addressed arguments that the PRC VAT is not an export tax.
- The Department followed its established practice by applying the difference between the general VAT rate and the export rate specific to the subject merchandise.
- The Department's practice is to reject firm-wide allocations across all company sales or across sales of products with different VAT schedules, as the PRC's VAT regime is product-specific, with VAT schedules that vary by industry and specific products.
- The Department has declined to base irrecoverable VAT adjustments on the total VAT liability of a respondent for well-founded reasons.
- GTC's argument that the Department should make an adjustment to account for the particular input VAT for purchases of certain natural rubber and Double Coin's argument regarding the VAT status of some of its inputs at its Rugao factory are both in error, as each would result in an adjustment based on non-product specific data.
- Neither GTC nor Double Coin make a claim or offered any evidence that they were rebated input VAT at more than the standard nine percent on their export sales. As such, the Department should continue to reject GTC's and Double Coin's arguments that the applicable VAT should be calculated by reference to charges and refunds on all their merchandise rather than the irrecoverable VAT on the subject merchandise in question.

**Department's Position:** For the reasons explained below, we continue to apply the un-refunded (irrecoverable) VAT adjustment that we used in the *Preliminary Results* to deduct an amount for irrecoverable VAT from the reported U.S prices for both respondents. However, we agree with Double Coin that our application of the irrecoverable VAT percentage to the U.S. resale price overstated the adjustment and, therefore, as explained below, we based our determination of Double Coin's irrecoverable VAT adjustment on entered value less international freight for these final results of review.

In 2012, we announced a change of methodology with respect to the calculation of the EP or CEP to include an adjustment of any irrecoverable VAT in certain NME countries, in accordance with section 772(c)(2)(B) of the Act.[95] In this announcement, the Department stated that when a NME government has imposed an export tax, duty, or other charge on subject merchandise or on

[94] *See* Petitioners' Rebuttal Brief at 20-24. Petitioners cite the following: *Section 772(c)(2)(B) Methodological Change* (June 19, 2012); *Preliminary Results* (October 10, 2014) and PDM; *Small Diameter Graphite Electrodes From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012-2013*, 79 FR 57508 (September 25, 2014) ("*SDGE/PRC 12-13*"); *Frontseating Service Valves From the People's Republic of China; Final Results of Antidumping Duty Administrative Review; 2012-2013*, 79 FR 71385 (December 2, 2014) ("*FSVs/PRC 12-13*"); *Helical Spring Lock Washers From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2012-2013*, 79 FR 66356 (November 7, 2014); *Diamond Sawblades 11-12*, 79 FR 35723 (June 24, 2014); *Hangers/PRC 12-13 Prelim* (November 5, 2014); *Final Determination of Sales at Less Than Fair Value: Prestressed Concrete Steel Rail Tie Wire From the People's Republic of China*, 79 FR 25572 (May 5, 2014) ("*Prestressed Wire/PRC*"); *Chlorinated Isocyanurates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 4875 (January 30, 2014) ("*Chlorinated Isos/PRC 11-12*"). Petitioners reference Double Coin's Case Brief and GTC's Case Brief.

[95] *See Section 772(c)(2)(B) Methodological Change* (June 19, 2012), 77 FR at 36482.

inputs used to produce subject merchandise, from which the respondent was not exempted, the Department will reduce the respondent's EPs or CEPs accordingly by the amount of the tax, duty or charge paid, but not rebated.[96]

In a typical VAT system, companies do not incur any VAT expense; they receive on export a full rebate of the VAT they pay on purchases of inputs used in the production of exports ("input VAT"), and, in the case of domestic sales, the company can credit the VAT they pay on input purchases for those sales against the VAT they collect from customers.[97] That stands in contrast to the PRC's VAT regime, where some portion of the input VAT that a company pays on purchases of inputs used in the production of exports is not refunded.[98] This amounts to a tax, duty, or other charge imposed on exports that is not imposed on domestic sales and we, thus, disagree with the respondents' assertions that irrecoverable VAT should not be deducted from their U.S. prices. Where the irrecoverable VAT is a fixed percentage of U.S. price, the Department explained that the final step in arriving at a tax-neutral dumping comparison is to reduce the U.S. price downward by this same percentage.[99]

Section 772(c)(2)(B) of the Act authorizes the Department to deduct from EP or CEP the amount, if included in the price, of any "export tax, duty, or other charge imposed by the exporting country on the exportation" of the subject merchandise. We disagree with respondents' claims that we do not have the statutory authority to adjust for irrecoverable VAT, or that our methodology unlawfully re-interprets section 772(c)(2)(B) of the Act. Section 772(c)(2)(B) of the Act authorizes us to deduct from EP or CEP the amount, if included in the price, of any "export tax, duty, or other charge imposed by the exporting country on the exportation" of the subject merchandise. Moreover, respondents argue that they pay no VAT tax upon export and that the PRC VAT is not an export tax, duty or charge but, rather, a charge on domestic purchases of inputs; however, this misstates what is at issue: the issue is the irrecoverable VAT, not VAT *per se*. Irrecoverable VAT, as defined in PRC law, is a net VAT burden that arises solely from, and is specific to, exports. It is VAT paid on inputs and raw materials (used in the production of exports) that is non-refundable and, therefore, a cost.[100] Irrecoverable VAT is, therefore, an "export tax, duty, or other charge imposed" on exportation of the subject merchandise to the United States.[101] The statute does not define the terms "export tax, duty, or other charge imposed" on the exportation of subject merchandise. We find it reasonable to interpret these terms as encompassing irrecoverable VAT because the irrecoverable VAT is a cost that arises as a result of export sales. It is set forth in PRC law and, therefore, can be considered to be "imposed" by the exporting country on exportation of subject merchandise. Further, an adjustment for irrecoverable VAT achieves what is called for under section 772(c)(2)(B) of the Act, as it reduces the gross U.S. price charged to the customer to a tax neutral

---

[96] *Id.*, 77 FR at 36483; *see also Chlorinated Isos/PRC 11-12* (January 30, 2014) and accompanying IDM at Comment 5.
[97] *See*, *e.g.*, *Diamond Sawblades 11-12,* 79 FR 35723 (June 24, 2014) and accompanying IDM at Comment 6; *Section 772(c)(2)(B) Methodological Change*, 77 FR at 36483.
[98] *See* Double Coin's VAT Response at Exhibit SC-1; GTC's VAT Response at Exhibits 1-3; and *Methodological Change*, 77 FR at 36483.
[99] *See Section 772(c)(2)(B) Methodological Change* (June 19, 2012), 77 FR at 36483.
[100] *See SDGE/PRC 12-13* (September 25, 2014) and accompanying IDM at Comment 7.
[101] *See*, *e.g.*, *Diamond Sawblades 11-12*, 79 FR 35723 (June 24, 2014) and accompanying IDM at Comment 6 and *FSVs/PRC 12-13* (December 2, 2014) and accompanying IDM at Comment 5.

net price received by the seller. This deduction is consistent with our longstanding policy, which is consistent with the intent of the statute, that dumping margin calculations be tax-neutral.[102]

In both an initial and supplemental questionnaire, the Department instructed GTC and Double Coin to report value-added taxes on inputs used to produce the merchandise sold to the U.S. and identify the portion of input VAT that was not fully refunded on exportation. In response, both respondents stated their disagreement with our product-specific methodology and reported that their total VAT refund exceeded VAT paid for export sales during the POR and, thus, reported no value in the VAT field of their respective sales databases.[103] However, our practice is that we will not consider allocations across all company sales or across sales of products with different VAT schedules but, rather, to use the difference between the VAT rate and the refund rate, consistent with PRC regulations, unless the company can show otherwise for the subject merchandise.[104] Rather, our irrecoverable VAT calculation methodology, as applied in this review, consists of performing two basic steps: (1) determining the irrecoverable VAT tax on subject merchandise, and (2) reducing U.S. price by the amount determined in step one. Information placed on the record of this review by both GTC and Double Coin indicates that according to the Chinese VAT schedule, the standard VAT levy is 17 percent and the rebate rate for subject merchandise is nine percent.[105] For the purposes of these final results, therefore, we removed from U.S. price the difference between the rates (*i.e.*, eight percent), which is the irrecoverable VAT as defined under PRC tax law and regulation.[106]

For these final results, both Double Coin and GTC argue that the Department should take into account for the calculation of irrecoverable VAT the various alternate (or absent) input VAT rates that they claim are applicable to certain inputs used in the production of subject merchandise: for GTC's purchases of certain natural rubber (which, according to GTC is assessed at a VAT rate of 13 percent for all other inputs); and for Double Coin's raw materials consumed to produce merchandise for export at its Rugao factory that were imported through a bonded warehouse (which Double Coin claims did not incur any input VAT, pursuant to PRC law). In our questionnaires to Double Coin and GTC we asked that if the irrecoverable VAT amount reported is not directly derived as the difference between the VAT tax rate applicable to domestic purchases and inputs and the refund rate for export sales of subject merchandise, then they need to: 1) explain in detail why and provide worksheets demonstrating how to calculate the irrecoverable VAT; 2) reconcile the worksheets to the translated VAT tax returns provided and provide a detailed narrative explanation that describes the calculations shown in the worksheets; and 3) for each reconciling item reported in the worksheets, provide documentation and a citation to the Chinese laws and regulations to fully support the reason for the reconciling item. However, the respondents did not provide this information, and the limited information they did provide would result in an adjustment to irrecoverable VAT based on non-product

---

[102] *See* Article 5(3) of Circular 39 that states, "(3) Where the Tax Refund Rate is lower than the applicable tax rate, the amount of tax calculated according to the difference in rates shall be included in the costs of the Exported Goods and Services."; *See Section 772(c)(2)(B) Methodological Change* (June 19, 2012), 77 FR at 36483, and *Final Rule* (May 19, 1997) 62 FR at 27369 (citing the SAA).

[103] *See* Double Coin's VAT Response and GTC's VAT Response.

[104] *See, e.g.*, *Diamond Sawblades 11-12* (June 24, 2014) and accompanying IDM at Comment 6.

[105] *See*, *e.g.*, Double Coin's VAT Response at 2-3 and GTC's VAT Response at 1-2.

[106] *See*, *e.g.*, *Prestressed Wire/PRC* (May 5, 2014) and accompanying IDM at Comment 1. *See* the Program Log and Output attached to Double Coin's and GTC's Final Analysis Memoranda for details regarding this calculation.

specific data. For the calculation of irrecoverable VAT we will not consider allocations across all company sales or across sales of products with different VAT schedules.[107] Furthermore, we note that GTC fails to cite to any evidence on record of this specifically lower rate that it claims applies to one of the inputs it consumed, nor did the Department verify the claimed 13 percent VAT rate for natural rubber at verification. Further, Double Coin's argument that it did not pay VAT on certain inputs ignores the fact that it did not receive the full refund from its exports that it would have otherwise received and, thus, the difference in these amounts is a cost arising from exportation. Indeed, neither GTC nor Double Coin make a claim or offered any evidence that they were rebated input VAT at more than the standard nine percent on their export sales. With respect to GTC's assertion that it provided the exact type of reconciliation to its VAT tax returns that the Department requested in its VAT questionnaire, we note that our request was for parties to reconcile the amount of irrecoverable VAT reported to its VAT tax returns, but GTC only reconciled the input and output VAT to their tax returns and, as such, did not provide the reconciliation requested.[108]

Irrecoverable VAT is (1) the free-on-board value of the exported good, applied to the difference between (2) the standard VAT levy rate and (3) the VAT rebate rate applicable to exported goods.[109] The first variable, export value, is unique to each respondent and sale while the rates in (2) and (3), as well as the formula for determining irrecoverable VAT, are each explicitly set forth in Chinese law and regulations.[110]

19 CFR 351.401(c) requires that the Department rely on price adjustments that are "reasonably attributable to the subject merchandise." The PRC's VAT regime is product-specific, with VAT schedules that vary by industry and even across products within the same industry. Irrecoverable VAT is a product-specific export tax, duty, or other charge that is incurred on the exportation of subject merchandise. Thus, our analysis is consistent with our current irrecoverable VAT policy and our treatment of irrecoverable VAT in recently completed NME cases.[111] Therefore, we have not altered our irrecoverable VAT adjustment methodology for these final results.

Finally, Double Coin argues that – notwithstanding its aforementioned arguments regarding the applicability of the Department's irrecoverable VAT methodology – in applying this methodology the Department should not assess irrecoverable VAT on the gross unit price (*i.e.*, CMA's re-sale price in the United States). Instead, Double Coin argues, the Department should instead apply the irrecoverable VAT assessment to the PRC export price less freight expenses, which can be calculated by subtracting reported ocean freight from reported entered value. We agree with Double Coin that the calculation in the *Preliminary Results* overstated the export sales value and that Double Coin's suggested correction to the calculation is appropriate and

---

[107] *See*, *e.g.*, *Prestressed Wire/PRC* (May 5, 2014) and accompanying IDM at Comment 1.
[108] *See* GTC's VAT Response at Exhibit 2.
[109] *See Prestressed Wire/PRC* (May 5, 2014) and accompanying IDM at Comment 1, n. 35.
[110] *Id.* at Comment 1, n. 36.
[111] *See*, *e.g., Certain Polyester Staple Fiber From the People's Republic of China: Final Results of the Antidumping Duty Administrative Review; 2012-2013*, 80 FR 4542 (January 28, 2015) and IDM at Comment 6; *Chlorinated Isocyanurates From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012-2013* (January 28, 2015) and IDM at Comment 4.

consistent with our recent practice.[112] Accordingly, for Double Coin's CEP sales, we based our determination of the irrecoverable VAT tax offset on entered value less international freight.[113]

**Comment 5: Use of Adverse Facts Available in Calculating Double Coin's Margin**

Double Coin's Comments[114]

- As a result of the discovery of an unreported CONNUM at verification, Department officials applied the highest CONNUM-specific margin to the percentage of all sales comprised by the missing CONNUM, and applied this to the calculated margin as an adverse inference to account for the amount of unreported sales. Double Coin argues that there is no basis for applying an adverse inference in accounting for the sales of the unreported CONNUM, as the Department acknowledged and verified that the error was inadvertent.
- CMA offered all relevant information once the error was discovered, and in no way failed to cooperate by not acting to the best of its ability or impeded the proceeding.
- The Department should instead apply the average of all CONNUM-specific margins as facts available ("FA").
- Regardless of whether the Department applies facts available ("FA") or AFA to the unreported sales, the Department must apply this margin only to the percentage of sales shown to have been sold to U.S. customers. The summary sheet provided at verification clearly shows the breakdown of domestic and export sales, and Department officials verified this information.

Petitioners' Comments[115]

- In past determinations where a respondent did not report all U.S. sales, the Department has held that applying the highest calculated margin as partial AFA is appropriate, even when the respondent claims inadvertence or the missing data is offered during verification.

---

[112] *See Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China: Final Results of the Antidumping Duty Administrative Review and Final Results of the New Shipper Review; 2012-2013*, 80 FR 4244 (January 27, 2015) and accompanying IDM at Comment 9 ("We agree with CPZ/SKF that it is appropriate to use the entered value of its merchandise as the tax base here, given that: 1) it is essentially the same as the company's export value; and 2) the Government of the PRC determines the amount of VAT rebated upon exportation using export values."). *See also Frontseating Service Valves From the People's Republic of China; Final Results of Antidumping Duty Administrative Review; 2012-2013*, 79 FR 71385 (December 2, 2014) and accompanying IDM at Comment 5 ("{A}s Sanhua noted, in the *Preliminary Results*, the Department overstated the export sales value by deducting only international freight and certain adjustments from CEP. For these final results, we based our determination of the VAT tax offset, as Sanhua suggested, on entered value, which excludes international freight and U.S. selling expenses.").

[113] *See* Double Coin's Final Analysis Memo for further details on the calculation pursuant to this correction. As GTC previously provided FOB prices for its sales, and these prices were used for the VAT calculation in the *Preliminary Results*, no such change is needed to GTC's VAT liability calculation.

[114] *See* Double Coin's Case Brief at 59-64. Double Coin cites to *Jiangsu Changbao* (CIT 2012) and section 776(a) and (b) of the Act. Double Coin references the following record documents: Double Coin's Preliminary Analysis Memo and Double Coin's Verification Report.

[115] *See* Petitioners' Rebuttal Brief at 15-18. Petitioners cite to *Final Determination of Sales at Less Than Fair Value: Silica Bricks and Shapes From the People's Republic of China*, 78 FR 70918 (November 27, 2013) ("*Bricks/PRC*") and *Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003). Petitioners reference the following record documents: Double Coin's Preliminary Analysis Memo, Double Coin's Verification Report, and Double Coin's Case Brief.

- The Department only accepted information at verification to collect information necessary to allow the inclusion of these sales in the average margin calculated for Double Coin and did not verify whether any of the sales were re-exported (regardless of what fields are included on the summary sheet provided). Instead the Department explicitly noted there is nothing on the record to demonstrate that these sales were not entered for U.S. consumption, and should continue to include the total volume of unreported sales in the final calculation.

**Department's Position:** At verification of Double Coin's U.S. sales affiliate, CMA, we discovered an unreported CONNUM that company officials admitted should have been reported as subject merchandise, but claimed was unreported because of an oversight with respect to product lines.[116] As information with respect to these sales was not previously on the record, we declined to take invoices or other sales-specific information regarding sales of this product during the POR, but took a summary sheet which contained the quantity and value information of the sales.[117] Company officials stated that the majority of these sales were to non-U.S. markets and the number of tires sold to downstream U.S. customers represented only about 35 percent of the total number of tires sold of this product. In the *Preliminary Results*, we noted that the record lacked evidence to demonstrate that the entirety of the sales of this CONNUM (*i.e.*, representing all of CMA's sales of this OTR product during the POR, whether to downstream U.S. customers or export sales) was not entered for U.S. consumption. Accordingly, in calculating Double Coin's weighted-average margin for the *Preliminary Results*, we weight-averaged the *ad valorem* margin for Double Coin's reported sales (calculated from our standard antidumping duty program) with a margin determined for all unreported sales.[118] As the record did not contain information for which to calculate a margin for these sales, we assigned the highest CONNUM-specific margin calculated for the reported sales as an adverse inference applicable to the unreported sales.[119]

For these final results, Double Coin asserts that the highest calculated CONNUM-specific margin should not be applied in accounting for these sales, as section 776(b) of the Act only permits the application of an adverse inference when a party fails to cooperate by not acting to the best of its ability to comply with a request for information and is found to have willfully impeded the proceeding, which is not the case in the instant proceeding.

We agree that Double Coin's error was inadvertent and the respondent was cooperative once the omission was discovered at verification. However, we agree with Petitioners that the application of the adverse inference in this situation is proper and well supported by precedent.[120] Section 776(a)(2)(B) and (D) of the Act provides that if an interested party fails to provide information within the established deadlines or provides information but the information cannot be verified, the Department shall use, subject to section 782(d) of the Act, facts otherwise available in reaching the applicable determination. Moreover, section 776(b) of the Act provides that, if the Department finds that an interested party failed to cooperate by not acting to the best of its ability

---

[116] *See* Double Coin's Verification Report at section VII.A.4.
[117] *Id.,* at Exhibit US-VE 12.
[118] *See* Double Coin's Preliminary Results Analysis Memo at Attachment III.
[119] *Id.*, at 10 and Attachments II and III.
[120] *See Final Determination of Sales at Less Than Fair Value: Silica Bricks and Shapes From the People's Republic Of China*, 78 FR 70918 (November 27, 2013), and accompanying IDM at Comment 7.

to comply with a request for information, the Department may use an inference adverse to the interests of that party in selecting the facts otherwise available. In addition, the SAA accompanying the Uruguay Round Agreements Act explains that the Department may employ an adverse inference "to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully."[121]

In *Nippon Steel*, the Federal Circuit noted that while the statute does not provide an express definition of the "failure to act to the best of its ability" standard, the ordinary meaning of "best" is "one's maximum effort."[122] Thus, according to the Federal Circuit, the statutory mandate that a respondent act to the "best of its ability" requires the respondent to do the maximum it is able to do. The Federal Circuit indicated that inadequate responses to an agency's inquiries would suffice to find that a respondent did not act to the best of its ability.[123] While the Federal Circuit noted that the "best of its ability" standard does not require perfection, it does not condone inattentiveness, carelessness, or inadequate record keeping.[124] The "best of its ability" standard recognizes that mistakes sometimes occur; however, it requires a respondent to, among other things, "have familiarity with all of the records it maintains," and "conduct prompt, careful, and comprehensive investigations of all relevant records that refer or relate to the imports in question to the full extent of" its ability to do so.[125]

The antidumping duty questionnaire issued in this review requires respondents to report all of their relevant U.S. sales during the POR. Double Coin had multiple opportunities to provide the full universe of sales, given that the Department issued multiple supplemental questionnaires to Double Coin, and Double Coin made adjustments to reported sales notwithstanding the unreported CONNUM in its responses to the supplemental questionnaires.[126] Thus, section 782(d) was satisfied with respect to the universe of Double Coin's sales. By not reporting the entire universe of its U.S. sales in its questionnaire and supplemental questionnaire responses, Double Coin failed to provide information within the deadlines established.

The Department previously declined to accept unreported sales information identified at verification and instead relied upon FA or AFA as appropriate.[127] In this case, we find it is

---

[121] *See* SAA, H.R. Rep. No. 103-316, at 870; *see also Notice of Final Results of Antidumping Duty Administrative Review: Stainless Steel Bar from India*, 70 FR 54023, 54025-26 (September 13, 2005); *Notice of Final Determination of Sales at Less Than Fair Value and Final Negative Critical Circumstances: Carbon and Certain Alloy Steel Wire Rod from Brazil*, 67 FR 55792, 55794-96 (August 30, 2002).
[122] *See Nippon Steel v. United States*, 337 F.3d 1373, 1382-83 (Fed. Cir. 2003).
[123] *Id*.
[124] *Id*.
[125] *Id*.
[126] *See*, *e.g.*, Double Coin's Supplemental C&D Response.
[127] *See Final Determination of Sales at Less Than Fair Value; Stainless Steel Sheet and Strip in Coils From Germany*, 64 FR 30710 (June 8, 1999) at Comment 10 ("*SSSS*/*Germany*"). In this case, the Department noted that the respondent identified the missing sales at the outset of verification (and provided a complete packet containing copies of each of the relevant invoices which the Department included on the record as a verification exhibit), but for the final results the Department noted "that {the respondent} had three opportunities spread over four months to provide the Department with a complete listing of its U.S. sales. In response to its failure to do so, as adverse facts available, we are applying the highest non-aberrational margin calculated based on {the respondent's} correctly reported CEP transactions to the unreported sales and have included these transactions in our calculation of the overall weighted-average margin." *See also*, *Bricks/PRC* (November 27, 2013) at Comment 7, where the respondent similarly claimed its failure to report all U.S. sales was inadvertent after the Department discovered the unreported

appropriate to base dumping margins for these unreported sales on FA pursuant to section 776(a) of the Act. Further, as evidenced by its ability at verification to identify the invoices related to these specific unreported U.S. sales, it is clear that Double Coin possessed the necessary records to provide a complete U.S. sales database but did not conduct a comprehensive investigation of all relevant records to identify the unreported sales in a timely manner. As discussed in prior cases, we note that the purpose of verification is to verify the accuracy of information previously submitted to the record by the respondent, not to collect new sales information that had been previously requested but not reported. Therefore, we find that Double Coin's failure to report all of its U.S. sales of in-scope products during the POR, using the information over which it maintained control at all times, indicates that the respondent did not act to the best of its ability to comply with our request for information.[128] Hence, we find it is appropriate to base the dumping margins for these unreported sales on AFA and continue to assign the highest CONNUM-specific margin to the unreported sales for the final results.[129]

However, we agree with Double Coin that we should only apply this adverse inference to the 35 percent of unreported sales shown to have been sold to U.S. customers. Upon discovery of the omission of sales of this product at verification, Department officials requested information for all sales of this product during the POR. For the sake of completion and in compliance with the Department's request, Double Coin provided all information available for all sales of this tire type, whether sold to a U.S. customer or foreign customer, including original invoices for each sale, along with a cover sheet summarizing all transactions (*i.e.*, the summary sheet provided at US VE-12 of Double Coin's Verification Report). As noted in the verification report, Department officials declined to take new factual information on the specific sales for the record (*i.e.*, copies of invoices). However, in order to have a record of the quantity of the missing sales for any necessary margin calculation, we accepted the summary sheet (*i.e.*, US VE-12). Though Department officials did not take the invoices for the record, we did review the information on these original invoices to ensure the veracity of the information provided in the summary sheet. Thus, after considering Double Coin's comments, we find that the use of the total sales value corresponding to sales of all unreported tires sold by CMA during the POR, regardless of destination, used for the total margin calculation in *Preliminary Results* was in error, and we

---

sales at verification, but the Department nonetheless determined that the respondent failed to act to the best of its ability by not reporting all U.S. sales prior to verification (rejecting the respondent's arguments that an inadvertent omission cannot be viewed as a withholding of information). Citing to *Nippon Steel*, the Department noted that the respondent had all the information in its possession prior to the Department's discovery, and it had been instructed to submit all its U.S. sales and rejected the respondent's arguments that the Department could have accepted information on the unreported sales at verification, stating, "the purpose of verification is to verify the accuracy of information previously submitted to the record by the respondent, not to collect new sales information that had been previously requested but not reported."

[128] *Id.* As in this *Bricks/PRC* (November 27, 2013) case, where the Department held that by reporting U.S. sales based on knowledge of customers' typical purchases rather than thoroughly examining sales records, the respondent had not done the maximum it could have done, we note that, in the instant case, by failing to cross check for subject merchandise across product lines (an error that, while inadvertent, was readily apparent to Department officials quite early in the relevant review process at verification), Double Coin did not do the maximum it could have done to provide the full universe of sales information to Department officials in a timely manner. *See also*, *e.g.*, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2012-2013*, 80 FR 1021 (January 8, 2015), citing to *SSSS/Germany* (June 8, 1999) at Comment 10.

[129] *See* Double Coin's Final Analysis Memo.

instead used the reported sales value of the domestic sales of the tire type in question (*i.e.*, representing 35 percent of all unreported sales) in the calculation of Double Coin's margin for these final results.[130]

**Comment 6: Use of PT Gajah Tunggal's Financial Statement for the Surrogate Financial Ratio Calculation**

GTC's Comments[131]

- The Department should adjust the financial ratios to account for Gajah Tunggal's total cost of labor. Specifically, the Department correctly adjusted Gajah Tunggal's manufacturing expenses to account for the cost of energy using Gajah Tunggal's annual report in the *Preliminary Results*, and should now adopt the same methodology to adjust Gajah Tunggal's total production labor.
- Alternatively, the Department should place Gajah Tunggal's corrected 2013 statements on the record and use these revised statements (the Department should be aware of such corrected statements for Gajah Tunggal, since they are on the record of the *PVLT Tires/PRC LTFV Prelim* (January 27, 2015)).

[130] For a further proprietary discussion of our findings at verification and of this calculation, *see* Double Coin's Final Analysis Memo.

[131] *See* GTC's Case Brief at 4-11. GTC cites to the following: *Grobest & I-Mei Indus. (Vietnam) Co. v. United States*, 815 F. Supp. 2d 1342 (CIT 2012); *Chlorinated Isocyanurates From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2010-2011*, 78 FR 4386 (January 22, 2013); *Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value; Preliminary Affirmative Determination of Critical Circumstances; In Part and Postponement of Final Determination*, 80 FR 4250 (January 27, 2015) ("*PVLT Tires/PRC LTFV Prelim*"); *Fresh Garlic From the People's Republic of China: Final Rescission of Antidumping Duty New Shipper Reviews; 2010-2011*, 78 FR 18316 (March 26, 2013); *Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results of the Antidumping Duty Administrative Review and New Shipper Reviews*, 74 FR 11349 (March 17, 2009); *Certain Preserved Mushrooms from the People's Republic of China: Final Results of the Antidumping Duty New Shipper Review*, 71 FR 66910 (November 17, 2006); *Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances: Certain Color Television Receivers From the People's Republic of China*, 69 FR 20594 (April 16, 2004); *Heavy Forged Hand Tools From the People's Republic of China; Final Results and Partial Rescission of Antidumping Duty Administrative Review and Determination Not To Revoke in Part*, 66 FR 48026 (September 17, 2001); *Shakeproof Assembly Components. v. United States*, 268 F.3d 1376 (Fed. Cir. 2001); *Union Camp Corp. v. United States*, 53 F. Supp. 2d 1310 (CIT 1999); and its own analysis of adjusted overhead ratio provided at Exhibit 1to the Case Brief. GTC references the following record documents: The Department's Memorandum to the File, entitled, "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Preliminary Results Surrogate Value Memorandum," dated September 30, 2014 ("Preliminary SV Memo"); and Petitioners' letter, entitled, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off The-Road Tires from China (A–570–912): Petitioners' Initial Surrogate Value Comments," dated April 14, 2014 ("Petitioners' Initial SV Comments") (specifically, the PT Gajah Tunggal Tbk ("Gajah Tunggal") and PT Goodyear Indonesia Tbk ("Goodyear") financial statements provided at Attachment 19 thereto).

Petitioners' Comments[132]
- The Department should not adjust the reported labor costs in Gajah Tunggal's financial ratios using the unaudited annual report, but should continue to rely on the labor value reported in the audited financial statements as the best available information.
- Citing to *HRS/Romania* (June 14, 2005), Petitioners allege that the Department should decline to "take notice" of a corrected financial statement for Gajah Tunggal that was submitted in the ongoing investigation of passenger vehicle and light truck ("PVLT") tires from the PRC because Gajah Tunggal is affiliated with interested parties in that investigation.

**Department's Position:**  For the *Preliminary Results*, in order to calculate surrogate financial ratios, we used the financial statements of two Indonesian producers of identical merchandise: Gajah Tunggal and Goodyear.  Though Goodyear's financial statements break out energy, Gajah Tunggal's financial statements do not.  However, Gajah Tunggal's annual report provides the cost of energy as a percentage of the total cost of production.  Thus, for the *Preliminary Results*, we used the percentage provided in Gajah Tunggal's annual report to compute the cost of energy for Gajah Tunggal in the computation of the financial ratios.  For these final results, as explained below, we relied solely on Goodyear's financial statements for computation of financial ratios.

As a preliminary matter, no party disputed either the use of Goodyear's financial statements or the manner in which the Department used Goodyear's statements to calculate surrogate financial ratios.  Second, we note that Goodyear is a producer of identical merchandise and that its audited financial statements are complete, contemporaneous with the POR, and include detailed expense lines for raw materials, manufacturing labor, manufacturing energy, and manufacturing overhead.

With regards to Gajah Tunggal's financial statements, GTC argues that either (1) the Department should make an adjustment to direct labor, the same way the Department did for Gajah Tunggal's manufacturing energy using Gajah Tunggal's annual report, or (2) that the Department should "take notice" of a corrected version of Gajah Tunggal's financial statements, which were placed on the record of the ongoing investigation of PVLT tires from the PRC.

In this case, because we still have another financial statement (*i.e.*, Goodyear), which no party disputed, we did not use the financial statements of Gajah Tunggal for these final results because Gajah Tunggal's audited financial statements do not contain a line for manufacturing energy.  As GTC pointed out, there may be some inconsistency between Gajah Tunggal's annual report and its audited financial statements; thus, rather than rely upon Gajah Tunggal's unaudited annual report to generate a cost for manufacturing energy for Gajah Tunggal as we did in the *Preliminary Results* or to generate a cost for production labor, we discarded Gajah Tunggal's statement in favor of only using Goodyear's complete, audited financial statements which break out all relevant manufacturing costs.

---

[132] *See* Petitioners' Rebuttal Brief at 24-26 and Exhibit 1.  Petitioners cite to *HRS/Romania* (June 14, 2005) and section 773(c)(1) of the Act.  Petitioners reference the following record documents:  Preliminary SV Memo and GTC's Case Brief.

The Department's practice is to rely upon the best, publicly available information when making determinations. As we determined not to use Gajah Tunggal's financial statements, and to rely only on Goodyear's financial statements for calculation of the financial ratios, the Department does not need to examine information not on the instant case record (*i.e.*, the filing in the PVLT tires investigation), since Goodyear's statements represent the best information available for this case.

Additionally, with regards to Petitioners' arguments that the labor percentage suggested by GTC to calculate Gajah Tunggal's financial ratio is not an accurate representation of the actual amount of direct labor used by GTC itself, we note that this argument is moot because the Department decided not to use Gajah Tunggal's financial statements for other reasons.

For the final results, we determined to reject Gajah Tunggal's statement entirely because its financial statements did not include energy and, upon further consideration, the un-audited annual report is not a sufficiently reliable source to derive the energy ratio and, at any rate, Gajah Tunggal's statement is not necessary because we already have a complete and useable statement from Goodyear that does break out energy. Therefore, we relied solely on the Goodyear statement for the calculation of surrogate financial ratios.[133]

**Comment 7: Surrogate Value ("SV") for Coal**

- GTC argues that the Department should value coal using the more product-specific price data from Argus Coalindo rather than Global Trade Atlas ("GTA") import data used in the *Preliminary Results*.[134]

---

[133] *See* Final SV Memo at 2 and Attachments I, II, and III.

[134] *See* GTC's Case Brief at 12-17. GTC cites to the following: *Multilayered Wood Flooring From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 76 FR 64318 (October 18, 2011); *Chlorinated Isocyanurates From the People's Republic of China: Final Results of 2008-2009 Antidumping Duty Administrative Review*, 75 FR 70212 (November 17, 2010); *Certain Hot-Rolled Carbon Steel Flat Products from Romania: Final Results of Antidumping Duty Administrative Review*, 70 FR 34448 (June 14, 2005) ("*HRS/Romania*"); *Taian Ziyang Food Company, Ltd. v. United States*, 783 F. Supp. 2d 1292 (CIT 2011) (as related to the Department's *Policy Bulletin* 04.1); *Chlorinated Isocyanurates From the People's Republic of China: Final Results of June 2008 Through November 2008 Semi-Annual New Shipper Review*, 74 FR 68575 (December 28, 2009); *Certain Tissue Paper Products from the People's Republic of China: Final Results and Final Rescission, in Part, of Antidumping Duty Administrative Review*, 73 FR 58113 (October 6, 2008); *Clearon Corp. v. United States*, Court No. 13-00073, Slip Op. 2014-88 (CIT 2014); *Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*, 366 F. Supp. 2d 1264 (CIT 2005); *Yantai Oriental Juice Co. v. United States*, Court No. 00-07-00309, Slip Op. 2002-56 (CIT 2002); section 773(c)(1) of the Act; and its own summary of the Argus Coalindo information on record, provided at Exhibit 2 to the Case Brief. GTC references the following record documents: GTC's letter entitled, "Surrogate Value Comments for GTC: Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated April 14, 2014 ("GTC's SV Submission") (specifically, the Argus Coalindo data provided at Exhibit 6A thereto); GTC's letter entitled, "GTC's Second Surrogate Value Submission: Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated September 2, 2014 ("GTC's Second SV Submission"); GTC's submission entitled, "GTC's Surrogate Value Rebuttal Submission: Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated May 2, 2014 ("GTC's Rebuttal SV Submission"); and GTC's SCDQR.

- Petitioners rebut that the Department should continue to use GTA import data because it provides a more accurate measure of coal values in Indonesia than the international coal values reported by Argus Coalindo.[135]

**Department's Position:** We do not find Argus Coalindo to be an appropriate source to use to value coal because the Argus Coalindo data represent "prices for Indonesian coal traded on the international spot market" (*i.e.*, prices for Indonesian coal exports) and thus do not accurately represent the price of coal bought or sold in Indonesia.[136] Conversely, the GTA data represent actual prices of coal purchases in Indonesia. When selecting SVs for use in an NME proceeding, the Department's preference is to use, where possible, a range of publicly available, non-export, tax-exclusive, and product-specific prices for the POR, with each of these factors applied non-hierarchically to the case-specific facts and with preference to data from a single surrogate country.[137] As established in the *Preliminary Results*, the Department continues to find that the Indonesia import data obtained from GTA are publicly available, broad market averages, tax-exclusive, and specific to the input in question, satisfying the Department's criteria for selection of a surrogate value. Because the Argus Coalindo data is for export prices paid for Indonesian coal, GTA data is a better, more specific, source to value coal inputs and fulfills the Department's standard SV criteria (non-export, broad-market, *etc*.). Accordingly, we made no changes to the valuation of coal from the *Preliminary Results*.

Additionally, we agree with Petitioners that there is insufficient record data to establish consistent heat values for GTC's coal during the POR (*i.e.*, GTC provided only a handful of coal testing slips with heat values that vary quite widely).[138] Moreover, contrary to GTC's claim that heat value is the most important attribute of its coal purchases and necessarily makes the Argus Coalindo values more specific, we note that the information GTC placed on the record gives equal weight to sulfur content and ash content of the coal. Specifically, the Argus Coalindo report itself has maximum sulfur and ash values for each heat value range and the Platts Coal Pricing Methodologies states that "heat and sulfur content are considered the primary determinants of steam coal price; ash as a secondary determinant."[139] Though GTC did provide a limited selection of coal testing slips with heat values, GTC made no effort to corroborate its

---

[135] *See* Petitioners' Rebuttal Brief at 27-28. Petitioners cite to *Certain Polyester Staple Fiber From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2010-2011*, 78 FR 2366 (January 11, 2013) and *Drill Pipe From the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value and Affirmative Determination of Critical Circumstances, and Postponement of Final Determination*, 75 FR 51004 (August 18, 2010). Petitioners reference the following submissions: GTC's Second SV Submission; GTC's Rebuttal SV Submission; GTC's SCDQR; GTC's Case Brief; and GTC's submission entitled, "GTC Supplemental Section C&D Responses: Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated June 17, 2014 ("GTC's Supplemental SCDQR").
[136] *See* GTC's Second SV Submission at Exhibit 5. Confirming that these are international spot market prices for Indonesian exports of coal (and not prices representative of domestic coal consumption in Indonesia), Argus Coalindo describes its data collection team as consisting of "specialist market reporters/analysts in Singapore, Beijing, Tokyo, Sydney, London, Moscow, Washington, Johannesburg and Bogota, drawing on Argus' global network of energy correspondents."
[137] *See, e.g.*, *Multilayered Wood Flooring From the People's Republic of China: Final Results of Antidumping Duty New Shipper Reviews; 2012-2013*, 79 FR 66355 (November 7, 2014), and accompanying IDM.
[138] *See* GTC's SCDQR at Exhibit SD-7.
[139] *See* GTC's Second SV Submission at Exhibit 5 and GTC's Rebuttal SV Submission at Exhibit 4A.

ash and sulfur levels with those specified in the Argus Coalindo or Platts Coal Pricing Methodologies sources.

Thus, we continue to find that the GTA value for "Bituminous Coal, Not Agglomerated" from Indonesia (HS code 270112) represents the most product-specific, publicly available, tax-exclusive, non-export price on the record with which to value steam coal in Indonesia.

**Comment 8: Valuation of Labor**

- Petitioners argue that the Department should not use a calculated labor rate that falls below the minimum wage as an SV and should inflate the International Labor Organization ("ILO") wage rate by 250 percent or should use the $232 per month value reported in the World Bank's *Doing Business 2014: Indonesia* report.[140]
- GTC rebuts that the Department should not adjust the calculated labor SV based on the stated Indonesian minimum wage from a source unrelated to the ILO Yearbook (*i.e.*, the source of the labor SV used for the *Preliminary Results*).[141]
- Double Coin argues that the Department should reject Petitioners' suggested SV for labor rates because they are not based on the best available information and contends that the allegation that the minimum wage in Indonesia has increased by 250 percent is incorrect.[142]

**Department's Position:** The *Doing Business* wage rates cited by Petitioners bear no relation to the ILO wage rate and are less specific to the production of tires. Specifically, the data in *Doing Business* do not appear to be derived from any country-wide Indonesian law, but rather from a survey of businesses operating in Jakarta and reporting minimum wages for a 19-year old

[140] *See* Petitioners' Case Brief at 12-15. Petitioners cite to: *Saccharin from the People's Republic of China: Final Results of the 2005-2006 Antidumping Duty Administrative Review*, 72 FR 51800 (September 11, 2007); *Steel Wire Garment Hangers From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2012-2013*, 79 FR 65616 (November 5, 2014) ("*Hangers/PRC 12-13 Prelim*"); *Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam: Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 75 FR 47771 (August 9, 2010) ("*Shrimp/Vietnam 08-09*"); and section 773(c)(1) of the Act. Petitioners reference the following submissions: Preliminary SV Memo (specifically, the International Labor Organization's ("ILO") *Yearbook of Labor Statistics* (2008) Chapter 5B data contained therein); GTC's SV Submission (specifically, the World Bank's *Doing Business 2014: Indonesia* information contained at Exhibit 11); and Petitioners' Initial SV Comments (specifically, the ILO *Yearbook of Labor Statistics* (2009) Chapter 5B data contained at Exhibit 14).

[141] *See* GTC's Rebuttal Brief at 1-8. GTC discusses the *Shrimp/Vietnam 08-09* (August 9, 2010) and *Hangers/PRC 12-13 Prelim* (November 5, 2014) cases cited by Petitioner and further cites to *Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor*, 76 FR 36092 (June 21, 2011) ("*Labor Methodologies*"). GTC references the following record submissions: Preliminary SV Memo and *Doing Business 2014: Indonesia* (submitted in GTC's SV Submission at Exhibit 11), and Petitioners' Case Brief.

[142] *See* Double Coin's Rebuttal Brief at 7-13. Double Coin cites the following: *Preliminary Results* (October 10, 2014); *Hangers/PRC 12-13 Prelim* (November 5, 2014); *Labor Methodologies* (June 21, 2011); and further discusses Petitioners' use of *Shrimp/Vietnam 08-09* (August 9, 2010) and *Hangers/PRC 12-13 Prelim* (November 5, 2014). Double Coin references the following record submissions: Letter from Petitioners' entitled, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off-The-Road Tires from China (A–570–912): Petitioners' Fourth Surrogate Value Comments," dated September 2, 2014 ("Petitioners' 4th SV Submission"); Petitioners' Initial SV Comments; *Doing Business 2014: Indonesia* (submitted in GTC's SV Submission at Exhibit 11); Preliminary SV Memo; and Petitioners' Case Brief.

worker/apprentice.[143] Thus, the "minimum wage" in *Doing Business* in not representative of the experience of Indonesian tire producers and does not provide a more reliable indicator of inflation in wages than the "Division: 25 – Manufacture of rubber and plastics products" ILO wage data and Consumer Price Index ("CPI") used in the *Preliminary Results*. Additionally, in response to cases cited by Petitioners, we note that: (1) the ILO data in *Shrimp/Vietnam 08-09* were significantly different from one year to the next and the Department had other ILO data from which to choose;[144] and (2) with regards to *Hangers/PRC 12-13 Prelim*, the Department used more specific, more contemporaneous Thai National Statistical Office data.[145] Thus, we made no change from the *Preliminary Results* and continue to value labor via the Department's standard ILO wage rate methodology, using chapter 25 data for Indonesia, inflated with CPI data.[146]

**Comment 9: Valuation of Domestic Truck Freight**

- Petitioners argue that the Department should recalculate the truck freight rate for Indonesia using a single distance of 16.7 kilometers, representing the distance from the center of Jakarta to the port of Jakarta.[147]
- GTC rebuts that the Department rejected Petitioners' proposed calculation in the recent *MSG/PRC LTFV* (September 29, 2014) case and that the existing calculation is supported by record evidence and current practice.[148]
- Double Coin rebuts that *Doing Business 2014: Indonesia* is clear in defining the distance from the port to a business "located in the periurban area" and, thus, the Department should reject Petitioners' proposed distance. Moreover, Double Coin argues that use of Petitioners' suggested distance would result in an SV for truck freight that does not reflect commercial reality.[149]

---

[143] *See* GTC's SV Submission at Exhibit 11, *Doing Business 2014: Indonesia* at pages 98-99.
[144] *See Shrimp/Vietnam 08-09* and accompanying IDM at Comment 9.
[145] *See Hangers/PRC 12-13 Prelim* and accompanying decision memorandum at 25, unchanged in *Steel Wire Garment Hangers From the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 2012–2013*, 80 FR 13332 (March 13, 2015).
[146] *See Labor Methodologies*.
[147] *See* Petitioners' Case Brief at 15-17. Petitioners cite to: *Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review and New Shipper Review; 2011-2012*, 79 FR 19053 (April 7, 2014) ("*Fish Fillets/Vietnam 11-12*"); *Monosodium Glutamate From the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, and Postponement of Final Determination*, 79 FR 26408 (May 8, 2014); and *Certain Steel Wheels From the People's Republic of China: Notice of Final Determination of Sales at Less Than Fair Value and Partial Affirmative Final Determination of Critical Circumstances*, 77 FR 17021 (March 23, 2012). Petitioners reference the following submissions to the record: Preliminary SV Memo; Petitioners' Initial SV Comments (including *Doing Business 2014: Indonesia*); GTC's SV Submission; Petitioners' Pre-Prelim Comments; GTC's submission entitled, "GTC's Pre-Preliminary Comments: Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated September 9, 2014 ("GTC's Pre-Prelim Comments").
[148] *See* GTC's Rebuttal Brief at 8-10. GTC cites to *Monosodium Glutamate From the People's Republic of China: Final Determination of Sales at Less Than Fair Value and the Final Affirmative Determination of Critical Circumstances*, 79 FR 58326 (September 29, 2014) ("*MSG/PRC LTFV*"). GTC references the following record submissions: *Doing Business 2014: Indonesia* (submitted in GTC's SV Submission at Exhibit 11) and Petitioners' Case Brief.
[149] *See* Double Coin's Rebuttal Brief at 14-19. Double Coin cites to *Certain Frozen Fish Fillets from Vietnam:*

**Department's Position:** *Doing Business* specifies that the business exporting is "located in the periurban area of the economy's largest business city."[150] GTC placed complete evidence on the record of this case establishing the five periurban areas of Jakarta and showing the distance from each area to the port of Jakarta.[151] Following past case precedent, we continued to use an average of five distances from periurban areas of Jakarta to the port of Jakarta.[152] Thus, we made no change to truck freight and continued to calculate freight using a 65.08 kilometer average of distances from the periurban areas of Jakarta to the port of Jakarta.

**Comment 10: Valuation of Electricity**

Petitioners' Comments[153]

- Petitioners contend that the Department should not use electricity rates from the Indonesian utility PT PLN (Persero) ("PLN") as a SV, as information on record and various CVD determinations demonstrate that the PLN rates are heavily subsidized, and the Department must avoid using any prices which it has reason to believe or suspect may be dumped or subsidized.
- The Department should instead use either electricity prices on the record from Thailand or, in the alternative, PLN's cost of production for electricity in Indonesia.

---

*Preliminary Results of AD Administrative Review for 2012-2013*, 79 FR 40059 (July 11, 2014); *Fish Fillets/Vietnam 11-12* (April 7, 2014); *Shandong TTCA Biochemistry Co. v. United States*, 774 F. Supp. 2d 1317 (CIT 2011); *Gallant Ocean* (Fed. Cir. 2010); *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of the 2009-2010 Antidumping Duty Administrative Review and Final Rescission, in Part*, 77 FR 14495 (March 12, 2012); *Tires/PRC 10-11* (April 16, 2013); and *Tires/PRC 11-12 NSR Prelim* (March 5, 2013). Double Coin references the following record submissions: *Doing Business 2014: Indonesia* (submitted in GTC's SV Submission at Exhibit 11) and Petitioners' Case Brief.

[150] *See* GTC's SV Submission at Exhibit 11, *Doing Business 2014: Indonesia* at page 75.

[151] *See* GTC's SV Submission at Exhibit 11.

[152] *See, e.g.*, *MSG/PRC LTFV* and accompanying IDM at Comment 1 and *Fish Fillets/Vietnam 11-12* and accompanying IDM at Comment XIII.

[153] *See* Petitioners' Case Brief at 18-20. Petitioners cite to: Omnibus Trade and Competitiveness Act of 1988, Conf. Report to Accompany H.R. 3, H.R. Rep. No. 576, 100th Cong., 2nd Sess. (1988); *China Nat'l Mach. Imp. & Exp. Corp. v. United States,* 264 F. Supp. 2d 1229 (CIT 2003); *Tianjin Mach. Imp. & Exp. Corp. v. United States*, 806 F. Supp. 1008 (CIT 1992); *Luoyang Bearing Corp. v. United States*, 347 F. Supp. 2d 1326 (CIT 2004); *Xanthan Gum From the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 78 FR 2252 (January 10, 2013); *Notice of Final Determination of Sales at Less Than Fair Value: Certain Small Diameter Carbon and Alloy Seamless Standard, Line and Pressure Pipe From Romania*, 65 FR 39125 (June 23, 2000) ("*Pressure Pipe/Romania LTFV Final*"); *Polyvinyl Alcohol From the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 71 FR 27991 (May 15, 2006). Petitioners reference the following submissions to the record: Petitioners' submission entitled, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off The-Road Tires from China (A–570–912): Petitioners' Additional Surrogate Value Comments," dated May 2, 2014 ("Petitioners' Additional SV Submission"); Preliminary SV Memo; PDM; and Petitioners' Pre-Prelim Comments.

Respondents' Comments[154,155]

- GTC and Double Coin rebut that the Department should continue to value electricity using the PLN rate, because in previous CVD cases the Department examined allegations of sales of electricity for less than adequate remuneration ("LTAR") in Indonesia, and found no benefit from the program.
- GTC avers that there is no evidence establishing that the rate charged by PLN is below its actual production cost. GTC suggests that, if the Department declines to use PLN's data, it could instead use the average electricity price charged to industrial customers in Indonesia published in the 2012 Energy Handbook.
- Double Coin further argues that the Thai electricity value does not constitute "best available information," as it is not specific to the surrogate country, Indonesia.

**Department's Position**: For these final results, we continued to use the PLN electricity prices that we used for the *Preliminary Results* to value respondents' consumption of electricity. First, we prefer to use the same country, where possible, to value all factors of production;[156] in this case, Indonesia is our primary surrogate country. Thus, if we can find an acceptable data source in Indonesia, we would prefer to use the Indonesian value. Second, we prefer to use prices actually paid by producers in the primary surrogate country.[157] Additionally, in countervailing duty cases where the Department examined allegations of sales of electricity for LTAR in Indonesia, the Department determined (as discussed below) that electricity in Indonesia does not provide a countervailable benefit; accordingly, we have no reason to disregard the prices on the record which are charged to industrial customers in Indonesia by PLN.

In the *Shrimp/Indonesia CVD Investigation*, the Department found that PLN charged uniform tariff rates to industrial users. We did not find the provision of electricity to be a countervailable

---

[154] *See* GTC's Rebuttal Brief at 10-14. GTC cites to *Certain Frozen Warmwater Shrimp From Indonesia: Negative Preliminary Countervailing Duty Determination*, 78 FR 33349 (June 4, 2013) ("*Shrimp/Indonesia CVD Prelim*"), sustained in *Certain Frozen Warmwater Shrimp From the Republic of Indonesia: Final Negative Countervailing Duty Determination*, 78 FR 50383 (August 19, 2013) (collectively, "*Shrimp/Indonesia CVD Investigation"*); *Final Affirmative Countervailing Duty Determination: Certain Cut-to-Length Carbon-Quality Steel Plate from Indonesia*, 64 FR 73155 (December 29, 1999) ("*CTL Plate/Indonesia*"); *Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Preliminary Results of the Antidumping Duty Administrative Review and New Shipper Review; 2011-2012*, 78 FR 55676 (September 11, 2013); *Preliminary Results* (October 10, 2014); and *Pressure Pipe/Romania LTFV Final* (June 23, 2000). GTC references the following record submissions: Double Coin's submission entitled, "Double Coin Holdings and China Manufacturers Alliance, LLC 's Surrogate Value Comments: Certain New Pneumatic Off-the-Road Tires from China," dated April 14, 2014 ("Double Coin's SV Comments"), containing the Indonesian Government's 2012 Handbook of Energy & Economic Statistics of Indonesia ("2012 Energy Handbook") at attachment SV-4; Petitioners' Additional SV Submission; and Petitioners' Case Brief.

[155] *See* Double Coin's Rebuttal Brief at 20-22. Double Coin cites to *Pressure Pipe/Romania LTFV Final* (June 23, 2000); *Shrimp/Indonesia CVD Prelim* (June 4, 2013); and *CTL Plate/Indonesia* (December 29, 1999). Double Coin references the following record submissions: Petitioners' Initial SV Comments; GTC's SV Submission; Petitioners' Additional SV Submission; Petitioners' Case Brief.

[156] *See, e.g.*, *Chlorinated Isocyanurates From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2010-2011*, 78 FR 4386 (January 22, 2013) at Comment 4, "the Department prefers to rely on a single surrogate country to value all factors when possible." *See also* 19 CFR 351.408(c)(2), "except for labor, … the Secretary normally will value all factors in a single surrogate country."

[157] *See, e.g.*, *Iron Construction Castings From the People's Republic of China; Final Results of Antidumping Duty Administrative Review*, 56 FR 2742 (January 24, 1991) at Comment 11.

subsidy in Indonesia.[158]  Thus, consistent with the Department's findings in *Shrimp/Indonesia CVD Investigation* and the AD investigation of *Pressure Pipe/Romania LTFV Final*, we continue to find the PLN electricity data acceptable.[159]  Therefore, we continued to use the PLN electricity prices to value electricity for these final results.

**Comment 11:  Container Weight Used in Ocean Freight and Brokerage and Handling Surrogate Value Calculations**

- GTC argues that the Department should remedy the inconsistency between the SV calculations for ocean freight, domestic brokerage and handling ("B&H"), and domestic inland trucking.  Specifically, GTC urges the Department to either use:
  - GTC's actual container weight for both B&H and ocean freight; or
  - The assumed weight of 10 tons for the B&H calculation and the quote-specific assumed weights from the Descartes quotes (*i.e.*, the ocean freight SV source) for the ocean freight SV calculation.[160]
- Petitioners rebut that the Department correctly measured movement expenses since the Department's calculations of ocean freight, domestic B&H, and truck freight expenses were based on different facts and, thus, calculated in different ways.[161]

**Department's Position:**  The Department's clearly defined practice in calculating the B&H and domestic truck freight SVs from *Doing Business* is to use the 10-ton weight specified in the World Bank's survey methodology.[162]  Thus, we have not changed the 10-ton denominator for the calculation of domestic truck freight and B&H.

For ocean freight, the Department preliminarily used an average of actual container weights from GTC and Double Coin to calculate company-specific shipment weights for valuation of ocean freight.[163]  While the Descartes ocean freight quotes are issued on a per-container basis, the quotes also provide an assumed weight for each quoted shipment.[164]  Therefore, because the quotes include a weight, we find the weights on the Descartes freight quotes to be more specific to the quotes than the average weights of respondents' own shipments.  Thus, for these final results, we are using the ocean freight weights provided in the Descartes international ocean freight quotes, on a weighted-average basis, to derive the overall ocean freight surrogate value, rather than relying upon the average of respondent-specific container weights used for the *Preliminary Results*.[165]

---

[158] *See Shrimp/Indonesia CVD Prelim* and accompanying decision memorandum at 20.

[159] *See Pressure Pipe/Romania LTFV Final* and accompanying IDM at Comment 7, citing to *CTL Plate/Indonesia* at 64 FR 73162.

[160] *See* GTC's Case Brief at 29-30.  GTC cites to the following:  *Pakfood Pub. Co. v. United States*, 724 F. Supp. 2d 1327 (CIT 2011) and *SKF* (Fed. Cir. 2001).  GTC references the following submissions:  GTC's SV Submission and the Preliminary SV Memo.

[161] *See* Petitioners Rebuttal at 29-30.  Petitioners reference the following submissions:  GTC's Case Brief; Petitioners' Case Brief; GTC's SV Submission; and the Preliminary SV Memo.

[162] *See, e.g.*, *Certain Steel Threaded Rod From the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2012-2013*, 79 FR 71743 (December 3, 2014) and accompanying IDM at Comment 5.  *See also* Petitioners' Initial SV Comments at Attachment 17.

[163] *See* Preliminary SV Memo at 15-16 and Attachment X.

[164] *See* GTC's SV Submission at Exhibit 8.

[165] *See* Final SV Memo at 2 and Attachments I, II, IV, and V.

**Comment 12: Whether to Exclude Certain Ocean Freight Charges When Calculating a Surrogate Value for Ocean Freight**

- GTC argues that the Department has double counted certain costs between domestic B&H and ocean freight (*e.g.*, documentation charges, traffic mitigation fees, AMS charges, clean truck fees, chassis usage charges, Shanghai port surcharges, international ship and port security charges, and ISD handling charges) and thus should exclude certain charges from the ocean freight SV calculation.[166]
- Petitioners rebut that the Department correctly determined that B&H charges did not overlap with ocean freight charges.[167]

**Department's Position:** Consistent with past Department precedent and record evidence, we did not exclude any charges from the Descartes ocean freight quotes, as they appear to be necessary for the shipment of freight and because they do not appear to be double counted (*i.e.*, they do not appear to have already been covered by the B&H surrogate value).

*Doing Business* states that its trading-across-borders methodology measures the "cost necessary to complete every official procedure for exporting and importing" a "standardized cargo of goods by sea transport," but not the "cost for sea transport" itself.[168] In addition to the surcharges enumerated by GTC, the Descartes freight quotes include numerous other surcharges (*e.g.*, peak season surcharge, bunker surcharge, Panama Canal transit surcharge).[169] The surcharges on the Descartes quotes do not appear to overlap with the B&H charges related to exporting, but simply appear to be additional fees imposed by the ocean freight company in order to transport the merchandise from the Chinese port of origination to the U.S. destination port. Moreover, GTC does not cite to any record evidence in support of its argument that the Descartes ocean freight surcharges it alleges should be covered by the B&H value from *Doing Business* are, in fact, included in those export costs. Furthermore, GTC does not cite to a single Department precedent supporting its contention. To the contrary, in *Stilbenic OBAs*, the Department "included certain additional charges (*i.e.*, fuel surcharges, destination delivery charges, and bill of lading charges) in the ocean freight calculation because these charges, in addition to the base ocean freight charge, are incurred by the surrogate freight forwarders and are not separately covered by the brokerage and handling surrogate value."[170] Thus, including these charges is both consistent with the Department's practice and with the record evidence in this case.

---

[166] *See* GTC's Case Brief at 31-32. GTC references the following submissions: Petitioners' Initial SV Comments, GTC's SV Submission, and the Preliminary SV Memo.
[167] *See* Petitioners Rebuttal at 30-31. Petitioners reference the following submissions: GTC's Case Brief; Petitioners' Case Brief; GTC's SV Submission; and the Preliminary SV Memo.
[168] *See* Petitioners' Initial SV Comments at Attachment 17.
[169] *See* GTC's SV Submission at Exhibit 8.
[170] *See Certain Stilbenic Optical Brightening Agents From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 77 FR 17436 (March 26, 2012) and accompanying IDM at Comment 4.

**Comment 13: Whether to Deflate the Surrogate Value for GTC's Warehouse Costs**

- For the *Preliminary Results*, the Department valued GTC's domestic warehousing expenses using a SV derived from an April 9, 2014 price quote. In accordance with its standard practice, the Department should deflate this value using the average producer price index ("PPI") for the POR of 116.02 compared with the PPI for April 2014.[171]
- No other interested party provided comment on this issue.

**Department's Position:** Though the record information from which this SV was derived shows that the relevant price quote was accessed on April 9, 2014, there is no indication that the quoted price was not in effect during the POR and no party provided a better source of data for the warehouse cost.[172] As such, we did not deflate this value for the final results.

**Comment 14: Whether to Calculate Region-Specific U.S. Delivery Charges for GTC's U.S. Inland Freight Surrogate Value**

- GTC notes that the Department's preliminary calculation of a U.S. inland freight SV accounted for different prices associated with delivery to East Coast or West Coast ports in the United States, but made no distinction based on the distance from the port to the customer for each shipment. GTC asserts that the Department should make this calculation more precise by computing the delivery charge from both the East Coast and West Coast for each of the four geographical regions used for the regional "targeted dumping" test.[173]
- No other interested party provided comment on this issue.

**Department's Position:** Since no party opposed this change in calculation, and because we have adequate information on the record to support and perform such a calculation, and because this calculation is more accurate and specific to the manner in which GTC conducts business, we calculated U.S. inland freight delivery charges for GTC that are specific to the port of import and delivery region for these final results.[174]

**Comment 15: Surrogate Values for GTC's Tackifier Inputs**

- GTC argues that certain of its tackifier inputs are phenolic resins and, as such, should be valued using GTA Indonesia import data for Harmonized Tariff Schedule ("HTS") 3909.40 (*i.e.*, TACKIFIER10, which is a standard phenolic resin, HTS 3909.40 covers "Phenolic Resins, Pr Fms") and HTS 3909.40.9000 (*i.e.*, TACKIFIER 08, 09, and 14, which are "other" phenolic resins, HTS 3909.40.90 covers "Other Phenolic Resins"). Further, GTC argues that TACKIFIER 18, 19, and 20, should be valued under HTS 3909.40.90 (*i.e.*, the "Other Phenolic resins"), which covers products more specific to these "other" resin inputs than the

[171] *See* GTC's Case Brief at 30-31. GTC references the following submissions: Petitioners' Initial SV Comments and the Preliminary SV Memo.
[172] *See* Petitioners' Initial SV Comments at Attachment 18.
[173] *See* GTC's Case Brief at 32-33 and Exhibit 4. GTC further references the Preliminary SV Memo.
[174] *See* Final SV Memo at 2 and Attachments I and IV.

phenolic resins covered in the 3909.40 category used to preliminarily value these tackifier inputs.[175]

- Petitioners rebut that the Department has reasonably valued GTC's TACKIFIER08, 09, 10 and 14 inputs using HTS 3506.99 ("Products Suitable For Use As Adhesives"). Furthermore, GTC has not demonstrated that TACKIFIER18, 19, and 20 belong to an "other" category rather than the broader six digit category that the Department used for the *Preliminary Results*.[176]

**Department's Position:** For proprietary reasons discussed in GTC's analysis memo, we continued to classify GTC's inputs of TACKIFIERs 08, 09, 10, and 14 under HTS 3506.99 ("Products Suitable For Use As Adhesives").[177]

For the *Preliminary Results*, TACKIFIERs 18, 19, and 20, were valued using the broad six-digit category of 3909.40 ("Phenolic Resins, Pr Fms"). However, record evidence shows that there are only two categories under Indonesian HTS code 3909.40: "Phenolic Resins in Moulding Compound" {*sic*} and "Other Phenolic Resins."[178] The descriptions provided by GTC for tackifiers 18, 19, and 20 demonstrate that they are phenolic resins, but do not show them as being in molding compound, so the "other" category is more specific to GTC's tackifiers (because there are only two detailed phenolic resin categories).[179] Thus, for the final results, we valued tackifiers 18, 19, and 20, using the more specific category 3909.40.9000 ("Other Phenolic Resins").

**Comment 16: Freight Distance Applied to GTC's Inputs**

- Petitioners argue that, for GTC's *Sigma* cap distance, the Department should use the same distance from port to factory that GTC provided for its market economy ("ME") inputs rather than the distance reported to the nearest port.[180]
- GTC rebuts that Petitioners' argument to revise GTC's *Sigma* freight cap is contrary to both record evidence and agency practice regarding the *Sigma* cap calculation. Moreover, GTC

---

[175] *See* GTC's Case Brief at 33-36. GTC cites *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 75 FR 59217 (September 27, 2010). GTC further references the Preliminary SV Memo, GTC's Rebuttal SV Submission, GTC's Second SV Submission, Petitioners' Initial SV Comments.
[176] *See* Petitioners' Rebuttal at 31-32. Petitioners reference GTC's Case Brief and the Preliminary SV Memo.
[177] *See* Memorandum titled "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Analysis of the Final Results Margin Calculation for Guizhou Tyre Co., Ltd." at 3.
[178] *See* GTC's Rebuttal SV Submission at Exhibit 5D.
[179] *See* GTC's Supplemental SCDQR at Exhibit SD-5.
[180] *See* Petitioners' Case Brief at 36-37. Petitioners cite to: *Sigma*, 117 F.3d 1401.; *Notice of Final Determination of Sales at Less Than Fair Value, and Affirmative Critical Circumstances, In Part: Certain Lined Paper Products From the People's Republic of China,* 71 FR 53079 (September 8, 2006); and *Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review of the Order on Bars and Wedges*, 68 FR 53347 (September 10, 2003). Petitioners reference: Memorandum entitled "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Analysis of the Preliminary Results Margin Calculation for Guizhou Tyre Co., Ltd.," dated September 30, 2014 ("GTC's Preliminary Analysis Memo"); and GTC's SCDQR.

notes that Petitioners did not offer any precedent for their proposed revision to the *Sigma* cap methodology.[181]

**Department's Position:** The Department's practice when the surrogate value for the material is based on import prices is to use the shorter of the reported distance, or the distance from the nearest port to the producer to value the materials transportation in the surrogate country.[182]

For the *Preliminary Results*, we used GTC's reported distance from the factory to the closest commercial port (*i.e.*, the Port of Fengcheng, at 710 km) as the *Sigma* cap distance. GTC provided evidence suggesting that the Port of Fengcheng is a major commercial Chinese port; Petitioners have not provided any evidence to the contrary and did not dispute GTC's assertion.[183] The record also demonstrates that GTC's ME input purchases and finished good exports predominantly transit through a different port (or ports), which is (are) at a greater distance from GTC's factory.[184] On this basis, Petitioners suggest we should alter the Department's long established practice of capping import distances to the closest port and should instead use the distance to the port actually utilized by GTC during the POR for its ME imports and export sales. As we stated in the PDM, and in accordance with the Department's practice,[185] we:

> adjusted input prices by including freight costs to render them delivered prices. Specifically, the Department added to Indonesian import SVs a surrogate freight cost using the shorter of the reported distance from the domestic supplier to the factory or the distance from the nearest seaport to the factory where it relied on an import value. This adjustment is in accordance with the decision of the Federal Circuit in *Sigma*...[186]

Petitioners' suggestion is without precedent and contrary to long-standing Department practice following the Federal Circuit's holding in *Sigma*; thus, we made no changes to GTC's *Sigma* cap for the final results.

---

[181] *See* GTC's Rebuttal Brief at 14-15. GTC cites to *Sigma*, 117 F.3d 1401 *and Sawblades/PRC LTFV Final* (May 22, 2006). GTC references the following record submissions: GTC's submission entitled, "GTC 2nd and 3rd Supplemental Section C&D Responses: Fifth Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated July 14, 2014 ("GTC's 2nd and 3rd SSCDR") and Petitioners' Case Brief.
[182] *See Sigma,* 117 F.3d 1401. Because of the litigation from which this practice arose, this materials transportation value is sometimes referred to as the *Sigma* freight.
[183] *See* GTC's 2nd and 3rd SSCDR at Exhibit S2-4.
[184] *See* GTC's SCDQR at Exhibit D-15 showing ME input purchases and the port of import. *See also* GTC's 2nd and 3rd SSCDR at 5 and 7, where GTC states its warehouse address in Guangzhou and the distances from the warehouse to the actual ports of export. *See also*, GTC's U.S. Sales Database.
[185] *See, e.g.*, *Hand Trucks and Certain Parts Thereof From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 3779 (January 23, 2014) and accompanying decision memorandum, unchanged in *Hand Trucks and Certain Parts Thereof From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 44008 (July 29, 2014).
[186] *See* PDM at 25.

**Comment 17: Calculation of Double Coin's Truck Freight and Distance**

Petitioners' Comments[187]

- The record is unclear whether Double Coin reported supplier distances at the *Sigma* cap, as requested by the Department; therefore, the Department should set the supplier distance to the *Sigma* cap for all NME inputs.
- The Department used the reported simple average of the distance to port for each Double Coin factory to calculate the distance applied for MEP inputs. However, because unique CONNUMs are produced at each facility and the factory-specific distances to port are available, the Department should use the factory-specific distances.
- Double Coin first reported that the Yangshan port was closest to both production facilities but later calculated the *Sigma* cap distance using the average from each factory to two Shanghai ports (Yangshan and Waigaoqiao, of which the latter is closest to each factory). However, Double Coin never stated that merchandise was actually shipped out of Waigaoqiao (or both Yangshan and Waigaoqiao) and record information suggests that Yangshan is the port predominantly used for international container shipping. Therefore, the Department should recalculate the domestic inland freight calculations and *Sigma* distances using only the Waigaoqiao distance.

Double Coin's Rebuttal[188]

- Double Coin complied with the Department's specific request to cap the individual distances for transactions with traders in the underlying supplier worksheets at the *Sigma* distance rather than the distance to the trader.
- The Department used the factory-specific capped distance in its calculation of normal value and domestic inland freight, precisely as Petitioners request.
- The Department verified that Double Coin exported subject merchandise out of both ports.

---

[187] *See* Petitioners' Case Brief at 23-28. Petitioners cite to: *Sigma*, 117 F.3d 1401; and *Lasko Metal Products, Inc. v. United States*, 43 F.3d 1442 (Fed. Cir. 1994). Petitioners also cite to their own freight calculations provided at Exhibit 1 to the Case Brief. Petitioners reference: Department Letter entitled, "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Request for Revised FOP and U.S. Sales Databases," dated September 16, 2014 ("Request for Revised Databases"); Double Coin's submission entitled, "Revised US and FOP Databases Certain New Pneumatic Off-the-Road Tires from China," dated September 23, 2014 ("Double Coin's Post-Verification Corrections"); the Department Letter to Double Coin entitled, "2012-2013 Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Questionnaire" dated December 16, 2013 ("Initial Questionnaire"); Letter from Petitioners entitled, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off-The-Road Tires from China (A–570–912): Petitioners' Rebuttal Factual Information and Comments on Double Coin's Supplemental Section C and D Questionnaire Responses," dated July 14, 2014 ("Petitioners' July 14 Rebuttal") at Attachment 2 ("Comparing Shanghai's Major Shipping Ports," by Jeremy Chapman, dated March 22, 2011 ("Shanghai Shipping Ports")); Letter from Double Coin entitled, "Section A Response of Double Coin Holdings and China Manufacturers Alliance, LLC," dated January 22, 2014 ("Double Coin SAQR"); Double Coin's Verification Report; Double Coin's 2nd Supplemental ACD Response; Double Coin's Preliminary Analysis Memo; Double Coin's SCQR; and Double Coin's Supplemental C&D Response.

[188] *See* Double Coin's Rebuttal Brief at 22-25. Double Coin cites to *Sigma*, 117 F.3d 1401 and references the following submissions: Double Coin's Verification Report; the *Shanghai Shipping Ports* article in Petitioners' July 14 Rebuttal; Double Coin's Post-Verification Corrections; and Petitioners' Case Brief.

**Department's Position:** Petitioners note that the record is unclear as to whether Double Coin re-reported supplier distances as instructed in the Department's post-verification Request for Revised Databases. We note that Double Coin certified that it made all requested corrections in its Post-Verification Corrections submission and further confirmed that it capped the underlying line item distances at the distance to the port for the trading companies (rather than the distance to the trading companies), as requested. Though Double Coin's resubmission did not include the underlying worksheets demonstrating the change for every supplier (nor was such information requested), our review of the changes to the overall distances reported for each input between the most recent factors of production ("FOP") database and the preceding database demonstrate that the requested changes were properly reported. As such, we do not agree with Petitioners that the record is sufficiently unclear as to provide compelling reason to further alter the calculation.

Furthermore, as Double Coin points out, our margin calculation used the factory-specific capped distance for each NME-source input, and did not use an average distance of the two factories to calculate freight costs as alleged by Petitioners. As such, we continue to use the factory-specific capped distance where applicable in our NV calculation and for the domestic inland freight distance.

With respect to the specific ports used to calculate the distance from factory to port, Double Coin asserts that the Department's statement in the verification report that "as part of our review of the sales trace packages, we checked the various adjustments and discounts, movement expenses, and other expenses, and we noted no discrepancies from what Double Coin reported" makes "crystal clear" that "the Department has completely verified the distances reported." Double Coin asserts that "{t}hus… the Department verified that Double Coin exported the subject merchandise out of both Yangshan and Waigaoqiao Ports during the POR."[189] As an initial matter, we disagree with Double Coin's characterization of our verification findings. In this case, the Department reviewed with company officials and verified that the distances between the production factories and Shanghai ports was consistent with the distances reported. Our report noted no discrepancies with respect to reported movement expenses in general, including these factory distances. However, "{v}erification is a spot check and is not intended to be an exhaustive examination of the respondent's business. (Commerce) has considerable latitude in picking and choosing which items it will examine in detail,"[190] and we did not specifically spot check that "Double Coin exported the subject merchandise out of both Yangshan and Waigaoqiao Ports during the POR", nor did we make any statement to that effect.[191]

Regardless of our issue with Double Coin's characterization of our findings, as noted above, Double Coin reported and we verified the distance to two Shanghai ports. While Petitioners cite to information suggesting that the Yangshan port is becoming (or is already) the primary port of export for international container cargo shipments and that the Waigaoqio port is increasingly

---

[189] *See* Double Coin's Verification Report at 24 and Rebuttal Brief at 25.
[190] *See F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000); *see also NTN Bearing Corp. of Am. v. United States*, 186 F. Supp. 2d 1257, 1296 (CIT 2002).
[191] Indeed, a review of shipment-related documentation identifying port of export (*e.g.*, invoices, bills of lading, PRC and U.S. customs documentation, *etc.*) shows that the port of export is generally listed only as "Shanghai," and does not identify the specific facility. *See*, *e.g.*, the sales trace packages in Double Coin's Verification Report at PRC VE-5 and US VE-10.

utilized for intra-Asian shipping,[192] there is simply no evidence on the record to confirm that all shipments were shipped from the Yangshan port or that subject merchandise could not have been shipped from the Waigaoqiao port. As Shanghai contains two international container ports, absent affirmative information that one is the exclusive port of exportation, we find no basis for changing the current calculation.

**Comment 18: Whether Truck Freight Costs are Over-Counted**

- Double Coin asserts that the Department inadvertently multiplied the truck freight rate SV by the distance and then by the consumption of raw materials, resulting in an exponential over-counting of freight costs.[193]
- Petitioners point out that Double Coin's argument presumes that the freight cost and the SV are first summed and then that sum is multiplied by the amount of the material (which would provide an incorrect result, if true), but the SAS program calculates this correctly and no change is necessary.[194]

**Department's Position:** Upon review, we confirm that the equation used in the margin calculation did not actually contain the mathematical errors noted by Double Coin and the freight variables are properly calculated on a per tire basis in the program. While the calculation would indeed over-count freight if the equations operated as argued by Double Coin, Petitioners are correct that this is not the way they actually function in the program. As such, no change is necessary for these final results.[195]

**Comment 19: Surrogate Value for Double Coin's Polyester Cord Inputs**

- Double Coin contends that the Department inadvertently utilized an incorrect HTS code for valuing Double Coin's consumption of polyester cord. Specifically, Double Coin suggested price data for Indonesian imports of HTS subcategory 5902.20 ("Tire Cord Fabric, Of High Tenacity Yarns, Of Nylon Or Other Polyamides, Polyesters Or Viscose Rayon: Of Polyesters") but the Department instead valued the input using price data for Indonesian imports of HTS subcategory 5509.22 ("Yarn, Not Sewing Thread, of Synthetic Staple Fiber Not For Retail Sale Greater Than 85% Weight Of Polyester Staple Fibers Multiple (folded) Or Cabled Yarn"), but offered no explanation for why it deviated from the suggested SV in the Preliminary SV Memo.[196]
- No other interested party provided comment on this issue.

**Department's Position:** For the final results, we valued Double Coin's polyester cord input using HTS 5902.20, rather than HTS 5509.22, which was used for the *Preliminary Results*. The description of products included in HTS 5902.20 specifies polyester "tire cord fabric… {made of} polyesters," while HTS 5509.22 pertains to "Yarn, Not Sewing Thread, of Synthetic Staple

[192] *See* Comparing Shanghai's Major Shipping Ports, in Petitioners' July 14 Rebuttal at Attachment 2.
[193] *See* Double Coin's Case Brief at 69-72. Double Coin references the Double Coin Preliminary Analysis Memo.
[194] *See* Petitioners' Rebuttal Brief at 18-19. Petitioners reference Double Coin's Case Brief.
[195] *See* Double Coin's Final Analysis Memo at Attachment II (*i.e.*, Margin Program Output).
[196] *See* Double Coin's Case Brief at 72-73. Double Coin references the Preliminary SV Memo and Double Coin's SV Comments.

Fiber Not For Retail Sale Greater Than 85% Weight Of Polyester Staple Fibers Multiple (folded) Or Cabled Yarn." Therefore, as the description of HTS 5902.20 appears to be specific to Double Coin's polyester cord input, was requested for use as the best available category by Double Coin, and there is no contradictory evidence on the record, we are valuing Double Coin's tire cord inputs using Indonesian price data for imports of HTS 5902.20 for the final results.[197]

**Comment 20: Surrogate Values for Double Coin's Cinder and Calcium Oxide By-products**

<u>Double Coin's Comments</u>[198]

- Double Coin argues that, without explanation, the Department valued cinder and calcium oxide byproducts with a coal SV rather than the byproduct-specific price data on the record.
- Double Coin submits that, if the Department finds that an offset cannot exceed input price:
  - It strongly disagrees with this practice, as it is tantamount to cherry-picking data; and
  - Should the Department continue to incorrectly cap the byproduct offset, because both bituminous and anthracite coal were reported as used in production, the cap should reflect the respective values of the each type of coal consumed, rather than just capping the offset at the value of bituminous coal.

<u>Petitioner's Comments</u>[199]

- Petitioners note that the Department has repeatedly recognized the "unreasonable result" of assigning more value to a waste product than to the input material from which the waste is produced and, thus, should continue to apply a SV to Double Coin's coal waste products that is no higher than the lowest SV for its coal inputs.

**Department's Position:** Double Coin submits that the Department's use of price data for Indonesian imports of HTS 2701.12 ("Bituminous Coal, Not Agglomerated", *i.e.*, the SV used to properly value bituminous coal energy inputs) to value Double Coin's reported offset quantities of cinder and calcium oxide byproducts sold during the POR for the *Preliminary Results* must have been a ministerial error, since Double Coin instead reported Indonesian price data for imports of HTS 2620 ("Ash And Residues (Except From Iron Or Steel Manufacture) Containing Arsenic, Metals Or Their Compounds") as the most appropriate information from which to value these byproducts, and the Department did not further explain why it declined to utilize this by-product-specific data. At the outset, we note that the use of the HTS 2701.12 SV to value cinder and calcium oxide by-products was not in error but, rather, consistent with our practice (discussed below) that the surrogate used to value a by-product offset will be capped at the value of the surrogate used to value the input from which that by-product offset was produced if no more appropriate value can be found. However, we acknowledge that we neglected to discuss our reasoning our Preliminary SV Memo.

---

[197] *See* Final Surrogate Value Memo.
[198] *See* Double Coin's Case Brief at 72-73. Double Coin references Double Coin's SV Comments and the Preliminary SV Memo.
[199] *See* Petitioners' Rebuttal Brief at 19-20. Petitioners cite to *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 74 FR 3987 (January 22, 2009). Petitioners reference: Double Coin's SV Comments; Preliminary SV Memo; and Double Coin's Case Brief.

Filed By: Andrew Medley, Filed Date: 4/9/15 12:19 PM, Submission Status: Approved

Double Coin reported that it sells the ash and residue by-products (*i.e.*, coal cinder and calcium oxide) resulting from its consumption of coal, which were used as an energy input in the production of subject merchandise.[200] Double Coin consumes two types of coal in the production of subject merchandise, bituminous (valued using HTS 2701.12 import data, with an average unit value ("AUV") of $0.15 USD/Kg) and anthracite (valued using HTS 2701.11 ("Anthracite Coal, Not Agglomerated") with an AUV $0.43 USD/Kg).[201] On the other hand, the AUV of Double Coin suggested data to value the by-product coal waste (*i.e.*, Indonesian price data for imports under the four-digit HTS 2620 category including any type of non-ferrous residue containing metals) is $37.77 USD/Kg: over 250 times greater than the price selected to value the bituminous coal inputs from which this by-product is derived (and over 85 times the value of the SV for anthracite coal).

We find it unreasonable to assign a higher value to a waste product than to its input product. Double Coin asserts that there is no logic to using an HTS code of the raw material as the surrogate value for the byproduct of that raw material, as the Department verified that the by-products in question are by-products of using coal, not coal itself, and that this practice is tantamount to cherry-picking the surrogate data. Despite Double Coin's objections, the Department has a long-standing practice of rejecting or capping the by-product SV in instances where the by-product SV exceeds the SV of the product from which it was derived.[202] Indeed, recent case precedent supports the practice of rejecting and/or capping a scrap SV when it is of a higher price than the SV for the input which created the scrap byproduct in question.[203]

---

[200] *See* Double Coin's SCDQR at Exhibit D-8.

[201] Both Petitioners and Double Coin accept that these are the proper input-specific HTS subcategories from which to value the coal inputs and neither party has provided objection as to the suitability of the Indonesian AUVs for valuing Double Coin's coal FOPs in this review. *See* Double Coin's SV Comments at Attachment I and Petitioners' Initial SV Submission at 10.

[202] *See Certain Steel Nails from the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances,* 73 FR 33977 (June 16, 2008) ("*Steel Nails/PRC*") at Comment 12 ("In the Final Determination Pursuant To The Remand Order From The U.S. Court Of International Trade In Paslode Division of Illinois Tool Works, Inc. v. United States, Ct. No. 9712–02161 (Jan. 15, 1999), the Department stated that "It is clear that our steel scrap value selection produced an unreasonable result – a value for steel wire rod scrap (0.8390 USD/kg) that exceeded the price for steel wire rod (0.3119 USD/kg) – one that cannot be explained by any notes or data..." We find that in this case, the facts match this situation closely in that one of the suggested HTS categories for the valuation of steel scrap (7204.41.00) has a value greater than the value the Department determined in Comment 10 above. While we acknowledge that HTS category 7204.41.00 includes an explicit reference to "shavings" and that "shavings" were clearly identified as among the types of scrap generated by respondents, the HTS description is is {sic} not the only relevant factor for the Department to consider in valuing steel scrap. As discussed above, reliance on this value will produce an unreasonable result. Therefore, we are using only HTS category 7204.49.00 to value steel scrap.")

[203] *See*, *e.g.*, *MSG/PRC LTFV* (September 29, 2014) at Comment 11 ("A by-product by definition is less valuable than the input from which it is derived. Where there is no evidence that the by-product is a value-added by-product, assigning a by-product a value that is higher than the value of the input from which it is derived is unreasonable. In this investigation, the quantity of the by-product reported exceeds the quantity of the primary input consumed in the production of that by-product. Thus the extended value of the by-product exceeds the extended value of the primary input. Therefore, in the instant investigation, the Department finds it appropriate and reasonable to cap the specific by-product quantity at the specific FOP input amount."); *Multilayered Wood Flooring From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 76 FR 64318 (Tuesday, October 18, 2011) ("*MLWF/PRC*") at Comment 24 ("For purposes of this final determination, the Department has valued Layo Wood's byproducts using a simple average of the surrogate values for Layo Wood's wood veneer and wood core inputs… As explained in *Steel Nails* and argued by Petitioner, the Department has found in past cases that it may

Accordingly, we capped the value of the SV used to value coal by-products to the value of the coal input SVs for these final results, as in the *Preliminary Results*, as Double Coin provides no compelling argument to depart from this established practice. However, Double Coin was correct to note that *Preliminary Results* margin calculation capped these SVs only to the value of the bituminous coal SV, though the waste by-products were produced by the consumption of both bituminous and anthracite coal during the POR. Accordingly, for the final results, we used price data for Indonesian imports of merchandise classified under both HTS subcategory 2701.12 and 2701.11 to create a single by-product cap SV (apportioned based on reported consumption of each type of coal input) to value Double Coin's coal waste offset.[204]

**Comment 21: Calculation of Double Coin's Warranty Costs**

- Petitioners note that the Department's margin program is set up to reduce CEP U.S. prices by reported warranty expenses, in accordance with section 772(d)(1)(B). However, because Double Coin reported warranty expenses as a negative number, the calculation improperly added any such reported expenses to U.S. price. Petitioners request the Department correct this inadvertent error for the final results.[205]
- No other interested party provided comment on this issue.

**Department's Position:** As noted by Petitioners, the *Preliminary Results* margin program is correctly set up to reduce CEP U.S. prices by reported warranty expenses. However, because Double Coin reported warranty expenses as a negative number,[206] the calculation of the sum of all CEP selling expenses added a negative number, resulting in the improper subtraction of reported U.S. direct selling expenses (of which the negative warranty expenses are the only

---

disregard a surrogate value when it is clear that the selection of that surrogate value would yield an unreasonable result. The facts of this case closely match those of *Steel Nails*, in that the AUV of Philippine HTS 4401.30 {*i.e.*, the scrap by–product} would be higher than the surrogate values used for Layo Wood's log, veneer and core inputs {*i.e.*, the inputs from which the scrap by–product is produced}. All parties, including the Petitioner, acknowledge that HTS 4401.30 offers the most specific description of Layo Wood's byproducts. While we agree that the HTS description provided by Philippine HTS 4401.30 includes the terms "sawdust" and "scrap," the HTS description is not the only relevant factor for the Department to consider. In this case, as was the case in Steel Nails, we find that the valuation of a scrap byproduct with a surrogate value higher than the substantive inputs into that scrap product would produce an unreasonable result not explained by the record. Consequently, we have valued Layo Wood's byproducts using a simple average of the surrogate values for Layo Wood's wood veneer and wood core inputs." *See also, Fish Fillets/Vietnam 11–12* (July 2, 2013) at comment VI.B, stating that the Department finds it unreasonable that the surrogate value for fish oil byproducts (derived from whole fish) would be higher than their main input (*i.e*., whole fish). Whereas the "unreasonable" SV was still used to value fish oil, because it was input specific, the fish oil SV was capped at the price of the SV for the whole fish input product. *See also* C*ertain Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results and Partial Rescission of the Seventh Antidumping Duty Administrative Review*, 77 FR 15039 (March 14, 2012) (*Fish Fillets/Vietnam 10–11*) at Comment II.B.3, where the Department capped broken fillet by-products at the value for whole live fish because broken fillets were not a value-added byproduct.

[204] *See* Final Surrogate Value Memo for more information regarding the weighted-average calculation of this SV cap.

[205] *See* Petitioners' Case Brief at 20-21. Petitioners cite to: section 772(d)(1)(B) of the Act. Petitioners reference Double Coin's Preliminary Analysis Memo and Double Coin's SCDQR.

[206] *See* Double Coin's SCQR at 42. *See also*, Double Coin's Section C sales database.

component) from total CEP selling expenses.[207] Accordingly, we corrected this error by subtracting the negative U.S. direct selling expenses from the calculation of CEP selling expenses (*i.e.*, subtracting a negative value, resulting in the proper addition of warranty expenses to the sum of all CEP selling expenses).[208]

**Comment 22: Conversion of the Truck Freight Surrogate Value Applied to Double Coin's Coal Consumption**

- Petitioners note that the Department mistakenly applied a per kilogram ("Kg") truck freight rate to determine freight for per metric ton ("MT") coal values; thus, the freight value calculated for the transport of coal to Double Coin's factories is 1000 times lower than it should be. Accordingly, the Department should also adjust the per-Kg coal freight SV to a per-MT unit of measure, consistent with the per-MT manner in which Double Coin reported coal FOPs.[209]
- No other interested party provided comment on this issue.

**Department's Position:** Whereas Double Coin reported its coal consumption on a per MT basis (which we correctly valued using a SV reported on a per-MT unit of measure), we inadvertently applied a per-Kg per-Km SV in valuing the truck freight costs applicable this factor of production in the *Preliminary Results*. Accordingly, for the final results, we corrected this conversion error to report coal truck freight on a per-MT per-Km basis.[210]

**Comment 23: Calculation of Credit Costs for Double Coin's Drop-Shipped Sales**

- Petitioners point out that, for all sales, Double Coin calculated the number of days for which credit was extended by subtracting the reported invoice date by the reported payment date. However, for drop-shipped sales, because CMA does not invoice the customer until the customer receives delivery, the date of sale reported is different from the invoice date. Accordingly, the Department should recalculate credit expenses for drop-shipped sales by using the reported date of sale rather than the invoice date.[211]
- No other interested party provided comment on this issue.

**Department's Position:** For the *Preliminary Results*, as a result of the manner in which Double Coin reported credit expenses, the number of days for which credit was extended for Double

---

[207] As these total summed CEP expenses are then deducted from the gross unit price, the ultimate effect was to improperly add warranty costs to U.S. price.
[208] *See* Double Coin's Final Analysis Memo (and Program Log at Attachment I thereto) for further details on this change.
[209] *See* Petitioners' Case Brief at 21-22. Petitioners reference Double Coin's Verification Report, Double Coin's Preliminary Analysis Memo, and the Preliminary SV Memo.
[210] *See* Double Coin's Final Analysis Memo (and Program Log at Attachment I thereto) for further details on this change.
[211] *See* Petitioners' Case Brief at 28-29. Petitioners cite to *Certain Hot-Rolled Carbon Steel Flat Products From India: Notice of Final Results of Antidumping Duty Administrative Review*, 73 FR 31961 (June 5, 2008) ("*HRS/India*") and *Notice of Final Results of Antidumping Duty Administrative Review: Carbon and Certain Alloy Steel Wire Rod from Trinidad and Tobago*, 70 FR 12648 (March 15, 2005). Petitioners reference: Double Coin's SAQR, Double Coin's 2nd Supplemental ACD Response; Double Coin's SCQR; and Double Coin's Supplemental C&D Response.

Coin was calculated by subtracting the reported invoice date by the reported payment date, as is the standard practice when the invoice date is reported as the date of sale (as it is in the instant case for Double Coin's sales of merchandise from its U.S. warehouses). However, Petitioners correctly note that, for Double Coin's drop-shipped sales, the date of sale reported is different from the invoice date because CMA does not invoice the customer until the customer receives delivery.[212] Accordingly, to calculate the most accurate margin possible for the final results, we recalculated credit expenses for drop-shipped sales using the reported date of sale rather than the invoice date, consistent with, for example, *HRS/India* (June 5, 2008).[213]

**Comment 24: Calculation of Inventory Carrying Costs for Double Coin's Warehouse Sales**

<u>Petitioners' Comments</u>[214]

- An analysis of the inventory carrying cost ("ICC") information reported by Double Coin shows that the ICC methodology used by Double Coin's results in an average of 13.5 days in inventory for each tire sold.
- Petitioners assert that it is "unclear" why Double Coin did not employ the "typical" methodology employed by respondents that do not track inventory-in (*i.e.*, computing a ratio of the average inventory value during the POR to the total sales during the POR and then applying that ratio to the number of days in a year), but that – when employing this "typical" methodology – the average time in inventory is 290.6 days. Record evidence supports the use of this latter figure, and Petitioners urge the Department to recalculate ICC using this average 290.6 days in inventory figure for the final results.

<u>Double Coin's Comments</u>[215]

- Petitioners' claims run contrary to verified information on the record which demonstrates that products were sold from inventory more quickly than they were being replaced; as such, Double Coin's methodology is acceptable and appropriate.
- Double Coin notes that the calculation espoused by Petitioners (and resulting 290.6 average days in inventory figure) is incorrectly based on total sales information of both subject and non-subject tires. However, in applying Petitioners' methodology only to the movement of subject merchandise (*i.e.*, a negative monthly balance), results in negative average costs and suggests the existing calculation may, in fact, overstate ICCs.

**Department's Position:** Because CMA does not track the movement of individual tires into its warehouse, the inventory carrying cost calculation must necessarily rely on an estimate of average days in inventory. Accordingly, the Department must assess the reasonableness of Double Coin's estimate and whether Petitioners' suggested alternative is a more accurate or otherwise suitable estimate of average days in inventory.

---

[212] *See* Double Coin's Supplemental C&D Response at 16-17 and 39-40.
[213] *See* Double Coin's Final Analysis Memo (and Program Log at Attachment I thereto) for further details on this change.
[214] *See* Petitioners' Case Brief at 30-31. Petitioners cite to their own analysis of the inventory carrying cost calculation provided at Exhibit 2 of the Case Brief. Petitioners reference: Double Coin's Verification Report and Double Coin's SCQR.
[215] *See* Double Coin's Rebuttal Brief at 25-27. Double Coin references the following submissions: Double Coin's Verification Report and Petitioners' Case Brief.

As noted above and, in the verification report, CMA does not track individual tires to a specific shipment into their warehouses, and the accounting for warehouse inventory only tracks the quantity of a given product in and out of inventory.[216] Because they do not know when the first shipment of a tire that has gone out for sale came in, Double Coin utilized a last-in-first-out ("LIFO") method to estimate average days in inventory for reporting its inventory carrying costs because company officials know exactly when a tire went out for sale and exactly when the last instance of that type of tire came in to the warehouse.[217] As support for this method, CMA provided and Department officials reviewed documentation demonstrating that, for certain models of their larger selling tires, the inventory is moving out of inventory at a quicker pace than it is replaced.[218] As noted in our verification report and emphasized in Double Coin's rebuttal brief, our discussion with CMA officials and review of relevant documentation comported with information submitted to the record.[219]

Therefore, we previously found that the methodology used by Double Coin to determine average days in inventory is acceptable and verified that the relevant information was properly reported. Petitioners cite to no information and provide no reasoning as to why this methodology is unusable or unreliable. As such, we continue to find Double Coin's reported inventory carrying costs, based on CMA's LIFO method of estimating average days in inventory, to be acceptable and appropriate for use in these final results.

Petitioners request that the Department instead compute a ratio of the average inventory value during the POR to the total sales during the POR and then apply that ratio to the number of days in a year, arguing that this is the methodology typically employed by respondents that do not track inventory on a product specific basis. Petitioners further argue that record evidence supports the use of this latter figure, and that this methodology is a more accurate measure of days in inventory. First, though Petitioners claim that their suggested methodology is a more typical calculation, they cite to no precedent to support this claim. Furthermore, Petitioners reference no actual record evidence that supports the use of their proposed calculation, except to cite to a single note from CMA's financial statements that reference how inventory is valued for financial reporting purposes but provides no discussion of or insight into the calculation of days in inventory. Finally, aside from noting that Double Coin's methodology results in an average of 13.5 days in inventory and their own methodology results in an average of 290.6 days (with the implication that the large difference between these numbers, alone, represents *prima facie* evidence of the superiority of the latter figure), Petitioners provide no evidence or argument to support the contention that their calculation is more accurate or otherwise representative of Double Coin's commercial reality. As an initial matter, we find this argument insufficient to compel us to change the calculation. Moreover, as noted by Double Coin, this calculation is based on total sales and inventory values for all products both subject and non-subject. Therefore we do not find Petitioners' non-OTR-tire-specific calculation to be a more accurate estimation of the average days in inventory for subject merchandise than the calculation provided by Double Coin and used in the *Preliminary Results* (based on the LIFO movement of only subject OTR tires), and did not alter the ICC calculation for these final results.

---

[216] *See* Double Coin's Verification Report at 25-26 and US-VE 11.
[217] *Id*.
[218] *Id*. at US-VE 11.
[219] *Id*. at 26.

**Comment 25: Differential Price Calculation**

Petitioners' Comments[220]

- The preliminary margin identified that over 23 percent of Double Coin's sales were price differentiated based on the quarterly comparison of prices. However, a monthly comparison of prices increases the incidence of targeting to over 33 percent.
- The Department has historically relied upon domestic interested parties for the identification of targeted customers and time periods. Recently, in *Shrimp/Thailand 11-12*, the Department modified time periods used for this analysis in response to comments from the domestic interested parties. Accordingly, the Department should use month of sale as the measure of price differentiation for the final results.

Double Coin's Comments[221]

- Double Coin notes the Department's selected a quarterly basis for price analysis as a neutral and fair standard for evaluating differential pricing. Absent a specific reason to change, the Department should refrain from departing from this reasonable standard.
- Petitioners provide no specific justification, based on market knowledge or otherwise, for switching the analysis from quarters to months. Nor do they explain why this change is necessary for an analysis of Double Coin's sales, but not requested for other respondents.
- Third, even under monthly analysis, the percentage passing the Cohen's d test remains low and does not justify departure from average-to-average comparisons.

**Department's Position:** As noted by Petitioners, historically, the Department required an allegation of targeted dumping prior to employing a differential pricing analysis and looked to domestic interested parties as a starting point for information on the appropriate parameters

---

[220] *See* Petitioners' Case Brief at 31-35. Petitioners cite: *Differential Pricing Analysis: Request for Comments*, 79 FR 26720 (May 9, 2014) ("*Differential Pricing Comment Request*"); *Strip From the United Arab Emirates: Final Results of Antidumping Duty Administrative Review; 2010-2011*, 78 FR 29700 (May 21, 2013) ("*PET Film/ UAE 10-11*"); *Withdrawal of the Regulatory Provisions Governing Targeted Dumping in Antidumping Duty Investigations*, 73 FR 74930 (December 10, 2008); *Certain Frozen Warmwater Shrimp From Thailand: Final Results of Antidumping Duty Administrative Review, Partial Rescission of Review, and Revocation of Order (in Part); 2011-2012*, 78 FR 42497 (July 16, 2013) ("*Shrimp/Thailand 11-12*"); *Polyethylene Terephthalate Film, Sheet, and Notice of Final Determination of Sales at Less Than Fair Value: Large Residential Washers From the Republic of Korea*, 77 FR 75988 (December 26, 2012); *Notice of Final Determination of Sales at Less Than Fair Value and Affirmative Critical Circumstances Determination: Bottom Mount Combination Refrigerator-Freezers From Mexico*, 77 FR 17422 (March 26, 2012) ("*Refrigerators/Mexico*"); *Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings; Final Modification*, 77 FR 8101 (February 14, 2012); *Certain Steel Nails from the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 FR 33977 (June 16, 2008); *Certain Steel Nails from the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 FR 33977 (June 16, 2008); *Certain Steel Nails from the United Arab Emirates: Notice of Final Determination of Sales at Not Less Than Fair Value*, 73 FR 33985 (June 16, 2008); *Antidumping Duties; Countervailing Duties*, 62 FR 27295 (May 19, 1997); and their own differential pricing analysis provided at Exhibit 3 to the Case Brief. Petitioners reference Double Coin's Preliminary Analysis Memo.

[221] *See* Double Coin's Rebuttal Brief at 28-30. Double Coin cites to the *Differential Pricing Comment Request* (May 9, 2014) and references the following submissions: PDM and Petitioners' Case Brief.

examined in the resulting analysis.[222] Indeed, the Department cited the domestic industry's product expertise and intimate market knowledge as the basis for the deference given to said parties in establishing the analytical criterion on a case to case basis (*e.g.*, the effects of specific time periods on pricing in the U.S. market).[223] Accordingly, in order to properly focus its analysis in past cases where targeting was alleged, the Department would modify the time periods it examines for targeted dumping based on a domestic party's allegations.[224]

More recently, however, the Department adopted a standard price whereby a differentiation analysis is conducted automatically in each margin program to evaluate the incidence and prevalence of targeted dumping.[225] In adopting this regular methodology, the Department established quarterly time periods as the baseline standards for temporal analysis.[226] Additionally, the Department stated that in the context of ongoing and future proceedings, parties to the particular proceeding will have an opportunity to provide comments that are relevant to the possible use of an alternative comparison method in that proceeding.[227]

We find, however, that, Petitioners provide no concerns with respect to the standard quarterly analysis and cite to no evidence supporting the use of a monthly analysis. Indeed, the only reasoning underlying Petitioners' request appears to be that it would increase the incidence of differential pricing for Double Coin. Petitioners, however, do not request the Department to make this change for the other respondent examined in this review, where a monthly analysis would, presumably, have little effect on the incidence of differential pricing. We find this results-based argument insufficient and, in fact, contrary to the principles underlying the Department's historical deference to domestic parties' market knowledge in cases involving price targeting.

As further support for their request, Petitioners note that in the recent *Shrimp/Thailand 11-12* (July 16, 2013) case, the Department had indeed changed the periods it examined for the final results in a review when a domestic party alleged that different periods resulted in a sufficient showing of a pattern of prices. First, we note that this *Shrimp/Thailand 11-12* (July 16, 2013) case was decided prior to the adoption of the new differential pricing methodology pursuant to the *Differential Pricing Comment Request* (May 9, 2014). Second, while Petitioners are correct that the Department indeed agreed with the domestic party's request to modify the time periods for analysis (and, as in this case, did not cite any specific market knowledge or expertise), the Department's determination to modify the time periods in *Shrimp/Thailand 11-12* (July 16, 2013) simply reflected the Department's agreement with the petitioner that the monthly analysis of pricing employed in the preliminary results was inconsistent with the quarterly analysis initially requested by Petitioners under the former methodology, and thus found the requested quarterly basis to be the appropriate standard for the final results. As such, rather than exemplifying the extent of the deference given to domestic parties by the Department with respect to requests involving differential pricing, the *Shrimp/Thailand 11-12* (July 16, 2013) case

---

[222] *See*, *e.g.*, *PET Film/UAE 10-11* (May 21, 2013) and accompanying IDM at 2-4.
[223] *See Antidumping Duties; Countervailing Duties*, 62 FR 27295 (May 19, 1997)
[224] *See*, *e.g.*, *Refrigerators/Mexico* (March 26, 2012) and accompanying IDM at Comment 16.
[225] *See Differential Pricing Comment Request* (May 9, 2014).
[226] *Id.*, 79 FR at 26720 (May 9, 2014) ("Time periods are defined by the quarter within the period of investigation or administrative review based upon the reported date of sale.").
[227] *Id.*, 79 FR at 26722 (May 9, 2014).

represents a standard correction of an inadvertent error. Further, in changing the standard from a monthly analysis back to a quarterly one, *Shrimp/Thailand 11-12* (July 16, 2013) demonstrates exactly the opposite fact pattern and result than is advocated by Petitioners in the instant case.

As noted above, Petitioners provide no justification as to why a monthly analysis would be superior to existing analysis, based on market expertise or relevant knowledge otherwise, aside from the simple fact that it would increase the incidence of Double Coin's targeted sales above the minimum threshold. We find this insufficient reasoning to deviate from the standard quarterly analysis, and continue to employ the quarterly analysis for these final results. Accordingly, the differential pricing analysis continues to not confirm the existence of a pattern of prices for comparable merchandise that differ significantly among purchasers, regions, or time periods and, therefore, we continue to use the average-to-average ("A-A") method to calculate the weighted-average dumping margin for Double Coin's reported sales.[228]

**RECOMMENDATION**

Based on our analysis of the comments received, we recommend adopting the above positions. If this recommendation is accepted, we will publish the final results of the review and the final weighted-average dumping margins in the *Federal Register*.

Agree ✓ Disagree _____

Ronald K. Lorentzen

Ronald K. Lorentzen
Acting Assistant Secretary
for Enforcement and Compliance

April 8, 2015
Date

[228] *See* Double Coin's Final Analysis Memo at Attachment II.

Filed By: Andrew Medley, Filed Date: 4/9/15 12:19 PM, Submission Status: Approved

FORM 19. Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 23-2391

**Short Case Caption:** China Manufacturers Alliance, LLC v. US

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 13,563 words.

☐ the filing has been prepared using a monospaced typeface and includes ________ lines of text.

☐ the filing contains ________ pages / ________ words / ________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ________).

Date: 11/28/2023

Signature: /s/ Daniel L. Porter

Name: Daniel L. Porter