2023-2391

_____

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

_____

CHINA MANUFACTURERS ALLIANCE, LLC, DOUBLE COIN
HOLDINGS LTD.,
Plaintiffs-Appellants,

And

GUIZHOU TYRE CO., LTD., GUIZHOU TYRE IMPORT AND EXPORT
CO., LTD.,
Plaintiff,

v.

UNITED STATES,
Defendant-Appellee.

_____

Appeal from United States Court of International Trade
Court Nos. 1:15-cv-00124, 1:15-cv-00128, Judge Timothy C. Stanceu

_____

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
PATRICIA M. McCARTHY
Director
FRANKLIN E. WHITE, JR.
Assistant Director
STEPHEN C. TOSINI
Senior Trial Counsel
Department of Justice, Civil Division
Commercial Litigation Branch
PO Box 480, Ben Franklin Station
Washington, D.C.  20530
Tel: (202) 616-5196
Email: stephen.tosini@usdoj.gov

February 7, 2024                Attorneys for Defendant-Appellee

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Federal Circuit Rule 47.5(a), We agree with Plaintiffs-Appellants' statement that the prior case: *China Manufacturers Alliance v. US*, Ct. No. 20-1159 (Decided June 10, 2021) (panel consisting of Circuit Judges Lourie, Clevenger, and Hughes), 1 F.4th 1028 was before this Court. The Court has determined that this appeal, 23-2391, is a companion case with the following cases now pending before this court: *Guizhou Trye Co., Ltd. v. US*, Ct. No. 23-2163; and *Guizhou Trye Co., Ltd. v. US*, Ct. No. 23-2165.

# TABLE OF CONTENTS

STATEMENT OF THE ISSUE.................................................................2

STATEMENT OF THE CASE SETTING FORTH RELEVANT FACTS ...............................2

   I.    Relevant Statutes And Agency Practice .................................2

   II.   Substantial Evidence Of Government Control Adduced During
          Administrative Proceeding.................................................5

   III.  Court Of International Trade's First Judgment....................................8

   IV.  This Court Reverses The Trial Court's First Judgment ......................10

   V.   Post-Appeal Trial Court Proceedings.................................11

SUMMARY OF THE ARGUMENT ............................................................15

ARGUMENT .................................................................................16

   I.    The Court Should Not Reopen The Issue Of Double Coin's Eligibility
          For A Separate Rate.........................................................16

   II.   Commerce's Determination That Double Coin Failed To Qualify For A
          Separate Rate Is Supported By Substantial Evidence And In Accordance
          With Law.........................................................21

        A. Commerce Lawfully Determined That Double Coin Failed To Rebut
           The Presumption Of *De Facto* Chinese Government Control .......22

        B. Double Coin Misunderstands The Analytical Framework Of
           Rebuttable Presumptions...............................................25

        C. Double Coin's Evidentiary Challenges To Commerce's *De Facto*
           Analysis Are Meritless...............................................28

        D. Double Coin's Contention That It Showed *De Facto* Independence
           Due To A Lack Of Board Control Of Its Export Activities Is
           Unfounded .............................................................33

CONCLUSION.................................................................................37

**TABLE OF AUTHORITIES**

**Cases**                                                                 **Page(s)**

*Advanced Tech. & Materials Co. v. United States*,
   885 F. Supp. 2d 1343 (Ct. Int'l Trade 2012), *aff'd*,
   581 F. App'x 900 (Fed. Cir. 2014) ............................................*passim*

*Allegheny Ludlum Corp. v. United States*,
   346 F.3d 1368 (Fed. Cir. 2003) ........................................................13

*Am. Silicon Techs. v. United States*,
   261 F.3d 1371 (Fed. Cir. 2001) ........................................................27

*AMS Assocs., Inc. v. United States*,
   719 F.3d 1376 (Fed. Cir. 2013) ..........................................................4

*An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*,
   284 F. Supp. 3d 1350 (Ct. Int'l Trade 2018)....................................23

*Atchison, T. & S. F. Ry. Co. v. Wichita Bd. of Trade*,
   412 U.S. 800 (1973)........................................................................13

*Bannum, Inc. v. United States*,
   779 F.3d 1376 (Fed. Cir. 2015) ......................................................18

*Can Tho Imp.-Exp. Joint Stock Co. v. United States*,
   435 F. Supp. 3d 1300 (Ct. Int'l Trade 2020)....................................23

*China Mfrs All., LLC v. United States*,
   1 F.4th 1028 (Fed. Cir. 2021)..................................................*passim*

*China Mfrs. All., LLC v. United States*,
   205 F. Supp. 3d 1325 (Ct. Int'l Trade 2017)............................*passim*

*China Mfrs. Alliance, LLC v. United States*,
   357 F. Supp. 3d 1364 (Ct. Int'l Trade Jan. 16, 2019)............9, 19, 20

*China Mfrs. Alliance, LLC v. United States*,
  639 F. Supp.3d 1260 (Ct. Int'l Trade May 16, 2023)................................*passim*

*China Mfrs. Alliance, LLC v. United States*,
Consol. Court No. 15-00124,
  2019 WL 4165274 (Ct. Int'l Trade Sept. 3, 2019).....................................10, 17

*China Manufacturers Alliance v. United States*,
  No. 2020-1159 (Fed. Cir.)................................................................................10

*Consolo v. Fed. Mar. Comm'n*,
  383 U.S. 607 (1966).................................................................................27, 34

*Daewoo Elecs. Co. v. United States*,
  6 F.3d 1511 (Fed. Cir. 1993)...........................................................................29

*Diamond Sawblades Mfrs. Coalition v. United States*,
  866 F.3d 1304 (Fed. Cir. 2017).....................................................................4, 9

*Dongtai Peak Honey Indus. Co. v. United States*,
  777 F.3d 1343 (Fed. Cir. 2015)........................................................................3

*Engel Indus., Inc. v. Lockformer Co.*,
  166 F.3d 1379 (Fed. Cir. 1999)...................................................................17, 18

*Sigma Corp. v. United States*,
  117 F.3d 1401 (Fed. Cir. 1997).....................................................................3, 4

*Transcom, Inc. v. United States*,
  182 F.3d 876, 882 (Fed. Cir. 1999)..............................................................3, 4

*Tronzo v. Biomet, Inc.*,
  236 F.3d 1342 (Fed. Cir. 2001) )..................................................................3, 4

*United States v. Husband*,
  312 F.3d 247 (7th Cir. 2002).........................................................................18

*Usinor Sacilor v. United States*,
  215 F.3d 1350 (Fed. Cir. 1999).....................................................................27

iii

*Yantai CMC Bearing Co. v. United States*,
 203 F. Supp. 3d 1317 (Ct. Int'l Trade 2017)...................................................4, 24

*Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*,
 350 F. Supp. 3d 1308 (Ct. Int'l Trade 2018)...........................................4, 24, 32

## Statutes

19 U.S.C. § 1581(c) ...........................................................................................3

19 U.S.C. § 1673...............................................................................................2

19 U.S.C. § 1675(a)(1)(B)................................................................................3

19 U.S.C. § 1677(18) ........................................................................................3

19 U.S.C. § 1677(35) ........................................................................................3

## Administrative Determinations

*Certain New Pneumatic Off-the-Road Tires from the People's Republic of China*,
 79 Fed. Reg. 61,291 (Dep't of Commerce Oct. 10, 2014) ................................. 5

*Diamond Sawblades and Parts Thereof from the People's Republic of China*, 71
 Fed. Reg. 29,303, 29,307 (Dep't of Commerce May 22, 2006) .......................... 5

## Other Authorities

13B Wright & Miller, Fed. Prac. & Proc. § 4478.3 (2d ed.)..................................18

2023-2391

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

CHINA MANUFACTURERS ALLIANCE, LLC, DOUBLE COIN
HOLDINGS LTD.,
Plaintiffs-Appellants,

And

GUIZHOU TYRE CO., LTD., GUIZHOU TYRE IMPORT AND EXPORT
CO., LTD.,
Plaintiff,

v.

UNITED STATES,
Defendant-Appellee.

Appeal from United States Court of International Trade
Court Nos. 1:15-cv-00124, 1:15-cv-00128, Judge Timothy C. Stanceu

## <u>BRIEF OF DEFENDANT-APPELLEE, THE UNITED STATES</u>

Plaintiffs-appellants (collectively Double Coin) contend that the Court of
International Trade committed reversible error by concluding that they had failed
to demonstrate independence from state control in an antidumping proceeding,
where a Chinese government entity (1) owned 65 percent of Double Coin's stock;
and (2) possessed exclusive power to appoint directors and management.

Substantial evidence establishing these facts coupled with the Department of Commerce's (Commerce) wide discretion compel affirmance.

## STATEMENT OF THE ISSUES[1]

1.      Whether Double Coin's challenge to the Department of Commerce's (Commerce) determination that it had failed to establish independence from state control is foreclosed by the Court's previous opinion in this case, which sustained Commerce's application of the China-wide antidumping duty rate to Double Coin.

2.      If the Court determines that this appeal is not foreclosed by its previous opinion in this case, whether substantial evidence supports Commerce's finding that Double Coin failed to qualify for a separate antidumping rate, where a Chinese government entity (1) owned 65 percent of Double Coin's stock; and (2) possessed sole power to appoint a controlling majority of directors and management.

## STATEMENT OF THE CASE SETTING FORTH RELEVANT FACTS

### I.      Relevant Statutes And Agency Practice

The antidumping duty statute is a remedial law that provides relief to domestic manufacturers by imposing duties on injurious imports of comparable products that are sold in the United States at less than fair value.  19 U.S.C. § 1673.

---

[1]  We include a statement of the issues and statement of the case because we raise an additional issue not addressed by Double Coin and because we disagree with Double Coin's argumentative statements.

The amount of duty is the difference between the United States price of the subject merchandise and its home market price, or "normal value." 19 U.S.C. § 1677(35). If requested, Commerce conducts annual reviews to determine the rate, if any, of antidumping duty to impose on subject merchandise entered during a specified period. 19 U.S.C. § 1675(a)(1)(B).

Because the statute recognizes that prices paid in nonmarket economies such as China do not reflect the fair market value of the merchandise, 19 U.S.C. § 1677(18), Commerce applies a different methodology to determine normal value of merchandise imported from nonmarket economies. In "antidumping duty proceedings involving merchandise from a non-market economy, . . . Commerce presumes that all respondents are government-controlled and therefore subject to a single country-wide rate." *Dongtai Peak Honey Indus. Co. v. United States*, 777 F.3d 1343, 1349–50 (Fed. Cir. 2015) (citing *Sigma Corp. v. United States*, 117 F.3d 1401, 1405 (Fed. Cir. 1997)). "Respondents may rebut this presumption and become eligible for a separate rate by establishing the absence of both *de jure* and *de facto* government control. If a respondent fails to establish its independence, Commerce relies upon the presumption of government control and applies the country-wide rate to that respondent." *Id*. at 1350 (citing *Sigma*, 117 F.3d at 1405); *Transcom, Inc. v. United  States*, 182 F.3d 876, 882 (Fed. Cir. 1999)).

3

Commerce conducts these analyses during administrative reviews.  *See id*. at 1346 (stemming from 19 U.S.C. § 1581(c) challenge to administrative review).

Relevant here, Commerce generally considers four factors in evaluating whether each respondent is subject to *de facto* government control of its export functions:  (1) whether the export prices are set by or are subject to the approval of a government authority; (2) whether the respondent has authority to negotiate and sign contracts and other agreements; (3) whether the respondent has autonomy from the government in making decisions regarding the selection of management; and (4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses.  *See AMS Assocs., Inc. v. United States*, 719 F.3d 1376, 1379 (Fed. Cir. 2013) (citing among other things *Sigma Corp*., 117 F.3d at 1405); *Diamond Sawblades and Parts Thereof from the People's Republic of China*, 71 Fed. Reg. 29,303, 29,307 (Dep't of Commerce May 22, 2006) (final determ.)).  Companies must satisfy all four factors of the *de facto* test to rebut the presumption of government control; therefore, Commerce need only determine that a company failed to rebut the presumption for one factor to deny a separate, non-countrywide rate.  *See Yantai CMC Bearing Co. v. United States*, 203 F. Supp. 3d 1317, 1325-26 (Ct. Int'l Trade 2017) (*Yantai CMC*); *Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*, 350 F. Supp. 3d 1308, 1321 (Ct. Int'l Trade 2018) (*Zhejiang Quzhou*).

4

## II.    Substantial Evidence Of Government Control Adduced During Administrative Proceeding

This appeal concerns the fifth administrative review of the antidumping duty order on pneumatic off-the-road tires from China covering the period of review September 1, 2012, through August 30, 2013.  Commerce found that Double Coin had "'failed to demonstrate absence of *de facto* government control over export activities [because] its controlling shareholder is wholly-owned by the State-owned Assets Supervision and Administration Commission of the State Council and the significant level of control this majority shareholder wields over the respondent's Board of Directors.'"  *China Manufacturers All., LLC v. United States*, 1 F.4th 1028, 1032 (Fed. Cir. 2021) (*CMA IV*) (quoting *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China*, 79 Fed. Reg. 61,291, 61,293 (Dep't of Commerce Oct. 10, 2014) (prelim. results admin. review)).

In its Section A questionnaire response, Double Coin stated that "Shanghai Huayi (Group) Company {Huayi} is the controlling shareholder of Double Coin Holdings.  At the end of the {period of review}, Shanghai Huayi (Group) Company held 65.66% shares of Double Coin Holdings."  Appx518.  Huayi, in turn is "wholly owned by" Shanghai State-owned Assets Supervision and Administration Commission of the State Council's (Shanghai SASAC).  *See, e.g.*, Double Coin Br. at 42, ECF No. 16.  Shanghai SASAC is a Chinese governmental entity.  *See Advanced Tech. & Materials Co. v. United States*, 885 F. Supp. 2d

5

1343, 1347 (Ct. Int'l Trade 2012) (*ATM*), *aff'd*, 581 F. App'x 900 (Fed. Cir. 2014))
(discussing in detail the legal regime for state-owned assets). Double Coin further
conceded that its "remaining shares are owned by stock market investors and none
of them holds more than 1% shares of Double Coin Holdings." Appx518.

Moreover, Commerce found that Double Coin and "Huayi have intertwined
management and board members," which includes sharing a "chairman of the
Board of Directors." Appx3016; *see also* Appx1634 (questionnaire response).

Commerce next reviewed Double Coin's Articles of Association Appx2141-
Appx2178. In its preliminary analysis memorandum, Commerce analyzed the
confidential information contained in the articles to conclude that "through its
majority-ownership, Huayi has the potential to unilaterally adopt resolutions of
significant importance to the operations of the company and is able to nominate
and appoint all members of DCH's board." Appx 3016. Specifically, Commerce
reviewed Articles 35 (Appx2147), 45 (Appx2149), 55 (Appx2151), 78
(Appx2155), 79 (Appx2155), 85 (2156), and 133 (Appx2164-Appx2165).
Commerce also found that the board of directors possessed authority to appoint the
general manager, Appx3016, among other powers. *See, e.g.*, Articles of
Association at Art. 110 (Appx2160-Appx2161), Art. 114 (Appx2161). Commerce
then traced the General Manager's significant authority over company operations
through the Articles of Association. Appx3016 (citing Art. 146 at Appx2166-

6

Appx2167).  As a result, Commerce concluded that the Articles of Association

afford Shanghai SASAC the potential for operational control over the company:

> the Articles of Association set up a structure where the
> majority-owner and sole owner with any significant
> share-ownership of the company has effective control
> over the composition of the board of directors, which
> appoints all management and maintains operational
> control over the company via the General Manager. As
> the 100 percent -SASAC-owned Huayi group is DCH's
> majority-owner and sole owner with more than 1 percent
> share, this affords SASAC the potential for operational
> control over the company.

Appx3061.

Moreover, Commerce conducted a verification of Double Coin's responses

and asked further questions regarding the process for nomination of the company's

board and whether minority shareholders had exercised rights under the Articles of

Association.  *See* Appx2975-Appx2977.  Double Coin proffered no evidence of

minority shareholders exercising rights under the Articles of Association.  *Id.*

Double Coin does not contest any of these facts.

Commerce thus concluded that Double Coin did not satisfy the criteria

demonstrating absence of *de facto* government control over export activities

because, through its 100-percent SASAC-owned Huayi assets, the Chinese

government exercises rights inherent in majority ownership as would be expected.

Commerce found that Huayi had control over the composition of Double Coin's

board of directors, which in turn chose the company's management.  *Id.*  Further,

7

Commerce found that Double Coin and Huayi had extensively intertwined management and board members. Commerce thus determined that Double Coin was ineligible for a separate rate and was part of the China-wide entity.

Because Double Coin had provided all requested information necessary to calculate a margin for Double Coin during the proceeding, Commerce calculated a *de minimis* antidumping duty rate for it. However, Commerce did not have data for "the remaining unspecified portion of the entity [that is, any and all other exporters in the PRC-wide entity].'" *CMA IV*, 1 F.4th at 1032 (citation omitted). Thus, Commerce "performed a simple average of the previous PRC-wide rate and the calculated rate for Double Coin, to arrive at a final rate of 105.31% applicable to the PRC-wide entity (including Double Coin)." *Id*.

## III. Court Of International Trade's First Judgment

The trial court remanded. *China Mfrs. Alliance LLC v. United States*, 205 F. Supp. 3d 1325 (Ct. Int'l Trade 2017) (*CMA I*). Among other things, the trial court instructed Commerce to rescind the China-wide rate as applied to Double Coin and instead apply the *de minimis* margin that had been calculated using Double Coin's data, finding that (1) Commerce's selection of Double Coin as a mandatory respondent required Commerce to assign Double Coin an individual rate and (2) Double Coin's cooperation with Commerce's requests for information meant that Commerce could not carry forward the adverse inferences built into the original

8

210.48 percent China-wide rate, which was based on non-cooperation of different companies during the initial investigation. *Id.* at 1334-42. The trial court thus assigned the 0.14 percent *de minimis* margin to Double Coin as "the only possible result that, on the record of the fifth administrative review, could comply with all statutory requirements[.]" *Id.* at 1344.

Commerce complied with *CMA I* under respectful protest by assigning Double Coin the 0.14 percent *de minimis* calculated margin on remand. Appx177. During the intervening period, this Court sustained Commerce's application of the China-wide rate to a mandatory respondent that had failed to rebut the presumption of government control and was found ineligible for a separate rate, notwithstanding the respondent's argument (like Double Coin's here) that Commerce did not find a lack of cooperation. *Diamond Sawblades Mfrs. Coalition v. United States*, 866 F.3d 1304 (Fed. Cir. 2017) (*Diamond Sawblades*). In light of *Diamond Sawblades*, we asked the trial court to remand the issue of Double Coin's dumping margin to Commerce for reconsideration.

The trial court sustained-in-part and remanded-in-part Commerce's remand redetermination and denied the Government's motion for remand with respect to Double Coin. *China Mfrs. Alliance, LLC v. United States*, 357 F. Supp. 3d 1364, 1379-89 (Ct. Int'l Trade Jan. 16, 2019) (*CMA II*) (remand to address unrelated issues). After Commerce addressed those other issues in a second remand, the trial

court sustained those results and entered final judgment. *China Mfrs. Alliance, LLC v. United States*, Consol. Court No. 15-00124, 2019 WL 4165274 (Ct. Int'l Trade Sept. 3, 2019) (*CMA III*).

## IV.   This Court Reverses The Trial Court's First Judgment

The Government appealed the decision to overturn Commerce's application of the China-wide antidumping duty rate to Double Coin, and the Court reversed, concluding that, "where a respondent in a {non-market economy} country cooperates with an investigation or review but fails to rebut the presumption of government control, Commerce may permissibly apply the country-wide {non-market economy} entity rate." *CMA IV*, 1 F.4th at 1040.

The Court further explained that "Double Coin does not appeal Commerce's factual determination that Double Coin failed to demonstrate de facto independence from Chinese government control." *CMA IV*, 1 F.4th at 1032 n.5[2]. The Court thus ordered the case remanded to the trial court with instructions to proceed in a manner consistent with its opinion.

---

[2]  Double Coin did file a cross appeal which it ultimately dismissed. *See China Manufacturers Alliance v. United States*, No. 2020-1159 (Fed. Cir.).  In its docketing statement, Double Coin stated that "the CIT affirmed Commerce's remand determination but on different grounds than desired by Plaintiffs" and asserted that it was raising the issue whether Commerce "has the legal authority under the antidumping statute to issue a general country-wide PRC-entity rate in antidumping cases." *Id.*, ECF No. 19 at 1-2.  Double Coin voluntarily dismissed its cross-appeal.  *Id.*, ECF No. 32.

**V.    Post-Appeal Trial Court Proceedings**

After the mandate issued, the trial court concluded that (1) this Court had not

adjudicated the merits of Double Coin's claim that it had rebutted the presumption

that it is a part of the China-wide entity, *China Mfrs. Alliance, LLC v. United*

*States*, 639 F. Supp.3d 1260, 1264 (Ct. Int'l Trade May 16, 2023) (*CMA V*), and

(2) Commerce's determination that Double Coin had failed to establish

independence from state control was supported by substantial evidence. *Id*. at

1264-67.

The trial court first determined that, because it had not "adjudicated Double

Coin's claim contesting {it had failed to rebut the presumption of government

control,}. . . *CMA IV* was not a judgment on the merits of Double Coin's claim."

*CMA V*, 639 F. Supp.3d at 1264. So it proceeded to the merits. The court did not

address whether Double Coin could have raised the issue during its first appeal.

Second, and on the merits, the trial court concluded that Commerce's

determination was supported by substantial evidence. The trial court reviewed

Double Coin's ownership structure and articles of association to conclude that the

company could not rebut the presumption of state control. *Id*. at 1264-67. The

court explained that more than 65 percent of Double Coin was state owned, and the

remaining shares were scattered among numerous stockholders, none of whom

owned more than one percent of the company's stock. Likewise, the court

11

sustained Commerce's finding that "Double Coin's Articles of Association demonstrate that a majority shareholder—and particularly one with a 65.66 percent ownership—has near complete control over any shareholder decisions, including decisions which may affect the management and operations of the company." *Id*. at 1264.  The trial court thus noted that Commerce had concluded that "there is undeniable evidence that the . . . majority–owner of Double Coin exerts considerable influence over the board of directors (and, thus, the management and operations of the company)[.]" *Id*.  Accordingly, the trial court explained that these facts led Commerce to conclude that "the factual record does not provide sufficient information to rebut the presumption of government control." *Id*. at 1264-65.

Double Coin proffered no record evidence contradicting Commerce's findings regarding state ownership and management overlap/control and, indeed, it conceded below that its 100 percent state-owned majority shareholder "has significant influence in the constitution of the board, and even in the selection of Double Coin's management." *Id*. at 1265 (citation and internal quotation marks omitted).  Instead, it claimed that this level of ownership and management control did not translate into day-to-day control over export activities and that Commerce had unlawfully departed from past practice because it placed substantial weight on

12

the third factor of the *de facto* government control test (management control) to the exclusion of factors one, two, and four.

The trial court rejected these contentions. The court reasoned that Commerce possesses significant discretion in determining whether an entity has established independence from government control. *Id*. at 1265. And Commerce's methodology, under which "the presumption of government control over export functions, as a general matter, is not rebutted if a board of directors under the control of a majority government shareholder had the authority and potential to select and oversee company management," was lawful. *Id*. Specifically, to the extent that Commerce had departed from its four-factor test in favor of the management control factor exclusively, the court reasoned that Commerce's test is "{u}ntethered by statutory or regulatory standards {and thus} Commerce was free to change its interpretation and application of the four–factor test at any time, so long as it provided a reasonable explanation for a departure from past practice." *Id*. at 1265-66 (citing *Atchison, T. & S. F. Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973); *Allegheny Ludlum Corp. v. United States*, 346 F.3d 1368, 1373 (Fed. Cir. 2003)). The court noted that Commerce had amended its methodology to give additional weight to management control in response to a previous trial court decision which had reasoned that management was "beholden" to the board that controls its pay. *Id*. at 1266 (citing *ATM*, 885 F. Supp. 2d at 1359.

13

Indeed, if "board members are properly presumed subject to governmental control, directly or indirectly, then true independence and autonomy remain in doubt until proven otherwise. If they are not so presumed, then the presumption of state control is without purpose or application." *ATM*, 885 F. Supp.2d at 1359. And "nothing precluded Commerce from being guided by {*ATM*} in revising the practice by which it applies its *de facto* test." *CMA V*, 639 F. Supp.3d at 1266. Thus, the court was "not persuaded by Double Coin's argument that Commerce exceeded its discretion by giving controlling weight to its third factor on the record facts of the review." *Id*.

The trial court further disposed of Double Coin's contention that "substantial evidence did not support a finding that {the majority shareholder} actually controlled day–to–day business decisions during the period of review, including decisions on the pricing of exports." *Id*. The court reasoned that "{u}nder its revised *de facto* test, Commerce need not base its decision entirely on evidence, or the lack thereof, of direct government control of the day–to–day general business operations, or the export–related operations in particular, of a majority–government–owned corporation." *Id*. Instead, "Commerce may consider whether there is indirect, or potential, control of such day–to–day operations because of a government–influenced board of directors that has the authority to appoint and oversee a company's management." *Id*. And "{t}hat is what

14

Commerce did" in this case.  Accordingly, the court entered judgment for the

United States and this appeal followed.

## SUMMARY OF THE ARGUMENT

The Court should decline to reopen the issue of Double Coin's eligibility for

a separate rate because this Court held that Commerce's application of the 105.31

percent China-wide rate to Double Coin was reasonable on the facts of this case,

and Double Coin waived any challenge to Commerce's separate rate determination

by failing to raise the issue during the first appeal as an alternative basis to affirm.

If the Court were to address on the merits the issue of state control of Double

Coin, it should sustain Commerce's determination because the agency reasonably

determined that the Chinese government's majority ownership of Double Coin, via

Shanghai SASAC and Huayi, means that Double Coin was not *de facto*

independent from the Chinese government concerning selection of management.

Double Coin's contrary arguments fail because they do not undermine the fact that

Huayi's majority ownership allows it to appoint the members of Double Coin's

board of directors, which appoints the general manager responsible for the day-to-

day operations of the company.  Additionally, Commerce's determination followed

the trial court's reasoning from other cases concluding that majority Chinese

government ownership rendered a respondent ineligible for a separate rate under

similar facts.  Lastly, Double Coin's argument that majority state ownership would

15

not indicate control unless its board of directors micromanaged operational

decisions is legally and factually unsupported and thus Commerce's determination

that Double Coin failed to qualify for a separate rate should be sustained.

## ARGUMENT

## I.     The Court Should Not Reopen The Issue Of Double Coin's Eligibility For A Separate Rate

In *CMA IV*, the Court held that "Commerce's application of the 105.31%

PRC-wide entity rate to Double Coin was not contrary to law and was reasonable

on the facts of this case." *CMA IV*, 1 F.4th at 1040.  The Court's remand

instruction made no mention of the trial court reopening the question whether

Double Coin demonstrated eligibility for a separate rate by rebutting the

presumption of state control.  The Court further concluded that the application of

the 105.31 percent rate to Double Coin was "reasonable on the facts of this case."

*Id.*  Accordingly, it should not be the subject of a second appeal.

Furthermore, Double Coin waived the issue of whether it was part of the

China-wide entity on appeal.  This Court applies the same standard of review as

applied by the trial court, without deference, and thus could have reviewed

Commerce's determination that Double Coin was part of the China-wide entity had

Double Coin raised the issue on appeal.  *See*, *e.g.*, *CMA IV*, 1 F.4th at 1035.  And

the Court explained that "Double Coin does not appeal Commerce's factual

determination that Double Coin failed to demonstrate *de facto* independence from

16

Chinese government control." *Id.* at 1032 n.5.  Nevertheless, Double Coin had filed a cross-appeal raising different issues and it certainly could have raised the issue in this appeal in its first cross-appeal or as an alternative basis for affirmance in the earlier appeal.  *See China Manufacturers Alliance v. United States*, No. 2020-1159 (Fed. Cir.), ECF No. 19 (docketing statement).

Instead, Double Coin elected to argue first in its cross-appeal and then as a basis for affirmance that Commerce lacked authority to apply a China-wide rate as an alternative basis for affirmance.  *CMA IV*, 1 F.4th at 1036.  It could have argued in the alternative that it had established independence and thus was not part of the China-wide entity.  Indeed, it cross-appealed, raising a different issue,

Accordingly, Double Coin's request to reopen the issue of *de facto* independence also violates the mandate rule and was waived.  "Unless remanded by this court, all issues within the scope of the appealed judgment are deemed incorporated within the mandate and thus are precluded from further adjudication." *Engel Indus., Inc. v. Lockformer Co.*, 166 F.3d 1379, 1383 (Fed. Cir. 1999) (collecting cases); *see also Tronzo v. Biomet, Inc.*, 236 F.3d 1342, 1349 (Fed. Cir. 2001) (explaining that once a contested issue is addressed by the trial court, that issue is ripe for challenge on appeal and if a party fails to challenge the issue on appeal, the appellate court's mandate acts to preclude the party from raising that issue on remand).  Additionally, an "issue that falls within the scope of the

17

judgment appealed from but is not raised by the appellant in its opening brief on appeal' may properly be deemed waived." *Bannum, Inc. v. United States*, 779 F.3d 1376, 1382 (Fed. Cir. 2015) (quoting *Engel*, 166 F.3d at 1383); *see also United States v. Husband*, 312 F.3d 247, 250-51 (7th Cir. 2002) ("{t}here are two major limitations on the scope of a remand.  First, any issue that could have been but was not raised on appeal is waived and thus not remanded. . . . Second, any issue conclusively decided by this court on the first appeal is not remanded."); 13B Wright & Miller, Fed. Prac. & Proc. § 4478.3 (2d ed.) (district court may not "reconsider its own rulings made before appeal and not raised on appeal").

Double Coin may not reopen the issue of *de facto* independence because the Court's mandate did not preserve the issue on remand and Double Coin did not raise the issue as an alternative basis for affirmance during the first appeal.  The question whether Double Coin had demonstrated *de facto* independence was within the scope of the trial court's first final judgment because that judgment was premised on Double Coin being part of the China-wide entity.  In *CMA I*, the court remanded Commerce's application of the China-wide entity rate of 105.31 percent to Double Coin with instructions to apply a rate of 0.14 percent based upon Double Coin's individual data.  205 F. Supp. 3d at 1335.  In so doing, the trial court considered whether Commerce had the statutory authority to apply a China-wide entity rate to Double Coin as part of the China-wide entity without having first

18

conducted an individual examination of the China-wide entity on the record of the fifth administrative review. *Id.* at 1335-37. If the trial court had ruled that Double Coin was not part of the China-wide entity, however, it would not have needed to reach the question of whether Commerce had lawfully investigated the China-wide entity—instead, it necessarily would have ruled that Double Coin had established independence and therefore Commerce should have applied a rate based on Double Coin's own data. Thus, the trial court's decision in *CMA I* proceeded from the premise that Double Coin was part of the China-wide entity.

Similarly, in *CMA II*, the trial court held that "the only rate Commerce reasonably could assign the PRC-wide entity on the record of the fifth review would be the 0.14% rate Commerce assigned Double Coin." 357 F. Supp. 3d at 1382. The trial court held that "no Chinese exporter or producer of OTR tires other than Double Coin was in a position to be determined to be part of the PRC-wide entity, with the result that the record contained no information on *any part of the PRC-wide entity except for Double Coin*." *Id.* at 1386 (emphasis added). The trial court further held that, "Commerce never requested any information from the government of the PRC or from *any part of the PRC-wide entity other than Double Coin*[,]" and that, "if the PRC-wide entity can be presumed to include any exporters or producers of OTR tires *other than Double Coin*, they cannot be identified and do not appear in the record[.]" *Id.* at 1387 (emphasis added).

19

Accordingly, the trial court's first judgment hinged on Double Coin being part of the China-wide entity, and the question whether Double Coin was part of the China-wide entity was within the scope of this Court's decision and mandate in the first appeal.

CMA II also was premised upon Double Coin being part of the China-wide entity because the court distinguished *Diamond Sawblades* on the ground that, in this review, no portion of the China-wide entity had failed to cooperate. *See CMA II*, 357 F. Supp. 3d at 1383. The trial court then held that, "the only rate Commerce reasonably could assign to the {China}-wide entity is one equivalent to the individual margin it calculated for Double Coin." *Id.* at 1384. The fact that the trial court held that Double Coin's individual data could be the only basis for a China-wide rate in *CMA II* necessarily meant that its decision proceeded from the premise that Double Coin was part of the China-wide entity.

Because the Court sustained Commerce's application of the China-wide rate to Double Coin and concluded that Double Coin did not appeal Commerce's finding that Double Coin failed to demonstrate *de facto* independence from government control, the Court should not reopen this issue during a second appeal.

20

II.     **Commerce's Determination That Double Coin Failed To Qualify For A Separate Rate Is Supported By Substantial Evidence And In Accordance With Law**

Even if the Court were to review Double Coin's eligibility for a separate rate, Commerce's determination that Double Coin failed to rebut the presumption of Chinese government control is supported by substantial evidence and in accordance with law. Commerce lawfully determined that Double Coin had failed to rebut the presumption of Chinese government control due to its majority ownership by a state-controlled entity, and, as such, was not entitled to a separate, company-specific rate. Appx328; Appx422-Appx432; Appx3014-Appx3018. Commerce considered and weighed the available evidence regarding Double Coin's degree of independence in its export activities and its conclusion that Double Coin failed to demonstrate *de facto* independence is supported by substantial evidence.

Double Coin incorrectly contends that Commerce's determination regarding its separate rate status is unsupported by substantial evidence. First, it contends that Commerce failed to follow the correct legal test which requires the agency to focus solely on "export" activities. Double Coin Br. at 21-32. Second, Double Coin asserts that Commerce's practice misapplies the analytical framework regarding "rebuttable presumptions." *Id*. at 32-38. Lastly, Double Coin maintains that Commerce's decision is unsupported by substantial evidence because the

agency allegedly did not demonstrate that Double Coin's board of directors

exercised control over Double Coin's export activities after the fact, rather than

beforehand by selecting or having the power to replace management. *Id.* at 39-50.

Double Coin's contentions fail.

A. **Commerce Lawfully Determined That Double Coin Failed To Rebut The Presumption Of *De Facto* Chinese Government Control**

Applying its *de facto* analysis, Commerce reasonably found that Double

Coin was subject to *de facto* control by the Chinese government and, thus, had

failed to qualify for a company-specific separate rate. Double Coin argues that

Commerce failed to consider certain record evidence in making its determination

and to make separate findings regarding each of the four *de facto* independence

factors. Double Coin Br. at 21-32. Commerce, however, considered the totality of

the record and determined that the evidence cited by Double Coin was insufficient

to establish that the company operates free of *de facto* government control given

that its board was beholden to the state. *See* Appx367.

As discussed above, Commerce generally considers four factors in

evaluating whether a respondent is subject to *de facto* government control: (1)

whether export prices are set by or are subject to the approval of a government

authority; (2) whether the respondent has authority to negotiate and sign contracts

and other agreements; (3) whether the respondent has autonomy from the

government in making decisions regarding the selection of management; and (4)

whether the respondent retains the proceeds of its export sales and makes

independent decisions regarding disposition of profits or financing of losses.  *See*

Double Coin Br. at 22 (citation omitted).  In evaluating these factors, Commerce

has concluded that, if a government entity holds a majority ownership share, either

directly or indirectly, in an exporter, then that majority ownership in and of itself

means that the government exercises, or has the potential to exercise, control over

the company's operations generally, regardless of whether such control is actually

exercised.  *See ATM*, 885 F. Supp. 2d 1343; *see also Can Tho Imp.-Exp. Joint

Stock Co. v. United States*, 435 F. Supp. 3d 1300, 1305-06 (Ct. Int'l Trade 2020)

(*Can Tho*); *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 284

F. Supp. 3d 1350, 1358-59 (Ct. Int'l Trade 2018) (*An Giang*).

Commerce's conclusion is based on Shanghai SASAC's control over, for

example, the selection of management, a key factor in determining whether a

company has sufficient independence in its export activities to merit a separate

rate.  Appx3016.  Consistent with normal business practices, Commerce

reasonably determined that any majority shareholder, including a government,

would have the ability to control, and an interest in controlling, the operations of

the company, including the selection of management and the profitability of the

company.  *See* Appx425-Appx429; Appx3014-3018.

23

Record evidence in this proceeding further supports Commerce's conclusion that Double Coin was not entitled to a separate rate. There is no dispute that Shanghai SASAC owns 100 percent of the shares in Huayi. *See* Appx3013-Appx3017 (citing Appx2925-Appx2927; Appx2141-Appx2148). Huayi is the majority shareholder of Double Coin with 65.66 percent of the ownership shares. The remainder of Double Coin's ownership is held by a diverse range of investors on the stock market, no one of which holds more than a one percent share. Appx427; Appx3015. As the majority shareholder, and the sole shareholder with more than one percent of ownership of Double Coin, Huayi has nearly complete control over shareholder decisions, including decisions that affect the management and operations of the company. Appx425-Appx429; Appx3015-Appx3016.

Additionally, contrary to Double Coin's argument that Commerce was required to weigh each of the four *de facto* factors individually, Commerce may deny separate rate requests to applicants who fail to demonstrate separation from the government with respect to any one *de jure* or *de facto* criterion. In particular, the trial court has held that if a respondent fails the third factor of the *de facto* independence analysis, autonomy in the selection of management, that failure alone establishes the lack of independence from state control. *Yantai CMC*, 203 F. Supp. 3d at 1326; *Zhejiang Quzhou*, 350 F. Supp. 3d at 1321.

24

## B.    Double Coin Misunderstands The Analytical Framework Of Rebuttable Presumptions

Double Coin raises an untenable argument at pages 32 through 38 of its brief, asserting that Commerce misapplied the analytical framework for rebuttable presumptions. Double Coin notes that a "rebuttable presumption is 'a species of legal presumption which holds good until evidence contrary to it is introduced.'" Double Coin Br. at 32 (quoting BLACK'S LAW DICTIONARY at 1267 (6th Ed.)) (cleaned up). From this definition, Double Coin extrapolates to argue that, so long as it proffers any countervailing evidence then it must have rebutted the presumption as a matter of law. *Id*. at 33.

Of course, Double Coin would have a better case if there were *no evidence* of state control here. If Double Coin were entirely owned by non-governmental shareholders and the evidence demonstrated that its board was, in fact, not beholden to the state, then, absent countervailing evidence, it might establish *de facto* independence. But the facts tell a different story. Double Coin proffered evidence that it claimed established independence from government control, and Commerce weighed this evidence against other evidence that tended to establish government control.

For example, Double Coin maintains that "Commerce has focused its analysis entirely on ownership of the ultimate shareholders of the exporting entity to the exclusion of the other categories of evidence under the policy. Ignoring this

evidence is itself a fatal flaw." *Id.* at 34. Double Coin contends that its "evidence actually demonstrates that the exporter sets prices, negotiates with customers, and otherwise conducts its export operations free from government control. In other words, the evidence affirmatively demonstrates the absence of government control over what matters – the export activities of the entity under investigation." *Id.*

This framework lacks merit for two primary reasons.

First and foremost, it advances a definition of government control under which a Communist Party functionary must directly supervise export activities. This has never been the correct test. Instead, the "presumption stems not from an economy comprised entirely of the government (*e.g.*, a firm is nothing more than a government work unit), but rather from the . . . use of a variety of legal and administrative levers to exert influence and control (both direct and indirect) over the assembly of economic actors across the economy." Appx428. And Double Coin nowhere contests that these "levers" exist.

Second, Commerce did, in fact, weigh all record evidence to reach its determination. Appx3014-Appx3018. Commerce considered evidence that "there is no direct owner/shareholder involvement in the selection of management" and that "its shareholders, including but not limited to the Huayi Group select the seven directors . . ., by design, to limit the influence of the controlling shareholder on the board), and that the rights of minority owners are protected." Appx3017.

26

Commerce then weighed this evidence against other evidence demonstrating state control, for example, Shanghai SASAC's ability to control the composition of the majority of the board, which appoints the general manager, who hires other managers, to conclude that the government owned "majority owner of the respondent exerts considerable influence over the board of directors and, thus, the management and operations of the company." Appx3016-Appx3017.

In sum, the most that Double Coin can establish is the presence of evidence both favoring and detracting from its position. That is not enough. Rather, the "possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966); *see also Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1381 (Fed. Cir. 2001) ("Where we are faced with two opposing views of the record, it is the function of the court to uphold Commerce's determination if it is supported by substantial evidence and is otherwise in accordance with the law."); *Usinor Sacilor v. United States*, 215 F.3d 1350 (Fed. Cir. 1999) ("Our review of the record indicates that the {Court of International Trade} evaluated and weighed the evidence in order to make its own {factual} determination . . . . That was error. It was not proper for the court to conclude that evidence that it considered 'persuasive' eclipsed contrary evidence that Commerce thought persuasive.") (internal citations omitted).

27

### C.    Double Coin's Evidentiary Challenges To Commerce's *De Facto* Analysis Are Meritless

Double Coin admits that "a majority shareholder has significant influence in the constitution of the board, and even in the selection of Double Coin's management." Double Coin Br. at 51. Despite this admission, Double Coin contends that Commerce erred in its *de facto* analysis of government control based on its allegations that: (1) Double Coin's Articles of Association state that its managers control the company's day-to-day operations; (2) Double Coin's minority shareholders have "specific rights"; (3) Double Coin's board of directors may have independent directors; and (4) there are no instances in which Huayi "actually exercised" control over the day-to-day operations of Double Coin. *Id.* at 41-54. Double Coin's arguments lack merit.

First, Double Coin contends that its Articles of Association and other company documents demonstrate an absence of *de facto* government control because they state that managers control the company's day-to-day operations. *Id.* at 48. Commerce evaluated this evidence and reasonably found that even if operational management authority has been granted to certain individuals by the Articles of Association, these managers ultimately answer to Double Coin's board of directors. *See* Appx425-Appx426; Appx3015-Appx3017. Thus, and as explained above, ultimate operational control rests with the shareholders – in particular state-owned Huayi – through the board. *Id.*

28

Further, in *ATM*, the trial court rejected a similar argument, holding that managers should be presumed "to be beholden to the board that controls their pay, in particular to the chairman of the board as the *de facto* company head under the PRC model[,]" until proven otherwise. *ATM*, 885 F. Supp. 2d at 1359. The court further held that "{i}f board members are properly presumed subject to governmental control, directly or indirectly, then true independence and autonomy remain in doubt until proven otherwise. If they are not so presumed, then the presumption of state control is without purpose or application." *Id.* Similarly, Commerce reasonably found that, as the controlling shareholder, Huayi controls Double Coin's board and management. *See also Daewoo Elecs. Co. v. United States*, 6 F.3d 1511, 1520 (Fed. Cir. 1993) (explaining that substantial evidence may include "reasonable inferences from the record."). Indeed, both Double Coin and the state-owned Huayi shared the same board chairman during the period of review. Appx3016; Appx1634.

Second, Double Coin maintains that Commerce ignored that its minority shareholders have rights under the company's Articles of Association that "temper the control" that the state-owned Huayi entity can exert over Double Coin. Double Coin Br. at 47-52. Contrary to Double Coin's contention, Commerce addressed this issue and found that the protections afforded to Double Coin's minority

shareholders went unused and were insufficient to demonstrate that it was entitled to separate rate status.  Appx2975-Appx2977 (verification report)

Specifically, as Commerce explained, the standard for determining such a status is that a non-market economy exporter is presumed to be under state control until such a presumption is sufficiently rebutted.  *See* Appx427.  The existence of certain minority shareholder rights, such as the ability to sue board members or managers who act against the interests of the company, or the right of minority shareholders to call shareholder meetings, does not prove the absence of state control particularly where there has no evidence of any demonstrable action on behalf of a minority stakeholder.  *Id.*  The trial court previously rejected the argument that a minority shareholder's "protected rights," including voting rights, are sufficient to demonstrate an absence of state control, holding that, for example, "the power to veto {a board member} nomination does not equilibrate the power of control *over* nomination."  *ATM*, 885 F. Supp. 2d at 1357-58 (emphasis in original).

Similarly, as Double Coin's majority shareholder and the only shareholder with more than one percent ownership, Huayi has near complete control over all shareholder decisions, including decisions which may affect the management and operations of the company.  *See*, *e.g.*, Appx3014-Appx3017.  Huayi's choice of management then has control over the day-to-day operations of the company.  In

30

the case of an exporter in a non-market economy country, such an arrangement does not rebut the presumption of state control, but rather supports it.

In particular, Article 146 of Double Coin's Articles of Association dictates that its general manager is appointed by the board of directors. Appx3016. The general manager, pursuant to Article 114 of the Articles of Association, then directs the company's day-to-day operations and hiring decisions. *Id.* In other words, rather than limit Huayi's control, as Double Coin contends, Double Coin's Articles of Association establish that the majority-owner possesses effective control over shareholder decisions and maintains operational control over the company through the general manager. Through Huayi, a wholly-owned entity of Shanghai SASAC, the Chinese government has the potential for operational control over the company, and thus, Commerce lawfully concluded that Double Coin should not be entitled to a separate rate.

Third, Double Coin asserts that Commerce ignored the importance of independent members of Double Coin's board of directors. Double Coin Br. at 52-53. Commerce, however, found that despite Double Coin's claims that any shareholder can nominate a director for a vacant position, no minority shareholder has ever nominated a director and no Huayi nominee has ever been rejected. Appx426; Appx2976. In fact, Double Coin's Articles of Association limit minority shareholder rights. Appx3014-Appx3018. In other words, as the

31

majority shareholder, Huayi can unilaterally adopt resolutions of significant importance to the operations of the company regardless of the presence of an independent director on the board of directors. *Id.*

The record also demonstrates that Huayi and Double Coin have intertwined management and board members, including, for example, Mr. Liu Xunfeng, who was the Chairman of the boards of directors of both Double Coin and Huayi during the period of review. Appx3016; Appx1634. Further, certain senior managers of Double Coin had prior roles with Huayi. *See*, *e.g*., Appx526. Thus, regardless of the possibility of an independent director, the record supports Commerce's determination that the state-owned Huayi had near-complete control over Double Coin's shareholder decisions.

Fourth, Double Coin contends that Commerce erred in finding that Double Coin was not entitled to a separate rate because it did not identify examples of Huayi "actually" exercising its legal right to control or influence day-to-day operations. Double Coin Br. at 54-55. This misconstrues the standard for rebutting the presumption of control. As the party seeking to obtain a separate, company-specific rate in a non-market economy proceeding, Double Coin must affirmatively demonstrate the absence of *de facto*, as well as *de jure*, state control. In other words, the burden to rebut the presumption of state control is on the respondent, not Commerce to prove "actual" control over day-to-day operations.

32

*See Zhejiang Quzhou*, 350 F. Supp. 3d at 1321-22 (explaining that a "lack of evidence of specific instances of actual control does not render Commerce's finding unsupported by substantial evidence").

Moreover, and as described above, when Commerce did inquire into the issue during its verification, Double Coin failed to provide any example of where a minority shareholder nominated a potential director or a Huayi Group nominee was rejected.  Appx3016-Appx3017; Appx2925-Appx2927.  To the contrary, the record demonstrates that Huayi had the ability to appoint all members of Double Coin's board of directors, which would then appoint the general manager. Appx3016.  Double Coin's general manager, in turn, was responsible for the day-to-day operations of the company.  Thus, Double Coin's argument that it demonstrated *de facto* independence from state control is unfounded.

### D.   Double Coin's Contention That It Showed *De Facto* Independence Due To A Lack Of Board Control Of Its Export Activities Is Unfounded

In the alternative, Double Coin argues that, even if the Chinese government could select the board, which in turn selected management, this does not equate to state control over export activities.  Double Coin Br. at 55-67.  Double Coin contends that this is because the shareholder control over the selection of Double Coin's board was too attenuated to constitute control over Double Coin's export activities.  Double Coin asserts that export activities, specifically the prices

charged for exports, were set by its U.S.-based affiliate, CMA, without direct involvement from the parent company, and so the ability of the shareholder to control the composition of Double Coin's board does not equate to direct control over Double Coin's export activities.  In essence, Double Coin argues that it should be treated as independent because Commerce did not rely on evidence that Double Coin's board of directors exerted control over management's decisions *after the fact* rather than beforehand by appointing management or having the power to replace management.  Double Coin's argument lacks merit.

Double Coin lists various aspects of its export activities and argues that Commerce lacked substantial evidence for its finding that Double Coin failed to rebut the presumption of state control on the ground that Commerce did not find that the Chinese government exercised its control by affirmatively interfering with management decisions.  *Id*. at 57-62.  Double Coin thus argues that the finding that Double Coin lacked independence is invalid unless Commerce demonstrates that the Chinese government exerted control over individual export decisions, as opposed to Double Coin failing to rebut the presumption that the Chinese government could control its decisions if it chose to do so.  This conflicts with the presumption of state control applied to non-market economy producers.

Double Coin makes several claims that Commerce failed to consider certain information relevant to the *de facto* criteria for government control, but it simply

34

disagrees with Commerce's conclusion.  *Id.* at 63-66.  Its disagreement, however, does not render Commerce's decision unsupported by substantial evidence.  *See Consolo*, 383 U.S. at 620 (the "possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence").

The export decisions that Double Coin references, where management allegedly made decisions without the board's meddling do not detract from Commerce's conclusion that the Chinese government had power to make those decisions if it wished through the selection of the board and therefore management. Because Commerce reasonably evaluated and interpreted the record before it, its determination should be sustained.

Contrary to Double Coin's argument that Commerce must demonstrate affirmative exercise of state control over export pricing to find a lack of *de facto* independence over export activities, the question whether export prices are set by the state or the "market" is not determinative for purposes of a separate rate analysis.  *ATM*, 885 F. Supp. 2d at 1360.  Specifically, "the price of an arm's length transaction to a buyer in the market is always a market transaction by definition, and regardless of any setting of or involvement in price by the seller's government.  For that matter, the actual setting of price is only one of the four *de facto* factors [], whereas governmental manipulation of the cost of inputs or

35

rationalization of industry or output are among numerous other scenarios of

concern that can affect seller pricing." *Id.* (internal quotations omitted & cleaned

up). The ability to control board composition, and thus selection of management

who would control export activities, was sufficient evidence to support the

presumption of state control in *ATM*, and the same is true here. Accordingly,

Double Coin's argument is indistinguishable from the producer's argument in *ATM*

and its argument should be rejected for the same reasons as in that case.

Further, Double Coin contends that the Chinese government could not have

controlled its export activities because Double Coin's U.S. affiliate, CMA, is

responsible for setting "export pricing." Double Coin Br. at 63. As explained

above, however, the ability to set export prices is one of the four criteria that

Commerce examines in its *de facto* control analysis. Commerce reasonably found

that CMA's United States operations, which addressed one factor of Commerce's

analysis, did not overcome the other considerations on the record, including

Huayi's ability to make decisions regarding the selection of its management and its

power to unilaterally adopt resolutions of significant importance to Double Coin's

operations. Appx427-Appx428. In any event, it is reasonable to conclude that, as

a U.S. subsidiary, CMA remained "beholden" to Double Coin.

Finally, Double Coin contends that it identified additional evidence that its

export activities were insulated from Chinese government control by the operation

Case: 23-2391    Document: 24    Page: 43    Filed: 02/07/2024

of various layers of management and coordination with CMA. Double Coin Br. at 65-67. This argument relies on the premise that Double Coin establishes *de facto* independence if it shows that "the Double Coin board of directors exercised no influence over the setting of export prices." *Id.* at 66. Contrary to this argument, however, Commerce reasonably found that the other *de facto* factors weighed against a finding of independence, and that Double Coin's board of directors exercised influence over the setting of export prices by appointing the management who set them or having the power to replace the management if the management did not comply with the board's directives. Appx425-428; Appx3014-Appx3018.

## CONCLUSION

For these reasons, we respectfully request that the Court affirm.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

/s/ FRANKLIN E. WHITE, JR.
Assistant Director

37

/s/  STEPHEN C. TOSINI
Senior Trial Counsel
Department of Justice
Civil Division
Commercial Litigation Branch
PO Box 480, Ben Franklin Station
Washington, D.C.  20530
Tel: (202) 616-5196
Fax: (202) 514-7969
Email: stephen.tosini@usdoj.gov

February 7, 2024                    Attorneys for Defendant-Appellee

## **CERTIFICATE OF COMPLIANCE**

I, Stephen C. Tosini, in reliance upon the word count of Microsoft Word,

certify that the "BRIEF OF DEFENDANT-APPELLEE, THE UNITED STATES,"

excluding the table of contents, table of authorities, certificate of service, and any

certificates of counsel, contains 8,378 words.  This brief thus complies with Rule

32(a)(7)(B), which permits response briefs of 14,000 words or fewer.


/s/  Stephen C. Tosini