**2023-2391**

---

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

---

**CHINA MANUFACTURERS ALLIANCE, LLC, DOUBLE COIN HOLDINGS LTD.,**

*Plaintiffs-Appellants*

**GUIZHOU TYRE CO., LTD., GUIZHOU TYRE IMPORT AND EXPORT CO., LTD.,**

*Plaintiff*

**v.**

**UNITED STATES,**

*Defendants-Appellee*

---

Appeal from United States Court of International Trade
Court Nos. 1:15-cv-00124, 1:15-cv-00128, Judge Timothy C. Stanceu

---

**PLAINTIFFS-APPELLANTS' REPLY BRIEF**

---

Daniel L. Porter
James P. Durling
James C. Beaty
Katherine R. Afzal

CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
202-452-7373

*Counsel for China Manufacturers Alliance, LLC et al.*

February 28, 2024

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 23-2391 |
| **Short Case Caption** | China Manufacturers Alliance, LLC v. US |
| **Filing Party/Entity** | China Manufacturers Alliance, LLC, Double Coin Holdings Ltd |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 2/28/2024

Signature: /s/Daniel L. Porter

Name: Daniel L. Porter

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☐ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| Double Coin Holdings Ltd | Shanghai Huayi Group Corporation Limited (formerly Double Coin Holdings., Ltd.) | Shanghai Huayi Group Corporation Limited (formerly Double Coin Holdings., Ltd.) |
| China Manufacturers Alliance, LLC, | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| Daniel L. Porter | Katherine R. Afzal | |
| James P. Durling | | |
| James C. Beaty | | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑  Yes (file separate notice; see below)    ☐  No    ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# **TABLE OF CONTENTS**

SUMMARY OF ARGUMENT ...................................................................1

ARGUMENT ........................................................................................3

I.    COMMERCE'S ARGUMENT THAT THIS COURT SHOULD NOT
      ADDRESS CMA'S ARGUMENTS AT ALL SHOULD BE
      REJECTED ...................................................................................3

II.   COMMERCE'S APPROACH TO ANALYZING WHETHER
      DOUBLE COIN WAS CONTROLLED BY THE CHINESE
      GOVERNMENT WAS UNLAWFUL .............................................11

      A.    Contrary To Claims By Commerce, The Language and
            Structure of Policy Bulletin 05.1 Requires Each Factor to Be
            Linked to Export Activities ..................................................13

      B.    Commerce Adopted an Unlawful Interpretation and Application
            of "Rebuttable Presumption" .............................................15

III.  COMMERCE'S ANALYSIS IS NOT SUFFICIENT FOR THIS
      COURT TO CONCLUDE THAT THE UNDERLYING
      DETERMINATION WAS SUPPORTED BY SUBSTANTIAL
      EVIDENCE .................................................................................19

      A.    Applicable Standard of Review and Substantial Evidence.................19

      B.    Commerce Fails to Show How the Agency's Separate Rate
            Analysis Comports with the Agency's Obligation to Examine
            the Whole Record and its Own Stated Legal Test for Separate
            Rate Eligibility ...................................................................22

CONCLUSION AND RECOMMENDED APPELLATE REMEDY ...................31

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*A. C. Aukerman Co. v. R. L. Chaides Constr. Co.*,
   960 F.2d 1020 (Fed. Cir. 1992) ..............................................................17

*Advanced Tech. & Materials Co. v. United States*,
   938 F. Supp. 2d 1342 (Ct. Int'l Trade 2013) ................................. 24, 26

*Allentown Mack Sales & Serv., Inc. v. NLRB*,
   522 U.S. 359 (1998) ................................................................... 20, 21

*Amado v. Microsoft Corp.*,
   517 F.3d 1353 (Fed. Cir. 2008) ..............................................................6

*Atlanta Gas Light Co. v. Bennett Regul. Guards, Inc.*,
   33 F.4th 1348 (Fed. Cir. 2022) ..............................................................6

*Atlantic Sugar, Ltd. v. United States*,
   744 F.2d 1556 (Fed. Cir. 1984) ............................................................21

*Bannum, Inc. v. United States*,
   779 F.3d 1376 (Fed. Cir. 2015) ......................................................9, 10

*Burlington Truck Lines, Inc. v. United States*,
   371 U.S. 156 (1962) ................................................................... 18, 21

*China Mfrs. All., LLC v. United States*,
   205 F. Supp. 3d 1325 (Ct. Int'l Trade 2017) ....................................4, 8

*China Mfrs. All., LLC v. United States*,
   639 F. Supp. 3d 1260 (Ct. Int'l Trade 2023) ................................ 3, 5, 8

*China Mfrs. Alliance, LLC v. United States*,
   1 F.4th 1028 (Fed. Cir. 2021) ............................................................3, 6

*Consol. Edison Co. of NY v. NLRB*,
   305 U.S. 197 (1938) ..............................................................................20

*Downhole Pipe & Equip., L.P. v. United States*,
   776 F.3d 1369 (Fed. Cir. 2015) ..........................................................20

*Engel Indus., Inc. v. Lockformer Co.*,
  166 F.3d 1379 (Fed. Cir. 1999) ...............................................6, 8

*Exxon Chem. Patents, Inc. v. Lubrizol Corp.*,
  137 F.3d 1475  (Fed. Cir. 1998) ...........................................11

*Finch v. Hughes Aircraft Co.*,
  926 F.2d 1574 (Fed. Cir. 1991) .............................................5

*Golden Bridge Tech., Inc. v. Nokia, Inc.*,
  527 F.3d 1318 (Fed. Cir. 2008) ...........................................5

*Guizhou Tyre Co. v. United States*,
  557 F. Supp. 3d 1302 (Ct. Int'l Trade 2022) .......................26

*In re Sanford Fork & Tool Co.*,
  160 U.S. 247 (1895) ..........................................................6

*Laitram Corp. v. NEC Corp.*,
  115 F.3d 947 (Fed. Cir. 1997) ............................................6

*Matsushita Elec. Indus. Co. v. United States*,
  750 F.2d 927 (Fed. Cir. 1984) ...........................................20

*Motor Vehicle Mrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ...........................................................21

*Nippon Steel Corp. v. United States*,
  458 F.3d 1345 (Fed. Cir. 2006) ........................................20

*Seah Steel Vina Corp. v. United States*,
  950 F.3d 833 (Fed. Cir. 2020) ..................................... 20, 21

*Securities Exchange Comm'n v. Chenery Corp.*,
  332 U.S. 194 (1947) .........................................................18

*Singleton v. Wulff*,
  428 U.S. 106 (1976) ..........................................................5

*Sprague v. Ticonic Nat'l Bank*,
  307 U.S. 161 (1939) ..........................................................6

*Suramerica de Aleaciones Laminadas, C.A. v. United States*,
44 F.3d 978 (Fed. Cir. 1994) ...............................................................21

*Timken Co. v. United States*,
699 F. Supp. 300 (Ct. Int'l Trade 1988)...........................................20

*Tronzo v. Biomet, Inc.*,
236 F.3d 1342 (Fed. Cir. 2001) ............................................................9

*U.S. Steel Group v. United States*,
162 F. Supp. 2d 676 (Ct. Int'l Trade 2001) ......................................21

*United States v. Husband*,
312 F.3d 247 (7th Cir. 2002) ..............................................................10

*Universal Camera Corp. v. NLRB*,
340 U.S. 474 (1951) ..................................................................... 20, 21

*Yantai CMC Bearing Co. v. United States*,
203 F. Supp. 3d 1317 (Ct. Int'l Trade 2017)......................................26

## Statutes

19 U.S.C. § 1516a(b) ........................................................... 19, 20

## Administrative Decisions

*Final Determination of Sales at Less Than Fair Value and Final Partial
Affirmative Determination of Critical Circumstances: Diamond Sawblades and
Parts Thereof from the People's Republic of China*,
71 Fed. Reg. 29,303 (May 22, 2006)..................................................25

## Other Authorities

*Import Administration Policy Bulletin 05.1 Separate-Rates Practice and
Application of Combination Rates in Antidumping Investigations involving Non-
Market Economy Countries* (Apr. 5, 2005)........................................... 12, 13, 15

# SUMMARY OF ARGUMENT

Plaintiffs-Appellants, China Manufacturers Alliance, LLC and Double Coin Holding Ltd. (hereinafter "CMA") have properly raised issues that this Court should consider. Commerce's arguments to the contrary mischaracterize the proceedings below and misunderstand the proper application of the mandate rule under this Court's precedents. On the merits, this case should be remanded because Commerce applied a flawed legal framework and made a decision not supported by substantial evidence as whole.

First, Commerce's decision below is unlawful because it ignored the explicit requirements of its separate rate test and misunderstood the role of rebuttable presumptions. Commerce's separate rate test states – not once, but twice – that the various specific factors are to be analyzed from the perspective of export functions. Yet having crafted that limiting principle, Commerce now simply ignores that principle and states that it does not exist. Similarly, Commerce's separate rate test states expressly that the presumption of government control is "rebuttable," yet continues to apply the presumption even when the presumption has been rebutted by the minimum quantum of evidence necessary to rebut the presumption. These errors meant that Commerce acted unlawfully in considering the evidence here from a deeply flawed perspective, considering irrelevant evidence unrelated to export functions, and assessing that evidence with the distortion of continuing to

include the weight of a presumption that should no longer exist. Each of these factors would render Commerce's decision unlawful and together they reinforce each other.

Second, Commerce's decision is not supported by substantial evidence as whole because Commerce initially defined its task too narrowly and then ignored the evidence showing the lack of any relevant control. Having admitted it essentially ignored the evidence regarding three of the four factors in its separate rate test, Commerce now tries to justify that narrow focus by misreading the relevant precedent on this issue. And having limited its inquiry to only one of four factors, Commerce then basically ignored the specific evidence demonstrating lack of control or influence over export activities – the legally relevant inquiry – and instead focused on more amorphous and generic notions of possible control not grounded in the specific facts of this proceeding. The evidentiary record of this proceeding makes very clear that it is CMA – an American company with American sales personnel – establishes U.S. selling prices without any influence from Double Coin or Double Coin's shareholders. The resulting determination is simply not supported by substantial evidence.

**ARGUMENT**

## I. COMMERCE'S ARGUMENT THAT THIS COURT SHOULD NOT ADDRESS CMA'S ARGUMENTS AT ALL SHOULD BE REJECTED

Section I of Commerce's Response Brief argues that this Court should not address CMA's arguments at all because they are foreclosed by this Court's earlier decision, *China Mfrs. Alliance, LLC v. United States*, 1 F.4th 1028 (Fed. Cir. 2021) ("*CMA IV*"), Commerce made this same argument below to the Trade Court.  The Trade Court rejected this Commerce argument concluding that (a) "the issue of whether substantial evidence supported {the} agency decision was not before the Court of Appeals in {the Federal Circuit's CMA decision}" and (b) the Trade Court "not having adjudicated" the CMA arguments on this issue was in fact the issue.  *China Mfrs. All., LLC v. United States,* 639 F. Supp. 3d 1260 (Ct. Int'l Trade 2023) ("*CMA V"),* Appx0014-0015.  Likewise, this Court should reject Commerce's argument to prevent consideration of CMA's arguments.

Commerce's argument conflates very distinct arguments presented by CMA.  In their original appeal to the Trade Court, CMA made two types of arguments challenging Commerce's determination.  First, CMA made purely legal claims that Commerce's determination was not in accordance with law because Commerce was acting contrary to the statute.  Second, CMA also made substantial evidence claims that Commerce's conclusion that the Chinese Government controlled Double Coin was not supported by substantial evidence.

In its decision, the Trade Court had only addressed the arguments about the legal claim. The decision did not address at all, and therefore did not render any conclusion concerning Section III of CMA's opening brief that had separately argued the lack of substantial evidence in Commerce's conclusion of Chinese government control. The Trade Court specifically stated, "{f}or the reasons discussed in this Opinion and Order, the court agrees with the fourth argument {CMA} put forth. Therefore, <u>the court does not address the remaining arguments</u>." See *China Mfrs. All., LLC v. United States*, 205 F. Supp. 3d 1325, 1333 (Ct. Int'l Trade 2017) ("*CMA I*")(emphasis added), Appx0225.

The referenced fourth argument was that "it was unlawful for Commerce to subject Double Coin to the 105.31% rate, rather than a rate determined based on Double Coin's own data." *Id.* Given the Trade Court's explicit statement that was not addressing any of CMA's other arguments, the issue of separate rate eligibility was not decided by the Trade Court, was not raised on appeal to this Court, and accordingly can now be litigated. And indeed (as noted above), in its final decision, the Trade Court concluded, that:

> The issue of whether substantial evidence supported that agency decision was not before the Court of Appeals in CMA IV, this Court not having adjudicated Double Coin's claim contesting it. Accordingly, the judgment of this Court set aside by CMA IV was not a judgment on the merits of Double Coin's claim contesting the Department's determination that Double Coin failed to rebut the presumption of government control."

*CMA V*, Appx0014-0015.

Commerce's argument that this Court does not have the authority to consider CMA's claims is based primarily on Commerce's <u>assumption</u> that CMA could have appealed to this Court those issues not addressed by the Trade Court. Commerce Response Br. at 17. But there is no legitimate basis for this assumption.

Contrary to Commerce's argument, parties cannot appeal those issues not addressed by the trial court. Forcing parties to make contingent appeals of issues the trial the court did not address, and forcing appellate courts to rule on such claims in the first instance without the benefit of an initial review by the trial court, would make no sense at all. That is why, as stated by this Court, "{i}t is well-settled that, absent exceptional circumstances, a party cannot raise on appeal legal issues not raised <u>and considered</u> in the trial forum. *Finch v. Hughes Aircraft Co.*, 926 F.2d 1574, 1576 (Fed. Cir. 1991)(emphasis added); *see also Golden Bridge Tech., Inc. v. Nokia, Inc*., 527 F.3d 1318, 1322 (Fed. Cir. 2008) ("{i}t is the general rule . . . that a federal appellate court does not consider an issue not passed upon below.") (citing *Singleton v. Wulff*, 428 U.S. 106, 120, 96 S. Ct. 2868, 49 L. Ed. 2d 826 (1976)).

Commerce's argument also completely misunderstands the legal principle of the mandate rule and how it works. The mandate rule "provides that 'issues

actually decided {on appeal}-- those within the scope of the judgment appealed

from, minus those explicitly reserved or remanded by the court -- are foreclosed

from further consideration.'" *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1360

(Fed. Cir. 2008) (quoting *Engel Indus., Inc. v. Lockformer Co.*, 166 F.3d 1379,

1383 (Fed. Cir. 1999)).

The Supreme Court has clarified, however, that, "while a mandate is

controlling as to matters within its compass, on the remand a lower court is free as

to other issues." *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 168 (1939) (citing *In

re Sanford Fork & Tool Co.*, 160 U.S. 247, 256, 40 L. Ed. 414, 16 S. Ct. 291

(1895)); see also *Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 951 (Fed. Cir. 1997)

("Upon return of its mandate, the district court cannot give relief beyond the scope

of that mandate, but it may act on matters left open by the mandate."). The Federal

Circuit has followed these Supreme Court principles. *See e.g. Atlanta Gas Light

Co. v. Bennett Regul. Guards, Inc*., 33 F.4th 1348, 1355 (Fed. Cir. 2022).

In the instant case, in its earlier decision, this Court "reverse{d} the final

judgment of the Trade Court and remand{ed} for further proceedings" without

making any judgment on separate rate eligibility. *CMA IV*, 1 F.4th at 1030. This

Court remanded for "further proceedings" precisely because it correctly recognized

there might well be remaining issues for the trial court to address in the first

instance. In fact, this Court specifically noted in footnote five that the appeal did

not include or address the factual determination regarding *de facto* independence from Chinese government control. *Id.* at 1032 n.5 ("Double Coin does not appeal Commerce's factual determination that Double Coin failed to demonstrate *de facto* independence from Chinese government control.") This footnote demonstrates that this Court and subsequently the Trade Court understood that the issue of separate rate eligibility had not been addressed by the early Trade Court decision, was not part of the appeal, and therefore was not included in this Court's mandate. The only reasonable interpretation of the footnote is that the issue was not before the Federal Circuit because there was no trial decision addressing the issue of separate rate eligibility. Commerce seems to suggest this footnote means the Federal Circuit somehow thought Plaintiffs could have appealed, Commerce Response Br. at 17-18, but this reading goes too far. The footnote merely notes for clarity the point that since the issue had not been addressed by the trial court, it was not on appeal before the Federal Circuit.

Commerce argues that the Trade Court's decisions implicitly found Double Coin to be part of the China-wide entity, Commerce Response Br. at 18-20, but this reading is simply incorrect. The Trade Court made explicit it was not addressing the distinct issue of Double Coin's separate rate eligibility. For example, it stated that it "agrees with the fourth argument {CMA} put forth. Therefore, the court does not address the remaining arguments." *CMA I,*

Appx0225.   Additionally, the Trade Court prefaced its conclusion with the

comment, "{w}hether or not it was lawful for Commerce to deem Double Coin to

be part of what it deemed "the PRC-wide entity…" *Id.* Appx0241.  This comment

reinforces the point that the Trade Court was not addressing the issue of whether

Double Coin was lawfully deemed part of the PRC-wide entity because it did not

affect the outcome of the decision and need not be addressed.  And again in *CMA*

*V*, the Trade Court reiterated that it had not adjudicated CMA's claim regarding

substantial evidence.  *CMA V*, Appx0014-0015.

Commerce cites *Engel Indus., Inc.* as support for its argument that CMA's

arguments are precluded from further adjudication.  However, the court in *Engel*

*Indus.*, explicitly stated that "{u}nless remanded by this court, all issues within the

scope of the appealed judgment are deemed incorporated within the mandate and

thus are precluded from further adjudication." *Engel Indus., Inc.*, 166 F.3d at 1383

(emphasis added).   Commerce quotes this very portion of the decision but

conveniently ignores the first clause, "unless remanded by this court." Commerce

Response Br. at 17.  The court in *Engels* emphasized in its decision that the issues

were precluded from further adjudication specifically because the case was decided

without remand.  As stated above, there is no question that in this case the this

Court's previous opinion remanded for further proceedings.  *CMA IV*, 1 F.4th at

1040.

Commerce also cites cases in which either the issue was decided by the trial court and then subsequently not raised on appeal or the issue was never raised by the party before the initial court and only raised for the first time after appeal on remand. Commerce cites *Tronzo v. Biomet, Inc*., 236 F.3d 1342 (Fed. Cir. 2001), a case in which Biomet did not challenge an issue on appeal and therefore was determined to have waived the issue on remand. In *Tronzo*, the court determined that because the district court in the first iteration of the case ruled on the issue of punitive damages and Biomet did not challenge the initial decision on appeal it could not do so on remand. *Tronzo*, 236 F.3d 1342 at 1349. This decision again is not relevant because in this case the court did not reach a decision on the issue of separate rate eligibility and therefore it was not an issue previously decided. Indeed, Commerce's own parenthetical stresses the key point that "once a contested issue is addressed by the trial court," then waiver can apply. But that key factual predicate – being addressed by the trial court – does not apply here.

Commerce's argument regarding the scope of a mandate makes the same mistakes. First, Commerce cites *Bannum, Inc. v. United States*, 779 F.3d 1376 (Fed. Cir. 2015), a case in which the plaintiff filed complaints on two grounds (defects in solicitations and defects in the evaluation process) *both* of which were ruled on by the Court of Federal Claims. *Id.* at 1378. On appeal the plaintiff argued exclusively on its challenge to the defects in solicitation and made no

mention of the evaluation process claim therefore did not preserve the issue. *Id.* at 1381. The court determined that because the plaintiff focused entirely on the solicitation claim and did not respond to the government's waiver argument in its reply brief therefore the claim was properly deemed waived. *Id.* at 1382. Again, this case only demonstrates that because the underlying court previously decided both issues and the plaintiff only addressed one on appeal the second issue was deemed waived. As stated above, in the present case this Court did not address the substantial evidence claim regarding separate rate eligibility in its decision and therefore the issue was not waived.

Similarly, Commerce cites *United States v. Husband*, 312 F.3d 247, 250-51 (7th Cir. 2002), a case regarding an alleged improper search and seizure. On appeal the defendant argued only that the method used to execute the search warrant violated his Fourth Amendment right, but then on remand the defendant also raised additional challenges. The court explained "the parties did not raise, nor did we address, the issues of the Terry stop, the arrest, or the validity of the warrant. The defendant had waived these issues and thus they were not in the scope of our remand." *Id.* at 251. Again, the defendant never raised the additional issues before the lower court whereas here, CMA clearly raised the issue of separate rate eligibility in Section III of the opening brief.

In short, the evidentiary issue of separate rate eligibility was affirmatively raised by CMA in the original case before the Trade Court, but was not addressed by the Trade Court in its first decision.  The Trade Court only addressed the legal arguments before it and those were the only issues addressed on appeal before this Court.  As a general rule, "an appellate mandate governs only that which was actually decided" leaving the underlying court free to consider issues left unresolved.  *See Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 137 F.3d 1475, 1478 (Fed. Cir. 1998).  Consequently, the issue of separate rate eligibility was not included in the appeal and therefore on remand the Trade Court appropriately addressed the remaining issues of the case and therefore, likewise, it is appropriate for this Court to address now.

## II.    COMMERCE'S APPROACH TO ANALYZING WHETHER DOUBLE COIN WAS CONTROLLED BY THE CHINESE GOVERNMENT WAS UNLAWFUL

CMA's Opening Brief argued that Commerce's conclusion regarding Double Coin's eligibility for a separate rate is "otherwise unlawful," even before addressing the record evidence, because the overall framework adopted by Commerce for analyzing whether Double Coin was controlled by the Chinese Government was unlawful.  CMA's arguments on this issue have focused on the exact nature and requirements of Commerce's separate rate eligibility test.

- 11 -

Commerce's Response Brief fully acknowledges that "Commerce generally considers four factors in evaluating Commerce generally considers four factors in evaluating whether each respondent is subject to *de facto* government control of its export functions" and then identifies the same four factors as set forth in Commerce's Policy Bulletin 05.1. *Import Administration Policy Bulletin 05.1 Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations involving Non-Market Economy Countries* (Apr. 5, 2005) ("Policy Bulletin 05.1") Commerce Response Br. at 4. Accordingly, the key issues before this Court are (a) what Policy Bulletin 05.1 states Commerce must examine in making its determinations, and (b) how the rebuttable presumption that Commerce applies in non-market economy might be rebutted. CMA's opening brief demonstrated that Commerce's underlying determination did not properly apply the applicable legal criteria set forth in Policy Bulletin 05.1 and adopted an unlawful interpretation and application of "rebuttable presumption." Opening Br. 19-39.

In addressing these arguments Commerce's Response Brief reflects a fundamental misunderstanding of what CMA has argued before this Court. As demonstrated below, CMA's legal arguments are based on the express language and structure of the Policy Bulletin 05.1 and the jurisprudence of this Court regarding rebuttable presumptions.

### A.    Contrary To Claims By Commerce, The Language and Structure of Policy Bulletin 05.1 Requires Each Factor to Be Linked to Export Activities

In response to CMA's argument that the governing law requires Commerce to link each of the four factors to "export activities," Commerce's Response Brief implies that no such link is required. Commerce Response Br. at 22-24. But Commerce is just wrong as to this point.

The language and structure of Policy Bulletin 05.1 focus on how the four factors of *de facto* government control bear on a respondent's export activities. The Policy Bulletin first notes generally that the test "focuses on controls over the decision-making process on <u>export-related</u> investment, pricing, and output decisions at the individual firm level." Policy Bulletin 05.1, p.1(emphasis added). The chapeau that precedes the enunciation of the four factors of the *de facto* test then repeats this same limitation:

> Typically, the Department considers four factors in evaluating whether each respondent is subject to de facto governmental control <u>of its export functions</u>.

Policy Bulletin 05.1, p.2 (emphasis added). This is a logical limitation on the scope of the *de facto* test given that the crucial focus of any antidumping proceeding is exports to the United States. And this limitation is repeated twice, emphasizing its importance as a framing principle.

The requirement that each factor – including factor three – have some connection to export activities is especially important here because of the attenuated connection between the alleged source of government influence and the underlying separate rate applicant. There are numerous aspects of Double Coin and CMA's corporate organization structure – discussed in Section III below – that affirmatively prevented Chinese influences on Double Coin's export pricing decisions.

CMA has consistently pointed to a set of facts, well-established in the record, demonstrating that (1) that CMA – an American company -- sets the prices at which the exported products are sold in the United States, (2) Double Coin is a publicly traded company, which means the rights of majority shareholders, such as Hauyi are limited; (3) Double Coin's articles of association create obligations of independence; and (4) Double Coin has independent directors. Articles Association and of Company Law, July 2014 Supplemental QR, Appx2104, Appx2141-2178, Appx2196-2197; Code of Corporate Governance for Listed Companies, July 2014 Supplemental QR, Appx2230-2237.

The dumping law does not charge Commerce to investigate generalized concerns about foreign corporate structures that involve state-owned shareholders. Rather, Commerce is charged with detecting and remedying dumping – export prices for a specific product. By severing the link between factor three –

management independence – and the focus on export activities, Commerce has impermissibly rewritten *sub silentio* its Policy Bulletin into a much broader grant than initially envisioned. When the proper legal framework is applied to the facts here, Commerce may not permissibly conclude that Double Coin failed factor three of the separate rate test.

Notably, Commerce does not really dispute this point and instead simply ignores the text of its Policy Bulletin and the limiting principle it sets forth. Commerce correctly notes that CMA has specifically argued about the need to focus on export activities, Commerce Response Br. at 21, but then simply ignores that specific argument grounded in the text of the Policy Bulletin, Commerce Response Br. at 22-24. Commerce assert that a focus on the export activities was never the correct text, Commerce Response Br. at 26, 34-35, but never grapples with the actual text of its Policy Bulletin. Commerce has never rescinded this Policy Bulletin or rewritten it. It is not lawful for Commerce to adopt a policy, and then simply ignore its own policy.

**B.      Commerce Adopted an Unlawful Interpretation and Application of "Rebuttable Presumption"**

Much of the legal argument here centered around Commerce's rebuttable presumption of government control. There is a fundamental disconnect between legal presumptions as they are typically understood in law and the device that

Commerce is applying.  This distinction is fundamental to gauging the lawfulness of Commerce's determination.

Commerce claims CMA's arguments are "untenable" and that if there was "no evidence" of state control that Double Coin would have a better case. Commerce Response Br. at 25.  Yet again, Commerce misses the point.  CMA's argument is not about weighing the evidence, but rather the proper application of a rebuttable assumption.  Given that CMA affirmatively placed on the record evidence that rebutted the presumption then that presumption no longer applied, Commerce had to support its determination with substantial evidence.  Yet Commerce's own decision memorandum indicates that it relied heavily on the application of the rebuttable presumption:  "{W}e continue to find that the factual record does not provide sufficient information to rebut the presumption of government control." Final IDM, Appx0429.  That statement confirms Commerce's decision rested on the failure to overcome a presumption that companies with a state-owned shareholder are themselves controlled by the state. Accordingly, given that Commerce explicitly relied on an allegedly un-rebutted presumption to render its decision, the legal question is whether Commerce did so lawfully.

This Court has stated that a "presumption compels the production of this minimum quantum of evidence from the party against whom it operates, nothing

more" and that once that evidence has been proffered "a presumption is not merely rebuttable but completely vanishes upon the introduction of evidence sufficient to support a finding of the nonexistence of the presumed fact." *A. C. Aukerman Co. v. R. L. Chaides Constr. Co.*, 960 F.2d 1020, 1037 (Fed. Cir. 1992).  That case was not an antidumping proceeding but we believe is good law concerning the legal meaning of a "rebuttable presumption" in this circuit.

Applying that definition to Commerce's stated reason here for finding Double Coin to be part of the China-wide entity means that Commerce found "that Double Coin failed to produce the "minimum quantum of evidence" demonstrating a lack of government control.  *See* Final IDM, Appx0429.  As a result, the legal question at issue is precisely the one that the government now seeks to disclaim, namely, whether CMA produced the minimum quantum of evidence required to make the presumption of state-control disappear.

Of course, after undertaking a proper examination of all of the evidence, Commerce might conclude that there was substantial evidence that Double Coin was not eligible for a separate rate.  But given the explicit statement in Commerce's decision memorandum – that it deemed the presumption to be unrebutted – it does not appear that this is the approach that Commerce adopted.

Again, contrary to Commerce's contention that it rendered a substantial evidence conclusion, Commerce stated in its determination that it was relying on

something else; namely, the allegedly unrebutted presumption. When reviewing agency actions, the court "must judge the propriety of such action solely by the grounds invoked by the agency." *Securities Exchange Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947); *see also Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962). Commerce claims that it performed an analysis under the substantial evidence standard. Commerce's actual determination, however, suggests that it was using a different legal standard with a separate and independent meaning.

CMA acknowledges that the Commerce's Decision Memorandum appears to address some of the issues raised in the substantial evidence sections of their Opening Brief. But in stating and summarizing the basis for its determination, Commerce's reasoning is stated as a failure to "provide sufficient information to rebut the presumption of government control." Final IDM, Appx0429. As a result, this Court must assess Commerce's determination on that basis.

Commerce does not argue that a "rebuttable presumption" lacks any independent legal meaning. Instead, Commerce suggests that implicit in the way that Commerce applies its special type of rebuttable presumption is an analysis reflecting the substantial evidence standard simply because Commerce discussed the facts. But this argument overlooks that the analysis of a "minimum quantum of evidence" would still require an analysis of facts just as a determination based on a

- 18 -

"preponderance of the evidence" or "substantial evidence" would. Commerce was not sufficiently clear – in its determination as written – for this Court to know if Commerce viewed the evidence in this case correctly through the lens of substantial evidence or not. Commerce even states in its response brief that "the most that Double Coin can establish is the presence of evidence both favoring and detracting from its position." Commerce Response Br. at 27. Commerce stated it was relying on a presumption that should have disappeared once CMA had provided the minimum quantum of evidence required. Commerce has a burden to apply the correct legal standard and to sufficiently explain its decisions. Commerce has not met that burden here.

## III. COMMERCE'S ANALYSIS IS NOT SUFFICIENT FOR THIS COURT TO CONCLUDE THAT THE UNDERLYING DETERMINATION WAS SUPPORTED BY SUBSTANTIAL EVIDENCE

### A. Applicable Standard of Review and Substantial Evidence

Given its importance to this case, we start with the applicable standard of review, which is that the court "shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record or otherwise not in accordance with the law." 19 U.S.C. § 1516a(b). We note three key points about this standard of review.

First, "{s}ubstantial evidence is defined as 'more than a mere scintilla.'" *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1374 (Fed. Cir.

2015) (quoting *Consol. Edison Co. of NY v. NLRB,* 305 U.S. 197, 217 (1938).

Any conclusion made by Commerce must be supported by "evidence that a

reasonable mind might accept as adequate to support a conclusion," *Seah Steel*

*Vina Corp. v. United States,* 950 F.3d 833, 840 (Fed. Cir. 2020), and that

"could reasonably lead to the {Agency}'s conclusion." *Matsushita Elec. Indus.*

*Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).  These jurisprudential

controls reflect that "substantial evidence review exists precisely to ensure

that…{the agency} achieves minimal compliance with this obligation, which is

the foundation of all honest and legitimate adjudication." *Allentown Mack Sales*

*& Serv., Inc. v. NLRB,* 522 U.S. 359, 378-79 (1998).

Second, though a reviewing Court will defer to the trade agency's

"expertise," that deference is limited by the standard of review.  *Nippon Steel*

*Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (citing 19 U.S.C.

§ 1516a(b)(1)(B)(i)).  Specifically, a reviewing court must perform its review

based on the "record as a whole." *Nippon Steel Corp.* 458 F.3d at 1351 (citing

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477-78 (1951)).  "The 'whole

record' means that the Court must consider both sides of the record.  It is not

sufficient to merely examine the evidence that sustains the agency's

conclusion." *Timken Co. v. United States,* 699 F. Supp. 300, 306 (1988), *aff'd,*

894 F.2d 385 (Fed. Cir. 1990) (citing *Universal Camera,* 340 U.S. at 488).  The

reviewing court, in addition to considering the evidence upon which the agency did rely, must also "take into account 'whatever in the record fairly detracts from its weight.'" *Seah Steel Vina Corp.*, 950 F.3d at 847 (*citing Universal Camera,* 340 U.S. at 488 (1951)); *Suramerica de Aleaciones Laminadas, C.A. v. United States,* 44 F.3d 978, 985 (Fed. Cir. 1994); *Atlantic Sugar, Ltd. v. United States,* 744 F.2d 1556, 1562 (Fed. Cir. 1984)).  Likewise, the court must scrutinize any inferences drawn from the evidence. The agency "is not free to prescribe what inference from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands." *Allentown,* 522 U.S. at 378.

Third, in addition to basing its conclusions on the record as whole, the agency must provide a reasoned explanation of its determination – "a reasoned explanation supported by a stated connection between the facts found and the choice made." *U.S. Steel Group v. United States*, 162 F. Supp. 2d 676, 678 (Ct. Int'l Trade 2001) (citing *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168 (1962)).  Fundamentally, an agency's decision is unsupported by substantial evidence where the agency "fail{s} to consider an important aspect of the problem, {or} offer{s} an explanation for its decision that runs counter to the evidence before the agency."  *Motor Vehicle Mrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Commerce alludes to CMA presenting evidence that both favors and detracts from the record as not being enough to establish substantial evidence, however, this actually supports CMA's position that the rebuttable presumption was overcome and does not demonstrate that the substantial evidence standard was met. CMA is not asking the Court to reweigh the evidence and but rather for Commerce to address the evidence as proscribed by the substantial evidence standard not as a rebuttable presumption.

**B.    Commerce Fails to Show How the Agency's Separate Rate Analysis Comports with the Agency's Obligation to Examine the Whole Record and its Own Stated Legal Test for Separate Rate Eligibility**

In the administrative determination, Commerce failed to consider important aspects of the factual record, and instead relied solely on SASAC's potential ability to control Double Coin through Huayi. Final IDM, Appx0425-0427. Notwithstanding this fact, Commerce's Response Brief asserts that it's decision is lawful because it "considered the totality of the record and determined that the evidence cited by Double Coin was insufficient to establish that the company operates free of *de facto* government control." Commerce Response Br. at 22 (italics in original). But then later in the same section of the brief, Commerce asserts that Commerce does not need to analyze the whole record as long as it reaches a negative conclusion on one of the four factors of the *de facto* control test.

Commerce Response Br. at 24 ("Commerce may deny separate rate requests to applicants who fail to demonstrate separation from the government with respect to any one *de jure* or *de facto* criterion."). These two statements about what evidence Commerce examined and what analysis it performed are inconsistent, making Commerce's ultimate conclusion unreasonable.

And indeed, during oral argument the Trade Court explicitly recognized that counsel for Commerce had effectively conceded that Commerce, in fact, had not examined the totality of the record; but rather had limited its analysis to Huayi's relationship with SASAC. *See* Transcript of Oral Argument at 182-191, *China Manufacturers Alliance, LLC et al., v. United States*, Consol. Court No. 15-00124 (2016) (ECF No. 259). This admission by Commerce counsel that Commerce's Final Determination had not addressed any of other factors and thereby had not addressed any of the evidence supporting the other factors demonstrates that the Commerce's Final Determination does not satisfy the substantial evidence standard.

Commerce's Response Brief attempts to skirts this shortcoming under the substantial evidence standard problem by relying heavily on the *Advanced Tech* cases that resulted in Commerce's policy shift to suggest that the gap in Commerce's analysis is lawful. Commerce Response Br. at 29-30. Commerce's characterization of the holding in those cases is, however, inaccurate. Commerce

cites *Advanced Tech* and other cases for the proposition that Commerce may determine control through majority ownership and need not examine all of the four criteria in its separate rate test.  Commerce Response at 23-24.  In *Advanced Tech* specifically, the focus was whether Commerce's conclusion regarding the two disputed elements was supported by substantial evidence.  *Advanced Tech. & Materials Co. v. United States*, 938 F. Supp. 2d 1342 (Ct. Int'l Trade 2013) (referred to by Commerce as *ATM*).   Unlike the case before this Court, in the underlying administrative decision in *Advanced Tech* Commerce, in fact, analyzed all four factors making a separate finding on each one.

Specifically, in the underlying final determination for the *ATM* case

Commerce found as follows:

| Criteria | Evidence |
|---|---|
| Whether the export prices are set by or are subject to the approval of a governmental agency | "emails between its general manager and unaffiliated U.S. customers regarding price negotiation on U.S. sales, and documents demonstrating independent negotiation of contracts for purchases of raw materials"[1] |
| Whether the respondent has authority to negotiate and sign contracts and other agreements | |
| Whether the respondent has autonomy from the government in making decisions regarding the selection of management | "documentation that both BGY and AT&M select their own management and boards of directors, demonstrating that BGY and AT&M have autonomy over the selection of management"[2] |
| Whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses | "financial statements and board resolution minutes regarding the distribution of profit by both BGY and AT&M"[3] |

---

[1] *Preliminary Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Preliminary Partial Determination of Critical Circumstances: Diamond Sawblades and Parts Thereof from the People's Republic of China*, 70 Fed. Reg. 77,121, 77,127 (Dec. 29, 2005) (unchanged in final determination *Final Determination of Sales at Less Than Fair Value and Final Partial Affirmative Determination of Critical Circumstances: Diamond Sawblades and Parts Thereof from the People's Republic of China*, 71 Fed. Reg. 29,303 (May 22, 2006)).

[2] *Id.*

[3] *Id.*

Though Commerce's determination was ultimately overturned on the basis of a change in analysis of two of the factors, the *Advanced Tech* cases do not stand for the proposition that Commerce does not have to perform the separate rate test or consider each of the factors that make up that test. *Advanced Tech.*, 938 F. Supp. 2d at 1350 (quoting Commerce that it was "not replacing its prior practice but was altering its analysis under protest given this Court's prior remand orders.").

In addition, Commerce cites *Yantai CMC Bearing Co.* as support for the proposition that Commerce may deny separate rate requests based on the one criterion, but this does not mean that Commerce did not have to address the factor and weight of the substantial evidence. *See* Commerce Response Br. at 4, 24; *Yantai CMC Bearing Co. v. United States* 203 F. Supp. 3d 1317 (Ct. Int'l Trade 2017). In this regard, we note that this Court has ruled that Commerce must in fact perform the whole test to ensure that its determinations are consistent with the record and the purpose of the test. As the Trade Court stated in its recent decision in *Guizhou Tyre*, when Commerce states that its separate rate analysis is focused on whether the government can influence the "export activities" of a respondent it must then "explain whether its finding of government control extended, specifically, to GTCIE's export activities during the period of investigation." *Guizhou Tyre Co. v. United States*, 557 F. Supp. 3d 1302, 1320 (Ct. Int'l Trade 2022). The analytical paradigm presented in that case mirrors the one that

Commerce utilized in the instant case. Commerce found that there was a SASAC owned entity in the respondent's corporate tree and denied the respondent a separate rate without performing the stated analysis.

As importantly, in the instant case, Commerce failed to examine whether Double Coin's export prices were set without government influence, given the existence of a U.S. sales affiliate that negotiates all export prices, and thus did not consider whether the link between SASAC control and export activities had been broken. This is a critical element of the analysis as CMA's activities satisfy the first two criteria of Commerce's test and serves to undermine Commerce's position that a relationship to SASAC must necessarily result in a denial of separate rate eligibility.

To be clear in its Opening Brief, at pages 55 – 67, CMA referenced multiple pieces of evidence which demonstrated that, in fact, regardless of a shareholder's ability to nominate Board of Directors of Double Coin, there was no influence by the shareholder (or Double Coin's Board of Directors) in establishing the U.S. selling prices for the subject merchandise. Such record evidence included the following:

- All – one hundred percent – of Double Coin's U.S. sales of subject merchandise were made by Double Coin's U.S. corporate subsidiary China Manufacturers' Alliance (CMA) after importation.[4]

---

[4] *See* Preliminary Analysis Memo, Appx3006.

- The operating agreement between Double Coin and its affiliate CMA (an American company run by American personnel) provides that " the day to day affairs of the company – <u>such as price setting</u>" <u>are operated and managed by CMA's own officers</u> and with no mention of operational control or authority on behalf of other entities ."[5]

- CMA sales of subject OTR customers are handled by Walter Weller and Aaron Murphy, two <u>American</u> CMA employees that have worked at CMA selling tires since before Double Coin obtained majority ownership of CMA.[6]

- CMA sets prices directly with its U.S. customers based on price lists that are created and updated regularly.[7]

- Double Coin does not review CMA's price lists, nor would CMA readily share this information with Double Coin.[8]

- The operating agreement between Double Coin and its affiliate CMA (an American company run by American personnel) provides that "the day to day affairs of the company – including disposition of profits from sales – <u>are operated and managed by CMA's own officers</u>.[9]

As noted in CMA's Opening Brief, not a single one of the above facts is in dispute; indeed, most are reflected in Commerce's own "verification report." And so, each of the above constitutes a separate piece of evidence from the administrative record.

In response to the identification of this record evidence, Commerce's Response Brief makes two claims. First, Commerce alleges that, regardless of all

---

[5] *See* Commerce Verification Report, Appx2973.
[6] *See id.* at Appx2980, *see also* July 2014 Supplemental QR, Appx1894.
[7] *See* July 2014 Supplemental QR, Appx1894; Commerce's Verification Report, Appx2980.
[8] *See* Commerce Verification Report, Appx2980.
[9] *See* Commerce Verification Report, Appx2973.

of the above, "it is reasonable to conclude that, as a U.S. subsidiary, CMA remained "beholden" to Double Coin." Commerce Response Brief at 36. Such response can be readily dismissed. Such rationale does not appear in the Commerce's Final Determination. Commerce's Final Determination did not render a factual conclusion that CMA was beholden to Double Coin's about U.S. selling prices.

As importantly, simply alleging that "it is reasonable to conclude" *by itself* does not satisfy the applicable substantial evidence standard. Rather, to satisfy the substantial evidence standard Commerce must reference actual pieces of evidence from the administrative record to support the factual conclusion. Vis-à-vis CMA, Commerce has not done so.

The second purported response set forth in Commerce's Response Brief was that "Double Coin's argument {concerning how CMA establishes the U.S. selling prices} is indistinguishable from the producer's argument in *ATM*." Commerce Response Brief at 36. But such claim can be dismissed as being without foundation. At the outset we note Commerce's Response Brief does not even attempt to offer a specific citation to any of the *Advanced Tech* decisions that might support this claim. The lack of specific citation is not surprising that review of both of the *Advanced Tech* decision referenced by Commerce's Response Brief confirms that there is no evidence that all of the important facts noted above can be

found in the *Advanced Tech* case. And so, once again, Commerce's purported

rebuttal is without support.

## CONCLUSION AND RECOMMENDED APPELLATE REMEDY

For the reasons set forth above, China Manufacturers Alliance respectfully requests that this Court hold Commerce's determination unlawful and otherwise inconsistent with the record, reverse the Trade Court's decision affirming the determination, and remand the matter to the Trade Court for further proceedings consistent with this Court's decision.

Respectfully submitted,

/s/ Daniel L. Porter

Daniel L. Porter
James P. Durling
James C. Beaty
Katherine R. Afzal

CURTIS, MALLET-PREVOST, COLT &
MOSLE LLP
1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

*Counsel for China Manufacturers Alliance, LLC et al.*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** 23-2391

**Short Case Caption:** China Manufacturers Alliance, LLC v. US

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑      the filing has been prepared using a proportionally-spaced typeface and includes  6,624  words.

☐      the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐      the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 2/28/2024

Signature: /s/ Daniel L. Porter

Name: Daniel L. Porter